1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

FEDERAL TRADE COMMISSION,

STATE OF NEW YORK,

STATE OF CONNECTICUT,

COMMONWEALTH OF PENNSYLVANIA,

STATE OF DELAWARE,

STATE OF MAINE,

STATE OF MARYLAND,

COMMONWEALTH OF MASSACHUSETTS,

STATE OF MICHIGAN,

STATE OF MINNESOTA,

STATE OF NEVADA,

STATE OF NEW HAMPSHIRE,

STATE OF NEW JERSEY,

STATE OF NEW MEXICO,

STATE OF OKLAHOMA,

STATE OF OREGON,

**CASE NO.:** 2:23-cv-01495

**COMPLAINT**

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  STATE OF RHODE ISLAND,

2  and

3  STATE OF WISCONSIN,

4          Plaintiffs,

5          v.

6  AMAZON.COM, INC., a corporation,

7          Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

**TABLE OF CONTENTS**

2   I.      NATURE OF THE CASE ..................................................................................... 1

3   II.     JURISDICTION AND VENUE ...................................................................... 11

4   III.    THE PARTIES................................................................................................... 12

5   IV.     AMAZON'S OPERATIONS.............................................................................. 18

6           A.      Amazon's First-Party Retail And Third-Party Marketplace Business Units ........ 19

7           B.      Amazon's Online Superstore ....................................................... 21

8           C.      Amazon's Advertising Services.................................................... 28

9           D.      Amazon Prime ............................................................................. 32

10          E.      Fulfillment By Amazon ............................................................... 38

11  V.      AMAZON POSSESSES MONOPOLY POWER IN TWO RELEVANT MARKETS... 39

12          A.      Amazon Has Durable Monopoly Power In The Online Superstore Market ......... 40

13          B.      Amazon Has Durable Monopoly Power In The Online Marketplace

14                  Services Market ........................................................................... 59

15          C.      Feedback Loops Between The Relevant Markets Further Amplify The

16                  Cumulative Impact Of Scale And Related Network Effects ............................... 65

17          D.      Direct Evidence Further Demonstrates Amazon's Monopoly Power................... 71

18  VI.     AMAZON IS ENGAGED IN A COURSE OF CONDUCT THAT ILLEGALLY

19          MAINTAINS ITS MONOPOLIES IN BOTH RELEVANT MARKETS ...................... 80

20          A.      Amazon Maintains Its Monopolies In Both Relevant Markets Through

21                  Exclusionary Anti-Discounting Conduct That Stifles Price Competition ........... 81

22          B.      Amazon Maintains Its Monopolies In Both Relevant Markets By Coercing

23                  Sellers To Use Amazon's Fulfillment Service.................................................. 102

24

COMPLAINT - iii
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1       C.     Amazon's Anticompetitive Tactics Work Together To Amplify Their

2             Overall Exclusionary Effect...................................................................... 117

3  VII.  AMAZON ████████████████████████

4  █████████████████████████......................................................... 119

5       A.     Project Nessie ███████████████████████

6             ██████████████████████............................................. 119

7       B.     Amazon Has ███████████████ Project Nessie ███████████

8             ███████████████████████................................................... 121

9  VIII.  AMAZON'S CONDUCT HARMS COMPETITION AND CONSUMERS................. 122

10  IX.  VIOLATIONS ALLEGED...................................................................... 125

11  X.  REQUEST FOR RELIEF ...................................................................... 147

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - iv
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    Plaintiffs Federal Trade Commission ("FTC") and the states of New York, Connecticut,

2  Pennsylvania, Delaware, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New

3  Hampshire, New Jersey, New Mexico, Oklahoma, Oregon, Rhode Island, and Wisconsin, by and

4  through their respective Attorneys General (together, the "State Plaintiffs," and collectively with

5  the FTC, "Plaintiffs"), petition this Court pursuant to Section 13(b) of the Federal Trade

6  Commission Act ("FTC Act"), 15 U.S.C. § 53(b); 15 U.S.C. § 26; and applicable state laws for

7  equitable relief against Defendant Amazon.com, Inc. ("Amazon") to undo and prevent its unfair

8  methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); Section 2

9  of the Sherman Act, 15 U.S.C. § 2; and state competition and consumer protection laws.

10  **I.     NATURE OF THE CASE**

11      1.      The early days of online trade were bursting with possibility.  Competition

12  flourished.  A newly connected nation saw a wide-open frontier where anyone with a good idea

13  would have a fair shot at success.

14      2.      Today, however, this wide-open frontier has been enclosed.  A single company,

15  Amazon, has seized control over much of the online retail economy.

16      3.      Amazon is a monopolist.  It exploits its monopolies in ways that enrich Amazon

17  but harm its customers: both the tens of millions of American households who regularly shop on

18  Amazon's online superstore and the hundreds of thousands of businesses who rely on Amazon to

19  reach them.

20      4.      For example, Amazon has hiked so steeply the fees it charges sellers that it now

21  reportedly takes close to *half* of every dollar from the typical seller that uses Amazon's

22  fulfillment service.  Amazon recognizes that sellers find "that it has become more difficult over

23  time to be profitable on Amazon" due to Amazon's ███████████████     But as one seller

24  explains, "we have nowhere else to go and Amazon knows it."  Amazon has also ████████

COMPLAINT - 1
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 ██████████████████████ through a █████ operation called "Project Nessie."

2 ████████████████████████████████ Amazon's Project Nessie has already

3 extracted over ██████████ from American households.

4     5.    In addition to overcharging its customers, Amazon is degrading the services it

5 provides them.  Amazon's online storefront once prioritized relevant, organic search results.

6 ███████████████████████████ Amazon shifted gears so that it

7 now litters its storefront with pay-to-play advertisements.  Amazon executives internally

8 acknowledge this creates ████████████ by making it ██████████████████

9 ████████████████████████████ This practice, too, harms

10 both sellers and shoppers alike.  Most sellers must now pay for advertising to reach Amazon's

11 massive base of online shoppers, while shoppers consequently face less relevant search results

12 and are steered toward more expensive products.  Notably, Amazon has increased not only the

13 number of advertisements it shows, but also ██████████████████████████

14 ████████████████████████████ because Amazon can

15 extract billions of dollars through increased advertising despite worsening its services for

16 customers.

17     6.    In a competitive world, Amazon's decision to raise prices and degrade services

18 would create an opening for rivals and potential rivals to attract business, gain momentum, and

19 grow.  But Amazon has engaged in an unlawful monopolistic strategy to close off that

20 possibility.

21     7.    This case is about the illegal course of exclusionary conduct Amazon deploys to

22 block competition, stunt rivals' growth, and cement its dominance.  The elements of this strategy

23 are mutually reinforcing.  Amazon uses a set of anti-discounting tactics to prevent rivals from

24 growing by offering lower prices, and it uses coercive tactics involving its order fulfillment

COMPLAINT - 2
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    service to prevent rivals from gaining the scale they need to meaningfully compete.  Amazon

2    deploys this interconnected strategy to block off every major avenue of competition—including

3    price, product selection, quality, and innovation—in the relevant markets for online superstores

4    and online marketplace services.

5        8.    Amazon's course of conduct has unlawfully entrenched its monopoly position in

6    both relevant markets.  According to an industry source, Amazon now captures more sales than

7    the next fifteen largest U.S. online retail firms combined.  Yet Amazon has violated the law not

8    by being big, but by how it uses its scale and scope to stifle competition.

9        9.    A critical mass of customers is key to powering what Amazon calls its

10   "flywheel."  By providing sellers access to significant shopper traffic, Amazon is able to attract

11   more sellers onto its platform.  Those sellers' selection and variety of products, in turn, attract

12   additional shoppers.  More shoppers yield more customer-generated product ratings, reviews,

13   and valuable consumer data for Amazon to use.  All of this enables Amazon to benefit from the

14   accelerated growth and momentum that network effects and scale economies can fuel.

15      10.    The biggest threat to Amazon's monopoly power would be for a rival to attract its

16   own critical mass of dedicated customers.  Competitors able to build a sizable base of either

17   shoppers or sellers could spin up their own "flywheels," overcome barriers to entry and

18   expansion, and achieve the scale needed to compete effectively in the relevant markets.  As Mr.

19   Bezos once wrote, "[o]nline selling (relative to traditional retailing) is a scale business

20   characterized by high fixed costs and relatively low variable costs.  This makes it difficult to be a

21   medium-sized e-commerce company," and it is "difficult . . . for single-category e-commerce

22   companies to achieve the scale necessary to succeed."  In order to "build an important and

23   lasting company . . . online in e-commerce," Mr. Bezos explained, "you have to have a scale

24   business," because "[t]his kind of business isn't going to work in small volumes."

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

11.     Having gained its own critical mass of both shoppers and sellers, Amazon set out to deny both current and would-be rivals the ability to do the same.

12.     Amazon uses its vast power, size, and control over multiple business units to implement an interrelated and exclusionary course of conduct.  Each element of this overarching strategy aims at the same goal: to keep rivals from gaining the scale needed to compete effectively against Amazon.  And each element amplifies the force of the rest, in a self-reinforcing cycle of dominance and harm.

13.     One set of tactics stifles the ability of rivals to attract shoppers by offering lower prices.  Amazon deploys a sophisticated surveillance network of web crawlers that constantly monitor the internet, searching for discounts that might threaten Amazon's empire.  When Amazon detects elsewhere online a product that is cheaper than a seller's offer for the same product on Amazon, Amazon punishes that seller.  It does so to prevent rivals from gaining business by offering shoppers or sellers lower prices.

14.     Originally, Amazon imposed explicit contractual requirements barring all sellers from offering their goods for lower prices anywhere else.  After European regulators began investigating, Amazon got rid of these requirements in Europe.  After a U.S. senator called for antitrust scrutiny, Amazon did the same in the United States in 2019.

15.     Amazon recognized that dropping an explicit contractual requirement while continuing to use other anti-discounting tactics would appear "not only trivial but a trick and an attempt to garner goodwill with policymakers amid increasing competition concerns."

16.     But Amazon has done just that.  It continues to use—and add—other anti-discounting tactics to discipline sellers who offer lower-priced goods elsewhere.  The sanctions Amazon levies on sellers vary.  For example, Amazon knocks these sellers out of the all-important "Buy Box," the display from which a shopper can "Add to Cart" or "Buy Now" an

1   Amazon-selected offer for a product. Nearly ██% of Amazon sales are made through the Buy

2   Box and, as Amazon internally recognizes, eliminating a seller from the Buy Box causes that

3   seller's sales to "tank." Another form of punishment is to bury discounting sellers so far down in

4   Amazon's search results that they become effectively invisible. Still another is ████████

5   ████████████████████████████████████████████ For

6   especially important sellers, Amazon keeps in place a targeted version of the contractual

7   requirement it supposedly stopped using in 2019. If caught offering lower prices elsewhere

8   online, these sellers face the ultimate threat: not just banishment from the Buy Box, but total

9   exile from Amazon's Marketplace. As Amazon internally admits, these tactics have a ████████

10   ████ and many sellers "live in constant fear" of them.

11          17.     Moreover, Amazon's one-two punch of seller punishments and high seller fees

12   often forces sellers to use their inflated Amazon prices as a price floor everywhere else. As a

13   result, Amazon's conduct causes online shoppers to face artificially higher prices even when

14   shopping somewhere other than Amazon. Amazon's punitive regime distorts basic market

15   signals: one of the ways sellers respond to Amazon's fee hikes is by increasing their own prices

16   off Amazon. An executive from another online retailer sums up this perverse dynamic:

17   Amazon's anti-discounting conduct ████████████████████████████████

18   ████████████████████ Amazon's illegal tactics mean that when Amazon raises its

19   fees, others—competitors, sellers, and shoppers—suffer the harms.

20          18.     Amazon's tactics suppress rival online superstores' ability to compete for

21   shoppers by offering lower prices, thereby depriving American households of more affordable

22   options. Amazon's conduct also suppresses rival online marketplace service providers' ability to

23   compete for sellers by offering lower fees because sellers cannot pass along those savings to

24   shoppers in the form of lower product prices.

COMPLAINT - 5
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

19.     These various anti-discounting tactics constrain sellers operating on Amazon's third-party business unit, through which sellers set their own product prices.  But Amazon also operates an enormous first-party arm, which accounted for 40% of its overall unit sales in the second quarter of 2023, as shown in Figure 1.  Using its direct control over these prices, Amazon created another anti-discounting tool to weaponize its first-party arm in its campaign against competition.



Figure 1.  Source: Amazon Q2 2023 Earnings Call.

20.     Amazon has implemented an algorithm for the express purpose of deterring other online stores from offering lower prices.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████  Rather than trying to compete, Amazon uses ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  Ultimately, this conduct is meant to deter rivals from attempting to compete on price altogether—competition that could bring lower prices to tens of millions of American households.  As a result of this conduct, Amazon predicted, "prices will go up."  ████████████  Amazon's prediction has borne out and the

COMPLAINT - 6
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    algorithm has worked just as ▮ envisioned: suppressing price competition by disciplining rival

2    retailers who dare to discount.

3         21.    Amazon's various anti-discounting tactics upend the normal give-and-take

4    process of competition.  Even rivals that offer lower-cost marketplace services struggle to attract

5    sellers and watch as sellers hike prices on their storefronts due to fear of Amazon's penalties.

6    Many sellers raise their prices off Amazon to avoid punishment.  Others never try discounting in

7    the first place; fear of retribution by Amazon drives them to preemptively set higher prices

8    everywhere.  Still others simply stop—or never start—selling anywhere other than Amazon to

9    avoid any possibility of Amazon's sanctions.

10        22.    By taming price cutters into price followers, Amazon freezes price competition

11   and deprives American shoppers of lower prices.

12        23.    Alongside these anti-discounting tactics, Amazon also goes a step further and

13   ▮▮▮▮▮▮▮▮▮▮▮ Amazon created a ▮▮▮ algorithm internally codenamed

14   "Project Nessie" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Amazon has deemed Project

17   Nessie ▮▮▮▮▮▮▮: it has generated more than ▮▮▮ in excess profit for

18   Amazon. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20        24.    Amazon deploys yet another tactic as part of its monopolistic course of conduct.

21   Amazon conditions sellers' ability to be "Prime eligible" on their use of Amazon's order

22   fulfillment service.  As with Amazon's anti-discounting tactics, this coercive conduct forecloses

23   Amazon's rivals from drawing a critical mass of sellers or shoppers—thereby depriving them of

24   the scale needed to compete effectively online.

1        25.     Amazon makes Prime eligibility critical for sellers to fully reach Amazon's

2 enormous base of shoppers.  In 2021, more than ▮% of all units sold on Amazon in the United

3 States were Prime eligible.

4        26.     Prime eligibility is critical for sellers in part because of the enormous reach of

5 Amazon's Prime subscription program.  According to public reports, Mr. Bezos told Amazon

6 executives that Prime was created in 2005 to "draw a moat around [Amazon's] best customers."

7 Prime now blankets more than ▮% of all U.S. households, with its reach extending as far as

8 ▮% in some zip codes.

9        27.     Amazon requires sellers who want their products to be Prime eligible to use

10 Amazon's fulfillment service, Fulfillment by Amazon ("FBA"), even though many sellers would

11 rather use an alternative fulfillment method to store and package customer orders.

12        28.     Many sellers would also prefer to "multihome," simultaneously offering their

13 goods across multiple online sales channels.  Multihoming can be an especially critical

14 mechanism of competition in online markets, enabling rivals to overcome the barriers to entry

15 and expansion that scale economies and network effects can create.  Multihoming is one way that

16 sellers can reduce their dependence on a single sales channel.

17        29.     Sellers could multihome more cheaply and easily by using an independent

18 fulfillment provider—a provider not tied to any one marketplace—to fulfill orders across

19 multiple marketplaces.  Permitting independent fulfillment providers to compete for any order—

20 on or off Amazon—would enable them to gain scale and lower their costs to sellers.  That, in

21 turn, would make independent providers even more attractive to sellers seeking a single,

22 universal provider.  All of this would make it easier for sellers to offer items across a variety of

23 outlets, fostering competition and reducing sellers' dependence on Amazon.

24

COMPLAINT - 8
CASE NO. _:__-cv-_____

1    30.    But by coercively conditioning access to an enormous base of shoppers on sellers'

2    use of FBA, Amazon forecloses that world.

3    31.    Amazon caught a glimpse of this alternative universe when it temporarily relaxed

4    its coercive conduct.  As Amazon recognized, this decision was immediately popular with both

5    shoppers and sellers.  But internally, ███████████████████████████████████

6    ████████████████████████ that would threaten Amazon's monopoly power.  An

7    Amazon executive explained ███████████████████████

8    ████████████████████████████████████████

9    █████████████████████████████████████████████

10   ███████████████████████████

11   32.    To combat this competitive threat, Amazon resumed its coercive fulfillment

12   conduct: today, virtually all sellers must use Amazon's proprietary FBA service to fully reach

13   Amazon's enormous base of U.S. shoppers.

14   33.    Each element of Amazon's monopolistic strategy works to keep its rivals and

15   potential rivals from growing, gaining momentum, and achieving the scale necessary to

16   meaningfully compete against Amazon.  The cumulative impact of Amazon's unlawful conduct

17   is greater than the harm caused by any particular element.  Each aspect of Amazon's strategy

18   amplifies the exclusionary effects of the others, further insulating Amazon from meaningful

19   competition and further widening the gulf between Amazon and everyone else.

20   34.    Together, this self-reinforcing course of conduct blocks every important avenue

21   of competition.  With its monopoly power cemented, Amazon is now extracting monopoly

22   profits without denting—and instead while growing—its monopoly power.  Amazon has

23   consistently hiked the prices it charges sellers, as shown in Figure 2.

24

COMPLAINT - 9
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

*Figure 2. Source: Amazon Internal Documents.*

35.     Amazon's price hikes in the form of pay-to-play advertisements have been enormously lucrative, leading its revenues from U.S. ad sales to skyrocket from ▮▮▮▮ in 2015 to ▮▮▮▮ in 2021. Amazon took in ▮▮▮▮ in revenue from U.S. Marketplace seller fees in 2021 alone. Strikingly, these seller fees now account for *over* ▮% of Amazon's total profits. Sellers pay. Shoppers get lower-quality search results for higher-priced products. Only Amazon wins.

36.     In a market free from anticompetitive restraints, Amazon's choice to exploit its monopoly power would create openings for rivals to enter, grow, and meaningfully compete. Rival online marketplaces could draw sellers by offering them lower fees or better terms, and sellers could pass along those lower costs to American shoppers in the form of lower prices. Rival online superstores, meanwhile, could draw shoppers by offering better prices, greater selection, or a superior shopping experience. But Amazon's illegal course of conduct shields Amazon from the competitive checks it would face in a free enterprise system.

COMPLAINT - 10
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

37.     Amazon's illegal monopolistic strategy is paying off for Amazon, but at great cost to tens of millions of American households and hundreds of thousands of sellers.

38.     Left unchecked, Amazon will continue its illegal course of conduct to maintain its monopoly power.  That conduct will include—but will not necessarily be limited to—the schemes it uses today.  As Mr. Bezos has said, "on matters of vision we are stubborn and relentless," but "[o]n the details, we at Amazon are always flexible."

39.     Plaintiffs bring this lawsuit despite Amazon's extensive efforts to impede the government's investigation and hide information about its internal operations.  Amazon executives systematically and intentionally ███████████████████████████ ████████████████████ of the Signal messaging app.  Amazon prejudicially ███████ ████████████████████████████████████████████████████████████ despite Plaintiffs' instructing Amazon not to do so.

40.     Plaintiffs now ask this Court to put an end to Amazon's illegal course of conduct, pry loose Amazon's monopolistic control, deny Amazon the fruits of its unlawful practices, and restore the lost promise of competition.

## II.     JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this action pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), 15 U.S.C. § 26, 28 U.S.C. §§ 1331, 1337(a), and 1345, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  This Court's exercise of supplemental jurisdiction over State Plaintiffs' state law claims will avoid unnecessary duplication and multiplicity of actions and will promote the interests of judicial economy, convenience, and fairness.

42.     This Court has personal jurisdiction over Amazon because Amazon has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

COMPLAINT - 11
CASE NO.  _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

This Court also has personal jurisdiction over Amazon because it maintains its corporate headquarters in Washington, does business in Washington, and has engaged in the illegal conduct alleged herein in Washington, including by making corporate decisions challenged in this matter from its corporate headquarters in Washington.

43.     Amazon's general business practices, and the unfair methods of competition alleged herein, are activities "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

44.     Amazon is, and at all relevant times has been, a corporation, as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

45.     Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b), (c), and (d), and 15 U.S.C. § 53(b).  Amazon is found, resides, transacts business, and has agents in this state and district, and a portion of the affected commerce described herein has been carried out in this state and district.

III.    **THE PARTIES**

46.     Plaintiff FTC is an administrative agency of the United States Government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its principal offices in the District of Columbia.  The FTC is vested with authority and responsibility for enforcing, among other laws, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.  This case is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), because the FTC has reason to believe that Amazon is violating, or is about to violate, Section 5 of the FTC Act, making it appropriate, efficient, and suitable to file this action in federal court with State Plaintiffs to seek the requested relief.

47.     Plaintiff State of New York is a sovereign state.  The Attorney General of the State of New York is the chief legal officer for the state and brings this action on behalf of the people of the State of New York to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and New York Executive Law § 63(12), to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

48.     Plaintiff State of Connecticut is a sovereign state.  The Attorney General of the State of Connecticut is the chief legal officer for the state and brings this action on behalf of the people of the State of Connecticut to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*, and the Attorney General, acting at the request of the Commissioner of Consumer Protection, has the authority under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

49.     Plaintiff Commonwealth of Pennsylvania is a sovereign commonwealth state. The Attorney General of the Commonwealth of Pennsylvania is the chief legal officer for the state and brings this action in the name and on behalf of the people of the Commonwealth of Pennsylvania to protect the Commonwealth, its general economy, its residents, and consumers from Amazon's unlawful business practices.  The Attorney General has authority under state and federal law, including Section 16 of the Clayton Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-4 and 201-4.1, and the Commonwealth Attorneys

COMPLAINT - 13
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   Act, 71 P.S. § 732-204(c), to pursue injunctive and other equitable relief to prevent and remedy

2   the harms caused by anticompetitive conduct and unfair and deceptive acts and practices.

3      50.    Plaintiff State of Delaware is a sovereign state.  The Attorney General of the State

4   of Delaware is the chief legal officer for the state and brings this action in the name and on

5   behalf of the people of the State of Delaware to protect the state, its general economy, and its

6   residents from Amazon's unlawful business practices.  The Attorney General has authority under

7   federal and state law, including Section 16 of the Clayton Act and Del. Code Ann. Tit. 6, § 2105,

8   to pursue injunctive and other equitable relief to prevent and remedy the harms caused by

9   anticompetitive conduct.

10     51.    Plaintiff State of Maine is a sovereign state.  The Attorney General of the State of

11  Maine is the chief legal officer for the state and brings this action in the name and on behalf of

12  the people of the State of Maine to protect the state, its general economy, and its residents from

13  Amazon's unlawful business practices.  The Attorney General has authority under state and

14  federal law, including Section 16 of the Clayton Act and the Maine Monopolies and Profiteering

15  Law, 10 M.R.S.A. § 1104, to pursue injunctive and other equitable relief to prevent and remedy

16  the harms caused by anticompetitive conduct.

17     52.    Plaintiff State of Maryland is a sovereign state.  The Attorney General of the State

18  of Maryland is the chief legal officer for the state and brings this action in the name and on

19  behalf of the people of the State of Maryland to protect the state, its general economy, and its

20  residents from Amazon's unlawful business practices.  The Attorney General has authority under

21  state and federal law, including Section 16 of the Clayton Act and Maryland Commercial Code

22  Ann. § 11-201 *et seq.*, to pursue injunctive and other equitable relief to prevent and remedy the

23  harms caused by anticompetitive conduct.

24

COMPLAINT - 14
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

53.     Plaintiff Commonwealth of Massachusetts is a sovereign state.  The Attorney General of the Commonwealth of Massachusetts is the chief legal officer for the state and brings this action on behalf of the people of the Commonwealth of Massachusetts to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal law, including Section 16 of the Clayton Act, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

54.     Plaintiff State of Michigan is a sovereign state.  The Attorney General of the State of Michigan is the chief legal officer for the state and brings this action on behalf of the people of the State of Michigan to protect the state, its general economy, and its residents from Defendants' unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

55.     Plaintiff State of Minnesota is a sovereign state.  The Attorney General of the State of Minnesota is the chief legal officer for the state and brings this action on behalf of the people of the State of Minnesota to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and Minnesota Statute 8.31, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

56.     Plaintiff State of Nevada is a sovereign state.  The Attorney General of the State of Nevada is the chief legal officer for the state, and the Consumer Advocate is vested with the authority to enforce Nevada's antitrust laws.  The Attorney General, by and through the

1   Consumer Advocate, brings this action on behalf of the people of the State of Nevada to protect

2   the state, its general economy, and its residents from Amazon's unlawful business practices.  The

3   Nevada Attorney General and the Consumer Advocate have the authority under federal and state

4   law, including Section 16 of the Clayton Act, and Nev. Rev. Stat. §§ 228.380 and 598A.160, to

5   pursue injunctive and other equitable relief to prevent and remedy the harms caused by

6   anticompetitive conduct.

