1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

7

8    FEDERAL TRADE COMMISSION,

9    STATE OF NEW YORK,

10    STATE OF CONNECTICUT,

11    COMMONWEALTH OF PENNSYLVANIA,

12    STATE OF DELAWARE,

13    STATE OF MAINE,

14    STATE OF MARYLAND,

15    COMMONWEALTH OF MASSACHUSETTS,

16    STATE OF MICHIGAN,

17    STATE OF MINNESOTA,

18    STATE OF NEVADA,

19    STATE OF NEW HAMPSHIRE,

20    STATE OF NEW JERSEY,

21    STATE OF NEW MEXICO,

22    STATE OF OKLAHOMA,

23    STATE OF OREGON,

24

**CASE NO.: 2:23-cv-01495-JHC**

**COMPLAINT**
**[PUBLIC REDACTED VERSION]**

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    STATE OF RHODE ISLAND,

2    and

3    STATE OF WISCONSIN,

4                    Plaintiffs,

5                v.

6    AMAZON.COM, INC., a corporation,

7                    Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

**TABLE OF CONTENTS**

2  I.    NATURE OF THE CASE ................................................................. 1

3  II.   JURISDICTION AND VENUE ...................................................... 11

4  III.  THE PARTIES.............................................................................. 12

5  IV.   AMAZON'S OPERATIONS........................................................... 18

6        A.   Amazon's First-Party Retail And Third-Party Marketplace Business Units........ 19

7        B.   Amazon's Online Superstore ............................................... 21

8        C.   Amazon's Advertising Services............................................ 28

9        D.   Amazon Prime .................................................................... 32

10       E.   Fulfillment By Amazon ....................................................... 38

11 V.    AMAZON POSSESSES MONOPOLY POWER IN TWO RELEVANT MARKETS... 39

12       A.   Amazon Has Durable Monopoly Power In The Online Superstore Market......... 40

13       B.   Amazon Has Durable Monopoly Power In The Online Marketplace

14            Services Market ................................................................... 59

15       C.   Feedback Loops Between The Relevant Markets Further Amplify The

16            Cumulative Impact Of Scale And Related Network Effects ................................ 65

17       D.   Direct Evidence Further Demonstrates Amazon's Monopoly Power................... 71

18 VI.   AMAZON IS ENGAGED IN A COURSE OF CONDUCT THAT ILLEGALLY

19       MAINTAINS ITS MONOPOLIES IN BOTH RELEVANT MARKETS ...................... 80

20       A.   Amazon Maintains Its Monopolies In Both Relevant Markets Through

21            Exclusionary Anti-Discounting Conduct That Stifles Price Competition ........... 81

22       B.   Amazon Maintains Its Monopolies In Both Relevant Markets By Coercing

23            Sellers To Use Amazon's Fulfillment Service................................................... 102

24

COMPLAINT - iii
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

C.    Amazon's Anticompetitive Tactics Work Together To Amplify Their

Overall Exclusionary Effect ................................................................. 117

VII.   AMAZON HAS MANIPULATED OTHER ONLINE STORES' PRICING

ALGORITHMS INTO INCREASING PRICES ........................................... 119

A.    Project Nessie Induced Other Online Stores To Raise Their Prices,

Generating Enormous Profits For Amazon ........................................... 119

B.    Amazon Has Repeatedly Turned Project Nessie On And Off, And

Amazon Can Turn It Back On Today ................................................. 121

VIII.  AMAZON'S CONDUCT HARMS COMPETITION AND CONSUMERS ................. 122

IX.    VIOLATIONS ALLEGED ............................................................... 125

X.     REQUEST FOR RELIEF ................................................................. 147

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

Plaintiffs Federal Trade Commission ("FTC") and the states of New York, Connecticut, Pennsylvania, Delaware, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, Oklahoma, Oregon, Rhode Island, and Wisconsin, by and through their respective Attorneys General (together, the "State Plaintiffs," and collectively with the FTC, "Plaintiffs"), petition this Court pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b); 15 U.S.C. § 26; and applicable state laws for equitable relief against Defendant Amazon.com, Inc. ("Amazon") to undo and prevent its unfair methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); Section 2 of the Sherman Act, 15 U.S.C. § 2; and state competition and consumer protection laws.

# I.    NATURE OF THE CASE

1.    The early days of online trade were bursting with possibility.  Competition flourished.  A newly connected nation saw a wide-open frontier where anyone with a good idea would have a fair shot at success.

2.    Today, however, this wide-open frontier has been enclosed.  A single company, Amazon, has seized control over much of the online retail economy.

3.    Amazon is a monopolist.  It exploits its monopolies in ways that enrich Amazon but harm its customers: both the tens of millions of American households who regularly shop on Amazon's online superstore and the hundreds of thousands of businesses who rely on Amazon to reach them.

4.    For example, Amazon has hiked so steeply the fees it charges sellers that it now reportedly takes close to *half* of every dollar from the typical seller that uses Amazon's fulfillment service.  Amazon recognizes that sellers find "that it has become more difficult over time to be profitable on Amazon" due to Amazon's "increasing fees and costs."  But as one seller explains, "we have nowhere else to go and Amazon knows it."  Amazon has also quietly and

1  deliberately raised prices for shoppers through a covert operation called "Project Nessie."

2  Explicitly intended to inflate the prices that shoppers pay, Amazon's Project Nessie has already

3  extracted over a billion dollars from American households.

4       5.     In addition to overcharging its customers, Amazon is degrading the services it

5  provides them.  Amazon's online storefront once prioritized relevant, organic search results.

6  Following directions from its founder and then-CEO Jeff Bezos, Amazon shifted gears so that it

7  now litters its storefront with pay-to-play advertisements.  Amazon executives internally

8  acknowledge this creates "harm to consumers" by making it "almost impossible for high quality,

9  helpful organic content to win over barely relevant sponsored content."  This practice, too, harms

10  both sellers and shoppers alike.  Most sellers must now pay for advertising to reach Amazon's

11  massive base of online shoppers, while shoppers consequently face less relevant search results

12  and are steered toward more expensive products.  Notably, Amazon has increased not only the

13  number of advertisements it shows, but also the number of irrelevant junk ads, internally called

14  "defects."  Mr. Bezos instructed his executives to "[a]ccept more defects" because Amazon can

15  extract billions of dollars through increased advertising despite worsening its services for

16  customers.

17       6.     In a competitive world, Amazon's decision to raise prices and degrade services

18  would create an opening for rivals and potential rivals to attract business, gain momentum, and

19  grow.  But Amazon has engaged in an unlawful monopolistic strategy to close off that

20  possibility.

21       7.     This case is about the illegal course of exclusionary conduct Amazon deploys to

22  block competition, stunt rivals' growth, and cement its dominance.  The elements of this strategy

23  are mutually reinforcing.  Amazon uses a set of anti-discounting tactics to prevent rivals from

24  growing by offering lower prices, and it uses coercive tactics involving its order fulfillment

COMPLAINT - 2
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  service to prevent rivals from gaining the scale they need to meaningfully compete.  Amazon

2  deploys this interconnected strategy to block off every major avenue of competition—including

3  price, product selection, quality, and innovation—in the relevant markets for online superstores

4  and online marketplace services.

5       8.     Amazon's course of conduct has unlawfully entrenched its monopoly position in

6  both relevant markets.  According to an industry source, Amazon now captures more sales than

7  the next fifteen largest U.S. online retail firms combined.  Yet Amazon has violated the law not

8  by being big, but by how it uses its scale and scope to stifle competition.

9       9.     A critical mass of customers is key to powering what Amazon calls its

10  "flywheel."  By providing sellers access to significant shopper traffic, Amazon is able to attract

11  more sellers onto its platform.  Those sellers' selection and variety of products, in turn, attract

12  additional shoppers.  More shoppers yield more customer-generated product ratings, reviews,

13  and valuable consumer data for Amazon to use.  All of this enables Amazon to benefit from the

14  accelerated growth and momentum that network effects and scale economies can fuel.

15       10.     The biggest threat to Amazon's monopoly power would be for a rival to attract its

16  own critical mass of dedicated customers.  Competitors able to build a sizable base of either

17  shoppers or sellers could spin up their own "flywheels," overcome barriers to entry and

18  expansion, and achieve the scale needed to compete effectively in the relevant markets.  As Mr.

19  Bezos once wrote, "[o]nline selling (relative to traditional retailing) is a scale business

20  characterized by high fixed costs and relatively low variable costs.  This makes it difficult to be a

21  medium-sized e-commerce company," and it is "difficult . . . for single-category e-commerce

22  companies to achieve the scale necessary to succeed."  In order to "build an important and

23  lasting company . . . online in e-commerce," Mr. Bezos explained, "you have to have a scale

24  business," because "[t]his kind of business isn't going to work in small volumes."

11.     Having gained its own critical mass of both shoppers and sellers, Amazon set out to deny both current and would-be rivals the ability to do the same.

12.     Amazon uses its vast power, size, and control over multiple business units to implement an interrelated and exclusionary course of conduct.  Each element of this overarching strategy aims at the same goal: to keep rivals from gaining the scale needed to compete effectively against Amazon.  And each element amplifies the force of the rest, in a self-reinforcing cycle of dominance and harm.

13.     One set of tactics stifles the ability of rivals to attract shoppers by offering lower prices.  Amazon deploys a sophisticated surveillance network of web crawlers that constantly monitor the internet, searching for discounts that might threaten Amazon's empire.  When Amazon detects elsewhere online a product that is cheaper than a seller's offer for the same product on Amazon, Amazon punishes that seller.  It does so to prevent rivals from gaining business by offering shoppers or sellers lower prices.

14.     Originally, Amazon imposed explicit contractual requirements barring all sellers from offering their goods for lower prices anywhere else.  After European regulators began investigating, Amazon got rid of these requirements in Europe.  After a U.S. senator called for antitrust scrutiny, Amazon did the same in the United States in 2019.

15.     Amazon recognized that dropping an explicit contractual requirement while continuing to use other anti-discounting tactics would appear "not only trivial but a trick and an attempt to garner goodwill with policymakers amid increasing competition concerns."

16.     But Amazon has done just that.  It continues to use—and add—other anti-discounting tactics to discipline sellers who offer lower-priced goods elsewhere.  The sanctions Amazon levies on sellers vary.  For example, Amazon knocks these sellers out of the all-important "Buy Box," the display from which a shopper can "Add to Cart" or "Buy Now" an

COMPLAINT - 4
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

Amazon-selected offer for a product.  Nearly 98% of Amazon sales are made through the Buy Box and, as Amazon internally recognizes, eliminating a seller from the Buy Box causes that seller's sales to "tank."  Another form of punishment is to bury discounting sellers so far down in Amazon's search results that they become effectively invisible.  Still another is to erase a product's price from public view, even if the offer is the best deal available on Amazon.  For especially important sellers, Amazon keeps in place a targeted version of the contractual requirement it supposedly stopped using in 2019.  If caught offering lower prices elsewhere online, these sellers face the ultimate threat: not just banishment from the Buy Box, but total exile from Amazon's Marketplace.  As Amazon internally admits, these tactics have a "punitive aspect," and many sellers "live in constant fear" of them.

17.    Moreover, Amazon's one-two punch of seller punishments and high seller fees often forces sellers to use their inflated Amazon prices as a price floor everywhere else.  As a result, Amazon's conduct causes online shoppers to face artificially higher prices even when shopping somewhere other than Amazon.  Amazon's punitive regime distorts basic market signals: one of the ways sellers respond to Amazon's fee hikes is by increasing their own prices off Amazon.  An executive from another online retailer sums up this perverse dynamic: Amazon's anti-discounting conduct "forc[es sellers] to raise prices on other platforms where their cost base is potentially lower."  Amazon's illegal tactics mean that when Amazon raises its fees, others—competitors, sellers, and shoppers—suffer the harms.

18.    Amazon's tactics suppress rival online superstores' ability to compete for shoppers by offering lower prices, thereby depriving American households of more affordable options.  Amazon's conduct also suppresses rival online marketplace service providers' ability to compete for sellers by offering lower fees because sellers cannot pass along those savings to shoppers in the form of lower product prices.

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

19. These various anti-discounting tactics constrain sellers operating on Amazon's third-party business unit, through which sellers set their own product prices. But Amazon also operates an enormous first-party arm, which accounted for 40% of its overall unit sales in the second quarter of 2023, as shown in Figure 1. Using its direct control over these prices, Amazon created another anti-discounting tool to weaponize its first-party arm in its campaign against competition.



*Figure 1. Source: Amazon Q2 2023 Earnings Call.*

20. Amazon has implemented an algorithm for the express purpose of deterring other online stores from offering lower prices. This algorithm was conceived by Amazon's former CEO of its Worldwide Consumer business, Jeff Wilke. According to Mr. Wilke, Amazon deploys this algorithm to avoid a "perfectly competitive market" in which participants lower their prices to a competitive level. Rather than trying to compete, Amazon uses a "game theory approach," never making the first move and instead disciplining rivals by rapidly copying others' moves to the penny, both up and down. The goal is to ensure that rivals' price cuts and discounts do not translate to greater scale, only lower margins. Ultimately, this conduct is meant to deter rivals from attempting to compete on price altogether—competition that could bring lower prices to tens of millions of American households. As a result of this conduct, Amazon predicted, "prices will go up." Mr. Wilke believes that Amazon's prediction has borne out and the

algorithm has worked just as he envisioned: suppressing price competition by disciplining rival retailers who dare to discount.

21.     Amazon's various anti-discounting tactics upend the normal give-and-take process of competition.  Even rivals that offer lower-cost marketplace services struggle to attract sellers and watch as sellers hike prices on their storefronts due to fear of Amazon's penalties. Many sellers raise their prices off Amazon to avoid punishment.  Others never try discounting in the first place; fear of retribution by Amazon drives them to preemptively set higher prices everywhere.  Still others simply stop—or never start—selling anywhere other than Amazon to avoid any possibility of Amazon's sanctions.

22.     By taming price cutters into price followers, Amazon freezes price competition and deprives American shoppers of lower prices.

23.     Alongside these anti-discounting tactics, Amazon also goes a step further and hikes prices directly and outright.  Amazon created a secret algorithm internally codenamed "Project Nessie" to identify specific products for which it predicts other online stores will follow Amazon's price increases.  When activated, this algorithm raises prices for those products and, when other stores follow suit, keeps the now-higher price in place.  Amazon has deemed Project Nessie "an incredible success": it has generated more than $1 billion in excess profit for Amazon.  Aware of the public fallout it risks, Amazon has turned Project Nessie off during periods of heightened outside scrutiny and then back on when it thinks that no one is watching.

24.     Amazon deploys yet another tactic as part of its monopolistic course of conduct. Amazon conditions sellers' ability to be "Prime eligible" on their use of Amazon's order fulfillment service.  As with Amazon's anti-discounting tactics, this coercive conduct forecloses Amazon's rivals from drawing a critical mass of sellers or shoppers—thereby depriving them of the scale needed to compete effectively online.

COMPLAINT - 7
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

25.     Amazon makes Prime eligibility critical for sellers to fully reach Amazon's enormous base of shoppers.  In 2021, more than █% of all units sold on Amazon in the United States were Prime eligible.

26.     Prime eligibility is critical for sellers in part because of the enormous reach of Amazon's Prime subscription program.  According to public reports, Mr. Bezos told Amazon executives that Prime was created in 2005 to "draw a moat around [Amazon's] best customers."  Prime now blankets more than █% of all U.S. households, with its reach extending as far as █% in some zip codes.

27.     Amazon requires sellers who want their products to be Prime eligible to use Amazon's fulfillment service, Fulfillment by Amazon ("FBA"), even though many sellers would rather use an alternative fulfillment method to store and package customer orders.

28.     Many sellers would also prefer to "multihome," simultaneously offering their goods across multiple online sales channels.  Multihoming can be an especially critical mechanism of competition in online markets, enabling rivals to overcome the barriers to entry and expansion that scale economies and network effects can create.  Multihoming is one way that sellers can reduce their dependence on a single sales channel.

29.     Sellers could multihome more cheaply and easily by using an independent fulfillment provider—a provider not tied to any one marketplace—to fulfill orders across multiple marketplaces.  Permitting independent fulfillment providers to compete for any order— on or off Amazon—would enable them to gain scale and lower their costs to sellers.  That, in turn, would make independent providers even more attractive to sellers seeking a single, universal provider.  All of this would make it easier for sellers to offer items across a variety of outlets, fostering competition and reducing sellers' dependence on Amazon.

30. But by coercively conditioning access to an enormous base of shoppers on sellers' use of FBA, Amazon forecloses that world.

31. Amazon caught a glimpse of this alternative universe when it temporarily relaxed its coercive conduct. As Amazon recognized, this decision was immediately popular with both shoppers and sellers. But internally, Amazon soon realized that its move could enable greater multihoming, facilitating competition that would threaten Amazon's monopoly power. An Amazon executive explained to his colleagues that he had an "'oh crap' moment" when he realized that this was "fundamentally weakening [Amazon's] competitive advantage in the U.S. . . . as sellers are now incented to run their own warehouses and enable other marketplaces with inventory that in FBA would only be available to our customers."

32. To combat this competitive threat, Amazon resumed its coercive fulfillment conduct: today, virtually all sellers must use Amazon's proprietary FBA service to fully reach Amazon's enormous base of U.S. shoppers.

33. Each element of Amazon's monopolistic strategy works to keep its rivals and potential rivals from growing, gaining momentum, and achieving the scale necessary to meaningfully compete against Amazon. The cumulative impact of Amazon's unlawful conduct is greater than the harm caused by any particular element. Each aspect of Amazon's strategy amplifies the exclusionary effects of the others, further insulating Amazon from meaningful competition and further widening the gulf between Amazon and everyone else.

34. Together, this self-reinforcing course of conduct blocks every important avenue of competition. With its monopoly power cemented, Amazon is now extracting monopoly profits without denting—and instead while growing—its monopoly power. Amazon has consistently hiked the prices it charges sellers, as shown in Figure 2.

COMPLAINT - 9
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1
2
3
4
5
6
7
8
9

**Amazon's Average Take Rate From Sellers Who Use FBA**

| 2014 | 2015 | 2016 | 2017 | 2018E | 2019 | 2020 | 2021E | 2022E |
|------|------|------|------|-------|------|------|-------|-------|
| 27.6% | 28.9% | 31.9% | 35.6% | 39.5% | | | | |

10    *Figure 2.  Source: Amazon Internal Documents.*

11    35.    Amazon's price hikes in the form of pay-to-play advertisements have been

12 enormously lucrative, leading its revenues from U.S. ad sales to skyrocket from $1 billion in

13 2015 to ▮ billion in 2021.  Amazon took in ▮ billion in revenue from U.S. Marketplace

14 seller fees in 2021 alone.  Strikingly, these seller fees now account for *over* ▮*%* of Amazon's

15 total profits.  Sellers pay.  Shoppers get lower-quality search results for higher-priced products.

16 Only Amazon wins.

17    36.    In a market free from anticompetitive restraints, Amazon's choice to exploit its

18 monopoly power would create openings for rivals to enter, grow, and meaningfully compete.

19 Rival online marketplaces could draw sellers by offering them lower fees or better terms, and

20 sellers could pass along those lower costs to American shoppers in the form of lower prices.

21 Rival online superstores, meanwhile, could draw shoppers by offering better prices, greater

22 selection, or a superior shopping experience.  But Amazon's illegal course of conduct shields

23 Amazon from the competitive checks it would face in a free enterprise system.

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

37.     Amazon's illegal monopolistic strategy is paying off for Amazon, but at great cost to tens of millions of American households and hundreds of thousands of sellers.

38.     Left unchecked, Amazon will continue its illegal course of conduct to maintain its monopoly power.  That conduct will include—but will not necessarily be limited to—the schemes it uses today.  As Mr. Bezos has said, "on matters of vision we are stubborn and relentless," but "[o]n the details, we at Amazon are always flexible."

39.     Plaintiffs bring this lawsuit despite Amazon's extensive efforts to impede the government's investigation and hide information about its internal operations.  Amazon executives systematically and intentionally deleted internal communications using the "disappearing message" feature of the Signal messaging app.  Amazon prejudicially destroyed more than two years' worth of such communications—from June 2019 to at least early 2022—despite Plaintiffs' instructing Amazon not to do so.

40.     Plaintiffs now ask this Court to put an end to Amazon's illegal course of conduct, pry loose Amazon's monopolistic control, deny Amazon the fruits of its unlawful practices, and restore the lost promise of competition.

## II.     JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this action pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), 15 U.S.C. § 26, 28 U.S.C. §§ 1331, 1337(a), and 1345, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  This Court's exercise of supplemental jurisdiction over State Plaintiffs' state law claims will avoid unnecessary duplication and multiplicity of actions and will promote the interests of judicial economy, convenience, and fairness.

42.     This Court has personal jurisdiction over Amazon because Amazon has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

COMPLAINT - 11
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   This Court also has personal jurisdiction over Amazon because it maintains its corporate

2   headquarters in Washington, does business in Washington, and has engaged in the illegal

3   conduct alleged herein in Washington, including by making corporate decisions challenged in

4   this matter from its corporate headquarters in Washington.

5        43.   Amazon's general business practices, and the unfair methods of competition

6   alleged herein, are activities "in or affecting commerce" within the meaning of Section 5 of the

7   FTC Act, 15 U.S.C. § 45.

8        44.   Amazon is, and at all relevant times has been, a corporation, as the term

9   "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

10        45.   Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b), (c),

11   and (d), and 15 U.S.C. § 53(b).  Amazon is found, resides, transacts business, and has agents in

12   this state and district, and a portion of the affected commerce described herein has been carried

13   out in this state and district.

14   **III.   THE PARTIES**

15        46.   Plaintiff FTC is an administrative agency of the United States Government

16   established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its

17   principal offices in the District of Columbia.  The FTC is vested with authority and responsibility

18   for enforcing, among other laws, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized

19   under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin

20   violations of any law the FTC enforces.  This case is proper under Section 13(b) of the FTC Act,

21   15 U.S.C. § 53(b), because the FTC has reason to believe that Amazon is violating, or is about to

22   violate, Section 5 of the FTC Act, making it appropriate, efficient, and suitable to file this action

23   in federal court with State Plaintiffs to seek the requested relief.

24

COMPLAINT - 12
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

47.     Plaintiff State of New York is a sovereign state.  The Attorney General of the State of New York is the chief legal officer for the state and brings this action on behalf of the people of the State of New York to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and New York Executive Law § 63(12), to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

48.     Plaintiff State of Connecticut is a sovereign state.  The Attorney General of the State of Connecticut is the chief legal officer for the state and brings this action on behalf of the people of the State of Connecticut to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*, and the Attorney General, acting at the request of the Commissioner of Consumer Protection, has the authority under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

49.     Plaintiff Commonwealth of Pennsylvania is a sovereign commonwealth state. The Attorney General of the Commonwealth of Pennsylvania is the chief legal officer for the state and brings this action in the name and on behalf of the people of the Commonwealth of Pennsylvania to protect the Commonwealth, its general economy, its residents, and consumers from Amazon's unlawful business practices.  The Attorney General has authority under state and federal law, including Section 16 of the Clayton Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-4 and 201-4.1, and the Commonwealth Attorneys

COMPLAINT - 13
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Act, 71 P.S. § 732-204(c), to pursue injunctive and other equitable relief to prevent and remedy

2  the harms caused by anticompetitive conduct and unfair and deceptive acts and practices.

3      50.    Plaintiff State of Delaware is a sovereign state.  The Attorney General of the State

4  of Delaware is the chief legal officer for the state and brings this action in the name and on

5  behalf of the people of the State of Delaware to protect the state, its general economy, and its

6  residents from Amazon's unlawful business practices.  The Attorney General has authority under

7  federal and state law, including Section 16 of the Clayton Act and Del. Code Ann. Tit. 6, § 2105,

8  to pursue injunctive and other equitable relief to prevent and remedy the harms caused by

9  anticompetitive conduct.

10     51.    Plaintiff State of Maine is a sovereign state.  The Attorney General of the State of

11  Maine is the chief legal officer for the state and brings this action in the name and on behalf of

12  the people of the State of Maine to protect the state, its general economy, and its residents from

13  Amazon's unlawful business practices.  The Attorney General has authority under state and

14  federal law, including Section 16 of the Clayton Act and the Maine Monopolies and Profiteering

15  Law, 10 M.R.S.A. § 1104, to pursue injunctive and other equitable relief to prevent and remedy

16  the harms caused by anticompetitive conduct.

17     52.    Plaintiff State of Maryland is a sovereign state.  The Attorney General of the State

18  of Maryland is the chief legal officer for the state and brings this action in the name and on

19  behalf of the people of the State of Maryland to protect the state, its general economy, and its

20  residents from Amazon's unlawful business practices.  The Attorney General has authority under

21  state and federal law, including Section 16 of the Clayton Act and Maryland Commercial Code

22  Ann. § 11-201 *et seq.*, to pursue injunctive and other equitable relief to prevent and remedy the

23  harms caused by anticompetitive conduct.

24

COMPLAINT - 14
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

53.     Plaintiff Commonwealth of Massachusetts is a sovereign state.  The Attorney General of the Commonwealth of Massachusetts is the chief legal officer for the state and brings this action on behalf of the people of the Commonwealth of Massachusetts to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal law, including Section 16 of the Clayton Act, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

54.     Plaintiff State of Michigan is a sovereign state.  The Attorney General of the State of Michigan is the chief legal officer for the state and brings this action on behalf of the people of the State of Michigan to protect the state, its general economy, and its residents from Defendants' unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

55.     Plaintiff State of Minnesota is a sovereign state.  The Attorney General of the State of Minnesota is the chief legal officer for the state and brings this action on behalf of the people of the State of Minnesota to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and Minnesota Statute 8.31, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

56.     Plaintiff State of Nevada is a sovereign state.  The Attorney General of the State of Nevada is the chief legal officer for the state, and the Consumer Advocate is vested with the authority to enforce Nevada's antitrust laws.  The Attorney General, by and through the

COMPLAINT - 15
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Consumer Advocate, brings this action on behalf of the people of the State of Nevada to protect

2  the state, its general economy, and its residents from Amazon's unlawful business practices.  The

3  Nevada Attorney General and the Consumer Advocate have the authority under federal and state

4  law, including Section 16 of the Clayton Act, and Nev. Rev. Stat. §§ 228.380 and 598A.160, to

5  pursue injunctive and other equitable relief to prevent and remedy the harms caused by

6  anticompetitive conduct.

7       57.    Plaintiff State of New Hampshire is a sovereign state, acting through the Office of

8  the Attorney General, Consumer Protection and Antitrust Bureau to enforce state and federal

9  laws designed to protect free and open markets for the benefit of consumers.  The Attorney

10  General brings this action on behalf of the State of New Hampshire to protect the state, its

11  general economy, and its consumers from Amazon's unlawful business practices.  The Attorney

12  General has the authority under state and federal law, including Section 16 of the Clayton Act

13  and New Hampshire Combinations and Monopolies Act, N.H. Rev. Stat. Ann. ch. 356 *et seq.*, to

14  pursue injunctive and other equitable relief to prevent and remedy the harms caused by the

15  anticompetitive conduct.

16       58.    Plaintiff State of New Jersey is a sovereign state.  The Attorney General of the

17  State of New Jersey is the chief legal officer for the state and brings this action in the name and

18  on behalf of the people of the State of New Jersey to protect the state, its general economy, and

19  its residents from Amazon's unlawful business practices.  The Attorney General has authority

20  under state and federal law, including Section 16 of the Clayton Act, the New Jersey Antitrust

21  Act, New Jersey Statutes Annotated ("N.J.S.A.") § 56:9-1 to -19 ("NJ ATA"), and the New

22  Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 to -227 ("NJ CFA"), to pursue injunctive and

23  other equitable relief to prevent and remedy the harms caused by anticompetitive conduct and

24  unfair and deceptive acts and practices.  The Director of the New Jersey Division of Consumer

COMPLAINT - 16
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Affairs is charged with the responsibility of administering the NJ CFA on behalf of the Attorney

2  General.  N.J.S.A. 52:17B-120; N.J.S.A. 52:17B-124.  The Attorney General brings this action

3  for relief pursuant to his authority under the NJ ATA, specifically N.J.S.A. 56:9-6, 56:9-10(a),

4  56:9-12(b) and the NJ CFA, specifically N.J.S.A. 56:8-8, 56:8-11, and 56:8-19.

