# EXHIBIT F

# In the Matter of:

# Amazon eCommerce

*October 20, 2022*
*Jeffrey P. Bezos*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

277
1       MS. HUBBARD: Objection to form.
2       THE WITNESS: I don't recall any such thing.
3    Q. (By Mr. Schwartz) When did you begin using
4  Signal for work purposes?
5    A. Early 2019. And just certain -- as I've said
6  before, just certain limited work purposes.
7    Q. Why did you begin using Signal for work purposes?
8       MS. HUBBARD: Objection to form.
9       THE WITNESS: My phone got hacked, and I became
10 more aware of end-to-end encryption.
11   Q. (By Mr. Schwartz) Was your work e-mail hacked?
12   A. My phone was hacked.
13   Q. Your entire phone?
14   A. Apparently. I'm not an expert on this, but
15 apparently the -- the attacker had complete access to
16 everything on my phone.
17   Q. Before you were hacked, did you use text for work
18 purposes?
19   A. Occasionally. But, again, for very casual
20 things.
21   Q. After you were hacked, did you request a separate
22 phone to use for work purposes?
23   A. No.
24      MS. HUBBARD: Objection to form.
25      THE WITNESS: I don't think so. I don't remember

278
1  that.
2    Q. (By Mr. Schwartz) Why not?
3    A. I don't know.
4    Q. Wouldn't that have been a solution to the issue?
5       MS. HUBBARD: Objection to form.
6       THE WITNESS: Maybe. But then you have to carry
7  two phones. It's not that convenient. And it wouldn't
8  necessarily stop that phone from being hacked, either.
9    Q. (By Mr. Schwartz) Why did you think Signal would
10 stop the hackers whereas a work phone wouldn't?
11   A. Well, I just would say the hacking, you know,
12 focused my attention. And the -- and the end-to-end
13 encryption seemed like a good feature of Signal.
14   Q. Are you familiar with a program within Amazon
15 called Chime?
16   A. Yes.
17   Q. Did you use Chime for work?
18   A. Yes. Chime, the video conferencing app?
19   Q. That's -- I understand Chime to also have a
20 messaging feature.
21   A. I don't use the messaging feature of Chime. I
22 just use it for videoconferencing.
23   Q. Why don't you use the messing feature on Chime?
24   A. I don't know. Actually, to be honest, I didn't
25 even know it had one.

279
1    Q. We talked about how you use text messages for
2  work.
3       MS. HUBBARD: Objection to the characterization.
4    Q. (By Mr. Schwartz) How did you decide when to use
5  Signal versus using text messages for work?
6       MS. HUBBARD: Objection to form.
7       THE WITNESS: Well, I would have preferred Signal
8  to text, because texts are not encrypted end to end. But
9  maybe some people aren't on Signal.
10   Q. (By Mr. Schwartz) So you use text messages when
11 someone was not on Signal?
12      MS. HUBBARD: Objection to form.
13      THE WITNESS: Occasionally. Might have. Again,
14 I wouldn't do anything substantive that way. It's just
15 not conducive to it.
16   Q. (By Mr. Schwartz) We looked at an e-mail a
17 couple minutes ago where you told Mike Hopkins -- or
18 you -- excuse me -- you ask Mike Hopkins if he was on
19 Signal.
20      Have you done that other times with other people?
21   A. Probably. I remember encouraging certain people
22 to -- if they'd get on the Signal app 'cause I thought it
23 was more secure. I was using it, and it was an easier
24 way to get ahold of me. Kind of like a different way to
25 text me.

280
1    Q. Those people you encouraged, were some of those
2  people members of the S-team?
3       MS. HUBBARD: Objection to the characterization.
4       Go ahead.
5       THE WITNESS: Some of them probably were, yeah.
6    Q. (By Mr. Schwartz) Did you ever ask the entire
7  S-team to start using Signal to communicate with you?
8    A. You know, I might have suggested it as an option.
9  I don't think I ever required it.
10   Q. Do you still use Signal for work purposes today?
11      MS. HUBBARD: Objection to form.
12      THE WITNESS: For work purposes?
13      MR. SCHWARTZ: Yeah.
14      THE WITNESS: No.
15   Q. (By Mr. Schwartz) When did you stop?
16   A. I mean, actually, I might -- there still might be
17 the occasional message. I was thinking about it. But
18 what I did recently, or not recently, maybe some number
19 of months ago anyway, is turn off all -- make sure I
20 never had any disappearing messages on it.
21   Q. Why did you turn off having disappearing
22 messages?
23      MS. HUBBARD: So, Mr. Bezos, if we are getting
24 into an area where, to answer counsel's questions, you
25 would need to reveal attorney-client privilege, then I'm

                                                                 281

1   going to instruct you not to answer.  And I don't think
2   counsel is trying to invade the privilege.
3        So are you able to answer that question without
4   relying on or exposing attorney-client privilege
5   communications?
6        THE WITNESS:  No.
7        **Q.  (By Mr. Schwartz)  Is there any non-privileged**
8   **reason you can give me for why you stopped using the**
9   **disappearing message feature on Signal?**
10       A.  No.
11       **Q.  Do you know who David Zapolsky is?**
12       A.  Yes.
13       **Q.  He's Amazon's general counsel, right?**
14       A.  Yes.
15       **Q.  Did you communicate with David Zapolsky using**
16  **Signal?**
17       MS. HUBBARD:  So I would ask you to just answer
18  that question "yes" or "no."  Because, again, we could
19  potentially be in a attorney-client privileged context.
20       THE WITNESS:  Yes.
21       **Q.  (By Mr. Schwartz)  At a high level -- and I'm not**
22  **trying get into any privileged matters -- did you**
23  **communicate with David Zapolsky using Signal about Amazon**
24  **business?**
25       MS. HUBBARD:  I would need a stipulation on the

                                                                 282

1   record that if he answers that question, that you will
2   not claim there's been a waiver.  Just protecting
3   privilege.
4        MR. SCHWARTZ:  I'm not prepared to enter into any
5   stipulation here today.  I just want to ask if he ever
6   talked about Amazon business.  I'm not getting more
7   specific than that.
8        MS. HUBBARD:  All right.  So, Mr. Bezos, if you
9   can answer without revealing anything that you talked
10  about with Mr. Zapolsky, but just the very general nature
11  of conversations that you might have had with him on
12  Signal, is it possible to do that?
13       THE WITNESS:  It would have been similar to the
14  things I've already discussed I would do with other
15  Amazon executives.  You know what I mean?  Like data
16  security issues, sensitive personnel -- personal iss- --
17  personnel issues, those kinds of things.
18       MS. HUBBARD:  All right.  And since Mr. Bezos has
19  been careful to simply keep it to subject matters, then
20  we'll let the record stand on that.
21       MR. SCHWARTZ:  Okay.
22       **Q.  (By Mr. Schwartz)  You mentioned a minute ago you**
23  **used Signal to discuss Amazon business while using your**
24  **personal smartphone; is that right?**
25       MS. HUBBARD:  Objection to form.

