# EXHIBIT O

# In the Matter of:

# Amazon eCommerce

*October 7, 2022*
*Robert Stangler*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

```
                                      1
 1              FEDERAL TRADE COMMISSION
 2
 3   In the Matter of:          )
 4   AMAZON eCOMMERCE,          ) File No. 191-0129
 5            a corporation. )
 6   ------------------------------)
 7                      Friday, October 7, 2022
 8
 9                      Room 8103
10                      Federal Trade Commission
11                      Constitution Center
12                      400 7th Street, S.W.
13                      Washington, D.C.  20024
14
15         The above-entitled matter came on for
16   investigational hearing, pursuant to subpoena, at
17   9:29 a.m.
18
19
20
21
22
23
24
25
```

```
                                      2
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4        SUSAN MUSSER, ESQ.
 5        EMILY BOLLES, ESQ.
 6        KELLY FABIAN, ESQ. (via phone)
 7        U.S. Federal Trade Commission
 8        Bureau of Competition
 9        Constitution Center
10        400 7th Street, S.W.
11        Washington, D.C.  20024
12        (202) 326-2122
13        smusser@ftc.gov
14
15   ON BEHALF OF THE STATE OF IOWA:
16        BRYCE PASHLER, ESQ. (via phone)
17        Iowa Department of Justice
18        Office of the Attorney General
19        Consumer Protection Division
20        1305 E. Walnut Street - 2nd Floor
21        Des Moines, Iowa  50319
22        (515) 281-5926
23        Bryce.Pashler@ag.iowa.gov
24
25
```

```
                                      3
 1   APPEARANCES: (continued)
 2
 3   ON BEHALF OF AMAZON.COM, INC. AND THE WITNESS:
 4        KOSTA STOJILKOVIC, ESQ.
 5        ANTHONY P. FERRARA, ESQ.
 6        BETH WILKINSON, ESQ. (via realtime)
 7        Wilkinson Stekloff
 8        2001 M Street, N.W.
 9        Washington, D.C.  20036
10        (202) 847-4045
11        kstojilkovic@wilkinsonstekloff.com
12             -and-
13        RALIA POLECHRONIS, ESQ.
14        Wilkinson Stekloff
15        130 West 42nd Street
16        24th Floor
17        New York, New York  10036
18        (212) 294-8922
19        rpolechronis@wilkinsonstekloff.com
20
21
22
23
24
25
```

```
                                      4
 1   APPEARANCES: (continued)
 2
 3   ON BEHALF OF AMAZON.COM, INC. AND THE WITNESS:
 4        MARIE HANEWINCKEL, ESQ.
 5        ADDISON THOMPSON, ESQ. (via realtime)
 6        SUMNER TRUAX, ESQ. (via realtime)
 7        Covington & Burling LLP
 8        One CityCenter
 9        850 Tenth Street, N.W.
10        Washington, D.C.  20001-4956
11        (202) 662-5174
12        mhanewinckel@cov.com
13        (202) 662-5709
14
15
16   ALSO PRESENT:
17        SCOTT FITZGERALD, ESQ. - Amazon
18        ALEXIS COLLINS, ESQ. - Amazon (via realtime)
19        CAELAN DICK, Paralegal - FTC
20
21
22
23
24
25
```

                                          FEDERAL TRADE COMMISSION
INDEX

| WITNESS: | EXAMINATION: | PAGE |
|---|---|---|
| ROBERT STANGLER | BY MS. MUSSER | 6 |

EXHIBITS MARKED

| PX | DESCRIPTION | FOR ID |
|---|---|---|
| Number 9006 | 10-4-2022 letter to David Schwartz from Beth Wilkinson | 194 |

PREMARKED EXHIBITS REFERENCED

| PX | PAGE |
|---|---|
| Number 1689 | 26 |
| Number 1693 | 200 |
| Number 1701 | 58 |
| Number 1703 | 62 |
| Number 1706 | 9 |
| Number 1825 | 185 |
| Number 1826 | 44 |
| Number 1828 | 84 |
| Number 9005 | 60 |

P R O C E E D I N G S
\- - - - -
Whereupon --
ROBERT STANGLER
a witness, called for examination, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. MUSSER:
**Q. Good morning. How are you?**
A. Good morning. Well. And yourself?
**Q. I'm well. Thank you.**
**I'm Susan Musser. I'm joined today by my colleague Emily Bolles. We're both attorneys for the FTC. And I'll be asking you some questions today.**
**Have you ever been deposed before?**
A. I have.
[redacted]