7        57.   Plaintiff State of New Hampshire is a sovereign state, acting through the Office of

8   the Attorney General, Consumer Protection and Antitrust Bureau to enforce state and federal

9   laws designed to protect free and open markets for the benefit of consumers.  The Attorney

10   General brings this action on behalf of the State of New Hampshire to protect the state, its

11   general economy, and its consumers from Amazon's unlawful business practices.  The Attorney

12   General has the authority under state and federal law, including Section 16 of the Clayton Act

13   and New Hampshire Combinations and Monopolies Act, N.H. Rev. Stat. Ann. ch. 356 *et seq.*, to

14   pursue injunctive and other equitable relief to prevent and remedy the harms caused by the

15   anticompetitive conduct.

16        58.   Plaintiff State of New Jersey is a sovereign state.  The Attorney General of the

17   State of New Jersey is the chief legal officer for the state and brings this action in the name and

18   on behalf of the people of the State of New Jersey to protect the state, its general economy, and

19   its residents from Amazon's unlawful business practices.  The Attorney General has authority

20   under state and federal law, including Section 16 of the Clayton Act, the New Jersey Antitrust

21   Act, New Jersey Statutes Annotated ("N.J.S.A.") § 56:9-1 to -19 ("NJ ATA"), and the New

22   Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 to -227 ("NJ CFA"), to pursue injunctive and

23   other equitable relief to prevent and remedy the harms caused by anticompetitive conduct and

24   unfair and deceptive acts and practices.  The Director of the New Jersey Division of Consumer

1    Affairs is charged with the responsibility of administering the NJ CFA on behalf of the Attorney

2    General.  N.J.S.A. 52:17B-120; N.J.S.A. 52:17B-124.  The Attorney General brings this action

3    for relief pursuant to his authority under the NJ ATA, specifically N.J.S.A. 56:9-6, 56:9-10(a),

4    56:9-12(b) and the NJ CFA, specifically N.J.S.A. 56:8-8, 56:8-11, and 56:8-19.

5        59.    Plaintiff State of New Mexico is a sovereign state.  The Attorney General of the

6    State of New Mexico is the chief legal officer for the state and brings this action on behalf of the

7    people of the State of New Mexico to protect the state, its general economy, and its residents

8    from Amazon's unlawful business practices.  The Attorney General has the authority under

9    federal and state law, including Section 16 of the Clayton Act and Section 10 of the New Mexico

10   Antitrust Act, to pursue injunctive and other equitable relief to prevent and remedy the harms

11   caused by anticompetitive conduct.

12       60.    Plaintiff State of Oklahoma is a sovereign state.  The Attorney General of the

13   State of Oklahoma is the chief legal officer of the state and brings this action in the name and on

14   behalf of the people of the State of Oklahoma to protect the state, its general economy, and its

15   residents from Amazon's unlawful business practices.  The Attorney General has authority under

16   state and federal law, including Section 16 of the Clayton Act and the Oklahoma Antitrust

17   Reform Act, 15 79 O.S. §§ 201, *et seq.*, to pursue injunctive and other equitable relief to prevent

18   and remedy the harms caused by anticompetitive conduct.

19       61.    Plaintiff State of Oregon is a sovereign state.  The Attorney General of the State

20   of Oregon is the chief legal officer for the state and brings this action on behalf of the people of

21   the State of Oregon to protect the state, its general economy, and its residents from Amazon's

22   unlawful business practices.  The Attorney General has the authority under federal and state law

23   including Section 16 of the Clayton Act and the Oregon Antitrust Law, Oregon Revised Statutes

24

("ORS") 646.705 to ORS 646.836, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

62.     Plaintiff State of Rhode Island is a sovereign state.  The Attorney General of the State of Rhode Island is the chief legal officer for Rhode Island and brings this action on behalf of the people of the State of Rhode Island to protect Rhode Islanders from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and Rhode Island General Laws § 6–13.1–1 *et seq.*, to pursue all available types of relief to prevent and remedy the harms caused by anticompetitive conduct.

63.     Plaintiff State of Wisconsin is a sovereign state.  The Attorney General of the State of Wisconsin is the chief legal officer for the state and brings this action on behalf of the people of the State of Wisconsin to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and Wis. Stat. § 133.03, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

64.     Defendant Amazon is a multinational online retail and technology company that conducts business throughout the United States.  Amazon is headquartered in Seattle, Washington, with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109, and is organized and existing under the laws of Delaware.  Unless otherwise specified, "Amazon" refers to Amazon.com, Inc., and all corporate predecessors, subsidiaries, successors, and affiliates.

## IV.     AMAZON'S OPERATIONS

65.     Amazon is one of the largest companies in the world, ranked among the five largest publicly traded companies by both market capitalization and revenue.  Amazon's

1  business spans vast portions of the American economy, extending from its core of online retail

2  into media, cloud computing, brick-and-mortar grocery stores, an array of logistics and

3  operational services, and more.  It has expanded in part through an acquisition spree, buying up

4  more than 100 companies in sectors spanning entertainment, grocery, and healthcare.  Its reach

5  ranges from selling socks and making movies to running a pharmacy and operating datacenters

6  that house exabytes of data.

7          66.     The key aspects of Amazon's operations relevant to this Complaint are its:

8  (1) first-party Retail and third-party Marketplace business units; (2) public-facing online

9  superstore; (3) advertising services; (4) Prime subscription program; and (5) fulfillment service.

10         **A.      Amazon's First-Party Retail And Third-Party Marketplace Business Units**

11         67.     Amazon began as an online bookstore in 1994 and rapidly expanded into new

12  product categories: first DVDs and CDs, then electronics and toys, and then nearly everything.

13  In 2020, Amazon sold almost ███████ unique products across virtually every conceivable

14  category to U.S. consumers.

15         68.     Amazon originally sold goods to shoppers by purchasing items wholesale and

16  reselling them on its website.  Amazon calls its wholesale suppliers "vendors."  Today, Amazon

17  continues to sell a wide range of products through this type of vendor-retailer relationship, from

18  laundry detergent to sports equipment.

19         69.     Amazon also sells its own private label goods.  These range from devices like

20  Amazon's Kindle e-reader or Ring doorbell, to consumer products like batteries sold under the

21  "Amazon Basics" label, to products without any clear Amazon affiliation, such as dietary

22  supplements sold under the "Revly" label.

23         70.     These two components, vendor-retailer and private label, make up Amazon's

24  first-party retail business unit, which Amazon refers to collectively as Amazon "Retail."

COMPLAINT - 19
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

71.     Amazon also runs what it calls its "Marketplace," where other companies can sell products directly to shoppers through its online store.  Amazon calls third-party companies that sell on Amazon "sellers," and refers to sales by sellers as "Marketplace" sales.

72.     Amazon charges sellers four primary fees to sell on its Marketplace.  First, Amazon requires sellers to pay a selling fee, which can be a monthly fee or a fee for each item sold.  Second, Amazon charges all sellers a commission or "referral fee" based on the price of each item sold on Amazon.  Third, Amazon charges sellers for the use of Amazon's fulfillment and delivery services.  Fourth, Amazon charges sellers for advertising services.  While Amazon also charges sellers other fees, these four types constitute over ██% of the revenue Amazon takes in from sellers.  As a practical matter, most sellers must pay these four fees to make a significant volume of sales on Amazon.

73.     Amazon estimated that in 2022, it would take ██% of all sales revenue earned by sellers who use its fulfillment service.

74.     The Marketplace accelerated Amazon's growth by allowing it to exponentially expand the selection of products on Amazon without having to carry the risks of unsold inventory.  Sellers, who range from small businesses that offer a single product to multinational firms that sell thousands of products, ultimately bear that risk.  As of the first quarter of 2021, there were over ██ active sellers on Amazon's U.S. Marketplace.

75.     Amazon touts to its investors that sellers on the Marketplace are "a key contributor to the selection offered" to Amazon shoppers.  Sellers offer a huge variety of items for sale, from laptop computers to harnesses for walking pet chickens, complete with bowtie.  In 2020, sellers offered more than ██% of the unique items available for sale on Amazon.  Sellers' products make up a growing majority of Amazon unit sales—60% in the second quarter of 2023, up from 55% in 2021.

76.     Amazon's online superstore unites its Retail and Marketplace arms, with products intermixed and presented to the public simultaneously and side-by-side.  To a shopper browsing on Amazon, there are no obvious differences between the types of listings, nor is there a way to regularly shop for products sold only by Amazon Retail or Amazon Marketplace.

77.     Amazon has achieved unprecedented scale.  In 2021, goods worth more than ███ were sold through Amazon's U.S. online store.  That amount is larger than the 2021 gross domestic product of ██ countries.

78.     Amazon achieved this astonishing scale in part by combining its Retail and Marketplace arms.  Amazon's product selection includes popular and frequently purchased items and a "long tail" made up of an immense variety of less-frequently purchased products.  Products offered by sellers on Amazon's Marketplace contribute substantially to that "long tail."  More generally, Amazon's sellers dramatically increase Amazon's product selection, which draws more shoppers to Amazon, which, in turn, attracts more sellers.

79.     Sellers have also made the Marketplace enormously profitable for Amazon.  Amazon's internal documents show that profits from its U.S. Marketplace totaled more than ███ in 2021—nearly ██% of its total reported net income for that year.

**B.     Amazon's Online Superstore**

80.     Shoppers typically reach Amazon using an internet browser or a dedicated Amazon shopping application ("mobile app") on an internet-connected device.  Each month in the United States, 126 million people visit Amazon on a mobile device, and more than 42 million people access Amazon on a desktop computer.

81.     There are more than ███ different products available for sale on Amazon.  To navigate this ███ product catalog, Amazon offers a search bar.  When shoppers enter a search, Amazon's systems generate a "Search Results Page" that displays product listings

interspersed with advertisements (discussed in more detail in the next section).  Product listings

on the Search Results Page typically show a name, picture, price, star rating, shipping speed

estimate, and Prime status (or lack thereof) for each item, as shown in Figures 3a (desktop) and

3b (mobile).



*Figure 3a.  Amazon Search Results Page, Desktop Browser.*

1
2
3
4
5
6
7
8
9
10
11
12
13



14    *Figure 3b.  Amazon Search Results Page, Mobile App.*

15       82.    If shoppers want to learn more about or purchase an item displayed on the Search

16   Results Page, they must click the product listing, which brings them to the "Detail Page" for that

17   item.  An item's Detail Page typically includes a detailed product description, additional pictures,

18   product dimensions or specifications, and customer-generated ratings and reviews.

19       83.    Importantly, the Detail Page usually includes a "Buy Box."  The Buy Box

20   displays a single offer for that specific item, as shown in Figures 4a (desktop) and 4b (mobile).

21   Shoppers can use the Buy Box to add the displayed item into their online shopping cart ("Add to

22   Cart") or buy the item immediately ("Buy Now").

23

24

COMPLAINT - 23
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222



*Figure 4a.  Product Detail Page with Buy Box Enlarged in Red, Desktop Browser.*



*Figure 4b.  Product Detail Page with Buy Box Enlarged in Red, Mobile App.*

84.     An item may be offered by more than one seller on Amazon.  When there are

multiple offers for a single item, Amazon uses the "Featured Merchant Algorithm" to choose one

offer to display in the Buy Box.  Amazon calls this displayed offer the "Featured Offer."  Being

chosen as the Featured Offer is commonly known as "winning" the Buy Box.

85.     Nearly ███% of all purchases on Amazon are made using the "Add to Cart" and

"Buy Now" buttons in the Buy Box.  As a result, winning the Buy Box is essential to making

sales on Amazon.

86.     Amazon deliberately steers shoppers away from offers that are not featured in the

Buy Box.  If a shopper using a computer wants to see an offer from a seller that is not featured in

the Buy Box, the shopper must either click a link that identifies only the number of additional

offers, which takes the shopper to the "All Offer Display," as shown in Figure 5a, or scroll down

the page to see "Other Sellers on Amazon," which includes a list of additional sellers Amazon

has selected.  Shoppers using Amazon's mobile app must click on a link labeled "Other Sellers

on Amazon" to access the All Offer Display, which opens another page that displays multiple

offers, as shown in Figure 5b.



*Figure 5a.  All Offer Display, Desktop Browser.*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

2

3

4

5

6

7

8

9

10

11

12



13     *Figure 5b.  All Offer Display After Clicking "Other Sellers On Amazon," Mobile App.*

14          87.     Amazon makes it similarly difficult for shoppers to make a purchase when

15  Amazon has removed the Buy Box from an item's Detail Page.  Amazon's page layout prevents

16  shoppers from adding to a shopping cart or buying any offers directly from the Detail Page, as

17  shown in Figure 6a.

18

19

20

21

22

23

24

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222



*Figure 6a.  Detail Page Without Buy Box with "See All Buying Options" Link Enlarged in Red,*

*Desktop Browser.*

*Figure 6b.  Detail Page Without Buy Box with "See All Buying Options" Link Enlarged in Red,*

*Mobile App.*

88.     If there is no Buy Box for an item, then shoppers must navigate to the "All Offer

Display" by clicking on a link labeled "See All Buying Options," shown in Figures 6a (desktop)

and 6b (mobile), above.

COMPLAINT - 27
CASE NO. _:__-cv-_____

89.     Fewer than █% of purchases on Amazon are made from offers outside the Buy Box.

**C.     Amazon's Advertising Services**

90.     In 2014, Amazon sought to "unleash monetization of Amazon web pages, devices, and mobile apps" ███████████████████████████████ ███████ Amazon saw ██████████████████████████████ ████████████████████████████ Accordingly, Amazon ███████████████ ███████████████████████████████████ Amazon also ███████████████████████████████████████████ ████████████████████████████ Amazon was determined ██████████████ ███████████████████████████████████████████████████ ██████████████████████

91.     In 2021, Amazon recorded advertising profits of more than ███████████ in the United States.

92.     Each month, advertisements on Amazon reach 96% of all Americans between the ages of 25 and 54.

93.     Amazon's ███████████ advertisements are shown in connection with specific customer search queries that lead to Search Results Pages.  Historically, Amazon's Search Results Pages displayed mostly organic search results—the results most directly responsive to the search query.

94.     Today, however, Amazon's Search Results Pages are cluttered with advertisements.  The ███████████████ types of advertisements on Amazon's Search Results Pages are "Sponsored Brand" advertisements, which appear above search results, and "Sponsored Product" advertisements, which appear within search results, as shown in Figure 7.

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222



*Figure 7.  Search Results Page with Sponsored Brand and Sponsored Product Advertisements*

*Highlighted in Red, Desktop Browser.*

95.    These advertisements typically occupy the most desirable space on the Search Results Page ▮▮▮▮▮▮▮▮▮▮▮▮  Since ▮% of Amazon shoppers do not click past the first Search Results Page, they often see more Sponsored Brand and Sponsored Product advertisements than organic search results.

96.    At the same time, Amazon typically buries organic search results beneath advertisements, making them harder to find and less likely to be clicked.  In Figure 8a (desktop), no organic search results appear in the first row.  The first four results are "Sponsored" advertisements, and the fifth is another non-organic result known as a "recommendation widget." In Figure 8b (mobile), the top two results are "Sponsored" advertisements, and the third is a recommendation widget.

COMPLAINT - 29
CASE NO.  _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1



*Figure 8a.  First Row of Search Results with Sponsored Product Advertisements Highlighted in Red, Desktop Browser.*



*Figure 8b.  Search Results Page with Sponsored Product Advertisements Highlighted in Red,*

*Mobile App.*

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

97.     For shoppers on mobile devices, Sponsored Brand and Sponsored Product advertisements are often the only results visible without scrolling, as shown in Figure 8c.



*Figure 8c.  Search Results Page Showing Visible Screen, Mobile App.*

**D.     Amazon Prime**

98.     Amazon runs a subscription program called Amazon Prime.  Amazon launched Prime in 2005 as a shipping subscription.  For an annual fee of $79, subscribers bought unlimited shipping on eligible items, at no per-order cost to shoppers.  Amazon today continues to include a shipping service as part of Prime, with an unlimited two-day shipping promise on eligible items at no per-order cost.

COMPLAINT - 32
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

99.     Over time, Amazon has expanded Prime from a shipping program to a subscription that is, in Amazon's internal assessment, ███████████████████ ████████████████████████ It includes a broad combination of products and services, including many that are unrelated to online retail shopping, such as: (1) Prime Video, a video-on-demand and streaming service; (2) Amazon Music Prime, an ad-free music streaming service; (3) Prime Gaming, a video gaming service that includes downloadable games, exclusive in-game content, and channel subscriptions and badges on Twitch, a livestreaming service Amazon acquired for nearly $1 billion in 2014; and (4) RxPass, which provides access to a list of eligible prescription medications, including shipping, for a flat $5 per month fee.  Prime subscribers also receive access to exclusive online shopping discounts and promotions such as "Prime Day," a highly publicized annual promotion with exclusive deals for Prime subscribers.

100.    Amazon has increased the subscription fee for Prime from the original $79 to nearly double that price, at $139 per year, with a monthly subscription priced at $14.99.

101.    Amazon charges a Prime subscription fee primarily to ███████████████ ███████████████ As Amazon puts it, ████████████████████████ ████████████ The Prime subscription fee makes subscribers feel as though they must make the subscription fee worth it by making more purchases on Amazon.  A former Amazon employee who was involved in the development of Prime explained that Prime pricing "was never really about the seventy-nine dollars.  It was really about changing people's mentality so they wouldn't shop anywhere else."

102.    According to Amazon's internal analyses, ██████████████████████ ████████████████████████████████████████ ████████████████████████ Accordingly, the average Prime subscriber spends ████████████ each year on Amazon than the average non-Prime Amazon shopper.

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Conversely, consumers who are not Prime subscribers are █████████████████████

2  ███████  Amazon's rivals' analyses also show a ████████████████████████████████

3  ████████████████████████████████

4      103.    As shown in Figures 9a (desktop) and 9b (mobile), Amazon displays a "Prime

5  Badge" to show Prime subscribers which items are eligible for the prepaid unlimited shipping

6  included in the Prime subscription.



7  *Figure 9a.  Search Results Page with Prime Badges Highlighted in Red, Desktop Browser.*



*Figure 9b.  Search Results Page with Prime Badges Highlighted in Red, Mobile App.*

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

104.    Amazon's interfaces let Prime subscribers filter their searches to display only Prime-eligible offers.  On the top left-hand side of Amazon's desktop webpage and mobile app, Amazon displays a "Prime" filter.  Once a shopper selects the filter, only Prime-eligible offers appear in search results, as shown in Figures 10a (desktop) and 10b (mobile).



*Figure 10a.  Search Results Page with Prime Filter Enlarged in Red, Desktop Browser.*



*Figure 10b.  Search Results Page with Prime Filter Enlarged in Red, Mobile App.*

105.    For Amazon, signing up and maintaining as many Prime subscribers as possible is a top priority.  In service of this goal, Amazon has even knowingly tricked shoppers into signing

1    up for Prime and actively thwarted their efforts to cancel their subscriptions.  Amazon internally

2    admits to using ███████████ for its user interfaces "to mislead or trick users to make

3    them do something they didn't want to do, like signing up for a recurring bill, ████████

4    ████████████████  At multiple points, Amazon considered ████████████

5    ████████████████████████████████████████

6    ████████████████████████████████████

7    ████████████ Amazon constructed a cancellation process so lengthy, arduous,

8    and complex that it was internally codenamed the "Iliad Flow," after Homer's 15,693-line epic

9    poem.

10        106.    As of late 2021, nearly ████████ people in the United States—██% of U.S.

11   households—were enrolled in Prime.  In some zip codes, more than ██% of households have a

12   Prime subscriber.  Amazon's U.S. Prime subscriber base is larger than the populations of ██

13   ████████ Amazon projects that by 2024, ██% of all U.S. households ████████████

14   ████████ and that Prime enrollment will be ████████████████████

15   ████████████████



*Figure 11.  Source: Amazon Internal Documents.*

COMPLAINT - 37
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

107.    In 2021, Prime subscriber purchases accounted for more than ██% of the purchases by dollar amount on Amazon's U.S. online superstore.  And in 2021 alone, U.S. customers paid Amazon more than ███████ in Prime subscription fees.

**E.    Fulfillment By Amazon**

108.    Amazon sells fulfillment services and facilitates delivery under the name "Fulfillment by Amazon," which is commonly abbreviated to "FBA."  Sellers can use FBA to fulfill orders made on Amazon.

109.    "Fulfillment" refers to the process of preparing items for shipping to "fulfill" online orders.  Fulfillment involves storing, picking (retrieving from storage), packaging, and preparing items purchased from online retail stores for delivery.  Fulfillment operations generally occur within a specialized warehouse called a "fulfillment center."

110.    For most online sellers, fulfillment is a significant business cost.

111.    Delivery is a related but distinct service.  "Delivery" refers to the specific process of transporting a package from a fulfillment center to a customer's chosen address.  One company may fulfill an order, then transfer the package to a different company for delivery.  For example, a fulfillment provider may hand a package off to a parcel carrier like the U.S. Postal Service, FedEx, or UPS, to complete delivery.

112.    Amazon both fulfills and delivers products purchased on its online superstore.  In 2021, Amazon fulfilled nearly ██% of all orders made on Amazon across both its Marketplace and Retail business units.  Amazon delivers products itself or contracts with a third-party delivery company to do so.  Amazon has estimated that it now makes more deliveries in the United States than any other company.

113.    When online shoppers buy an item, they also expect fulfillment and delivery of that item.

COMPLAINT - 38
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

114.     When a seller uses FBA, Amazon charges the seller for storing their items and charges the seller a fee based on the dimensions and weight of the product when it is purchased.

115.     Amazon has increased the fulfillment fees it charges to sellers by approximately 30% in just two years, from 2020 to 2022.

116.     As explained in Part VI.B, below, sellers have little choice but to use FBA.  In 2020, more than ████ sellers used FBA to fulfill more than ████ orders in the United States.

V.     **AMAZON POSSESSES MONOPOLY POWER IN TWO RELEVANT MARKETS**

117.     Structural and direct evidence show that Amazon has monopoly power in two markets: (1) the online superstore market and (2) the market for online marketplace services (together, the "relevant markets").

118.     The structural evidence of monopoly power in both markets includes Amazon's dominant market shares and the presence of significant barriers to entry, including powerful network effects and strong economies of scale.  These markets and their individual barriers to entry are discussed further in Parts V.A and V.B, below.

119.     Feedback loops between the two relevant markets further demonstrate the critical importance of scale and network effects in these markets.  While the markets for online superstores and online marketplace services are distinct, an online superstore may operate an online marketplace and offer associated online marketplace services to sellers.  As a result, the relationship and feedback loops between the two relevant markets can create powerful barriers to entry in both markets.  Amazon offers an illustration of this dynamic: Amazon's base of shoppers in the online superstore market attracts sellers to buy services from Amazon in the online marketplace services market.  Amazon in turn relies on those sellers to increase the breadth and depth of goods offered on Amazon's online superstore, which further draws

COMPLAINT - 39
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   shoppers to Amazon.  In addition, Amazon imposes restrictions on how shoppers can purchase

2   its Prime subscription program to artificially increase barriers to entry in the online superstore

3   and online marketplace services markets.  These scale and network effects reinforce Amazon's

4   monopoly power in both relevant markets, as explained in Part V.C, below.

5          120.    Direct evidence also demonstrates Amazon's monopoly power.  Amazon has

6   continually exercised its monopoly power and degraded the customer experience ████████

7   ████████████████████████████████████████████████████████████████

8   ███████████████    Amazon worsens quality and hikes prices for both shoppers and

9   sellers, all without denting—and while in fact expanding— its dominance.  This and other direct

10  evidence of Amazon's monopoly power are discussed further in Part V.D, below.

11         **A.     Amazon Has Durable Monopoly Power In The Online Superstore Market**

12         121.    Amazon has durable monopoly power in the online superstore market.

13             **1.     The U.S. online superstore market is a relevant market**

14         122.    The online superstore market is a relevant product market.  Online superstores

15  compete to build long-term relationships with consumers across multiple purchases of a variety

16  of items.  Online superstores do so by offering a distinct set of features that reduce time and

17  effort for shoppers online, thereby encouraging shoppers to return to those online superstores for

18  a broad swath of goods.  Because of these and other features, brick-and-mortar stores and online

19  stores with a more limited selection are not reasonably interchangeable with online superstores

20  for the same purposes and are thus properly excluded from the online superstore market.