5      59.    Plaintiff State of New Mexico is a sovereign state.  The Attorney General of the

6  State of New Mexico is the chief legal officer for the state and brings this action on behalf of the

7  people of the State of New Mexico to protect the state, its general economy, and its residents

8  from Amazon's unlawful business practices.  The Attorney General has the authority under

9  federal and state law, including Section 16 of the Clayton Act and Section 10 of the New Mexico

10  Antitrust Act, to pursue injunctive and other equitable relief to prevent and remedy the harms

11  caused by anticompetitive conduct.

12      60.    Plaintiff State of Oklahoma is a sovereign state.  The Attorney General of the

13  State of Oklahoma is the chief legal officer of the state and brings this action in the name and on

14  behalf of the people of the State of Oklahoma to protect the state, its general economy, and its

15  residents from Amazon's unlawful business practices.  The Attorney General has authority under

16  state and federal law, including Section 16 of the Clayton Act and the Oklahoma Antitrust

17  Reform Act, 15 79 O.S. §§ 201, *et seq.*, to pursue injunctive and other equitable relief to prevent

18  and remedy the harms caused by anticompetitive conduct.

19      61.    Plaintiff State of Oregon is a sovereign state.  The Attorney General of the State

20  of Oregon is the chief legal officer for the state and brings this action on behalf of the people of

21  the State of Oregon to protect the state, its general economy, and its residents from Amazon's

22  unlawful business practices.  The Attorney General has the authority under federal and state law

23  including Section 16 of the Clayton Act and the Oregon Antitrust Law, Oregon Revised Statutes

24

COMPLAINT - 17
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

("ORS") 646.705 to ORS 646.836, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

62.     Plaintiff State of Rhode Island is a sovereign state.  The Attorney General of the State of Rhode Island is the chief legal officer for Rhode Island and brings this action on behalf of the people of the State of Rhode Island to protect Rhode Islanders from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and Rhode Island General Laws § 6–13.1–1 *et seq.*, to pursue all available types of relief to prevent and remedy the harms caused by anticompetitive conduct.

63.     Plaintiff State of Wisconsin is a sovereign state.  The Attorney General of the State of Wisconsin is the chief legal officer for the state and brings this action on behalf of the people of the State of Wisconsin to protect the state, its general economy, and its residents from Amazon's unlawful business practices.  The Attorney General has the authority under federal and state law, including Section 16 of the Clayton Act and Wis. Stat. § 133.03, to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

64.     Defendant Amazon is a multinational online retail and technology company that conducts business throughout the United States.  Amazon is headquartered in Seattle, Washington, with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109, and is organized and existing under the laws of Delaware.  Unless otherwise specified, "Amazon" refers to Amazon.com, Inc., and all corporate predecessors, subsidiaries, successors, and affiliates.

## IV.   AMAZON'S OPERATIONS

65.     Amazon is one of the largest companies in the world, ranked among the five largest publicly traded companies by both market capitalization and revenue.  Amazon's

business spans vast portions of the American economy, extending from its core of online retail into media, cloud computing, brick-and-mortar grocery stores, an array of logistics and operational services, and more.  It has expanded in part through an acquisition spree, buying up more than 100 companies in sectors spanning entertainment, grocery, and healthcare.  Its reach ranges from selling socks and making movies to running a pharmacy and operating datacenters that house exabytes of data.

66.     The key aspects of Amazon's operations relevant to this Complaint are its: (1) first-party Retail and third-party Marketplace business units; (2) public-facing online superstore; (3) advertising services; (4) Prime subscription program; and (5) fulfillment service.

A.      **Amazon's First-Party Retail And Third-Party Marketplace Business Units**

67.     Amazon began as an online bookstore in 1994 and rapidly expanded into new product categories: first DVDs and CDs, then electronics and toys, and then nearly everything. In 2020, Amazon sold almost 92 million unique products across virtually every conceivable category to U.S. consumers.

68.     Amazon originally sold goods to shoppers by purchasing items wholesale and reselling them on its website.  Amazon calls its wholesale suppliers "vendors."  Today, Amazon continues to sell a wide range of products through this type of vendor-retailer relationship, from laundry detergent to sports equipment.

69.     Amazon also sells its own private label goods.  These range from devices like Amazon's Kindle e-reader or Ring doorbell, to consumer products like batteries sold under the "Amazon Basics" label, to products without any clear Amazon affiliation, such as dietary supplements sold under the "Revly" label.

70.     These two components, vendor-retailer and private label, make up Amazon's first-party retail business unit, which Amazon refers to collectively as Amazon "Retail."

COMPLAINT - 19
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

71.     Amazon also runs what it calls its "Marketplace," where other companies can sell products directly to shoppers through its online store.  Amazon calls third-party companies that sell on Amazon "sellers," and refers to sales by sellers as "Marketplace" sales.

72.     Amazon charges sellers four primary fees to sell on its Marketplace.  First, Amazon requires sellers to pay a selling fee, which can be a monthly fee or a fee for each item sold.  Second, Amazon charges all sellers a commission or "referral fee" based on the price of each item sold on Amazon.  Third, Amazon charges sellers for the use of Amazon's fulfillment and delivery services.  Fourth, Amazon charges sellers for advertising services.  While Amazon also charges sellers other fees, these four types constitute over █% of the revenue Amazon takes in from sellers.  As a practical matter, most sellers must pay these four fees to make a significant volume of sales on Amazon.

73.     Amazon estimated that in 2022, it would take █% of all sales revenue earned by sellers who use its fulfillment service.

74.     The Marketplace accelerated Amazon's growth by allowing it to exponentially expand the selection of products on Amazon without having to carry the risks of unsold inventory.  Sellers, who range from small businesses that offer a single product to multinational firms that sell thousands of products, ultimately bear that risk.  As of the first quarter of 2021, there were over 560,000 active sellers on Amazon's U.S. Marketplace.

75.     Amazon touts to its investors that sellers on the Marketplace are "a key contributor to the selection offered" to Amazon shoppers.  Sellers offer a huge variety of items for sale, from laptop computers to harnesses for walking pet chickens, complete with bowtie.  In 2020, sellers offered more than 80% of the unique items available for sale on Amazon.  Sellers' products make up a growing majority of Amazon unit sales—60% in the second quarter of 2023, up from 55% in 2021.

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

76.     Amazon's online superstore unites its Retail and Marketplace arms, with products intermixed and presented to the public simultaneously and side-by-side.  To a shopper browsing on Amazon, there are no obvious differences between the types of listings, nor is there a way to regularly shop for products sold only by Amazon Retail or Amazon Marketplace.

77.     Amazon has achieved unprecedented scale.  In 2021, goods worth more than ███ billion were sold through Amazon's U.S. online store.  That amount is larger than the 2021 gross domestic product of 145 countries.

78.     Amazon achieved this astonishing scale in part by combining its Retail and Marketplace arms.  Amazon's product selection includes popular and frequently purchased items and a "long tail" made up of an immense variety of less-frequently purchased products.  Products offered by sellers on Amazon's Marketplace contribute substantially to that "long tail."  More generally, Amazon's sellers dramatically increase Amazon's product selection, which draws more shoppers to Amazon, which, in turn, attracts more sellers.

79.     Sellers have also made the Marketplace enormously profitable for Amazon.  Amazon's internal documents show that profits from its U.S. Marketplace totaled more than ███ billion in 2021—nearly ██% of its total reported net income for that year.

**B.      Amazon's Online Superstore**

80.     Shoppers typically reach Amazon using an internet browser or a dedicated Amazon shopping application ("mobile app") on an internet-connected device.  Each month in the United States, 126 million people visit Amazon on a mobile device, and more than 42 million people access Amazon on a desktop computer.

81.     There are more than a billion different products available for sale on Amazon.  To navigate this billion-plus product catalog, Amazon offers a search bar.  When shoppers enter a search, Amazon's systems generate a "Search Results Page" that displays product listings

COMPLAINT - 21
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

interspersed with advertisements (discussed in more detail in the next section).  Product listings on the Search Results Page typically show a name, picture, price, star rating, shipping speed estimate, and Prime status (or lack thereof) for each item, as shown in Figures 3a (desktop) and 3b (mobile).



*Figure 3a.  Amazon Search Results Page, Desktop Browser.*

1

2

3

4

5

6

7

8

9

10

11

12

13



14         *Figure 3b.  Amazon Search Results Page, Mobile App.*

15         82.     If shoppers want to learn more about or purchase an item displayed on the Search

16   Results Page, they must click the product listing, which brings them to the "Detail Page" for that

17   item.  An item's Detail Page typically includes a detailed product description, additional pictures,

18   product dimensions or specifications, and customer-generated ratings and reviews.

19         83.     Importantly, the Detail Page usually includes a "Buy Box."  The Buy Box

20   displays a single offer for that specific item, as shown in Figures 4a (desktop) and 4b (mobile).

21   Shoppers can use the Buy Box to add the displayed item into their online shopping cart ("Add to

22   Cart") or buy the item immediately ("Buy Now").

23

24

COMPLAINT - 23
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222



*Figure 4a.  Product Detail Page with Buy Box Enlarged in Red, Desktop Browser.*

*Figure 4b.  Product Detail Page with Buy Box Enlarged in Red, Mobile App.*

84.     An item may be offered by more than one seller on Amazon.  When there are

multiple offers for a single item, Amazon uses the "Featured Merchant Algorithm" to choose one

COMPLAINT - 24
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

offer to display in the Buy Box.  Amazon calls this displayed offer the "Featured Offer."  Being

chosen as the Featured Offer is commonly known as "winning" the Buy Box.

85.     Nearly 98% of all purchases on Amazon are made using the "Add to Cart" and

"Buy Now" buttons in the Buy Box.  As a result, winning the Buy Box is essential to making

sales on Amazon.

86.     Amazon deliberately steers shoppers away from offers that are not featured in the

Buy Box.  If a shopper using a computer wants to see an offer from a seller that is not featured in

the Buy Box, the shopper must either click a link that identifies only the number of additional

offers, which takes the shopper to the "All Offer Display," as shown in Figure 5a, or scroll down

the page to see "Other Sellers on Amazon," which includes a list of additional sellers Amazon

has selected.  Shoppers using Amazon's mobile app must click on a link labeled "Other Sellers

on Amazon" to access the All Offer Display, which opens another page that displays multiple

offers, as shown in Figure 5b.



*Figure 5a.  All Offer Display, Desktop Browser.*

COMPLAINT - 25
CASE NO. 2:23-cv-01495-JHC

1

2

3

4

5

6

7

8

9

10

11

12



13    *Figure 5b.  All Offer Display After Clicking "Other Sellers On Amazon," Mobile App.*

14        87.      Amazon makes it similarly difficult for shoppers to make a purchase when

15    Amazon has removed the Buy Box from an item's Detail Page.  Amazon's page layout prevents

16    shoppers from adding to a shopping cart or buying any offers directly from the Detail Page, as

17    shown in Figure 6a.

18

19

20

21

22

23

24



*Figure 6a.  Detail Page Without Buy Box with "See All Buying Options" Link Enlarged in Red, Desktop Browser.*

*Figure 6b.  Detail Page Without Buy Box with "See All Buying Options" Link Enlarged in Red, Mobile App.*

88.     If there is no Buy Box for an item, then shoppers must navigate to the "All Offer Display" by clicking on a link labeled "See All Buying Options," shown in Figures 6a (desktop) and 6b (mobile), above.

89.     Fewer than 3% of purchases on Amazon are made from offers outside the Buy Box.

**C.     Amazon's Advertising Services**

90.     In 2014, Amazon sought to "unleash monetization of Amazon web pages, devices, and mobile apps" by extracting additional revenue through advertising on the Search Results Page.  Amazon saw "a big opportunity" for advertisements "designed to blend into the shopping experience and look like merchandising."  Accordingly, Amazon deployed Search Results Page advertising "to extract the true value of Selling on Amazon."  Amazon also transitioned its advertising business from a direct sales model to an auction model where sellers bid against other sellers for advertisement placement.  Amazon was determined to grow "these programs to significant size" by increasing "the number of advertising placements and supply of impressions . . . on the Consumer website."

91.     In 2021, Amazon recorded advertising profits of more than █ billion in the United States.

92.     Each month, advertisements on Amazon reach 96% of all Americans between the ages of 25 and 54.

93.     Amazon's most lucrative advertisements are shown in connection with specific customer search queries that lead to Search Results Pages.  Historically, Amazon's Search Results Pages displayed mostly organic search results—the results most directly responsive to the search query.

94.     Today, however, Amazon's Search Results Pages are cluttered with advertisements.  The two most prominent types of advertisements on Amazon's Search Results Pages are "Sponsored Brand" advertisements, which appear above search results, and "Sponsored Product" advertisements, which appear within search results, as shown in Figure 7.



*Figure 7.  Search Results Page with Sponsored Brand and Sponsored Product Advertisements*

*Highlighted in Red, Desktop Browser.*

95.     These advertisements typically occupy the most desirable space on the Search Results Page and are the most profitable for Amazon.  Since 70% of Amazon shoppers do not click past the first Search Results Page, they often see more Sponsored Brand and Sponsored Product advertisements than organic search results.

96.     At the same time, Amazon typically buries organic search results beneath advertisements, making them harder to find and less likely to be clicked.  In Figure 8a (desktop), no organic search results appear in the first row.  The first four results are "Sponsored" advertisements, and the fifth is another non-organic result known as a "recommendation widget." In Figure 8b (mobile), the top two results are "Sponsored" advertisements, and the third is a recommendation widget.

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

*Figure 8a.  First Row of Search Results with Sponsored Product Advertisements Highlighted in Red, Desktop Browser.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



23   *Figure 8b.  Search Results Page with Sponsored Product Advertisements Highlighted in Red,*

24   *Mobile App.*

97.     For shoppers on mobile devices, Sponsored Brand and Sponsored Product advertisements are often the only results visible without scrolling, as shown in Figure 8c.



*Figure 8c.  Search Results Page Showing Visible Screen, Mobile App.*

**D.      Amazon Prime**

98.     Amazon runs a subscription program called Amazon Prime.  Amazon launched Prime in 2005 as a shipping subscription.  For an annual fee of $79, subscribers bought unlimited shipping on eligible items, at no per-order cost to shoppers.  Amazon today continues to include a shipping service as part of Prime, with an unlimited two-day shipping promise on eligible items at no per-order cost.

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

99.     Over time, Amazon has expanded Prime from a shipping program to a subscription that is, in Amazon's internal assessment, "prohibitively expensive, if not impossible, for competitors to replicate."  It includes a broad combination of products and services, including many that are unrelated to online retail shopping, such as: (1) Prime Video, a video-on-demand and streaming service; (2) Amazon Music Prime, an ad-free music streaming service; (3) Prime Gaming, a video gaming service that includes downloadable games, exclusive in-game content, and channel subscriptions and badges on Twitch, a livestreaming service Amazon acquired for nearly $1 billion in 2014; and (4) RxPass, which provides access to a list of eligible prescription medications, including shipping, for a flat $5 per month fee.  Prime subscribers also receive access to exclusive online shopping discounts and promotions such as "Prime Day," a highly publicized annual promotion with exclusive deals for Prime subscribers.

100.     Amazon has increased the subscription fee for Prime from the original $79 to nearly double that price, at $139 per year, with a monthly subscription priced at $14.99.

101.     Amazon charges a Prime subscription fee primarily to "create 'skin in the game' for [Prime] members."  As Amazon puts it, "Prime isn't free; we believe the membership fee drives engagement."  The Prime subscription fee makes subscribers feel as though they must make the subscription fee worth it by making more purchases on Amazon.  A former Amazon employee who was involved in the development of Prime explained that Prime pricing "was never really about the seventy-nine dollars.  It was really about changing people's mentality so they wouldn't shop anywhere else."

102.     According to Amazon's internal analyses, when a customer joins Prime, "there is a causal and substantial increase to a customer's annual spend with Amazon—buying more frequently and across a broader set of categories."  Accordingly, the average Prime subscriber spends ███ times more each year on Amazon than the average non-Prime Amazon shopper.

Conversely, consumers who are not Prime subscribers are more likely to shop at other online retailers.  Amazon's rivals' analyses also show a corresponding drop in spending on their stores when shoppers become Prime subscribers.

103.    As shown in Figures 9a (desktop) and 9b (mobile), Amazon displays a "Prime Badge" to show Prime subscribers which items are eligible for the prepaid unlimited shipping included in the Prime subscription.



*Figure 9a.  Search Results Page with Prime Badges Highlighted in Red, Desktop Browser.*



*Figure 9b.  Search Results Page with Prime Badges Highlighted in Red, Mobile App.*

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

104.     Amazon's interfaces let Prime subscribers filter their searches to display only Prime-eligible offers.  On the top left-hand side of Amazon's desktop webpage and mobile app, Amazon displays a "Prime" filter.  Once a shopper selects the filter, only Prime-eligible offers appear in search results, as shown in Figures 10a (desktop) and 10b (mobile).



*Figure 10a.  Search Results Page with Prime Filter Enlarged in Red, Desktop Browser.*



*Figure 10b.  Search Results Page with Prime Filter Enlarged in Red, Mobile App.*

105.     For Amazon, signing up and maintaining as many Prime subscribers as possible is a top priority.  In service of this goal, Amazon has even knowingly tricked shoppers into signing

COMPLAINT - 36
CASE NO. 2:23-cv-01495-JHC

1  up for Prime and actively thwarted their efforts to cancel their subscriptions.  Amazon internally

2  admits to using "misleading designs" for its user interfaces "to mislead or trick users to make

3  them do something they didn't want to do, like signing up for a recurring bill, favoring

4  shareholder value over user value."  At multiple points, Amazon considered changing flaws in its

5  signup process that led to what it knew were "mistaken signups," but chose not to correct those

6  issues and instead continued to trick more users into signing up for Prime.  In addition to its

7  "misleading" signup process, Amazon constructed a cancellation process so lengthy, arduous,

8  and complex that it was internally codenamed the "Iliad Flow," after Homer's 15,693-line epic

9  poem.

10      106.    As of late 2021, nearly ██ million people in the United States—██% of U.S.

11  households—were enrolled in Prime.  In some zip codes, more than ██% of households have a

12  Prime subscriber.  Amazon's U.S. Prime subscriber base is larger than the populations of ██

13  countries.  Amazon projects that by 2024, ██% of all U.S. households will include at least one

14  Prime subscriber, and that Prime enrollment will be more common than paid television and

15  almost as widespread as home internet access.



*Figure 11.  Source: Amazon Internal Documents.*

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

107.    In 2021, Prime subscriber purchases accounted for more than ▮% of the purchases by dollar amount on Amazon's U.S. online superstore.  And in 2021 alone, U.S. customers paid Amazon more than ▮ billion in Prime subscription fees.

### E.    Fulfillment By Amazon

108.    Amazon sells fulfillment services and facilitates delivery under the name "Fulfillment by Amazon," which is commonly abbreviated to "FBA."  Sellers can use FBA to fulfill orders made on Amazon.

109.    "Fulfillment" refers to the process of preparing items for shipping to "fulfill" online orders.  Fulfillment involves storing, picking (retrieving from storage), packaging, and preparing items purchased from online retail stores for delivery.  Fulfillment operations generally occur within a specialized warehouse called a "fulfillment center."

110.    For most online sellers, fulfillment is a significant business cost.

111.    Delivery is a related but distinct service.  "Delivery" refers to the specific process of transporting a package from a fulfillment center to a customer's chosen address.  One company may fulfill an order, then transfer the package to a different company for delivery.  For example, a fulfillment provider may hand a package off to a parcel carrier like the U.S. Postal Service, FedEx, or UPS, to complete delivery.

112.    Amazon both fulfills and delivers products purchased on its online superstore.  In 2021, Amazon fulfilled nearly 92% of all orders made on Amazon across both its Marketplace and Retail business units.  Amazon delivers products itself or contracts with a third-party delivery company to do so.  Amazon has estimated that it now makes more deliveries in the United States than any other company.

113.    When online shoppers buy an item, they also expect fulfillment and delivery of that item.

114.    When a seller uses FBA, Amazon charges the seller for storing their items and charges the seller a fee based on the dimensions and weight of the product when it is purchased.

115.    Amazon has increased the fulfillment fees it charges to sellers by approximately 30% in just two years, from 2020 to 2022.

116.    As explained in Part VI.B, below, sellers have little choice but to use FBA.  In 2020, more than ███████ sellers used FBA to fulfill more than 5.5 billion orders in the United States.

## V.    AMAZON POSSESSES MONOPOLY POWER IN TWO RELEVANT MARKETS

117.    Structural and direct evidence show that Amazon has monopoly power in two markets: (1) the online superstore market and (2) the market for online marketplace services (together, the "relevant markets").

118.    The structural evidence of monopoly power in both markets includes Amazon's dominant market shares and the presence of significant barriers to entry, including powerful network effects and strong economies of scale.  These markets and their individual barriers to entry are discussed further in Parts V.A and V.B, below.

119.    Feedback loops between the two relevant markets further demonstrate the critical importance of scale and network effects in these markets.  While the markets for online superstores and online marketplace services are distinct, an online superstore may operate an online marketplace and offer associated online marketplace services to sellers.  As a result, the relationship and feedback loops between the two relevant markets can create powerful barriers to entry in both markets.  Amazon offers an illustration of this dynamic: Amazon's base of shoppers in the online superstore market attracts sellers to buy services from Amazon in the online marketplace services market.  Amazon in turn relies on those sellers to increase the breadth and depth of goods offered on Amazon's online superstore, which further draws

shoppers to Amazon.  In addition, Amazon imposes restrictions on how shoppers can purchase its Prime subscription program to artificially increase barriers to entry in the online superstore and online marketplace services markets.  These scale and network effects reinforce Amazon's monopoly power in both relevant markets, as explained in Part V.C, below.

120.    Direct evidence also demonstrates Amazon's monopoly power.  Amazon has continually exercised its monopoly power and degraded the customer experience by showing irrelevant advertisements over more relevant results and by steering shoppers toward its own—often inferior—products.  Amazon worsens quality and hikes prices for both shoppers and sellers, all without denting—and while in fact expanding— its dominance.  This and other direct evidence of Amazon's monopoly power are discussed further in Part V.D, below.

**A.    Amazon Has Durable Monopoly Power In The Online Superstore Market**

121.    Amazon has durable monopoly power in the online superstore market.

**1.    The U.S. online superstore market is a relevant market**

122.    The online superstore market is a relevant product market.  Online superstores compete to build long-term relationships with consumers across multiple purchases of a variety of items.  Online superstores do so by offering a distinct set of features that reduce time and effort for shoppers online, thereby encouraging shoppers to return to those online superstores for a broad swath of goods.  Because of these and other features, brick-and-mortar stores and online stores with a more limited selection are not reasonably interchangeable with online superstores for the same purposes and are thus properly excluded from the online superstore market.

123.    The relevant geographic market is the United States.

*a.    Online superstores offer shoppers a unique set of features*

124.    An online superstore offers an extensive breadth and depth of product selection accessible through an online storefront.  "Breadth" refers to product offerings across multiple

categories, such as sporting goods, kitchen goods, apparel, and consumer electronics.  "Depth" refers to product selection within a given product category, such as a range of different brands of a product with different price points, levels of quality, sizes, and colors.

125.    Consumers incur shopping costs beyond the prices paid for purchased items.  For example, when considering a purchase, shoppers must determine which stores carry specific items.  Shoppers then often conduct research, including learning about the items' prices and features, reading consumer reviews, and comparing similar items.  Shoppers value stores that reduce search costs and the ability to discover new items that they may not have been initially searching for while shopping.  Many consumers also value shopping for different types of goods at a single store to reduce overall shopping costs.

126.    Online superstores provide shoppers a unique offering: 24/7 access to a broad and deep product selection accompanied by a distinct set of features that meaningfully reduce the time and effort shoppers expend online.  These features include tools to help shoppers quickly search for and identify their desired items, compare different items, and purchase and receive items, all from a single website or app.  Online superstores provide these features to develop long-term relationships with shoppers, entice shoppers to buy more products during a single shopping trip, and encourage them to come back again.

127.    Several characteristics distinguish online superstores from other forms of retail, including brick-and-mortar stores and online stores with comparatively limited selection.

128.    First, online superstores offer a single destination for shoppers to browse a large and diverse selection of goods from multiple brands across a wide range of categories, reducing consumers' shopping costs and encouraging customers to make an online superstore a preferred destination for a variety of shopping needs.

129.     By offering a broad selection, online superstores reduce the shopping costs of visiting multiple stores for goods spanning multiple categories.  By offering a deep selection within any given category, online superstores decrease the shopping costs of visiting multiple category-specific or brand-specific stores to identify the best options.

130.     The breadth and depth of selection available at online superstores encourages shoppers to return to and shop at those stores more regularly.  Shopping regularly at the same online superstore leads to reduced shopping costs by increasing shoppers' familiarity with an online superstore's format, features, offerings, and customer service process.  Repeated use of an online superstore can also provide confidence about its reputation and quality.  Increased familiarity, a positive reputation, and perceived high quality all make it more likely that a shopper will choose an online superstore as a preferred destination for purchasing retail goods online.

131.     Industry participants, including Amazon, have long recognized an online superstore's unique ability to leverage a broad and deep selection of goods to compete for repeat customers.  For example, Mr. Bezos explained in his 1999 letter to Amazon shareholders that "[e]ach new product and service we offer makes us more relevant to a wider group of customers and can increase the frequency with which they visit our store. . . .  The more frequently customers visit our store, the less time, energy, and marketing investment is required to get them to come back again."

132.     Second, online superstores are not limited to traditional operating hours that constrain brick-and-mortar retailers.  Instead, online superstores offer a quick, on-demand shopping experience at all times of the day or night.  Online superstores allow shoppers to browse and buy across a wide variety of goods 24 hours a day, 7 days a week, 365 days a year. Shoppers can also pause and resume their shopping session on an online superstore at any time.

133.    Third, shoppers can make purchases on online superstores anywhere they have internet access, through a website or an app on a desktop, tablet, or smart phone.

134.    Fourth, online superstores offer sophisticated filtering and discovery tools, allowing shoppers to browse and sift through the store's entire catalog quickly and efficiently.

135.    Online superstores also have access to data on items consumers have previously searched for and purchased.  Online superstores may use this data to offer repeat visitors tailored and personalized shopping experiences that can, for example, include recommendations for future purchases based on past search or purchase behavior.

136.    Fifth, online superstores offer research tools, including detailed information on a given item and a large volume of authentic, customer-generated ratings and reviews.  Online superstores give shoppers a single point of access to these research tools, including text descriptions, photos, videos, and user reviews.  The product detail pages available on online superstores often include far more information than physical packaging can accommodate.  For example, a product detail page can include links to user guides and product documentation that would otherwise only be accessible inside of a product's packaging.

137.    Sixth, online superstores provide shoppers a familiar and convenient checkout experience.  Online superstores reduce shopping costs by allowing customers to store personal information like payment details, home addresses, passwords, and other sensitive information.  For example, Mr. Bezos testified that when a consumer can avoid "typ[ing] in . . . payment credentials" like their "address and credit card number . . . every single time" they make a purchase, "you tend to get more repeat business from customers."

138.    Seventh, online superstores offer shoppers a convenient and consolidated post-purchase experience.  Shoppers who buy multiple items from an online superstore can often schedule them to be delivered together, limiting the need to keep track of multiple delivery times

COMPLAINT - 43
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  and decreasing packaging.  Mr. Bezos testified that shoppers "don't like to receive . . . ten

2  packages when they can receive one package with ten things in it."

3       139.    This combination of features distinguishes online superstores from brick-and-

4  mortar stores and from other online stores with comparatively limited selection.  Even though

5  such stores may price certain items comparably with online superstores, shoppers do not

6  seriously consider those stores as reasonable alternatives to online superstores for a significant

7  portion of their shopping needs.  Online superstores differentiate themselves by offering a

8  particular shopping experience to the sizeable group of consumers who view that experience as

9  distinct and prefer to shop at online superstores.