                                                                 283

1        MR. SCHWARTZ:  You can answer.
2        THE WITNESS:  I only have one phone.
3        **Q.  (By Mr. Schwartz)  And that covers personal and**
4   **work, right?**
5        A.  Covers personal, work.  Is there anything else?
6        **Q.  That's a great question.  I have to think about**
7   **that one.**
8        **Did you use Signal on any devices other than your**
9   **personal phone to discuss Amazon business?**
10       MS. HUBBARD:  Object to the characterization, the
11  general characterization of how he used it.
12       You can answer.
13       THE WITNESS:  I'm sorry.  Could you ask the
14  question again?
15       **Q.  (By Mr. Schwartz)  Did you use Signal on any**
16  **other devices to discuss Amazon business?**
17       MS. HUBBARD:  Objection to form.
18       THE WITNESS:  I haven't used Signal on any other
19  devices at all.  You mean, like, on a computer or
20  something?
21       MR. SCHWARTZ:  Correct.  Like, a work computer,
22  for example.
23       THE WITNESS:  No.
24       **Q.  (By Mr. Schwartz)  Do you ever use Signal on your**
25  **personal computer?**

                                                                 284

1        A.  No.
2        **Q.  How about a tablet?**
3        A.  No.
4        **Q.  Have you communicated with counsel here today**
5   **using Signal?**
6        MS. HUBBARD:  You can answer that "yes" or "no."
7        THE WITNESS:  No.  No.
8        **Q.  (By Mr. Schwartz)  You mentioned a few minutes**
9   **ago that Signal has a disappearing message feature,**
10  **right?**
11       A.  Yes.
12       **Q.  What's your understanding of that feature?**
13       MS. HUBBARD:  Objection to form.
14       THE WITNESS:  You can set it to different time
15  periods, and then after that time period elapses, it
16  delete -- it auto-deletes the messages.
17       **Q.  (By Mr. Schwartz)  Why did you use Signal's**
18  **disappearing message feature?**
19       A.  I -- I intended to use it.  I try to use that for
20  things that I considered especially sensitive, like the
21  data security, certain personnel issues, certain
22  sensitive PR issues.  So I would turn it on and off,
23  leaving the -- only for those issues.
24       **Q.  How did you decide how long to set the timer for?**
25       A.  Typically set it for a week mostly.

285

1   Q. Why one week?
2   A. I don't have a -- only guess is kind of
3   arbitrary.
4   Q. Would you always set it for one week, or would
5   you sometimes change the amount of time on the timer?
6   A. I pretty much always set it for one week. And
7   there are other people who may have sometimes set it for
8   different periods, but...
9   Q. When you first started using Signal in 2019, did
10  you receive technical guidance on how to use it?
11  A. I don't think so.
12  Q. You just downloaded it and started using it
13  yourself?
14  A. Yeah.
15  Q. How did you first hear about Signal?
16  A. It's a widely known messaging app.
17  Q. Have you received legal guidance on Signal?
18      MS. HUBBARD: You can answer that question "yes"
19  or "no."
20      THE WITNESS: Yes.
21  Q. (By Mr. Schwartz) When did you receive legal
22  guidance on Signal?
23  A. I don't know. Maybe -- I can't remember. A
24  year-ish ago maybe.
25  Q. Does July 2021 sound about right?

286

1       MS. HUBBARD: Objection to form.
2       THE WITNESS: I couldn't tell you.
3   Q. (By Mr. Schwartz) What about October 2020?
4   A. I can't be that precise for you.
5   Q. Did you ever receive a document preservation
6   notice related to this investigation?
7   A. Yes.
8   Q. When did you receive that?
9   A. I don't remember. It was some time ago.
10  Q. Last year, 2020?
11      MS. HUBBARD: Objection to form.
12      THE WITNESS: Perhaps.
13  Q. (By Mr. Schwartz) Okay. Who provided that
14  notice?
15  A. I don't remember for sure. Would have probably
16  been David Zapolsky or Andrew Devore.
17  Q. Who's Andrew Devore?
18  A. He's one of our lawyers.
19  Q. Is he senior?
20  A. Is he a senior lawyer?
21  Q. Is he a senior lawyer?
22  A. Yes.
23  Q. What was the format of that notice?
24  A. I think it was an e-mail.
25  Q. When you received the document preservation

287

1   notice, did you understand that you had an obligation to
2   preserve documents?
3   A. Yes.
4   Q. Were Signal messages a topic covered by the
5   document preservation notice?
6       MS. HUBBARD: Hang on for one second, Counsel. I
7   think that there is privileged legal guidance at stake
8   here, and so I think I'm going to have to instruct
9   Mr. Bezos not to answer. But I probably need a minute to
10  confer to see if we're into a privileged area.
11      MR. SCHWARTZ: Do you want to take that minute
12  right now?
13      MS. HUBBARD: Yeah, I think it would be
14  appropriate.
15      MR. SCHWARTZ: Okay. Why don't we go off the
16  record.
17      (Recess, 3:56 p.m. to 3:59 p.m.)
18      MS. HUBBARD: Counsel, thank you for the
19  opportunity to confer on attorney-client privilege.
20      The question that was just asked at the time of
21  the break would call for attorney-client privileged
22  information, and so I'm going to instruct Mr. Bezos not
23  to answer that specific question.
24  Q. (By Mr. Schwartz) Mr. Bezos, are you going to
25  follow your counsel's instruction?

288

1   A. Yes.
2   Q. Can we stipulate that if your counsel instructs
3   you not to answer, you're going to follow her
4   instruction?
5   A. I would expect to follow her instructions.
6   Q. Okay. So I'm not going to keep asking you that.
7   Okay?
8       MS. HUBBARD: Yeah, that's fine Counsel, yeah.
9       MR. SCHWARTZ: Okay.
10  Q. (By Mr. Schwartz) Did the document preservation
11  notice reference ephemeral messaging apps in any way?
12      MS. HUBBARD: Unfortunately, Counsel, I think the
13  way these questions are being framed, they're seeking
14  attorney-client-privilege-protected information. So I'm
15  going to have to instruct Mr. Bezos not to answer that
16  question the way it was framed.
17  Q. (By Mr. Schwartz) When do you recall first
18  receiving legal guidance relating to the topic of
19  ephemeral messaging apps?
20      MS. HUBBARD: So just as to the date, Mr. Bezos
21  can answer to the best of his recollection. I think you
22  already asked him that, but I'm not sure, so...
23      THE WITNESS: I think it was -- I think this is
24  the one I said about a year-ish ago.
25      MR. SCHWARTZ: Okay.

                                                                289
1      THE WITNESS:  But I'm not really -- I'm not
2  completely sure.
3      Q.  (By Mr. Schwartz)  When you received the document
4  preservation notice that we've been talking about before
5  the break, did you take any actions with respect to
6  Signal's disappearing messaging function as a result of
7  receiving that notice?
8      MS. HUBBARD:  Hang on one second.
9      I'm afraid it might be a backdoor way into what
10 the attorney privilege was.  And I think I need to
11 instruct Mr. Bezos not to answer that question, but there
12 could well be other questions that wouldn't try to
13 backdoor into privilege.  And I apologize, Counsel.  I
14 know it's a little hard to have respect for such in this
15 area, but it is an important doctrine.
16     Q.  (By Mr. Schwartz)  Let me try this a different
17 way since I'm running against privilege issues.
18         When did you stop turning off the disappear --
19 strike that.
20         When did you stop using the disappearing message
21 function on Signal?
22     MS. HUBBARD:  Entirely?
23     MR. SCHWARTZ:  Entirely.
24     MS. HUBBARD:  Okay.  You can answer that
25 question.