[redacted]
**Q. And so this might be a bit of old hat, but just as a little bit of a refresher, you'll note the court reporter to my right who is taking down everything that you say, everything that I say. A few rules, mostly for her benefit.**
**First, I will try to speak slowly and clearly, but to the extent that you don't understand something I say or my question, while intended to be perfectly articulated, is not so, please just let me know, and I'll be happy to re-ask the question.**
**Is that fair?**
A. That is. Thank you.
**Q. And if you answer the question, I will assume that you understand the question.**
**Is that also fair?**
A. That is.
**Q. And if you can wait until I'm finished answering my question before you -- asking my question before you answer my question, I'd appreciate that.**
**Does that work for you?**
A. That will.
**Q. And of course, as wonderful as our**

**court reporter is today, she cannot transcribe nonverbal answers. If you could just answer with a yes or no or verbally, that would be appreciated.**
**Does that work as well?**
A. That does.
**Q. And I'll be taking several breaks today, but if at any time you need a break, please let me know. My only request is that if I have a question pending that you answer the question before you take a break.**
**Is that also fair?**
A. That is. Thank you.
**Q. And you've been designated today to testify as a corporate designee on behalf of Amazon; is that correct?**
A. That is correct.
**Q. And when were you asked to testify as a corporate designee?**
A. I believe it was approximately a month or so ago.
**Q. And who asked you to testify as a corporate designee?**
A. I believe it was my direct manager at Consilio, Lauren Hause, H-A-U-S-E, had informed me of a potential request to be a deponent.

## 105

1  that would have been specifically mentioned in that
2  questionnaire?
3      A. There may have been other message -- messaging
4  applications discussed or represented in there. Wickr
5  and -- the consumer version of Wickr and Signal are the
6  two that I'm aware of.
7      Q. Okay. And have you seen a copy of this
8  questionnaire?
9      A. I have not.
10     Q. Have you seen a blank version of this
11 questionnaire?
12     A. I have not.
13        MS. MUSSER: And Kosta, did you have --
14        MR. STOJILKOVIC: That was it.
15        MS. MUSSER: Okay.
16        BY MS. MUSSER:
17     Q. So turning to PX 1689, that's the subpoena. I
18 think you already have that.
19        And I'm going to ask you about page 3.
20     A. Okay.
21     Q. And turning to topic 7, other than what you've
22 previously testified to regarding your preparation to
23 testify today, did you look at any other specific
24 documents relating to steps that the company took to
25 identify custodians that are using or have used Signal?

## 106

1      A. I have not.
2      Q. What did you do to prepare to testify as to
3  this topic?
4      A. I reviewed the materials provided to me by
5  counsel.
6      Q. And those materials would include 17- --
7  Exhibit 1701, which is the big document that's
8  previously been admitted into the record?
9      A. That is correct.
10     Q. Other than your counsel, did you speak to
11 anyone to prepare to testify as to topic 7?
12     A. I did not.
13     Q. Did Consilio have any involvement in
14 identifying current or former company employees who use
15 Signal?
16     A. We did not.
17     Q. Whose responsibility or role was it to identify
18 current and former employees who use Signal?
19     A. Counsel.
20     Q. What counsel?
21     A. Amazon counsel.
22     Q. Was it internal counsel or outside counsel?
23     A. I'm not sure.
24     Q. Did you speak to anyone at Covington in
25 preparation to testify as to topic 7?

## 107

1      A. I did.
2      Q. Without disclosing the content, can you tell me
3  who you spoke to?
4      A. Marie who is here (indicating) and Addison -- I
5  can't remember Addison's last name -- and -- I think
6  that is it. There may have been one other individual
7  on the phone, but I don't recall his name and I don't
8  recall speaking to him specifically about this.
9      Q. Okay. Do you -- about how long did you spend
10 preparing for this specific topic?
11     A. A few hours.
12     Q. If you could turn to document PX 1701.
13     A. Yeah.
14     Q. If you could turn to page ending in 009.
15        I believe you already testified that you were
16 familiar with this document?
17     A. That's correct.
18     Q. And did you review this document in order to
19 prepare for your testimony today?
20     A. I did.
21     Q. And actually, can you turn back to page 3 of
22 the same document. And this is ending in 003.
23        Have you reviewed this portion of this
24 document?
25     A. I have.