21         123.    The relevant geographic market is the United States.

22             *a.     Online superstores offer shoppers a unique set of features*

23         124.    An online superstore offers an extensive breadth and depth of product selection

24  accessible through an online storefront.  "Breadth" refers to product offerings across multiple

COMPLAINT - 40
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

categories, such as sporting goods, kitchen goods, apparel, and consumer electronics. "Depth" refers to product selection within a given product category, such as a range of different brands of a product with different price points, levels of quality, sizes, and colors.

125.   Consumers incur shopping costs beyond the prices paid for purchased items. For example, when considering a purchase, shoppers must determine which stores carry specific items. Shoppers then often conduct research, including learning about the items' prices and features, reading consumer reviews, and comparing similar items. Shoppers value stores that reduce search costs and the ability to discover new items that they may not have been initially searching for while shopping. Many consumers also value shopping for different types of goods at a single store to reduce overall shopping costs.

126.   Online superstores provide shoppers a unique offering: 24/7 access to a broad and deep product selection accompanied by a distinct set of features that meaningfully reduce the time and effort shoppers expend online. These features include tools to help shoppers quickly search for and identify their desired items, compare different items, and purchase and receive items, all from a single website or app. Online superstores provide these features to develop long-term relationships with shoppers, entice shoppers to buy more products during a single shopping trip, and encourage them to come back again.

127.   Several characteristics distinguish online superstores from other forms of retail, including brick-and-mortar stores and online stores with comparatively limited selection.

128.   First, online superstores offer a single destination for shoppers to browse a large and diverse selection of goods from multiple brands across a wide range of categories, reducing consumers' shopping costs and encouraging customers to make an online superstore a preferred destination for a variety of shopping needs.

129.     By offering a broad selection, online superstores reduce the shopping costs of visiting multiple stores for goods spanning multiple categories.  By offering a deep selection within any given category, online superstores decrease the shopping costs of visiting multiple category-specific or brand-specific stores to identify the best options.

130.     The breadth and depth of selection available at online superstores encourages shoppers to return to and shop at those stores more regularly.  Shopping regularly at the same online superstore leads to reduced shopping costs by increasing shoppers' familiarity with an online superstore's format, features, offerings, and customer service process.  Repeated use of an online superstore can also provide confidence about its reputation and quality.  Increased familiarity, a positive reputation, and perceived high quality all make it more likely that a shopper will choose an online superstore as a preferred destination for purchasing retail goods online.

131.     Industry participants, including Amazon, have long recognized an online superstore's unique ability to leverage a broad and deep selection of goods to compete for repeat customers.  For example, Mr. Bezos explained in his 1999 letter to Amazon shareholders that "[e]ach new product and service we offer makes us more relevant to a wider group of customers and can increase the frequency with which they visit our store. . . .  The more frequently customers visit our store, the less time, energy, and marketing investment is required to get them to come back again."

132.     Second, online superstores are not limited to traditional operating hours that constrain brick-and-mortar retailers.  Instead, online superstores offer a quick, on-demand shopping experience at all times of the day or night.  Online superstores allow shoppers to browse and buy across a wide variety of goods 24 hours a day, 7 days a week, 365 days a year. Shoppers can also pause and resume their shopping session on an online superstore at any time.

COMPLAINT - 42
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

133.   Third, shoppers can make purchases on online superstores anywhere they have internet access, through a website or an app on a desktop, tablet, or smart phone.

134.   Fourth, online superstores offer sophisticated filtering and discovery tools, allowing shoppers to browse and sift through the store's entire catalog quickly and efficiently.

135.   Online superstores also have access to data on items consumers have previously searched for and purchased.  Online superstores may use this data to offer repeat visitors tailored and personalized shopping experiences that can, for example, include recommendations for future purchases based on past search or purchase behavior.

136.   Fifth, online superstores offer research tools, including detailed information on a given item and a large volume of authentic, customer-generated ratings and reviews.  Online superstores give shoppers a single point of access to these research tools, including text descriptions, photos, videos, and user reviews.  The product detail pages available on online superstores often include far more information than physical packaging can accommodate.  For example, a product detail page can include links to user guides and product documentation that would otherwise only be accessible inside of a product's packaging.

137.   Sixth, online superstores provide shoppers a familiar and convenient checkout experience.  Online superstores reduce shopping costs by allowing customers to store personal information like payment details, home addresses, passwords, and other sensitive information. For example, Mr. Bezos ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

138.   Seventh, online superstores offer shoppers a convenient and consolidated post-purchase experience.  Shoppers who buy multiple items from an online superstore can often schedule them to be delivered together, limiting the need to keep track of multiple delivery times

COMPLAINT - 43
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 and decreasing packaging.  Mr. Bezos █████████████████████████████

2 █████████████████████████████████

3      139.    This combination of features distinguishes online superstores from brick-and-

4 mortar stores and from other online stores with comparatively limited selection.  Even though

5 such stores may price certain items comparably with online superstores, shoppers do not

6 seriously consider those stores as reasonable alternatives to online superstores for a significant

7 portion of their shopping needs.  Online superstores differentiate themselves by offering a

8 particular shopping experience to the sizeable group of consumers who view that experience as

9 distinct and prefer to shop at online superstores.

10                     **b.**     ***Online superstores are not reasonably interchangeable with***

11                               ***brick-and-mortar stores***

12      140.    Online superstores are distinct from, and not reasonably interchangeable with,

13 brick-and-mortar stores.  From start to finish, online superstores provide a vastly different

14 shopping experience from physical stores.

15      141.    Unlike online superstores, brick-and-mortar stores require shoppers to travel to a

16 specific location.  As Mr. Bezos noted in his 2020 letter to Amazon shareholders, "[r]esearch

17 suggests the typical physical store trip takes about an hour" and requires "driving, parking,

18 searching store aisles, waiting in the checkout line, finding your car, and driving home."  Mr.

19 Bezos contrasted this experience with shopping on Amazon, where more than a quarter of all

20 purchases are completed "in three minutes or less," and half of all purchases take less than

21 fifteen minutes.

22      142.    Brick-and-mortar stores can display only items that fit on the store's limited

23 physical shelf space, while online superstores can offer a practically unlimited number of items

24 for sale.  As Amazon's then-Vice President of Physical Stores explained in 2018, "whenever you

COMPLAINT - 44
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  are working offline, you can't have the endless aisle that you have online, and so when you're

2  working offline you really have to curate."

3      143.    Amazon recognizes that its unlimited shelf space appeals to shoppers and

4  distinguishes its online store from brick-and-mortar stores.  As Amazon has reminded its

5  shareholders every year since 1998, "[w]e brought [shoppers] much more selection than was

6  possible in a physical store . . . and presented it in a useful, easy-to-search, and easy-to-browse

7  format in a store open 365 days a year, 24 hours a day."

8      144.    Amazon internally contrasts the benefits of the depth of selection available in its

9  online superstore with the "clear gaps" in selection at physical stores.  As shown in Figure 12

10  below, an Amazon presentation ████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████

14

15

16

17

18

19

20

21

22

23

24

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

*Figure 12.  Amazon Slide* ▮▮▮▮▮▮▮▮▮▮▮

*Source: Amazon Internal Documents.*

145.    Brick-and-mortar stores also cannot tailor or personalize a consumer's shopping experience in the same way an online superstore can.  Physical stores have the same layout for any shopper browsing their selection at any given time.

146.    The process of searching and shopping for items at brick-and-mortar stores is much different than the process of searching and shopping on an online superstore.  Shoppers on online superstores can use sophisticated digital filtering and search tools to browse and select items, instead of physically traveling up and down aisles or asking a store employee for help. Online superstore shoppers can make purchases without waiting in physical checkout lanes.  And online superstore purchases typically ship to the shopper's address.  On the other hand, shoppers can see products in person before buying at brick-and-mortar stores and can typically take

COMPLAINT - 46
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  purchased items home immediately.  As Amazon's then-Vice President of Physical Stores

2  explained in a 2018 interview, "another thing you can do in offline retail that you can't do online

3  is customers can come in and touch the products themselves . . . try those products first person,

4  get a feel for them, [and] talk to an associate."

5       147.    Online and brick-and-mortar stores also involve distinct operations.  Because

6  different expertise is required to manage an online store, companies that operate both typically

7  run them through separate divisions.  For example, ███████████████████████████

8  ████████████████████████████████████████████████████████

9  ██████████████████████████  Amazon's CEO, Andy Jassy, has publicly emphasized

10  that "[t]he things you think about in physical retail" from an operational perspective, like

11  "lighting," "parking," and "physical merchandising," are "radically different things than you

12  think about in an online retail environment where technology is really driving the entire

13  experience."

14       **c.    *Online superstores are not reasonably interchangeable with***

15            ***other online stores that lack breadth and depth of product***

16            ***selection***

17       148.    Online superstores are also distinct from, and not reasonably interchangeable

18  with, online stores with limited product selection, including online stores that offer products

19  primarily from a single brand.  Whether considered individually or collectively, online stores

20  with limited selection are not reasonable substitutes to become a shopper's preferred destination

21  for their online purchases for a broad swath of retail goods.  Shopping at numerous limited-

22  selection online stores increases shopping costs, both for individual shopping needs and in

23  aggregate across a customer's total purchases.  Consumers' overall shopping costs would

24

COMPLAINT - 47
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    increase dramatically if they tried to replace online superstores with shopping at multiple

2    limited-selection online stores.

3           149.    Some consumers may prefer to shop at limited-selection online stores for certain

4    items.  For example, a consumer may turn to such an online store because it specializes in unique

5    or niche goods not available on an online superstore, because the shopper has particular brand

6    loyalty, because the shopper finds the online store particularly trustworthy and reliable (because,

7    for example, it screens for counterfeit goods or fake reviews), or because the non-superstore

8    offers specialized or expert knowledge about the items it sells.

9           150.    Limited-selection online stores do not provide an experience that is reasonably

10   interchangeable with an online superstore because, individually and collectively, they cannot

11   effectively compete to become a shopper's preferred destination for online purchases given the

12   increased shopping costs associated with shopping at online stores that lack the breadth and

13   depth of online superstores.

14          151.    Online stores with a limited product selection lack breadth.  A shopper who must

15   visit multiple online stores to compile a set of desired goods across different product categories

16   faces higher shopping costs than a shopper who can search for and complete those cross-category

17   purchases at a single online superstore.

18          152.    RainOrShineGolf.com—a retailer of indoor golf simulator equipment—is an

19   illustrative example of an online store that lacks the breadth of an online superstore.  Golf

20   simulator equipment such as golf ball launch monitors, mats, nets for hitting balls, and software

21   to analyze performance collectively allow a customer to practice golf indoors.  While Rain or

22   Shine Golf and Amazon both sell indoor golf simulator equipment, they offer consumers

23   different shopping experiences and a vastly different overall product due to the difference

24   between the breadth of product selection at each online store.  Shoppers may choose Rain or

COMPLAINT - 48
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Shine Golf for occasional category-specific purchases, but due to its limited breadth it could not

2  become a consumer's preferred destination for a broad swath of other online purchases.

3      153.    Unlike limited-selection online stores, an online superstore offers a single

4  destination for a shopper to browse, buy, and return to for repeat purchases of a much wider

5  array of goods.  On an online superstore like Amazon, shopping for a golf simulator may also

6  yield cross-category suggestions for accessories like golf gloves, golf clubs, or golf bag push

7  carts.  Moreover, if the need arises or mood strikes, a consumer shopping on an online superstore

8  like Amazon could resupply the correct size of kitchen trash bags they previously purchased and

9  add a new board game that the online superstore recommends based on their prior shopping

10  behavior, all during a single shopping session.  By contrast, a consumer who uses Rain or Shine

11  Golf to buy a golf simulator but would also like to make a set of additional purchases would need

12  to visit and do business with numerous other online stores.  Those visits would incur the added

13  shopping costs of finding those additional items, completing the various purchase processes with

14  different logins and credentials (if the shopper can remember them), and arranging for multiple

15  deliveries.

16      154.    Many online stores that lack breadth of product selection also lack depth,

17  especially online stores that primarily or exclusively feature their own brands.  A shopper forced

18  to visit multiple online stores to find the specific item that matches their needs faces higher

19  shopping costs than a shopper who can compare across a depth of options for that item on an

20  online superstore.

21      155.    Tumi.com is another illustrative example.  Shoppers can purchase a range of

22  luggage, backpacks, and bags at Tumi.com, but the items sold at Tumi.com are primarily Tumi's

23  own brand, limiting the depth of options for any particular item.  By contrast, a shopper looking

24  for luggage on an online superstore like Amazon can browse across options from a wide variety

COMPLAINT - 49
CASE NO. _:__-cv-_____

1    of brands that may include Tumi as well as other brands.  The shopper can peruse these options

2    by filtering across features like brand, price point, size, and colors without incurring the

3    additional search costs present in visiting all of the online stores operated by each brand.

4          156.    Furthermore, the breadth and depth of product selection on online superstores

5    increases access to valuable cross-category consumer data.  This data amplifies the ability of

6    online superstores to provide shoppers with tailored and personalized shopping experiences.  As

7    an online superstore, for example, Amazon recognizes in internal documents that

8    ████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████

10   ██████████████████████████████████

11         157.    These additional capabilities of online superstores influence consumers' shopping

12   behavior. ████████████████████████████████

13   ████████████████████████████████████

14         158.    Because limited-selection online stores do not have the same breadth and depth of

15   selection offered by online superstores, they have access to less consumer data across categories

16   and cannot replicate the personalization features of online superstores, reducing the ability of

17   limited-selection online stores to compete with online superstores.

18         159.    Online superstores treat rival online superstores differently than limited-selection

19   stores.  For example, Amazon does not allow other online superstores like Walmart.com to sell

20   through Amazon.  Yet Amazon encourages hundreds of thousands of sellers—including well-

21   known brands that sell through their own online stores or limited-selection online stores—to do

22   so. █████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ███████

COMPLAINT - 50
CASE NO. _:__-cv-_____

> **d.** **The online perishable grocery category is properly excluded from the online superstore market**

160.    Online purchases of perishable grocery products are not part of the online superstore market.  Perishable groceries are foods that cannot be safely stored at room temperature, including fresh fruits and vegetables, raw meat, and frozen items.  Though some online superstores may also offer online purchases of perishable grocery products, this distinct business line is not part of the relevant market and is excluded from the market share numbers in Part V.A.2, below.

161.    Consumers' experiences when shopping online for perishable groceries differ from their experiences purchasing other retail goods.  For example, consumers shopping for online perishable grocery products typically must select a specific time for the perishable grocery products to be delivered, which often also requires the customer to be present at the time of delivery to be able to promptly store those items.  Both Walmart.com's and Amazon's online perishable grocery businesses require shoppers to choose a delivery window or "time slot."  Neither Walmart.com nor Amazon typically require shoppers to choose time slots when purchasing other products online.

162.    The process for packaging and delivering perishable groceries to shoppers who ordered them online also differs from non-perishable grocery orders.  Perishable groceries require special handling, often including refrigeration or freezing, as well as quick and careful delivery to avoid damage or rot.  As such, perishable grocery delivery requires specialized storage facilities with refrigeration systems that serve a smaller geographic footprint.

163.    Competition for online perishable grocery sales is also different from competition between online superstores.  Competition for online perishable grocery sales is generally more localized, whereas online superstore competition is nationwide.  This difference is because

COMPLAINT - 51
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  grocery quality and shelf life are seasonal and regional.  For example, perishable fruit may be

2  available only during certain times and in certain regions.  As a result, Amazon █████████

3  ████████████████████████████████████████████████████████

4  ███████████████████████

5                    **e.      The relevant geographic market is the United States**

6          164.    The United States is the relevant geographic market for the online superstore

7  market.  Online superstores that serve consumers shopping for items to be delivered within the

8  United States generally do not compete for those consumers with online superstores that

9  primarily serve consumers shopping for items to be delivered outside of the United States.

10 Consumers shopping online for items to be delivered within the United States generally make

11 purchases from market participants' U.S. businesses and U.S.-facing online stores.  For example,

12 Amazon operates an online storefront for shoppers in the United States (Amazon.com) separately

13 from its storefront for shoppers in the United Kingdom (Amazon.co.uk).  The difference is not

14 just in their URLs; rather, despite being in the same language, they offer different products, at

15 different prices, under different shipping terms, and present unique search results and

16 advertisements.

17         165.    Online superstores that primarily serve shoppers seeking delivery outside the

18 United States are not reasonable substitutes for shoppers seeking delivery within the United

19 States because they offer a shopping experience tailored to those other countries, with different

20 currencies, prices, customs and border control conditions, and shipping terms.  In the ordinary

21 course of business, industry participants identify competitors for U.S. shoppers separately from

22 competitors that serve shoppers seeking items to be delivered to other countries.

23

24

COMPLAINT - 52
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

## 2.    Amazon has a dominant share of the online superstore market

166.    Amazon maintains a dominant market share when compared to other online superstores.  Documents and data, both from Amazon and industry analysts, confirm that Amazon's share of the overall value of goods sold by online superstores is well above 60%—and rising.

167.    Amazon's market share, when considered in conjunction with other characteristics of the online superstore market including its significant barriers to entry (*see* Parts V.A.3 and V.C, below), demonstrates Amazon's monopoly power.

168.    Gross Merchandise Value ("GMV") measures the total sales value of goods sold to customers during a given time period and is commonly used to track the market share of online stores.  Other financial indicators, such as revenue or net sales, may factor in commission fees or discounts that can vary both within a single store and across different stores.  GMV does not.  Accordingly, a calculation of Amazon's GMV captures the total value of goods sold through both its Retail and Marketplace arms.  Third-party reports, including those utilized by Amazon, regularly use GMV to compare Amazon to other firms.

169.    When measured by GMV, Amazon's business vastly overshadows that of all other online stores in the United States.

170.    Industry analysts and industry participants often track Amazon's U.S. online store by reference to Walmart, Target, and eBay.  According to third-party reports that assess market share across these "top-4 general merchandise platforms," Amazon has maintained an estimated market share of more than 69% of GMV since 2015, with that share growing over time.

COMPLAINT - 53
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

2

3

4

5

6

7

8



9

*Figure 13. Bank of America Global Research.*

10    171.    Other commercially available data, including recently reported statistics from

11 eMarketer Insider Intelligence, a widely cited industry market research firm, confirms Amazon's

12 sustained dominance across this same set of companies, with an estimated market share of more

13 than 82% of GMV in 2022.

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 54
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

2

3

4

5

6

7

8

9

10



11

*Figure 14.  Source: eMarketer Insider Intelligence (percentages rounded).*

12   172.   Amazon internally maintains ███████████████████████████

13   ███████████████████████████████████████████

14   ███████████████████████████████████████████████

15   ██████████████████████████████████████████

16   █████████████████████████████████████████████

17   ██████████████████████████████████████████████

18   ████████████████████████████████████ Amazon had a ███% market share

19   based on U.S. GMV among this set of online stores in 2021.

20   173.   Amazon also ████████████████████████████████████

21   ███████████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████████

24   █████████████████████████████████████████████

1   ███████████████████████████████████████████████████

2   ██████████ Amazon uses ████████████████████████

3   █████████████████████████████████████████████

4   ███████████████████████████████████████████

5   ████████████████████

6   174.   Amazon considers ████████████████████████████

7   ███████████████████████████████████████████

8   ████████████████████████████████████████████████

9   █████████████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ███████████████████████████████

12  175.   ████████████████████████████████████████

13  ████████████ Amazon still had a ████% share based on U.S. eCommerce GMV (excluding

14  online perishable grocery sales) among this set of online stores in 2021.

> 3.   **Amazon's dominant position in the online superstore market is**
>
> **protected by significant barriers to entry**

176.   Significant barriers limit entry into the online superstore market including scale economies and network effects, reputational barriers, and shopper switching costs. Feedback loops between online superstores and the online marketplace services market also contribute to a unique barrier to entry, as discussed in Part V.C, below.

177.   Scale is a critical factor for success in the online superstore market. Amazon itself has touted its scale as a key differentiator from medium-sized or single-category online stores. Mr. Bezos wrote that "[o]nline selling (relative to traditional retailing) is a scale business characterized by high fixed costs and relatively low variable costs. This makes it difficult to be a

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   medium-sized e-commerce company," and "difficult . . . for single-category e-commerce

2   companies to achieve the scale necessary to succeed."  According to Mr. Bezos, "build[ing] an

3   important and lasting company . . . in e-commerce" simply "isn't going to work in small

4   volumes."  Economies of scale are a barrier to entry in this market that new firms must overcome

5   in order to enter and compete.

6          178.    The online superstore market is also characterized by network effects, where the

7   value of the service increases as more people use it.  Network effects are not intrinsically

8   harmful, but they can present barriers to entry and to competition, reinforcing market power and

9   insulating incumbents.

10         179.    One aspect of the importance of scale and related network effects in the online

11  superstore market stems from user-generated reviews.  For example, as Amazon's shopper base

12  has grown, so too has the number of product ratings and reviews available on its store, a

13  feedback loop that further draws in new shoppers by enabling them to quickly learn more about

14  unfamiliar products or sellers.  In other words, by leaving helpful ratings and reviews, Amazon's

15  shoppers themselves provide immense value to future Amazon shoppers.  Amazon benefits from

16  this self-reinforcing dynamic, which would be difficult and expensive for new entrants to

17  reproduce.

18         180.    Another source of network effects in the online superstore market is access to

19  valuable shopper data, which allows online superstores to tailor and personalize shopping

20  experiences.  For example, Amazon records information about the items a shopper searches for,

21  views, places in their cart, and pays for, and the mechanism the shopper uses to pay.  This type

22  of data allows an online superstore to streamline a shopping experience and target specific

23  products to certain customers.  As with other network effects, the more scale an online superstore

24

1    gains, the more powerful this effect becomes.  Prospective entrants would have to acquire a

2    sufficient shopper base to obtain enough data to offer this level of personalization.

3         181.    The online superstore market also exhibits reputational barriers to entry.

4    Reputational barriers to entry arise when entrants need to establish trust among customers to

5    compete meaningfully against incumbents.  Because online superstores allow and encourage

6    repeat purchasing, they are able to develop positive reputations with shoppers that a prospective

7    entrant starting from scratch would need to cultivate.

8         182.    Switching costs also are a barrier to entry in the online superstore market.

9    Mr. Bezos recognized this dynamic and its implications in a speech in 1998, stating that

10   "switching costs long-term . . . should actually be higher in the online world than in the physical

11   world" because "[i]n the online world, businesses have the opportunity to develop very deep

12   relationships with customers, both through accepting preferences of customers and then

13   observing their purchase behavior over time, so that you can get that individualized knowledge

14   of the customer and use that individualized knowledge of the customer to accelerate their

15   discovery process."  For example, Amazon retains shoppers' payment, shipping, and order

16   history information.  Switching to a new online superstore would require reentering payment and

17   shipping information and forgoing the benefits of viewing past order history.  Shoppers also

18   develop routines while shopping at online superstores that can be difficult to break, particularly

19   given the additional costs of gaining familiarity with the format, features, and policies of a

20   different store.

21        183.    Finally, as described in detail below in Part VI, Amazon engages in an illegal

22   course of conduct that raises barriers to entry and competition, making it artificially and

23   substantially more costly and time-consuming for would-be competitors to enter the online

24   superstore market.

**B.      Amazon Has Durable Monopoly Power In The Online Marketplace Services Market**

184.    Amazon has durable monopoly power in the online marketplace services market.

185.    Online marketplace services include: (a) access to a significant base of shoppers in the United States who use the online marketplace to find and buy goods; (b) an interface for consumer search that allows sellers' products to be discovered and purchased without shoppers needing to leave the online marketplace; (c) the ability for sellers to set the prices for their goods on the online marketplace; (d) the ability for sellers to create and maintain product detail pages with product information and specifications on the online marketplace; and (e) the ability for sellers to display to potential shoppers on the online marketplace an array of customer-generated ratings and reviews.

**1.      Online marketplace services is a relevant market**

186.    Online marketplace services is a relevant product market.  Online marketplaces offer sellers a distinct set of services.  Chief among these services is access to an established online U.S. customer base.  Purchasing online marketplace services is not reasonably interchangeable with selling as a vendor to either an online or a brick-and-mortar retail store.  Nor are online marketplace services reasonably interchangeable with the offerings of online software-as-a-service providers.  Some providers of online marketplace services also offer fulfillment services, which sellers can purchase in addition to online marketplace services.

187.    The relevant geographic market for online marketplace services, which provide sellers access to U.S. shoppers, is worldwide.