10           ***b.        Online superstores are not reasonably interchangeable with***

11                        ***brick-and-mortar stores***

12      140.    Online superstores are distinct from, and not reasonably interchangeable with,

13  brick-and-mortar stores.  From start to finish, online superstores provide a vastly different

14  shopping experience from physical stores.

15      141.    Unlike online superstores, brick-and-mortar stores require shoppers to travel to a

16  specific location.  As Mr. Bezos noted in his 2020 letter to Amazon shareholders, "[r]esearch

17  suggests the typical physical store trip takes about an hour" and requires "driving, parking,

18  searching store aisles, waiting in the checkout line, finding your car, and driving home."  Mr.

19  Bezos contrasted this experience with shopping on Amazon, where more than a quarter of all

20  purchases are completed "in three minutes or less," and half of all purchases take less than

21  fifteen minutes.

22      142.    Brick-and-mortar stores can display only items that fit on the store's limited

23  physical shelf space, while online superstores can offer a practically unlimited number of items

24  for sale.  As Amazon's then-Vice President of Physical Stores explained in 2018, "whenever you

COMPLAINT - 44
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    are working offline, you can't have the endless aisle that you have online, and so when you're

2    working offline you really have to curate."

3          143.    Amazon recognizes that its unlimited shelf space appeals to shoppers and

4    distinguishes its online store from brick-and-mortar stores.  As Amazon has reminded its

5    shareholders every year since 1998, "[w]e brought [shoppers] much more selection than was

6    possible in a physical store . . . and presented it in a useful, easy-to-search, and easy-to-browse

7    format in a store open 365 days a year, 24 hours a day."

8          144.    Amazon internally contrasts the benefits of the depth of selection available in its

9    online superstore with the "clear gaps" in selection at physical stores.  As shown in Figure 12

10   below, an Amazon presentation emphasized that searching for a "Thermal Water Bottle" on

11   Amazon generated 40 responsive items across a variety of brands, features, and sizes on the first

12   page of search results.  A "typical department store aisle," however, may display "at most" only

13   "10 of these products in the store."

14

15

16

17

18

19

20

21

22

23

24

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222



If you look at a typical department store aisle, you may only find at most 10 of these products in the store. Many of the remaining brands represent smaller sellers and vendors who are leaning in and taking advantage of the unique advantages Amazon provides, such as advertising solutions to showcase products within or above search results and shopper insights to inform launch strategies - and as a result they are learning more about customer shopping habits, and working backwards by developing great products to address clear gaps that exist on retail shelves.

*Figure 12.  Amazon Slide Comparing Online Search Results to Brick-and-Mortar Shelf Space.*

*Source: Amazon Internal Documents.*

145.    Brick-and-mortar stores also cannot tailor or personalize a consumer's shopping experience in the same way an online superstore can.  Physical stores have the same layout for any shopper browsing their selection at any given time.

146.    The process of searching and shopping for items at brick-and-mortar stores is much different than the process of searching and shopping on an online superstore.  Shoppers on online superstores can use sophisticated digital filtering and search tools to browse and select items, instead of physically traveling up and down aisles or asking a store employee for help.  Online superstore shoppers can make purchases without waiting in physical checkout lanes.  And online superstore purchases typically ship to the shopper's address.  On the other hand, shoppers can see products in person before buying at brick-and-mortar stores and can typically take

1   purchased items home immediately.  As Amazon's then-Vice President of Physical Stores

2   explained in a 2018 interview, "another thing you can do in offline retail that you can't do online

3   is customers can come in and touch the products themselves . . . try those products first person,

4   get a feel for them, [and] talk to an associate."

5       147.    Online and brick-and-mortar stores also involve distinct operations.  Because

6   different expertise is required to manage an online store, companies that operate both typically

7   run them through separate divisions.  For example, a Walmart executive testified that managing

8   inventory and shelf space, a necessity at brick-and-mortar stores, is a different skill set than

9   managing web traffic for an online store.  Amazon's CEO, Andy Jassy, has publicly emphasized

10  that "[t]he things you think about in physical retail" from an operational perspective, like

11  "lighting," "parking," and "physical merchandising," are "radically different things than you

12  think about in an online retail environment where technology is really driving the entire

13  experience."

14          *c.*      ***Online superstores are not reasonably interchangeable with***

15                   ***other online stores that lack breadth and depth of product***

16                   ***selection***

17      148.    Online superstores are also distinct from, and not reasonably interchangeable

18  with, online stores with limited product selection, including online stores that offer products

19  primarily from a single brand.  Whether considered individually or collectively, online stores

20  with limited selection are not reasonable substitutes to become a shopper's preferred destination

21  for their online purchases for a broad swath of retail goods.  Shopping at numerous limited-

22  selection online stores increases shopping costs, both for individual shopping needs and in

23  aggregate across a customer's total purchases.  Consumers' overall shopping costs would

24

COMPLAINT - 47
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

increase dramatically if they tried to replace online superstores with shopping at multiple limited-selection online stores.

149.   Some consumers may prefer to shop at limited-selection online stores for certain items.  For example, a consumer may turn to such an online store because it specializes in unique or niche goods not available on an online superstore, because the shopper has particular brand loyalty, because the shopper finds the online store particularly trustworthy and reliable (because, for example, it screens for counterfeit goods or fake reviews), or because the non-superstore offers specialized or expert knowledge about the items it sells.

150.   Limited-selection online stores do not provide an experience that is reasonably interchangeable with an online superstore because, individually and collectively, they cannot effectively compete to become a shopper's preferred destination for online purchases given the increased shopping costs associated with shopping at online stores that lack the breadth and depth of online superstores.

151.   Online stores with a limited product selection lack breadth.  A shopper who must visit multiple online stores to compile a set of desired goods across different product categories faces higher shopping costs than a shopper who can search for and complete those cross-category purchases at a single online superstore.

152.   RainOrShineGolf.com—a retailer of indoor golf simulator equipment—is an illustrative example of an online store that lacks the breadth of an online superstore.  Golf simulator equipment such as golf ball launch monitors, mats, nets for hitting balls, and software to analyze performance collectively allow a customer to practice golf indoors.  While Rain or Shine Golf and Amazon both sell indoor golf simulator equipment, they offer consumers different shopping experiences and a vastly different overall product due to the difference between the breadth of product selection at each online store.  Shoppers may choose Rain or

1   Shine Golf for occasional category-specific purchases, but due to its limited breadth it could not

2   become a consumer's preferred destination for a broad swath of other online purchases.

3       153.   Unlike limited-selection online stores, an online superstore offers a single

4   destination for a shopper to browse, buy, and return to for repeat purchases of a much wider

5   array of goods.  On an online superstore like Amazon, shopping for a golf simulator may also

6   yield cross-category suggestions for accessories like golf gloves, golf clubs, or golf bag push

7   carts.  Moreover, if the need arises or mood strikes, a consumer shopping on an online superstore

8   like Amazon could resupply the correct size of kitchen trash bags they previously purchased and

9   add a new board game that the online superstore recommends based on their prior shopping

10  behavior, all during a single shopping session.  By contrast, a consumer who uses Rain or Shine

11  Golf to buy a golf simulator but would also like to make a set of additional purchases would need

12  to visit and do business with numerous other online stores.  Those visits would incur the added

13  shopping costs of finding those additional items, completing the various purchase processes with

14  different logins and credentials (if the shopper can remember them), and arranging for multiple

15  deliveries.

16      154.   Many online stores that lack breadth of product selection also lack depth,

17  especially online stores that primarily or exclusively feature their own brands.  A shopper forced

18  to visit multiple online stores to find the specific item that matches their needs faces higher

19  shopping costs than a shopper who can compare across a depth of options for that item on an

20  online superstore.

21      155.   Tumi.com is another illustrative example.  Shoppers can purchase a range of

22  luggage, backpacks, and bags at Tumi.com, but the items sold at Tumi.com are primarily Tumi's

23  own brand, limiting the depth of options for any particular item.  By contrast, a shopper looking

24  for luggage on an online superstore like Amazon can browse across options from a wide variety

COMPLAINT - 49
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  of brands that may include Tumi as well as other brands.  The shopper can peruse these options

2  by filtering across features like brand, price point, size, and colors without incurring the

3  additional search costs present in visiting all of the online stores operated by each brand.

4       156.    Furthermore, the breadth and depth of product selection on online superstores

5  increases access to valuable cross-category consumer data.  This data amplifies the ability of

6  online superstores to provide shoppers with tailored and personalized shopping experiences.  As

7  an online superstore, for example, Amazon recognizes in internal documents that

8  "[p]ersonalization is a competitive advantage."  This advantage is driven both by Amazon's

9  access to extensive customer data and its "breadth of content that can be scoped for a particular

10  interest, personalized, and targeted to the right customer."

11      157.    These additional capabilities of online superstores influence consumers' shopping

12  behavior.  Amazon attributed sales of more than ███ billion on its online store to its

13  personalization systems and technology in the first nine months of 2021.

14      158.    Because limited-selection online stores do not have the same breadth and depth of

15  selection offered by online superstores, they have access to less consumer data across categories

16  and cannot replicate the personalization features of online superstores, reducing the ability of

17  limited-selection online stores to compete with online superstores.

18      159.    Online superstores treat rival online superstores differently than limited-selection

19  stores.  For example, Amazon does not allow other online superstores like Walmart.com to sell

20  through Amazon.  Yet Amazon encourages hundreds of thousands of sellers—including well-

21  known brands that sell through their own online stores or limited-selection online stores—to do

22  so.  When asked why Amazon treats Walmart.com differently, Mr. Bezos testified, "It's just

23  different because of the scale and [be]cause of the competitive situation and so on.  It's just not

24  similar."

1

> ### d.   The online perishable grocery category is properly excluded from the online superstore market

160.     Online purchases of perishable grocery products are not part of the online superstore market.  Perishable groceries are foods that cannot be safely stored at room temperature, including fresh fruits and vegetables, raw meat, and frozen items.  Though some online superstores may also offer online purchases of perishable grocery products, this distinct business line is not part of the relevant market and is excluded from the market share numbers in Part V.A.2, below.

161.     Consumers' experiences when shopping online for perishable groceries differ from their experiences purchasing other retail goods.  For example, consumers shopping for online perishable grocery products typically must select a specific time for the perishable grocery products to be delivered, which often also requires the customer to be present at the time of delivery to be able to promptly store those items.  Both Walmart.com's and Amazon's online perishable grocery businesses require shoppers to choose a delivery window or "time slot."  Neither Walmart.com nor Amazon typically require shoppers to choose time slots when purchasing other products online.

162.     The process for packaging and delivering perishable groceries to shoppers who ordered them online also differs from non-perishable grocery orders.  Perishable groceries require special handling, often including refrigeration or freezing, as well as quick and careful delivery to avoid damage or rot.  As such, perishable grocery delivery requires specialized storage facilities with refrigeration systems that serve a smaller geographic footprint.

163.     Competition for online perishable grocery sales is also different from competition between online superstores.  Competition for online perishable grocery sales is generally more localized, whereas online superstore competition is nationwide.  This difference is because

COMPLAINT - 51
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   grocery quality and shelf life are seasonal and regional.  For example, perishable fruit may be

2   available only during certain times and in certain regions.  As a result, Amazon generally sets

3   regional prices for perishable grocery items, whereas items Amazon sells through its online

4   superstore usually have a single, nationwide price.

### e.      The relevant geographic market is the United States

6       164.    The United States is the relevant geographic market for the online superstore

7   market.  Online superstores that serve consumers shopping for items to be delivered within the

8   United States generally do not compete for those consumers with online superstores that

9   primarily serve consumers shopping for items to be delivered outside of the United States.

10  Consumers shopping online for items to be delivered within the United States generally make

11  purchases from market participants' U.S. businesses and U.S.-facing online stores.  For example,

12  Amazon operates an online storefront for shoppers in the United States (Amazon.com) separately

13  from its storefront for shoppers in the United Kingdom (Amazon.co.uk).  The difference is not

14  just in their URLs; rather, despite being in the same language, they offer different products, at

15  different prices, under different shipping terms, and present unique search results and

16  advertisements.

17      165.    Online superstores that primarily serve shoppers seeking delivery outside the

18  United States are not reasonable substitutes for shoppers seeking delivery within the United

19  States because they offer a shopping experience tailored to those other countries, with different

20  currencies, prices, customs and border control conditions, and shipping terms.  In the ordinary

21  course of business, industry participants identify competitors for U.S. shoppers separately from

22  competitors that serve shoppers seeking items to be delivered to other countries.

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1          **2.     Amazon has a dominant share of the online superstore market**

2          166.    Amazon maintains a dominant market share when compared to other online

3  superstores.  Documents and data, both from Amazon and industry analysts, confirm that

4  Amazon's share of the overall value of goods sold by online superstores is well above 60%—and

5  rising.

6          167.    Amazon's market share, when considered in conjunction with other

7  characteristics of the online superstore market including its significant barriers to entry (*see* Parts

8  V.A.3 and V.C, below), demonstrates Amazon's monopoly power.

9          168.    Gross Merchandise Value ("GMV") measures the total sales value of goods sold

10  to customers during a given time period and is commonly used to track the market share of

11  online stores.  Other financial indicators, such as revenue or net sales, may factor in commission

12  fees or discounts that can vary both within a single store and across different stores.  GMV does

13  not.  Accordingly, a calculation of Amazon's GMV captures the total value of goods sold

14  through both its Retail and Marketplace arms.  Third-party reports, including those utilized by

15  Amazon, regularly use GMV to compare Amazon to other firms.

16          169.    When measured by GMV, Amazon's business vastly overshadows that of all

17  other online stores in the United States.

18          170.    Industry analysts and industry participants often track Amazon's U.S. online store

19  by reference to Walmart, Target, and eBay.  According to third-party reports that assess market

20  share across these "top-4 general merchandise platforms," Amazon has maintained an estimated

21  market share of more than 69% of GMV since 2015, with that share growing over time.

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222



*Figure 13.  Bank of America Global Research.*

171.    Other commercially available data, including recently reported statistics from eMarketer Insider Intelligence, a widely cited industry market research firm, confirms Amazon's sustained dominance across this same set of companies, with an estimated market share of more than 82% of GMV in 2022.

1

2

3



4

5

6

7

8

9

10

11

*Figure 14.  Source: eMarketer Insider Intelligence (percentages rounded).*

12   172.    Amazon internally maintains a list of "Super Image Competitors" (SICs), which,

13   while not necessarily an appropriate measure of online superstores, nonetheless confirms

14   Amazon's dominance.  Amazon defines SICs to be competitors that ████████████████████

15   ████████████████████████████████████████████████████████████████████████████

16   ████████    As of December 2021, Amazon designated ██████████ as SICs.  Amazon's list

17   of SICs includes stores that may lack the breadth and/or depth of selection necessary to qualify

18   as online superstores.  Yet even using Amazon's list of SICs, Amazon had a 72.5% market share

19   based on U.S. GMV among this set of online stores in 2021.

20   173.    Amazon also calculates "Net Promoter Scores" for itself and companies Amazon

21   identifies as "key competitors."  Net Promoter Score is a metric that measures the willingness of

22   customers to recommend a company's products or services to others.  This metric is based on

23   how consumers rate stores on various attributes including the "ease of ordering," the "overall

24   selection of products available," the "ability to find what you wanted quickly," the "quality of

1   product recommendation based on your preferences," and the "usefulness of customer reviews to

2   make a purchase decision."  Amazon uses Net Promoter Scores and changes in those scores as a

3   "mechanism to monitor the competitive landscape."  In 2021, Amazon calculated and tracked

4   Net Promoter Scores for ▆ online stores (including Amazon's) ███████████████

5   ██████ available on Amazon.

6          174.    Amazon considers only ████████████ "key competitors" across more than

7   █████ of the ████████████████████████████████████

8   █████████ Other companies identified in these studies do not carry the breadth and/or depth of

9   selection necessary to qualify as online superstores.  For example, ████████████████

10  ███████████████████████████████████████████████

11  ██████████████████████████

12         175.    While the full list of companies tracked by Amazon for Net Promoter Scores is

13  overinclusive, Amazon still had a 60.8% share based on U.S. eCommerce GMV (excluding

14  online perishable grocery sales) among this set of online stores in 2021.

15         **3.     Amazon's dominant position in the online superstore market is**

16                 **protected by significant barriers to entry**

17         176.    Significant barriers limit entry into the online superstore market including scale

18  economies and network effects, reputational barriers, and shopper switching costs.  Feedback

19  loops between online superstores and the online marketplace services market also contribute to a

20  unique barrier to entry, as discussed in Part V.C, below.

21         177.    Scale is a critical factor for success in the online superstore market.  Amazon

22  itself has touted its scale as a key differentiator from medium-sized or single-category online

23  stores.  Mr. Bezos wrote that "[o]nline selling (relative to traditional retailing) is a scale business

24  characterized by high fixed costs and relatively low variable costs.  This makes it difficult to be a

1   medium-sized e-commerce company," and "difficult . . . for single-category e-commerce

2   companies to achieve the scale necessary to succeed." According to Mr. Bezos, "build[ing] an

3   important and lasting company . . . in e-commerce" simply "isn't going to work in small

4   volumes." Economies of scale are a barrier to entry in this market that new firms must overcome

5   in order to enter and compete.

6          178.    The online superstore market is also characterized by network effects, where the

7   value of the service increases as more people use it. Network effects are not intrinsically

8   harmful, but they can present barriers to entry and to competition, reinforcing market power and

9   insulating incumbents.

10         179.    One aspect of the importance of scale and related network effects in the online

11  superstore market stems from user-generated reviews. For example, as Amazon's shopper base

12  has grown, so too has the number of product ratings and reviews available on its store, a

13  feedback loop that further draws in new shoppers by enabling them to quickly learn more about

14  unfamiliar products or sellers. In other words, by leaving helpful ratings and reviews, Amazon's

15  shoppers themselves provide immense value to future Amazon shoppers. Amazon benefits from

16  this self-reinforcing dynamic, which would be difficult and expensive for new entrants to

17  reproduce.

18         180.    Another source of network effects in the online superstore market is access to

19  valuable shopper data, which allows online superstores to tailor and personalize shopping

20  experiences. For example, Amazon records information about the items a shopper searches for,

21  views, places in their cart, and pays for, and the mechanism the shopper uses to pay. This type

22  of data allows an online superstore to streamline a shopping experience and target specific

23  products to certain customers. As with other network effects, the more scale an online superstore

24

COMPLAINT - 57
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   gains, the more powerful this effect becomes.  Prospective entrants would have to acquire a

2   sufficient shopper base to obtain enough data to offer this level of personalization.

3        181.    The online superstore market also exhibits reputational barriers to entry.

4   Reputational barriers to entry arise when entrants need to establish trust among customers to

5   compete meaningfully against incumbents.  Because online superstores allow and encourage

6   repeat purchasing, they are able to develop positive reputations with shoppers that a prospective

7   entrant starting from scratch would need to cultivate.

8        182.    Switching costs also are a barrier to entry in the online superstore market.

9   Mr. Bezos recognized this dynamic and its implications in a speech in 1998, stating that

10  "switching costs long-term . . . should actually be higher in the online world than in the physical

11  world" because "[i]n the online world, businesses have the opportunity to develop very deep

12  relationships with customers, both through accepting preferences of customers and then

13  observing their purchase behavior over time, so that you can get that individualized knowledge

14  of the customer and use that individualized knowledge of the customer to accelerate their

15  discovery process."  For example, Amazon retains shoppers' payment, shipping, and order

16  history information.  Switching to a new online superstore would require reentering payment and

17  shipping information and forgoing the benefits of viewing past order history.  Shoppers also

18  develop routines while shopping at online superstores that can be difficult to break, particularly

19  given the additional costs of gaining familiarity with the format, features, and policies of a

20  different store.

21       183.    Finally, as described in detail below in Part VI, Amazon engages in an illegal

22  course of conduct that raises barriers to entry and competition, making it artificially and

23  substantially more costly and time-consuming for would-be competitors to enter the online

24  superstore market.

**B.      Amazon Has Durable Monopoly Power In The Online Marketplace Services Market**

184.    Amazon has durable monopoly power in the online marketplace services market.

185.    Online marketplace services include: (a) access to a significant base of shoppers in the United States who use the online marketplace to find and buy goods; (b) an interface for consumer search that allows sellers' products to be discovered and purchased without shoppers needing to leave the online marketplace; (c) the ability for sellers to set the prices for their goods on the online marketplace; (d) the ability for sellers to create and maintain product detail pages with product information and specifications on the online marketplace; and (e) the ability for sellers to display to potential shoppers on the online marketplace an array of customer-generated ratings and reviews.

### 1.      Online marketplace services is a relevant market

186.    Online marketplace services is a relevant product market.  Online marketplaces offer sellers a distinct set of services.  Chief among these services is access to an established online U.S. customer base.  Purchasing online marketplace services is not reasonably interchangeable with selling as a vendor to either an online or a brick-and-mortar retail store.  Nor are online marketplace services reasonably interchangeable with the offerings of online software-as-a-service providers.  Some providers of online marketplace services also offer fulfillment services, which sellers can purchase in addition to online marketplace services.

187.    The relevant geographic market for online marketplace services, which provide sellers access to U.S. shoppers, is worldwide.

#### a.      *Online marketplace services offer sellers a unique set of features*

188.    Online marketplace services encompass a suite of services that facilitate sellers making online sales to U.S. shoppers without having to directly operate an online store.  The

COMPLAINT - 59
CASE NO. 2:23-cv-01495-JHC

1  sellers who typically purchase online marketplace services are businesses seeking to sell goods

2  directly to U.S. shoppers by relying on the marketplace to attract shoppers rather than attracting

3  shoppers solely on their own.  These sellers use online marketplace services so that U.S.

4  shoppers can find and buy the sellers' offered items.

5         189.    Access to a large customer base is the most important characteristic of an online

6  marketplace.  Amazon advertises to prospective sellers that its marketplace allows them "to

7  reach the hundreds of millions of customers who visit Amazon to shop," which can "[r]educe the

8  time, effort, and money [they] spend on customer acquisition."  Similarly, Walmart advertises

9  that its marketplace gives sellers access to "a built-in audience of frequent shoppers and loyal

10  customers" and tells sellers that "[y]ou bring great products.  We bring millions of customers."

11  eBay tells sellers that "millions of buyers are waiting."

12         190.    Industry participants recognize online marketplace services as a distinct retail

13  product.  Many industry observers track online marketplaces separately from other types of

14  online commerce.

15             *b.    Online marketplace services are not reasonably interchangeable*

16                    *with selling as a vendor*

17         191.    Selling products as a vendor to a retail store, whether online or offline, who then

18  sells to shoppers is not reasonably interchangeable with buying online marketplace services.

19         192.    Selling products as a vendor to a retailer involves a pricing and transaction

20  structure different from buying online marketplace services.  A vendor generally sells goods to a

21  retailer for a wholesale price.  The retailer takes legal title to the goods and can sell them to

22  shoppers.  Online marketplace services providers price their services differently, typically

23  including a percentage-based commission fee.  The seller retains legal title to the goods and sells

24  those goods directly to shoppers on the online marketplace.

COMPLAINT - 60
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

193.    A vendor typically sells goods in batches to retailers, such as in a wholesale relationship.  A seller operating through an online marketplace, by contrast, typically sells goods one at a time to online shoppers.

194.    Vendor arrangements also exhibit different features and characteristics from online marketplace services.  A vendor usually gives up the ability to set the price offered to shoppers, and the retailer typically sets the shopper-facing prices.  But sellers who buy online marketplace services retain the ability to set and adjust prices to shoppers.  Many merchants prefer purchasing online marketplace services to vending to a retailer so that they can retain the ability to set their own prices to final customers.

195.    Selling as a vendor often requires the vendor to give physical control of its goods to the retailer.  That reduces the vendor's ability to decide which goods to offer and when to make goods available.  Unlike the retailer model, an online marketplace services provider allows sellers to maintain control over which of its goods will be offered at what times.

196.    Selling as a vendor also limits the seller's access to retail sales data, which is usually controlled by the retailer.  Some providers of online marketplace services, including Amazon, provide customer-level sales and shopping data to sellers but not vendors.

197.    Industry participants recognize that these are important distinguishing characteristics.  For example, Walmart tells sellers that using its marketplace allows them to "[r]emain in control of your business."

c.    *Online marketplace services are not reasonably interchangeable with services sold by SaaS providers*

198.    Software-as-a-service ("SaaS") providers, including Shopify and BigCommerce, sell software that enables sellers to create and maintain their own direct-to-consumer online

1    stores.  Sellers use this software to build and customize their own eCommerce websites.  These

2    SaaS providers' services are not reasonably interchangeable with online marketplace services.

3         199.    SaaS providers, unlike online marketplace service providers, do not provide

4    access to an established U.S. customer base.  Rather, merchants that use SaaS providers to

5    establish direct-to-consumer online stores must invest in marketing and promotion to attract U.S.

6    shoppers to their online stores.  As Mr. Jassy explained in a 2022 interview, "small and medium

7    sized" sellers use Amazon not because of the "eCommerce software" Amazon provides but

8    "because they get access to a few hundred million customers."

9         200.    Another difference is that SaaS providers allow their customers to exercise

10   control over branding and marketing in ways marketplaces do not.  For instance, SaaS providers

11   typically enable merchants to customize the look of their website and grant them access to all

12   consumer analytics, while allowing merchants to reach out to shoppers directly with sales

13   promotions and new releases.

14                 ***d.      Online marketplace services are not reasonably interchangeable***

15                 ***with services that primarily provide access to non-U.S. shoppers***

16        201.    Sellers who want to reach U.S. shoppers generally only consider online

17   marketplaces that already possess a significant U.S. customer base and facilitate sales to U.S.

18   shoppers through U.S.-specific marketplaces.  Online marketplace service providers typically

19   operate distinct websites focused on customer bases by different geographies; these websites list

20   prices in the local currency and operate differently to ensure compliance with local law.

21        202.    Online marketplaces set different fees across their various geography-specific

22   websites.

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

   *e.*    ***The relevant geographic market for online marketplace services***

      ***for sales to U.S. shoppers is worldwide***

203. Online marketplace services, which provide sellers access to U.S. shoppers, are procured by sellers worldwide.  Online marketplace services providers supply such services for sales to U.S. shoppers from anywhere in the world.

   **2.**   **Amazon has a dominant share of the online marketplace services**

     **market**

204. Amazon has a durable and dominant share of the online marketplace services market.  According to commercially available data sources and as illustrated in Figure 15, below, Amazon has maintained a market share of greater than 66% of marketplace sales, as measured by GMV, across all tracked marketplaces since at least 2018, and that share grew to more than 71% by 2022.



*Figure 15.  Source: eMarketer Insider Intelligence.*

COMPLAINT - 63
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

205.    In 2021, sales by sellers on Amazon's online U.S. Marketplace accounted for an estimated $226 billion in GMV, more than five times the estimated amount sold by sellers on eBay's online U.S. marketplace and more than thirty-four times the estimated amount sold by sellers on Walmart's online U.S. marketplace.  Amazon's market share across all tracked retail marketplaces dominates—and is continuing to outgrow—that of eBay and Walmart, as shown in Figure 16 below.



*Figure 16.  Source: eMarketer Insider Intelligence.*

### 3.    Amazon's dominant position in the online marketplace services market is protected by significant barriers to entry

206.    The online marketplace services market exhibits significant barriers to entry, including, for example, scale economies, switching costs, and network effects.  Network effects between the online marketplace services and online superstore markets also present a unique barrier, as discussed in Part V.C, below.  Moreover, Amazon's illegal course of conduct has

COMPLAINT - 64
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

made entry artificially and significantly more difficult than it would otherwise be, as discussed in Part VI, below.

207.    The market for online marketplace services is also characterized by network effects.  For example, as an online marketplace serves more sellers, it can collect, analyze, and offer robust aggregated sales data to its sellers, who can use the data to inform their business decisions.  A marketplace's increased ability to offer useful sales data to sellers helps it attract more sellers, which allows the marketplace to collect more data, and so on.