                                                                290
1      THE WITNESS:  I don't remember.  Several months
2  ago.
3      Q.  (By Mr. Schwartz)  Sometime in 2022?
4      A.  It could have even been 2021.  I really don't
5  remember.
6      Q.  Is it fair to say that you used the disappearing
7  messaging feature from sometime in 2019 through sometime
8  at least 2021?
9      MS. HUBBARD:  Objection to form.
10     THE WITNESS:  I'm not totally sure if it extended
11 into 2021, but it might have.  And -- but I was -- you
12 know, I was -- I was careful to limit my use of the
13 disappearing message feature.  I didn't use it for
14 everything.
15     Q.  (By Mr. Schwartz)  You used it for the topics you
16 told me about just a few minutes ago?
17     A.  Sensitive data topics, data security topics,
18 personnel.  And I would try to remember to turn it back
19 off again after those.  I may have made mistakes in that
20 regard from time to time.  But that was my intention, was
21 to turn it on for those topics and then turn it back off.
22     And I was also -- in addition, it was -- I never
23 would have used Signal under any circumstances with
24 disappearing messages on or off to discuss any
25 complicated business issues.  It just doesn't make sense.

                                                                291
1  It's just not a good practice.
2      Q.  Remember earlier today, we looked at an e-mail
3  from you that was just a question mark?
4      A.  (Witness nods head.)
5      Q.  Do you ever send one of those question marks
6  using Signal?
7      A.  I don't think so.
8      Q.  When you send just a question mark to your team,
9  your team understands that's a instruction from you to go
10 figure out the root source of the issue, right?
11     A.  I think they would interpret it -- it's a
12 long-standing practice.  Been doing it for so long.  I
13 think they interpret it kind of as a, "What's going on
14 here?"
15     Q.  It's fair to say that one question mark carries a
16 lot of weight to your team, right?
17     MS. HUBBARD:  Objection to form.
18     THE WITNESS:  I don't know.  I mean, it probably
19 depends on what they find.  In many cases, you know, they
20 go research the question mark and determine the customer
21 is just wrong.  They're misstating the facts or
22 misunderstanding something.  There's nothing to fix.
23     And other cases, you know, they go do a root
24 cause investigation and uncover something that's
25 generally applicable to a number of customers, and then

                                                                292
1  it -- you know, there would be -- in some cases, there
2  could even be a meeting that would end up taking place.
3  A six-page narrative might get written.  Like, it could
4  turn into something substantive, but --
5      Q.  (By Mr. Schwartz)  All from that one question
6  mark, right?
7      A.  It depends on the situation.  But if it did turn
8  into something substantive, there would be a memo
9  written, and we would meet about it.  It wouldn't be all
10 this, like, little, tiny text messages.
11     Q.  You're aware that -- well, strike that.
12         Are you aware that employees within Amazon have
13 an entire series of protocols about how to respond to a
14 question mark e-mail from you?
15     MS. HUBBARD:  Objection to form.
16     THE WITNESS:  I'm not really aware that there's
17 an entire series of protocols.  That sounds a little
18 dramatic to me.
19     MR. SCHWARTZ:  Well --
20     THE WITNESS:  But we do have a team called
21 executive customer relations, and their job is to make
22 sure that, you know, customer complaints that come to the
23 senior team -- myself included, but not just me -- get
24 handled well.  And I think that's important.  I think
25 those anecdotes are -- customer anecdotes can be very

293
1  valuable.
2      But if the implication is that this kind of short
3  message is super substantive, I don't agree with that.  I
4  think that it's the -- the work they do may be
5  substantive, but my question mark is not.
6      Q.  (By Mr. Schwartz)  How do you distinguish between
7  work that you view as substantive versus work that others
8  would view as substantive?
9          MS. HUBBARD:  Objection to form.
10         THE WITNESS:  I guess I would use my own
11 judgment.
12     Q.  (By Mr. Schwartz)  So you think those question
13 mark e-mails you send are substantive?
14     A.  The -- the question mark e-mail is not
15 substantive.
16     Q.  In your view?
17     A.  In my view, I wouldn't say that the question
18 mark, itself.  It's just literally, "What's going on
19 here?"
20         The reply could be substantive.  The reply might
21 take weeks to research.  Some of these question mark --
22 you know, the -- the customer complains, and I look at
23 it.  And I'm, like, That's weird.  Like, is that -- what
24 is going on here?
25         And, you know, every once in a while, you find,

294
1  hey, there really is something going on here.  And then
2  the response to that can become substantive.  The
3  question is not substantive.  That's just...
4      Q.  But we agree that something non-substantive from
5  you can turn into a substantive response?
6      A.  If you ask somebody, "What's going on here?"
7  depending on what they find, it could become substantive.
8  But then if that happened, it would be documented in a
9  six-page memo and, you know.
10     Q.  Do you recall ever sending even just a single-
11 character non-substantive message over Signal that
12 resulted in substantive work being performed?
13     A.  No.
14         MS. HUBBARD:  Objection to form.
15         THE WITNESS:  I don't recall that.
16     Q.  (By Mr. Schwartz)  You don't recall one way or
17 the other, right?
18     A.  I don't.  I just don't think so.
19     Q.  How do you know?
20         MS. HUBBARD:  Objection to form.
21         THE WITNESS:  I don't really use -- I don't get
22 customer -- I don't get customer complaints coming to my
23 Signal.  They come to my e-mail in-box.  So I don't even
24 know what my one-character thing would be.
25     Q.  (By Mr. Schwartz)  I'm going to introduce our

295
1  next exhibit, which is called PX1701.  This is a letter
2  to me from counsel for Amazon at Wilkinson Stekloff on
3  August 31st, 2022.
4      Mr. Bezos, have you seen this document before
5  today?
6      A.  I don't believe so.
7      Q.  Let me ask you to turn to Page 3 of the document.
8      Do you see there's a Table 1 listing document
9  preservation notice dates in the bottom half of Page 3 of
10 PX1701?
11     A.  Table 1.  "Custodian" and then "Document
12 Preservation Notice Dates."
13     Q.  And do you see your name in alphabetical order
14 here?
15     A.  I do.
16     Q.  Okay.  Next to it, it says April 13th, 2020, for
17 a document preservation notice date?
18     A.  I see that.
19     Q.  And you didn't stop using Signal until sometime
20 in 2021 -- strike that.
21     You didn't stop using Signal's disappearing
22 message feature until sometime in at least 2021, correct?
23         MS. HUBBARD:  Objection to form.
24         THE WITNESS:  I don't remember when, but it could
25 have been 2021.