## 108

1      Q. Okay. I'm looking at table 1.
2         Have you seen table 1 before?
3      A. I have.
4      Q. I'm looking at the second column where it
5  says (as read): Document Preservation Notices.
6         Do you see that?
7      A. I do.
8      Q. What do you understand that to refer to?
9      A. The dates the preservation notices were sent
10 with regards to this matter.
11     Q. And looking at this table, what is the first
12 preservation note that was sent, according to this
13 table?
14     A. July 2, 2019.
15     Q. And did that July 2, 2019 document preservation
16 notice address ephemeral messaging?
17        MR. STOJILKOVIC: Objection.
18        I guess -- so two things.
19        We view the contents of the hold notice as
20 privileged.
21        I guess if you're asking for -- if you're
22 asking for topically, you can answer if you know.
23        THE WITNESS: Could you repeat the question?
24        BY MS. MUSSER:
25     Q. Sure.

## 109

1  **Did the document preservation notice sent on**
2  **July 2, 2019 have any reference to the topic of**
3  **ephemeral messaging?**
4  A.  Generally my understanding of hold notices is
5  they're in -- they have interrelation to the document
6  preservation guidelines and policies, for instance, in
7  Amazon's policy on document and record retention and
8  destruction, which can be found in tab 3 part G.
9  **Q.  So this July 2, 2019 notice, was this a**
10  **document sent to cus- -- or to the recipients listed in**
11  **the first column under Custodian?**
12  A.  Could you repeat the question?
13  **Q.  Sure.**
14  **Was the July 2, 2019 document preservation**
15  **notice a physical -- a document that was sent to the**
16  **custodians?**
17  A.  My understanding it was an email.
18  **Q.  And was this email -- did it include an**
19  **attachment?**
20  A.  I'm not sure.
21  **Q.  But the preservation notice was either included**
22  **in the body of the email or an attachment; is that**
23  **fair?**
24  A.  That would be my understanding.
25  **Q.  Did that specific email or attachment**

## 110

1  **containing the document preservation notice mention the**
2  **topic ephemeral messaging?**
3  MR. STOJILKOVIC:  So I'll just -- just to make
4  this easier, we view the hold notices, including and
5  specifically how they are laid out and what's in them
6  as privileged, and for that reason we have not had the
7  witness review the specific hold notices, and so I
8  don't think he's going to be able to answer that.
9  MS. MUSSER:  Okay.
10  BY MS. MUSSER:
11  **Q.  So I'll ask you to --**
12  MR. STOJILKOVIC:  You can still ask.
13  BY MS. MUSSER:
14  **Q.  -- yeah -- answer the question.**
15  **I'll just ask you to answer the question.**
16  A.  Could you repeat the question?
17  **Q.  Sure.**
18  **Did the document preservation notice dated**
19  **July 2, 2019 contain a specific reference to ephemeral**
20  **messaging in either the email or any attachment sent to**
21  **the custodians?**
22  A.  I'm not sure.
23  **Q.  And did the document preservation notice sent**
24  **July 2, 2019 contain a reference to any disappearing**
25  **message features either in the attachment or in the**

## 111

1  **email sent to the custodian?**
2  A.  I'm not sure.
3  **Q.  Turning to -- if you look at the first -- the**
4  **third line -- my apologies -- under Custodian, there's**
5  **Aubrey, Colleen.**
6  **Do you see that?**
7  **Which is the first custodian listed?**
8  A.  Oh.
9  **Q.  Aubrey, Colleen?**
10  A.  I was thinking the third line.  Okay.  Gotcha,
11  I do.
12  **Q.  And do you see, going to the second column,**
13  **where it says "March 19, 2020"?**
14  A.  Yes.
15  **Q.  Was a document preservation notice sent on**
16  **March 19, 2020?**
17  A.  Yes.
18  **Q.  Do you know whether the document preservation**
19  **notice sent on March 19, 2020 in either the email or**
20  **any attachment made a specific reference to ephemeral**
21  **messaging?**
22  MR. STOJILKOVIC:  So again I'll let you answer
23  whether you know and I'll stamp -- just reiterate my
24  representation.  It's the same for all of them.
25  You can answer whether you know.