*a.      Online marketplace services offer sellers a unique set of features*

188.    Online marketplace services encompass a suite of services that facilitate sellers making online sales to U.S. shoppers without having to directly operate an online store.  The

COMPLAINT - 59
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  sellers who typically purchase online marketplace services are businesses seeking to sell goods

2  directly to U.S. shoppers by relying on the marketplace to attract shoppers rather than attracting

3  shoppers solely on their own.  These sellers use online marketplace services so that U.S.

4  shoppers can find and buy the sellers' offered items.

5  189.  Access to a large customer base is the most important characteristic of an online

6  marketplace.  Amazon advertises to prospective sellers that its marketplace allows them "to

7  reach the hundreds of millions of customers who visit Amazon to shop," which can "[r]educe the

8  time, effort, and money [they] spend on customer acquisition."  Similarly, Walmart advertises

9  that its marketplace gives sellers access to "a built-in audience of frequent shoppers and loyal

10  customers" and tells sellers that "[y]ou bring great products.  We bring millions of customers."

11  eBay tells sellers that "millions of buyers are waiting."

12  190.  Industry participants recognize online marketplace services as a distinct retail

13  product.  Many industry observers track online marketplaces separately from other types of

14  online commerce.

### b.  *Online marketplace services are not reasonably interchangeable with selling as a vendor*

17  191.  Selling products as a vendor to a retail store, whether online or offline, who then

18  sells to shoppers is not reasonably interchangeable with buying online marketplace services.

19  192.  Selling products as a vendor to a retailer involves a pricing and transaction

20  structure different from buying online marketplace services.  A vendor generally sells goods to a

21  retailer for a wholesale price.  The retailer takes legal title to the goods and can sell them to

22  shoppers.  Online marketplace services providers price their services differently, typically

23  including a percentage-based commission fee.  The seller retains legal title to the goods and sells

24  those goods directly to shoppers on the online marketplace.

COMPLAINT - 60
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

193.     A vendor typically sells goods in batches to retailers, such as in a wholesale relationship.  A seller operating through an online marketplace, by contrast, typically sells goods one at a time to online shoppers.

194.     Vendor arrangements also exhibit different features and characteristics from online marketplace services.  A vendor usually gives up the ability to set the price offered to shoppers, and the retailer typically sets the shopper-facing prices.  But sellers who buy online marketplace services retain the ability to set and adjust prices to shoppers.  Many merchants prefer purchasing online marketplace services to vending to a retailer so that they can retain the ability to set their own prices to final customers.

195.     Selling as a vendor often requires the vendor to give physical control of its goods to the retailer.  That reduces the vendor's ability to decide which goods to offer and when to make goods available.  Unlike the retailer model, an online marketplace services provider allows sellers to maintain control over which of its goods will be offered at what times.

196.     Selling as a vendor also limits the seller's access to retail sales data, which is usually controlled by the retailer.  Some providers of online marketplace services, including Amazon, provide customer-level sales and shopping data to sellers but not vendors.

197.     Industry participants recognize that these are important distinguishing characteristics.  For example, Walmart tells sellers that using its marketplace allows them to "[r]emain in control of your business."

         **c.**       ***Online marketplace services are not reasonably interchangeable with services sold by SaaS providers***

198.     Software-as-a-service ("SaaS") providers, including Shopify and BigCommerce, sell software that enables sellers to create and maintain their own direct-to-consumer online

stores.  Sellers use this software to build and customize their own eCommerce websites.  These SaaS providers' services are not reasonably interchangeable with online marketplace services.

199.    SaaS providers, unlike online marketplace service providers, do not provide access to an established U.S. customer base.  Rather, merchants that use SaaS providers to establish direct-to-consumer online stores must invest in marketing and promotion to attract U.S. shoppers to their online stores.  As Mr. Jassy explained in a 2022 interview, "small and medium sized" sellers use Amazon not because of the "eCommerce software" Amazon provides but "because they get access to a few hundred million customers."

200.    Another difference is that SaaS providers allow their customers to exercise control over branding and marketing in ways marketplaces do not.  For instance, SaaS providers typically enable merchants to customize the look of their website and grant them access to all consumer analytics, while allowing merchants to reach out to shoppers directly with sales promotions and new releases.

>   **d.      Online marketplace services are not reasonably interchangeable with services that primarily provide access to non-U.S. shoppers**

201.    Sellers who want to reach U.S. shoppers generally only consider online marketplaces that already possess a significant U.S. customer base and facilitate sales to U.S. shoppers through U.S.-specific marketplaces.  Online marketplace service providers typically operate distinct websites focused on customer bases by different geographies; these websites list prices in the local currency and operate differently to ensure compliance with local law.

202.    Online marketplaces set different fees across their various geography-specific websites.

1          ***e.      The relevant geographic market for online marketplace services***

2                    ***for sales to U.S. shoppers is worldwide***

3          203.    Online marketplace services, which provide sellers access to U.S. shoppers, are

4   procured by sellers worldwide.  Online marketplace services providers supply such services for

5   sales to U.S. shoppers from anywhere in the world.

6          **2.      Amazon has a dominant share of the online marketplace services**

7                    **market**

8          204.    Amazon has a durable and dominant share of the online marketplace services

9   market.  According to commercially available data sources and as illustrated in Figure 15, below,

10  Amazon has maintained a market share of greater than 66% of marketplace sales, as measured by

11  GMV, across all tracked marketplaces since at least 2018, and that share grew to more than 71%

12  by 2022.

13

14

15

16

17

18                          

19

20

21

22

23

24

*Figure 15.  Source: eMarketer Insider Intelligence.*

**FEDERAL TRADE COMMISSION**
                                                    600 Pennsylvania Avenue, NW
                                                    Washington, DC 20580
                                                    (202) 326-2222

205.    In 2021, sales by sellers on Amazon's online U.S. Marketplace accounted for an estimated $226 billion in GMV, more than five times the estimated amount sold by sellers on eBay's online U.S. marketplace and more than thirty-four times the estimated amount sold by sellers on Walmart's online U.S. marketplace.  Amazon's market share across all tracked retail marketplaces dominates—and is continuing to outgrow—that of eBay and Walmart, as shown in Figure 16 below.



*Figure 16.  Source: eMarketer Insider Intelligence.*

### 3.    Amazon's dominant position in the online marketplace services market is protected by significant barriers to entry

206.    The online marketplace services market exhibits significant barriers to entry, including, for example, scale economies, switching costs, and network effects.  Network effects between the online marketplace services and online superstore markets also present a unique barrier, as discussed in Part V.C, below.  Moreover, Amazon's illegal course of conduct has

1  made entry artificially and significantly more difficult than it would otherwise be, as discussed in

2  Part VI, below.

3      207.    The market for online marketplace services is also characterized by network

4  effects.  For example, as an online marketplace serves more sellers, it can collect, analyze, and

5  offer robust aggregated sales data to its sellers, who can use the data to inform their business

6  decisions.  A marketplace's increased ability to offer useful sales data to sellers helps it attract

7  more sellers, which allows the marketplace to collect more data, and so on.

8      208.    As an online marketplace gains sellers, it also becomes more appealing to sellers

9  who offer products that are complements to the products already offered on the marketplace.  For

10  example, a seller of cell phone cases may be more interested in selling on a marketplace on

11  which cell phones are also sold.

12  **C.    Feedback Loops Between The Relevant Markets Further Amplify The**

13  **Cumulative Impact Of Scale And Related Network Effects**

14      209.    The ability to gain scale is a critical factor in determining who can successfully

15  compete in both relevant markets.  The feedback loop between these two relevant markets

16  further amplifies the importance of scale and network effects in these markets, making it more

17  difficult for rivals and potential rivals to enter and compete effectively against incumbents in the

18  relevant markets.

19      210.    Online superstores that also offer online marketplace services operate in both

20  relevant markets and benefit from scale and network effects that flow between—and reinforce

21  market power across—those markets.  Though an online superstore does not necessarily need to

22  operate a marketplace, network effects between the two markets create an additional barrier to

23  entry for companies attempting to enter and compete in either market.  For online superstores

24  with marketplaces, increasing scale in one market can make it easier to grow in the other, and a

COMPLAINT - 65
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   denial of scale in one market can make it harder to grow in the other.  By amplifying the

2   importance of scale in both markets, these network effects can intensify the harmful impact of

3   conduct that unlawfully deprives rivals of scale, widening the gulf between firms that can and

4   cannot effectively compete.

5        211.   To attract shoppers, an online superstore needs to offer a wide breadth and depth

6   of product selection.  Online superstores that operate marketplaces can increase their breadth and

7   depth of product selection by offering products sold by third-party sellers.

8        212.   Similarly, sellers prefer marketplaces where many potential customers already

9   shop.  By reaching a larger customer base, sellers can increase sales.

10        213.   Prospective entrants to both relevant markets face a chicken-and-egg problem:

11   they need to attract enough sellers to offer sufficient product selection to attract shoppers, but

12   they simultaneously also need to generate enough shopper traffic to attract those sellers. ███

13   ████████████████████████████████████████████████████

14   ███████████████████████████████████████████

15   ██████████   This continuous loop creates a barrier to entry in both markets and accelerates

16   the growth of firms that can overcome it.

17

18

19

20

21

22

23

24

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

*Figure 17. Example of the "Chicken-and-Egg" Barrier to Entry.*

*Source:* █████████████████

214.     Amazon leverages these network effects.  At any given time, Amazon offers more than █████ different items for purchase on its online superstore.  Sellers who buy marketplace services from Amazon provide much of the product selection that helps Amazon attract and keep its shoppers.  As more shoppers turn to Amazon for its product selection, more sellers use its platform to gain access to its ever-expanding consumer base, which attracts more shoppers, and so on.

215.     Amazon recognizes this feedback loop.  An internal Amazon strategy document states that ████████████████████████████████████ ████████ And Mr. Bezos ████████████████████████████ ██████████████████████ Amazon publicly states that its "wide selection is made possible through independent sellers."

COMPLAINT - 67
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

216.     The interplay between Amazon's shoppers and sellers increases barriers to new entry and expansion in both relevant markets and limits existing rivals' ability to compete.  In this way, scale builds on itself, and is cumulative and self-reinforcing.

217.     This feedback loop spins Amazon's "flywheel."  Amazon publicly touts its flywheel as a "virtuous cycle."  But internally, Amazon █████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████

218.     For example, Amazon strategically restricts how shoppers can purchase the various services included in its Prime subscription, artificially increasing barriers to entry in the online superstore and online marketplace services markets.  Amazon has internally considered ████████████████████████████████████████████████████████████ ████████████████████████  Amazon fuses together a wide assortment of unrelated services ranging from streaming video, music, and gaming to prescription drugs and more to the unlimited shipping service included in Prime—and through it, to Amazon's monopoly online superstore.

219.     Amazon does not let shoppers subscribe only to the unlimited shipping component of Prime.

220.     And while Amazon technically offers Prime Video on a standalone basis, Amazon successfully uses dark patterns and other manipulative design techniques to thwart most shoppers from actually being able to sign up for it.

221.     Amazon's restrictive strategy of offering Prime services only on an all-or-nothing basis means that shoppers who want any of those services must effectively buy all of them and maintain a full Prime subscription.  Amazon estimates that ████████████████████████ ████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████ limiting other superstores' ability to build a

3 large customer base.

4        222.    Amazon's restrictive all-or-nothing Prime strategy artificially heightens entry

5 barriers because rivals and potential rivals cannot compete for shoppers—including the ██

6 ████ Prime subscribers described above—solely on the merits of their online superstores or

7 marketplace services.  Instead, they must enter multiple unrelated industries to attract Prime

8 subscribers away from Amazon or incur substantially increased costs to convince Prime

9 subscribers to sign up for a second shipping subscription or otherwise pay for shipping a second

10 time.  This substantial expense significantly constrains the number of firms who have any

11 meaningful chance to compete against Amazon and raises the costs of any that even try.  This

12 tactic blocks lower-priced rivals from competing head-to-head with Amazon to attract many

13 shoppers.  Even firms that have introduced comparable subscription services at a fraction of the

14 price have struggled to make serious inroads.  Amazon's restrictive strategy artificially heightens

15 barriers to entry, such that an equally or even a more efficient or innovative rival would be

16 unable to fully compete by offering a better online superstore or better online marketplace

17 services.

18        223.    Amazon internally acknowledges that ███████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ███████████████

22        224.    But Amazon also recognizes that ███████████████████

23 ████████████████████████████████████████████████████

24 So, Amazon deliberately restricts how shoppers can access various components of Prime, despite

COMPLAINT - 69
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  knowing that offering additional choices for consumers would lead to more competition and

2  better prices.

3      225.    This current restrictive structure of Prime reflects a deliberate strategy by Amazon

4  to artificially increase barriers to entry and competition.  As one former Amazon executive

5  explained in recalling Amazon's motivation for adding non-shipping services to Prime, "[a]ny

6  competitor might launch a Prime shipping clone, or they could potentially build a new Netflix-

7  type service, but it was unlikely that any one of them would be able to do both."

8      226.    In 2021, Amazon ██████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████

15 ████████████████████████████████████    As Mr. Bezos put it

16 publicly, Amazon "monetize[s] [Prime Video] content in an unusual way . . . .  When we win a

17 Golden Globe, it helps us sell more shoes." ██████████████████████

18 ████████████████████████████████████████████████████

19 ██████████████████████████████████████████████

20 ██████████████████████    To date, Amazon ████████████████████

21 ████████████████████  choosing to limit consumer choice and maintain artificially

22 heightened barriers to entry.

23      227.    Amazon has also pursued a set of anticompetitive tactics—discussed further in

24 Section VI, below—to unlawfully deny its rivals access to both shoppers and sellers, artificially

COMPLAINT - 70
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

stunting their growth by starving them of the feedback loops across the relevant markets that would benefit shoppers and sellers alike.

**D.    Direct Evidence Further Demonstrates Amazon's Monopoly Power**

228.    Direct evidence demonstrates that Amazon has monopoly power.  Amazon's ability to profitably do the following without losing sufficient business to change its behavior illustrates its monopoly power: (a) degrade the quality of its shopper-facing search results and ███████████████████████████████████████████████████████ (b) degrade the quality of the shopping experience on Amazon by ██████ ██████████████████████████████████████████████ and (c) raise the prices it charges sellers to access the full suite of Amazon's marketplace seller services and fulfillment services.  In addition, Amazon's unlawful conduct is further direct evidence confirming Amazon's monopoly power in both markets.

**1.    Amazon has** ████████████████████ ████████████████████████ ███████████

229.    Amazon ████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████████ █████████

230.    ████████████████████████ ██████████████████████████████████ █████████████████████████████████

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4      231.    In theory, relevant advertisements can be useful to shoppers in some instances.

5 Importantly, Amazon ███████████████████████████████████

6 ██████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ██████████████████████████████████████████████████

9 ██████████████████████████████

10     232.    ████████████████████████████████████████

11 ██████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ██████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 █████████

17     233.    ████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ██████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ██████████████████████████████████████████████████

COMPLAINT - 72
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 ██████████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████ Another senior Amazon

4 executive reportedly compared Amazon's advertising and search divisions to the parable of the

5 scorpion and the frog: it was in the advertising division's nature as the proverbial "scorpion" to

6 poison organic search results.

7     234. ██████████████████████████████

8 ██████████████████████████████████████████████

9 █████████████████████████████████████████

10 █████████████████████████████████████████

11 ██████████████████████████

12     235. By flooding its search results page with paid advertisements, Amazon ████

13 ███████████████████████████████████

14 ████████████████████████████████████████

15 ██████████████████████████████████████

16 ████████████████████████████████████████

17 ██████████████████████████████████

18 ████████████████████████████████████

19 █████████████████████████████████████

20 ██████████████████████████████████████████████

21 █████████████████████████████████████████

22 ██████████████████████████

23     236. As one Amazon executive explained, ████████████████████████

24 ██████████████████████████████████████████████

COMPLAINT - 73
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮ Moreover, because Amazon's anti-

5 discounting conduct punishes sellers who offer lower prices at rival online stores with lower

6 fees, many sellers set their price on Amazon—high fees and all—as the price floor across the

7 internet.

8      237.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮ According to public reports,

11 Amazon engineers found that "[w]hen sponsored ads were prominently displayed, there was a

12 small, statistically detectable short-term decline in the number of customers who ended up

13 making a purchase." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮ While fewer shoppers were finding what they wanted,

15 advertisements were making more money—"[a] lot of it."

16      238.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Despite

21 degrading shoppers' experiences, Amazon continues to have double digit growth in overall sales,

22 not losing meaningful numbers of shoppers to rivals.

23      239.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

COMPLAINT - 74
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

240.     Amazon's ability to profitably worsen its service for customers is a hallmark of monopoly power.

### 2.     Amazon degrades its search quality by stacking the deck against third-party competitors of Amazon's private label products

241.     Amazon further degrades the quality of its search results by burying organic content under recommendation widgets, such as the "expert recommendation" widget, which display Amazon's private label products over other products sold on Amazon.

242.     A recommendation widget is a discrete portion of Amazon's website or mobile app that lets customers scroll through a set of recommended products.  Previously, such widgets were limited to displays like an area on a product's Detail Page indicating what "customers also bought," or an area suggesting shoppers may want to replenish items they had previously purchased, like paper towels.

243.     Amazon

244.

245. ████████████████████████████████████████

246. ████████████████████████

████████ Rather than competing to secure recommendations based on quality, Amazon intentionally warped its own algorithms to hide helpful, objective, expert reviews from its shoppers. One Amazon executive reportedly said that "[f]or a lot of people on the team, it was not an Amazonian thing to do," explaining that "[j]ust putting our badges on those products when we didn't necessarily earn them seemed a little bit against the customer, as well as anti-competitive."

247. ████████████████████████████████████████

1

2

248.    In competitive markets, the possibility of losing business to rivals would tend to pressure a company to create more value for its customers, shoppers and sellers alike.  But Amazon's unchecked dominance allows it to degrade its service without ceding—and indeed while expanding—its business.  The fact that Amazon's degradation of its search results through biased widgets did not cause Amazon to lose sufficient business or to change its behavior further demonstrates its monopoly power.

### 3.    Amazon increases prices to sellers without losing meaningful business

249.    Amazon's monopoly power also allows it to charge higher prices and provide lower quality services to sellers.  As explained in Part IV, above, Amazon charges sellers selling fees, referral fees, fulfillment fees, and advertising fees.  The total price Amazon charges a seller has skyrocketed without a correspondingly large loss of business.

250.    Before Amazon decided to prioritize advertisements as a way to generate revenue, sellers were able to access prominent and valuable search page placement by paying just Amazon's referral and sales fees.  Now, advertised products on Amazon are 46 times more likely to be clicked on when compared with products that are not advertised.  Advertisements are now no longer a discretionary purchase but instead a necessary cost of doing business.  Therefore, sellers must not only pay Amazon's referral fee but must also now pay for advertising in order to reach shoppers.

251.    Amazon has also hiked average fulfillment fees to sellers, which jumped approximately 30% between 2020 and 2022.  Amazon has made these fees, too, a prerequisite to being a successful seller on Amazon.  As described in Part VI.B below, Amazon effectively

1  forces sellers to purchase its fulfillment services to access the full reach of Amazon's

2  marketplace services that Prime eligibility unlocks.

3       252.    By effectively requiring sellers to pay for search placements through advertising

4  and for Prime's shipping costs through FBA, Amazon has dramatically increased the percentage

5  cut it takes out of seller revenues, also known as Amazon's "take rate." Amazon's average take

6  rate for sellers who use FBA ██████████████% in 2014 to ██████████████% in 2022 for

7  essentially the same services. Amazon now takes nearly one out of every two dollars of sales

8  from sellers who use its fulfillment services, many of whom are small businesses with already

9  thin margins. By comparison, ████████████████████████ The fact that such

10  low-margin sellers remain on Amazon even as Amazon takes an ever-greater cut of their

11  revenues shows Amazon's monopoly power.

12       253.    Sellers note that because they depend on Amazon, they effectively have no choice

13  but to submit to Amazon's growing demands. As a third-party seller put it ██████████

14  ████████████████████████████ The seller continued, stating that

15  Amazon's prices ████████████████████████████████████████████

16  ██████████ According to a public article, another seller stated that "[f]or some products, we

17  realized that we need to pay for ads but we'll never profit at our current prices." As a result, that

18  seller had to raise prices to pay for advertising on Amazon.

19       254.    Amazon also recognizes that sellers believe "that it has become more difficult

20  over time to be profitable on Amazon." ████████████████████████

21  ████████████████████████ One of the only ways left for sellers

22  to eke out a profit is to raise the prices paid by shoppers. A seller succinctly explained this

23  dynamic:

24

COMPLAINT - 78
CASE NO. __:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1　[REDACTED]

2　[REDACTED]

3　[REDACTED]

4　　　　255.　　Amazon has hiked its fees even as it has failed to adequately protect sellers'

5　commercially sensitive data, exposing this data to theft and appropriation.  Internally, Amazon

6　recognized [REDACTED]

7　[REDACTED]

8　[REDACTED] Employees also recognized that

9　[REDACTED]

10　[REDACTED] and that [REDACTED]

11　[REDACTED]

12　[REDACTED]

13　[REDACTED]

14　　　　256.　[REDACTED]

15　[REDACTED] Indeed, seller forums on Amazon are rife with

16　complaints about issues ranging from abrupt and arbitrary account suspensions to sellers having

17　their inventory unexpectedly seized with no recourse.  One seller explained that they could not

18　leave Amazon because "[w]e have nowhere else to go and Amazon knows it."  According to an

19　internal Amazon study, Amazon's sellers live "in constant fear" of Amazon arbitrarily

20　interfering with their ability to sell on Amazon, which "put[s] their businesses and livelihoods at

21　risk."  Amazon's ability to profitably hike fees while maintaining its iron grip over sellers is

22　further evidence of its monopoly power.

23

24

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

## VI. AMAZON IS ENGAGED IN A COURSE OF CONDUCT THAT ILLEGALLY MAINTAINS ITS MONOPOLIES IN BOTH RELEVANT MARKETS

257.    Amazon illegally maintains its monopolies through an interrelated course of conduct that blocks competition.  First, Amazon deploys a series of anticompetitive practices that suppress price competition and push prices higher across much of the internet by creating an artificial price floor and penalizing sellers that offer lower prices off Amazon.  Second, Amazon coerces sellers into using its fulfillment service to obtain Prime eligibility and successfully sell on Amazon.  Each of these tactics—independently and collectively—prevents Amazon's rivals from gaining scale and maintains Amazon's monopolies.

258.    Amazon first ensures that no other online rival can gain scale through offering prices lower than those listed on Amazon.  Amazon accomplishes this anticompetitive goal through an interwoven set of algorithmic and contractual tactics, all of which rely on Amazon's massive web-crawling apparatus that constantly tracks online prices.  Amazon's anti-discounting punishments tame price cutters into price followers, effectively halting real price competition. This conduct imposes costs on shoppers and sellers alike.  Shoppers pay inflated prices on and off Amazon, as sellers must effectively submit to Amazon's high fees by raising prices even on non-Amazon sites.  Rivals no longer compete to offer sellers lower fees, since Amazon's anti-discounting conduct prevents sellers from passing those savings on to shoppers.

259.    For sellers, Amazon conditions access to Prime eligibility on sellers' use of Amazon's proprietary fulfillment service, FBA.  Amazon's coercion makes it more difficult and more expensive for sellers to sell on other marketplaces, which in turn makes it more difficult for rivals to attract sellers and compete with Amazon on product selection.  The result is a feedback loop that continues to inhibit the growth of rivals and starve them of scale while maintaining and expanding Amazon's dominant positions.

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

260.     Each element of Amazon's course of conduct mutually reinforces its monopolies in both relevant markets.  For example, Amazon's anti-discounting scheme stifles price competition.  That same scheme also reinforces the exclusionary effects of Amazon's use of Prime eligibility to force sellers to use FBA, by making it even less profitable for sellers to sell on other marketplaces.  This feedback loop fuels a flywheel of anticompetitive harm, amplifying the aggregate effects and further widening the gulf between Amazon and everyone else.

261.     Because Amazon suppresses meaningful competition on price and product selection, shoppers lack viable alternatives, further forcing sellers to submit to Amazon's exclusionary tactics to reach those customers, and further allowing Amazon to accelerate and expand its dominance.  Together, Amazon's conduct blocks off competition, shopper traffic, and seller business in the interrelated relevant markets.

**A.      Amazon Maintains Its Monopolies In Both Relevant Markets Through Exclusionary Anti-Discounting Conduct That Stifles Price Competition**

262.     A core Amazon strategy is to limit one of the most fundamental avenues of competition: price competition.  Amazon understands the importance of maintaining the *perception* among shoppers that it has the lowest prices.  But in reality, Amazon relentlessly stifles actual price competition by punishing sellers who offer lower prices anywhere other than Amazon and disciplining rivals that undercut Amazon's prices.