208.    As an online marketplace gains sellers, it also becomes more appealing to sellers who offer products that are complements to the products already offered on the marketplace.  For example, a seller of cell phone cases may be more interested in selling on a marketplace on which cell phones are also sold.

### C.    Feedback Loops Between The Relevant Markets Further Amplify The Cumulative Impact Of Scale And Related Network Effects

209.    The ability to gain scale is a critical factor in determining who can successfully compete in both relevant markets.  The feedback loop between these two relevant markets further amplifies the importance of scale and network effects in these markets, making it more difficult for rivals and potential rivals to enter and compete effectively against incumbents in the relevant markets.

210.    Online superstores that also offer online marketplace services operate in both relevant markets and benefit from scale and network effects that flow between—and reinforce market power across—those markets.  Though an online superstore does not necessarily need to operate a marketplace, network effects between the two markets create an additional barrier to entry for companies attempting to enter and compete in either market.  For online superstores with marketplaces, increasing scale in one market can make it easier to grow in the other, and a

COMPLAINT - 65
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  denial of scale in one market can make it harder to grow in the other.  By amplifying the

2  importance of scale in both markets, these network effects can intensify the harmful impact of

3  conduct that unlawfully deprives rivals of scale, widening the gulf between firms that can and

4  cannot effectively compete.

5       211.    To attract shoppers, an online superstore needs to offer a wide breadth and depth

6  of product selection.  Online superstores that operate marketplaces can increase their breadth and

7  depth of product selection by offering products sold by third-party sellers.

8       212.    Similarly, sellers prefer marketplaces where many potential customers already

9  shop.  By reaching a larger customer base, sellers can increase sales.

10       213.    Prospective entrants to both relevant markets face a chicken-and-egg problem:

11  they need to attract enough sellers to offer sufficient product selection to attract shoppers, but

12  they simultaneously also need to generate enough shopper traffic to attract those sellers.  As

13  Walmart explained, "many 3rd party sellers" are needed "to enable broad assortment" and meet

14  "customer assortment expectations," which "attracts more sellers" to the marketplace, in an

15  ongoing cycle.  This continuous loop creates a barrier to entry in both markets and accelerates

16  the growth of firms that can overcome it.

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

*Figure 17.  Example of the "Chicken-and-Egg" Barrier to Entry.*

*Source: Walmart Internal Documents.*

214.    Amazon leverages these network effects.  At any given time, Amazon offers more than a billion different items for purchase on its online superstore.  Sellers who buy marketplace services from Amazon provide much of the product selection that helps Amazon attract and keep its shoppers.  As more shoppers turn to Amazon for its product selection, more sellers use its platform to gain access to its ever-expanding consumer base, which attracts more shoppers, and so on.

215.    Amazon recognizes this feedback loop.  An internal Amazon strategy document states that "[t]he core value that Amazon provides to Sellers is access to a large number of Customers."  And Mr. Bezos testified that "third-party sellers increase selection for customers, and customers care deeply about selection."  Amazon publicly states that its "wide selection is made possible through independent sellers."

COMPLAINT - 67
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

216.    The interplay between Amazon's shoppers and sellers increases barriers to new entry and expansion in both relevant markets and limits existing rivals' ability to compete.  In this way, scale builds on itself, and is cumulative and self-reinforcing.

217.    This feedback loop spins Amazon's "flywheel."  Amazon publicly touts its flywheel as a "virtuous cycle."  But internally, Amazon focuses on creating "flywheel moat[s]" to bolster its dominance and on depriving rivals of the scale they would need to fully compete and challenge Amazon's dominance.

218.    For example, Amazon strategically restricts how shoppers can purchase the various services included in its Prime subscription, artificially increasing barriers to entry in the online superstore and online marketplace services markets.  Amazon has internally considered offering Prime services separately but instead chooses to weld them together to suppress rivals' and potential rivals' ability to gain scale.  Amazon fuses together a wide assortment of unrelated services ranging from streaming video, music, and gaming to prescription drugs and more to the unlimited shipping service included in Prime—and through it, to Amazon's monopoly online superstore.

219.    Amazon does not let shoppers subscribe only to the unlimited shipping component of Prime.

220.    And while Amazon technically offers Prime Video on a standalone basis, Amazon successfully uses dark patterns and other manipulative design techniques to thwart most shoppers from actually being able to sign up for it.

221.    Amazon's restrictive strategy of offering Prime services only on an all-or-nothing basis means that shoppers who want any of those services must effectively buy all of them and maintain a full Prime subscription.  Amazon estimates that approximately ■ million subscribers only subscribe to Prime because of Prime Video or other non-shipping services.  Once those

1    shoppers become Prime subscribers, however, they concentrate their online retail spending on

2    Amazon and away from other online superstores, limiting other superstores' ability to build a

3    large customer base.

4         222.   Amazon's restrictive all-or-nothing Prime strategy artificially heightens entry

5    barriers because rivals and potential rivals cannot compete for shoppers—including the ▮

6    million Prime subscribers described above—solely on the merits of their online superstores or

7    marketplace services.  Instead, they must enter multiple unrelated industries to attract Prime

8    subscribers away from Amazon or incur substantially increased costs to convince Prime

9    subscribers to sign up for a second shipping subscription or otherwise pay for shipping a second

10   time.  This substantial expense significantly constrains the number of firms who have any

11   meaningful chance to compete against Amazon and raises the costs of any that even try.  This

12   tactic blocks lower-priced rivals from competing head-to-head with Amazon to attract many

13   shoppers.  Even firms that have introduced comparable subscription services at a fraction of the

14   price have struggled to make serious inroads.  Amazon's restrictive strategy artificially heightens

15   barriers to entry, such that an equally or even a more efficient or innovative rival would be

16   unable to fully compete by offering a better online superstore or better online marketplace

17   services.

18        223.   Amazon internally acknowledges that many consumers would prefer the freedom

19   to pick and choose among the services it has combined into Prime—and that allowing shoppers

20   to do so would let Amazon offer these services to American shoppers "more competitively at a

21   lower price point."

22        224.   But Amazon also recognizes that "decoupl[ing] Prime" would "break[] the

23   existing flywheel" and therefore risk loosening Amazon's grip over both shoppers and sellers.

24   So, Amazon deliberately restricts how shoppers can access various components of Prime, despite

COMPLAINT - 69
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  knowing that offering additional choices for consumers would lead to more competition and

2  better prices.

3       225.    This current restrictive structure of Prime reflects a deliberate strategy by Amazon

4  to artificially increase barriers to entry and competition.  As one former Amazon executive

5  explained in recalling Amazon's motivation for adding non-shipping services to Prime, "[a]ny

6  competitor might launch a Prime shipping clone, or they could potentially build a new Netflix-

7  type service, but it was unlikely that any one of them would be able to do both."

8       226.    In 2021, Amazon considered and rejected a proposal to "decouple" Prime.  This

9  proposal would have increased consumer choice by creating a "Prime Shopping" subscription

10 that would have included unlimited shipping and other shopping-related services and a separate

11 "Prime Entertainment" subscription that would have included Prime Video and other purely

12 digital products.  But Amazon feared that offering consumers more options would "make it

13 easier for customers to substitute components of a bundle outside Amazon, (e.g., Netflix +

14 [Prime] Shopping only or [Prime] Entertainment + [Walmart+])," and would "break[] the

15 existing flywheel (digital → shopping engagement → GMS [sales])."  As Mr. Bezos put it

16 publicly, Amazon "monetize[s] [Prime Video] content in an unusual way . . . .  When we win a

17 Golden Globe, it helps us sell more shoes."  Offering "decouple[d]" Prime options to shoppers

18 would undermine that avenue of monetization, force Amazon to compete on the merits of its

19 various services and, according to Amazon, would "make it easier for customers to

20 substitute . . . outside Amazon."  To date, Amazon has forgone that option—it has not

21 "decouple[d]" Prime, instead choosing to limit consumer choice and maintain artificially

22 heightened barriers to entry.

23       227.    Amazon has also pursued a set of anticompetitive tactics—discussed further in

24 Section VI, below—to unlawfully deny its rivals access to both shoppers and sellers, artificially

COMPLAINT - 70
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   stunting their growth by starving them of the feedback loops across the relevant markets that

2   would benefit shoppers and sellers alike.

3       **D.    Direct Evidence Further Demonstrates Amazon's Monopoly Power**

4       228.    Direct evidence demonstrates that Amazon has monopoly power.  Amazon's

5   ability to profitably do the following without losing sufficient business to change its behavior

6   illustrates its monopoly power: (a) degrade the quality of its shopper-facing search results and

7   increase the number of irrelevant advertisements and advertisements for more expensive items

8   shown to shoppers; (b) degrade the quality of the shopping experience on Amazon by replacing

9   helpful organic search results with biased "widgets" that direct shoppers to purchase Amazon's

10  private label products; and (c) raise the prices it charges sellers to access the full suite of

11  Amazon's marketplace seller services and fulfillment services.  In addition, Amazon's unlawful

12  conduct is further direct evidence confirming Amazon's monopoly power in both markets.

13      **1.    Amazon has profitably degraded the quality of its search results by**

14      **cluttering organic search results with expensive, irrelevant**

15      **advertisements**

16      229.    Amazon fully launched its advertising business after Amazon's founder and then-

17  CEO, Mr. Bezos, told Amazon's senior executives "to go big, very big" on advertisements in late

18  2014.  Two years later, Mr. Bezos directly ordered his advertising team to continue to increase

19  the number of advertisements on Amazon by allowing more irrelevant advertisements, because

20  the revenue generated by advertisements eclipsed the revenue lost by degrading consumers'

21  shopping experience.

22      230.    Following those commands, Amazon dramatically ramped up the number of

23  advertisements it shows shoppers.  For example, by 2017, Amazon had transformed its most

24  valuable virtual real estate—the top of its search results page—into one giant advertisement.

**FEDERAL TRADE COMMISSION**
                                                              600 Pennsylvania Avenue, NW
                                                              Washington, DC 20580
                                                              (202) 326-2222

And, in the course of one year, Amazon more than doubled the percentage of instances where a desktop query would return an advertisement at the top of the search results page and more than quintupled the percentage of advertisements shown there in response to mobile search queries.

231.    In theory, relevant advertisements can be useful to shoppers in some instances. Importantly, Amazon has not only increased the total number of advertisements, but also the number of "defect" advertisements shown to shoppers.  Defects are advertisements which either are not relevant at all or only tangentially relevant to the users' query.  At a key meeting, Mr. Bezos directed his executives to "[a]ccept more defects" as a way to increase the total number of advertisements shown and drive up Amazon's advertising profits.

232.    Amazon employees followed Mr. Bezos's instructions.  Amazon's experiments showed that even when its advertisement defect rates increased by ██%, advertising revenue still increased Amazon's overall profits by ██ million.  Amazon ultimately revised its ad auction to incorporate the "cost of defect" in order to make the most money from its ad auctions.  With advertisements being so profitable to Amazon even at higher defect rates, senior Amazon executives agreed, "we'd be crazy not to" increase the number of advertisements shown to shoppers.

233.    Although Amazon considered placing "guardrails" on advertisements to protect the customer experience, it consistently rejected such ideas.  Senior Amazon executives gave "clear guidance" that "advertising should not be constrained by additional guardrails . . . like . . . search relevance."  Maximizing advertising profit at all costs "has effectively become 'law' even if it has many flaws," according to one senior Amazon executive.  When Amazon's advertising team was given control of a tool that could determine how many search page slots were allocated to advertisements, the same executive observed that with the advertising team now responsible for measuring the allocation of advertisements between organic and sponsored

COMPLAINT - 72
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

content, there was "a risk of the fox . . . guarding the henhouse." But it was too late to stop. The executive concluded Amazon was already "in a situation where the hens are out of the house anyways," given Amazon's control over advertising placement. Another senior Amazon executive reportedly compared Amazon's advertising and search divisions to the parable of the scorpion and the frog: it was in the advertising division's nature as the proverbial "scorpion" to poison organic search results.

234.     Another Amazon executive collected and circulated examples showing the extent to which displaying advertisements over organic search results worsened the shopper experience. Many results are plainly not what the customer searched for, such as when "a LA Lakers t-shirt ad show[ed] up in a search for 'Seahawks t-shirt.'" Other results are simply bizarre, like "Buck urine showing up in the first Sponsored Products slot for 'water bottles.'"

235.     By flooding its search results page with paid advertisements, Amazon also steers shoppers towards higher-priced products. In a 2018 internal study, a team of Amazon's economists found that the "median price for [Sponsored Products] search results is ██% higher than the median price of the neighboring organic content," and "██% of [Sponsored Products] Search results have higher prices than the adjacent organic result, and for ██% of impressions, the [Sponsored Products] price is at least twice that of the organic result." In that study, Amazon's economists recognized that its increased advertising makes it more difficult for customers to avoid higher prices because "as the share of site real estate devoted to sponsored content grows, it becomes harder for customers to undo price effects" by navigating to lower cost product listings. Amazon's economists also found that as advertising grew, "the price difference translates into a material impact on overall site ASP [average sales price]."

236.     As one Amazon executive explained, sellers who purchase advertising "have to pay per click for preferred Search and Detail Page placement in addition to the fixed commission

COMPLAINT - 73
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

Amazon charges per sale." In other words, Amazon's proliferation of pay-to-play advertisements increases the costs that sellers must bear to reach shoppers. And as the same Amazon executive explained further, "[t]his extra cost is likely to be passed down to the customer and result in higher prices for customers." Moreover, because Amazon's anti-discounting conduct punishes sellers who offer lower prices at rival online stores with lower fees, many sellers set their price on Amazon—high fees and all—as the price floor across the internet.

237.    Amazon's business development team explained in an internal study that imposing higher advertising loads on shoppers not only drives up the price shoppers pay, but also "decreases purchase rates and increases search abandonment." According to public reports, Amazon engineers found that "[w]hen sponsored ads were prominently displayed, there was a small, statistically detectable short-term decline in the number of customers who ended up making a purchase." But these qualitative harms, the team concluded, "are vastly outweighed in the short term by ad revenue." While fewer shoppers were finding what they wanted, advertisements were making more money—"[a] lot of it."

238.    Amazon's economic team responsible for analyzing the impact of advertising acknowledged in a business review that the "introduction of advertising on Amazon is a challenge for the consumer business since we trade off profitability against lost transactional revenue." But this tradeoff is profitable for Amazon because the increased advertising revenue outweighs the sales it loses from worsening the relevance and quality of search results. Despite degrading shoppers' experiences, Amazon continues to have double digit growth in overall sales, not losing meaningful numbers of shoppers to rivals.

239.    Amazon's quality degradation has been wildly profitable. In 2015, Amazon earned $1 billion in revenue from advertising in the United States. By 2021, that number had

increased to more than ▉ billion, leading to over ▉ billion in profits in the United States alone.

240.   Amazon's ability to profitably worsen its service for customers is a hallmark of monopoly power.

### 2.   Amazon degrades its search quality by stacking the deck against third-party competitors of Amazon's private label products

241.   Amazon further degrades the quality of its search results by burying organic content under recommendation widgets, such as the "expert recommendation" widget, which display Amazon's private label products over other products sold on Amazon.

242.   A recommendation widget is a discrete portion of Amazon's website or mobile app that lets customers scroll through a set of recommended products.  Previously, such widgets were limited to displays like an area on a product's Detail Page indicating what "customers also bought," or an area suggesting shoppers may want to replenish items they had previously purchased, like paper towels.  Amazon now uses recommendation widgets that often promote Amazon's own private label products.

243.   Amazon manipulates those recommendation widgets so that sellers cannot compete on equal footing against Amazon's private label products.  Instead, Amazon purposefully suppresses information about competing products to give its own private label products an artificial boost.

244.   One way Amazon stacked the deck in its favor was through its "expert recommendation" widget.  This widget originally showed what other websites, such as the *New York Times Wirecutter*, recommended as the best product.  But after Amazon acquired Ring, a video doorbell company, Amazon employees responsible for Ring complained that the expert

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   recommendation widget was recommending other sellers' doorbells instead of Amazon's Ring

2   doorbells.  The Ring employees pressed for preferential treatment.

3        245.    The then-head of Amazon Search strongly pushed back, writing to colleagues that

4   he was "very sensitive to anything that appears to stack the deck in our favor."  He advocated

5   that Amazon instead build good products that would earn the expert recommendation on the

6   merits.  A colleague agreed, observing that the incident "feels like one battle in the war for

7   Amazon['s] soul."

8        246.    Amazon's search organization lost that battle.  Amazon went on to blacklist

9   specific "competitive products" from its expert recommendation widget, concealing them from

10   consumers.  Amazon also decided that if Amazon sold one of its own "product[s] within a given

11   search query category," Amazon would display the "expert recommendation" widget only if the

12   recommendation included Amazon's product.  Under this policy, for example, Amazon "would

13   not show an expert recommendation for 'tablets' that does not include Kindle," an Amazon

14   private label product.  Rather than competing to secure recommendations based on quality,

15   Amazon intentionally warped its own algorithms to hide helpful, objective, expert reviews from

16   its shoppers.  One Amazon executive reportedly said that "[f]or a lot of people on the team, it

17   was not an Amazonian thing to do," explaining that "[j]ust putting our badges on those products

18   when we didn't necessarily earn them seemed a little bit against the customer, as well as anti-

19   competitive."

20        247.    A third-party seller noticed that Amazon was giving preferential treatment to its

21   own products and complained to Amazon about the effect on the customer experience.  The

22   seller wrote that it "appears Amazon brands and 1P offerings are given priority placement" and

23   concluded that "Amazon customers are likely to be served product listings from Amazon/1P

24

brands or sellers who spend the most money on advertising[,] NOT necessarily the products that are in the shoppers['] best interest."

248.   In competitive markets, the possibility of losing business to rivals would tend to pressure a company to create more value for its customers, shoppers and sellers alike.  But Amazon's unchecked dominance allows it to degrade its service without ceding—and indeed while expanding—its business.  The fact that Amazon's degradation of its search results through biased widgets did not cause Amazon to lose sufficient business or to change its behavior further demonstrates its monopoly power.

**3.   Amazon increases prices to sellers without losing meaningful business**

249.   Amazon's monopoly power also allows it to charge higher prices and provide lower quality services to sellers.  As explained in Part IV, above, Amazon charges sellers selling fees, referral fees, fulfillment fees, and advertising fees.  The total price Amazon charges a seller has skyrocketed without a correspondingly large loss of business.

250.   Before Amazon decided to prioritize advertisements as a way to generate revenue, sellers were able to access prominent and valuable search page placement by paying just Amazon's referral and sales fees.  Now, advertised products on Amazon are 46 times more likely to be clicked on when compared with products that are not advertised.  Advertisements are now no longer a discretionary purchase but instead a necessary cost of doing business.  Therefore, sellers must not only pay Amazon's referral fee but must also now pay for advertising in order to reach shoppers.

251.   Amazon has also hiked average fulfillment fees to sellers, which jumped approximately 30% between 2020 and 2022.  Amazon has made these fees, too, a prerequisite to being a successful seller on Amazon.  As described in Part VI.B below, Amazon effectively

forces sellers to purchase its fulfillment services to access the full reach of Amazon's marketplace services that Prime eligibility unlocks.

252.   By effectively requiring sellers to pay for search placements through advertising and for Prime's shipping costs through FBA, Amazon has dramatically increased the percentage cut it takes out of seller revenues, also known as Amazon's "take rate."  Amazon's average take rate for sellers who use FBA increased from 27.6% in 2014 to a projected ███% in 2022 for essentially the same services.  Amazon now takes nearly one out of every two dollars of sales from sellers who use its fulfillment services, many of whom are small businesses with already thin margins.  By comparison, Amazon's take rate is higher than its rivals.  The fact that such low-margin sellers remain on Amazon even as Amazon takes an ever-greater cut of their revenues shows Amazon's monopoly power.

253.   Sellers note that because they depend on Amazon, they effectively have no choice but to submit to Amazon's growing demands.  As a third-party seller put it in a complaint to Amazon: "Amazon is the most expensive place I do business."  The seller continued, stating that Amazon's prices have "resulted in . . . slim-to-nonexistent margins" and "higher consumer prices for our items."  According to a public article, another seller stated that "[f]or some products, we realized that we need to pay for ads but we'll never profit at our current prices."  As a result, that seller had to raise prices to pay for advertising on Amazon.

254.   Amazon also recognizes that sellers believe "that it has become more difficult over time to be profitable on Amazon."  A survey from 2021 found that less than 10% of sellers were "satisfied" with "[c]ost and profitability on Amazon."  One of the only ways left for sellers to eke out a profit is to raise the prices paid by shoppers.  A seller succinctly explained this dynamic:

COMPLAINT - 78
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

> Amazon charges are very high.  Amazon takes a % of the product price . . . and also storage fees, and [P]rime delivery fees, and if you want to sell anything you need to spend money in ads, so in the end, [A]mazon takes 50% of the cost of the product, and our profit margins are down to 0. . . .  We need to raise the price in all our products sold on Amazon just to be able to make some profits.

255.    Amazon has hiked its fees even as it has failed to adequately protect sellers' commercially sensitive data, exposing this data to theft and appropriation.  Internally, Amazon recognized that it gave employees access to a "very powerful tool that provide[d] users with the ability to indiscriminately search for any seller account, view and edit data without the seller's consent, and create risk for customers, sellers, and Amazon."  Employees also recognized that Amazon "lack[s] sufficient logging, monitoring, and alerting of unauthorized access" to seller data, and that "the lack of technical control and coverage for all uses of seller data causes risk to Amazon."  When faced with scrutiny and criticism over these practices, Amazon has touted its "seller data policy," but Amazon still has not implemented adequate technical controls to enforce that policy.

256.    Many sellers have unfavorable views of Amazon but continue to use Amazon because there are no viable alternatives.  Indeed, seller forums on Amazon are rife with complaints about issues ranging from abrupt and arbitrary account suspensions to sellers having their inventory unexpectedly seized with no recourse.  One seller explained that they could not leave Amazon because "[w]e have nowhere else to go and Amazon knows it."  According to an internal Amazon study, Amazon's sellers live "in constant fear" of Amazon arbitrarily interfering with their ability to sell on Amazon, which "put[s] their businesses and livelihoods at risk."  Amazon's ability to profitably hike fees while maintaining its iron grip over sellers is further evidence of its monopoly power.

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

VI.     **AMAZON IS ENGAGED IN A COURSE OF CONDUCT THAT ILLEGALLY MAINTAINS ITS MONOPOLIES IN BOTH RELEVANT MARKETS**

257.     Amazon illegally maintains its monopolies through an interrelated course of conduct that blocks competition.  First, Amazon deploys a series of anticompetitive practices that suppress price competition and push prices higher across much of the internet by creating an artificial price floor and penalizing sellers that offer lower prices off Amazon.  Second, Amazon coerces sellers into using its fulfillment service to obtain Prime eligibility and successfully sell on Amazon.  Each of these tactics—independently and collectively—prevents Amazon's rivals from gaining scale and maintains Amazon's monopolies.

258.     Amazon first ensures that no other online rival can gain scale through offering prices lower than those listed on Amazon.  Amazon accomplishes this anticompetitive goal through an interwoven set of algorithmic and contractual tactics, all of which rely on Amazon's massive web-crawling apparatus that constantly tracks online prices.  Amazon's anti-discounting punishments tame price cutters into price followers, effectively halting real price competition. This conduct imposes costs on shoppers and sellers alike.  Shoppers pay inflated prices on and off Amazon, as sellers must effectively submit to Amazon's high fees by raising prices even on non-Amazon sites.  Rivals no longer compete to offer sellers lower fees, since Amazon's anti-discounting conduct prevents sellers from passing those savings on to shoppers.

259.     For sellers, Amazon conditions access to Prime eligibility on sellers' use of Amazon's proprietary fulfillment service, FBA.  Amazon's coercion makes it more difficult and more expensive for sellers to sell on other marketplaces, which in turn makes it more difficult for rivals to attract sellers and compete with Amazon on product selection.  The result is a feedback loop that continues to inhibit the growth of rivals and starve them of scale while maintaining and expanding Amazon's dominant positions.

COMPLAINT - 80
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

260.     Each element of Amazon's course of conduct mutually reinforces its monopolies in both relevant markets.  For example, Amazon's anti-discounting scheme stifles price competition.  That same scheme also reinforces the exclusionary effects of Amazon's use of Prime eligibility to force sellers to use FBA, by making it even less profitable for sellers to sell on other marketplaces.  This feedback loop fuels a flywheel of anticompetitive harm, amplifying the aggregate effects and further widening the gulf between Amazon and everyone else.

261.     Because Amazon suppresses meaningful competition on price and product selection, shoppers lack viable alternatives, further forcing sellers to submit to Amazon's exclusionary tactics to reach those customers, and further allowing Amazon to accelerate and expand its dominance.  Together, Amazon's conduct blocks off competition, shopper traffic, and seller business in the interrelated relevant markets.

**A.     Amazon Maintains Its Monopolies In Both Relevant Markets Through Exclusionary Anti-Discounting Conduct That Stifles Price Competition**

262.     A core Amazon strategy is to limit one of the most fundamental avenues of competition: price competition.  Amazon understands the importance of maintaining the *perception* among shoppers that it has the lowest prices.  But in reality, Amazon relentlessly stifles actual price competition by punishing sellers who offer lower prices anywhere other than Amazon and disciplining rivals that undercut Amazon's prices.

263.     Amazon uses a variety of tactics to execute its anti-discounting strategy.  At the foundation is Amazon's sprawling price-surveillance group, the Competitive Monitoring Team, which constantly crawls the internet for prices.  Using this price-surveillance team, Amazon punishes third-party Marketplace sellers who offer lower prices on other online stores.  Amazon imposes additional contractual obligations suppressing price competition on its most important sellers, backed up by the threat of even stronger penalties—including total banishment from

Amazon's Marketplace.  Amazon also deters rivals from even attempting to compete with Amazon's first-party Retail business on price by ensuring that rivals' price cuts do not result in greater scale, only lower margins.

264.    Combined, Amazon's conduct quashes one of the most direct ways to compete with Amazon in both relevant markets: by offering lower prices.  In an open, competitive environment, rival online superstores could attract more business by offering shoppers lower prices, and rival online marketplaces could attract sellers by charging them lower fees, allowing sellers to pass those savings on to shoppers via lower prices.  Amazon suppresses this price competition by wielding its monopoly power to prevent sellers and retailers from offering lower prices off Amazon.

265.    Without the ability to attract shoppers or sellers through lower prices, rivals are unable to gain a critical mass of either shoppers or sellers despite needing both to compete against Amazon.  Further, by punishing sellers when there are lower prices off Amazon and disciplining rivals that try to compete on price, Amazon teaches shoppers not to look for lower prices off Amazon.  Less comparison shopping again hinders rivals from gaining a larger consumer base.  Amazon's anti-discounting strategy therefore denies rivals the ability to gain scale, cements Amazon's dominance in both relevant markets, and ultimately keeps prices higher than they would be in a competitive market.

**1.    Amazon engages in price surveillance to support its anti-discounting scheme**

266.    The foundation of Amazon's anti-discounting scheme is an extensive price-tracking operation housed within its "Competitive Monitoring Team."  This team, staffed with

COMPLAINT - 82
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 ███████████████████████████████████████████

2 ████

3     267.    Amazon's Competitive Monitoring Team ██████████████████

4 ███████████████████████████████████████████

5 ███████████████████████████████ Amazon

6 has estimated that for thousands of the most popular products on Amazon it can detect any price

7 change virtually anywhere on the internet within hours.

8     268.    Amazon uses this surveillance apparatus to detect whether sellers or vendors "are

9 stepping out on us" by offering lower prices on other websites.  Amazon's CEO of Worldwide

10 Stores explained that policing sellers to prevent them from discounting elsewhere, so Amazon

11 can maintain a reputation for having low prices, is "a dirty job, but we need to do it."