296
1      Q.  (By Mr. Schwartz)  It could have been 2022,
2  right?
3      A.  Perhaps.
4      Q.  Let me ask you to turn to Page 10, please.
5      Do you see at the top of Page 10, the end of that
6  carryover paragraph, the last sentence reads, "Based on
7  custodians' responses to these questionnaires, as well as
8  subsequent diligence on particular custodians during the
9  collection period from summer 2020 and spring 2021,
10 Amazon determined which custodians may have used Signal
11 for work-related communications"?
12     Did I read that correctly?
13     A.  I'm sorry.  I'm trying to find out where you are,
14 but I don't see it.
15     Q.  The very top of Page 10, the last sentence of
16 that paragraph carrying over from Page 9.
17     A.  "Based on custodians'" --
18     Q.  Yes.
19     A.  -- "responses"?
20     Q.  Mm-hmm.
21     A.  Okay.
22     Q.  Do you recall responding to a custodian
23 questionnaire for this matter?
24     A.  I -- I don't recall it.
25     Q.  Do you recall providing additional information to

74 (Pages 293 to 296)

297

1  counsel in the summer of 2020 about your Signal usage?
2      MS. HUBBARD: I think, Counsel, we're back into
3  an area where we're bumping up on privilege.
4      Will you say the question again, please.
5      Q. (By Mr. Schwartz) Do you recall --
6      MR. SCHWARTZ: You know what? John, why don't
7  you just read my question back. I was happy with that
8  the first time.
9      (Pertinent portion of the record read by the
10  reporter.)
11     Q. (By Mr. Schwartz) Can you answer that "yes" or
12  "no"?
13     MS. HUBBARD: I think with the understanding that
14  it is a subject-matter question, you could answer "yes"
15  or "no" whether you recall providing -- what was the
16  question? -- information to counsel --
17     MR. SCHWARTZ: Mm-hmm.
18     MS. HUBBARD: In the summer of when?
19     MR. SCHWARTZ: 2020.
20     MS. HUBBARD: -- about Signal usage.
21     Do you recall that?
22     THE WITNESS: I don't remember.
23     Q. (By Mr. Schwartz) Okay. Staying on this same
24  page of PX1701, the next paragraph, the one that begins,
25  "After identifying."

298

1      Do you see that?
2      A. I do.
3      Q. And the very bottom of that paragraph, the
4  second-to-last sentence says, "Counsel also issued legal
5  guidance regarding Amazon's preservation obligations with
6  respect to secure messaging apps to Amazon's S-team,
7  including over a dozen investigation custodians, in
8  October 2020."
9      Did I read that correctly?
10     A. Yes.
11     Q. Were you one of the members of the S-team that
12  received this guidance in October 2020?
13     MS. HUBBARD: You can answer, if you remember.
14     THE WITNESS: I don't remember.
15     Q. (By Mr. Schwartz) And you continue to use
16  Signal's disappearing messing function until sometime in
17  2021 or 2022; is that correct?
18     MS. HUBBARD: Objection to form.
19     THE WITNESS: I used it in -- I don't know
20  exactly when I stopped using it. I used it, but I was --
21  I -- I tried very hard to be careful not to use it, to
22  preserve messages and only use disappearing messages on
23  things that were not, you know, responsive to these
24  document preservation requests.
25     Q. (By Mr. Schwartz) Okay. Let's turn to Page 11

299

1  of PX1701.
2      Do you see in the middle, there's a bullet that
3  says "Jeff Bezos" on Page 11?
4      A. I do.
5      Q. Okay. And the first sentence of this bullet on
6  Page 11 of PX1701 says, "In addition to Mr. Bezos being
7  issued the notice identified in response to
8  Specification 6 and additional guidance -- including the
9  October 2020 S-team guidance and additional guidance in
10  July 2021 -- counsel interviewed him in February 2022
11  concerning his Signal usage."
12     Did I read that correctly?
13     A. Yes.
14     Q. Does this refresh your recollection about whether
15  you received legal guidance in October 2020?
16     A. No.
17     Q. Do you have any reason to believe what's written
18  here is incorrect?
19     A. No.
20     Q. Does this refresh your recollection about any
21  legal guidance you got in July 2021?
22     A. No.
23     Q. Okay. Do you have any reason to believe what's
24  written here is incorrect?
25     A. No.

300

1      Q. Do you recall receiving legal guidance relating
2  to an app called Wickr in March 2022?
3      MS. HUBBARD: You can answer that question "yes"
4  or "no."
5      THE WITNESS: I mean, I know what Wickr is. But
6  to answer your question, no, I don't remember it.
7      Q. (By Mr. Schwartz) Okay. Let's look at our next
8  document, which is PX1825.
9      Okay. So introducing PX1825, a document titled
10  "Legal Hold FAQ" that was produced to the FTC by Amazon
11  without a Bates number on October 6th, 2022.
12     Mr. Bezos, have you seen this document before
13  today?
14     A. Not that I recall.
15     Q. You have no recollection reading this document
16  before sitting here today.
17     Is that your testimony?
18     MS. HUBBARD: Objection to form.
19     THE WITNESS: I don't remember it. It's
20  possible.
21     Q. (By Mr. Schwartz) Do you ever recall being told
22  by a lawyer to review the legal hold FAQ?
23     MS. HUBBARD: Will you say that question again
24  one more time, Counsel.
25     Q. (By Mr. Schwartz) Do you ever recall being told

75 (Pages 297 to 300)

```
                                                301                                                      303
 1   by a lawyer to read the legal hold FAQ?            1      Q. Would you have access to that wiki within Amazon?
 2         MS. HUBBARD: I think that is privileged, but 2         MS. HUBBARD: Objection to form.
 3   there might be a different way you could ask it.   3         THE WITNESS: I -- probably. I don't know.
 4         So I'll instruct him not to answer that      4      Q. (By Mr. Schwartz) You just don't know one way or
 5   particular question.                               5   the other?
 6      Q. (By Mr. Schwartz) Okay. Do you see here, it  6      A. I just don't know one way or another.
 7   says on the top, "If you are under a legal hold" -- 7     Q. We were talking a minute ago about this hyperlink
 8   strike that -- "if you are under legal hold, you would 8 says "follow these steps." Let's take a look at that
 9   have received an e-mail titled 'Document Preservation 9 now.
10   Notice'"?                                         10         My colleague is going to hand you what's been
11      A. I do see that.                              11   marked as 1826. It's a document titled "Privileged &
12      Q. Did you receive an e-mail titled "Document  12   Confidential, How turn off disappearing messages on
13   Preservation Notice"?                             13   Signal" that was produced to the FTC by Amazon on October
14      A. I remember learning about the document      14   6, 2022, without a Bates number.
15   preservation notice, yes. I don't really remember if it 15        Mr. Bezos, have you seen this document before
16   was e-mail, but it might have been.               16   today?
17      Q. Do you recall e-mail ever instructing you to 17         MS. HUBBARD: You can answer that "yes" or "no."
18   review this if you needed additional information? 18         THE WITNESS: No, not that I recall.
19      A. I don't recall that, but it's possible.     19      Q. (By Mr. Schwartz) You're testifying to the best
20      Q. Okay. Do you see in the middle of this page, 20  of your ability today, right?
21   there's some unredacted text that says, "If you use 21     A. Yes.
22   Signal, follow these steps to turn off disappearing 22    Q. So you're trying to recall whether or not you've
23   messages"?                                        23   seen this document before, right?
24      A. I do see that.                              24      A. Yes.
25      Q. And that's under the section "What about Slack, 25  Q. And you -- despite your trying, you can't tell me

                                                302                                                      304
 1   Chime, and other software?" right?                 1   whether you've seen it?
 2      A. Yes, I see that too.                         2      A. I don't remember seeing this document.
 3      Q. You see the text "follow these steps" contains a 3  Q. Is it possible you've never seen this document
 4   hyperlink?                                         4   before?
 5      A. I do see that.                               5      A. It's possible.
 6      Q. Have you ever clicked that hyperlink?        6      Q. Does it feel brand-new to you as you're sitting
 7      A. Not that I recall.                           7   here today?
 8      Q. I'm sorry.                                   8         MS. HUBBARD: Objection to form.
 9         At the very top, do you see how it says "Legal 9        THE WITNESS: I don't -- I don't think I can
10   Hold FAQ (LitigationRegulatory.HoldFAQ.WebHome) - XWiki"? 10 answer that. I don't -- I am doing my best to answer
11      A. Sorry. Where are you?                       11   your questions, and what I can tell you is I don't recall
12      Q. The very top. The tiny, little header right at 12 seeing this document. And I see a lot of documents, and
13   the top of the page.                              13   I'm not sure if I've seen this or not.
14      A. Oh. Okay.                                   14      Q. (By Mr. Schwartz) Do you understand that PX1826
15      Q. Do you see that?                            15   is the document that the hyperlink we looked at in PX1825
16      A. Yeah.                                       16   links to?
17      Q. What does that mean to you?                 17      A. I mean, I -- that's what you're saying. I have
18      A. Looks like it's a wiki page.                18   no reason to doubt you.
19      Q. Is that from an internal Amazon regulatory wiki? 19  Q. That's what's been represented to me.
20      A. I don't know.                               20      A. Okay.
21      Q. Does Amazon have an internal regulatory wiki? 21    Q. So I can represent that to you.
22      A. I'm not sure.                               22      A. Okay.
23      Q. Do you recall ever reviewing a regulatory wiki 23   Q. Does PX1826 contain instructions on how to turn
24   within Amazon?                                    24   off disappearing messages in Signal?
25      A. I don't recall it.                          25      A. It looks that way.
```