## 112

1  THE WITNESS:  I'm not sure.
2  BY MS. MUSSER:
3  **Q.  And did that March 19, 2020 notice in either**
4  **the email or any attachment specifically reference the**
5  **disappearing message function or feature?**
6  A.  I'm not sure.
7  **Q.  And on the same column there's another date,**
8  **June 4, 2020.**
9  **Do you see that?**
10  A.  I do.
11  **Q.  In the June 4, 2020 document preservation**
12  **notice, did that contain a specific reference to**
13  **ephemeral messaging in either the email or any**
14  **attachment?**
15  A.  I'm not sure.
16  **Q.  And I believe you earlier referenced that**
17  **there was a link to Amazon's document retention policy**
18  **in the document preservation notice.  Do I have that**
19  **correct?**
20  A.  I don't believe that's accurate.
21  **Q.  Okay.  You mentioned a document retention**
22  **policy, which is tab 3-G in your binder.**
23  **Can you explain again why or whether that's**
24  **relevant to Amazon's document preservation notices that**
25  **we've been talking about?**

```
                    185                                              187
 1   replaced, so they transferred all messages from their     1        Do you see that?
 2   old -- they transferred their Signal messages from        2      A. I do.
 3   their old phones to their new devices.                    3      Q. What is that?
 4      Q. At a high level, can you describe how that          4      A. ████████████ who is I believe one of
 5   works?                                                    5   the leaders within the legal ops department in Amazon
 6      A. Is your question, at a high level, how do you       6   legal.
 7   transfer information from one device to another?          7      Q. And does "primary owner" mean he's the primary
 8      Q. How do you transfer Signal messaging from an        8   drafter of this?
 9   old device to a new device?                               9      A. I believe she is the owner of the -- this legal
10      A. My understanding is when you log in to the new    10   hold FAQ.
11   device, the information -- you're reauthenticated and   11      Q. What does it mean to be the owner of this legal
12   everything from your Signal account is then carried     12   FAQ?
13   over to your new device.                                13      A. I believe her department owns the publication
14      Q. Did Consilio do any QC or auditing to make sure  14   and upkeep of this FAQ.
15   that everything transferred?                            15      Q. And this says (as read): Last modified
16      A. Not that I'm aware of.                            16   12 months ago by ████████████
17      Q. Can you turn -- actually, you don't have this,   17       Do you see that?
18   at least not that I'm aware of.                         18      A. I do.
19         MR. STOJILKOVIC: He doesn't.                      19      Q. What does ████████████ mean?
20         BY MS. MUSSER:                                    20      A. That is a user.
21      Q. There you go.                                     21      Q. Which user?
22         I'm handing you what's been marked as PX 1825.    22      A. ████████████
23   This is titled Legal Hold FAQ.                          23      Q. Is ████████████ part of the legal
24         Just take a minute to look through this.          24   team?
25         (Document review.)                                25      A. She is.

                    186                                              188
 1      A. Okay.                                              1      Q. And is this the last time this document has
 2      Q. Are you familiar with this document?               2   been modified?
 3      A. I am.                                              3      A. I believe so. Yes.
 4      Q. What is it?                                        4      Q. Do you know when this document was created?
 5      A. It is a legal hold FAQ, frequently asked           5      A. I do not.
 6   questions.                                               6      Q. How would you figure out that information?
 7      Q. Going to the top right, it says                    7      A. I would have to ask ████ if she was aware of
 8   "Legal Hold FAQ" and then there's a                      8   when it was created.
 9   (LitigationRegulatory.HoldFAQ.WebHome) - XWiki.          9      Q. Is there a way that you could look at the
10         Do you see that?                                  10   metadata of this Wiki link to determine that?
11      A. I do.                                             11      A. We might be able to look at the previous
12      Q. Where is this document housed?                    12   versions to determine that, but that would infer to
13      A. This is housed on the litigation regulatory       13   when it was first published on that Wiki site.
14   Wiki site within Amazon.                                14      Q. Okay.
15      Q. Who has access to that site?                      15         Going to the first line, it says, "If you are
16      A. I believe all users would have access to this     16   under legal hold, you would have received an email
17   site.                                                   17   titled 'Document Preservation Notice.'"
18      Q. Looking at the top left, there's a date,          18         Do you see that?
19   August 23, 22, 3:25 p.m.                                19      A. I do.
20         What is the significance of that date?            20      Q. Is that document preservation notice the
21      A. I believe that is the date and time that this     21   notices that were sent and we discussed earlier in
22   would have been printed.                                22   1701?
23      Q. And it says -- going to Legal Hold FAQ,           23      A. That is my understanding, yes.
24   underneath that there's Primary Owner. Then it says    24      Q. Looking at the fourth FAQ, "What about Slack,
25   ████████████                                           25   Chime, and other software?" do you see that?
```