263.     Amazon uses a variety of tactics to execute its anti-discounting strategy.  At the foundation is Amazon's sprawling price-surveillance group, the ██████████████████ which constantly crawls the internet for prices.  Using this price-surveillance team, Amazon punishes third-party Marketplace sellers who offer lower prices on other online stores.  Amazon imposes additional contractual obligations suppressing price competition on its most important sellers, backed up by the threat of even stronger penalties—including total banishment from

1    Amazon's Marketplace.  Amazon also deters rivals from even attempting to compete with

2    Amazon's first-party Retail business on price by ensuring that rivals' price cuts do not result in

3    greater scale, only lower margins.

4         264.    Combined, Amazon's conduct quashes one of the most direct ways to compete

5    with Amazon in both relevant markets: by offering lower prices.  In an open, competitive

6    environment, rival online superstores could attract more business by offering shoppers lower

7    prices, and rival online marketplaces could attract sellers by charging them lower fees, allowing

8    sellers to pass those savings on to shoppers via lower prices.  Amazon suppresses this price

9    competition by wielding its monopoly power to prevent sellers and retailers from offering lower

10   prices off Amazon.

11        265.    Without the ability to attract shoppers or sellers through lower prices, rivals are

12   unable to gain a critical mass of either shoppers or sellers despite needing both to compete

13   against Amazon.  Further, by punishing sellers when there are lower prices off Amazon and

14   disciplining rivals that try to compete on price, Amazon teaches shoppers not to look for lower

15   prices off Amazon.  Less comparison shopping again hinders rivals from gaining a larger

16   consumer base.  Amazon's anti-discounting strategy therefore denies rivals the ability to gain

17   scale, cements Amazon's dominance in both relevant markets, and ultimately keeps prices higher

18   than they would be in a competitive market.

19        **1.    Amazon engages in price surveillance to support its anti-discounting**

20             **scheme**

21        266.    The foundation of Amazon's anti-discounting scheme is an extensive price-

22   tracking operation housed within ███████████████████████████████

23   ████████████████████████████████████████

24

COMPLAINT - 82
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

267.    Amazon's

268.    Amazon

**2.      Amazon maintains its monopolies by punishing third-party sellers when Amazon detects lower prices on other online stores**

269.    Using its vast surveillance network, Amazon systematically punishes sellers when Amazon detects a lower price on other online stores.  Amazon does this in two ways.  One way Amazon punishes sellers is by disqualifying a seller's offer from appearing in the Buy Box when Amazon finds a lower price on another online store for an item being sold by a seller on Amazon.  For many sellers, losing the Buy Box—and even the ability to qualify for the Buy Box—is an existential threat to their business.  Amazon has amassed and maintains a huge shopper base, making Amazon a vital sales channel for many sellers.  The second way Amazon punishes sellers is by imposing contractual obligations on certain important sellers, backed up with the threat of even stronger penalties, including total banishment from Amazon's Marketplace.

270.     As a result of Amazon's threats and punishments, even rival platforms that charge sellers less than Amazon for marketplace services would not be able to draw shoppers through lower prices.

271.     Amazon not only suppresses the ability of sellers and retailers to offer lower prices elsewhere, but its conduct effectively *elevates* prices even off Amazon.  Because Amazon has steadily hiked the fees it charges sellers while also prohibiting them from discounting on other websites, sellers must often use their inflated Amazon prices as an artificial price floor everywhere.  As a result, Amazon's conduct causes online shoppers to face artificially higher prices even when shopping somewhere other than Amazon.

          *a.*        ***Amazon penalizes sellers when Amazon finds lower prices off Amazon***

272.     Amazon's anti-discounting strategy has taken several forms.  Amazon originally included a clause in its Business Solutions Agreement—a contract every seller must agree to—that explicitly prohibited sellers from offering lower prices elsewhere.  From at least as early as ▋ until March 2019, this contract required each seller to "maintain [price] parity" between Amazon and other online sales channels.  This meant that a seller could not offer lower prices on other online stores without breaching their Amazon contract, even when their selling costs were lower on those stores.

273.     After European competition authorities launched multiple investigations into Amazon's price parity clauses, Amazon dropped this requirement in Europe in August 2013.

274.     In December 2018, U.S. Senator Richard Blumenthal sent public letters to the Federal Trade Commission and the U.S. Department of Justice expressing "deep[] concern[] that the price parity provisions in Amazon's contracts with third-party sellers could stifle market competition and artificially inflate prices on consumer goods."  Three months later, Amazon

COMPLAINT - 84
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   quietly stopped its practice of applying this particular contractual price parity provision to all

2   sellers.

3       275.    Despite making this particular change, Amazon never abandoned its strategy of

4   preventing sellers from offering lower prices elsewhere.  Instead, Amazon ███████████

5   ████████████████████████████████████████████████

6   ████████████████

7       276.    An internal Amazon document written weeks after Amazon dropped its

8   contractual price parity requirement acknowledged that Amazon intended to use ████████ to

9   enforce its "expectations and policies," which "ha[d] not changed."  Whether done contractually

10  or algorithmically, Amazon requires sellers to keep prices off Amazon as high or higher than

11  prices on Amazon.  Amazon uses ████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████ "not only trivial but a trick and an attempt to garner goodwill with policymakers

14  amid increasing competition concerns."

15      277.    ████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████ If Amazon disqualifies every

18  offer for a given product from winning the Buy Box, Amazon removes the Buy Box itself from

19  the product's Detail Page.

20      278.    ████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  ███████████████████████████████████████████

2  ████████████████████

3  279.  ████████████████████████████████

4  ██████████████████████████████████████████████

5  ██████████████████████████████████████████████

6  ███████████████████████████████████████████████

7  ██████████████████████

8  280.  ████████████████████████████████

9  ██████████████████████████████████████████████

10  ███████████████████████████████████████████████

11  ██████████████████████████████████████████████

12  ██████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  █████████████

15  281.  Today, Amazon tells sellers that they will be punished if Amazon detects a lower

16  price on any other online store.  In 2022, for example, Amazon explained to thousands of sellers

17  that a "pre-requisite" to "win[ning] the 'Buy Box'" is to ensure that lower prices are never

18  available off Amazon.

19  282.  ████████████████████████████████

20  ██████████████████████████████████████████████

21  ███████████████████

22  283.  Today, Amazon ███████████████████████

23  ███████  by wielding a suite of penalties to bury products ██████████  including:

24  (a) demoting them in search results;

1          (b) ████████████████████████

2          (c) ████████████████████████ and

3          (d) ████████████████████████████

4     284.   ████████████████████████████

5   ███████████████ Amazon itself recognizes that removing a seller from the Buy Box causes

6   their sales to "tank."  Offers outside of the Buy Box comprise less than ██% of all purchases on

7   Amazon.

8     285.   Amazon's penalties effectively deter sellers from offering prices elsewhere that

9   are lower than their prices on Amazon, even where their costs are lower through other online

10  sales channels.  That in turn limits the ability of other online superstores to offer prices lower

11  than those on Amazon, hindering the growth of would-be rivals and denying them the scale

12  necessary to compete.

13          ***b.      Amazon continues to contractually prohibit its most important***

14                 ***sellers from discounting elsewhere***

15    286.   Amazon places additional limits on certain sellers' ability to sell products at lower

16  prices on other online stores.  These restrictions are embedded in the "Amazon's Standards for

17  Brands" ("ASB") program.

18    287.   Amazon applies ASB to brands, brand licensees, and brand representatives that

19  use Amazon's Marketplace ("ASB sellers"), regardless of whether their brand is a long-

20  established household name or an upstart few people would recognize.  ██████████████████

21  ██████████████████████████████

22    288.   ASB sellers are an especially important type of seller to Amazon for two reasons.

23  First, ASB sellers constitute ████████████████████████████████████

24  ████████████████████████████████████████

1    ████████   In 2021, ██% of Amazon Marketplace sales were by ASB sellers, and Amazon

2    projected they would sell more than ██████████ of products on Amazon in 2022.

3    289.    Second, because of their close relationship with the brands they sell, ASB sellers

4    have more influence over brand prices and selection across channels than "resellers," which lack

5    such a relationship.  As a founding member of the team responsible for ASB explained, ████

6    ████████████████████████████████████████████████████████████

7    ████████████

8    290.    Amazon implemented ASB in September 2018 through an amendment to the

9    Business Solutions Agreement.  All sellers, including ASB sellers, must agree to Amazon's

10    Business Solutions Agreement in order to sell on Amazon's Marketplace.  The ASB restrictions

11    are therefore binding contractual obligations that Amazon imposes on ASB sellers.

12    291.    Through ASB, ██████████████████████████████

13    ████████████████████████████████████████████████████████████

14    ████████████

15    292.    Amazon also ████████████████████████████████████

16    ████████████████████████████████████████████████████████████

17    ████████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████████████

20    ████████████████████

21    293.    ██████████████████████████████████████

22    ████████████████████████████████████████████████████████████

23    ████████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████████

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮

5     294.    Amazon threatens an ASB seller's "privileges"—including the "privilege" to

6 "operate as a seller in the Amazon store altogether"—if the ASB seller violates any part of ASB.

7 In other words, Amazon threatens not just to kick ASB sellers' offers out of the Buy Box but to

8 boot them out of Amazon's Marketplace altogether if ▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮

11     295.    In addition to revoking some ASB sellers' selling privileges in full by shutting

12 down their seller accounts, Amazon also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮▮▮ under the guise of ASB policy

14 enforcement, Amazon ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮

16     296.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮

21     297.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

2

3

4

5

6     298.

7

8     299.    In 2019, Amazon

9

10

11

12

13

14     300.    In late 2021,

15

16

17

18     301.    Amazon

19

20

21     302.    The Amazon team responsible for ASB has

22

23

24

COMPLAINT - 90
CASE NO. _:__-cv-_____

1   ████████████████████████████████████████

2   █████████████████████████████████████████

3   ███████████████████████████████████████

4   █████████████████████████████████████

5   ████████████████████████████

6   303.   ████████████████████████████████████████

7   █████████████████████████████████████████

8   █████████████████████████████████████████

9   █████████████████████████████

10   304.   ASB—████████████████████—are thus additional elements working across

11   Amazon's business in tandem with Amazon's other strategies that punish off-Amazon

12   discounting, stifle competition, impede the growth of potential competitors, hike prices, and

13   degrade quality for consumers in the relevant markets.

14   *c.*   ***Amazon's anti-discounting strategy prevents rivals and sellers***

15   ***from offering lower prices and deprives rivals of scale necessary***

16   ***to compete***

17   305.   By suppressing competition in the online superstore and marketplace services

18   markets, Amazon's anti-discounting strategy artificially inflates prices.  Shoppers and sellers pay

19   more, and Amazon reaps the benefits.

20   306.   Amazon's one-two punch of high fees and seller threats forces sellers to use their

21   inflated Amazon prices as a price floor everywhere else they sell online.  As a result of

22   Amazon's conduct, shoppers often have no choice but to pay *at least* the price in Amazon's Buy

23   Box even when they buy online somewhere other than Amazon.

24

307.     Sellers generally price their goods to at least cover their costs, including fees charged by online marketplace services providers (such as those discussed in Part IV, above). Thus, the seller's shopper-facing price depends on the amount of fees charged by different marketplaces.

308.     As discussed in Part V.D.3, above, the cost of doing business is higher on Amazon than on other marketplaces—and Amazon has steadily hiked the fees it charges sellers, ███████████████████████████████

309.     Because Amazon has steeply raised its fees, sellers need to charge higher prices on Amazon than they would on a less-costly marketplace to make the same per-unit profit. Amazon's high fees should present other online superstores with an opportunity that would make shoppers, sellers, and themselves better off: if those superstores can offer sellers lower fees, sellers could offer shoppers lower prices while making the same or a higher profit margin, which should cause shoppers and sellers alike to flock to the less-costly online store.

310.     Amazon has destroyed this competitive dynamic by algorithmically forcing sellers to ensure that their prices off Amazon are no lower than their prices on Amazon, regardless of the relative costs.  Similar anticompetitive effects flow from ASB, which contractually prevents brands from offering lower prices elsewhere online even when it would be profitable for them to do so, including on their own websites.

311.     Amazon internally recognizes that ████████████████████ ████████████████████████████████ ██████████████████████████████ ████████████████████████████████ ████████████████████

COMPLAINT - 92
CASE NO. _:__-cv-_____

312.　███████████████████████████████████
█████████████████████████████████████████████
██████████████████████ For instance, one seller told Amazon that ███████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████ Sellers have also complained to Amazon
"that [Buy Box disqualification] encourages Sellers to raise their prices on competitor websites."

313.　One Amazon seller █████████████████████████████
███████████████████████████████████████████████
████████████████████

314.　Another seller ████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████

315.　Amazon understands that its anti-discounting strategy generally does not have the
effect of lowering prices on Amazon because sellers must pay the high fees charged by Amazon.
A 2017 Amazon internal memo observed that Buy Box disqualification "has not led Sellers to
lower their prices" and "has not motivated Sellers to reduce prices." ███████████████
██████████████████████████████████████ "it has become
more difficult over time [for sellers] to be profitable on Amazon."  As discussed in Part V.D.3,
above, the fees Amazon charges sellers have ballooned ████████████████████
███████████

316.　The primary and intended effect of Amazon's anti-discounting strategy is that
sellers do not offer lower prices off Amazon even if other online marketplaces offer sellers lower
costs.

1    317.    This effect is intensified for sellers subject to ASB.  While Amazon's algorithmic

2    anti-discounting punishment focuses on individual products, Amazon's enforcement of ASB

3    threatens an ASB seller's ability to sell anything at all as a third-party seller on Amazon's

4    Marketplace.  ASB's threatened contractual punishments could therefore effectively cut off a

5    huge channel for sellers.  In that way, ASB is broader in scope than any particular instance of

6    Amazon's algorithmic third-party punishment, making it even more likely that Amazon's

7    punitive program deeply chills discounting by ASB sellers off Amazon.

8    318.    ███████████████████████████████████████

9    ███████████████████████████████████████

10   ███████████████████████████████████████

11   ████████████████████████████████████████

12   ███████████    The force and fear of Amazon's tactics are so strong that actual punishment is

13   often not necessary.  The threat alone can be enough.

14   319.    For example, ██████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████

17   Amazon's anti-discounting punishments also limit the extent to which sellers sell on other online

18   marketplaces, where sellers can control the final prices offered to customers.  █████████

19   ██████████████████████████████████████

20   ███████████████████████████████████████

21   ███████████████████████████████████████

22   █████████████████████████████████████

23   320.    Amazon's anti-discounting conduct reverberates throughout both relevant markets

24   because of Amazon's dominance in each market.  For example, ██████████████████

1 ████████████████████████████████████████

2 ████████ However, ██████████████████████

3 █████████████████████████████████████████

4 ███████

5    321.   ██████████████████████████████

6 ██████████████████████████████████████████

7 █████████████████████████████████████████

8 █████████████████████████████████████████

9 ████████████████████████████████████

10 ███████████████████████████████████

11 ████████████████████████████████████████

12 ███████████████

13    322.   ██████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 ██████ This is not a healthy, competitive market.

17    323.   ██████████████████████████████

18 █████████████████

19    ████████████████████████████████████

20    ████████████████████████████████████

21    ██████████████████████████████████

22    324.   In total, Amazon's anti-discounting conduct helps maintain Amazon's

23 monopolies by stifling competition in both relevant markets, denying scale to rivals, harming

24 sellers, and depriving shoppers of lower prices.

COMPLAINT - 95
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

3.     **Amazon maintains its monopolies by suppressing price competition with its first-party anti-discounting algorithm**

325.     For Retail products that Amazon prices and sells itself, Amazon deploys a similar anti-discounting program that it implements through another pricing algorithm.  While the exact mechanism differs from the mechanisms Amazon uses to punish sellers, the means, motive, and effects are all the same.  Amazon uses its extensive surveillance network to block price competition by detecting and deterring discounting, artificially inflating prices on and off Amazon, and depriving rivals of the ability to gain scale by offering lower prices.

a.     *Amazon's first-party anti-discounting algorithm is designed to discipline rivals from lowering their prices*

326.     Amazon designed and implemented a first-party anti-discounting algorithm to deter other online stores from offering lower prices than those of Amazon's Retail products.  Amazon recognizes the importance of maintaining the *perception* that it has lower prices than competitors.  Behind closed doors, however, Amazon executives actively ███████████ █████████████████████████

327.     Amazon's former ████████████████████████████ ███████████████████████████████ ████████████████████████████████ ███████████████████████████████ ████████████████

328.     Instead, ███████████████████████ ████████████████████████████ ████████████████████████████ ██████████████████████████████ "prices will go up."

COMPLAINT - 96
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

329.    When using its first-party anti-discounting algorithm, Amazon disciplines rivals by ███████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

330.    In effect, Amazon deters rivals from even attempting to compete with Amazon's first-party Retail business on price because rivals quickly learn that their price cuts do not result in greater market share or scale, only lower margins.

331.    In an open and competitive market, rivals can compete to attract business by offering lower prices to shoppers.  Instead, Amazon has committed to its first-party anti-discounting pricing strategy because that strategy deters rivals from price competition and prevents rivals from drawing business and gaining market share.  Amazon's algorithmic process unfolds over and over to discipline rivals who dare to lower their prices, conveying to them that they will not gain business through competing on price.  As a result, Amazon has successfully taught its rivals that lower prices are unlikely to result in increased sales—the opposite of what should happen in a well-functioning market.

332.    By relentlessly disciplining rivals, Amazon forecloses the give and take that is typical in a competitive market and limits rivals' ability to gain customers by undercutting Amazon's prices.  The result is that rivals' growth is stunted, and shopper prices are pushed higher than they would be in a world without Amazon's anti-discounting scheme.  According to

COMPLAINT - 97
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    ███████ Amazon's first-party anti-discounting algorithm has "work[ed]" ████████

2    ██████

3         **b.      *Amazon's first-party anti-discounting algorithm has stopped***

4              ***other online stores from competing through offering lower prices***

5         333.    Though the different elements of Amazon's anti-discounting strategy often work

6    in tandem to stifle competition (as discussed in Part VI.A.4, below), Amazon's first-party anti-

7    discounting algorithm has, on its own, deterred other online stores from competing through

8    lower prices.

9         334.    For example, Amazon's first-party anti-discounting scheme successfully deterred

10   price competition in 2017 when ██████ introduced a ████████████████

11   ████████████████████████████████████

12   ██████████████████████████████████

13   ████████████████████████████████████

14   █████████████████████████████████

15   ██████

16        335.    Amazon concluded that its first-party anti-discounting strategy ultimately helped

17   induce ██████ to stop competing on price through its pickup discount program.  In an internal

18   planning and strategy document, Amazon determined that its first-party anti-discounting

19   algorithm created a ████████████████████████████

20   ██████████████████

21        336.    In response to Amazon's anti-discounting conduct, ████████████

22   █████████████████████████████████

23   █████████████████ Amazon estimated that ████████████

24   ████████████████████████████

COMPLAINT - 98
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

337.    At one point in 2019, after enduring years of Amazon's algorithmic disciplining,

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

**4.      Amazon combines its various anti-discounting programs to maximize**

**their collective anticompetitive effect**

338.    Amazon uses all of its various anti-discounting programs—and the combined

power of its Marketplace and Retail arms—to limit price competition and comparison shopping

for the hundreds of billions of dollars in goods sold annually in the relevant markets.  This

suppression of price competition and comparison shopping also artificially contributes to

converting more shoppers into Prime subscribers.

339.    Amazon's seller-disciplining tactics and first-party anti-discounting algorithm are

each powerful on their own (as explained in Parts VI.A.2.c and VI.A.3.b, respectively), but the

whole of their combined anticompetitive impact is significantly greater than the sum of their

individual effects.

340.    In 2016, Amazon used various elements of its anti-discounting strategy to

hamstring ███████████ a new online superstore that planned to compete against Amazon by

offering shoppers and sellers lower prices.  Amazon feared that ████████████████

████████████████████████████████████████████████████

██████████████████████████████████████   Amazon predicted that

COMPLAINT - 99
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    ███████████████████████████████████████ In Amazon's

2    estimation ████████████████████████████████████

3    ████████████

4         341.    Amazon responded to ████ launch by activating the combined might of its

5    Marketplace and Retail businesses.  With respect to the Marketplace business, Amazon ██████

6    █████████████████████████████████████████

7    ██████ On the Retail front, █████████████████████████████████████

8    ████████████

9         342.    The combined force of Amazon's anti-discounting schemes worked.  Less than

10   three months after ████ launched, ████ was forced to ██████████████████████

11   █████████████████████████████████████

12   ███████████████████████████████████████

13   ██████████████████████████████████████

14   ███████████████

15        343.    More recently, Amazon used the same combination of its anti-discounting

16   strategies to target ██████ a potential entrant to the online superstore market specializing in

17   homeware, children's products, and women's clothing.  Until recently, ███████ primary strategy

18   was to offer shoppers deep discounts on various products during limited time "flash sales."

19   ██████ endeavored to offer the "lowest price online" during those sales.  This meant beating

20   Amazon's prices.

21        344.    In late 2019, ██████ rolled out a █████████████████ initiative that displayed its

22   lower price alongside the higher prices of identical products on Amazon or Walmart.com.  This

23   is a classic form of price competition that should flourish in a competitive market.

24

COMPLAINT - 100
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

345.     To Amazon, this price competition was intolerable—and so it set out to destroy it. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ In 2019, for example, Amazon's estimated U.S. sales volume was approximately 100 times greater than ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆

346.     Amazon activated its Marketplace arm against ▆▆▆ by punishing sellers.  Its seller punishments quickly stopped many ▆▆▆ suppliers that were also Amazon sellers from offering lower prices on ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆

347.     Amazon also swung its Retail business into action, applying its first-party anti-discounting algorithm to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆

348.     After Amazon began using the combined force of its Marketplace and Retail anti-discounting strategies ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████

349.     Facing the full brunt of Amazon's anti-discounting conduct, ████████

████████████████████████████████ After a few months,

████████████████████████████████████

████████████████

350.     In sum, Amazon's monopolistic anti-discounting conduct blocks critical avenues of competition in both relevant markets through its anti-discounting practices.  Amazon's conduct denies rivals scale, stifles innovation, deadens price competition, reduces output, and deprives the American public of lower prices.

**B.     Amazon Maintains Its Monopolies In Both Relevant Markets By Coercing Sellers To Use Amazon's Fulfillment Service**

351.     Amazon maintains its monopolies in both relevant markets by coercing sellers to use FBA, thereby denying rival online marketplace services providers and superstores the ability to gain the scale needed to compete meaningfully against Amazon in both relevant markets.

352.     Prime eligibility is a basic prerequisite for sellers to fully access Amazon's substantial base of shoppers, making it a critical aspect of the marketplace services Amazon offers to sellers.  When a seller's product is Prime eligible, it receives the Prime badge.  For sellers, this designation boosts their chance of winning the Buy Box and making significant sales, while sellers who forgo Prime eligibility effectively disappear from Amazon's storefront. For shoppers that are Prime subscribers, the Prime badge denotes that a purchase of the product will not include additional shipping and handling costs, often making these products more attractive.

COMPLAINT - 102
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

353.    Amazon exploits sellers' demand for access to Prime eligibility by generally conditioning that access on use of Amazon's proprietary fulfillment service, FBA, even though other fulfillment options could provide comparable or better service.

354.    Sellers who use FBA must relinquish physical control over their products and place them in Amazon's fulfillment centers, which principally can be used to serve only Amazon customers.  As a result, a seller who wants to sell both to Amazon and non-Amazon customers must maintain a separate supply of inventory dedicated exclusively to non-Amazon customers and engage a separate fulfillment provider to serve those non-Amazon customers.

355.    Absent Amazon's restrictions, many sellers would prefer to use an independent fulfillment provider that would allow them to more easily fulfill orders placed on both Amazon and non-Amazon marketplaces.  That, in turn, would increase the ability of rival online marketplace services providers to compete for sellers' business and increase the ability of rival online superstores with marketplaces to compete by offering greater product selection to shoppers.  Conditioning a product's Prime eligibility on its seller's use of FBA maintains Amazon's monopoly in both relevant markets in two main ways.  First, it raises the cost of multihoming, forcing sellers who sell through more than one online superstore to bear the increased costs of using multiple fulfillment providers.  Second, it forecloses independent fulfillment providers from competing to fulfill Prime orders on Amazon, depriving those independent providers of an important source of business and scale needed to build out an efficient fulfillment network.  Because fewer sellers can cost-effectively multihome, rivals and potential rivals to Amazon are deprived of product selection.

356.    In the relevant online superstore and online marketplace services markets where scale and network effects insulate incumbents from competition, the effects of Amazon's conduct continuously compound as it diminishes sellers' incentive and ability to multihome.