12         **2.      Amazon maintains its monopolies by punishing third-party sellers**

13              **when Amazon detects lower prices on other online stores**

14     269.    Using its vast surveillance network, Amazon systematically punishes sellers when

15 Amazon detects a lower price on other online stores.  Amazon does this in two ways.  One way

16 Amazon punishes sellers is by disqualifying a seller's offer from appearing in the Buy Box when

17 Amazon finds a lower price on another online store for an item being sold by a seller on

18 Amazon.  For many sellers, losing the Buy Box—and even the ability to qualify for the Buy

19 Box—is an existential threat to their business.  Amazon has amassed and maintains a huge

20 shopper base, making Amazon a vital sales channel for many sellers.  The second way Amazon

21 punishes sellers is by imposing contractual obligations on certain important sellers, backed up

22 with the threat of even stronger penalties, including total banishment from Amazon's

23 Marketplace.

24

COMPLAINT - 83
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

270.    As a result of Amazon's threats and punishments, even rival platforms that charge sellers less than Amazon for marketplace services would not be able to draw shoppers through lower prices.

271.    Amazon not only suppresses the ability of sellers and retailers to offer lower prices elsewhere, but its conduct effectively *elevates* prices even off Amazon.  Because Amazon has steadily hiked the fees it charges sellers while also prohibiting them from discounting on other websites, sellers must often use their inflated Amazon prices as an artificial price floor everywhere.  As a result, Amazon's conduct causes online shoppers to face artificially higher prices even when shopping somewhere other than Amazon.

### a.    *Amazon penalizes sellers when Amazon finds lower prices off Amazon*

272.    Amazon's anti-discounting strategy has taken several forms.  Amazon originally included a clause in its Business Solutions Agreement—a contract every seller must agree to—that explicitly prohibited sellers from offering lower prices elsewhere.  From at least as early as 2011 until March 2019, this contract required each seller to "maintain [price] parity" between Amazon and other online sales channels.  This meant that a seller could not offer lower prices on other online stores without breaching their Amazon contract, even when their selling costs were lower on those stores.

273.    After European competition authorities launched multiple investigations into Amazon's price parity clauses, Amazon dropped this requirement in Europe in August 2013.

274.    In December 2018, U.S. Senator Richard Blumenthal sent public letters to the Federal Trade Commission and the U.S. Department of Justice expressing "deep[] concern[] that the price parity provisions in Amazon's contracts with third-party sellers could stifle market competition and artificially inflate prices on consumer goods."  Three months later, Amazon

COMPLAINT - 84
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    quietly stopped its practice of applying this particular contractual price parity provision to all

2    sellers.

3        275.    Despite making this particular change, Amazon never abandoned its strategy of

4    preventing sellers from offering lower prices elsewhere.  Instead, Amazon increased the scope

5    and effectiveness of an internal mechanism called "Select Competitor – Featured Offer

6    Disqualification," or "SC-FOD."

7        276.    An internal Amazon document written weeks after Amazon dropped its

8    contractual price parity requirement acknowledged that Amazon intended to use SC-FOD to

9    enforce its "expectations and policies," which "ha[d] not changed."  Whether done contractually

10   or algorithmically, Amazon requires sellers to keep prices off Amazon as high or higher than

11   prices on Amazon.  Amazon uses SC-FOD to enforce this policy even as it recognized internally

12   that its replacement of a contractual price parity term with an expansion of SC-FOD would

13   appear to be "not only trivial but a trick and an attempt to garner goodwill with policymakers

14   amid increasing competition concerns."

15       277.    SC-FOD is an Amazon algorithm that disqualifies a seller's offer from winning

16   the Buy Box if Amazon detects a price that is lower—even by a penny—for that product on any

17   online store that Amazon designates as a "Select Competitor."  If Amazon disqualifies every

18   offer for a given product from winning the Buy Box, Amazon removes the Buy Box itself from

19   the product's Detail Page.

20       278.    When evaluating prices at another online store, SC-FOD ███████████████

21   ███████████      For example, if a seller's Amazon price is ████████████  and

22   Amazon detects the same product being sold at another online store ████████████

23   ███████████  Amazon would still ██████████████████████████

24   ██████████████  To avoid retribution from Amazon, the seller would have to

1   ████████████████████████████████ making the total off-Amazon price

2   ($12) more expensive than the total Amazon price.

3       279.   When Amazon disqualifies a seller's offer from the Buy Box, it tells the seller

4   that Amazon detected a lower price elsewhere and informs the seller what that price is.  Amazon

5   does not, however, tell the seller where it found the lower price.  Amazon deliberately withholds

6   the source of the lower price to foster the impression that a lower price anywhere online will tank

7   a product's Amazon sales, chilling discounting far and wide.

8       280.   At one time, Amazon designated only the very largest online stores as "Select

9   Competitors" for purposes of SC-FOD.  After dropping the price parity clause from its Business

10   Solutions Agreement, Amazon exponentially expanded its classification of "Select Competitors."

11   Amazon now designates ████████████████████████████████

12   ████████████████████████████ as "Select Competitors."  According

13   to a senior Amazon executive, Amazon expanded this designation to make "the punitive aspect"

14   of SC-FOD "more effective."

15       281.   Today, Amazon tells sellers that they will be punished if Amazon detects a lower

16   price on any other online store.  In 2022, for example, Amazon explained to thousands of sellers

17   that a "pre-requisite" to "win[ning] the 'Buy Box'" is to ensure that lower prices are never

18   available off Amazon.

19       282.   In addition to expanding SC-FOD's scope, Amazon has intentionally made it

20   difficult for shoppers to find and purchase items that do not have a Buy Box, further amplifying

21   the "punitive aspect" of SC-FOD disqualification.

22       283.   Today, Amazon carries out the "dirty job" of ensuring that no seller "step[s] out"

23   on Amazon by wielding a suite of penalties to bury products without a Buy Box, including:

24           (a) demoting them in search results;

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1        (b) hiding their prices on the Search Results Page;

2        (c) excluding them from Sponsored Products advertisements; and

3        (d) prohibiting them from appearing in certain recommendation widgets.

4        284.    Amazon's penalties are highly effective at preventing sales of product listings

5 targeted by SC-FOD.  Amazon itself recognizes that removing a seller from the Buy Box causes

6 their sales to "tank."  Offers outside of the Buy Box comprise less than 3% of all purchases on

7 Amazon.

8        285.    Amazon's penalties effectively deter sellers from offering prices elsewhere that

9 are lower than their prices on Amazon, even where their costs are lower through other online

10 sales channels.  That in turn limits the ability of other online superstores to offer prices lower

11 than those on Amazon, hindering the growth of would-be rivals and denying them the scale

12 necessary to compete.

13        ***b.***     ***Amazon continues to contractually prohibit its most important***

14        ***sellers from discounting elsewhere***

15        286.    Amazon places additional limits on certain sellers' ability to sell products at lower

16 prices on other online stores.  These restrictions are embedded in the "Amazon's Standards for

17 Brands" ("ASB") program.

18        287.    Amazon applies ASB to brands, brand licensees, and brand representatives that

19 use Amazon's Marketplace ("ASB sellers"), regardless of whether their brand is a long-

20 established household name or an upstart few people would recognize.  Amazon can, at its own

21 election, designate a seller as an ASB seller even if the seller objects.

22        288.    ASB sellers are an especially important type of seller to Amazon for two reasons.

23 First, ASB sellers constitute a large and fast-growing segment of total third-party seller sales.

24 Sales from ASB sellers have grown significantly faster than overall Amazon Marketplace sales

for years.  In 2021, 55% of Amazon Marketplace sales were by ASB sellers, and Amazon projected they would sell more than $151 billion of products on Amazon in 2022.

289.    Second, because of their close relationship with the brands they sell, ASB sellers have more influence over brand prices and selection across channels than "resellers," which lack such a relationship.  As a founding member of the team responsible for ASB explained, ASB sellers are subject to special rules because they have more control over sourcing and inventory than resellers.

290.    Amazon implemented ASB in September 2018 through an amendment to the Business Solutions Agreement.  All sellers, including ASB sellers, must agree to Amazon's Business Solutions Agreement in order to sell on Amazon's Marketplace.  The ASB restrictions are therefore binding contractual obligations that Amazon imposes on ASB sellers.

291.    Through ASB, Amazon contractually requires ASB sellers to ensure that their products' prices on other online stores are as high or higher than their prices on Amazon at least 95% of the time.

292.    Amazon also imposes strict contractual requirements on ASB sellers related to product selection, in-stock rates, and Prime eligibility.  The selection requirement compels ASB sellers to sell most of their selection on Amazon; the in-stock requirement compels ASB sellers to have nearly all of their inventory in-stock and ready for sale to Amazon customers; and the Prime eligibility requirement compels ASB sellers to use Amazon's fulfillment service for the vast majority of their products.

293.    These requirements limit ASB sellers from offering products anywhere but Amazon.  They do so by restricting ASB sellers from pursuing differentiated sales strategies that are tailored to the strengths and weaknesses of a given online channel.  Rival online superstores or marketplaces are disincentivized from competing against Amazon by offering ASB sellers

COMPLAINT - 88
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   better terms in exchange for lower prices or exclusive selection.  In addition, the in-stock and

2   Prime requirements exacerbate Amazon's coercive fulfillment practices, discussed in Part VI.B,

3   below, which raise sellers' costs to sell on multiple online stores.  These ASB conditions

4   therefore substantially enhance Amazon's monopoly power in both markets.

5         294.    Amazon threatens an ASB seller's "privileges"—including the "privilege" to

6   "operate as a seller in the Amazon store altogether"—if the ASB seller violates any part of ASB.

7   In other words, Amazon threatens not just to kick ASB sellers' offers out of the Buy Box but to

8   boot them out of Amazon's Marketplace altogether if they offer lower prices or a different

9   selection of products on other online stores, if they fail to meet certain inventory in-stock levels,

10  or if they do not ensure that most of their products are Prime eligible.

11        295.    In addition to revoking some ASB sellers' selling privileges in full by shutting

12  down their seller accounts, Amazon also places limits on which products or brands sellers are

13  allowed to sell.  Between October 2019 and February 2022, under the guise of ASB policy

14  enforcement, Amazon placed more than ██ such restrictions on ASB seller accounts (an

15  average of more than █ penalties per day for more than █ years).

16        296.    ASB's origins demonstrate that one of its primary purposes is to ensure that ASB

17  sellers do not offer lower prices off Amazon.  The development of ASB can be traced directly to

18  Amazon's now-CEO of Worldwide Stores reaching a "boiling point" because "well-known

19  brands" were using "other marketplaces" and "competitor sites" to sell products "at significantly

20  lower prices than on Amazon."

21        297.    The intent underlying this policy is further evidenced by the messages Amazon

22  sent to certain ASB sellers when it penalized them for violating ASB restrictions.  Amazon told

23  those punished ASB sellers that they were being sanctioned because "customers considering

24  your products could have easily found your products cheaper at another major retailer, and may

COMPLAINT - 89
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

have chosen to shop elsewhere."  In that same message, Amazon offered to restore the ASB

sellers' privileges if the ASB sellers met the ASB requirement that their off-Amazon prices were

as high as their on-Amazon prices at least 95% of the time.  In response to a newspaper article

reporting that some sellers complied with ASB by raising prices off Amazon, Amazon changed

the language in their messages to sellers, but not the 95% price parity requirement.

298.    As ASB sellers have told Amazon, ASB has the effect of keeping prices higher

than they would be otherwise.

299.    In 2019, Amazon punished an ASB seller because another online retailer with

which the ASB seller had a vendor relationship set a price for the ASB seller's product that was

lower than the seller's price on Amazon.  After Amazon contacted the ASB seller, the seller told

Amazon that they would act within days to "fix the prices at the other Retailers" by directing

their "wholesale team" to make sure that all their online prices were at least as high as their

Amazon prices.

300.    In late 2021, another ASB seller told a top-level Amazon executive that ASB is a

"Brand Killer."  The ASB seller explained that "[t]he ASB Team is trying to dictate the prices at

which we sell inventory. . . . This may, in turn, cause us to raise prices in other sales channels in

order to keep Amazon offers. . . .  This is a lose-lose situation for all parties involved."

301.    Amazon observed in a late 2021 internal program assessment that ASB

punishments create a "strong incentive" for ASB sellers to ensure that their products are not

priced lower elsewhere.

302.    The Amazon team responsible for ASB has also implemented a different program

modeled on ASB called "Customer Experience Ambassadors" ("CXA").  While ASB imposes

stringent price, selection, stock, and logistics requirements, CXA imposes even stricter

requirements, including a 98% price parity requirement, on the approximately ██████

COMPLAINT - 90
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

largest Amazon sellers by sales volume.  Amazon targets these "top Sellers" because it knows

that they "have an outsized impact on [c]ustomers' shopping experience."  Each of these sellers

has at least  ██  million in annual sales on Amazon, and they collectively sold more than  ██

billion worth of products from June 2020 through June 2021.  Like ASB, CXA is neither

"optional nor negotiable" for the sellers on which Amazon imposes it.

303.    CXA, too, is motivated by Amazon's fear of competition.  Amazon is concerned

that some of its largest sellers could "[g]et [t]oo [b]ig" and use their size to "divert traffic away

from Amazon, either by providing competing fulfillment capabilities and [P]rime like benefits

through their own store, or by selling to a competitor with these capabilities."

304.    ASB—and its sister program, CXA—are thus additional elements working across

Amazon's business in tandem with Amazon's other strategies that punish off-Amazon

discounting, stifle competition, impede the growth of potential competitors, hike prices, and

degrade quality for consumers in the relevant markets.

### c.    *Amazon's anti-discounting strategy prevents rivals and sellers from offering lower prices and deprives rivals of scale necessary to compete*

305.    By suppressing competition in the online superstore and marketplace services

markets, Amazon's anti-discounting strategy artificially inflates prices.  Shoppers and sellers pay

more, and Amazon reaps the benefits.

306.    Amazon's one-two punch of high fees and seller threats forces sellers to use their

inflated Amazon prices as a price floor everywhere else they sell online.  As a result of

Amazon's conduct, shoppers often have no choice but to pay *at least* the price in Amazon's Buy

Box even when they buy online somewhere other than Amazon.

COMPLAINT - 91
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

307.    Sellers generally price their goods to at least cover their costs, including fees charged by online marketplace services providers (such as those discussed in Part IV, above). Thus, the seller's shopper-facing price depends on the amount of fees charged by different marketplaces.

308.    As discussed in Part V.D.3, above, the cost of doing business is higher on Amazon than on other marketplaces—and Amazon has steadily hiked the fees it charges sellers, almost doubling them over 9 years for sellers in FBA.

309.    Because Amazon has steeply raised its fees, sellers need to charge higher prices on Amazon than they would on a less-costly marketplace to make the same per-unit profit. Amazon's high fees should present other online superstores with an opportunity that would make shoppers, sellers, and themselves better off: if those superstores can offer sellers lower fees, sellers could offer shoppers lower prices while making the same or a higher profit margin, which should cause shoppers and sellers alike to flock to the less-costly online store.

310.    Amazon has destroyed this competitive dynamic by algorithmically forcing sellers to ensure that their prices off Amazon are no lower than their prices on Amazon, regardless of the relative costs.  Similar anticompetitive effects flow from ASB, which contractually prevents brands from offering lower prices elsewhere online even when it would be profitable for them to do so, including on their own websites.

311.    Amazon internally recognizes that any seller dependent on Amazon "would not have an incentive to lower prices in one of its [less important] outlet[s]/channel[s] because the financial impact would be multiplied" across sales they also make on Amazon.  To avoid any risk of jeopardizing their Amazon sales, some sellers limit the selection of products they sell on other online channels—or forgo selling on other online channels altogether.

312. Although Amazon tells sellers they can regain Buy Box eligibility by lowering their Amazon price, the sky-high fees Amazon charges sellers often put this option out of reach unless sellers are willing to sell at a loss.  For instance, one seller told Amazon that because of the high prices Amazon charges for its marketplace and fulfillment services, the seller would lose $1.70 on every item they sold on Amazon if they lowered their price to the one Amazon required for the seller to regain Buy Box eligibility.  Sellers have also complained to Amazon "that [Buy Box disqualification] encourages Sellers to raise their prices on competitor websites."

313. One Amazon seller adopted a go-forward policy to make "absolutely sure that our products are not priced lower on Walmart than they are on Amazon" after losing the Buy Box and receiving a pricing notification from Amazon.

314. Another seller "increased the price [of a product] to a really high number" on a rival marketplace because Amazon "threaten[ed] to take [sellers] off [Amazon's] Marketplace" if the seller's prices on the other marketplace were lower than their Amazon prices.

315. Amazon understands that its anti-discounting strategy generally does not have the effect of lowering prices on Amazon because sellers must pay the high fees charged by Amazon. A 2017 Amazon internal memo observed that Buy Box disqualification "has not led Sellers to lower their prices" and "has not motivated Sellers to reduce prices."  A 2018 analysis reached the same conclusion, noting that Amazon has increased seller costs to the point that "it has become more difficult over time [for sellers] to be profitable on Amazon."  As discussed in Part V.D.3, above, the fees Amazon charges sellers have ballooned in the years since these analyses were completed.

316. The primary and intended effect of Amazon's anti-discounting strategy is that sellers do not offer lower prices off Amazon even if other online marketplaces offer sellers lower costs.

317.     This effect is intensified for sellers subject to ASB.  While Amazon's algorithmic anti-discounting punishment focuses on individual products, Amazon's enforcement of ASB threatens an ASB seller's ability to sell anything at all as a third-party seller on Amazon's Marketplace.  ASB's threatened contractual punishments could therefore effectively cut off a huge channel for sellers.  In that way, ASB is broader in scope than any particular instance of Amazon's algorithmic third-party punishment, making it even more likely that Amazon's punitive program deeply chills discounting by ASB sellers off Amazon.

318.     The swiftness and severity of Amazon's punishments has prompted some sellers to stop doing business with other online marketplaces and online stores.  As one supplier told another online retailer, Amazon's Buy Box suppression strategy left the supplier with limited options, including having to "move up our price on [your site]" or "stop selling our best selling styles to [you]."  The force and fear of Amazon's tactics are so strong that actual punishment is often not necessary.  The threat alone can be enough.

319.     For example, as one seller that sells across multiple online stores explained, he is reluctant to sell his company's products on other websites because he does not know whether the other store will "price things in a way that will cause our products to be suppressed on Amazon." Amazon's anti-discounting punishments also limit the extent to which sellers sell on other online marketplaces, where sellers can control the final prices offered to customers.  The same seller stated that the need to ensure that he offers the same prices across all marketplaces "makes it more difficult . . . to sell in multiple places."  To avoid the risk that Amazon's punishments will cause a seller's sales on Amazon to disappear, some sellers either limit which products they sell on other online stores, stop selling elsewhere altogether, or never start in the first place.

320.     Amazon's anti-discounting conduct reverberates throughout both relevant markets because of Amazon's dominance in each market.  For example, ███████ runs a program

1  offering sellers discounted marketplace services to incentivize them to set lower prices on

2  ████████ marketplace.  However, sellers have told ████████ that it is not possible to provide

3  discounts to customers on ████████ because the sellers can only match Amazon in terms of

4  pricing.

5        321.  Instead of taking advantage of ████████ lower costs to offer better deals to

6  shoppers, some sellers asked ████████ to help them ensure that their prices on ████████ were

7  never lower than prices on Amazon.  ████████ developed software that provides sellers options,

8  including the option of matching their price set on ████████ to the price on Amazon, which

9  according to ████████ avoids the "risk that . . . their price end[s] up lower on ████████

10  inadvertently."  The relatively few sellers who offer their goods on both Amazon and

11  ████████ can use the program to ensure that ████████ marketplace prices are not lower

12  than prices on Amazon.

13        322.  The power and reach of Amazon's punitive scheme are so significant that its

14  ████████ rival created a program that helped sellers ensure that they were abiding by Amazon's

15  anti-discounting rules—even though these rules undermine the rival's ability to compete with

16  Amazon.  This is not a healthy, competitive market.

17        323.  As an industry executive concisely summed up the pernicious and pervasive

18  effects of Amazon's conduct:

19       The seller is losing sales because they're missing the discoverability of that item
        or the featuring of that item in the promotion.  We're missing on delivering value
20       to customers because we could otherwise be offering customers a lower price on
        that product, which we're unable to do . . . and it's a loss to the customer because
21       they[ ] end up paying more for an item than they otherwise could have.

22        324.  In total, Amazon's anti-discounting conduct helps maintain Amazon's

23  monopolies by stifling competition in both relevant markets, denying scale to rivals, harming

24  sellers, and depriving shoppers of lower prices.

COMPLAINT - 95
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

**3.      Amazon maintains its monopolies by suppressing price competition with its first-party anti-discounting algorithm**

325.    For Retail products that Amazon prices and sells itself, Amazon deploys a similar anti-discounting program that it implements through another pricing algorithm.  While the exact mechanism differs from the mechanisms Amazon uses to punish sellers, the means, motive, and effects are all the same.  Amazon uses its extensive surveillance network to block price competition by detecting and deterring discounting, artificially inflating prices on and off Amazon, and depriving rivals of the ability to gain scale by offering lower prices.

*a.      Amazon's first-party anti-discounting algorithm is designed to discipline rivals from lowering their prices*

326.    Amazon designed and implemented a first-party anti-discounting algorithm to deter other online stores from offering lower prices than those of Amazon's Retail products. Amazon recognizes the importance of maintaining the *perception* that it has lower prices than competitors.  Behind closed doors, however, Amazon executives actively discourage setting prices lower than those of rivals, which Amazon deems "heretical."

327.    Amazon's former CEO of Worldwide Consumer, Mr. Wilke, conceived of an algorithm to solve Amazon's ostensible dilemma when it came to the prices of Amazon's first-party Retail unit's products.  As he explained, this anti-discounting algorithm enables Amazon to avoid a "perfectly competitive market" in which rivals continually lower their prices, benefiting shoppers but competing away profits.

328.    Instead, Mr. Wilke explained, Amazon uses a "game theory approach" where Amazon will "never move first" when it comes to lowering prices.  If Amazon detects a price change in either direction by a monitored online store or marketplace seller, Amazon will copy that change in price to the penny.  The net effect, Mr. Wilke predicted, is that "prices will go up."

329. When using its first-party anti-discounting algorithm, Amazon disciplines rivals by immediately copying—but never undercutting—prices. If and when the lowest price by a monitored online store or marketplace seller increases (or the product goes out of stock), Amazon automatically increases its Retail price to copy the new lowest price, whether that is a higher price offered by the same online store or marketplace seller it had been copying or a price offered on a different website. If Amazon detects a "lowest price" drop, Amazon automatically copies that move. And if the "lowest price" increases, Amazon automatically copies again without even considering whether it could earn more business by continuing to offer shoppers the lower price.

330. In effect, Amazon deters rivals from even attempting to compete with Amazon's first-party Retail business on price because rivals quickly learn that their price cuts do not result in greater market share or scale, only lower margins.

331. In an open and competitive market, rivals can compete to attract business by offering lower prices to shoppers. Instead, Amazon has committed to its first-party anti-discounting pricing strategy because that strategy deters rivals from price competition and prevents rivals from drawing business and gaining market share. Amazon's algorithmic process unfolds over and over to discipline rivals who dare to lower their prices, conveying to them that they will not gain business through competing on price. As a result, Amazon has successfully taught its rivals that lower prices are unlikely to result in increased sales—the opposite of what should happen in a well-functioning market.

332. By relentlessly disciplining rivals, Amazon forecloses the give and take that is typical in a competitive market and limits rivals' ability to gain customers by undercutting Amazon's prices. The result is that rivals' growth is stunted, and shopper prices are pushed higher than they would be in a world without Amazon's anti-discounting scheme. According to

COMPLAINT - 97
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Mr. Wilke, Amazon's first-party anti-discounting algorithm has "work[ed]" just as he envisioned

2  it would.

3          **b.      *Amazon's first-party anti-discounting algorithm has stopped***

4                  ***other online stores from competing through offering lower prices***

5          333.    Though the different elements of Amazon's anti-discounting strategy often work

6  in tandem to stifle competition (as discussed in Part VI.A.4, below), Amazon's first-party anti-

7  discounting algorithm has, on its own, deterred other online stores from competing through

8  lower prices.

9          334.    For example, Amazon's first-party anti-discounting scheme successfully deterred

10  price competition in 2017 when Walmart introduced a "pickup discount" program.  Walmart

11  offered discounts to online shoppers who were willing to pick up orders at Walmart stores

12  instead of having them delivered. ███████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ██████████

16          335.    Amazon concluded that its first-party anti-discounting strategy ultimately helped

17  induce Walmart to stop competing on price through its pickup discount program.  In an internal

18  planning and strategy document, Amazon determined that its first-party anti-discounting

19  algorithm created a "financial disincentive for Walmart" and would likely deter Walmart from

20  "expand[ing] the [pickup discount] program further."

21          336.    In response to Amazon's anti-discounting conduct, ██████████████

22  ████████████████████████████████████████████

23  ███████████████████████████     Amazon estimated that Walmart ultimately

24  discounted hundreds of thousands fewer products than it had initially planned.

1    337.    At one point in 2019, after enduring years of Amazon's algorithmic disciplining,

2    ███████████████████████████████████████████████

3    ██████████████████████████████████████████

4    ████████████████████████████████████████████████

5    █████████████████████████████████████████████████

6    ███████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████

9        **4.      Amazon combines its various anti-discounting programs to maximize**

10           **their collective anticompetitive effect**

11    338.    Amazon uses all of its various anti-discounting programs—and the combined

12    power of its Marketplace and Retail arms—to limit price competition and comparison shopping

13    for the hundreds of billions of dollars in goods sold annually in the relevant markets.  This

14    suppression of price competition and comparison shopping also artificially contributes to

15    converting more shoppers into Prime subscribers.

16    339.    Amazon's seller-disciplining tactics and first-party anti-discounting algorithm are

17    each powerful on their own (as explained in Parts VI.A.2.c and VI.A.3.b, respectively), but the

18    whole of their combined anticompetitive impact is significantly greater than the sum of their

19    individual effects.

20    340.    In 2016, Amazon used various elements of its anti-discounting strategy to

21    hamstring Jet.com ("Jet"), a new online superstore that planned to compete against Amazon by

22    offering shoppers and sellers lower prices.  Amazon feared that Jet could provide shoppers

23    "prices up to 10-15% lower than Amazon" by not collecting commissions from sellers, which

24    would allow those sellers to then "pass all the savings onto customers."  Amazon predicted that

Jet's business model could allow Jet to consistently beat Amazon on price. In Amazon's estimation "the biggest risk" posed by Jet's entry was the competitive pressure Amazon would face to lower its seller fees.

341. Amazon responded to Jet's launch by activating the combined might of its Marketplace and Retail businesses. With respect to the Marketplace business, Amazon removed sellers' offers from the Buy Box if shoppers could find the same products at lower prices on Jet.com. On the Retail front, Amazon deployed its first-party anti-discounting algorithm against Jet's most popular products.

342. The combined force of Amazon's anti-discounting schemes worked. Less than three months after Jet launched, Jet was forced to "revise[] [its] price leadership strategy to 'simply match the lowest price elsewhere on the [w]eb instead of trying to beat it,'" and increased its prices. Despite raising over half a billion dollars in funding, Jet was acquired by Walmart only a year after it launched and ceased operations as an independent competitor. Walmart shut Jet down in 2020.

343. More recently, Amazon used the same combination of its anti-discounting strategies to target Zulily, a potential entrant to the online superstore market specializing in homeware, children's products, and women's clothing. Until recently, Zulily's primary strategy was to offer shoppers deep discounts on various products during limited time "flash sales." Zulily endeavored to offer the "lowest price online" during those sales. This meant beating Amazon's prices.

344. In late 2019, Zulily rolled out a "Best Price Promise" initiative that displayed its lower price alongside the higher prices of identical products on Amazon or Walmart.com. This is a classic form of price competition that should flourish in a competitive market.

COMPLAINT - 100
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

345.    To Amazon, this price competition was intolerable—and so it set out to destroy it. Zulily's online store was originally not popular enough for ███████████████ ██████████████ in the normal course of business.  In 2019, for example, Amazon's estimated U.S. sales volume was approximately 100 times greater than Zulily's.  However, Amazon ██████████ and specifically aimed its surveillance apparatus and anti-discounting algorithms at Zulily.  Amazon dedicated ██ members of its Competitive Monitoring Team to monitoring Zulily.com.