76 (Pages 301 to 304)

---

**305**

1  Q. Have you followed the steps in PX1826?
2  A. I know how to turn off disappearing messages on
3  Signal. So I don't know if I followed these steps,
4  but --
5  Q. When did you first learn how to turn off
6  disappearing messages on Signal?
7  A. It's not very hard.
8  Q. So almost as soon as you downloaded the app?
9  A. I mean, I don't -- "I don't remember" is the
10 answer to your question. It's not like this is the kind
11 of thing that needs a giant user manual.
12 Q. Let's look at our next exhibit, PX1828. It's a
13 March 2nd, 2022, e-mail from David Zapolsky to a number
14 of recipients, including Jeff Bezos, with the subject
15 line "Wickr Instructions: Privileged and Confidential."
16    I'll represent that this was produced to us by
17 Amazon without a Bates number on October 6, 2022.
18    Mr. Bezos, do you recall seeing this document
19 before?
20    MS. HUBBARD: Counsel, you know, when you do
21 that -- and I'm not trying to get in your way -- you
22 know, you're usually asking, like, a second after the
23 document comes in front of him. You might just want to
24 give him a second to look at it.
25    MR. SCHWARTZ: Take all the time you need,

**306**

1  Mr. Bezos.
2    THE WITNESS: (Peruses document.)
3    I vaguely recall this, and I -- at some point, I
4  did install Wickr onto my phone. I don't know if it was
5  directly as a result of this. But I either saw this or
6  something similar to it at some point. And -- and I knew
7  that the team had been working on getting Wickr installed
8  for some time. There'd been some delays for some reason,
9  and I don't really understand.
10 Q. (By Mr. Schwartz) Is it your testimony that
11 around the time you were sent this e-mail, March 2nd,
12 2022, you started using Wickr?
13 A. I remember installing Wickr, you know, sometime.
14 It could have been in that time frame. I don't really
15 know exactly when it was. And I remember the first time
16 I installed it, it did not work. And I inquired with my
17 executive assistant, and eventually not too much time
18 passed, was finally made to work.
19 Q. When you received this e-mail, did you stop using
20 Signal to discuss Amazon business?
21    MS. HUBBARD: Objection to form.
22    THE WITNESS: I believe so. Maybe with some
23 limited exceptions and with disappearing messages turned
24 off.
25 Q. (By Mr. Schwartz) Did this e-mail cause you to

**307**

1  turn disappearing messages off?
2    MS. HUBBARD: Objection to form.
3    THE WITNESS: No. But I believe that had already
4  happened. But, again, the timeline is not clear in my
5  head.
6  Q. (By Mr. Schwartz) And to be clear, there's no
7  non-privileged reason you can give me as to why you
8  stopped using the disappearing message feature, correct?
9  A. Correct.
10 Q. Mr. Bezos, when was the first time you became
11 aware of this investigation for which you're sitting for
12 an IH today?
13 A. I -- I don't know.
14 Q. Do you know how you became aware of this
15 investigation?
16 A. I have a vague recollection that one of our --
17 one of our lawyers told me.
18    MS. HUBBARD: So obviously counsel's not going to
19 ask you further what you were told.
20    MR. SCHWARTZ: Well, no.
21    But I will ask:
22 Q. (By Mr. Schwartz) Do you recall when that
23 happened?
24 A. I don't.
25 Q. Let's look at our next exhibit. It's Document PX

**308**

1  No. 2079. It's a June 17th, 2019, letter from Stephen
2  Antonio to Andrew Devore, re: Amazon.com, Inc., FTC File
3  No. 191-029 -- strike that -- 0129. Excuse me.
4    Mr. Bezos, have you ever seen this document
5  before?
6    MS. HUBBARD: And, again, if you could just give
7  him a second to look at it.
8    MR. SCHWARTZ: Sure. Take all the time you need.
9    THE WITNESS: (Peruses document.)
10   Okay.
11 Q. (By Mr. Schwartz) Have you ever seen this
12 document before today?
13 A. Not that I recall. But it's possible.
14 Q. Possible.
15   How did you receive this document before today,
16 if you recall?
17 A. I don't recall.
18 Q. Okay.
19 A. I'm not sure I did -- I'm not sure I have seen
20 it.
21 Q. Okay. Looking at the first page of PX2079, in
22 the second paragraph, the second sentence reads,
23 "Accordingly, we ask that the company immediately take
24 the necessary measures to preserve all documents and
25 information and cease all document destruction activities

Page 309

1   with respect to matters that may be of relevance to this
2   investigation."
3       Did I read that correctly?
4       A. Yes.
5       Q. At the very bottom of Page 1 of PX2079, this
6   letter continues, "This also specifically extends to
7   computer files; electronic correspondence (including
8   instant messaging); and all other written, recorded, and
9   graphic material of every kind."
10      Did I read that correctly?
11      A. I think so.
12      Q. Have you seen this language before today?
13      A. I don't know if I've seen this language. You
14  know, I'm familiar with document preservation.
15      Q. We talked before about how you received your
16  document preservation notice on April 13th, 2020?
17      MS. HUBBARD: You're just referring to the
18  document you showed him?
19      MR. SCHWARTZ: No. We talked about the document
20  preservation notice a few minutes --
21      MS. HUBBARD: Yeah, but I think you just inserted
22  a date in that question, and I'm not sure that he
23  testified to the date.
24      Q. (By Mr. Schwartz) Let's pull out PX1701, the
25  big, thick doc. And let's look at Table -- Page 3, Table