189

1     A. I do.
2     Q. It says, "If you use Signal, follow these steps
3 to turn off disappearing messages."
4     Do you see that?
5     A. I do.
6     Q. Do you know when that guidance was first issued
7 on these FAQs?
8     A. I do not.
9     Q. Do you know why it was included on these FAQs?
10     A. I do not.
11     Q. And we had earlier talked about PX 1826. I
12 believe you should have a copy of that in your stack
13 there. It's the screenshot of Signal.
14     A. Thank you.
15     Q. Is this the link that is embedded within the
16 legal hold FAQ?
17     A. I believe so. Yes.
18     Q. And what is this document?
19     A. This document is instructions on how to turn
20 off the disappearing message feature within Signal.
21     Q. And looking at the first paragraph there, the
22 third sentence says, "For new contact groups,
23 disappearing messages are turned off by default."
24     Can you explain that?
25     A. My understanding is, within the application,

190

1 the -- if you create a new contact group, the
2 disappearing message feature is turned off by default.
3     Q. Okay. So, in other words, in order to change
4 that, you would have to actively go into Settings and
5 select one of the disappearing message features that we
6 talked about previously.
7     A. That is correct.
8     Q. And aside from this legal hold FAQ, did you
9 review any other guidance that we haven't spoken about
10 today regarding document preservation obligations in
11 preparation for this, your testimony today?
12     A. Outside of the policies I mentioned earlier
13 which was the -- Amazon's policy on document and
14 retention and destruction policy?
15     Q. Uh-huh.
16     A. I'm sorry. What was your --
17     Q. Did you review any other policies that relate
18 to document preservation?
19     A. Outside of the ones that are in this binder, I
20 did not.
21     Q. And are you aware of whether any other policies
22 exist that you did not review?
23     A. Not that I'm aware of.
24     MS. MUSSER: All right. If you can give me
25 10-15 minutes, I'm going to get my notes together and

191

1 flip through things, and hopefully we can get you out
2 of here by like 3:30.
3     Does that work for everyone.
4     MR. STOJILKOVIC: Yep.
5     (Recess)
6     MR. STOJILKOVIC: So just again very quickly
7 to clarify something from the last session, you were
8 asked about collections of other apps other than
9 Signal, and you said -- potentially ephemeral apps
10 other than Signal, and you -- I don't think you
11 indicated any.
12     Is there something you can add to that?
13     THE WITNESS: Yes.
14     When I understood you to say collected, I mean,
15 I was assuming you were saying collected as far as
16 retrieving from a system.
17     The Wickr enterprise messages are being
18 preserved or collected on the back end for users that
19 are subject to legal hold.
20     In addition, we performed a collection on a
21 custodian who had WhatsApp, but that was part of a full
22 mobile forensic collection, and I just wanted to
23 clarify that.
24     MS. MUSSER: Okay.
25     Anything else?

192

1     MR. STOJILKOVIC: That's it.
2     BY MS. MUSSER:
3     Q. So closing the loop on Signal collections, do
4 you know whether any Signal -- or any ephemeral
5 messaging was collected for David Limp?
6     A. I do not believe any Signal messages were
7 collected for the custodian David Limp.
8     Q. Do you know why not?
9     A. During the conversations, counsel had
10 interviewed Mr. Limp in 2020 and again in
11 November 2021 and confirmed he did not possess any
12 substantive messages within the time frame that were
13 responsive to the investigation.
14     Q. Do you know whether counsel personally reviewed
15 the messages on Mr. Limp's phone?
16     A. I believe in the conversations they were
17 involving public relations, so they're not responsive
18 to the investigation.
19     Q. So did counsel personally review the
20 conversations on the phone or was that based on
21 Mr. Limp's representations?
22     A. I'm not sure which one it was.
23     Q. And do you know the criteria or methodology
24 counsel employed to determine whether it was
25 responsive?

48 (Pages 189 to 192)