COMPLAINT - 103
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

357.    Amazon's conduct constrains its rivals' ability to compete, harming shoppers and competition in both relevant markets and entrenching Amazon's monopoly.  By making it more expensive for sellers to sell the same product on multiple online superstores and marketplaces, Amazon artificially limits rivals' ability to gain sufficient growth, momentum, and scale to draw a critical mass of shoppers and meaningfully compete.

### 1.    Sellers who forgo Prime eligibility effectively disappear from Amazon's storefront

358.    In 2021, over ████████ U.S. consumers, or approximately ██% of U.S. households, subscribed to Amazon Prime.  Prime subscribers account for an overwhelming share of all purchases on Amazon—more than ██% of all purchases by dollar value in 2021.  Prime subscribers also disproportionately purchase Prime-eligible offers.  For example, more than ██% of the items U.S. Prime subscribers purchased in the third quarter of 2021 were Prime eligible. In the first quarter of 2021, U.S. Prime subscribers bought nearly ████ Prime-eligible products for every one non-Prime-eligible product they purchased.

359.    For many sellers, having Prime-eligible products is a prerequisite to making significant sales on Amazon.  The Prime designation makes sellers' products more discoverable—and therefore likely to be purchased— ████████████████████ ███████████████████████████ ██████████████████████████ ███████████████████████████ ██████████████

360.    Overall, Prime eligibility alone regularly ██████ a seller's sales on Amazon. Meanwhile, sellers who forgo Prime eligibility effectively disappear from Amazon's storefront. Amazon relegates non-Prime-eligible products to a near-invisible, second-rate version of

COMPLAINT - 104
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Amazon's Marketplace.  Without Prime eligibility, ███████████████████████████

2  ███████████████████████████████████████████████████████████████

3  ████████████████████████████  Ready access to online shoppers is a

4  critical aspect of online marketplace services, but Amazon effectively conditions access to a

5  substantial portion of its shoppers on sellers also buying FBA services.

**2.      Amazon requires sellers to use FBA to obtain Prime eligibility**

7  361.    Amazon requires sellers to use FBA for their products to obtain Prime eligibility,

8  even though many sellers would prefer to use an alternative fulfillment method.  As the former

9  head of FBA put it, ███████████████████████████████████████████

10  ████████████████████████████████████████████

11  362.    Mr. Bezos explained in his 2014 letter to Amazon shareholders that "FBA is so

12  important because it is glue that inextricably links Marketplace and Prime.  Thanks to FBA,

13  Marketplace and Prime are no longer two things. . . .  Their economics . . . are now happily and

14  deeply intertwined."

15  363.    One internal Amazon study found that ██████████████████████████

16  ████████████████████████████████████████████████████████████

17  ███████████████████  According to another internal study, ████████████████

18  ████████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████  In other

20  words, ██████████████████████████████████████████

21  ████████████████████

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1          **3.**       **By forcing sellers to use FBA for their products to be Prime eligible,**

2                  **Amazon raises sellers' costs of selling on multiple marketplaces,**

3                  **stifling competition in both relevant markets**

4        364.    By tying Prime eligibility to FBA, Amazon restricts sellers' choices about which

5 fulfillment provider they use, stifling multihoming and thus harming competition in both the

6 online marketplace services and online superstore markets.  Many sellers would prefer to use a

7 single fulfillment network for all their online orders, on and off Amazon.  Indeed, as Amazon's

8 Vice President of Worldwide Selling Partner Services reportedly recognized recently, "[a] seller

9 doesn't want to have two sets of supply-chain services, one that's for Amazon and one that's for

10 someone else."  By forcing sellers to use FBA for their products to be Prime eligible, Amazon

11 functionally forecloses that option for sellers.

12        365.    Without Amazon's coercion, sellers could more easily offer their products to

13 shoppers via multiple outlets, including other online superstores and marketplaces.  They could

14 also use a single fulfillment provider of their choice and pass associated savings on to their

15 customers across all online sales channels, including Amazon.  Amazon's rivals, in turn, could

16 gain scale by attracting new sellers to their marketplaces and offering new selection to shoppers.

17 Amazon fears that world, and so it uses Prime eligibility to foreclose it from coming to pass.

18        366.    Amazon's conduct blocks competition for sellers and the ability of online

19 superstores to gain those sellers' product selection in two interrelated ways.  First, Amazon

20 forces sellers who want to make Prime-eligible offers on Amazon and to sell through other sales

21 channels to use two duplicative fulfillment operations instead of saving costs by consolidating

22 inventory with a single fulfillment provider.  Second, Amazon forecloses a significant volume of

23 orders from independent fulfillment providers by making FBA effectively the only fulfillment

24 option available for Prime-eligible orders.  By essentially forcing sellers to use FBA, Amazon

COMPLAINT - 106
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  deprives independent fulfillment companies of an important source of scale that is necessary to

2  develop efficient fulfillment networks.  Sellers are less likely to commit inventory to independent

3  fulfillment providers that do not have the scale to efficiently serve their needs, and without cost

4  effective and efficient fulfillment operations, sellers are less likely to sell across multiple online

5  marketplaces.  Thus, Amazon's tying of Prime eligibility to FBA usage raises the cost of

6  multihoming, making it harder and more expensive for sellers to sell on alternative online

7  marketplaces and more difficult for online superstores to attract sellers and expand their product

8  selection.

9       367.    These twin mechanisms harm competition in the online retail fulfillment services

10  market while also stifling competition in both relevant markets.  They do so by raising the costs

11  Amazon sellers must incur to do business with other online superstores and online marketplace

12  services providers.  Some sellers cope by simply not selling anywhere other than Amazon.

13  Others are pressured to pass on higher costs in the form of higher prices, slower shipping speeds,

14  or both.  As a result, by tying Prime eligibility to FBA, Amazon reduces product selection

15  available to Amazon's rivals, thereby degrading quality for shoppers and raising sellers' costs,

16  which can lead to price increases for shoppers.

17           a.    **Amazon raises sellers' costs by forcing them to split their**

18                **inventory to sell across multiple sales channels**

19       368.    Because Amazon forces sellers to use FBA to receive Prime eligibility, sellers

20  who do not want to sell solely through Amazon must split their physical inventory by putting

21  inventory for Amazon orders into FBA and inventory for non-Amazon orders in a different

22  fulfillment network, such as one operated by an independent fulfillment provider.

23       369.    Splitting inventory among multiple fulfillment networks raises the costs for sellers

24  to offer products for sale through multiple sales channels by, among other things:

COMPLAINT - 107
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    (a) ███████████████████████████████████

2    ██████████████████████████████████

3    (b) ███████████████████████████████████

4    ████████████████████████████

5    (c) ██████████████████████████████████████

6    ███████████████████████

7    (d) ███████████████████████████

8    ████████████████████████

9    (e) ████████████████████████████████████

10   █████████████████████████████████████

11   ██████████ and

12   (f) ████████████████████████████████

13   ██████████████████████████████████

14   ████████████

15       370.    For these reasons, many sellers would prefer to commit all of their inventory to a

16   single independent fulfillment provider of sufficient scale to facilitate sales across Amazon and

17   non-Amazon sales channels.

18       371.    Amazon recognizes that ██████████████████████████████

19   ██████████████████████████████████████

20   ██████████████████████████████████████

21   ██████

22       372.    █████████████████████████████████

23   ██████████████████████████████████ By

24

COMPLAINT - 108
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  foreclosing these sellers from using a single independent fulfillment provider, Amazon

2  effectively forces these sellers to sell exclusively on Amazon.

3      373.    For sellers who do offer their products across multiple online sales channels,

4  Amazon's tying Prime eligibility to FBA imposes unnecessary and additional costs that can lead

5  to higher product prices, reduced seller profitability, and fewer sales.  This, in turn, reduces

6  sellers' incentives to offer their products and invest resources into selling on multiple online

7  superstores by purchasing services from multiple online marketplaces.

8      374.    Because most sellers must sell Prime-eligible products on Amazon to be

9  successful, tying Prime eligibility to FBA increases sellers' costs by forcing them to use multiple

10  fulfillment providers to sell off Amazon.  Amazon's conduct hinders other online marketplaces'

11  ability to attract sellers and impedes online superstores' ability to offer enough product selection

12  to compete meaningfully with Amazon.  This conduct also artificially contributes to converting

13  more shoppers into Prime subscribers.

14              **b.      *Forcing sellers to use FBA to obtain Prime eligibility impedes***

15                         ***competition and the growth of independent fulfillment providers***

16      375.    Amazon's coercive conduct that forces sellers to use FBA forecloses significant

17  volumes of business from independent fulfillment providers that could facilitate seller

18  multihoming across multiple online marketplaces and superstores.

19      376.    By forcing sellers to purchase FBA to ensure that their products are Prime

20  eligible, Amazon artificially walls off a massive volume of Prime-eligible orders from

21  competition, instead funneling it solely into FBA.  In so doing, Amazon harms competition in the

22  market for online retail fulfillment services.  Amazon's foreclosure of competition in the online

23  retail fulfillment services market helps maintain Amazon's monopolies in the online marketplace

24  services and online superstore markets.

COMPLAINT - 109
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

377.    Online retail fulfillment services include storing, picking (i.e., retrieving from storage), packaging, and preparing items purchased by shoppers online for delivery.  Sellers purchase online retail fulfillment services to complete online orders placed by shoppers.

378.    Online retail fulfillment services are discrete and separate from online marketplace services.  Online marketplace services enable sellers to offer items for sale to online shoppers, whereas online retail fulfillment services are focused on physically storing and preparing items for delivery to shoppers.

379.    These services are offered to sellers at distinct prices and pricing structures compared to online marketplace services.  For example, Amazon charges sellers that use its "Professional" plan to access its Marketplace on a monthly basis whether or not any sale is made.  But Amazon's fulfillment fees are based on the item's size and weight, as well as how long Amazon had to store it before fulfilling the order.

380.    Demand for online retail fulfillment services is separate from demand for online marketplace services.  Sellers often choose to purchase these services separately.  And online retail fulfillment services are frequently provided by distinct suppliers.

381.    Providers of online retail fulfillment services must have fulfillment facilities in the United States to timely and reliably serve U.S.-based shoppers.  Online retail fulfillment services providers that do not have U.S. fulfillment facilities generally are not substitutable for U.S. online retail fulfillment providers.

382.    Amazon, through FBA, is by far the largest U.S. supplier of online retail fulfillment services.  In 2020, Amazon fulfilled orders for over ███████ items using more than 200 U.S. fulfillment centers.

383.    As the sheer size of Amazon's fulfillment operations suggests, the online retail fulfillment services market benefits from economies of scale.  Online retail fulfillment service

COMPLAINT - 110
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   providers can ship products faster and cheaper when they can place products closer to the end-

2   consumer by having a large network of fulfillment centers.  These speed and cost savings may be

3   shared with shoppers via faster deliveries and cheaper products.

4       384.   Amazon recognizes that █████████████████████████████

5   █████████████  Amazon measured ████████████████████████████████████

6   ██████████████████████████████████████████████████████████████████

7   ████████████████████

8       385.   Independent fulfillment providers, too, benefit from large fulfillment volumes that

9   can help them scale and reduce costs.  But by tying Prime eligibility to FBA use, Amazon

10  effectively removes the opportunity for online fulfillment providers to compete for Prime order

11  volumes—locking in those volumes for FBA alone.

12      386.   This foreclosure denies independent fulfillment providers an important source of

13  scale that may contribute to their growth, allow them to take advantage of volume-based cost

14  savings, and help them build the infrastructure necessary to efficiently fulfill orders for products

15  sold online.

16      387.   Unlike Amazon's FBA, independent fulfillment providers are agnostic about the

17  channel from which sales originate.  These independent logistics firms let sellers offer products

18  seamlessly across multiple marketplaces and online superstores.

19      388.   In contrast to independent fulfillment providers, Amazon's FBA service only

20  fulfills orders placed on Amazon's Marketplace.  Sellers cannot use FBA to fulfill orders off

21  Amazon.  To fulfill orders off Amazon, sellers can pay an additional fee for a separate Amazon

22  fulfillment service.  ████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████

COMPLAINT - 111
CASE NO. _:__-cv-_____

389.     In a competitive world, the growth of independent fulfillment providers could erode Amazon's monopoly power in the relevant markets.  Successful independent fulfillment providers could foster competition among marketplaces by breaking down the barrier to efficiently selling across marketplaces.  That, in turn, could open up rival online superstores' and online marketplace services providers' ability to attract sellers' business and product selection.

390.     Amazon's former head of Global Fulfillment Services internally voiced ███ ████████████████████████████████████████████████████████████ ██████████████████████ Another executive █████████████ ████████████████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████

391.     Following conversations with sellers, other Amazon executives confirmed ███ ████████████████████████████████████ ██████████████████ Amazon's former head of Global Fulfillment Services ██████████████████████████ ██████████████████████

392.     Prime-eligible fulfillment volumes are significant.  In 2020, FBA fulfilled more than ████████ units, which, if shipped individually, would account for nearly ██ boxes for every person in the United States.  Conditioning Prime eligibility on FBA enrollment has locked in massive volumes of shipments exclusively to Amazon, allowing it to scale its fulfillment network into the behemoth it is today.

393.     Independent fulfillment providers' operations remain far smaller than FBA. These providers fulfill orders for only a few thousand, and often only a few hundred, sellers.

1  Had independent fulfillment providers been able to compete for Amazon order volumes, they

2  could have won significant business from Amazon's third-party sellers.

3      394.   Amazon ensures that independent fulfillment providers will stay artificially small

4  by requiring that sellers who want Prime-eligible products use FBA for fulfillment.  As a result,

5  Amazon makes some providers' services comparatively more expensive because they are unable

6  to take full advantage of the economies of scale.  Amazon locks in the scale for itself through

7  tying Prime eligibility to use of FBA, and sellers have fewer choices for fulfillment providers.

8          ***c.***      ***Amazon unlawfully maintains its monopolies by conditioning***

9              ***Prime eligibility on sellers' use of FBA***

10      395.   Through these twin mechanisms—(1) raising the costs for sellers of using

11  multiple sales channels and (2) artificially stunting the growth of independent fulfillment

12  providers—Amazon maintains its monopolies in the online superstore and online marketplace

13  services markets by denying rivals the ability to gain the scale needed to compete meaningfully

14  against Amazon.

15      396.   ████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████ Some sellers on Amazon that might otherwise also sell off

18  Amazon choose not to due to the associated logistics and administrative costs, while other sellers

19  offer only certain products to other online stores.  Sellers must effectively accept Amazon's

20  burdensome terms, and Amazon's rivals are thus deprived of the opportunity to meaningfully

21  compete for sellers.  By tying a product's Prime eligibility to the seller's use of FBA for that

22  product, Amazon suppresses competition for sellers' product selection and for online shoppers.

23

24

### 4. Amazon's use of Seller Fulfilled Prime underscores the harms to competition caused by Amazon's conditioning Prime eligibility on use of FBA

397.    Amazon's fear of a world in which unrestricted seller choice leads to increased competition is grounded in experience.  For a period of time, Amazon temporarily allowed sellers to use their own fulfillment solution for Prime-eligible orders.  When Amazon realized it had lowered a barrier to competition, it quickly reversed course.

398.    In 2015, Amazon briefly experimented with allowing a small subset of sellers to fulfill Prime-eligible orders without using FBA.  That year, Amazon launched a program it later called Seller Fulfilled Prime ("SFP"), which was ███████████████████████████████ ████████████████████████████████████████████████████████ SFP let sellers make Prime-eligible offers without purchasing FBA services.  Though SFP was popular with sellers, Amazon shuttered SFP enrollment in 2019 ████████████████████ ███████████████████████████████████████████████████

399.    From SFP's launch, Amazon ██████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████████

400.    SFP was an immediate hit among sellers.  In the program's first full year, Amazon onboarded more than ████ sellers.  At its peak, approximately ████ sellers had enrolled in SFP.  Yet even these enrollment numbers understate seller demand for SFP, because Amazon ████████████████████████████████████

401.    Sellers enrolled in SFP ████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

402.    Mr. Bezos highlighted SFP in his 2015 letter to shareholders, explaining that Amazon had "invited sellers . . . to be part of the Prime program and ship their own orders at Prime speed directly."  Mr. Bezos described SFP as a win-win for sellers and shoppers, writing, "[t]hose [enrolled] sellers have already seen a significant bump in sales, and the program has led to hundreds of thousands of additional items that are available to Prime customers via free two-day or next-day shipping."  Though SFP was benefitting at least some shoppers and sellers, internally certain Amazon executives ███████████████████████████████████ ███ Amazon executives ████████████████████████████████████████ ████████████████████ These executives ██████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████

403.    Amazon ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████████████

404.    A few months later, ████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ But Amazon decided to prioritize excluding rivals and foreclosing competition, even if it came at a cost to Amazon's customers.

405.    Some Amazon employees had suggested ████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████ Amazon wanted to
minimize any potential backlash from SFP sellers, so in 2019 Amazon let sellers already in SFP
remain while blocking all new enrollment.  Critically, Amazon communicated to those sellers
who were already in SFP that it expected them to fulfill orders themselves, rather than using
independent fulfillment providers.  ███████████████████████████
███████████████████

406.    Some sellers who still participate in SFP report frustrations with Amazon's
administration of the program, including concerns that Amazon holds SFP sellers to stricter
delivery benchmarks than FBA.  And despite Amazon's promise that SFP products will receive
the Prime badge, Amazon does not consistently display the Prime badge on SFP products.
Amazon's search filter that allows shoppers to view only Prime-eligible products suppresses
Prime offers fulfilled through SFP.

407.    Sellers continue to want Prime eligibility uncoupled from the coerced purchase of
FBA services.  ██████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████

408.    Conditioning Prime eligibility on FBA usage—and thus preventing sellers from
using independent fulfillment providers—is not necessary to ensure Prime subscribers receive
quality shipping.  Amazon's internal analyses showed that ████████████████████████
██████████████████████████████████████████████████████

COMPLAINT - 116
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  For example, ████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████  Had Amazon genuinely cared about

5  improving shipping speeds, it would have *encouraged* SFP sellers to use independent fulfillment

6  providers instead of shuttering SFP to deliberately impede those providers' growth.

7      409.    Amazon recently announced plans to reopen SFP enrollment.  According to

8  Amazon, to enroll in the program, sellers would need to meet rigorous pre-qualification criteria

9  to enroll in a 30-day SFP trial, after which Amazon will determine whether they may participate

10  in SFP.  Amazon's communications about upcoming changes to the SFP program continue to

11  indicate that sellers would need to fulfill Prime orders themselves, without using independent

12  fulfillment providers.  As of this filing, SFP enrollment remains closed.

13      **C.    Amazon's Anticompetitive Tactics Work Together To Amplify Their Overall**

14          **Exclusionary Effect**

15      410.    The cumulative impact of Amazon's unlawful conduct is greater than the sum of

16  its parts.

17      411.    While each anticompetitive tactic independently violates the antitrust laws, all

18  work together in mutually reinforcing ways to stifle even an equally or more efficient

19  competitor's ability to respond to any one of them.  As a result, the interrelated nature of

20  Amazon's overall course of conduct amplifies the exclusionary effects of each individual aspect,

21  further entrenching Amazon's monopoly power in and across both relevant markets.

22      412.    Both relevant markets exhibit network effects and scale economies that render

23  gaining scale and competitive momentum especially critical.  Yet each element of Amazon's

24  course of conduct works together to artificially limit rivals' ability to grow, gather momentum,

COMPLAINT - 117
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 and gain sufficient scale to meaningfully compete against Amazon.  Consequently, in these

2 relevant markets, the combined exclusionary effect of Amazon's conduct is especially pernicious

3 and acute.

4        413.   The various elements of Amazon's anti-discounting conduct—algorithmically

5 punishing sellers for offering lower prices elsewhere, contractually restraining ASB sellers, and

6 systematically disciplining rivals via its first-party anti-discounting algorithm—work together to

7 suppress competition in both relevant markets, thereby preventing even an equally or more

8 efficient rival from attracting a critical mass of either shoppers or sellers.

9        414.   Amazon's requirement that sellers use FBA to obtain Prime eligibility for their

10 products amplifies those effects.  By further limiting sellers' alternatives to Amazon, Amazon's

11 coercive fulfillment conduct intensifies the exclusionary effect of its anti-discounting conduct.

12 In a world where rivals and potential rivals were not artificially prevented from gaining the scale

13 needed to meaningfully compete against Amazon, Amazon's seller punishments would pose less

14 of a threat to sellers' survival.  But Amazon's coercive FBA conduct works in tandem with its

15 anti-discounting conduct to foreclose that world.  The resulting lack of comparable alternatives

16 to Amazon intensifies the severity of Amazon's anti-discounting punishments, giving those

17 punishments—and even the threat of those punishments—greater force.

18        415.   Amazon's anti-discounting conduct, in turn, amplifies the exclusionary effects of

19 tying Prime eligibility to sellers' use of FBA.  Amazon's FBA conduct alone prevents sellers

20 from using alternatives to FBA to fulfill Prime-eligible orders *on* Amazon and lowers the

21 attractiveness of selling *off* Amazon because it raises sellers' costs, which are often passed on to

22 shoppers.  Amazon's anti-discounting conduct further reduces the appeal of selling off Amazon

23 by threatening sellers with the risk of losing their Amazon sales if Amazon detects a lower price

24 elsewhere and suppressing the effectiveness of marketplaces' attempts to compete on price by

1  lowering their fees to sellers.  As a result, sellers are further deterred from bringing additional

2  selection to rival marketplaces, prices for products on rival marketplaces are higher, and

3  independent fulfillment providers are artificially stunted.  Collectively, this impedes an equally

4  or more efficient rival from being able to meaningfully compete with Amazon.

5  **VII.    AMAZON** ██████████████████████████████

6  ██████████████████████████████

7  416.  ██████████████████████████████

8  ██████████████████████████████

9  ██████████████████████████████

10 ██████████████████████████████

11 417.   Project Nessie is an algorithm ██████████████████

12 Aware that this scheme belies its public claim that it "seek[s] to be Earth's most customer-centric

13 company," ██████████████████████████████

14 ██████████████████████████████

15 ██████████████████████████████

16 418.  ██████████████████████████████

17 ██████████████████████████████

18 ██████████████

19 **A.    Project Nessie** ████████████████████

20 ██████████████████████

21 419.  ██████████████████████████████

22 ██████████████████████████████

23 ██████████████████████████████

24 ██████████████████████████████

COMPLAINT - 119
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

2

3

4

5    420.    Amazon used these findings to create Project Nessie, an algorithmic tool

6

7

8

9    (discussed in Part VI.A.3, above),

10

11

12

13

14    421.

15

16

17

18

19    422.

20

21

22

23

24

1   423.   ███████████████████████████████████████

2   ███████████████████████████████████████████

3   ████████████████████████████████████████

4   ████████████████████████████████████████

5   ██████████████████████████████████████████

6   ████████████████████████████████████████

7   ███████████████████████████████████████████

8   ████████████████████████████

9   424.   Amazon used Project Nessie to ████████████████

10   ███████████████████████████████████████████

11   ██████████████████████████

12   425.   ███████████████████████████████████████

13   ███████████████████████████████████████████

14   ████████████████████████████████████████

15   ███████████████████████████████████████████

16   ██

17   **B.**   **Amazon Has** ████████████████ **Project Nessie** ████████████

18   ██████████████████

19   426.   Amazon typically ran Project Nessie ████████████████

20   ███████████████████████████████████████████

21   █████████████████████████

22   427.   ███████████████████████████████████████████

23   ██████████████████████████████████████████

24

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

428.

429.

430.

431.

432.

## VIII.  AMAZON'S CONDUCT HARMS COMPETITION AND CONSUMERS

433.    Amazon's unfair and monopolistic conduct has broken the competitive process.

Amazon's anticompetitive conduct closes off each major avenue of competition—including

price, product selection, quality, and innovation—in both relevant markets.  Amazon's

1    monopolistic conduct also harms consumers in both markets, shoppers and sellers alike, by

2    depriving them of the benefits of open, fair competition and allowing Amazon to exploit its

3    monopoly power without facing the competitive checks of a free enterprise system.

4        434.    The presence of scale economies and network effects in both relevant markets

5    means that a firm must be able to gain scale in order to compete effectively.  But Amazon has

6    artificially suppressed rivals' ability to attract business, gain momentum, and grow.

7        435.    Amazon's conduct interrupts, impedes, and distorts the normal give-and-take of a

8    healthy market by blocking off every major avenue of competition—including price, product

9    selection, quality, and innovation—that rivals and potential rivals would ordinarily use to

10   compete on the merits for shoppers' and sellers' business in the relevant markets for online

11   superstores and online marketplace services.