346.    Amazon activated its Marketplace arm against Zulily by punishing sellers.  Its seller punishments quickly stopped many Zulily suppliers that were also Amazon sellers from offering lower prices on Zulily.  Zulily's suppliers told Zulily that they lost the Buy Box on Amazon because of Zulily's discounted prices, and that they could not afford to lose their Amazon sales.  A supplier of infant care products, for example, told Zulily that Amazon had responded to Zulily's "Best Price Promise" by removing the Buy Box on nearly 2,000 of the supplier's products, drastically reducing the supplier's sales on Amazon.  Because they could not afford the retaliation meted out by Amazon's anti-discounting scheme, several suppliers stopped selling to Zulily altogether.

347.    Amazon also swung its Retail business into action, applying its first-party anti-discounting algorithm to attack Zulily's attempts to compete with Amazon.  Zulily tried to respond by further reducing its prices, but Amazon rapidly copied Zulily's prices with predictable consequences: "continuous price spirals" that resulted in Zulily dropping the products from its online store.

348.    After Amazon began using the combined force of its Marketplace and Retail anti-discounting strategies against Zulily, Amazon observed a "consistent drop" in shopper visits to Zulily.  Despite dwindling shopper visits to a website that was already not popular enough by

COMPLAINT - 101
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  Amazon's usual standards to be a target of Amazon's anti-discounting conduct, Amazon's Vice

2  President of Pricing told his team to "keep going . . . [e]ven though their traffic is trending

3  down."

4      349.  Facing the full brunt of Amazon's anti-discounting conduct, Zulily could not

5  sustain its low-price campaign against a giant sitting on monopoly profits.  After a few months,

6  Zulily abandoned its "Best Price Promise" initiative and took down all Amazon price-

7  comparison information from its website.

8      350.  In sum, Amazon's monopolistic anti-discounting conduct blocks critical avenues

9  of competition in both relevant markets through its anti-discounting practices.  Amazon's

10  conduct denies rivals scale, stifles innovation, deadens price competition, reduces output, and

11  deprives the American public of lower prices.

12      **B.**    **Amazon Maintains Its Monopolies In Both Relevant Markets By Coercing**

13          **Sellers To Use Amazon's Fulfillment Service**

14      351.  Amazon maintains its monopolies in both relevant markets by coercing sellers to

15  use FBA, thereby denying rival online marketplace services providers and superstores the ability

16  to gain the scale needed to compete meaningfully against Amazon in both relevant markets.

17      352.  Prime eligibility is a basic prerequisite for sellers to fully access Amazon's

18  substantial base of shoppers, making it a critical aspect of the marketplace services Amazon

19  offers to sellers.  When a seller's product is Prime eligible, it receives the Prime badge.  For

20  sellers, this designation boosts their chance of winning the Buy Box and making significant

21  sales, while sellers who forgo Prime eligibility effectively disappear from Amazon's storefront.

22  For shoppers that are Prime subscribers, the Prime badge denotes that a purchase of the product

23  will not include additional shipping and handling costs, often making these products more

24  attractive.

COMPLAINT - 102
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

353.     Amazon exploits sellers' demand for access to Prime eligibility by generally conditioning that access on use of Amazon's proprietary fulfillment service, FBA, even though other fulfillment options could provide comparable or better service.

354.     Sellers who use FBA must relinquish physical control over their products and place them in Amazon's fulfillment centers, which principally can be used to serve only Amazon customers.  As a result, a seller who wants to sell both to Amazon and non-Amazon customers must maintain a separate supply of inventory dedicated exclusively to non-Amazon customers and engage a separate fulfillment provider to serve those non-Amazon customers.

355.     Absent Amazon's restrictions, many sellers would prefer to use an independent fulfillment provider that would allow them to more easily fulfill orders placed on both Amazon and non-Amazon marketplaces.  That, in turn, would increase the ability of rival online marketplace services providers to compete for sellers' business and increase the ability of rival online superstores with marketplaces to compete by offering greater product selection to shoppers.  Conditioning a product's Prime eligibility on its seller's use of FBA maintains Amazon's monopoly in both relevant markets in two main ways.  First, it raises the cost of multihoming, forcing sellers who sell through more than one online superstore to bear the increased costs of using multiple fulfillment providers.  Second, it forecloses independent fulfillment providers from competing to fulfill Prime orders on Amazon, depriving those independent providers of an important source of business and scale needed to build out an efficient fulfillment network.  Because fewer sellers can cost-effectively multihome, rivals and potential rivals to Amazon are deprived of product selection.

356.     In the relevant online superstore and online marketplace services markets where scale and network effects insulate incumbents from competition, the effects of Amazon's conduct continuously compound as it diminishes sellers' incentive and ability to multihome.

COMPLAINT - 103
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

357.    Amazon's conduct constrains its rivals' ability to compete, harming shoppers and competition in both relevant markets and entrenching Amazon's monopoly.  By making it more expensive for sellers to sell the same product on multiple online superstores and marketplaces, Amazon artificially limits rivals' ability to gain sufficient growth, momentum, and scale to draw a critical mass of shoppers and meaningfully compete.

### 1.    Sellers who forgo Prime eligibility effectively disappear from Amazon's storefront

358.    In 2021, over ███ million U.S. consumers, or approximately ███% of U.S. households, subscribed to Amazon Prime.  Prime subscribers account for an overwhelming share of all purchases on Amazon—more than ███% of all purchases by dollar value in 2021.  Prime subscribers also disproportionately purchase Prime-eligible offers.  For example, more than ███% of the items U.S. Prime subscribers purchased in the third quarter of 2021 were Prime eligible. In the first quarter of 2021, U.S. Prime subscribers bought nearly ███████ Prime-eligible products for every one non-Prime-eligible product they purchased.

359.    For many sellers, having Prime-eligible products is a prerequisite to making significant sales on Amazon.  The Prime designation makes sellers' products more discoverable—and therefore likely to be purchased—even by shoppers who are not Prime subscribers.  Prime eligibility is critical to win the Buy Box: Amazon acknowledges that the Featured Merchant Algorithm that determines which offer will win the Buy Box gives "preference to Prime-eligible offers" and increases the odds that orders from sellers who use FBA will be featured.

360.    Overall, Prime eligibility alone regularly triples a seller's sales on Amazon. Meanwhile, sellers who forgo Prime eligibility effectively disappear from Amazon's storefront. Amazon relegates non-Prime-eligible products to a near-invisible, second-rate version of

COMPLAINT - 104
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

Amazon's Marketplace.  Without Prime eligibility, a seller's offer will get fewer impressions in search queries, be filtered out of searches by many Prime subscribers, have a lower sales conversion rate, and be less likely to win the Buy Box.  Ready access to online shoppers is a critical aspect of online marketplace services, but Amazon effectively conditions access to a substantial portion of its shoppers on sellers also buying FBA services.

### 2.    Amazon requires sellers to use FBA to obtain Prime eligibility

361.    Amazon requires sellers to use FBA for their products to obtain Prime eligibility, even though many sellers would prefer to use an alternative fulfillment method.  As the former head of FBA put it, "[s]ellers may not have wanted to buy fulfillment [from Amazon]" but they did so in order to "buy increased sales" that come with Prime eligibility.

362.    Mr. Bezos explained in his 2014 letter to Amazon shareholders that "FBA is so important because it is glue that inextricably links Marketplace and Prime.  Thanks to FBA, Marketplace and Prime are no longer two things. . . .  Their economics . . . are now happily and deeply intertwined."

363.    One internal Amazon study found that sellers who gained Prime eligibility by using FBA increased their chances of winning the Buy Box by ██% compared to sellers using a non-Amazon fulfillment service.  According to another internal study, Amazon's conditioning Prime eligibility on the use of FBA means that sellers who forgo Prime eligibility and FBA incur a sales "penalty" that is "equivalent to a ██% markup compared with FBA offers."  In other words, a seller who does not use FBA experiences a drop in sales equivalent to the seller increasing its prices by ██%.

**3.** **By forcing sellers to use FBA for their products to be Prime eligible, Amazon raises sellers' costs of selling on multiple marketplaces, stifling competition in both relevant markets**

364. By tying Prime eligibility to FBA, Amazon restricts sellers' choices about which fulfillment provider they use, stifling multihoming and thus harming competition in both the online marketplace services and online superstore markets. Many sellers would prefer to use a single fulfillment network for all their online orders, on and off Amazon. Indeed, as Amazon's Vice President of Worldwide Selling Partner Services reportedly recognized recently, "[a] seller doesn't want to have two sets of supply-chain services, one that's for Amazon and one that's for someone else." By forcing sellers to use FBA for their products to be Prime eligible, Amazon functionally forecloses that option for sellers.

365. Without Amazon's coercion, sellers could more easily offer their products to shoppers via multiple outlets, including other online superstores and marketplaces. They could also use a single fulfillment provider of their choice and pass associated savings on to their customers across all online sales channels, including Amazon. Amazon's rivals, in turn, could gain scale by attracting new sellers to their marketplaces and offering new selection to shoppers. Amazon fears that world, and so it uses Prime eligibility to foreclose it from coming to pass.

366. Amazon's conduct blocks competition for sellers and the ability of online superstores to gain those sellers' product selection in two interrelated ways. First, Amazon forces sellers who want to make Prime-eligible offers on Amazon and to sell through other sales channels to use two duplicative fulfillment operations instead of saving costs by consolidating inventory with a single fulfillment provider. Second, Amazon forecloses a significant volume of orders from independent fulfillment providers by making FBA effectively the only fulfillment option available for Prime-eligible orders. By essentially forcing sellers to use FBA, Amazon

deprives independent fulfillment companies of an important source of scale that is necessary to develop efficient fulfillment networks.  Sellers are less likely to commit inventory to independent fulfillment providers that do not have the scale to efficiently serve their needs, and without cost effective and efficient fulfillment operations, sellers are less likely to sell across multiple online marketplaces.  Thus, Amazon's tying of Prime eligibility to FBA usage raises the cost of multihoming, making it harder and more expensive for sellers to sell on alternative online marketplaces and more difficult for online superstores to attract sellers and expand their product selection.

367.    These twin mechanisms harm competition in the online retail fulfillment services market while also stifling competition in both relevant markets.  They do so by raising the costs Amazon sellers must incur to do business with other online superstores and online marketplace services providers.  Some sellers cope by simply not selling anywhere other than Amazon.  Others are pressured to pass on higher costs in the form of higher prices, slower shipping speeds, or both.  As a result, by tying Prime eligibility to FBA, Amazon reduces product selection available to Amazon's rivals, thereby degrading quality for shoppers and raising sellers' costs, which can lead to price increases for shoppers.

### a.    *Amazon raises sellers' costs by forcing them to split their inventory to sell across multiple sales channels*

368.    Because Amazon forces sellers to use FBA to receive Prime eligibility, sellers who do not want to sell solely through Amazon must split their physical inventory by putting inventory for Amazon orders into FBA and inventory for non-Amazon orders in a different fulfillment network, such as one operated by an independent fulfillment provider.

369.    Splitting inventory among multiple fulfillment networks raises the costs for sellers to offer products for sale through multiple sales channels by, among other things:

(a) increasing the total amount of inventory a seller must keep available to avoid running out of stock on both Amazon and other channels of distribution;

(b) increasing labor and transportation costs when sellers need to shift inventory to ensure adequate supply across different sales channels;

(c) increasing the number of facilities a seller uses to ensure they are close enough to shoppers for quick, efficient delivery;

(d) increasing administrative costs associated with managing duplicative inventory and fulfillment operations;

(e) reducing sellers' leverage to negotiate fulfillment discounts by preventing them from aggregating their total sales volumes with a single fulfillment provider; and

(f) reducing sellers' leverage to negotiate last-mile delivery discounts by preventing them from aggregating all their sales volumes with a single shipping provider.

370. For these reasons, many sellers would prefer to commit all of their inventory to a single independent fulfillment provider of sufficient scale to facilitate sales across Amazon and non-Amazon sales channels.

371. Amazon recognizes that many sellers benefit from aggregating all of their inventory with a single fulfillment provider. Doing so reduces the amount of inventory sellers need to carry and decreases the costs of managing inventory across channels and logistics providers.

372. For some sellers on Amazon, the higher costs associated with using multiple fulfillment providers make it unprofitable to sell on other online sales channels at all. By

COMPLAINT - 108
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   foreclosing these sellers from using a single independent fulfillment provider, Amazon

2   effectively forces these sellers to sell exclusively on Amazon.

3       373.    For sellers who do offer their products across multiple online sales channels,

4   Amazon's tying Prime eligibility to FBA imposes unnecessary and additional costs that can lead

5   to higher product prices, reduced seller profitability, and fewer sales.  This, in turn, reduces

6   sellers' incentives to offer their products and invest resources into selling on multiple online

7   superstores by purchasing services from multiple online marketplaces.

8       374.    Because most sellers must sell Prime-eligible products on Amazon to be

9   successful, tying Prime eligibility to FBA increases sellers' costs by forcing them to use multiple

10  fulfillment providers to sell off Amazon.  Amazon's conduct hinders other online marketplaces'

11  ability to attract sellers and impedes online superstores' ability to offer enough product selection

12  to compete meaningfully with Amazon.  This conduct also artificially contributes to converting

13  more shoppers into Prime subscribers.

14          **b.**      ***Forcing sellers to use FBA to obtain Prime eligibility impedes***

15              ***competition and the growth of independent fulfillment providers***

16      375.    Amazon's coercive conduct that forces sellers to use FBA forecloses significant

17  volumes of business from independent fulfillment providers that could facilitate seller

18  multihoming across multiple online marketplaces and superstores.

19      376.    By forcing sellers to purchase FBA to ensure that their products are Prime

20  eligible, Amazon artificially walls off a massive volume of Prime-eligible orders from

21  competition, instead funneling it solely into FBA.  In so doing, Amazon harms competition in the

22  market for online retail fulfillment services.  Amazon's foreclosure of competition in the online

23  retail fulfillment services market helps maintain Amazon's monopolies in the online marketplace

24  services and online superstore markets.

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

377.    Online retail fulfillment services include storing, picking (i.e., retrieving from storage), packaging, and preparing items purchased by shoppers online for delivery.  Sellers purchase online retail fulfillment services to complete online orders placed by shoppers.

378.    Online retail fulfillment services are discrete and separate from online marketplace services.  Online marketplace services enable sellers to offer items for sale to online shoppers, whereas online retail fulfillment services are focused on physically storing and preparing items for delivery to shoppers.

379.    These services are offered to sellers at distinct prices and pricing structures compared to online marketplace services.  For example, Amazon charges sellers that use its "Professional" plan to access its Marketplace on a monthly basis whether or not any sale is made.  But Amazon's fulfillment fees are based on the item's size and weight, as well as how long Amazon had to store it before fulfilling the order.

380.    Demand for online retail fulfillment services is separate from demand for online marketplace services.  Sellers often choose to purchase these services separately.  And online retail fulfillment services are frequently provided by distinct suppliers.

381.    Providers of online retail fulfillment services must have fulfillment facilities in the United States to timely and reliably serve U.S.-based shoppers.  Online retail fulfillment services providers that do not have U.S. fulfillment facilities generally are not substitutable for U.S. online retail fulfillment providers.

382.    Amazon, through FBA, is by far the largest U.S. supplier of online retail fulfillment services.  In 2020, Amazon fulfilled orders for over 5.5 billion items using more than 200 U.S. fulfillment centers.

383.    As the sheer size of Amazon's fulfillment operations suggests, the online retail fulfillment services market benefits from economies of scale.  Online retail fulfillment service

COMPLAINT - 110
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  providers can ship products faster and cheaper when they can place products closer to the end-

2  consumer by having a large network of fulfillment centers.  These speed and cost savings may be

3  shared with shoppers via faster deliveries and cheaper products.

4      384.    Amazon recognizes that scale is necessary to build an efficient online retail

5  fulfillment network.  Amazon measured the progress of its fulfillment operations against its goal

6  of achieving "fulfillment scale" by tracking "key scaling metrics," including the number and size

7  of its fulfillment centers.

8      385.    Independent fulfillment providers, too, benefit from large fulfillment volumes that

9  can help them scale and reduce costs.  But by tying Prime eligibility to FBA use, Amazon

10  effectively removes the opportunity for online fulfillment providers to compete for Prime order

11  volumes—locking in those volumes for FBA alone.

12      386.    This foreclosure denies independent fulfillment providers an important source of

13  scale that may contribute to their growth, allow them to take advantage of volume-based cost

14  savings, and help them build the infrastructure necessary to efficiently fulfill orders for products

15  sold online.

16      387.    Unlike Amazon's FBA, independent fulfillment providers are agnostic about the

17  channel from which sales originate.  These independent logistics firms let sellers offer products

18  seamlessly across multiple marketplaces and online superstores.

19      388.    In contrast to independent fulfillment providers, Amazon's FBA service only

20  fulfills orders placed on Amazon's Marketplace.  Sellers cannot use FBA to fulfill orders off

21  Amazon.  To fulfill orders off Amazon, sellers can pay an additional fee for a separate Amazon

22  fulfillment service.  But unlike independent fulfillment providers, this Amazon fulfillment

23  service does not provide custom packaging, standard integration with non-Amazon platforms, or

24  visibility into the separate but complementary delivery process.

COMPLAINT - 111
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

389.    In a competitive world, the growth of independent fulfillment providers could erode Amazon's monopoly power in the relevant markets.  Successful independent fulfillment providers could foster competition among marketplaces by breaking down the barrier to efficiently selling across marketplaces.  That, in turn, could open up rival online superstores' and online marketplace services providers' ability to attract sellers' business and product selection.

390.    Amazon's former head of Global Fulfillment Services internally voiced his fear that independent fulfillment providers have the potential to "create a compelling value proposition for Marketplaces like Walmart and beyond."  Another executive told his Amazon colleagues that he had an "'oh crap' moment" and realized that allowing sellers to receive Prime eligibility without using FBA was "fundamentally weakening [Amazon's] competitive advantage, . . . as sellers are now incented to run their own warehouses and enable other marketplaces with inventory that in FBA would only be available to our customers."

391.    Following conversations with sellers, other Amazon executives confirmed that if Amazon did not require FBA for Prime eligibility, many sellers would use independent fulfillment providers to "fulfill on whichever platform gives [the seller] an order."  Amazon's former head of Global Fulfillment Services admitted in response that the prospect of independent fulfillment providers increasing competition "keeps me up at night."

392.    Prime-eligible fulfillment volumes are significant.  In 2020, FBA fulfilled more than 5.5 billion units, which, if shipped individually, would account for nearly 17 boxes for every person in the United States.  Conditioning Prime eligibility on FBA enrollment has locked in massive volumes of shipments exclusively to Amazon, allowing it to scale its fulfillment network into the behemoth it is today.

393.    Independent fulfillment providers' operations remain far smaller than FBA. These providers fulfill orders for only a few thousand, and often only a few hundred, sellers.

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   Had independent fulfillment providers been able to compete for Amazon order volumes, they

2   could have won significant business from Amazon's third-party sellers.

3         394.   Amazon ensures that independent fulfillment providers will stay artificially small

4   by requiring that sellers who want Prime-eligible products use FBA for fulfillment.  As a result,

5   Amazon makes some providers' services comparatively more expensive because they are unable

6   to take full advantage of the economies of scale.  Amazon locks in the scale for itself through

7   tying Prime eligibility to use of FBA, and sellers have fewer choices for fulfillment providers.

8         c.      ***Amazon unlawfully maintains its monopolies by conditioning***

9                 ***Prime eligibility on sellers' use of FBA***

10        395.   Through these twin mechanisms—(1) raising the costs for sellers of using

11  multiple sales channels and (2) artificially stunting the growth of independent fulfillment

12  providers—Amazon maintains its monopolies in the online superstore and online marketplace

13  services markets by denying rivals the ability to gain the scale needed to compete meaningfully

14  against Amazon.

15        396.   By raising sellers' costs to use multiple sales channels, Amazon limits rival online

16  superstores' and online marketplace services providers' ability to attract sellers, artificially

17  stunting the growth of those rivals.  Some sellers on Amazon that might otherwise also sell off

18  Amazon choose not to due to the associated logistics and administrative costs, while other sellers

19  offer only certain products to other online stores.  Sellers must effectively accept Amazon's

20  burdensome terms, and Amazon's rivals are thus deprived of the opportunity to meaningfully

21  compete for sellers.  By tying a product's Prime eligibility to the seller's use of FBA for that

22  product, Amazon suppresses competition for sellers' product selection and for online shoppers.

23

24

COMPLAINT - 113
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

4.      **Amazon's use of Seller Fulfilled Prime underscores the harms to competition caused by Amazon's conditioning Prime eligibility on use of FBA**

397.    Amazon's fear of a world in which unrestricted seller choice leads to increased competition is grounded in experience.  For a period of time, Amazon temporarily allowed sellers to use their own fulfillment solution for Prime-eligible orders.  When Amazon realized it had lowered a barrier to competition, it quickly reversed course.

398.    In 2015, Amazon briefly experimented with allowing a small subset of sellers to fulfill Prime-eligible orders without using FBA.  That year, Amazon launched a program it later called Seller Fulfilled Prime ("SFP"), which was designed to bring new Prime-eligible selection to Amazon shoppers, increasing sales and further driving Amazon's accelerated growth.  SFP let sellers make Prime-eligible offers without purchasing FBA services.  Though SFP was popular with sellers, Amazon shuttered SFP enrollment in 2019 when Amazon executives recognized that SFP was fostering competition and could lessen Amazon's stranglehold on its monopolies.

399.    From SFP's launch, Amazon required sellers to meet certain standards to enroll in SFP and receive Prime eligibility.  Specifically, sellers had to "meet a high bar for shipping speed and consistency" comparable to the shipping speeds Amazon promises Prime subscribers.

400.    SFP was an immediate hit among sellers.  In the program's first full year, Amazon onboarded more than 3,200 sellers.  At its peak, approximately 15,000 sellers had enrolled in SFP.  Yet even these enrollment numbers understate seller demand for SFP, because Amazon never opened the program to all potentially eligible sellers.

401.    Sellers enrolled in SFP met their promised "delivery estimate" requirement set by Amazon more than 95% of the time in 2018.  At times, these sellers outperformed FBA-fulfilled orders on this metric.

402.     Mr. Bezos highlighted SFP in his 2015 letter to shareholders, explaining that Amazon had "invited sellers . . . to be part of the Prime program and ship their own orders at Prime speed directly."  Mr. Bezos described SFP as a win-win for sellers and shoppers, writing, "[t]hose [enrolled] sellers have already seen a significant bump in sales, and the program has led to hundreds of thousands of additional items that are available to Prime customers via free two-day or next-day shipping."  Though SFP was benefitting at least some shoppers and sellers, internally certain Amazon executives feared SFP was "[s]trategically risky" because it could "seriously imper[i]l FBA."  Amazon executives worried that because SFP "does not really have a moat," it could "enable competitors to ship fast."  These executives were concerned that SFP was an independent fulfillment provider "enabler" that could help independent fulfillment providers "get to scale," which could then benefit "other retailers."

403.     Amazon turned against SFP in early 2019, when it learned that independent fulfillment providers were advertising their ability to help sellers obtain Prime eligibility for products sold on Amazon and fulfilled through SFP.  Amazon's CEO of Worldwide Operations wrote that he was "losing [his] mind" after learning that UPS was advertising that its online retail fulfillment service could fulfill Prime-eligible orders.  In that same email chain, two high-level Amazon executives agreed that Amazon should consider shutting down SFP in the United States.

404.     A few months later, in a meeting titled "3PL impact mitigation," referring to the industry term for independent fulfillment service providers, Amazon formally decided to stop new enrollment in SFP.  Amazon knew closing SFP would harm its shoppers by reducing the number of Prime-eligible offers available to Prime subscribers and slow overall shipping speeds for products sold on Amazon.  But Amazon decided to prioritize excluding rivals and foreclosing competition, even if it came at a cost to Amazon's customers.

COMPLAINT - 115
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

405.     Some Amazon employees had suggested re-opening the program by creating an alternative "badge" for offers eligible for Prime through SFP.  Those employees recommended "*not to Sunset the SFP Program* as both Customers and Sellers will lose the Prime benefits on 115 [million] unique items that are offered today with faster speeds to our Prime customers." Amazon's then-CEO of Worldwide Consumer, Mr. Wilke, vetoed the idea.  Amazon wanted to minimize any potential backlash from SFP sellers, so in 2019 Amazon let sellers already in SFP remain while blocking all new enrollment.  Critically, Amazon communicated to those sellers who were already in SFP that it expected them to fulfill orders themselves, rather than using independent fulfillment providers.  Most remaining SFP sellers have since left or been disqualified from the program.

406.     Some sellers who still participate in SFP report frustrations with Amazon's administration of the program, including concerns that Amazon holds SFP sellers to stricter delivery benchmarks than FBA.  And despite Amazon's promise that SFP products will receive the Prime badge, Amazon does not consistently display the Prime badge on SFP products. Amazon's search filter that allows shoppers to view only Prime-eligible products suppresses Prime offers fulfilled through SFP.

407.     Sellers continue to want Prime eligibility uncoupled from the coerced purchase of FBA services.  An SFP waitlist maintained by Amazon quickly ballooned to more than 8,000 sellers just six weeks after Amazon stopped letting new sellers enroll.  As of June 2022, there were over ▮▮▮▮ sellers on the SFP waitlist.

408.     Conditioning Prime eligibility on FBA usage—and thus preventing sellers from using independent fulfillment providers—is not necessary to ensure Prime subscribers receive quality shipping.  Amazon's internal analyses showed that sellers using independent fulfillment services met Amazon's stringent SFP standards more often than sellers fulfilling orders

themselves.  For example, in the last quarter before Amazon suspended enrollment, SFP sellers using independent fulfillment providers satisfied Amazon's delivery requirement 98.4% of the time (compared to 96% for all SFP sellers) and satisfied Amazon's shipping requirement 99.8% of the time (compared to 96.8% for all SFP sellers).  Had Amazon genuinely cared about improving shipping speeds, it would have *encouraged* SFP sellers to use independent fulfillment providers instead of shuttering SFP to deliberately impede those providers' growth.

409.    Amazon recently announced plans to reopen SFP enrollment.  According to Amazon, to enroll in the program, sellers would need to meet rigorous pre-qualification criteria to enroll in a 30-day SFP trial, after which Amazon will determine whether they may participate in SFP.  Amazon's communications about upcoming changes to the SFP program continue to indicate that sellers would need to fulfill Prime orders themselves, without using independent fulfillment providers.  As of this filing, SFP enrollment remains closed.

## C.    Amazon's Anticompetitive Tactics Work Together To Amplify Their Overall Exclusionary Effect

410.    The cumulative impact of Amazon's unlawful conduct is greater than the sum of its parts.

411.    While each anticompetitive tactic independently violates the antitrust laws, all work together in mutually reinforcing ways to stifle even an equally or more efficient competitor's ability to respond to any one of them.  As a result, the interrelated nature of Amazon's overall course of conduct amplifies the exclusionary effects of each individual aspect, further entrenching Amazon's monopoly power in and across both relevant markets.

412.    Both relevant markets exhibit network effects and scale economies that render gaining scale and competitive momentum especially critical.  Yet each element of Amazon's course of conduct works together to artificially limit rivals' ability to grow, gather momentum,

COMPLAINT - 117
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    and gain sufficient scale to meaningfully compete against Amazon.  Consequently, in these

2    relevant markets, the combined exclusionary effect of Amazon's conduct is especially pernicious

3    and acute.

4         413.   The various elements of Amazon's anti-discounting conduct—algorithmically

5    punishing sellers for offering lower prices elsewhere, contractually restraining ASB sellers, and

6    systematically disciplining rivals via its first-party anti-discounting algorithm—work together to

7    suppress competition in both relevant markets, thereby preventing even an equally or more

8    efficient rival from attracting a critical mass of either shoppers or sellers.