Page 310

1   1, like we were before.
2       A. Mm-hmm.
3       Q. Do you see your name in Table 1?
4       A. I do.
5       Q. Do you see how it says document preservation
6   notice dates for you, April 13th, 2020?
7       A. I do.
8       Q. Okay. So you got a document preservation notice
9   on April 13th, 2020, correct?
10      MS. HUBBARD: Well, objection to form.
11      THE WITNESS: I -- I can't confirm that for you.
12  I have no reason to doubt it.
13      Q. (By Mr. Schwartz) Okay. Let's assume what's
14  written here by your lawyers is accurate. Let's go back
15  to PX2079 for a moment.
16      You see how PX2079 is dated June 17th, 2019?
17      A. Yes.
18      Q. Do you know why you didn't get a document
19  preservation notice until April 13th, 2020?
20      MS. HUBBARD: Objection to form.
21      THE WITNESS: No.
22      Q. (By Mr. Schwartz) Have you ever asked?
23      MS. HUBBARD: Objection to form.
24      THE WITNESS: I don't think so.
25      Q. (By Mr. Schwartz) We talked a little bit ago

Page 311

1   about a custodian questionnaire that I believe you said
2   you did recall responding to.
3       Is that right?
4       A. I don't -- yes, it's correct I don't recall it.
5       Q. Okay. Do you recall whether the topics on that
6   questionnaire included ephemeral messaging apps?
7       MS. HUBBARD: I think I may have to confer on
8   privilege again.
9       Yeah, Counsel, the question as just phrased
10  called for attorney-client protected information.
11      So, Mr. Bezos, I will instruct you not to answer
12  that particular question.
13      Q. (By Mr. Schwartz) Have you told counsel that you
14  used Signal with the disappearing messaging feature?
15      MS. HUBBARD: So, unfortunately, you're asking
16  him about a communication with counsel, so I have to
17  instruct him not to answer that question.
18      Q. (By Mr. Schwartz) Is there anything non-
19  privileged you can tell me about when you told counsel
20  that you're using Signal with a disappearing messaging
21  feature?
22      MS. HUBBARD: Again, I think -- let me see if I
23  can help a little bit.
24      I think if you generalized to the subject matter
25  of Signal generally, Mr. Bezos could answer the question

Page 312

1   does he recall the dates. Any conversations with counsel
2   on the subject matter of Signal, that --
3       MR. SCHWARTZ: That wasn't my question, but
4   actually I want to hear the answer to that question,
5   so --
6       MS. HUBBARD: I know it wasn't, Counsel. I was
7   trying to help on the attorney-client privilege issue.
8       MR. SCHWARTZ: Sure.
9       Q. (By Mr. Schwartz) What's the answer to your
10  counsel's question?
11      A. Could you ask me the question again? I'm not
12  sure I tracked it.
13      MS. HUBBARD: It's whether you recall the dates
14  when you had any conversations. If you did have any
15  conversations with Counsel on the subject matter of
16  Signal, if you recall those dates. I think dates,
17  themselves, and general subject matter, itself, would not
18  be privileged.
19      THE WITNESS: I -- I don't recall the dates.
20      Q. (By Mr. Schwartz) Okay. Signal messages from
21  your phone were eventually collected, right?
22      MS. HUBBARD: Yes or no: Were Signal messages
23  from his phone collected?
24      You can answer that question, Jeff.
25      THE WITNESS: Yes.

78 (Pages 309 to 312)

313

1   Q. (By Mr. Schwartz) When did that happen?
2   A. I think it happened a couple -- I think it
3   happened more than once, but I can't remember the dates.
4   Q. Does January 7th and May 14th, 2022, sound about
5   right?
6   A. Let's see. January 7th and May -- it could be.
7   I don't know.
8   Q. How were those messages collected from your
9   phone?
10  A. I sat with counsel, and we exhaustively went
11  through my phone, message by message.
12  Q. And when you say "exhaustively went through my
13  phone, message by message," you mean you opened up Signal
14  on your phone and you scrolled through each thread?
15  A. Yes. Not just Signal. Also text messages.
16  Q. While this happened, your phone was connected to
17  a laptop, right?
18  A. Yes. Basically, it was a laptop that was
19  recording kind of the video from my phone.
20  Q. You said there were lawyers in the room with you
21  when that happened?
22  A. Correct.
23  Q. Which lawyers?
24  A. Andrew Devore was there.
25  Q. Anyone in this room today was there with you?

314

1   A. I -- I don't think so. I'm not sure, actually.
2   Q. What about someone from a company called
3   Consilio?
4   A. There was -- there was a technical person there
5   to help, but I'm not sure I know -- I'm not sure I know
6   what company they're with or what their name was.
7   Q. When you were scrolling through the Signal
8   messages on your phone, did you control the screen?
9       MS. HUBBARD: Objection to form.
10      THE WITNESS: I controlled the screen with, like,
11  people hovering over me.
12  Q. (By Mr. Schwartz) Did Amazon collect every
13  Signal message on your phone?
14  A. They collected every Amazon-related message on my
15  phone. They did not collect every message with my
16  children or my partner, who I -- you know, parents and so
17  on.
18  Q. How did you decide when a message was
19  Amazon-related?
20      MS. HUBBARD: Objection to form.
21      THE WITNESS: They decided.
22  Q. (By Mr. Schwartz) You didn't decide?
23  A. I did not decide.
24  Q. Do you know what they were -- what metric they
25  were using to decide whether something was Amazon-

315

1   related?
2       MS. HUBBARD: You can only answer that question
3   if you can do so without revealing conversation with
4   counsel.
5       THE WITNESS: I don't think I can answer that.
6   Q. (By Mr. Schwartz) Okay. Thinking about before
7   the first time your Signal messages were collected, at
8   any time before that did you ever make a copy of Signal
9   messages on your phone?
10  A. No, I don't think so.
11  Q. Did you ever take a screenshot of any Signal
12  messages?
13  A. I don't think so. Not of an Amazon message
14  anyway.
15  Q. Did you ever check your photos to see if there
16  was a screenshot of an Amazon message?
17      MS. HUBBARD: Objection to form.
18      THE WITNESS: I don't know if I've done that.
19  It's not my practice to take screenshots of these
20  messages. So I wouldn't -- is it possible it's happened
21  when I wanted to forward one to somebody or something?
22  Maybe. But I don't recall that.
23  Q. (By Mr. Schwartz) It's possible, though?
24      MS. HUBBARD: Objection to form.
25      THE WITNESS: I -- I guess it's -- I think

316

1   it's -- I don't think that ever happened, but I can't
2   rule it out completely.
3   Q. (By Mr. Schwartz) Did you ever copy the text of
4   any of your Signal messages and then paste that text
5   somewhere else?
6   A. Like, into an e-mail or something?
7   Q. Sure.
8   A. Maybe. I don't recall doing that either.
9   Q. Are you personally aware of anyone you
10  communicated with on Signal making a copy of your Signal
11  messages?
12  A. No. I know it happens and people do, do that.
13  But I'm not aware of it.
14  Q. Let's look at our next exhibit, which is PX2078.
15  It's an October 11th, 2022, document titled "Signal Log
16  with DM Feature Information."
17      And I'll represent for the record that this
18  document was produced to the FTC by Amazon on October
19  11th, 2022.
20      This is a long document. But I'm only going to
21  ask you about a couple paragraphs. Let me ask you just
22  to quickly give it a skim.
23  A. (Witness peruses document.)
24      What are the bold ones?
25  Q. That's a good question. I believe the bold ones