12       436.    For example, Amazon's anti-discounting conduct leverages both its first-party

13   Retail and its third-party Marketplace business units to suppress competition.  Amazon's first-

14   party anti-discounting algorithm disciplines rivals from undercutting Amazon's prices, and

15   Amazon punishes third-party sellers for offering lower prices on other platforms.  Without the

16   ability to attract either shoppers or sellers through lower prices, rivals are unable to gain a critical

17   mass of customers and meaningfully compete against Amazon.  At the same time, Amazon's

18   coercive fulfillment conduct both artificially stunts the growth of independent fulfillment

19   providers and artificially raises the costs that sellers face when seeking to multihome.  This limits

20   seller multihoming and thereby suppresses Amazon's rivals' ability to compete for sellers by

21   offering better terms and for shoppers by offering additional product selection.

22       437.    Together, Amazon's exclusionary course of conduct works to suppress

23   competition in both relevant markets, foreclosing even an innovative, high-quality rival or

24   potential rival from competing on the merits.

438.    Amazon's conduct also harms consumers in both relevant markets.  For example, Amazon's conduct has artificially inflated prices for both shoppers and sellers, degraded the quality of online superstores for shoppers and of online marketplace services for sellers, reduced output in both relevant markets, hindered shoppers from comparison-shopping for the best deals, suppressed the flow of useful price and quality information to shoppers, stifled sellers' ability to gain additional business by offering lower prices, restricted sellers' freedom to choose to multihome across their preferred sales channels, reduced consumer choice for both shoppers and sellers by yielding a less diverse set of competitive options, and stripped consumers in both relevant markets of the benefits of innovation.

439.    Amazon's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits.  The anticompetitive harm from those practices outweighs any procompetitive benefits, and Amazon could reasonably achieve any procompetitive goals through less restrictive alternatives.

440.    Amazon's unlawful conduct has caused cumulative and compounding harm over time.  Through its years-long course of illegal conduct, Amazon has deeply entrenched its monopolies in both relevant markets and further widened the gulf between Amazon and everyone else.  Particularly given the importance of scale economies and network effects in these markets, Amazon's conduct has yielded a distorted and stunted competitive landscape.

441.    Left unchecked, Amazon will continue to harm competition and maintain its monopoly power over the online superstore market and the market for online marketplace services, causing myriad and widespread harms to shoppers, sellers, and the public—and depriving Americans of the benefits of fair and free competition.

COMPLAINT - 124
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

**IX.     VIOLATIONS ALLEGED**

2

**COUNT I**

3

**MONOPOLY MAINTENANCE OF THE ONLINE SUPERSTORE MARKET**

4

**(15 U.S.C. § 45(a))**

5      442.    Plaintiff FTC re-alleges and incorporates by reference the allegations in

6   paragraphs 1-441 above.

7      443.    At all relevant times, Amazon has had monopoly power in the online superstore

8   market in the United States.

9      444.    Amazon has willfully maintained its monopoly power through its course of

10  anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which

11  stifle price competition and tend to create an artificial price floor, and Amazon's practice of

12  coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon,

13  which makes it more difficult and more expensive for rivals to offer increased product selection.

14     445.    Although each of these acts is anticompetitive in its own right, these interrelated

15  and independent actions have had a cumulative and synergistic effect that has harmed

16  competition and the competitive process.

17     446.    There is no valid procompetitive justification for Amazon's anticompetitive and

18  exclusionary conduct in the online superstore market.

19     447.    Amazon's anticompetitive and exclusionary conduct constitutes unlawful

20  monopoly maintenance, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and

21  Section 2 of the Sherman Act, 15 U.S.C. § 2.

22

23

24

COMPLAINT - 125
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

# COUNT II

## MONOPOLY MAINTENANCE OF THE

## ONLINE MARKETPLACE SERVICES MARKET

### (15 U.S.C. § 45(a))

448.     Plaintiff FTC re-alleges and incorporates by reference the allegations in paragraphs 1-447 above.

449.     At all relevant times, Amazon has had monopoly power in the worldwide market for online marketplace services for U.S. customers.

450.     Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

451.     Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

452.     There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online marketplace services market.

453.     Amazon's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 2 of the Sherman Act, 15 U.S.C. § 2.

COMPLAINT - 126
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

## COUNT III

## UNFAIR METHOD OF COMPETITION

### (15 U.S.C. § 45(a))

454.    Plaintiff FTC re-alleges and incorporates by reference the allegations in paragraphs 1-453 above.

455.    Amazon's course of conduct—including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection—is anticompetitive and exclusionary, and constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

456.    There is no valid and cognizable justification for Amazon's anticompetitive and exclusionary conduct.

## COUNT IV

## UNFAIR METHOD OF COMPETITION

### (15 U.S.C. § 45(a))

457.    Plaintiff FTC re-alleges and incorporates by reference the allegations in paragraphs 1-456 above.

458.    Amazon has engaged in an unfair method of competition, called Project Nessie, that ███████████████████████████████████████████████

███████████████████████████

459.    Amazon designed and used its Project Nessie pricing system ████████████████

██████████████████████████████

COMPLAINT - 127
CASE NO. _:__-cv-_____

460.    Amazon's Project Nessie pricing system ████████████████████

461.    ████████████████████████████████████████████

462.    Amazon's use of its Project Nessie pricing system is an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

463.    There is no valid and cognizable justification for Amazon's use of Project Nessie.

**COUNT V**

**MONOPOLY MAINTENANCE OF THE ONLINE SUPERSTORE MARKET**

**(15 U.S.C. § 2)**

464.    State Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-463 above.

465.    At all relevant times, Amazon has had monopoly power in the online superstore market in the United States.

466.    Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

467.    Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

COMPLAINT - 128
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

468.    Amazon's conduct has harmed and continues to harm competition, and Plaintiff States have therefore suffered and continue to suffer harm to their general economies and to their residents.

469.    There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online superstore market.

470.    Amazon's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT VI

## MONOPOLY MAINTENANCE OF THE

## ONLINE MARKETPLACE SERVICES MARKET

### (15 U.S.C. § 2)

471.    State Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-470 above.

472.    At all relevant times, Amazon has had monopoly power in the worldwide market for online marketplace services for U.S. customers.

473.    Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

474.    Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

475.    Amazon's conduct has harmed and continues to harm competition, and Plaintiff States have therefore suffered and continue to suffer harm to their general economies and to their residents.

476.    There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online marketplace services market.

477.    Amazon's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT VII

## VIOLATIONS OF CONNECTICUT STATE LAW

478.    The State of Connecticut repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

479.    Amazon's actions alleged in the Complaint violate the Connecticut Antitrust Act ("CAA"), General Statutes § 35-24 *et seq.*

480.    Amazon's actions alleged in the Complaint constitute monopolization of a part of trade or commerce within the state in violation of Conn. Gen. Stat. § 35-27.

481.    The State of Connecticut seeks all remedies available under CAA, including, without limitation, the following:

      (a) Injunctive and other equitable relief, pursuant to Conn. Gen. Stat. § 35-34;

      (b) Costs and attorney's fees, pursuant to Conn. Gen. Stat. § 35-34; and

      (c) Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

482.    Amazon's actions as alleged herein also constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b *et seq.*

483.    The State of Connecticut seeks all remedies available under CUTPA, including, without limitation, the following:

(a) Disgorgement, pursuant to Conn. Gen. Stat. § 42-110m;

(b) Injunctive and other equitable relief, pursuant to Conn. Gen. Stat. § 42-110m;

(c) Costs and attorney's fees, pursuant to Conn. Gen. Stat. § 42-110m; and

(d) Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

## COUNT VIII

### VIOLATIONS OF MAINE STATE LAW

484.    Plaintiff State of Maine repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

485.    The aforementioned acts of Amazon violate Section 1102 of the Maine Monopolies and Profiteering Law, 10 M.R.S.A. § 1102.

486.    Further, the State of Maine seeks and is entitled to injunctive relief, costs of suit, including necessary and reasonable investigative costs, reasonable experts' fees and reasonable attorney fees under 10 M.R.S.A. § 1104.

## COUNT IX

### VIOLATIONS OF MARYLAND STATE LAW

487.    Plaintiff State of Maryland repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

488.    The aforementioned acts of Amazon violate the Maryland Antitrust Act, MD Commercial Law Code, Ann. § 11-201 *et seq.*

489.    Further, Section 11-209(b)(3) provides that the Court may exercise all equitable powers necessary to remove the effects of any violation, including injunction, restitution, and

COMPLAINT - 131
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    divestiture.  Plaintiff State of Maryland is entitled to costs and reasonable attorney's fees.  MD

2    Commercial Law Code, Ann. §§ 11-209(a)(4), 11-209(b)(3).

3                                        **COUNT X**

4                          **VIOLATIONS OF MICHIGAN STATE LAW**

5          490.    Plaintiff State of Michigan repeats and re-alleges and incorporates by reference

6    each and every paragraph and allegation of the Complaint as if fully set forth herein.

7          491.    The acts alleged in the Complaint violate the Michigan Antitrust Reform Act,

8    Mich. Comp. Laws § 445.771, *et seq.*

9          492.    The acts alleged in the Complaint constitute the establishment, maintenance, or

10   use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant

11   market by Amazon, for the purpose of excluding or limiting competition or controlling, fixing, or

12   maintaining prices, pursuant to Mich. Comp. Laws § 445.773.

13         493.    Michigan seeks equitable and injunctive relief as authorized by Mich. Comp.

14   Laws § 445.777, including, without limitation, the following:

15               (a) Injunctive or other equitable relief;

16               (b) Costs and fees incurred by Michigan in this suit; and

17               (c) Other remedies as the Court finds necessary to redress and prevent recurrence

18                     of each of Amazon's violations.

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
                                                                 600 Pennsylvania Avenue, NW
                                                                 Washington, DC 20580
                                                                 (202) 326-2222

**COUNT XI**

**VIOLATIONS OF THE NEVADA UNFAIR TRADE PRACTICES ACT**

494.   Plaintiff State of Nevada repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

495.   As repeatedly alleged *supra*, Amazon's monopolistic and anticompetitive conduct produced, and continues to produce, harm to businesses and consumers across the Plaintiff States, including in Nevada.  Accordingly, the aforementioned acts and practices by Amazon were, and continue to be, prohibited acts under the Nevada Unfair Trade Practices Act, as provided in Nev. Rev. Stat. § 598A.060.

496.   To remedy Amazon's violations of the Nevada Unfair Trade Practices Act, Plaintiff State of Nevada seeks the following relief:

> (a) Injunctive relief to permanently prevent and restrain Amazon's monopolistic and anticompetitive conduct, pursuant Nev. Rev. Stat. § 598A.070(c)(1);
>
> (b) Equitable relief, and specifically disgorgement, pursuant to Nev. Rev. Stat. § 598A.070(c)(4); and
>
> (c) Any other equitable relief the Court considers appropriate and has the discretion to award pursuant to Nev. Rev. Stat. § 598A.090(4).

**COUNT XII**

**VIOLATION OF THE NEW JERSEY ANTITRUST ACT**

**(MONOPOLY MAINTENANCE)**

497.   Plaintiff State of New Jersey repeats and realleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

498.   The New Jersey Antitrust Act, N.J.S.A. 56:9-4(a), states:

1   It shall be unlawful for any person to monopolize, or attempt to monopolize, or to
2   combine or conspire with any person or persons, to monopolize trade or
    commerce in any relevant market within this State.

3   499.   In the operation of its business, Amazon engaged in numerous commercial

4   practices that violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, including

5   monopolizing or attempting to monopolize trade or commerce in the online superstore market

6   and the market for online marketplace services within the State of New Jersey, in violation of

7   N.J.S.A. 56:9-4.

8   500.   Each violation of the New Jersey Antitrust Act by Amazon constitutes a separate

9   unlawful practice and violation, under N.J.S.A. 56:9-16.

10  501.   Plaintiff State of New Jersey seeks all remedies available under the New Jersey

11  Antitrust Act, N.J.S.A. 56:9-1 to -19, including, without limitation, the following:

12      (a) Injunctive and other equitable relief, pursuant to N.J.S.A. 56:9-7 and N.J.S.A.

13          56:9-10(a);

14      (b) Costs and attorney's fees, pursuant to N.J.S.A. 56:9-12; and

15      (c) Other remedies as the Court may deem appropriate and the interests of justice

16          may require.

17  **COUNT XIII**

18  **VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("CFA")**

19  **(COMMERCIAL PRACTICES IN VIOLATION OF STATE AND FEDERAL LAW)**

20  502.   Plaintiff State of New Jersey repeats and realleges and incorporates by reference

21  each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

22  503.   The CFA, N.J.S.A. 56:8-4(b), states:

23   In an action brought by the Attorney General, any commercial practice that
     violates State or federal law is conclusively presumed to be an unlawful practice
24   under [N.J.S.A. 56:8-2] . . . .

504.     In the operation of its business, Amazon engaged in numerous commercial practices that violate the New Jersey Antitrust Act, including, but not limited to, N.J.S.A. 56:9-4, monopolizing, or attempting to monopolize a part of trade or commerce within the state.

505.     In the operation of its business, Amazon engaged in monopolization, or attempted monopolization of a part of trade or commerce, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

506.     Each violation of New Jersey and/or federal law by Amazon, on or after August 5, 2022, constitutes a separate unlawful practice and violation of the CFA, N.J.S.A. 56:8-2, under N.J.S.A. 56:8-4(b).

507.     Plaintiff State of New Jersey seeks all remedies available under the CFA, N.J.S.A. 56:8-1 to -227, including, without limitation, the following:

(a) Disgorgement of all profits Amazon derived as a result of the conduct alleged herein, pursuant to N.J.S.A. 56:8-8;

(b) Injunctive and other equitable relief, pursuant to N.J.S.A. 56:8-8;

(c) Costs and attorney's fees, pursuant to N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

(d) Other remedies as the Court may deem appropriate and the interests of justice may require.

**COUNT XIV**

**VIOLATION OF THE NEW JERSEY CFA BY DEFENDANT**

**(UNCONSCIONABLE COMMERCIAL PRACTICES BY DEFENDANT)**

508.     Plaintiff State of New Jersey repeats and realleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

509.     The CFA, N.J.S.A. 56:8-2, prohibits:

COMPLAINT - 135
CASE NO. _:__-cv-_____

1

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

2

3

4

5     510.    The CFA defines "sale" as including "any sale, rental or distribution, offer for

6     sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute . . . ."

7     N.J.S.A. 56:8-1(e).

8     511.    The CFA defines "merchandise" as "any objects, wares, goods, commodities,

9     services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

10    512.    At all relevant times, Amazon has engaged in the advertisement, offer for sale,

11    and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c).

12    513.    In the operation of its businesses, Amazon engaged in unconscionable

13    commercial practices and deception, and made misrepresentations, in violation of N.J.S.A. 56:8-

14    2, including, but not limited to, the following:

15        (a) Raising, maintaining and stabilizing the prices of products in its online

16            superstore market at artificially high levels;

17        (b) Representing that it "seek[s] to be the Earth's most customer-centric

18            company" and creating and perpetuating a reputation for having low or the

19            lowest prices, ███████████████████████████████████

20            ███████ to the detriment of consumers and for reasons unrelated to cost,

21            supply, and demand; and

22        (c) Depriving consumers of diversity of selection and free and open markets.

23    514.    Each unconscionable commercial practice, misrepresentation, and act of

24    deception constitutes a separate violation under the CFA, N.J.S.A. 56:8-2.

515. Plaintiff State of New Jersey seeks all remedies available under the CFA, N.J.S.A. 56:8-1 to -227, including, without limitation, the following:

(a) Injunctive and other equitable relief, pursuant to N.J.S.A. 56:8-8;

(b) Costs and attorney's fees, pursuant to N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

(c) Other remedies as the Court may deem appropriate and the interests of justice may require.

## COUNT XV

### VIOLATIONS OF NEW YORK STATE LAW

516. Plaintiff State of New York repeats and re-alleges and incorporates by reference each and every paragraph and allegation of this Complaint as if fully set forth herein.

517. Amazon's aforementioned acts and practices alleged in the Complaint violate Section 63(12) of New York's Executive Law, in that Amazon engaged in repeated and/or persistent illegal acts—violations of Section 2 of the Sherman Act and Section 5 of the FTC Act—in the carrying on, conducting, or transaction of business within the meaning and intent of Executive Law Section 63(12).

## COUNT XVI

### VIOLATIONS OF OKLAHOMA STATE LAW

518. Plaintiff State of Oklahoma repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

519. Amazon was at all times relevant hereto engaged in trade and commerce within the State of Oklahoma.

520. The acts alleged in the Complaint constitute violations of the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*

1    (a) The acts alleged in the Complaint constitute unlawful monopolization of a

2      part of trade or commerce in a relevant market within the State of Oklahoma

3      pursuant to 79 O.S. § 203.

4   521.  Plaintiff State of Oklahoma seeks relief under the Oklahoma Antitrust Reform

5 Act, 79 O.S. §§ 201, *et seq.*, including, without limitation, the following:

6    (a) Injunctive and other equitable relief pursuant to 79 O.S. § 205;

7    (b) Disgorgement and restitution pursuant to 79 O.S. § 205;

8    (c) Costs and attorney's fees pursuant to 79 O.S. § 205; and

9    (d) Other remedies as the Court may deem appropriate under the facts and

10      circumstances of the case.

11   522.  The acts alleged in the Complaint also constitute violations of the Oklahoma

12 Consumer Protection Act, 15 O.S. §§ 751, *et seq.*

13    (a) Amazon is a person within the meaning of 15 O.S. § 752;

14    (b) The acts alleged in the Complaint occurred in connection with consumer

15      transactions within the meaning of 15 O.S. § 752; and

16    (c) The acts alleged in the Complaint constitute unfair or deceptive trade

17      practices, within the meaning of 15 O.S. § 752, and were committed in

18      violation of 15 O.S. § 753.

19   523.  Plaintiff State of Oklahoma seeks relief under the Oklahoma Consumer

20 Protection Act, 15 O.S. §§ 751, *et seq.*, including, without limitation, the following:

21    (a) Injunctive and other equitable relief pursuant to 15 O.S. § 756.1;

22    (b) Disgorgement and restitution pursuant to 79 O.S. § 756.1;

23    (c) Costs and attorney's fees pursuant to 15 O.S. § 761.1; and

24

COMPLAINT - 138
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1     (d) Other remedies as the Court may deem appropriate under the facts and

2          circumstances of the case.

3                              **COUNT XVII**

4                    **VIOLATIONS OF OREGON STATE LAW**

5     524.    Plaintiff State of Oregon, acting by and through its Attorney General, Ellen

6     Rosenblum (the "State of Oregon"), repeats and re-alleges and incorporates by reference each

7     and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

8     525.    The acts alleged in the Complaint also constitute violations of the Oregon

9     Antitrust Law, Oregon Revised Statutes ("ORS") 646.705 to ORS 646.836.  These violations had

10    impacts within the State of Oregon and substantially affected the people of Oregon.

11    526.    The State of Oregon appears in its sovereign or quasi-sovereign capacities and

12    under its statutory, common law, and equitable powers pursuant to Section 4 of the Sherman Act,

13    15 U.S.C. § 4, Section 16 of the Clayton Act, 15 U.S.C. § 26, and the Oregon Antitrust Law

14    including ORS 646.760 and ORS 646.770.  The State of Oregon seeks equitable and injunctive

15    relief under federal law and the Oregon Antitrust Law, including, without limitation, the

16    following:

17        (a) Equitable relief pursuant to federal law including Section 4 of the Sherman

18            Act, 15 U.S.C. § 4, and pursuant to state law including ORS 646.770;

19        (b) Injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26,

20            ORS 646.760, and ORS 646.770;

21        (c) The cost of suit, including expert witness fees, costs of investigation, and

22            attorney's fees, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26,

23            ORS 646.760, and ORS 646.770; and

24

COMPLAINT - 139
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

(d)  Other remedies as the Court may deem appropriate under the facts and

circumstances of the case.

### COUNT XVIII

### VIOLATIONS OF PENNSYLVANIA STATE LAW

**A.     Pennsylvania's Unfair Trade Practices And Consumer Protection Law**

527.     Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates by reference each and every paragraph and allegation of this Complaint as if fully set forth herein.

528.     Amazon's lines of business ranging from online retail, media, cloud computing, grocery stores, advertising and logistics and operational services are offered to consumers through their substantial online presence as well as physical locations in the case of grocery stores.  By engaging in the conduct more fully described herein with respect to these products and services, Amazon is engaging in trade or commerce that has directly or indirectly harmed the Commonwealth of Pennsylvania and Pennsylvania consumers within the meaning of 73 P.S. § 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL").

529.     The Pennsylvania Attorney General has reason to believe that Amazon is using or is about to use any method, act or practice in violation of 73 P.S. § 201-3 and it is in the public interest to prevent and restrain the use of such methods, acts or practices under 73 P.S. § 201-4.

**1.     Unfair methods of competition and unfair acts or practices under PUTPCPL**

530.     Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates by reference each and every paragraph and allegation of the Complaint as if fully set forth herein.

1     531.    Regardless of the nature or quality of Amazon's aforementioned acts or practices

2  on the competitive process or competition, Amazon's conduct has been otherwise unfair or

3  unconscionable because they offend public policy as established by statutes, the common law, or

4  otherwise, are immoral, unethical, oppressive, unscrupulous, or substantially injurious to the

5  Commonwealth of Pennsylvania and consumers.

6     532.    Amazon's unfair conduct has resulted in the Commonwealth and consumers being

7  substantially injured by paying more for products than they otherwise would have in a free and

8  open market.

9     533.    Amazon's impairment of choice and the competitive process has had the

10 following effects: (1) competition in the online superstore market and the market for online

11 marketplace services has been restrained, suppressed and eliminated throughout Pennsylvania;

12 (2) online superstore market prices and the market for online marketplace services prices have

13 been raised, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3)

14 Commonwealth of Pennsylvania and consumers have been deprived of free and open markets;

15 and (4) Commonwealth of Pennsylvania and consumers have paid supra-competitive, artificially

16 inflated prices for online superstore products and online marketplace services.

17    534.    Amazon's impairment of choice and the competitive process have caused the

18 Commonwealth of Pennsylvania and consumers to suffer and to continue to suffer loss of money

19 by means of Amazon's use or employment of unfair methods of competition and/or unfair acts or

20 practices as set forth above.

21    535.    Amazon's conduct more fully described herein is unlawful pursuant to 73 P.S.

22 § 201-3.

23    536.    The aforesaid methods, acts or practices constitute unfair methods of competition

24 and/or unfair acts or practices within their meaning under Section 2(4) of the PUTPCPL,

1 including, but not limited to, "Engaging in any other fraudulent or deceptive conduct which

2 creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

3      537.    The above-described conduct created the likelihood of confusion and

4 misunderstanding and exploited unfair advantage of the Commonwealth of Pennsylvania and

5 consumers seeking to exercise a meaningful choice in markets expected to be free of impairment

6 to the competitive process and thus constitutes an unfair method of competition through one or

7 more of the following:

8         (a) Violating Section 2 of the Sherman Act, 15 U.S.C. § 2, through willfully

9             maintaining its monopoly power over the online superstore market as set forth

10             in the preceding counts;

11         (b) Violating Section 2 of the Sherman Act, 15 U.S.C. § 2, through willfully

12             maintaining its monopoly power over the market for online marketplace

13             services as set forth in the preceding counts;

14         (c) Violating Section 5 of the Federal Trade Commission Act, 15 U.S.C § 45(a);

15         (d) Violating Pennsylvania antitrust common law through willfully maintaining

16             its monopoly power over the online superstore market;

17         (e) Violating Pennsylvania antitrust common law through willfully maintaining

18             its monopoly power over the market for online marketplace services; and/or

19         (f) Engaging in any conduct which causes substantial injury to consumers.

20      538.    The above-described conduct substantially injured consumers and the

21 Commonwealth of Pennsylvania.

22      539.    The Commonwealth seeks entry of a permanent injunction restraining Amazon's

23 unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

24

COMPLAINT - 142
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

540.    The Commonwealth also requests that the Court direct Amazon to restore to the Commonwealth on behalf of all victims the ill-gotten gains acquired from their inflated pricing during the period of time Amazon's unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

### 2.    Deceptive acts or practices under PUTPCPL

541.    Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates by reference each and every paragraph and allegation of the Complaint as if fully set forth herein.

542.    Amazon deceptively misrepresented to the Commonwealth of Pennsylvania and consumers that Amazon's pricing in the online superstore market and the market for online marketplace services was competitive and fair.

543.    Amazon deceptively concealed from, or otherwise misled, the Commonwealth of Pennsylvania and consumers as to the actual characteristics of the marketplace being other than competitive and fair.

544.    Regardless of the nature or quality of Amazon's aforementioned acts or practices on the competitive process or competition, Amazon's conduct has had the tendency or capacity to deceive.