9         414.   Amazon's requirement that sellers use FBA to obtain Prime eligibility for their

10   products amplifies those effects.  By further limiting sellers' alternatives to Amazon, Amazon's

11   coercive fulfillment conduct intensifies the exclusionary effect of its anti-discounting conduct.

12   In a world where rivals and potential rivals were not artificially prevented from gaining the scale

13   needed to meaningfully compete against Amazon, Amazon's seller punishments would pose less

14   of a threat to sellers' survival.  But Amazon's coercive FBA conduct works in tandem with its

15   anti-discounting conduct to foreclose that world.  The resulting lack of comparable alternatives

16   to Amazon intensifies the severity of Amazon's anti-discounting punishments, giving those

17   punishments—and even the threat of those punishments—greater force.

18        415.   Amazon's anti-discounting conduct, in turn, amplifies the exclusionary effects of

19   tying Prime eligibility to sellers' use of FBA.  Amazon's FBA conduct alone prevents sellers

20   from using alternatives to FBA to fulfill Prime-eligible orders *on* Amazon and lowers the

21   attractiveness of selling *off* Amazon because it raises sellers' costs, which are often passed on to

22   shoppers.  Amazon's anti-discounting conduct further reduces the appeal of selling off Amazon

23   by threatening sellers with the risk of losing their Amazon sales if Amazon detects a lower price

24   elsewhere and suppressing the effectiveness of marketplaces' attempts to compete on price by

COMPLAINT - 118
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  lowering their fees to sellers.  As a result, sellers are further deterred from bringing additional

2  selection to rival marketplaces, prices for products on rival marketplaces are higher, and

3  independent fulfillment providers are artificially stunted.  Collectively, this impedes an equally

4  or more efficient rival from being able to meaningfully compete with Amazon.

5  **VII.    AMAZON HAS MANIPULATED OTHER ONLINE STORES' PRICING**

6  **ALGORITHMS INTO INCREASING PRICES**

7      416.    From 2015 to 2019, Amazon deployed a secretive scheme that induced other

8  online stores to raise their prices and allowed Amazon to extract additional profits from

9  shoppers.  Amazon codenamed this price-raising tool "Project Nessie."  Amazon used Project

10  Nessie to extract more than a billion dollars directly from Americans' pocketbooks.

11      417.    Project Nessie is an algorithm whose sole purpose is to raise prices for shoppers.

12  Aware that this scheme belies its public claim that it "seek[s] to be Earth's most customer-centric

13  company," Amazon repeatedly paused Project Nessie when it grew concerned that the public

14  might detect the higher prices Project Nessie produced.  When that scrutiny receded, Amazon

15  turned Project Nessie back on to continue raising prices for shoppers.

16      418.    While Project Nessie is currently paused, Amazon could turn it back on at any

17  time.  Indeed, Amazon has repeatedly considered turning it back on—and there are no obstacles

18  preventing Amazon from doing so.

19      **A.    Project Nessie Induced Other Online Stores To Raise Their Prices,**

20      **Generating Enormous Profits For Amazon**

21      419.    In the early 2010s, Amazon began testing whether other online stores' pricing

22  algorithms were following the prices set by Amazon's first-party Retail arm, where Amazon

23  directly controls prices.  These early experiments showed that "in many cases competitors match

24  us at the higher price."  Amazon realized that it could increase its prices while reducing the risk

COMPLAINT - 119
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  of shoppers finding a lower price off Amazon if Amazon focused its price increases on products

2  sold by competitors that were matching Amazon's prices.  Armed with the knowledge that others

3  would likely follow its price hikes, Amazon could charge shoppers higher prices while

4  minimizing the chance that shoppers would catch on.

5          420.    Amazon used these findings to create Project Nessie, an algorithmic tool designed

6  to raise prices on and off Amazon.  Project Nessie predicted the likelihood that the online store

7  or stores offering the lowest price for a given product would follow an Amazon price increase.

8  Armed with these predictions, Amazon Retail deviated from its normal price-disciplining

9  strategy (discussed in Part VI.A.3, above), and increased products' prices when those price hikes

10  were most likely to be followed.  After Amazon successfully induced the other online store to

11  raise its price, Amazon continued to sell the product at the now-inflated price.  Amazon deployed

12  Project Nessie beginning in 2014 to set prices across many thousands of products in its online

13  superstore sold by Amazon's Retail arm.

14          421.    There was often a time lag between Amazon raising its price and the targeted

15  online stores following Amazon's prices upwards.  As a result, Project Nessie sometimes caused

16  Amazon to temporarily have higher prices than at least one other online store.  Amazon

17  nonetheless decided that this risk was a worthwhile tradeoff if other online stores followed

18  Amazon's price increases at least 20% of the time.

19          422.    To minimize the risk of consumer backlash, Amazon limited and rotated the

20  products subject to Project Nessie at any given time.  Despite this, Project Nessie had a

21  significant impact.  For example, in 2018, Amazon used Project Nessie to set prices that were

22  viewed by shoppers more than 400 million times.  In April 2018 alone, Amazon used Project

23  Nessie to set prices for more than 8 million items purchased by customers that collectively cost

24  almost $194 million.

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

423.    Project Nessie generated enormous profits for Amazon even though its higher prices caused Amazon's unit sales to decrease.  In 2015, for example, Project Nessie's higher prices reduced Amazon's gross sales revenue while increasing Amazon's profits on those reduced sales by an extra $363 million.  In 2018, Amazon estimated that Project Nessie increased Amazon's yearly profits by $334 million, including nearly $57 million in additional profit from selling higher-priced books and at least $10 million in additional profit in each of twelve other product categories.  According to Amazon's calculations, from 2016 through 2018, Nessie generated over $1 billion in additional profit for Amazon.

424.    Amazon used Project Nessie to increase prices on products that Amazon had already been selling at a profit.  The sole purpose of Project Nessie was to further hike consumer prices by manipulating other online stores into raising their prices.

425.    The additional profit Amazon attributed to Project Nessie is money that Amazon shoppers would have kept in their pockets if not for Amazon's use of Project Nessie.  And since this figure does not account for the excess amounts that shoppers paid at other online stores because of Project Nessie, the overall amount that American shoppers have overpaid is likely far higher.

**B.      Amazon Has Repeatedly Turned Project Nessie On And Off, And Amazon Can Turn It Back On Today**

426.    Amazon typically ran Project Nessie 24 hours a day, 7 days a week, with two exceptions: the holiday shopping season and Prime Day.  Amazon paused Project Nessie during these periods because "of increased media focus and customer traffic."

427.    After the public's focus turned elsewhere, Amazon turned Project Nessie back on and ran it more widely to make up for the pause.  For example, in January 2017, Amazon ran

1 Project Nessie on twice as many products as it had before the 2016 holiday season to "recapture

2 the lost [profit] opportunity" from having temporarily paused Project Nessie during the holidays.

3    428.    Amazon turned Project Nessie "on" and "off" at least eight times between 2015

4 and 2019.

5    429.    Amazon also broadened Project Nessie's parameters in other situations to boost

6 profits even further.  For example, in 2017, Amazon broadened its use of Project Nessie to help

7 close a projected $450 million shortfall in operating profits—just because it could.

8    430.    Amazon paused Project Nessie in 2019 only when regulatory scrutiny, including

9 the Federal Trade Commission's initiation of the investigation that led to this Complaint, caused

10 Amazon to superficially change or conceal many of its practices.

11    431.    Though Amazon claims that Project Nessie is currently paused, Amazon

12 considered running experiments in 2020 and 2021 to improve Project Nessie's effectiveness with

13 an eye towards turning it back on.  These discussions picked up steam in late 2021 and early

14 2022 as inflation threatened to dent Amazon's profitability.  In January 2022, the CEO of

15 Worldwide Amazon Stores, Doug Herrington, asked about turning on "[o]ur old friend Nessie,

16 perhaps with some new targeting logic" to juice profits for Amazon's Retail arm.

17    432.    There are no technical barriers to Amazon resurrecting—or even expanding—its

18 use of Project Nessie, just as it repeatedly has in the past.  Amazon could readily reverse the

19 current pause and begin using Nessie again at any time to hike prices for consumers and

20 undermine competition.

21 **VIII.   AMAZON'S CONDUCT HARMS COMPETITION AND CONSUMERS**

22    433.    Amazon's unfair and monopolistic conduct has broken the competitive process.

23 Amazon's anticompetitive conduct closes off each major avenue of competition—including

24 price, product selection, quality, and innovation—in both relevant markets.  Amazon's

COMPLAINT - 122
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1 monopolistic conduct also harms consumers in both markets, shoppers and sellers alike, by

2 depriving them of the benefits of open, fair competition and allowing Amazon to exploit its

3 monopoly power without facing the competitive checks of a free enterprise system.

4      434.     The presence of scale economies and network effects in both relevant markets

5 means that a firm must be able to gain scale in order to compete effectively.  But Amazon has

6 artificially suppressed rivals' ability to attract business, gain momentum, and grow.

7      435.     Amazon's conduct interrupts, impedes, and distorts the normal give-and-take of a

8 healthy market by blocking off every major avenue of competition—including price, product

9 selection, quality, and innovation—that rivals and potential rivals would ordinarily use to

10 compete on the merits for shoppers' and sellers' business in the relevant markets for online

11 superstores and online marketplace services.

12      436.     For example, Amazon's anti-discounting conduct leverages both its first-party

13 Retail and its third-party Marketplace business units to suppress competition.  Amazon's first-

14 party anti-discounting algorithm disciplines rivals from undercutting Amazon's prices, and

15 Amazon punishes third-party sellers for offering lower prices on other platforms.  Without the

16 ability to attract either shoppers or sellers through lower prices, rivals are unable to gain a critical

17 mass of customers and meaningfully compete against Amazon.  At the same time, Amazon's

18 coercive fulfillment conduct both artificially stunts the growth of independent fulfillment

19 providers and artificially raises the costs that sellers face when seeking to multihome.  This limits

20 seller multihoming and thereby suppresses Amazon's rivals' ability to compete for sellers by

21 offering better terms and for shoppers by offering additional product selection.

22      437.     Together, Amazon's exclusionary course of conduct works to suppress

23 competition in both relevant markets, foreclosing even an innovative, high-quality rival or

24 potential rival from competing on the merits.

COMPLAINT - 123
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

438.    Amazon's conduct also harms consumers in both relevant markets.  For example, Amazon's conduct has artificially inflated prices for both shoppers and sellers, degraded the quality of online superstores for shoppers and of online marketplace services for sellers, reduced output in both relevant markets, hindered shoppers from comparison-shopping for the best deals, suppressed the flow of useful price and quality information to shoppers, stifled sellers' ability to gain additional business by offering lower prices, restricted sellers' freedom to choose to multihome across their preferred sales channels, reduced consumer choice for both shoppers and sellers by yielding a less diverse set of competitive options, and stripped consumers in both relevant markets of the benefits of innovation.

439.    Amazon's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits.  The anticompetitive harm from those practices outweighs any procompetitive benefits, and Amazon could reasonably achieve any procompetitive goals through less restrictive alternatives.

440.    Amazon's unlawful conduct has caused cumulative and compounding harm over time.  Through its years-long course of illegal conduct, Amazon has deeply entrenched its monopolies in both relevant markets and further widened the gulf between Amazon and everyone else.  Particularly given the importance of scale economies and network effects in these markets, Amazon's conduct has yielded a distorted and stunted competitive landscape.

441.    Left unchecked, Amazon will continue to harm competition and maintain its monopoly power over the online superstore market and the market for online marketplace services, causing myriad and widespread harms to shoppers, sellers, and the public—and depriving Americans of the benefits of fair and free competition.

COMPLAINT - 124
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  **IX.      VIOLATIONS ALLEGED**

2  **COUNT I**

3  **MONOPOLY MAINTENANCE OF THE ONLINE SUPERSTORE MARKET**

4  **(15 U.S.C. § 45(a))**

5     442.    Plaintiff FTC re-alleges and incorporates by reference the allegations in

6  paragraphs 1-441 above.

7     443.    At all relevant times, Amazon has had monopoly power in the online superstore

8  market in the United States.

9     444.    Amazon has willfully maintained its monopoly power through its course of

10  anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which

11  stifle price competition and tend to create an artificial price floor, and Amazon's practice of

12  coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon,

13  which makes it more difficult and more expensive for rivals to offer increased product selection.

14     445.    Although each of these acts is anticompetitive in its own right, these interrelated

15  and independent actions have had a cumulative and synergistic effect that has harmed

16  competition and the competitive process.

17     446.    There is no valid procompetitive justification for Amazon's anticompetitive and

18  exclusionary conduct in the online superstore market.

19     447.    Amazon's anticompetitive and exclusionary conduct constitutes unlawful

20  monopoly maintenance, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and

21  Section 2 of the Sherman Act, 15 U.S.C. § 2.

22

23

24

COMPLAINT - 125
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

**COUNT II**

**MONOPOLY MAINTENANCE OF THE**

**ONLINE MARKETPLACE SERVICES MARKET**

**(15 U.S.C. § 45(a))**

448.    Plaintiff FTC re-alleges and incorporates by reference the allegations in paragraphs 1-447 above.

449.    At all relevant times, Amazon has had monopoly power in the worldwide market for online marketplace services for U.S. customers.

450.    Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

451.    Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

452.    There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online marketplace services market.

453.    Amazon's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 2 of the Sherman Act, 15 U.S.C. § 2.

COMPLAINT - 126
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

**COUNT III**

**UNFAIR METHOD OF COMPETITION**

**(15 U.S.C. § 45(a))**

454.     Plaintiff FTC re-alleges and incorporates by reference the allegations in paragraphs 1-453 above.

455.     Amazon's course of conduct—including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection—is anticompetitive and exclusionary, and constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

456.     There is no valid and cognizable justification for Amazon's anticompetitive and exclusionary conduct.

**COUNT IV**

**UNFAIR METHOD OF COMPETITION**

**(15 U.S.C. § 45(a))**

457.     Plaintiff FTC re-alleges and incorporates by reference the allegations in paragraphs 1-456 above.

458.     Amazon has engaged in an unfair method of competition, called Project Nessie, that raised prices by manipulating other online stores' pricing algorithms into matching Amazon's increases in the prices offered to shoppers.

459.     Amazon designed and used its Project Nessie pricing system for the sole purpose of manipulating other online stores into increasing their prices.

COMPLAINT - 127
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

460.    Amazon's Project Nessie pricing system was successful in accomplishing this goal.

461.    Amazon retains the ability to use its Project Nessie pricing system to increase the prices offered by other online stores.

462.    Amazon's use of its Project Nessie pricing system is an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

463.    There is no valid and cognizable justification for Amazon's use of Project Nessie.

### COUNT V

### MONOPOLY MAINTENANCE OF THE ONLINE SUPERSTORE MARKET

### (15 U.S.C. § 2)

464.    State Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-463 above.

465.    At all relevant times, Amazon has had monopoly power in the online superstore market in the United States.

466.    Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

467.    Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

COMPLAINT - 128
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

468.   Amazon's conduct has harmed and continues to harm competition, and Plaintiff States have therefore suffered and continue to suffer harm to their general economies and to their residents.

469.   There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online superstore market.

470.   Amazon's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT VI**

**MONOPOLY MAINTENANCE OF THE**

**ONLINE MARKETPLACE SERVICES MARKET**

**(15 U.S.C. § 2)**

471.   State Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-470 above.

472.   At all relevant times, Amazon has had monopoly power in the worldwide market for online marketplace services for U.S. customers.

473.   Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

474.   Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

475.     Amazon's conduct has harmed and continues to harm competition, and Plaintiff States have therefore suffered and continue to suffer harm to their general economies and to their residents.

476.     There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online marketplace services market.

477.     Amazon's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT VII

## VIOLATIONS OF CONNECTICUT STATE LAW

478.     The State of Connecticut repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

479.     Amazon's actions alleged in the Complaint violate the Connecticut Antitrust Act ("CAA"), General Statutes § 35-24 *et seq*.

480.     Amazon's actions alleged in the Complaint constitute monopolization of a part of trade or commerce within the state in violation of Conn. Gen. Stat. § 35-27.

481.     The State of Connecticut seeks all remedies available under CAA, including, without limitation, the following:

(a) Injunctive and other equitable relief, pursuant to Conn. Gen. Stat. § 35-34;

(b) Costs and attorney's fees, pursuant to Conn. Gen. Stat. § 35-34; and

(c) Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

482.     Amazon's actions as alleged herein also constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b *et seq.*

483.    The State of Connecticut seeks all remedies available under CUTPA, including, without limitation, the following:

(a) Disgorgement, pursuant to Conn. Gen. Stat. § 42-110m;

(b) Injunctive and other equitable relief, pursuant to Conn. Gen. Stat. § 42-110m;

(c) Costs and attorney's fees, pursuant to Conn. Gen. Stat. § 42-110m; and

(d) Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

## COUNT VIII

### VIOLATIONS OF MAINE STATE LAW

484.    Plaintiff State of Maine repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

485.    The aforementioned acts of Amazon violate Section 1102 of the Maine Monopolies and Profiteering Law, 10 M.R.S.A. § 1102.

486.    Further, the State of Maine seeks and is entitled to injunctive relief, costs of suit, including necessary and reasonable investigative costs, reasonable experts' fees and reasonable attorney fees under 10 M.R.S.A. § 1104.

## COUNT IX

### VIOLATIONS OF MARYLAND STATE LAW

487.    Plaintiff State of Maryland repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

488.    The aforementioned acts of Amazon violate the Maryland Antitrust Act, MD Commercial Law Code, Ann. § 11-201 *et seq.*

489.    Further, Section 11-209(b)(3) provides that the Court may exercise all equitable powers necessary to remove the effects of any violation, including injunction, restitution, and

divestiture.  Plaintiff State of Maryland is entitled to costs and reasonable attorney's fees.  MD Commercial Law Code, Ann. §§ 11-209(a)(4), 11-209(b)(3).

**COUNT X**

**VIOLATIONS OF MICHIGAN STATE LAW**

490.    Plaintiff State of Michigan repeats and re-alleges and incorporates by reference each and every paragraph and allegation of the Complaint as if fully set forth herein.

491.    The acts alleged in the Complaint violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*

492.    The acts alleged in the Complaint constitute the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by Amazon, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, pursuant to Mich. Comp. Laws § 445.773.

493.    Michigan seeks equitable and injunctive relief as authorized by Mich. Comp. Laws § 445.777, including, without limitation, the following:

      (a) Injunctive or other equitable relief;

      (b) Costs and fees incurred by Michigan in this suit; and

      (c) Other remedies as the Court finds necessary to redress and prevent recurrence of each of Amazon's violations.

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

## COUNT XI

### VIOLATIONS OF THE NEVADA UNFAIR TRADE PRACTICES ACT

494.   Plaintiff State of Nevada repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

495.   As repeatedly alleged *supra*, Amazon's monopolistic and anticompetitive conduct produced, and continues to produce, harm to businesses and consumers across the Plaintiff States, including in Nevada.  Accordingly, the aforementioned acts and practices by Amazon were, and continue to be, prohibited acts under the Nevada Unfair Trade Practices Act, as provided in Nev. Rev. Stat. § 598A.060.

496.   To remedy Amazon's violations of the Nevada Unfair Trade Practices Act, Plaintiff State of Nevada seeks the following relief:

    (a) Injunctive relief to permanently prevent and restrain Amazon's monopolistic and anticompetitive conduct, pursuant Nev. Rev. Stat. § 598A.070(c)(1);

    (b) Equitable relief, and specifically disgorgement, pursuant to Nev. Rev. Stat. § 598A.070(c)(4); and

    (c) Any other equitable relief the Court considers appropriate and has the discretion to award pursuant to Nev. Rev. Stat. § 598A.090(4).

## COUNT XII

### VIOLATION OF THE NEW JERSEY ANTITRUST ACT

### (MONOPOLY MAINTENANCE)

497.   Plaintiff State of New Jersey repeats and realleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

498.   The New Jersey Antitrust Act, N.J.S.A. 56:9-4(a), states:

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State.

499.    In the operation of its business, Amazon engaged in numerous commercial practices that violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, including monopolizing or attempting to monopolize trade or commerce in the online superstore market and the market for online marketplace services within the State of New Jersey, in violation of N.J.S.A. 56:9-4.

500.    Each violation of the New Jersey Antitrust Act by Amazon constitutes a separate unlawful practice and violation, under N.J.S.A. 56:9-16.

501.    Plaintiff State of New Jersey seeks all remedies available under the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, including, without limitation, the following:

(a) Injunctive and other equitable relief, pursuant to N.J.S.A. 56:9-7 and N.J.S.A. 56:9-10(a);

(b) Costs and attorney's fees, pursuant to N.J.S.A. 56:9-12; and

(c) Other remedies as the Court may deem appropriate and the interests of justice may require.

## COUNT XIII

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("CFA")

## (COMMERCIAL PRACTICES IN VIOLATION OF STATE AND FEDERAL LAW)

502.    Plaintiff State of New Jersey repeats and realleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

503.    The CFA, N.J.S.A. 56:8-4(b), states:

In an action brought by the Attorney General, any commercial practice that violates State or federal law is conclusively presumed to be an unlawful practice under [N.J.S.A. 56:8-2] . . . .

COMPLAINT - 134
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

504.    In the operation of its business, Amazon engaged in numerous commercial practices that violate the New Jersey Antitrust Act, including, but not limited to, N.J.S.A. 56:9-4, monopolizing, or attempting to monopolize a part of trade or commerce within the state.

505.    In the operation of its business, Amazon engaged in monopolization, or attempted monopolization of a part of trade or commerce, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

506.    Each violation of New Jersey and/or federal law by Amazon, on or after August 5, 2022, constitutes a separate unlawful practice and violation of the CFA, N.J.S.A. 56:8-2, under N.J.S.A. 56:8-4(b).

507.    Plaintiff State of New Jersey seeks all remedies available under the CFA, N.J.S.A. 56:8-1 to -227, including, without limitation, the following:

    (a) Disgorgement of all profits Amazon derived as a result of the conduct alleged herein, pursuant to N.J.S.A. 56:8-8;

    (b) Injunctive and other equitable relief, pursuant to N.J.S.A. 56:8-8;

    (c) Costs and attorney's fees, pursuant to N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

    (d) Other remedies as the Court may deem appropriate and the interests of justice may require.

## COUNT XIV

**VIOLATION OF THE NEW JERSEY CFA BY DEFENDANT**

**(UNCONSCIONABLE COMMERCIAL PRACTICES BY DEFENDANT)**

508.    Plaintiff State of New Jersey repeats and realleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

509.    The CFA, N.J.S.A. 56:8-2, prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

510.    The CFA defines "sale" as including "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute . . . ." N.J.S.A. 56:8-1(e).

511.    The CFA defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

512.    At all relevant times, Amazon has engaged in the advertisement, offer for sale, and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c).

513.    In the operation of its businesses, Amazon engaged in unconscionable commercial practices and deception, and made misrepresentations, in violation of N.J.S.A. 56:8-2, including, but not limited to, the following:

(a) Raising, maintaining and stabilizing the prices of products in its online superstore market at artificially high levels;

(b) Representing that it "seek[s] to be the Earth's most customer-centric company" and creating and perpetuating a reputation for having low or the lowest prices, while intentionally and strategically raising prices on various products to the detriment of consumers and for reasons unrelated to cost, supply, and demand; and

(c) Depriving consumers of diversity of selection and free and open markets.

514.    Each unconscionable commercial practice, misrepresentation, and act of deception constitutes a separate violation under the CFA, N.J.S.A. 56:8-2.

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

515.    Plaintiff State of New Jersey seeks all remedies available under the CFA, N.J.S.A. 56:8-1 to -227, including, without limitation, the following:

      (a) Injunctive and other equitable relief, pursuant to N.J.S.A. 56:8-8;

      (b) Costs and attorney's fees, pursuant to N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

      (c) Other remedies as the Court may deem appropriate and the interests of justice may require.

## COUNT XV

## VIOLATIONS OF NEW YORK STATE LAW

516.    Plaintiff State of New York repeats and re-alleges and incorporates by reference each and every paragraph and allegation of this Complaint as if fully set forth herein.

517.    Amazon's aforementioned acts and practices alleged in the Complaint violate Section 63(12) of New York's Executive Law, in that Amazon engaged in repeated and/or persistent illegal acts—violations of Section 2 of the Sherman Act and Section 5 of the FTC Act—in the carrying on, conducting, or transaction of business within the meaning and intent of Executive Law Section 63(12).

## COUNT XVI

## VIOLATIONS OF OKLAHOMA STATE LAW

518.    Plaintiff State of Oklahoma repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

519.    Amazon was at all times relevant hereto engaged in trade and commerce within the State of Oklahoma.

520.    The acts alleged in the Complaint constitute violations of the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*

COMPLAINT - 137
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1     (a) The acts alleged in the Complaint constitute unlawful monopolization of a

2       part of trade or commerce in a relevant market within the State of Oklahoma

3       pursuant to 79 O.S. § 203.

4    521.  Plaintiff State of Oklahoma seeks relief under the Oklahoma Antitrust Reform

5 Act, 79 O.S. §§ 201, *et seq.*, including, without limitation, the following:

6     (a) Injunctive and other equitable relief pursuant to 79 O.S. § 205;

7     (b) Disgorgement and restitution pursuant to 79 O.S. § 205;

8     (c) Costs and attorney's fees pursuant to 79 O.S. § 205; and

9     (d) Other remedies as the Court may deem appropriate under the facts and

10      circumstances of the case.

11    522.  The acts alleged in the Complaint also constitute violations of the Oklahoma

12 Consumer Protection Act, 15 O.S. §§ 751, *et seq.*

13     (a) Amazon is a person within the meaning of 15 O.S. § 752;

14     (b) The acts alleged in the Complaint occurred in connection with consumer

15      transactions within the meaning of 15 O.S. § 752; and

16     (c) The acts alleged in the Complaint constitute unfair or deceptive trade

17      practices, within the meaning of 15 O.S. § 752, and were committed in

18      violation of 15 O.S. § 753.

19    523.  Plaintiff State of Oklahoma seeks relief under the Oklahoma Consumer

20 Protection Act, 15 O.S. §§ 751, *et seq.*, including, without limitation, the following:

21     (a) Injunctive and other equitable relief pursuant to 15 O.S. § 756.1;

22     (b) Disgorgement and restitution pursuant to 79 O.S. § 756.1;

23     (c) Costs and attorney's fees pursuant to 15 O.S. § 761.1; and

24

COMPLAINT - 138
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    (d) Other remedies as the Court may deem appropriate under the facts and

2        circumstances of the case.

3                              **COUNT XVII**

4                    **VIOLATIONS OF OREGON STATE LAW**

5        524.    Plaintiff State of Oregon, acting by and through its Attorney General, Ellen

6    Rosenblum (the "State of Oregon"), repeats and re-alleges and incorporates by reference each

7    and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

8        525.    The acts alleged in the Complaint also constitute violations of the Oregon

9    Antitrust Law, Oregon Revised Statutes ("ORS") 646.705 to ORS 646.836.  These violations had

10   impacts within the State of Oregon and substantially affected the people of Oregon.

11       526.    The State of Oregon appears in its sovereign or quasi-sovereign capacities and

12   under its statutory, common law, and equitable powers pursuant to Section 4 of the Sherman Act,

13   15 U.S.C. § 4, Section 16 of the Clayton Act, 15 U.S.C. § 26, and the Oregon Antitrust Law

14   including ORS 646.760 and ORS 646.770.  The State of Oregon seeks equitable and injunctive

15   relief under federal law and the Oregon Antitrust Law, including, without limitation, the

16   following:

17       (a) Equitable relief pursuant to federal law including Section 4 of the Sherman

18           Act, 15 U.S.C. § 4, and pursuant to state law including ORS 646.770;

19       (b) Injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26,

20           ORS 646.760, and ORS 646.770;

21       (c) The cost of suit, including expert witness fees, costs of investigation, and

22           attorney's fees, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26,

23           ORS 646.760, and ORS 646.770; and

24

COMPLAINT - 139                              **FEDERAL TRADE COMMISSION**
CASE NO. 2:23-cv-01495-JHC                   600 Pennsylvania Avenue, NW
                                             Washington, DC 20580
                                             (202) 326-2222

1     (d) Other remedies as the Court may deem appropriate under the facts and

2            circumstances of the case.