79 (Pages 313 to 316)

317

1  are the ones that were produced to the FTC.
2      A. (Witness peruses document.)
3      Okay.
4      Q. Mr. Bezos, have you seen this document before?
5      A. I think counsel might have showed me this
6  document.
7      Q. Okay.
8          MS. HUBBARD: And counsel's not asking any kind
9  of work-product-protected questions about what we may
10 have. So when you -- he's not --
11         MR. SCHWARTZ: Just trying to establish
12 familiarity.
13         MS. HUBBARD: Yeah. Maybe, Counsel, you could
14 ask him if he has seen it, yes or no -- why don't you ask
15 him when, if he saw it when, and that would help us know
16 if it was in a work-product-protected context.
17     Q. (By Mr. Schwartz) When did you see this
18 document?
19     A. Very recently.
20     Q. Okay. I won't ask anything further.
21         Do you understand this document to be a log of
22 Signal messages that were used with the disappearing
23 message feature activated at some point during the
24 conversation?
25         MS. HUBBARD: Objection to form.

318

1          THE WITNESS: I'm sorry. Could you say that one
2  more time?
3      Q. (By Mr. Schwartz) Do you understand this to be a
4  log of Signal messages that were used with the
5  disappearing message feature activated at some point
6  during the conversation?
7      A. No, I don't. I don't know that.
8      Q. Okay. Please turn to Page 4 of --
9      A. Okay.
10     Q. -- PX2078.
11         Do you see a list of bullets on this page?
12     A. Yes.
13     Q. The third main bullet from the top describes a
14 Signal thread between yourself and Andy Jassy between
15 October 7th, 2019, and March 9th, 2022, correct?
16     A. Yes.
17     Q. Who is Andy Jassy?
18     A. He's the current CEO of Amazon.
19     Q. When did he become the CEO of Amazon?
20     A. When was that? 18 months ago? Is that right?
21 Do I have the year wrong?
22     Q. 18 months ago?
23     A. Approximately.
24     Q. Okay. That would fall within the range of the
25 dates covered by this bullet, right?

319

1      A. Would it? I guess, within the range, yeah.
2  'Cause it goes to March 9th.
3      Q. Do you see how this bullet lists the topics that
4  were allegedly discussed in this Signal thread?
5      A. Scheduling, security.
6      Q. Right.
7      A. I'm just reading. Is that what you're --
8      Q. Yeah. I'm just asking --
9      A. COVID-19.
10     Q. You don't need to read them all.
11     A. Okay.
12     Q. Let me ask you. The very last topic is personnel
13 issues.
14         Do you see that?
15     A. Mm-hmm.
16     Q. Would Andy Jassy's promotion to CEO be a
17 personnel issue?
18         MS. HUBBARD: Objection to form.
19         THE WITNESS: Well, I -- I guess. It's not
20 really what I have in mind when I think of sensitive
21 personnel issues.
22     Q. (By Mr. Schwartz) Who's going become the next
23 CEO of Amazon is not a sensitive personnel issue?
24     A. I mean, not if I'm talking to him about it. I'm
25 not...

320

1      Q. Okay. All right. Fair enough.
2          Did you talk to him about him becoming the CEO of
3  Amazon in this Signal thread?
4          MS. HUBBARD: I'm sorry. You're asking if this
5  Signal thread is about Andy becoming the CEO?
6          MR. SCHWARTZ: Mm-hmm.
7          THE WITNESS: I talked to Andy about that on the
8  phone. You know, I called -- if you're referring to the
9  very first time I approached the idea with him, it was by
10 phone, not by Signal.
11     Q. (By Mr. Schwartz) After that first phone call,
12 did you have additional conversations over Signal?
13     A. "Conversation" would be way too strong. I
14 don't -- I don't think so. This is -- these kinds of
15 matters are best handled -- it would be best handled in
16 person. And the pandemic was probably interfering with
17 some of the in-person conversations, so it probably
18 happened mostly by phone.
19     Q. The first topic here is relating to scheduling.
20         Do you see that?
21     A. I do.
22     Q. Remember we were talking about some OP1 S-team
23 meetings earlier, and you told me you couldn't recall
24 whether or not you attended those?
25         MS. HUBBARD: Objection to form.

80 (Pages 317 to 320)

|  | 321 |
|---|---|
| 1 | THE WITNESS: I -- I recall that, yes. |
| 2 | Q. (By Mr. Schwartz) Would you have said over |
| 3 | Signal something like, "I'm coming to this meeting"? |
| 4 | MS. HUBBARD: Objection to form. |
| 5 | THE WITNESS: Maybe. I doubt it. |
| 6 | Q. (By Mr. Schwartz) Did you ever use Signal to let |
| 7 | other members of the S-team know whether or not you would |
| 8 | be attending a meeting? |
| 9 | A. Maybe. I mean, it'd be so casual. It'd be like |
| 10 | using a text message, "I'm going to be late," or, "I'm |
| 11 | going to" -- you know, "I can't make it after all," or |
| 12 | something like that. I don't know. |
| 13 | Q. Okay. The log states that on February 25th, |
| 14 | 2020, Mr. Jassy disabled the disappearing message |
| 15 | feature. |
| 16 | Do you see that? |
| 17 | A. I'm sorry. Where is this? |
| 18 | Q. This is -- yeah. Sorry. |
| 19 | This is in the sub-bullet below the third main |
| 20 | bullet down. The one that begins "DM settings before |
| 21 | collections were as follows," and then the second entry |
| 22 | says, "disabled on February 25th, 2020 (Jassy)." |
| 23 | Do you see that? |
| 24 | A. I do. |
| 25 | Q. Okay. Then on -- the next entry says, on March |

|  | 322 |
|---|---|
| 1 | 29th, 2020, you turned the disappearing messaging feature |
| 2 | back on with a one-week timer, right? |
| 3 | A. Where -- |
| 4 | MS. HUBBARD: I'm sorry. Where are you, Counsel? |
| 5 | THE WITNESS: Where are you seeing this? |
| 6 | MR. SCHWARTZ: I'm on the next entry, the second |
| 7 | line down. Right after "Jassy," it says "Jassy; one week |
| 8 | on March 29th, 2020 (Bezos)." |
| 9 | I'll just state for the record, the fact that |
| 10 | Mr. Bezos and you are both having difficulty tracking |
| 11 | this is reflective of how difficult this is to |
| 12 | understand. |
| 13 | MS. HUBBARD: Counsel, I'm sorry you're having a |
| 14 | hard time. But the fact that you're having a hard time |
| 15 | is not -- you know, look -- |
| 16 | MR. SCHWARTZ: I'm not having a hard time. |
| 17 | MS. HUBBARD: -- if you have an issue, I think |
| 18 | it's probably not a great use of the 15 minutes you have |
| 19 | left to complain about it on the record, but it's |
| 20 | entirely your choice. You've got 15 minutes left. |
| 21 | Q. (By Mr. Schwartz) Mr. Bezos, do you see that |
| 22 | where it says you turned it back on with a one-week timer |
| 23 | on March 29th, 2020? |
| 24 | A. I do. |
| 25 | Q. What caused you to turn the disappearing message |