545.    Amazon's deceptive conduct has resulted in the Commonwealth and consumers being substantially injured by paying more for products than they otherwise would have in a free, open, fair, and competitive market.

546.    Amazon's deceptive misrepresentations and failure to disclose material facts have had the following effects: (1) competition in the online superstore market and the market for online marketplace services has been restrained, suppressed and eliminated throughout Pennsylvania; (2) prices for products in the online superstore market and the market for online marketplace services prices have been raised, maintained and stabilized at artificially-high levels

COMPLAINT - 143
CASE NO. _:__-cv-_____

1   throughout Pennsylvania; (3) Commonwealth of Pennsylvania and consumers have been

2   deprived of free and open markets; and (4) Commonwealth of Pennsylvania and consumers have

3   paid supra-competitive, artificially inflated prices for products in the online superstore market

4   and the market for online marketplace services.

5        547.    Amazon's impairment of choice and the competitive process has caused the

6   Commonwealth of Pennsylvania and consumers to suffer and to continue to suffer loss of money

7   by means of Amazon's use or employment of unfair methods of competition and/or unfair acts or

8   practices as set forth above.

9        548.    Amazon's conduct more fully described herein is unlawful pursuant to 73 P. S.

10   § 201-3.

11        549.    The aforesaid methods, acts or practices constitute deceptive acts or practices

12   within their meaning under Section 2 (4) of the PUTPCPL, including, but not limited to:

13           (a) "Representing that goods or services have sponsorship, approval,

14                characteristics, ingredients, uses, benefits or quantities that they do not have or

15                that a person has a sponsorship, approval, status, affiliation or connection that

16                he does not have" in violation of 73 P.S. § 201-2(4)(v);

17           (b) "Representing that goods or services are of a particular standard, quality or

18                grade, or that goods are of a particular style or model, if they are of another"

19                in violation of 73 P.S. § 201-2(4)(vii);

20           (c) "Engaging in any other fraudulent or deceptive conduct which creates a

21                likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-

22                2(4)(xxi).

23        550.    The above-described conduct created the likelihood of confusion and

24   misunderstanding and exploited the deception and lack of disclosure as to the actual

COMPLAINT - 144
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    characteristics of the marketplace to the Commonwealth of Pennsylvania and consumers seeking

2    to exercise a meaningful choice in markets expected to be free, open, fair, and competitive and

3    thus constitutes a deceptive act or practice.

4        551.    The Commonwealth seeks entry of a permanent injunction restraining Amazon's

5    unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

6        552.    The Commonwealth also requests that the Court direct Amazon to restore to the

7    Commonwealth on behalf of all victims the ill-gotten gains acquired from their inflated pricing

8    during the period of time Amazon's unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

9        **B.**    **Common Law Doctrine Against Monopolization**

10       553.    Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates

11   by reference each and every paragraph and allegation of the Complaint as if fully set forth

12   herein.

13       554.    The conduct to maintain Amazon's monopolies as set forth in the preceding

14   counts constitutes monopolization in violation of Pennsylvania antitrust common law.

15       555.    Amazon's conduct in maintaining its monopolies had the following effects: (1)

16   competition in the online superstore market and the market for online marketplace services has

17   been restrained, suppressed and eliminated throughout Pennsylvania; (2) online superstore

18   market prices have been raised, maintained and stabilized at artificially-high levels throughout

19   Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers have been

20   deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania

21   consumers have paid supra-competitive, artificially inflated prices for online superstore products

22   and online marketplace services.

23       556.    The Commonwealth seeks all available equitable relief under Pennsylvania

24   common law.

COMPLAINT - 145
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

# COUNT XIX

## VIOLATIONS OF RHODE ISLAND LAW

557.   Plaintiff State of Rhode Island repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation in the Complaint as if fully set forth herein.

558.   Amazon's actions as alleged herein violate the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*

559.   Plaintiff State of Rhode Island seeks all remedies available under the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-10, 6-36-11 and 6-36-12 and seeks relief, including but not limited to injunctive relief, equitable monetary relief, fees, costs, and such other relief as this Court deems just and equitable.

560.   Amazon's actions as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices as defined in the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.3-1, *et seq.*

561.   The State of Rhode Island brings this action pursuant to R.I. Gen. Laws § 6-13.1-5, and seeks relief, including but not limited to injunctive relief, equitable monetary relief, fees, costs, and such other relief as this Court deems just and equitable.

# COUNT XX

## VIOLATIONS OF WISCONSIN STATE LAW

562.   Plaintiff State of Wisconsin repeats and re-alleges and incorporates by reference each and every paragraph and allegation in this Complaint as if fully set forth herein.

563.   The aforementioned practices by Defendant are in violation of Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 *et seq*.  These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

564.     Plaintiff State of Wisconsin, through its Attorney General and under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available under Wis. Stat. §§ 133.03, 133.16, 133.17, and 133.18.

## X.      REQUEST FOR RELIEF

WHEREFORE Plaintiffs request that this Court, as authorized by 15 U.S.C. § 53(b); 15 U.S.C. § 26; Conn. Gen. Stat. §§ 35-32(a) and 42-110m; 10 M.R.S.A. § 1104; Maryland Commercial Law Code Ann. § 11-209; Mich. Comp. Laws § 445.777; Nev. Rev. Stat. §§ 598A.070 and 598A.160; N.J.S.A. 56:8-8, 56:8-11, 56:8-19, 56:9-6, 56:9-7, 56:9-10(a), and 56:9-12; New York Executive Law § 63(12); Oklahoma Statutes §§ 79-203 and 15-756.1; Oregon Revised Statutes 646.760 and 646.770; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-4, Pennsylvania common law antitrust doctrine, and the Commonwealth Attorneys Act, 71 P.S. § 732-204(c); R.I. Gen. Laws § 6-36-10; Wis. Stat. §§ 133.03, 133.16, and 133.17; and its own equitable powers, enter final judgment against Amazon, declaring, ordering, and adjudging:

1.      that Amazon's conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

2.      that Amazon's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

3.      that Amazon's conduct violates the Connecticut Antitrust Act, General Statutes § 35-24 *et seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*;

4.      that Amazon's conduct violates Section 1102 of the Maine Monopolies and Profiteering Law, 10 M.R.S.A. § 1102;

5.      that Amazon's conduct violates the Maryland Antitrust Act, Maryland Commercial Law Code Ann. § 11-201 *et seq.*;

COMPLAINT - 147
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

6.      that Amazon's conduct violates the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq.*;

7.      that Amazon's conduct violates the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060;

8.      that Amazon's conduct violates N.J.S.A. 56:8-1 to –227, and N.J.S.A. 56:9-1 to –19;

9.      that Amazon's conduct violates New York Executive Law § 63(12);

10.     that Amazon's conduct violates the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*, and the Oklahoma Consumer Protection Act, 15 O.S. §§ 751, *et seq.*;

11.     that Amazon's conduct violates the Oregon Antitrust Law, Oregon Revised Statutes 646.705 to 646.836;

12.     that Amazon's conduct violates the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-3, and Pennsylvania common law antitrust doctrine;

13.     that Amazon's conduct violates the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*;

14.     that Amazon's conduct violates Wis. Stat. § 133.03 *et seq.*;

15.     that Amazon is permanently enjoined from engaging in its unlawful conduct;

16.     that Amazon is permanently enjoined from engaging in similar or related conduct, or any conduct with the same or similar purpose and effect;

17.     any preliminary or permanent equitable relief, including but not limited to structural relief, necessary to redress and prevent recurrence of Amazon's violations of the law, as alleged herein;

COMPLAINT - 148
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

18.     any preliminary or permanent equitable relief, including but not limited to structural relief, necessary to restore fair competition and remedy the harm to competition caused by Amazon's violations of the law;

19.     that the Court grant Plaintiff States equitable monetary relief pursuant to all applicable law;

20.     that the Court grant Plaintiff States the costs of suit, including all available fees and costs; and

21.     that the Court grant any additional relief the Court finds just and proper.

COMPLAINT - 149
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   Dated: September 26, 2023

2   Of counsel:

3   JOHN M. NEWMAN
    Deputy Director

4   Bureau of Competition

5

6

7

8

9   *s/ Stephen E. Antonio*
    STEPHEN E. ANTONIO

10  MA Bar # 667861

11  *s/ Emily K. Bolles*
    EMILY K. BOLLES

12  NY Reg. # 5408703

13  *s/ Daniel S. Bradley*
    DANIEL S. BRADLEY

14  TX Bar # 24097411

15  *s/ Emma Dick*
    EMMA DICK

16  IA Bar # 51155

17  *s/ Sara M. Divett*
    SARA M. DIVETT

18  DC Bar # 1736504

19  *s/ Megan E. B. Henry*
    MEGAN E. B. HENRY

20  NY Reg. # 5539671

21  *s/ Colin M. Herd*
    COLIN M. HERD

22  NY Reg. # 5665740

23

24

COMPLAINT - 150
CASE NO. _:__-cv-_____

By:   Respectfully submitted,

SUSAN A. MUSSER
DC Bar # 1531486

*s/ Edward H. Takashima*
EDWARD H. TAKASHIMA
DC Bar # 1001641

*Lead Counsel*

*s/ David B. Schwartz*
DAVID B. SCHWARTZ
NY Reg. # 4947925

*s/ Christine M. Kennedy*
CHRISTINE M. KENNEDY
DC Bar # 1032904

*s/ Daniel A. Principato*
DANIEL A. PRINCIPATO
NY Reg. # 5350129

*s/ Danielle C. Quinn*
DANIELLE C. QUINN
NY Reg. # 5408943

*s/ Z. Lily Rudy*
Z. LILY RUDY
DC Bar # 1023073

*s/ Kelly Schoolmeester*
KELLY SCHOOLMEESTER
DC Bar # 1008354

*s/ Christina F. Shackelford*
CHRISTINA F. SHACKELFORD
NY Reg. # 5339114

*s/ Jake Walter-Warner*
JAKE WALTER-WARNER
NY Reg. # 5396668

*Attorneys*
Bureau of Competition

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone:  (202) 326-2122 (Musser)
                     (202) 326-2464 (Takashima)
Email: smusser@ftc.gov
            etakashima@ftc.gov
            dschwartz1@ftc.gov
            santonio@ftc.gov
            ebolles@ftc.gov
            dbradley@ftc.gov
            edick@ftc.gov
            sdivett@ftc.gov
            mhenry1@ftc.gov
            cherd@ftc.gov
            ckennedy@ftc.gov
            dprincipato@ftc.gov
            dquinn@ftc.gov
            zrudy@ftc.gov
            kschoolmeester@ftc.gov
            cshackelford@ftc.gov
            jwalterwarner@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

COMPLAINT - 151
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   FOR PLAINTIFF STATE OF NEW YORK:

2

3                                     LETITIA JAMES
                                      Attorney General
4

5                                     Christopher D'Angelo
                                      Chief Deputy Attorney General,
                                      Economic Justice Division
6

7                                     Elinor R. Hoffmann
                                      (*pro hac vice* forthcoming)
                                      Chief, Antitrust Bureau
8                                     Elinor.Hoffmann@ag.ny.gov
                                      Amy McFarlane
9                                     (*pro hac vice* forthcoming)
                                      Deputy Chief, Antitrust Bureau
10                                    Amy.McFarlane@ag.ny.gov
                                      Michael Jo
11                                    (*pro hac vice* forthcoming)
                                      Assistant Attorney General, Antitrust Bureau
12                                    Michael.Jo@ag.ny.gov
                                      Tal Elmatad
13                                    (*pro hac vice* forthcoming)
                                      Assistant Attorney General, Antitrust Bureau
14                                    Tal.Elmatad@ag.ny.gov
                                      James Yoon
15                                    (*pro hac vice* forthcoming)
                                      Assistant Attorney General, Antitrust Bureau
16                                    James.Yoon@ag.ny.gov
                                      New York State Office of the Attorney General
17                                    28 Liberty Street
                                      New York, NY 10005
18                                    (212) 416-8262

19                                    *Attorneys for Plaintiff State of New York*

20

21

22

23

24

COMPLAINT - 152
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  FOR PLAINTIFF STATE OF CONNECTICUT:

2

3                                    WILLIAM TONG
                                     Attorney General
4
                                     Nicole Demers
5                                    (*pro hac vice* forthcoming)
                                     Deputy Associate Attorney General
6                                    Nicole.Demers@ct.gov
                                     Jeremy Pearlman
7                                    Associate Attorney General
                                     Jeremy.Pearlman@ct.gov
8                                    Rahul A. Darwar
                                     (*pro hac vice* forthcoming)
9                                    Assistant Attorney General
                                     Rahul.Darwar@ct.gov
10                                   Office of the Attorney General of Connecticut
                                     165 Capitol Avenue
11                                   Hartford, CT 06016
                                     Tel: (860) 808-5030
12                                   Email: Nicole.Demers@ct.gov

13                                   *Attorneys for Plaintiff State of Connecticut*

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 153                              **FEDERAL TRADE COMMISSION**
CASE NO. _:__-cv-_____                           600 Pennsylvania Avenue, NW
                                                      Washington, DC 20580
                                                         (202) 326-2222

1   FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:

2

3                                       MICHELLE A. HENRY
                                        Attorney General of Pennsylvania
4
                                        Tracy W. Wertz
5                                       (*pro hac vice* forthcoming)
                                        Chief Deputy Attorney General
6                                       twertz@attorneygeneral.gov
                                        Jennifer A. Thomson
7                                       (*pro hac vice* forthcoming)
                                        Senior Deputy Attorney General
8                                       jthomson@attorneygeneral.gov
                                        Norman A. Marden
9                                       Senior Deputy Attorney General
                                        nmarden@attorneygeneral.gov
10                                      Brandon Sprecher
                                        (*pro hac vice* forthcoming)
11                                      Deputy Attorney General
                                        bsprecher@attorneygeneral.gov
12

13                                      Pennsylvania Office of Attorney General
                                        Strawberry Square, 14th Floor
14                                      Harrisburg, PA 17120
                                        Tel: (717) 787-4530
15
                                        *Attorneys for Plaintiff Commonwealth of*
16                                      *Pennsylvania*

17

18

19

20

21

22

23

24

COMPLAINT - 154                                    **FEDERAL TRADE COMMISSION**
CASE NO. _:__-cv-_____                                 600 Pennsylvania Avenue, NW
                                                          Washington, DC 20580
                                                             (202) 326-2222

1  FOR PLAINTIFF STATE OF DELAWARE:

2

3                                          KATHLEEN JENNINGS
                                           Attorney General
4
                                           Michael A. Undorf
5                                          (*pro hac vice* forthcoming)
                                           Deputy Attorney General
6                                          michael.undorf@delaware.gov
                                           (302) 683-8816
7
                                           Brian Canfield
8                                          (*pro hac vice* forthcoming)
                                           Deputy Attorney General
9                                          brian.canfield@delaware.gov
                                           (302) 683-8809
10
                                           Delaware Department of Justice
11                                         820 N. French St., 5th Floor
                                           Wilmington, DE 19801
12
                                           *Attorneys for Plaintiff State of Delaware*
13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 | FOR PLAINTIFF STATE OF MAINE:

2

3 | AARON M. FREY
Attorney General

4

5 | Christina M. Moylan
(*pro hac vice* forthcoming)
Assistant Attorney General

6 | Chief, Consumer Protection Division
christina.moylan@maine.gov

7

8 | Michael Devine
(*pro hac vice* forthcoming)
Assistant Attorney General

9 | michael.devine@maine.gov

10 | Office of the Maine Attorney General
6 State House Station

11 | Augusta, ME 04333-0006
(207) 626-8800

12

13 | *Attorneys for Plaintiff State of Maine*

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  FOR PLAINTIFF STATE OF MARYLAND:

2

3              ANTHONY G. BROWN
             Attorney General

4
             Schonette J. Walker
5            Assistant Attorney General
             Chief, Antitrust Division
6            Swalker@oag.state.md.us

7            Gary Honick
             (*pro hac vice* forthcoming)
8            Assistant Attorney General
             Deputy Chief, Antitrust Division
9            Ghonick@oag.state.md.us

10           Byron Warren
             (*pro hac vice* forthcoming)
11           Assistant Attorney General
             Bwarren@oag.state.md.us
12
             Office of the Maryland Attorney General
13           200 St. Paul Place
             Baltimore, MD 21202
14           (410) 576-6474

15           *Attorneys for Plaintiff State of Maryland*

16

17

18

19

20

21

22

23

24

COMPLAINT - 157
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

2

3                                      ANDREA JOY CAMPBELL
                                       Attorney General
4
                                       MICHAEL MACKENZIE
5                                      (*pro hac vice* forthcoming)
                                       Deputy Chief, Antitrust Division
6                                      WILLIAM MATLACK
                                       Chief, Antitrust Division
7                                      Office of the Massachusetts Attorney General
                                       One Ashburton Place, 18th Floor
8                                      Boston, Massachusetts 02108
                                       (617) 963-2369
9                                      michael.mackenzie@mass.gov

10                                     *Attorneys for the Commonwealth of*
                                       *Massachusetts*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 158                                    **FEDERAL TRADE COMMISSION**
CASE NO. _:__-cv-_____                                600 Pennsylvania Avenue, NW
                                                          Washington, DC 20580
                                                             (202) 326-2222

1  FOR PLAINTIFF STATE OF MICHIGAN:

2

3                                        DANA NESSEL
                                         Attorney General
4
                                         Jason Evans
5                                        (*pro hac vice* forthcoming)
                                         Division Chief, Corporate Oversight Division
6                                        Assistant Attorney General
                                         EvansJ@michigan.gov
7                                        Scott Mertens
                                         (*pro hac vice* forthcoming)
8                                        Assistant Attorney General
                                         MertensS@michigan.gov
9                                        Jonathan Comish
                                         (*pro hac vice* forthcoming)
10                                       Assistant Attorney General
                                         ComishJ@michigan.gov
11
                                         Michigan Department of Attorney General
12                                       525 West Ottawa Street
                                         Lansing, MI 48933
13                                       Phone: (517) 335-7622
                                         Email: MertensS@michigan.gov
14
                                         *Attorneys for Plaintiff State of Michigan*
15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
                                                          600 Pennsylvania Avenue, NW
                                                          Washington, DC 20580
                                                          (202) 326-2222

1   FOR PLAINTIFF STATE OF MINNESOTA:

2

3               KEITH ELLISON
                Attorney General

4
                JESSICA WHITNEY
5               JAMES W. CANADAY
                Deputy Attorneys General

6
                ZACH BIESANZ
7               (*pro hac vice* forthcoming)
                Senior Enforcement Counsel
8               SARAH DOKTORI
                (*pro hac vice* forthcoming)
9               Assistant Attorney General
                Office of the Minnesota Attorney General
10              445 Minnesota Street, Suite 1400
                Saint Paul, Minnesota 55101
11              (651) 757-1257
                zach.biesanz@ag.state.mn.us
12
                *Attorneys for Plaintiff State of Minnesota*
13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    FOR PLAINTIFF STATE OF NEVADA:

2

3                                              AARON D. FORD
                                               Attorney General
4
                                               ERNEST D. FIGUEROA
5                                              Consumer Advocate

6                                              Lucas J. Tucker (NV Bar No. 10252)
                                               (*pro hac vice* forthcoming)
7                                              Senior Deputy Attorney General
                                               LTucker@ag.nv.gov
8                                              Mark J. Krueger (NV Bar No. 7410)
                                               Chief Deputy Attorney General
9                                              MKrueger@ag.nv.gov
                                               Whitney F. Digesti (NV Bar No. 13012)
10                                             Senior Deputy Attorney General
                                               WDigesti@ag.nv.gov
11                                             Office of the Nevada Attorney General
                                               100 N. Carson St.
12                                             Carson City, Nevada 89701
                                               Tel: (775) 684-1100
13
                                               *Attorneys for Plaintiff State of Nevada*
14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 161                                      **FEDERAL TRADE COMMISSION**
CASE NO. _:__-cv-_____                                  600 Pennsylvania Avenue, NW
                                                             Washington, DC 20580
                                                                 (202) 326-2222

1    PLAINTIFF STATE OF NEW HAMPSHIRE:

2                                          By its attorney,

3                                          JOHN M. FORMELLA
                                           Attorney General
4
                                           Alexandra C. Sosnowski
5                                          (*pro hac vice* forthcoming)
                                           Assistant Attorney General
6                                          Consumer Protection and Antitrust Bureau
                                           New Hampshire Department of Justice
7                                          Office of the Attorney General
                                           33 Capitol St.
8                                          Concord, NH 03301
                                           Alexandra.c.sosnowski@doj.nh.gov
9                                          (603) 271-2678

10                                         *Attorneys for Plaintiff State of New Hampshire*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 162                                    **FEDERAL TRADE COMMISSION**
CASE NO. _:__-cv-_____                               600 Pennsylvania Avenue, NW
                                                        Washington, DC 20580
                                                          (202) 326-2222

FOR PLAINTIFF STATE OF NEW JERSEY:

MATTHEW J. PLATKIN
Attorney General of New Jersey

Ana Atta-Alla
(*pro hac vice* forthcoming)
Deputy Attorney General
Ana.Atta-Alla@law.njoag.gov
Isabella Pitt
(*pro hac vice* forthcoming)
Assistant Section Chief – Antitrust
Isabella.Pitt@law.njoag.gov

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(973) 648-3070

*Attorneys for Plaintiff State of New Jersey*

COMPLAINT - 163
CASE NO. _:__-cv-_____

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General

Jeffrey Herrera
(*pro hac vice* forthcoming)
Assistant Attorney General
jherrera@nmag.gov
Julie Meade
(*pro hac vice* forthcoming)
Division Director, Consumer and
Environmental Protection Division
jmeade@nmag.gov
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Tel: (505) 490-4885

*Attorneys for Plaintiff State of New Mexico*

COMPLAINT - 164
CASE NO. _:__-cv-_____

1  FOR PLAINTIFF STATE OF OKLAHOMA:

2

3                                         GENTNER DRUMMOND
                                          Attorney General
4
                                          Caleb J. Smith, OBA No. 33613
5                                         (*pro hac vice* forthcoming)
                                          Assistant Attorney General
6                                         Consumer Protection Unit
                                          Office of the Oklahoma Attorney General
7                                         15 West 6th Street
                                          Suite 1000
8                                         Tulsa, OK 74119
                                          Tel. (918) 581-2230
9                                         Fax (918) 938-6348
                                          Email: caleb.smith@oag.ok.gov
10
                                          *Attorneys for Plaintiff State of Oklahoma*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 165                                    **FEDERAL TRADE COMMISSION**
CASE NO. _:__-cv-_____                                 600 Pennsylvania Avenue, NW
                                                           Washington, DC 20580
                                                              (202) 326-2222

1  FOR PLAINTIFF STATE OF OREGON:

2

3                                        ELLEN F. ROSENBLUM
                                         Attorney General
4
                                         *s/ Timothy D. Smith*
5                                        TIMOTHY D. SMITH, WSBA No. 44583
                                         Senior Assistant Attorney General
6                                        Antitrust and False Claims Unit
                                         Oregon Department of Justice
7                                        100 SW Market St
                                         Portland, OR 97201
8                                        (503) 934-4400
                                         tim.smith@doj.state.or.us
9
                                         *Attorneys for Plaintiff State of Oregon*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    FOR PLAINTIFF STATE OF RHODE ISLAND:

2

3                                          PETER F. NERONHA
                                           Attorney General
4
                                           STEPHEN N. PROVAZZA (RI Bar No.
5                                          10435) (*pro hac vice* forthcoming)
                                           Special Assistant Attorney General
6                                          Chief, Consumer and Economic Justice Unit
                                           Department of the Attorney General
7                                          150 South Main Street
                                           Providence, RI 02903
8                                          sprovazza@riag.ri.gov
                                           (401) 274-4400
9
                                           *Attorneys for Plaintiff State of Rhode Island*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
                                           600 Pennsylvania Avenue, NW
                                           Washington, DC 20580
                                           (202) 326-2222

1    FOR PLAINTIFF STATE OF WISCONSIN:

2

3                                    JOSHUA L. KAUL
                                     Attorney General
4
                                     GWENDOLYN J. COOLEY
5                                    (*pro hac vice* forthcoming)
                                     Assistant Attorney General
6                                    Wisconsin Department of Justice
                                     Post Office Box 7857
7                                    Madison, Wisconsin 53707-7857
                                     (608) 261-5810
8                                    (608) 266-2250 (Fax)
                                     cooleygj@doj.state.wi.us
9
                                     *Attorneys for Plaintiff State of Wisconsin*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 168                                    **FEDERAL TRADE COMMISSION**
CASE NO. _:__-cv-_____                                   600 Pennsylvania Avenue, NW
                                                              Washington, DC 20580
                                                                  (202) 326-2222