3                              **COUNT XVIII**

4            **VIOLATIONS OF PENNSYLVANIA STATE LAW**

5     A.     **Pennsylvania's Unfair Trade Practices And Consumer Protection Law**

6            527.    Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates

7     by reference each and every paragraph and allegation of this Complaint as if fully set forth

8     herein.

9            528.    Amazon's lines of business ranging from online retail, media, cloud computing,

10    grocery stores, advertising and logistics and operational services are offered to consumers

11    through their substantial online presence as well as physical locations in the case of grocery

12    stores.  By engaging in the conduct more fully described herein with respect to these products

13    and services, Amazon is engaging in trade or commerce that has directly or indirectly harmed the

14    Commonwealth of Pennsylvania and Pennsylvania consumers within the meaning of 73 P.S.

15    § 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

16    ("PUTPCPL").

17           529.    The Pennsylvania Attorney General has reason to believe that Amazon is using or

18    is about to use any method, act or practice in violation of 73 P.S. § 201-3 and it is in the public

19    interest to prevent and restrain the use of such methods, acts or practices under 73 P.S. § 201-4.

20           1.      **Unfair methods of competition and unfair acts or practices under**

21                   **PUTPCPL**

22           530.    Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates

23    by reference each and every paragraph and allegation of the Complaint as if fully set forth

24    herein.

531.    Regardless of the nature or quality of Amazon's aforementioned acts or practices on the competitive process or competition, Amazon's conduct has been otherwise unfair or unconscionable because they offend public policy as established by statutes, the common law, or otherwise, are immoral, unethical, oppressive, unscrupulous, or substantially injurious to the Commonwealth of Pennsylvania and consumers.

532.    Amazon's unfair conduct has resulted in the Commonwealth and consumers being substantially injured by paying more for products than they otherwise would have in a free and open market.

533.    Amazon's impairment of choice and the competitive process has had the following effects: (1) competition in the online superstore market and the market for online marketplace services has been restrained, suppressed and eliminated throughout Pennsylvania; (2) online superstore market prices and the market for online marketplace services prices have been raised, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and consumers have been deprived of free and open markets; and (4) Commonwealth of Pennsylvania and consumers have paid supra-competitive, artificially inflated prices for online superstore products and online marketplace services.

534.    Amazon's impairment of choice and the competitive process have caused the Commonwealth of Pennsylvania and consumers to suffer and to continue to suffer loss of money by means of Amazon's use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

535.    Amazon's conduct more fully described herein is unlawful pursuant to 73 P.S. § 201-3.

536.    The aforesaid methods, acts or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under Section 2(4) of the PUTPCPL,

COMPLAINT - 141
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

including, but not limited to, "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

537.   The above-described conduct created the likelihood of confusion and misunderstanding and exploited unfair advantage of the Commonwealth of Pennsylvania and consumers seeking to exercise a meaningful choice in markets expected to be free of impairment to the competitive process and thus constitutes an unfair method of competition through one or more of the following:

(a) Violating Section 2 of the Sherman Act, 15 U.S.C. § 2, through willfully maintaining its monopoly power over the online superstore market as set forth in the preceding counts;

(b) Violating Section 2 of the Sherman Act, 15 U.S.C. § 2, through willfully maintaining its monopoly power over the market for online marketplace services as set forth in the preceding counts;

(c) Violating Section 5 of the Federal Trade Commission Act, 15 U.S.C § 45(a);

(d) Violating Pennsylvania antitrust common law through willfully maintaining its monopoly power over the online superstore market;

(e) Violating Pennsylvania antitrust common law through willfully maintaining its monopoly power over the market for online marketplace services; and/or

(f) Engaging in any conduct which causes substantial injury to consumers.

538.   The above-described conduct substantially injured consumers and the Commonwealth of Pennsylvania.

539.   The Commonwealth seeks entry of a permanent injunction restraining Amazon's unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

COMPLAINT - 142
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

540.    The Commonwealth also requests that the Court direct Amazon to restore to the Commonwealth on behalf of all victims the ill-gotten gains acquired from their inflated pricing during the period of time Amazon's unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

### 2.    Deceptive acts or practices under PUTPCPL

541.    Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates by reference each and every paragraph and allegation of the Complaint as if fully set forth herein.

542.    Amazon deceptively misrepresented to the Commonwealth of Pennsylvania and consumers that Amazon's pricing in the online superstore market and the market for online marketplace services was competitive and fair.

543.    Amazon deceptively concealed from, or otherwise misled, the Commonwealth of Pennsylvania and consumers as to the actual characteristics of the marketplace being other than competitive and fair.

544.    Regardless of the nature or quality of Amazon's aforementioned acts or practices on the competitive process or competition, Amazon's conduct has had the tendency or capacity to deceive.

545.    Amazon's deceptive conduct has resulted in the Commonwealth and consumers being substantially injured by paying more for products than they otherwise would have in a free, open, fair, and competitive market.

546.    Amazon's deceptive misrepresentations and failure to disclose material facts have had the following effects: (1) competition in the online superstore market and the market for online marketplace services has been restrained, suppressed and eliminated throughout Pennsylvania; (2) prices for products in the online superstore market and the market for online marketplace services prices have been raised, maintained and stabilized at artificially-high levels

COMPLAINT - 143
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

throughout Pennsylvania; (3) Commonwealth of Pennsylvania and consumers have been deprived of free and open markets; and (4) Commonwealth of Pennsylvania and consumers have paid supra-competitive, artificially inflated prices for products in the online superstore market and the market for online marketplace services.

547.    Amazon's impairment of choice and the competitive process has caused the Commonwealth of Pennsylvania and consumers to suffer and to continue to suffer loss of money by means of Amazon's use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

548.    Amazon's conduct more fully described herein is unlawful pursuant to 73 P. S. § 201-3.

549.    The aforesaid methods, acts or practices constitute deceptive acts or practices within their meaning under Section 2 (4) of the PUTPCPL, including, but not limited to:

    (a) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

    (b) "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii);

    (c) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

550.    The above-described conduct created the likelihood of confusion and misunderstanding and exploited the deception and lack of disclosure as to the actual

COMPLAINT - 144
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  characteristics of the marketplace to the Commonwealth of Pennsylvania and consumers seeking

2  to exercise a meaningful choice in markets expected to be free, open, fair, and competitive and

3  thus constitutes a deceptive act or practice.

4      551.   The Commonwealth seeks entry of a permanent injunction restraining Amazon's

5  unlawful conduct and mandating corrective measures pursuant to 73 P. S. § 201-4.

6      552.   The Commonwealth also requests that the Court direct Amazon to restore to the

7  Commonwealth on behalf of all victims the ill-gotten gains acquired from their inflated pricing

8  during the period of time Amazon's unlawful conduct took place, pursuant to 73 P. S. § 201-4.1.

9      **B.      Common Law Doctrine Against Monopolization**

10     553.   Plaintiff Commonwealth of Pennsylvania repeats and re-alleges and incorporates

11 by reference each and every paragraph and allegation of the Complaint as if fully set forth

12 herein.

13     554.   The conduct to maintain Amazon's monopolies as set forth in the preceding

14 counts constitutes monopolization in violation of Pennsylvania antitrust common law.

15     555.   Amazon's conduct in maintaining its monopolies had the following effects: (1)

16 competition in the online superstore market and the market for online marketplace services has

17 been restrained, suppressed and eliminated throughout Pennsylvania; (2) online superstore

18 market prices have been raised, maintained and stabilized at artificially-high levels throughout

19 Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers have been

20 deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania

21 consumers have paid supra-competitive, artificially inflated prices for online superstore products

22 and online marketplace services.

23     556.   The Commonwealth seeks all available equitable relief under Pennsylvania

24 common law.

**COUNT XIX**

**VIOLATIONS OF RHODE ISLAND LAW**

557.    Plaintiff State of Rhode Island repeats and re-alleges and incorporates by reference each and every preceding paragraph and allegation in the Complaint as if fully set forth herein.

558.    Amazon's actions as alleged herein violate the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*

559.    Plaintiff State of Rhode Island seeks all remedies available under the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-10, 6-36-11 and 6-36-12 and seeks relief, including but not limited to injunctive relief, equitable monetary relief, fees, costs, and such other relief as this Court deems just and equitable.

560.    Amazon's actions as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices as defined in the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.3-1, *et seq.*

561.    The State of Rhode Island brings this action pursuant to R.I. Gen. Laws § 6-13.1-5, and seeks relief, including but not limited to injunctive relief, equitable monetary relief, fees, costs, and such other relief as this Court deems just and equitable.

**COUNT XX**

**VIOLATIONS OF WISCONSIN STATE LAW**

562.    Plaintiff State of Wisconsin repeats and re-alleges and incorporates by reference each and every paragraph and allegation in this Complaint as if fully set forth herein.

563.    The aforementioned practices by Defendant are in violation of Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 *et seq.*  These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

564.    Plaintiff State of Wisconsin, through its Attorney General and under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available under Wis. Stat. §§ 133.03, 133.16, 133.17, and 133.18.

## X.    REQUEST FOR RELIEF

WHEREFORE Plaintiffs request that this Court, as authorized by 15 U.S.C. § 53(b); 15 U.S.C. § 26; Conn. Gen. Stat. §§ 35-32(a) and 42-110m; 10 M.R.S.A. § 1104; Maryland Commercial Law Code Ann. § 11-209; Mich. Comp. Laws § 445.777; Nev. Rev. Stat. §§ 598A.070 and 598A.160; N.J.S.A. 56:8-8, 56:8-11, 56:8-19, 56:9-6, 56:9-7, 56:9-10(a), and 56:9-12; New York Executive Law § 63(12); Oklahoma Statutes §§ 79-203 and 15-756.1; Oregon Revised Statutes 646.760 and 646.770; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-4, Pennsylvania common law antitrust doctrine, and the Commonwealth Attorneys Act, 71 P.S. § 732-204(c); R.I. Gen. Laws § 6-36-10; Wis. Stat. §§ 133.03, 133.16, and 133.17; and its own equitable powers, enter final judgment against Amazon, declaring, ordering, and adjudging:

1.    that Amazon's conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

2.    that Amazon's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

3.    that Amazon's conduct violates the Connecticut Antitrust Act, General Statutes § 35-24 *et seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*;

4.    that Amazon's conduct violates Section 1102 of the Maine Monopolies and Profiteering Law, 10 M.R.S.A. § 1102;

5.    that Amazon's conduct violates the Maryland Antitrust Act, Maryland Commercial Law Code Ann. § 11-201 *et seq.*;

6.     that Amazon's conduct violates the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq.*;

7.     that Amazon's conduct violates the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060;

8.     that Amazon's conduct violates N.J.S.A. 56:8-1 to –227, and N.J.S.A. 56:9-1 to –19;

9.     that Amazon's conduct violates New York Executive Law § 63(12);

10.    that Amazon's conduct violates the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*, and the Oklahoma Consumer Protection Act, 15 O.S. §§ 751, *et seq.*;

11.    that Amazon's conduct violates the Oregon Antitrust Law, Oregon Revised Statutes 646.705 to 646.836;

12.    that Amazon's conduct violates the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-3, and Pennsylvania common law antitrust doctrine;

13.    that Amazon's conduct violates the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*;

14.    that Amazon's conduct violates Wis. Stat. § 133.03 *et seq.*;

15.    that Amazon is permanently enjoined from engaging in its unlawful conduct;

16.    that Amazon is permanently enjoined from engaging in similar or related conduct, or any conduct with the same or similar purpose and effect;

17.    any preliminary or permanent equitable relief, including but not limited to structural relief, necessary to redress and prevent recurrence of Amazon's violations of the law, as alleged herein;

COMPLAINT - 148
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

18.     any preliminary or permanent equitable relief, including but not limited to structural relief, necessary to restore fair competition and remedy the harm to competition caused by Amazon's violations of the law;

19.     that the Court grant Plaintiff States equitable monetary relief pursuant to all applicable law;

20.     that the Court grant Plaintiff States the costs of suit, including all available fees and costs; and

21.     that the Court grant any additional relief the Court finds just and proper.

COMPLAINT - 149
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

Dated: September 26, 2023

Of counsel:

JOHN M. NEWMAN
Deputy Director
Bureau of Competition

_s/ Stephen E. Antonio_
STEPHEN E. ANTONIO
MA Bar # 667861

_s/ Emily K. Bolles_
EMILY K. BOLLES
NY Reg. # 5408703

_s/ Daniel S. Bradley_
DANIEL S. BRADLEY
TX Bar # 24097411

_s/ Emma Dick_
EMMA DICK
IA Bar # 51155

_s/ Sara M. Divett_
SARA M. DIVETT
DC Bar # 1736504

_s/ Megan E. B. Henry_
MEGAN E. B. HENRY
NY Reg. # 5539671

_s/ Colin M. Herd_
COLIN M. HERD
NY Reg. # 5665740

Respectfully submitted,

By: _Susan A. Musser_
SUSAN A. MUSSER
DC Bar # 1531486

_s/ Edward H. Takashima_
EDWARD H. TAKASHIMA
DC Bar # 1001641

_Lead Counsel_

_s/ David B. Schwartz_
DAVID B. SCHWARTZ
NY Reg. # 4947925

_s/ Christine M. Kennedy_
CHRISTINE M. KENNEDY
DC Bar # 1032904

_s/ Daniel A. Principato_
DANIEL A. PRINCIPATO
NY Reg. # 5350129

_s/ Danielle C. Quinn_
DANIELLE C. QUINN
NY Reg. # 5408943

_s/ Z. Lily Rudy_
Z. LILY RUDY
DC Bar # 1023073

_s/ Kelly Schoolmeester_
KELLY SCHOOLMEESTER
DC Bar # 1008354

_s/ Christina F. Shackelford_
CHRISTINA F. SHACKELFORD
NY Reg. # 5339114

_s/ Jake Walter-Warner_
JAKE WALTER-WARNER
NY Reg. # 5396668

_Attorneys_
Bureau of Competition

COMPLAINT - 150
CASE NO. _:__-cv-_____

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone:  (202) 326-2122 (Musser)
                    (202) 326-2464 (Takashima)
Email: smusser@ftc.gov
           etakashima@ftc.gov
           dschwartz1@ftc.gov
           santonio@ftc.gov
           ebolles@ftc.gov
           dbradley@ftc.gov
           edick@ftc.gov
           sdivett@ftc.gov
           mhenry1@ftc.gov
           cherd@ftc.gov
           ckennedy@ftc.gov
           dprincipato@ftc.gov
           dquinn@ftc.gov
           zrudy@ftc.gov
           kschoolmeester@ftc.gov
           cshackelford@ftc.gov
           jwalterwarner@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

COMPLAINT - 151
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   FOR PLAINTIFF STATE OF NEW YORK:

2

3                                     LETITIA JAMES
                                      Attorney General
4
                                      Christopher D'Angelo
5                                     Chief Deputy Attorney General,
                                      Economic Justice Division
6
                                      Elinor R. Hoffmann
7                                     (*pro hac vice* forthcoming)
                                      Chief, Antitrust Bureau
8                                     Elinor.Hoffmann@ag.ny.gov
                                      Amy McFarlane
9                                     (*pro hac vice* forthcoming)
                                      Deputy Chief, Antitrust Bureau
10                                    Amy.McFarlane@ag.ny.gov
                                      Michael Jo
11                                    (*pro hac vice* forthcoming)
                                      Assistant Attorney General, Antitrust Bureau
12                                    Michael.Jo@ag.ny.gov
                                      Tal Elmatad
13                                    (*pro hac vice* forthcoming)
                                      Assistant Attorney General, Antitrust Bureau
14                                    Tal.Elmatad@ag.ny.gov
                                      James Yoon
15                                    (*pro hac vice* forthcoming)
                                      Assistant Attorney General, Antitrust Bureau
16                                    James.Yoon@ag.ny.gov
                                      New York State Office of the Attorney General
17                                    28 Liberty Street
                                      New York, NY 10005
18                                    (212) 416-8262

19                                    *Attorneys for Plaintiff State of New York*

20

21

22

23

24

COMPLAINT - 152                                    **FEDERAL TRADE COMMISSION**
CASE NO. 2:23-cv-01495-JHC                         600 Pennsylvania Avenue, NW
                                                   Washington, DC 20580
                                                   (202) 326-2222

1   FOR PLAINTIFF STATE OF CONNECTICUT:

2

3                                      WILLIAM TONG
                                       Attorney General
4
                                       Nicole Demers
5                                      (*pro hac vice* forthcoming)
                                       Deputy Associate Attorney General
6                                      Nicole.Demers@ct.gov
                                       Jeremy Pearlman
7                                      Associate Attorney General
                                       Jeremy.Pearlman@ct.gov
8                                      Rahul A. Darwar
                                       (*pro hac vice* forthcoming)
9                                      Assistant Attorney General
                                       Rahul.Darwar@ct.gov
10                                     Office of the Attorney General of Connecticut
                                       165 Capitol Avenue
11                                     Hartford, CT 06016
                                       Tel: (860) 808-5030
12                                     Email: Nicole.Demers@ct.gov

13                                     *Attorneys for Plaintiff State of Connecticut*

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 153                                    **FEDERAL TRADE COMMISSION**
CASE NO. 2:23-cv-01495-JHC                             600 Pennsylvania Avenue, NW
                                                          Washington, DC 20580
                                                             (202) 326-2222

1 │ FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:

2

3 │ MICHELLE A. HENRY
Attorney General of Pennsylvania

4

5 │ Tracy W. Wertz
(*pro hac vice* forthcoming)
Chief Deputy Attorney General

6 │ twertz@attorneygeneral.gov
Jennifer A. Thomson

7 │ (*pro hac vice* forthcoming)
Senior Deputy Attorney General

8 │ jthomson@attorneygeneral.gov
Norman A. Marden

9 │ Senior Deputy Attorney General
nmarden@attorneygeneral.gov

10 │ Brandon Sprecher
(*pro hac vice* forthcoming)

11 │ Deputy Attorney General
bsprecher@attorneygeneral.gov

12

13 │ Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor

14 │ Harrisburg, PA 17120
Tel: (717) 787-4530

15

16 │ *Attorneys for Plaintiff Commonwealth of
Pennsylvania*

17

18

19

20

21

22

23

24

COMPLAINT - 154
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

FOR PLAINTIFF STATE OF DELAWARE:

KATHLEEN JENNINGS
Attorney General

Michael A. Undorf
(*pro hac vice* forthcoming)
Deputy Attorney General
michael.undorf@delaware.gov
(302) 683-8816

Brian Canfield
(*pro hac vice* forthcoming)
Deputy Attorney General
brian.canfield@delaware.gov
(302) 683-8809

Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801

*Attorneys for Plaintiff State of Delaware*

FOR PLAINTIFF STATE OF MAINE:

AARON M. FREY
Attorney General

Christina M. Moylan
(*pro hac vice* forthcoming)
Assistant Attorney General
Chief, Consumer Protection Division
christina.moylan@maine.gov

Michael Devine
(*pro hac vice* forthcoming)
Assistant Attorney General
michael.devine@maine.gov

Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

*Attorneys for Plaintiff State of Maine*

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1    FOR PLAINTIFF STATE OF MARYLAND:

2

3                                          ANTHONY G. BROWN
                                           Attorney General
4
                                           Schonette J. Walker
5                                          Assistant Attorney General
                                           Chief, Antitrust Division
6                                          Swalker@oag.state.md.us

7                                          Gary Honick
                                           (*pro hac vice* forthcoming)
8                                          Assistant Attorney General
                                           Deputy Chief, Antitrust Division
9                                          Ghonick@oag.state.md.us

10                                         Byron Warren
                                           (*pro hac vice* forthcoming)
11                                         Assistant Attorney General
                                           Bwarren@oag.state.md.us
12
                                           Office of the Maryland Attorney General
13                                         200 St. Paul Place
                                           Baltimore, MD 21202
14                                         (410) 576-6474

15                                         *Attorneys for Plaintiff State of Maryland*

16

17

18

19

20

21

22

23

24

COMPLAINT - 157
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General

MICHAEL MACKENZIE
(*pro hac vice* forthcoming)
Deputy Chief, Antitrust Division
WILLIAM MATLACK
Chief, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 963-2369
michael.mackenzie@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

COMPLAINT - 158
CASE NO. 2:23-cv-01495-JHC

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  FOR PLAINTIFF STATE OF MICHIGAN:

2

3                                          DANA NESSEL
                                           Attorney General
4
                                           Jason Evans
5                                          (*pro hac vice* forthcoming)
                                           Division Chief, Corporate Oversight Division
6                                          Assistant Attorney General
                                           EvansJ@michigan.gov
7                                          Scott Mertens
                                           (*pro hac vice* forthcoming)
8                                          Assistant Attorney General
                                           MertensS@michigan.gov
9                                          Jonathan Comish
                                           (*pro hac vice* forthcoming)
10                                         Assistant Attorney General
                                           ComishJ@michigan.gov
11
                                           Michigan Department of Attorney General
12                                         525 West Ottawa Street
                                           Lansing, MI 48933
13                                         Phone: (517) 335-7622
                                           Email: MertensS@michigan.gov
14
                                           *Attorneys for Plaintiff State of Michigan*
15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
                                                                         600 Pennsylvania Avenue, NW
                                                                         Washington, DC 20580
                                                                         (202) 326-2222

1    FOR PLAINTIFF STATE OF MINNESOTA:

2

3                                          KEITH ELLISON
                                           Attorney General
4
                                           JESSICA WHITNEY
5                                          JAMES W. CANADAY
                                           Deputy Attorneys General
6
                                           ZACH BIESANZ
7                                          (*pro hac vice* forthcoming)
                                           Senior Enforcement Counsel
8                                          SARAH DOKTORI
                                           (*pro hac vice* forthcoming)
9                                          Assistant Attorney General
                                           Office of the Minnesota Attorney General
10                                         445 Minnesota Street, Suite 1400
                                           Saint Paul, Minnesota 55101
11                                         (651) 757-1257
                                           zach.biesanz@ag.state.mn.us
12
                                           *Attorneys for Plaintiff State of Minnesota*
13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
                                           600 Pennsylvania Avenue, NW
                                           Washington, DC 20580
                                           (202) 326-2222

1  FOR PLAINTIFF STATE OF NEVADA:

2

3                                      AARON D. FORD
                                       Attorney General

4
                                       ERNEST D. FIGUEROA
5                                      Consumer Advocate

6                                      Lucas J. Tucker (NV Bar No. 10252)
                                       (*pro hac vice* forthcoming)
7                                      Senior Deputy Attorney General
                                       LTucker@ag.nv.gov
8                                      Mark J. Krueger (NV Bar No. 7410)
                                       Chief Deputy Attorney General
9                                      MKrueger@ag.nv.gov
                                       Whitney F. Digesti (NV Bar No. 13012)
10                                     Senior Deputy Attorney General
                                       WDigesti@ag.nv.gov
11                                     Office of the Nevada Attorney General
                                       100 N. Carson St.
12                                     Carson City, Nevada 89701
                                       Tel: (775) 684-1100
13
                                       *Attorneys for Plaintiff State of Nevada*
14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 161                                    **FEDERAL TRADE COMMISSION**
CASE NO. 2:23-cv-01495-JHC                            600 Pennsylvania Avenue, NW
                                                          Washington, DC 20580
                                                             (202) 326-2222

1    PLAINTIFF STATE OF NEW HAMPSHIRE:

2                                           By its attorney,

3                                           JOHN M. FORMELLA
                                            Attorney General
4
                                            Alexandra C. Sosnowski
5                                           (*pro hac vice* forthcoming)
                                            Assistant Attorney General
6                                           Consumer Protection and Antitrust Bureau
                                            New Hampshire Department of Justice
7                                           Office of the Attorney General
                                            33 Capitol St.
8                                           Concord, NH 03301
                                            Alexandra.c.sosnowski@doj.nh.gov
9                                           (603) 271-2678

10                                          *Attorneys for Plaintiff State of New Hampshire*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
                                            600 Pennsylvania Avenue, NW
                                            Washington, DC 20580
                                            (202) 326-2222

FOR PLAINTIFF STATE OF NEW JERSEY:

MATTHEW J. PLATKIN
Attorney General of New Jersey

Ana Atta-Alla
(*pro hac vice* forthcoming)
Deputy Attorney General
Ana.Atta-Alla@law.njoag.gov
Isabella Pitt
(*pro hac vice* forthcoming)
Assistant Section Chief – Antitrust
Isabella.Pitt@law.njoag.gov

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(973) 648-3070

*Attorneys for Plaintiff State of New Jersey*

COMPLAINT - 163
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General

Jeffrey Herrera
(*pro hac vice* forthcoming)
Assistant Attorney General
jherrera@nmag.gov
Julie Meade
(*pro hac vice* forthcoming)
Division Director, Consumer and
Environmental Protection Division
jmeade@nmag.gov
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Tel: (505) 490-4885

*Attorneys for Plaintiff State of New Mexico*

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   FOR PLAINTIFF STATE OF OKLAHOMA:

2

3                                          GENTNER DRUMMOND
                                           Attorney General
4
                                           Caleb J. Smith, OBA No. 33613
5                                          (*pro hac vice* forthcoming)
                                           Assistant Attorney General
6                                          Consumer Protection Unit
                                           Office of the Oklahoma Attorney General
7                                          15 West 6th Street
                                           Suite 1000
8                                          Tulsa, OK 74119
                                           Tel. (918) 581-2230
9                                          Fax (918) 938-6348
                                           Email: caleb.smith@oag.ok.gov
10
                                           *Attorneys for Plaintiff State of Oklahoma*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

**FEDERAL TRADE COMMISSION**
                                                               600 Pennsylvania Avenue, NW
                                                               Washington, DC 20580
                                                               (202) 326-2222

1   FOR PLAINTIFF STATE OF OREGON:

2

3                                       ELLEN F. ROSENBLUM
                                        Attorney General
4
                                        *s/ Timothy D. Smith*
5                                       TIMOTHY D. SMITH, WSBA No. 44583
                                        Senior Assistant Attorney General
6                                       Antitrust and False Claims Unit
                                        Oregon Department of Justice
7                                       100 SW Market St
                                        Portland, OR 97201
8                                       (503) 934-4400
                                        tim.smith@doj.state.or.us
9
                                        *Attorneys for Plaintiff State of Oregon*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 166
CASE NO. 2:23-cv-01495

1  FOR PLAINTIFF STATE OF RHODE ISLAND:

2

3                                    PETER F. NERONHA
                                     Attorney General
4
                                     STEPHEN N. PROVAZZA (RI Bar No.
5                                    10435) (*pro hac vice* forthcoming)
                                     Special Assistant Attorney General
6                                    Chief, Consumer and Economic Justice Unit
                                     Department of the Attorney General
7                                    150 South Main Street
                                     Providence, RI 02903
8                                    sprovazza@riag.ri.gov
                                     (401) 274-4400
9
                                     *Attorneys for Plaintiff State of Rhode Island*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 167                                    **FEDERAL TRADE COMMISSION**
CASE NO. 2:23-cv-01495                                 600 Pennsylvania Avenue, NW
                                                          Washington, DC 20580
                                                             (202) 326-2222

1   FOR PLAINTIFF STATE OF WISCONSIN:

2

3                                          JOSHUA L. KAUL
                                           Attorney General
4
                                           GWENDOLYN J. COOLEY
5                                          (*pro hac vice* forthcoming)
                                           Assistant Attorney General
6                                          Wisconsin Department of Justice
                                           Post Office Box 7857
7                                          Madison, Wisconsin 53707-7857
                                           (608) 261-5810
8                                          (608) 266-2250 (Fax)
                                           cooleygj@doj.state.wi.us
9
                                           *Attorneys for Plaintiff State of Wisconsin*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT - 168                                        **FEDERAL TRADE COMMISSION**
CASE NO. 2:23-cv-01495                                 600 Pennsylvania Avenue, NW
                                                       Washington, DC 20580
                                                       (202) 326-2222