|  | 323 |
|---|---|
| 1 | feature back on, on March 29th, 2020? |
| 2 | A. I -- I don't remember. It was probably one of |
| 3 | these things like data security or sensitive personnel |
| 4 | issue or something like that. |
| 5 | Q. Okay. This same entry on Page 4 of PX2078 says |
| 6 | on April 7th, 2020, Mr. Jassy changed the disappearing |
| 7 | message timer to 30 minutes and then to five minutes. |
| 8 | Do you see that? |
| 9 | A. I do. |
| 10 | Q. What do you recall that happened that would cause |
| 11 | him to change a timer like that? |
| 12 | A. I -- |
| 13 | MS. HUBBARD: Objection to form. |
| 14 | THE WITNESS: Sorry. I -- I don't -- I don't |
| 15 | remember. Could have been a data security issue. |
| 16 | Q. (By Mr. Schwartz) The last line in this entry |
| 17 | says that you disabled the disappearing messages on |
| 18 | February 25th, 2022, correct? |
| 19 | A. Yes. |
| 20 | Q. Why did you disable disappearing messages on |
| 21 | February 25th, 2022? |
| 22 | A. I don't remember. |
| 23 | Q. Looking back at the main bullet of this thread |
| 24 | that we've been reviewing, the log says that this thread |
| 25 | between you and Mr. Jassy goes until March 9th, 2022, |

|  | 324 |
|---|---|
| 1 | correct? |
| 2 | A. Yes. |
| 3 | Q. Did you communicate with Mr. Jassy on Signal |
| 4 | after March 9th, 2022? |
| 5 | A. I don't -- I don't know. |
| 6 | Q. Staying on Page 4 of PX2078, looking now at the |
| 7 | third main bullet from the bottom, describing a Signal |
| 8 | thread between yourself, Mr. Jassy, and David Zapolsky |
| 9 | between October 29, 2019, and January 6, 2022. |
| 10 | Do you see that? |
| 11 | A. I do. |
| 12 | Q. And comprising four screenshots titled "Jedi |
| 13 | Privileged and Confidential," right? |
| 14 | A. I see that. |
| 15 | Q. This says the DM settings before collections were |
| 16 | as followed: One week on October 19th, 2019. |
| 17 | A. Okay. |
| 18 | Q. Do you see that? |
| 19 | A. I do. |
| 20 | Q. This entry does not say whether the disappearing |
| 21 | messages feature was ever turned off, right? |
| 22 | A. I don't -- it doesn't seem to. |
| 23 | Q. So is that accurate that the disappearing message |
| 24 | feature was never turned off? |
| 25 | MS. HUBBARD: Objection to form. |

81 (Pages 321 to 324)

Page 325

1    THE WITNESS:  I don't think so.  Because I went
2    through and turned it off everywhere.  So unless I missed
3    one somehow, I turned it off.  And I did that -- well, I
4    don't know if I can say that.
5        Q.  (By Mr. Schwartz)  "Jedi" here refers to a
6    project relating to processing returned packages at
7    fulfillment centers, right?
8        MS. HUBBARD:  Objection to form.
9        THE WITNESS:  Say that again.
10       Q.  (By Mr. Schwartz)  "Jedi" here refers to a
11   project relating to processing return packages at
12   fulfillment centers, right?
13       A.  No.
14       Q.  No.  What does "Jedi" refer to here?
15       MS. HUBBARD:  No, let me -- because this is
16   labeled "privileged and confidential" --
17       THE WITNESS:  Oh.
18       MS. HUBBARD:  -- let me just caution you,
19   Mr. Bezos, that if in order to answer counsel's question
20   you would have to reveal attorney-client communication,
21   you shouldn't reveal the attorney-client communication.
22   If you can answer his question without --
23       THE WITNESS:  I think I can answer it without.
24       MS. HUBBARD:  Okay.  Go ahead.
25       THE WITNESS:  Jedi is the AWS DOD contract.

Page 326

1        Q.  (By Mr. Schwartz)  That's what you use Signal to
2    communicate about?
3        A.  I don't know -- I have no idea know what we're
4    talking about.  It could have been, you know -- there was
5    a dispute with Microsoft Azure and AWS and the Department
6    of Defense and Donald Trump putting his thumb on the
7    scale, and it was a -- you know, this could have been a
8    very simple, you know, PR thing, but a sensitive one
9    perhaps.  I don't know.
10       Q.  You mentioned before that you used Signal to talk
11   about data security issues, right?
12       A.  Yes.
13       Q.  What's an example of a data security issue you
14   talk about?
15       A.  You know, there are attempts -- as there are with
16   all companies, there are attempts to -- by hackers to,
17   you know, do cyber attacks on our systems, now service
18   attacks, attacks on AWS customers.  And so, you know, and
19   we have a very talented, hardworking, high-IQ team of
20   people who put huge amounts of efforts into protecting
21   all of that.  And, you know, so sometimes we discuss
22   those attempts and how they were countered.  And that's
23   obviously something you don't want the bad guys to get
24   ahold of.
25       MR. SCHWARTZ:  All right.  Could we go off the

Page 327

1    record for just a minute?
2        (Recess, 4:51 p.m. to 4:54 p.m.)
3        Q.  (By Mr. Schwartz)  Just a couple final questions,
4    Mr. Bezos.
5        We've talked a little bit this last hour about
6    how you were using the disappearing messaging feature on
7    Signal from 2019, 2020, and sometime into 2021 or 2022,
8    correct?
9        MS. HUBBARD:  Objection to form;
10   characterization.
11       THE WITNESS:  Yeah, I mean, when I -- I don't
12   know the exact dates.  But, yes, we've talked about that
13   general topic.
14       Q.  (By Mr. Schwartz)  We also talked about how you
15   received guidance from counsel in April 2020, October
16   2020, and July 2021, correct?
17       MS. HUBBARD:  Objection to form.
18       I think the record will be what the record is on
19   what Mr. Bezos remembered and what was reflected in
20   documents.
21       MR. SCHWARTZ:  Just trying to orient you about
22   our previous discussion.
23       THE WITNESS:  We talked about this general topic.
24   And, you know, I don't think I could confirm you the
25   dates.

Page 328

1        Q.  (By Mr. Schwartz)  Did you ignore advice from
2    legal counsel about --
3        A.  Would you say that again?
4        Q.  Did you ignore advice from legal counsel about
5    turning off disappearing messages on Signal?
6        A.  No.  I wouldn't -- I would not have done that.
7        Q.  Are you someone who follows advice of counsel?
8        A.  Yeah.  I'm human.  I can make a mistake.  But I'm
9    definitely -- my goal would be to follow the advice of
10   counsel.
11       Q.  If counsel had told you to stop using Signal
12   messages, would you --- Signal's disappearing messaging
13   feature, would you have followed that advice?
14       MS. HUBBARD:  I'm going to object to the
15   question, which I think may incorporate some
16   misunderstanding about prior testimony.  So I will object
17   to the form of the question.
18       MR. SCHWARTZ:  You can answer.
19       THE WITNESS:  I would follow the advice as I
20   understood it.  And if I didn't understand it, I'd
21   probably ask questions.  If I misunderstood it at some
22   point, eventually get -- eventually I would understand
23   it, and I would do it differently.  But my practice would
24   be -- when it comes to legal matters, my practice is to
25   have smart counsel and to listen to them.