THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION, et al.,

    Plaintiffs,

v.

AMAZON.COM, INC., a corporation,

    Defendant.

Case No. 2:23-cv-01495-JHC

**DECLARATION OF KOSTA S. STOJILKOVIC IN SUPPORT OF AMAZON'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

I, Kosta S. Stojilkovic, declare as follows:

1.      I am a partner at the law firm of Wilkinson Stekloff LLP, and I represent Defendant Amazon.com, Inc. My application to appear *pro hac vice* before the United States District Court for the Western District of Washington in this litigation is pending. I submit this declaration in support of Amazon's Opposition to Plaintiffs' Motion to Compel Production of Documents. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2.      I certify that Amazon conferred in good faith with counsel for Plaintiffs in an effort to resolve the parties' dispute without Court action. Counsel for Amazon and counsel for Plaintiffs have met and conferred at length regarding Plaintiffs' RFP Nos. 25 and 27, as well as regarding sealing issues for certain exhibits to the motion to compel briefing. These conferences occurred

1   through multiple emails and letters, as well as through telephonic conferences on the following

2   dates: January 9, 2024; March 6, 2024; April 15, 2024; May 9, 2024; and May 10, 2024.

3        3.      On November 14, 2023, Plaintiffs served RFP No. 25 on Amazon. RFP No. 25 calls

4   for: "All litigation holds, preservation notices, or similar documents sent by Amazon in connection

5   with the June 17, 2019 preservation letters, August 5, 2019 Voluntary Access Letter, February 20,

6   2020 Civil Investigative Demand, and/or September 26, 2023 Complaint in this matter."

7        4.      On November 14, 2023, Plaintiffs served RFP No. 27 on Amazon. RFP No. 27 calls

8   for: "All documents relating to instructions or advice given to employees about the use of

9   ephemeral messaging, including but not limited to Signal or Wickr."

10       5.      Attached hereto as **Exhibit 1** is a true and correct copy of a news article by Corin

11  Faife, *Signal names Google walkout organizer as new company president*, THE VERGE (Sept. 6,

12  2022),    https://www.theverge.com/2022/9/6/23339064/signal-president-meredith-whittaker-tech-

13  critic-google, downloaded on May 6, 2024.

14       6.      Attached hereto as **Exhibit 2** is a true and correct copy of a webpage by

15  David Curry, *Signal Revenue & Usage Statistics,* Business of Apps (Jan. 10, 2024),

16  https://www.businessofapps.com/data/signal-statistics, downloaded on May 11, 2024.

17       7.      Attached hereto as **Exhibit 3** is a composite exhibit, prepared by Amazon's

18  counsel, collecting and citing public reports of the use of Signal and other ephemeral messaging

19  applications by governmental actors, including in many Plaintiff States.

20       8.      Attached hereto as **Exhibit 4** is a true and correct copy of a news article by

21  Joe Uchill, *Senate approves encrypted app Signal for staff use*, THE HILL (May 17, 2017),

22  https://www.thehill.com/policy/cybersecurity/333802-sen-staff-can-use-signal-for-encrypted-

23  chat/, downloaded on May 2, 2024.

24       9.      Attached hereto as **Exhibit 5** is a true and correct copy of a news article by Laurens

25  Cerulus, *EU Commission to staff: Switch to Signal messaging app*, POLITICO (Feb. 20, 2020),

26

STOJILKOVIC DECLARATION ISO AMAZON'S
OPPOSITION TO PLAINTIFFS' MOTION TO
COMPEL PRODUCTION OF DOCUMENTS - 2
(Case No. 2:23-cv-01495-JHC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1 https://www.politico.eu/article/eu-commission-to-staff-switch-to-signal-messaging-app/,

2 downloaded May 2, 2024.

3      10.    Attached hereto as **Exhibit 6** is a true and correct copy of a press release by the

4 FTC, *FTC Chair Lina M. Khan Announces New Appointments in Agency Leadership Positions*,

5 FTC (Nov. 19, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/11/ftc-chair-

6 lina-m-khan-announces-new-appointments-agency-leadership-positions, downloaded on May 13,

7 2024.

8      11.    Attached hereto as **Exhibit 7** is a true and correct copy of the Signal homepage,

9 https://www.signal.org/, downloaded on May 2, 2024.

10      12.    Attached hereto as **Exhibit 8** is a true and correct copy of a news article by

11 Madeline Stone, *Jeff Bezos Email Against PowerPoint Presentations*, Business Insider (July 28,

12 2015), https://www.businessinsider.com/jeff-bezos-email-against-powerpoint-presentations-

13 2015-7, downloaded on May 2, 2024.

14      13.    Attached hereto as **Exhibit 9** is a true and correct copy of a press release by the

15 United Nations Office of the High Commissioner for Human Rights, *UN experts call for*

16 *investigation into allegations that Saudi Crown Prince involved in hacking of Jeff Bezos' phone*,

17 OHCHR (Jan. 22, 2020), https://www.ohchr.org/en/press-releases/2020/01/un-experts-call-

18 investigation-allegations-saudi-crown-prince-involved, downloaded on May 2, 2024.

19      14.    Attached hereto as **Exhibit 10** is a true and correct copy of two annexes attached to

20 the report of the Special Rapporteur on extrajudicial, summary or arbitrary executions and mandate

21 of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and

22 expression, https://www.ohchr.org/sites/default/files/Documents/Issues/Expression/SRsSumex

23 FreedexAnnexes.pdf, downloaded May 2, 2024.

24      15.    Attached hereto as **Exhibit 11** is a true and correct copy of an excerpt from the

25 transcript of the September 22, 2022 Investigative Hearing of Andy Jassy conducted during

26 Plaintiffs' pre-Complaint investigation.

STOJILKOVIC DECLARATION ISO AMAZON'S
OPPOSITION TO PLAINTIFFS' MOTION TO
COMPEL PRODUCTION OF DOCUMENTS - 3
(Case No. 2:23-cv-01495-JHC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

16.     Attached hereto as **Exhibit 12** is a true and correct copy of an excerpt from the transcript of the October 20, 2022 Investigative Hearing of Jeffrey P. Bezos conducted during Plaintiffs' pre-Complaint investigation. Plaintiffs previously attached an excerpt of this transcript as Exhibit F to the Bolles Declaration.

17.     Attached hereto as **Exhibit 13** is a true and correct copy of the Voluntary Access Letter from Julie Goshorn, counsel for the FTC, to Andrew DeVore, counsel for Amazon, dated August 5, 2019.

18.     Attached hereto as **Exhibit 14** is a true and correct copy of Amazon.com, Inc.'s Response to the Request for Additional Information and Documentary Material issued on July 9, 2021 related to a confidential Federal Trade Commission investigation, submitted on February 14, 2022.

19.     Attached hereto as **Exhibit 15** is a true and correct copy of a letter from Robert Keeling, counsel for Amazon, to Emily Bolles, counsel for the FTC, dated March 22, 2024.

20.     Attached hereto as **Exhibit 16** is a true and correct copy of an excerpt from a letter from Constance Forkner, counsel for Amazon, to Emily Bolles, counsel for the FTC, dated March 29, 2024.

21.     Attached hereto as **Exhibit 17** is a true and correct copy of an excerpt from a letter from Emily Bolles, counsel for the FTC, to Constance Forkner, counsel for Amazon, dated February 7, 2024.

22.     Attached hereto as **Exhibit 18** is a true and correct copy of a news article by Daniel Howley, *Facebook and Microsoft smelling blood in the water clash with Apple amid antitrust probes*, YAHOO! FINANCE (Aug. 7, 2020), https://www.finance.yahoo.com/news/apple-app-store-antitrust-facebook-202125609.html, downloaded on May 2, 2024.

23.     Attached hereto as **Exhibit 19** is a true and correct copy of a news article by Dana Mattioli and others, *Amazon Restricts How Rival Device Makers Buy Ads on Its Site*, WALL ST. J.

STOJILKOVIC DECLARATION ISO AMAZON'S
OPPOSITION TO PLAINTIFFS' MOTION TO
COMPEL PRODUCTION OF DOCUMENTS - 4
(Case No. 2:23-cv-01495-JHC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

(Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertising-competitor-device-makers-roku-arlo-11600786638, downloaded on May 2, 2024.

24.     Attached hereto as **Exhibit 20** is a true and correct copy of a document produced by Amazon in relation to the FTC's pre-Complaint investigation, with the Bates number Amazon-FTC-CID_07491114.

25.     Attached hereto as **Exhibit 21** is a true and correct copy of a document produced by Amazon in relation to the FTC's pre-Complaint investigation, with the Bates number Amazon-FTC-CID_07491116.

26.     Attached hereto as **Exhibit 22** is a true and correct copy of a document produced by Amazon in relation to the FTC's pre-Complaint investigation, with the Bates number Amazon-FTC-CID_08060544.

27.     Attached hereto as **Exhibit 23** is a true and correct copy of a document produced by Amazon in relation to the FTC's pre-Complaint investigation, with the Bates number Amazon-FTC-CID_07492818.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this 13th day of May, 2024 in Washington, DC.

_s/ Kosta S. Stojilkovic_
Kosta S. Stojilkovic

STOJILKOVIC DECLARATION ISO AMAZON'S
OPPOSITION TO PLAINTIFFS' MOTION TO
COMPEL PRODUCTION OF DOCUMENTS - 5
(Case No. 2:23-cv-01495-JHC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

# EXHIBIT 1

# Signal names Google walkout organizer as new company president

**theverge.com**/2022/9/6/23339064/signal-president-meredith-whittaker-tech-critic-google

Corin Faife                                                                         September 6, 2022

## Meredith Whittaker is known as a fierce critic of Big Tech

By [Corin Faife](#)

Sep 6, 2022, 11:02 AM EDT



*Illustration by Alex Castro / The Verge*

Signal officially has a new president.

For the newly created position, the company behind the encrypted messaging app has hired Meredith Whittaker, a former Google manager and co-founder of the AI Now Institute.

Whittaker made the announcement herself in a [post on the Signal blog](#), where she outlined the strategic nature of the role in guiding the organization towards long-term sustainability.

"As President I will dedicate myself to helping Signal build a long taproot so it can grow and thrive in dynamic climates," Whittaker wrote. "In this role I will be working with Signal's CEO and leadership, with a particular focus on guiding Signal's strategy, ensuring our financial sustainability, sharpening and broadening Signal's public communications, and whatever else is needed to strengthen the app and the org."

Whittaker is a technology researcher who became widely known as one of the organizers of a mass walkout at Google in 2018 in protest of the company's handling of sexual harassment allegations against top executives. Within Google, she also became known for her advocacy for ethical AI and co-founded the AI Now Institute at NYU while still employed by the company.

In 2019, Whittaker left Google, becoming one of many walkout coordinators who claimed to have experienced retaliation for their internal activism. Her depth of knowledge and moral framework was recognized more recently when she joined the FTC as a senior adviser on AI in November 2021.

As president, Whittaker will join Signal at a time of transition for the company. She takes up the role in the same year that Signal founder Moxie Marlinspike stepped down as CEO — a position that currently remains unfilled — and in a moment when questions remain about the overall sustainability of the project.

The company is also the developer of the Signal Protocol, an open-source cryptographic protocol for end-to-end encrypted messages that has been incorporated into WhatsApp since 2016. As a standalone app, Signal has around 40 million users — a small fraction of WhatsApp's 2 billion or so users but enough to make it a significant player in the messaging landscape.

Employees were told last year that, for Signal to be self-sustaining, the app would need to reach around 100 million users. Though the user base has seen a period of rapid growth in recent years, workers at the company have raised concerns over lacking adequate resources to deal with potentially abusive uses of the app.

In comments given to *The Washington Post*, Whittaker seemed to suggest that she would push for more users to pay for the app. Developing and maintaining it costs "tens of millions of dollars per year," Whittaker said — and making up those costs without data collection will be an enormous challenge going forward.

# EXHIBIT 2

# Signal Revenue & Usage Statistics (2024)

**businessofapps.com**/data/signal-statistics





David Curry
Updated: January 10, 2024

Signal, formed through a merger of RedPhone and TextSecure, is the flagship app of the Signal Foundation, a non-profit dedicated to open-source privacy technology.

The software which underpins the Signal app has been imported onto WhatsApp, Facebook Messenger, Skype and Google Allo, although end-to-end encryption is not offered by default on these platforms.

It launched the Signal app in 2015 for iOS, Android and desktop, which came with end-to-end encrypted messaging. Signal has since added encrypted video calling, group chats and image, video and gif support, making it a feature-rich service without sacrificing the core benefit of privacy.

In response to a WhatsApp privacy update, which informed users that it would share data with its parent Facebook, millions of users shifted to Signal, considered best-in-class for encrypted messaging. The volume of new users caused Signal servers to crash on January 15 2021, and access was limited for two days afterwards.

Even with this influx, Signal is still quite a niche messaging platform, with much less usage than its end-to-end competitor, Telegram. It those few weeks, Signal did shoot past it in global downloads on both stores, however that has subsided in late 2021 and it is at normal levels of downloads in 2022.

Many celebrities have endorsed Signal as a messaging tool to avoid snooping governments and other bad actors. Edward Snowden and Elon Musk have both endorsed the app, and Black Lives Matter organizers also called for protesters to use the app during the summer protests.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 10

In 2021, Signal announced it would be launching a "privacy-focused" cryptocurrency, integrating MobileCoin to the platform. This move was criticized by some for shifting focus away from privacy and security, and into areas which may cause the app to be targeted by authorities.

A few months after the announcement, founder and CEO Moxie Marlinspike confirmed he was leaving the company. WhatsApp co-founder and Signal investor Brian Acton took over as CEO.

We have collected data and statistics on Signal. Read on below to find out more.

## Signal Key Statistics

- Signal had 40 million active users in 2022, most of which came from WhatsApp's poorly received privacy update
- Signal has been downloaded 155 million times, with the bulk of downloads happening in 2021
- It does not make revenue, but received a $50 million loan from Brian Acton, who is now the CEO of the company

## Signal Overview

| | |
|---|---|
| Launch date | 29 July 2014 |
| HQ | Mountain View, California |
| People | Brian Acton (CEO, chairman) Moxie Marlinspike (co-founder), Aruna Harder (COO) |
| Business type | Non-profit |
| Owner | Signal Foundation |
| Industry | Messaging |

## Signal Revenue

Signal does not make any revenue, as a non-profit it receives donations from users and benefactors. Brian Acton invested $50 million into the company in 2017.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 11

## Signal Users

Signal had 40 million active users in 2022, which was when a lot of users switched from WhatsApp to it.

### Signal annual users 2019 to 2022 (mm)

| Date | Users (mm) |
|------|------------|
| 2019 | 0.5 |
| 2020 | 12 |
| 2021 | 20 |
| 2022 | 40 |

*Sources: SimilarWeb, TechCrunch*

## Signal Downloads

Signal reached 155 million cumulative downloads in 2022, with the vast majority of downloads happening in January 2021.

### Signal cumulative downloads 2019 to 2021 (mm)

| Date | Downloads (mm) |
|------|----------------|
| 2019 | 10 |
| 2020 | 22 |
| 2021 | 125 |
| 2022 | 155 |

*Source: AppMagic*

## Signal FAQ

**What was Signal's biggest month for downloads?**

7.5 million users were added on Signal in the second week of January, 43 times more than the previous week (CNN)

**What are Signal's most popular countries?**

Some of Signal's most popular countries include Egypt, Iran, Saudi Arabia and the United Arab Emirates (SimilarWeb)

## More Messaging App Data

# EXHIBIT 3

*Federal Trade Commission, et al. v. Amazon.com, Inc.*
(2:23-cv-01495-JHC (W.D. Wash.))

This chart complies public reports of government institutions and officials authorizing or using ephemeral messaging applications such as Signal and WhatsApp.

| Use of Signal and Other Third-Party Encryption Services | | |
|---|---|---|
| **Name/Organization/Office** | **Application** | **Citation** |
| Atlanta Police Department | Signal | Timothy Pratt, The Guardian (Dec. 4, 2023), https://www.theguardian.com/us-news/2023/dec/04/cop-city-atlanta-police-signal-app. |
| City of Los Angeles public officials | Signal | Ray Johnston, State Scoop (Jul. 6, 2020), https://statescoop.com/los-angeles-dot-signal-mobility-data-specifications/ |
| Colorado House of Representatives | Signal | Colette Bordelon, ABC Denver7 (Aug. 9, 2023), https://www.denver7.com/news/politics/report-recommends-co-ban-public-officials-use-of-encrypted-disappearing-messaging-apps-for-official-business. |
| Environmental Protection Agency | Signal; Confide | Frank Konkel, NextGov (Nov. 28, 2017), https://www.nextgov.com/cybersecurity/2017/11/epa-sued-over-employees-using-encrypted-messaging-app/142852/ |
| | | Andrew Restuccia, Politico (Feb. 2, 2017), https://www.politico.com/story/2017/02/federal-workers-signal-app-234510 |
| | | Joe Uchill, The Hill (Jun. 17, 2017), https://thehill.com/policy/cybersecurity/333802-sen-staff-can-use-signal-for-encrypted-chat/ |

| Use of Signal and Other Third-Party Encryption Services | | |
|---|---|---|
| **Name/Organization/Office** | **Application** | **Citation** |
| European Commission (the antitrust regulator of the European Union) | Signal | Laurens Cerulus, Politico (Feb. 20, 2020), https://www.politico.eu/article/eu-commission-to-staff-switch-to-signal-messaging-app/. |
| Federal Bureau of Investigations | Signal | Shannon Vavra, The Daily Beast (Apr. 20, 2023), https://www.thedailybeast.com/fbi-turns-to-video-ads-in-hunt-for-russian-spies-ready-to-betray-vladimir-putin. |
| Staff of Former President Barack Obama while he was in office | Signal | Mara Gay, The Wall Street Journal (Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-hacking-concerns-1485215028. |
| Aides and staff of Former President Donald Trump while he was in office | Signal | Mara Gay, The Wall Street Journal Pro (Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-hacking-concerns-1485215028 <br><br> Greg Price, Newsweek (Dec. 20, 2017), https://www.newsweek.com/trump-team-discussed-using-signal-encrypt-mike-flynns-messages-report-754324 |
| Aides to Former Mayor of New York City Michael Bloomberg while he was in office | Signal | Mara Gay, The Wall Street Journal Pro (Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-hacking-concerns-1485215028 |

| Use of Signal and Other Third-Party Encryption Services | | |
|---|---|---|
| **Name/Organization/Office** | **Application** | **Citation** |
| Former Mayor of New York City Bill de Blasio and staff while he was in office | Signal | Katie Honan, The Wall Street Journal (Dec. 16, 2019), https://www.wsj.com/articles/nyc-mayors-aides-communicate-in-encrypted-messages-11576507167 |
| | | Annie McDonough, City & State (Feb. 25, 2020), https://www.cityandstateny.com/policy/2020/02/de-blasio-joins-other-lawmakers-on-messaging-app-signal/176355/ |
| Former New York Governor Andrew Cuomo's staff while he was in office[1] | Signal | Mara Gay, The Wall Street Journal Pro (Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-hacking-concerns-1485215028 |
| Former Oklahoma Attorney General Mike Hunter and other State of Oklahoma officials[2] | Signal | Wendy Suares, OKC Fox 25 (Nov. 6, 2023), https://okcfox.com/news/local/oklahoma-officials-use-of-encrypted-messaging-app-raises-concerns-over-open-records-act-transparency-and-legality-gentner-drummond-signal-app-kevin-stitt-department-of-corrections-police-san-diego-phoenix-eugene-oregon |
| Former Senior Advisor to the President, Jared Kushner, while he was in office | Signal; WhatsApp | Greg Price, Newsweek (Dec. 20, 2017), https://www.newsweek.com/trump-team-discussed-using-signal-encrypt-mike-flynns-messages-report-754324 |
| | | Alana Abramson, Time (Mar. 21, 2019), https://time.com/5556373/jared-kushner-ivanka-trump-private-email-whatsapp/ |

---

[1] New York State is a Plaintiff in this lawsuit.
[2] Oklahoma is a Plaintiff in this lawsuit.

| Use of Signal and Other Third-Party Encryption Services | | |
|---|---|---|
| **Name/Organization/Office** | **Application** | **Citation** |
| Former Secretary of State Hillary Clinton's Staff while she was in office | Signal | Nick Bilton, Vanity Fair (Aug. 26, 2016), https://www.vanityfair.com/news/2016/08/how-the-clinton-campaign-is-foiling-the-kremlin |
| | | Mara Gay, The Wall Street Journal Pro (Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-hacking-concerns-1485215028 |
| Governor of New Mexico Lujan Grisham and staff[3] | Signal; WhatsApp | Daniel Chacon, RGA citing The Sante Fe New Mexican (Jul. 7, 2021), https://www.rga.org/lujan-grisham-taxpayer-funded-staff-using-encrypted-messaging-apps/ |
| | | KRQE Staff, KRQE News (Jul. 8, 2021), https://www.krqe.com/news/politics-government/governors-office-responds-to-private-message-app-use-among-staffers/ |
| Maricopa County Attorney's Office | Signal | Dave Biscobing, AZ ABC 15 (Jul. 3, 2021), https://www.abc15.com/news/local-news/investigations/protest-arrests/prosecutor-maricopa-county-attorney-allister-adel-knew-about-plan-to-charge-protesters-as-gang |
| Michigan State Police[4] | Signal | Paul Egan, Detroit Free Press (Feb. 4, 2021), https://www.freep.com/story/news/local/michigan/2021/02/04/michigan-state-police-foia-signal-text-messaging-app/4390799001/ |

---

[3] New Mexico is a Plaintiff in this lawsuit.
[4] Michigan is a Plaintiff in this lawsuit.

| Use of Signal and Other Third-Party Encryption Services | | |
|---|---|---|
| **Name/Organization/Office** | **Application** | **Citation** |
| New York State Legislature officials and staff[5] | Signal | Mara Gay, The Wall Street Journal Pro (Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-hacking-concerns-1485215028 |
| | | Annie McDonough, City & State (Feb. 25, 2020), https://www.cityandstateny.com/policy/2020/02/de-blasio-joins-other-lawmakers-on-messaging-app-signal/176355/ |
| New Mexico Children, Youth, and Families Department[6] | Signal | Annalisa Pardo, KRQE News (Apr. 27, 2021), https://www.krqe.com/news/politics-government/republicans-seek-investigation-into-cyfd-gov-on-possible-ipra-violations/?ipid=related-recir |
| New York City Department of Education | Signal | Alex Zimmerman, Chalkbeat (Mar. 9, 2020), https://www.chalkbeat.org/newyork/2020/3/9/21178708/nyc-s-latest-official-to-join-an-encrypted-messaging-app-the-education-department-s-press-secretary/ |
| New York City Mayor Eric Adams | Signal | Annie McDonough, City & State (Jan. 28, 2022), https://www.cityandstateny.com/politics/2022/01/eric-adams-signal/361306/ |
| Phoenix Police Department | Signal | Dave Biscobing, ABC 15 (Aug. 10, 2022), https://www.abc15.com/news/local-news/investigations/protest-arrests/top-phoenix-pd-chiefs-used-secret-messaging-app |
| | | Abe Kwok, AZ Central (Sept. 9, 2022), https://www.azcentral.com/story/opinion/op-ed/abekwok/2022/09/09/phoenix-police-got-burned-using-signal-app-others-learn/8031648001/ |

[5] New York State is a Plaintiff in this lawsuit.
[6] New Mexico is a Plaintiff in this lawsuit.

| Use of Signal and Other Third-Party Encryption Services | | |
|---|---|---|
| **Name/Organization/Office** | **Application** | **Citation** |
| San Diego public officials | Signal | Claire Trageser, KPBS (May 25, 2022), https://www.kpbs.org/news/local/2022/05/25/advocates-alarmed-by-use-of-private-messaging-app-by-san-diego-public-officials |
| U.K. Army | Signal; WhatsApp | George Grylls, The Times (Mar. 21, 2022), https://www.thetimes.co.uk/article/soldiers-told-to-use-signal-instead-of-whatsapp-for-security-6pxh9z5cx. |
| U.S. Army | Signal; Wickr | Shawn Snow, Kyle Rempfer, and Meghann Myers, Army Times (Jan. 23, 2020), https://www.armytimes.com/flashpoints/2020/01/23/deployed-82nd-airborne-unit-told-to-use-these-encrypted-messaging-apps-on-government-cellphones/ |
| U.S. Senate and Staff | Signal | Joe Uchill, The Hill (Jun. 17, 2017), https://thehill.com/policy/cybersecurity/333802-sen-staff-can-use-signal-for-encrypted-chat/ |
| U.S. Trade Representative | Signal | U.S. Chamber of Commerce (Jan. 31, 2024), https://www.uschamber.com/international/trade-agreements/u-s-chamber-foia-requests-on-u-s-digital-trade-policy |
| United Nations Independent Mechanism re: Myanmar | Signal | The New York Post (Mar. 17, 2021), https://nypost.com/2021/03/17/un-seeks-evidence-linking-myanmar-military-to-crimes/ |

| Use of Non-Signal Encryption Services | | |
|---|---|---|
| **Name/Organization/Office** | **Application** | **Citation** |
| Former MD Gov. Larry Hogan[7] | Wickr | Steve Thompson, The Washington Post (Dec. 30, 2021), https://www.washingtonpost.com/dc-md-va/2021/12/30/hogan-wickr-messages-disappear/ |
| | | Kate Ryan, WTOP News (Dec. 30, 2021), https://wtop.com/maryland/2021/12/marylands-governors-office-defends-use-of-messaging-app-that-destroys-communications-with-state-employees/ |
| New York City Corrections Department | Wickr | Ian MacDougall, ProPublica (Dec. 10, 2019), https://www.propublica.org/article/new-york-city-paid-mckinsey-millions-to-stem-jail-violence-instead-violence-soared |
| U.S. Customs and Border Patrol | Wickr | Ben Goggin and Louise Matsakis, NBC News (Apr. 3, 2022), https://www.nbcnews.com/tech/tech-news/border-patrols-use-amazons-wickr-messaging-app-draws-scrutiny-rcna21448 |
| Washington D.C. Mayor Muriel Bowser and staff | WhatsApp | Cuneyt Dil, Axios (Feb. 15, 2022), https://www.axios.com/local/washington-dc/2022/02/15/dc-mayor-whatsapp-records-concerns |

---

[7] Maryland is a Plaintiff in this lawsuit.

# EXHIBIT 4

# Senate approves encrypted app Signal for staff use

thehill.com/policy/cybersecurity/333802-sen-staff-can-use-signal-for-encrypted-chat/



Getty Images

The Senate Sergeant at Arms has approved the encrypted messaging app Signal for lawmakers and staff.

The move was first noticed by the tech publication ZDNet in a letter from Sen. Ron Wyden (D-Ore.) thanking Sergeant at Arms Frank Larkin for the decision.

In a letter last week, the senator thanked Larkin for improving the security of Senate websites and also praised him for "the recent announcement by your office that the end-to-end encrypted messaging app Signal is approved for Senate staff use."

{mosads}ZDNet reported Tuesday that the approval for Signal took effect in March but appears to have flown under the public radar.

Recently, employees at the Environmental Protection Agency and White House both came under fire for either using Signal or the competing app Confide. Both of those agencies fall under different, stricter records laws than Congress.

Copyright 2024 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 23

# EXHIBIT 5

# EU Commission to staff: Switch to Signal messaging app

politico.eu/article/eu-commission-to-staff-switch-to-signal-messaging-app/

The move is part of EU's efforts to beef up cybersecurity, after several high-profile incidents shocked diplomats and officials.

POLITICOPRO Free article usually reserved for subscribers



The European Commission has recommended staff use a special messaging app | Josh Edelson/AFP via Getty Images

February 20, 2020 12:00 pm CET

By Laurens Cerulus

The European Commission has told its staff to start using Signal, an end-to-end-encrypted messaging app, in a push to increase the security of its communications.

The instruction appeared on internal messaging boards in early February, notifying employees that "Signal has been selected as the recommended application for public instant messaging."

The app is favored by privacy activists because of its end-to-end encryption and open-source technology.

"It's like Facebook's WhatsApp and Apple's iMessage but it's based on an encryption protocol that's very innovative," said Bart Preneel, cryptography expert at the University of Leuven. "Because it's open-source, you can check what's happening under the hood," he added.

Signal was developed in 2013 by privacy activists. It is supported by a nonprofit foundation that has the backing of WhatsApp founder Brian Acton, who had left the company in 2017 after clashing with Facebook's leadership.

> In December 2018, cybersecurity research firm Area 1 Security said it found that thousands of diplomatic cables were downloaded from the EU's COREU (or Courtesy) system

Privacy experts consider that Signal's security is superior to other apps'. "We can't read your messages or see your calls," its website reads, "and no one else can either."

While WhatsApp's technology is based on Signal's protocol (known as Open Whisper Systems), it isn't open-source. Another popular messaging app, Telegram, meanwhile, faces similar concerns over the lack of transparency on how its encryption works.

## EU not-so-confidential

After a series of high-profile incidents that shocked diplomats and officials in Brussels and across the Continent, the European Union is beefing up its cybersecurity standards.

In December 2018, cybersecurity research firm Area 1 Security said it found that thousands of diplomatic cables were downloaded from the EU's COREU (or Courtesy) system, which is used by national governments and EU institutions to exchange day-to-day information on foreign policy.

> The use of Signal was mainly recommended for communications between staff and people outside the institution.

Then in June last year, the news broke that the EU's delegation in Moscow had suffered what appeared to be a cybersecurity breach in 2017, with two computers allegedly hacked to steal diplomatic information. The Commission said it was investigating the issue and informed its top diplomats.

The EU on Wednesday said it would soon draft a new European cybersecurity strategy. It announced earlier it would set up a "joint cybersecurity unit" to support EU countries and organizations in the event of an attack.

Commission officials are already required to use encrypted emails to exchange sensitive, non-classified information, an official said. Classified documents fall under tighter security rules.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 26

The use of Signal was mainly recommended for communications between staff and people outside the institution. The move to use the application shows that the Commission is working on improving its security policies.

Promoting the app, however, could antagonize the law enforcement community.

Officials in Brussels, Washington and other capitals have been putting strong pressure on Facebook and Apple to allow government agencies to access to encrypted messages; if these agencies refuse, legal requirements could be introduced that force firms to do just that.

American, British and Australian officials have published an open letter to Facebook CEO Mark Zuckerberg in October, asking that he call off plans to encrypt the company's messaging service. Dutch Minister for Justice and Security Ferd Grappehaus told POLITICO last April that the EU needs to look into legislation allowing governments to access encrypted data.

Cybersecurity officials have dismissed calls to weaken encryption for decades, arguing that it would put the confidentiality of communications at risk across the board.

# EXHIBIT 6



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Chair Lina M. Khan Announces New Appointments in Agency Leadership Positions

November 19, 2021   
**Tags:** Consumer Protection | Competition | Bureau of Competition | Bureau of Consumer Protection | Bureau of Economics | Technology | Artificial Intelligence

Federal Trade Commission Chair Lina M. Khan announced several new additions to the FTC's Office of Policy Planning. Olivier Sylvain, Meredith Whittaker, Amba Kak, and Sarah Myers West will be working with the agency's Chief Technology Officer and technologists as part of an informal AI Strategy Group and in partnership with policy experts across the agency to provide insight and advice on emerging technology issues. John Kwoka will be working with competition economists and attorneys on an updated approach to merger review policies.

"At this critical time for the agency, I'm thrilled to welcome to the FTC several new additions: Amba Kak, John Kwoka, Sarah Myers West, Olivier Sylvain, and Meredith Whittaker," said Chair Lina M. Khan. "Tackling unlawful conduct requires that we ensure our law enforcement and policy work are keeping pace with new market realities. These leaders in tech and economic policy will work alongside experts within the FTC and my office to help us realize that goal."

**Olivier Sylvain** will serve as Senior Advisor on Technology to the Chair. Sylvain joins the FTC from Fordham University where he has served as Professor of Law. An expert on Section 230 of the Communications Decency Act, his areas of scholarship include administrative law, information law, U.S. data protection and privacy law, and other information-economy related matters. At Fordham, he has been the Director of the McGannon Center for Communications Research, the Academic Director of the Center for Law and Information Policy, and a research affiliate at the Center on Race, Law, and

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 29

Justice. Sylvain was also a Karpatkin Fellow in the National Legal Office of the American Civil Liberties Union and a litigation associate at Jenner & Block, LLC. He is a graduate of Williams College, holds a JD from the Georgetown University Law Center, and earned a Ph.D. from Columbia University.

**John Kwoka** will serve as Chief Economist to the Chair. John joins us from Northeastern University where he is the Neal F. Finnegan Distinguished Professor of Economics. Kwoka has published widely, with his recent scholarship focusing on ways to update and strengthen merger policy and other aspects of antitrust. Kwoka has previously taught at the University of North Carolina at Chapel Hill and George Washington University, and has had visiting positions at Northwestern University and Harvard University. He has lectured and consulted widely in the areas of industrial and competition policy and has published more than 85 research and policy papers on economic issues. Kwoka has previously served at the Federal Trade Commission, the Antitrust Division of the Justice Department, and the Federal Communications Commission. He holds a Ph.D. in Economics, University of Pennsylvania, and an A.B. in Economics from Brown University.

**Meredith Whittaker** will serve as Senior Advisor on Artificial Intelligence to the Chair. Whittaker joins the FTC from NYU's Tandon School of Engineering where she has served as Faculty Director of the AI Now Institute and the Minderoo Research Professor. Her work has focused on critically examining the intersection of technology and policy, including the political economy of artificial intelligence and companies that develop and profit from it. She founded Google's Open Research Group, and co-founded M-Lab, a globally distributed network measurement platform that provides the world's largest source of open data on internet performance. She has over 15 years of experience in tech, and has advised the White House, the Federal Communications Commission, the City of New York, and many other governments on artificial intelligence and related issues. She holds an A.B. in Rhetoric and English Literature from Berkeley.

**Amba Kak** will serve as a Senior Advisor on Artificial Intelligence. Kak joins the FTC from NYU's Tandon School of Engineering where she has served as the Director of Global Policy at the AI Now Institute. Having worked in multiple jurisdictions, Amba brings comparative global expertise to policy issues. Her recent research has focused on algorithmic accountability and biometric regulation. Previously, she was the Global Policy Advisor at Mozilla where she helped develop the organization's policy positions on network neutrality and data privacy regulation, among others. Amba has a Master's in Law (BCL) and an MSc in the Social Science of the Internet from the University of Oxford, which she attended as a Rhodes Scholar.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 30

**Sarah Myers West** will serve as a Senior Advisor on Artificial Intelligence. Myers West joins the FTC from NYU's Tandon School of Engineering where she has served as Research Scholar at the AI Now Institute. Her research examines the intersection of technology, labor, and platform accountability, as well as the history and political economy of the tech industry. She has testified before the NYC City Council and has been invited to present her research at venues such as the National Science Policy Network, Internet Governance Forum, and National Human Genome Research Institute, among others. Myers West received her doctoral degree from the Annenberg School for Communication and Journalism at the University of Southern California and holds Master's Degrees in Communication and Public Diplomacy.

The Federal Trade Commission works to promote competition, and protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. You can learn more about consumer topics and report scams, fraud, and bad business practices online at ReportFraud.ftc.gov. Follow the FTC on social media, read our blogs and subscribe to press releases for the latest FTC news and resources.

# Contact Information

## Media Contact

Office of Public Affairs
Office of Public Affairs
202-326-2180

# EXHIBIT 7

# Signal >> Home

☐ **signal.org/**

## Speak Freely

Say "hello" to a different messaging experience. An unexpected focus on privacy, combined with all of the features you expect.

Get Signal



STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 34







## Why use Signal?

Explore below to see why Signal is a simple, powerful, and secure messenger

Hey check this out!



Whoa where are you!?

New Zealand!

## Share Without Insecurity

State-of-the-art end-to-end encryption (powered by the open source Signal Protocol) keeps your conversations secure. We can't read your messages or listen to your calls, and no one else can either. Privacy isn't an optional mode — it's just the way that Signal works. Every

message, every call, every time.



## Say Anything

Share text, voice messages, photos, videos, GIFs and files for free. Signal uses your phone's data connection so you can avoid SMS and MMS fees.



## Speak Freely

Make crystal-clear voice and video calls to people who live across town, or across the ocean, with no long-distance charges.



## Make Privacy Stick

Add a new layer of expression to your conversations with encrypted stickers. You can also create and share your own sticker packs.



## Get Together with Groups

Group chats make it easy to stay connected to your family, friends, and coworkers.



## No ads. No trackers. No kidding.

There are no ads, no affiliate marketers, and no creepy tracking in Signal. So focus on sharing the moments that matter with the people who matter to you.

## Free for Everyone

Signal is an independent nonprofit. We're not tied to any major tech companies, and we can never be acquired by one either. Development is supported by grants and donations from people like you.

Donate to Signal



© 2013–2024 Signal, a 501c3 nonprofit.© 2013–2024 Signal, a 501c3 nonprofit.

# EXHIBIT 8

# Jeff Bezos Email Against PowerPoint Presentations

☐ businessinsider.com/jeff-bezos-email-against-powerpoint-presentations-2015-7

Amazon CEO Jeff Bezos is not a fan of PowerPoint presentations.

Anytime an Amazon worker has an idea to discuss, they're asked to structure their pitch in the form of a four-to-six-page memo, which the company calls a "narrative."

They then take their pitches to team meetings, where the first 20 minutes or so are spent reading the memo. After, the presenter fields questions from the rest of the team.



Reuters

It's an unconventional process, to be sure, but one that Amazon believes forces careful consideration of ideas.

In an email sent to his senior team — also known as the STeam — in 2004, Bezos explained why Amazon would no longer be using PowerPoint presentations.

Pete Abilla, an early Amazon employee and current director of digital, content, and demand generation at HireVue, shared Bezos' email in a recent post on his employer's blog.

The email was sent to the STeam on June 9, 2004, at 6:02 p.m. and had the subject line "No powerpoint presentations from now on at steam."

It reads:

A little more to help with the reason "why."

Well structured, narrative text is what we're after rather than just text. If someone builds a list of bullet points in word, that would be just as bad as powerpoint.

The reason writing a 4 page memo is harder than "writing" a 20 page powerpoint is because the narrative structure of a good memo forces better thought and better understanding of what's more important than what, and how things are related.

Powerpoint-style presentations somehow give permission to gloss over ideas, flatten out any sense of relative importance, and ignore the innerconnectedness of ideas.

# EXHIBIT 9

 

🏠 Welcome to the United Nations                                    Resource    English

**Latest / Media Center**

PRESS RELEASES | SPECIAL PROCEDURES

# UN experts call for investigation into allegations that Saudi Crown Prince involved in hacking of Jeff Bezos' phone

**22 January 2020**

**Share**



5/2/24, 12:38 AM    UN experts call for investigation into allegations that Saudi Crown Prince was involved in hacking of Jeff Bezos' phone | OHCHR

Case 2:23-cv-01495-JHC    Document 234    Filed 05/13/24    Page 47 of 123

GENEVA (22 January 2020) - UN human rights experts are gravely concerned by information they have received suggesting that, in contravention of fundamental international human rights standards, a WhatsApp account belonging to the Crown Prince of the Kingdom of Saudi Arabia in 2018 deployed digital spyware enabling surveillance of *The Washington Post* owner and Amazon CEO, Jeffery Bezos.

The independent experts – Agnes Callamard, UN Special Rapporteur on summary executions and extrajudicial killings, and David Kaye, UN Special Rapporteur on freedom of expression – said the following:

"The information we have received suggests the possible involvement of the Crown Prince in surveillance of Mr. Bezos, in an effort to influence, if not silence, The Washington Post's reporting on Saudi Arabia. The allegations reinforce other reporting pointing to a pattern of targeted surveillance of perceived opponents and those of broader strategic importance to the Saudi authorities, including nationals and non-nationals. These allegations are relevant as well to ongoing evaluation of claims about the Crown Prince's involvement in the 2018 murder of Saudi and Washington Post journalist, Jamal Khashoggi.

"The alleged hacking of Mr. Bezos's phone, and those of others, demands immediate investigation by US and other relevant authorities, including investigation of the continuous, multi-year, direct and personal involvement of the Crown Prince in efforts to target perceived opponents.

"This reported surveillance of Mr. Bezos, allegedly through software developed and marketed by a private company and transferred to a government without judicial control of its use, is, if true, a concrete example of the harms that result from the unconstrained marketing, sale and use of spyware. Surveillance through digital means must be subjected to the most rigorous control, including by judicial authorities and national and international export control regimes, to protect against the ease of its abuse. It underscores the pressing need for a moratorium on the global sale and transfer of private surveillance technology.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 47

"The circumstances and timing of the hacking and surveillance of Bezos also strengthen support for further investigation by US and other relevant authorities of the allegations that the Crown Prince ordered, incited, or, at a minimum, was aware of planning for but failed to stop the mission that fatally targeted Mr. Khashoggi in Istanbul.

At a time when Saudi Arabia was supposedly investigating the killing of Mr. Khashoggi, and prosecuting those it deemed responsible, it was clandestinely waging a massive online campaign against Mr. Bezos and Amazon targeting him principally as the owner of The Washington Post."

The two experts – who were appointed by the Human Rights Council - recently became aware of a 2019 forensic analysis of Mr. Bezos' iPhone that assessed with "medium to high confidence" that his phone was infiltrated on 1 May 2018 via an MP4 video file sent from a WhatsApp account utilized personally by Mohammed bin Salman, the Crown Prince of the Kingdom of Saudi Arabia. According to the analysis, the Crown Prince and Mr. Bezos exchanged phone/WhatsApp numbers the month before the alleged hack. The forensic analysis found that within hours of receipt of the MP4 video file from the Crown Prince's account, massive and (for Bezos' phone) unprecedented exfiltration of data from the phone began, increasing data egress suddenly by 29,156 per cent to 126 MB. Data spiking then continued undetected over some months and at rates as much as 106,032,045 per cent (4.6 GB) higher than the pre-video data egress baseline for Mr. Bezos' phone of 430KB.

The forensic analysis assessed that the intrusion likely was undertaken through the use of a prominent spyware product identified in other Saudi surveillance cases, such as the NSO Group's Pegasus-3 malware, a product widely reported to have been purchased and deployed by Saudi officials. This would be consistent with other information. For instance, the use of WhatsApp as a platform to enable installation of Pegasus onto devices has been well-documented and is the subject of a lawsuit by Facebook/WhatsApp against NSO Group.

The allegations are also reinforced by other evidence of Saudi targeting of dissidents and perceived opponents. For instance, the United States has

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 48

brought criminal proceedings against two Twitter employees and a Saudi national "for their respective roles in accessing private information in the accounts of certain Twitter users and providing that information to officials of the Kingdom of Saudi Arabia". All three individuals are charged with being illegal agents for Saudi Arabia who, according to U.S. prosecutors, engaged in the "targeting and obtaining private data from dissidents and known critics, under the direction and control of the government of Saudi Arabia".

The Special Rapporteurs note that the allegations regarding the hacking of Bezos' mobile phone are also consistent with the widely reported role of the Crown Prince in leading a campaign against dissidents and political opponents.  The hacking of Mr. Bezos' phone occurred during a period, May-June 2018, in which the phones of three close associates of Jamal Khashoggi, Yahya Assiri, Omar Abdulaziz and Ghanem Al Masarir were also hacked, allegedly using the Pegasus malware.

At the time of the alleged May 2018 hack of Mr. Bezos' phone, Jamal Khashoggi was a prominent columnist for *The Washington Post* whose writing increasingly raised concerns about the Crown Prince's rule. On 2 October 2018, Saudi government officials murdered Mr. Khashoggi in the Saudi consulate in Istanbul, Turkey. *The Post* quickly began its substantial coverage of the disappearance and murder investigation, expanding into reporting a number of related aspects of the Crown Prince's rule in Saudi Arabia.

According to the forensic analysis, following the hacking of Mr. Bezos' phone, the Crown Prince sent WhatsApp messages to Mr. Bezos, in November 2018 and February 2019, in which he allegedly revealed private and confidential information about Mr. Bezos' personal life that was not available from public sources. During the same period, Mr. Bezos was widely targeted in Saudi social media as an alleged adversary of the Kingdom. This was part of a massive, clandestine online campaign against Mr. Bezos and Amazon, apparently targeting him principally as the owner of *The Washington Post.* The UN experts further note that Mr. Sa al-Qahtani, named by the Saudi prosecutor as having incited the

5/2/24, 12:38 AM UN experts call for investigation into allegations that Saudi Crown Prince involved in hacking of Jeff Bezos' phone | OHCHR

Case 2:23-cv-01495 Document 234 Filed 05/13/24 Page 50 of 123

kidnapping of Mr. Khashoggi, was also linked repeatedly to the organization of the on-line campaign excoriating *The Post* and calling for boycotts of Mr. Bezos and his companies.

The annexes to this statement provide detail concerning the expert forensic analysis of Mr. Bezos' device that took place in 2019.

The Special Rapporteurs expect to continue their investigations into responsibility for the murder of Mr. Khashoggi and the growing role of the surveillance industry in permitting the unaccountable use of spyware to intimidate journalists, human rights defenders, and owners of media outlets.

ENDS

*Annex I and II*

*Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi*

*2019 report on the private surveillance industry to the United Nations Human Rights Council is now available online*

*Ms. **Agnes Callamard**, UN **Special Rapporteur on summary executions and extrajudicial killings**, investigated and reported to the Human Rights Council in 2019 evidence showing the role of the Government of Saudi Arabia in the murder of journalist Jamal Khashoggi.*

*Mr. **David Kaye**, UN **Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression**, reported to the Council at the same time on the growing and lawless use of malicious spyware to surveil and intimidate journalists, human rights defenders, and others in civil society.*

*The Special Rapporteurs are part of what is known as the **Special Procedures** of the Human Rights Council. Special Procedures, the large body of independent experts in the UN Human Rights system, is the*

Case 2:23-cv-01495 Document 224 Filed 05/13/24 Page 51 of 123

general name of the independent fact-finding and monitoring mechanisms of the Human Rights Council that address either specific country situations or thematic issues in all parts of the world. Special Procedures experts work on a voluntary basis; they are not UN staff and do not receive a salary for their work. They are independent from any government or organisation and serve in their individual capacity.

UN Human Rights country page – **Saudi Arabia**

**For inquiries and media requests**, please contact: Mr. Bach Avezdjanov (+1 212 854 6785) or write to **ba2482@columbia.edu**

For **media inquiries** related to other UN independent experts please contact:

Mr. Jeremy Laurence (+41 22 917 9383 / **jlaurence@ohchr.org**)

Follow news related to the UN's independent human rights experts on Twitter @UN_SPExperts.

Concerned about the world we live in?

**Then STAND UP for someone's rights today.**

#Standup4humanrights and visit the web page at **http://www.standup4humanrights.org**

---

## Tags

Saudi Arabia        Freedom of opinion and expression

Cybersecurity and data protection

---

## Related

STATEMENTS

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 51

5/2/24, 12 38 AM    UN experts call for investigation into allegations that the Saudi Crown Prince was involved in hacking of Jeff Bezos' phone | OHCHR

Case 2:23-cv-01495-JHC    Document 224    Filed 05/13/24    Page 52 of 123

Comment by UN Human Rights Office Spokesperson Liz Throssell after Saudi woman jailed for 34 years

PRESS RELEASES

Saudi Arabia: Revoke death penalty for social media activity, UN experts urge

PRESS RELEASES

Default title

Global Social Channels

## Latest

Feature Stories

Media Center

Meetings & Events

## Resources

Databases

Library

Publications

## Connect

Contact Us

Follow us

Work With Us

**Donate**

---

Contact

Copyrights

Privacy Policy

Terms of use

# EXHIBIT 10

**Mandate of the Special Rapporteur on extrajudicial, summary or arbitrary executions and mandate of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression**

**Annex One**

<div style="border:1px solid">

**Analysis of the Evidence of Surveillance of Mr. Bezos' personal phone
- Key Technical Elements -**

</div>

To complement the preliminary substantive findings and associated expressions of concern by the Special Rapporteurs to the Saudi authorities regarding their alleged surveillance of Mr. Bezos, the following annex summarises the technical methodologies deployed to establish grounds for a reasonable belief (a "medium to high confidence" to use the precise wording of the technical experts involved) that Mr. Bezos was subjected to intrusive surveillance via hacking of his phone as a result of actions attributable to the WhatsApp account used by Crown Prince Mohammed bin Salman.

An in-depth, forensic level examination of Mr. Bezos' phone – including full forensic imaging and analysis - was undertaken by a team of digital forensic experts. According to the expert team, this forensic study was undertaken in a protected environment specifically created to enable thorough investigation of the phone without risk of contamination. A full report of the expert findings was made available to the Special Rapporteurs.

The phone in question underwent the following tests:

| Test undertaken | Tool used | Finding/result |
|---|---|---|
| Logical mobile acquisition | Cellebrite UFED 4PC | Acquisition successful |
| Network package collection while device was locked, unlocked, idle and while simulating activity | Wireshark, Fiddler | Collection of network traffic successful |
| Presence of malware | Cellebrite Physical Analyser | No known malware detected |
| Presence of conventional or typical malicious software | Cellebrite Physical Analyser; use of a sandboxed network to simulate an active internet connection | Vetted 350,579 unique hashes but no known malicious software detected |
| Presence of suspect indicators of compromise (IOCs) from the network capture logs | Cellebrite reports and captured network logs | Identified 1,290 URLs and 378 unique domain names and identified 192 potentially suspect IOCs |
| In-depth audit of 192 suspect IOCs | Manual review by experts | No evidence found that any of the identified domain names or URLs were related to malicious traffic. |

| Test undertaken | Tool used | Finding/result |
|---|---|---|
| Presence of jail-breaking tools and known iOS exploits tools | In-depth investigation of logical file system - auditing 274,515 directories, sub-directories and filenames | No evidence found of jail-breaking tools or known iOS exploits being present. |
| Analysis of suspect video file (sent to Mr. Bezos on WhatsApp from the Crown Prince's account as provided by to Mr. Bezos by the Crown Prince) | Analysis of the WhatsApp artifacts from Cellebrite reports | Initial results did not identify the presence of any embedded malicious code, but further analysis revealed that the suspect video had been delivered via an encrypted downloader host on WhatsApp's media server. |
| Analysis of the contents of the downloader | Attempted decryption | Due to WhatsApp's end-to-end encryption, the contents of the downloader cannot be practically determined. |
| Comparative analysis of cellular data egress with past usage of Mr. Bezos' phone | Analysis of the forensic artifacts from the Cellebrite reports | Records showed that within hours of receipt of the video from the Crown Prince's WhatsApp account, there was an anomalous and extreme change in phone behavior, with cellular data originating from the phone (data egress) increasing by 29,156 per cent.   Data spiking then continued over the following months at rates as much as 106,031,045 per cent higher than the pre-video data egress base line. |
| Comparative analysis of cellular data egress with devices similar to the Bezos phone | Expert analysis of five other similar devices | Up until the day the suspect video file was received, data egress patterns were found to be similar – and explicable by nature of activity undertaken – across all five devices and Mr. Bezos' phone.  Following receipt of the suspect video file, a stark contrast was found in the magnitude of data egress from Mr. Bezos' phone as compared to the five other phones. |

| Test undertaken | Tool used | Finding/result |
|---|---|---|
| Assessment of possible use of mobile spyware – cyber weapons | Expert analysis of likelihood of cyber weapons as methods for anomalous stimulation and capture of data egress | Experts advised that the most likely explanation for the anomalous data egress was use of mobile spyware such as NSO Group's Pegasus or, less likely, Hacking Team's Galileo, that can hook into legitimate applications to bypass detection and obfuscate activity.  For example, following the initial spike of exfiltration after receipt of the suspect video file, more than 6GB of egress data was observed using exfiltration vectors. |

**Annex Two**

## Brief Timeline of Key Events

| KEY DATE | EVENT |
|---|---|
| **December 2016** | At a Washington-based think-tank, Jamal Khashoggi makes critical remarks about Donald Trump's ascent to the US presidency. Soon after, the Saudi regime cancelled Mr. Khashoggi's column in the al-Hayat newspaper, and ultimately banned him from writing, appearing on television, and attending conferences. A Saudi official explained that Mr. Khashoggi's statements "do not represent the government of Saudi Arabia or its positions at any level, and his opinions only represent his personal views, not that of the Kingdom of Saudi Arabia." Mr. Khashoggi's subsequent exile from Saudi Arabia was self-imposed, based upon his belief that for his own safety and freedom he had no other choice but to leave. |
| **September 2017** | The Washington Post publishes Mr. Khashoggi's first column: "*Saudi Arabia wasn't always this repressive. Now it's unbearable.*" |
| **November 2017** | Pegasus-3 spyware is acquired from NSO Group by the Saudi regime, specifically the Saudi Royal Guard. |
| **February 7, 2018** | Washington Post publishes a column by Mr. Khashoggi entitled: "*Saudi Arabia's crown prince already controlled the nation's media. Now he's squeezing it even further.*" |
| **February 28, 2018** | Washington Post publishes a column by Mr. Khashoggi in which he writes: "…maybe [the Crown Prince] should learn from the British royal house that has earned true stature, respect and success by trying a little humility himself." |
| **March 21, 2018** | Washington Post owner, Mr. Bezos, is invited to attend a small dinner with the Crown Prince in Los Angeles. |
| **April 3, 2018** | Washington Post publishes a column by Mr. Khashoggi while the Crown Prince is in the U.S. in which Mr. Khashoggi writes: "…replacing old tactics of intolerance with new ways of repression is not the answer." |
| **April 4, 2018** | Mr. Bezos attends dinner with the Crown Prince, in the course of which they exchange phone numbers that correspond to their WhatsApp accounts. |
| **May 1, 2018** | A message from the Crown Prince account is sent to Mr. Bezos through WhatsApp. The message is an encrypted video file. It is later established, with reasonable certainty, that the video's downloader infects Mr. Bezos' phone with malicious code. |
| **May, 2018** | The phone of Saudi human rights activist Yahya Assiri is infected with malicious code. Yahya Assiri was in frequent communication with Mr. Khashoggi. |

| | |
|---|---|
| **June, 2018** | The phone of Saudi political activist Omar Abdulaziz is infected with malicious code, via a texted link on Whats App. Omar Abdulaziz was in frequent communication with Mr. Khashoggi. |
| **June, 2018** | The phone of an Amnesty International official working in Saudi Arabia is targeted for infection via a WhatsApp link that it is determined leads to an NSO Group-controlled website. |
| **June 23, 2018** | The phone of Saudi dissident Ghanem al-Dosari is targeted via a text link leading to NSO infrastructure. |
| **June 23, 2018** | A second phone of Saudi dissident Ghanem al-Dosari is targeted via a text link leading to NSO infrastructure. |
| **October 2, 2018** | Mr. Khashoggi is killed by Saudi government officials. The Washington Post begins reporting on the murder, publishing ever-expanding revelations about the role of the Saudi government and of the Crown Prince personally. |
| **October 15, 2018** | Massive online campaign against Mr. Bezos begins, targeting and identifying him principally as the owner of The Washington Post. In November, the top-trending hashtag in Saudi Twitter is "Boycott Amazon." The online campaign against Mr. Bezos escalates and continues for months. |
| **November 8, 2018** | A single photograph is texted to Mr. Bezos from the Crown Prince's WhatsApp account, along with a sardonic caption. It is an image of a woman resembling the woman with whom Bezos is having an affair, months before the Bezos affair was known publicly. |
| **February 25, 2019** | The Daily Beast runs an op-ed by Iyad el Baghdadi entitled "How the Saudis Made Jeff Bezos Public Enemy No. 1." |
| **March 31, 2019** | Hundreds of major news outlets around the world report on the allegation that Saudi Arabia had access to Mr. Bezos' phone and had obtained private data. The allegation was first published in a Daily Beast op-ed by Gavin de Becker, and subsequently reported by the NY Times, CNN, al Jazeera, BBC, Bloomberg, Reuters, and others. |
| **April 1, 2019** | The entire Saudi online campaign against Mr. Bezos stops abruptly, strongly indicating inauthentic and coordinated hashtags and tweets. |
| **April 25, 2019** | Intelligence officials in Norway advise Iyad el Baghdadi of a CIA warning that he is being targeted by the Saudis and move him from his home. Intelligence sources believe the threats are connected to Mr. Baghdadi's work on Jeff Bezos. |
| **May 1, 2019** | Mr. el Baghdadi is advised by a source in Saudi Arabia that the Saudis have successfully targeted his phone. |
| **September 20, 2019** | Twitter suspends 5000 accounts for "inauthentic behavior," including that of an advisor to the Crown Prince, Saud al Qahtani. |
| **October 1, 2019** | Mr. Bezos attends the memorial for Mr. Khashoggi held outside the Saudi Consulate in Istanbul where Mr. Khashoggi was murdered. |
| **October 2, 2019** | The Saudi online campaign against Mr. Bezos resumes after being dormant for months, specifically citing Mr. Bezos' attendance of the memorial event, |

| | and again calling for boycott of Amazon.  CNN Arabia reports on the new campaign. |
|---|---|
| **October 29, 2019** | Facebook sues the NSO Group in U.S. federal court for trying to compromise the devices of up to 1,400 WhatsApp users' in just two weeks. |
| **November 5, 2019** | The US Department of Justice charges three people with serving as Saudi spies inside Twitter. One of the three had left Twitter and gone to work at Amazon. |
| **November 14, 2019** | Facebook confirms that "sending a specifically crafted MP4 [video] file to a WhatsApp user," is a method for installing malicious spyware; exactly as was sent to Mr. Bezos. |
| **November 15, 2019** | Several news outlets report on a WhatsApp vulnerability, and warn those who "have received a random, unexpected MP4 video file," exactly as Bezos did, to beware. |
| **December 20, 2019** | Twitter suspends 88,000 accounts linked to Saudi spying case, saying that the accounts were associated with "a significant state-backed information operation" originating in Saudi Arabia. |

# EXHIBIT 11

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:           )

 4   AMAZON eCOMMERCE            ) File No. 1910129

 5   -----------------------------)

 6                                Thursday, September 22, 2022

 7

 8                                Room 8102

 9                                Federal Trade Commission

10                                Constitution Center

11                                400 7th Street, S.W.

12                                Washington, D.C.  20024

13

14            The above-entitled matter came on for

15   investigational hearing, pursuant to subpoena, at

16   8:37 a.m.

17

18

19

20

21

22

23

24

25
```

Jassy

Amazon eCommerce                                    9/22/2022

 1          A.   I don't know.
 2          Q.   Do you know why you downloaded Signal?
 3          A.   Yes.
 4          Q.   Why did you download Signal?
 5          A.   Well, the first thing that happened was
 6     Jeff Bezos' email was compromised and breached, and so
 7     he started using Signal and a number of his leaders
 8     started to use Signal.
 9          And then I think the reason that we all thought
10     it made sense -- or at least I did -- I'll just speak
11     for myself -- is that if you are -- if you come from
12     working in technology for a while like I did managing
13     AWS for about 18 years and you're paranoid, which I am,
14     about security, and if you watch how many breaches of
15     companies' data happen all the time, like we all
16     watched what happened with Sony and I think even just
17     in the last couple of weeks International Hotel Group
18     with Hilton -- the Hilton Inn had their corporate data
19     and communication breached -- you want to try to find a
20     way to better protect your internal communications from
21     any potential third-party intrusion.
22          And Signal, as an app, does
23     endpoint-to-endpoint encryption, which meaningfully
24     decreases the chance that some third party can
25     intercept a communication or a message, so that was I

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Jassy
Amazon eCommerce                                          9/22/2022

1    think for -- I didn't use it for most or all of my

2    communication, but for -- for information that we

3    thought was potentially sensitive if it somehow got

4    intercepted, that was when we chose to use it.

5        Q.  And what would be examples of sensitive

6    information if it was intercepted?  And again, without

7    breaking privilege.

8        A.  The three people I probably communicated most

9    with in Signal I think are illustrative of, you know,

10   your question.

11           The first would be Steve Schmidt, who's our

12   chief information security officer.  And the type of

13   information -- he's the chief information security

14   officer -- when I was using Signal, he was the

15   chief information security officer for AWS.  The types

16   of information we would be talking about are security

17   issues and, you know, risks that he saw, things he

18   heard about other companies, things he believed we

19   should spend more time on, but, you know, security

20   issues, which I consider sensitive.

21           The second person that I communicated a lot

22   with in Signal was Beth Galetti, who runs HR.  And we

23   were mostly communicating about people issues,

24   performance issues, organizational design or

25   restructuring issues, also I consider sensitive

# EXHIBIT 12

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:                  )

 4   AMAZON eCOMMERCE,                   )
                                        ) File No. 191-0129
 5                a Corporation.         )

 6   ----------------------------------  )

 7                              Thursday, October 20, 2022

 8

 9                              920 Fifth Avenue

10                              Suite 3300

11                              Seattle, Washington 98104

12

13

14

15

16        The above-entitled matter came on for

17   investigational hearing, pursuant to civil

18   investigative demand, at 8:00 a.m.

19

20

21

22

23

24

25
```

268

Bezos

Amazon eCommerce                                    10/20/2022

1          THE WITNESS:  Okay.

2          MS. HUBBARD:  Okay.  Thank you, Counsel.

3          MR. SCHWARTZ:  Let's go off the record.

4          (Recess, 3:18 p.m. to 3:31 p.m.)

5          MR. SCHWARTZ:  Let's go back on the record.

6          MS. HUBBARD:  Do we have anyone who has not yet

7    identified themselves for the record who has joined

8    remotely?  If so, please identify yourselves now.

9      Q.  (By Mr. Schwartz)  Okay.  Mr. Bezos, are you

10   familiar with an app called Signal?

11     A.  Yes.

12     Q.  What is Signal?

13     A.  It is a messaging app.

14     Q.  Have you ever used Signal for work purposes?

15     A.  Yes.  For certain -- for certain work purposes.

16     Q.  What kind of work purpose?

17     A.  I've used Signal for data security, you know,

18   very personal sensi- -- sensitive personnel issues.

19   Occasional sensitive PR issues.  And, you know, and very

20   minor things, like somebody will maybe say, Don't --

21   don't forget to read this e-mail.  Almost the way you

22   might use text messaging or something for casual, I'm

23   going to be ten minutes late to the meeting, that sort of

24   thing.

25     Q.  Did you use Signal to discuss strategic issues?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Bezos
Amazon eCommerce                                    10/20/2022

1            MS. HUBBARD:  Objection to form.
2            THE WITNESS:  I would not use Signal to discuss
3       any substantive business issues.  I never have.  It's
4       just not a good -- at least the messaging format is too
5       short.
6            And we have a really established practice inside
7       Amazon, which we've had for decades.  The way we discuss
8       substantive business issues is somebody writes a
9       carefully thought-through six-page narratively structured
10      memo, and then we sit down as a group and read it.
11      You've seen -- you've presented some of them to me here
12      today.
13           And that process works really well.  To discuss
14      anything in text messaging or Signal messaging or
15      anything like that of any substance would be akin to
16      business malpractice.  It's just too short of a messaging
17      format.
18        Q.  (By Mr. Schwartz)  But you have used it to
19      discuss Amazon business, correct?
20           MS. HUBBARD:  Objection to form; asked and
21      answered.
22           THE WITNESS:  The kinds of things I -- I already
23      said.
24        Q.  (By Mr. Schwartz)  Did you use Signal to discuss
25      Prime Video?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# EXHIBIT 13



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Julie Goshorn
Bureau of Competition
Technology Task Force
Phone: (202) 326-3033
Email: jgoshorn@ftc.gov

August 5, 2019

**By Electronic Mail**

Andrew DeVore, Esq.
Vice President & Associate General Counsel
Litigation and Regulatory
Amazon.com, Inc.
2021 7th Ave.
Seattle, WA 98121
adevore@amazon.com

Re: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dear Mr. DeVore:

We notified you on June 17, 2019 that the Federal Trade Commission's Bureau of Competition is conducting a nonpublic investigation into whether Amazon.com, Inc. ("Amazon" or "the Company") has engaged or is engaging in unfair methods of competition through anticompetitive or exclusionary conduct related to online sales, distribution, and related business practices, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended. This letter requests information and documents from Amazon on a voluntary basis to assist in our investigation.[1]

As used in this letter, the term "the Company" means Amazon.com, Inc. and its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. Unless otherwise specified, the requests in this letter apply to materials created or in effect since January 1, 2012, relating to the Company's business in the United States.

---

[1] The term "documents" includes both "documents" and "electronically stored information" as those terms are utilized in Fed. R. Civ. P. 34(a).

Goshorn to DeVore
August 5, 2019
Page 2

<u>Requests for Documents and Information</u>

1.     Provide a copy of the Company's top-level organization charts.

2.     Describe each line of business in which the Company currently competes or plans to compete.  For each such line of business, provide the following:

      a.     a description of each product or service sold by the Company;

      b.     the Company's annual revenue;

      c.     the Company's top five competitors; and

      d.     the Company's annual marketing, strategic, and business plans relating to the business line since January 1, 2018.

Include in your response a description of Amazon.com and its line(s) of business.

3.     Provide monthly sales, in dollars and in units, of products and services sold on Amazon.com, by product category or department.  Specify monthly sales for each product category or department by:

      a.     third-party sellers;

      b.     the Company's private label brands;

      c.     the Company's exclusive brands; and

      d.     the Company, other than the Company's private label or exclusive brands.

4.     Provide a list of the Company's private label and exclusive brands available on Amazon.com, by product category or department.  For each Company private label or exclusive brand, state:

      a.     annual sales, in dollars and in units;

      b.     the beginning and ending dates that the brand was offered;

      c.     whether the brand was offered only to Amazon Prime members; and

      d.     the beginning and ending dates that the brand was available only to Amazon Prime members.

5.     Provide monthly sales, in dollars and in units, of products and services sold on Amazon.com, separately for the mobile environment and non-mobile environment.

6.     Provide monthly sales, in dollars and in units, of products and services sold at the Company's physical stores.

7.     Describe what portion of the Single Detail Page encompasses the "Buy Box" or "Featured Offer."  Provide monthly sales, in dollars and in units, of all products and

Goshorn to DeVore
August 5, 2019
Page 3

services sold on Amazon.com through the "Buy Box" or "Featured Offer" and not through the "Buy Box" or "Featured Offer." Provide such information separately for the mobile environment and non-mobile environment.

8.   Provide annual lists of the Company's top 20 and median 20 suppliers or vendors, by revenue and by volume, for each product category or department relating to products and services sold on Amazon.com. For each supplier or vendor, provide contact information (name, contact person, address, phone number, and email) and related agreements.

9.   Provide annual lists of the Company's top 20 and median 20 third-party sellers, by revenue and by volume, for each product category or department relating to products and services sold on Amazon.com. For each third-party seller, provide contact information (name, contact person, address, phone number, and email), and identify whether the third-party seller is a brand/manufacturer or a reseller.

10.  Provide a list of each Company distribution or fulfillment facility, and for each such facility, provide:

   a.   the address;

   b.   total square footage;

   c.   total cubic footage; and

   d.   annual shipments (by number and dollar value) associated with purchases through (i) Amazon.com, (ii) other Company websites or physical stores, and (iii) any online website not owned by the Company.

11.  Describe the Company's current and planned use of Whole Foods' distribution and fulfillment assets, including whether the Company is using, or has plans to use, such assets to deliver products and services purchased through Amazon.com.

12.  Provide documents sufficient to show the standard terms of the Company's agreements with third-party sellers relating to the provision or sale of products or services on Amazon.com, and provide a copy of sample agreements. Describe each change to the Company's standard terms with third-party sellers resulting from the Company's July 2019 settlements with German and Austrian antitrust authorities.

13.  Provide documents sufficient to show the Company's marketing strategies or business plans, including pricing policies and practices, relating to competition with third-party sellers on Amazon.com or third-party online platforms.

Goshorn to DeVore
August 5, 2019
Page 4

14. Describe, and provide documents sufficient to show, the type of data and information the Company collects or has access to relating to the provision or sale of products or services on Amazon.com from:

    a.    consumers;

    b.    third-party sellers; and

    c.    suppliers or vendors.

Include in your response a description of what pricing or other data the Company collects or has access to as part of any service or program Amazon makes available to third-party sellers.

15. Describe, and provide documents sufficient to show, how the Company maintains, uses, and/or sells the data and information identified in Specification 14 above, including whether and how the Company uses the data or information to price the Company's products or services or to decide whether to offer a product or service in competition with third-party sellers. Provide documents sufficient to show the Company's related policies and practices, including, but not limited to, the Company's Seller Data Protection Policy.

16. Describe, and provide documents sufficient to show, the Company's policies, procedures, and practices relating to:

    a.    the data and information that the Company makes available to third-party sellers relating to the provision or sale of products or services on Amazon.com;

    b.    any restrictions that the Company places on third-party sellers' use of the data and information identified in subpart (a) above;

    c.    the data and information that the Company makes available to suppliers or vendors relating to the provision or sale of products or services on Amazon.com; and

    d.    any restrictions that the Company places on suppliers' or vendors' use of the data and information identified in subpart (c) above.

17. Describe, and provide documents sufficient to show, the Company's policies, practices, and procedures relating to:

    a.    the Company's pricing of products and services it offers on Amazon.com;

    b.    any pricing, marketing, or inventory tools the Company offers to third-party sellers on Amazon.com, including, but not limited to, "Selling Coach," "Selling Partner Appstore," "Pricing Dashboard," and "Seller University";

    c.    any pricing, marketing, or inventory tools the Company offers to its suppliers or vendors on Amazon.com;

    d.    the Amazon Prime program, including, but not limited to, the terms of the program, the benefits and costs to subscribers, the date range of each such benefit

Goshorn to DeVore
August 5, 2019
Page 5

          or cost, and the price schedule for each year since the Amazon Prime program was initiated;

e.     the "Buy Box" or "Featured Offer," including, but not limited to, the Company's criteria for eligibility and selection of the seller or product or service;

f.     product placement, including, but not limited to, the ranking of search results and selection of product designations such as "Amazon's Choice," "Best Seller," "Recommended," and "Prime";

g.     advertising placement, including, but not limited to, the algorithm, methodology, or other processes for determining where and when to display advertising content; and

h.     the Fulfillment By Amazon program, including, but not limited to, the eligibility criteria, benefits, pricing, and other fees associated with fulfilling orders on Amazon.com and, separately, with fulfilling orders for third-party online platforms.

18.     Provide each agreement between the Company and a third-party seller that has the purpose or effect of restricting the third-party seller's price of any product or service on Amazon.com, including, but not limited to, any requirement that the third-party seller set its prices on Amazon.com at parity with, or lower than, prices charged elsewhere.

19.     Provide each agreement between the Company and a supplier or vendor (including, but not limited to, publishers) that:

a.     has the purpose or effect of restricting the supplier or vendor from, or requiring advance notice prior to, offering its product to a third party under different terms, including price and non-price terms, than those offered to the Company; or

b.     includes a price parity provision, including, but not limited to, any provision that has the purpose or effect of guaranteeing the Company's margin on a supplier's or vendor's product or service (including, but not limited to, e-books) in the event that the Company decreases or discounts its price in response to a third party's price or discount.

20.     Describe, and provide documents sufficient to show, whether and how enrollment in the Company's services to third-party sellers (e.g., Fulfillment by Amazon or Amazon's advertisement services) affects the third-party seller's product placement, including, but not limited to, the "Buy Box" or "Featured Offer."

21.     From **January 1, 2008** to the present, list each company or joint venture the Company acquired in whole or in part.  For each acquisition, provide:

a.     the name of the entity acquired;

b.     the percentage of the Company's ownership interest;

c.     the purchase price;

Goshorn to DeVore
August 5, 2019
Page 6

      d.     the acquisition date;

      e.     a description of the business(es), product(s), or service(s) acquired; and

      f.     a description of whether, at the time of the acquisition, the Company had: (1) a competing business, product, or service; (2) an adjacent business, product, or service; and/or (3) plans to enter the acquired business, product, or service.

22.    Describe, and provide documents sufficient to show, the Company's policies, procedures, and practices relating to:

      a.     the provision or sale of counterfeit products on Amazon.com by the Company or third-party sellers;

      b.     the provision or sale of used, repaired, or refurbished products on Amazon.com, including, but not limited to, the terms and conditions relating to the Amazon Renewed program; and

      c.     the requirements that went into effect in January 2019 relating to required minimum sales and inventory volumes for Apple-branded products.

23.    Provide each agreement, including any amendments, between the Company and a brand or brand licensee that has the purpose or effect of limiting or restricting:

      a.     the resale of the brand or brand licensee's product by a third-party seller on Amazon.com, including, but not limited to, used, repaired, or refurbished products; or

      b.     the online display of advertisements for competing products or services on Amazon.com, including, but not limited to, the display of advertisements on the single detail page, search results page, or any other web page.

24.    Provide each agreement, including any amendments, between the Company and Apple Inc. ("Apple") and all written communications relating to the implementation of such agreements. Describe, and provide documents sufficient to show, the Company's rationale for entering into such agreements.

25.    Provide a list of each type of Apple-branded product sold on Amazon.com since January 1, 2017, including whether the type of product was sold new, used, repaired, or refurbished (*e.g.*, new iPhones; refurbished iPads). For each type of Apple-branded product, provide, by month:

      a.     each seller on Amazon.com, including the seller's name, address, email address, and telephone number;

      b.     the Company's sales, in dollars and in units;

      c.     the top 20 sellers, by revenue and volume; and

      d.     each seller who was no longer able to sell Apple-branded products on Amazon.com because of requirements that went into effect in January 2019 relating to the required minimum sales and inventory volumes for Apple-branded

Goshorn to DeVore
August 5, 2019
Page 7

       products, including the seller's name, address, email address, and telephone number.

26.    Provide a list of all non-U.S. regulatory or enforcement agencies with antitrust or competition authority from which the Company has received request(s) for information, documents, or testimony.  Provide the related request(s) for information, documents, or testimony.

27.    Provide all antitrust-related requests from the United States Congress or from any U.S. state, district, or territory attorney general's office to the Company and submit all Company responses to such requests.

       Please send the requested information and documents by September 5, 2019.  Submit electronically-stored documents, information, or data in electronic format according to the instructions in the attached Appendix.  In the interest of time, please submit the requested documents and information on a rolling basis, identifying the requests to which the submission responds.

       Information submitted in response to this letter will be afforded confidential treatment and is exempt from disclosure under the Freedom of Information Act, as provided in 16 C.F.R. §§ 4.10-4.11 and 15 U.S.C. §§ 46(f) and 57b-2, respectively.  To ensure confidential treatment, please mark each page that contains confidential information as "Confidential."

       As with any preliminary investigation, we may find it necessary to seek additional information and documents from the Company.  If you believe the scope of this request can be narrowed or if you have other questions, please call Julie Goshorn at (202) 326-3033 or Christine Kennedy at (202) 326-3569.  Thank you for your cooperation.

       Sincerely,

       Julie Goshorn

cc: June Im

Goshorn to DeVore
August 5, 2019
Page 8

<div align="center">Appendix: Form of Production</div>

I.    The Company shall submit documents as instructed below absent written consent.

(a)    Documents stored in electronic or hard copy formats in the ordinary course of
business shall be submitted in the following electronic format provided that such
copies are true, correct, and complete copies of the original documents:

(i)    Submit Microsoft Excel, Access, and PowerPoint files in native format
with extracted text and metadata.

(ii)    Submit emails in TIFF (Group IV) format with extracted text and the
following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the email. |
| Bates End | Bates number of the last page of the email. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the person from whom the email was obtained. |
| Email BCC | Names of person(s) blind copied on the email. |
| Email CC | Names of person(s) copied on the email. |
| Email Date Received | Date the email was received. [MM/DD/YYYY] |
| Email Date Sent | Date the email was sent.  [MM/DD/YYYY] |
| Email From | Names of the person who authored the email. |
| Email Message ID | Microsoft Outlook Message ID or similar value in other message systems. |

Goshorn to DeVore
August 5, 2019
Page 9

| Metadata/Document Information | Description |
|---|---|
| Email Subject | Subject line of the email. |
| Email Time Received | Time email was received.  [HH:MM:SS AM/PM] |
| Email To | Recipients(s) of the email. |
| Email Time Sent | Time email was sent.  [HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Folder | File path/folder location of email. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Text Link | Relative path to submitted text file. Example:  \TEXT\001\FTC0003090.txt |

(iii)   Submit email attachments other than those described in subpart (a)(i) in
TIFF (Group IV) format.  For all email attachments, provide extracted text
and the following metadata and information as applicable:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |

Goshorn to DeVore
August 5, 2019
Page 10

| Metadata/Document Information | Description |
|---|---|
| Custodian | Name of person from whom the file was obtained. |
| Date Created | Date the file was created.  [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Native Link | Relative file path to submitted native or near native files. Example: \NATIVES\001\FTC0003090.xls |
| Parent ID | Document ID or beginning Bates number of the parent email. |
| Text Link | Relative path to submitted text file. Example: \TEXT\001\FTC0003090.txt |
| Time Created | Time file was created.  [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved.  [HH:MM:SS AM/PM] |

(iv)   Submit all other electronic documents, other than those described in subpart (a)(i), in TIFF (Group IV) format accompanied by extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|

Goshorn to DeVore
August 5, 2019
Page 11

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the original custodian of the file. |
| Date Created | Date the file was created.  [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Originating Path | File path of the file as it resided in its original environment. |
| Production Link | Relative path to submitted native or near native files. Example: \NATIVES\001\FTC0003090.xls |
| Text Link | Relative path to submitted text file. Example:  \TEXT\001\FTC-0003090.txt |
| Time Created | Time file was created.  [HH:MM:SS AM/PM] |

Goshorn to DeVore
August 5, 2019
Page 12

| Metadata/Document Information | Description |
|---|---|
| Time Modified | Time file was saved.  [HH:MM:SS AM/PM] |

(v)   Submit documents stored in hard copy in TIFF (Group IV) format accomplished by OCR with the following information:

| Metadata/Document Information | Description |
|---|---|
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Bates number of the last page of the document. |
| Custodian | Name of person from whom the file was obtained. |

(vi)   Submit redacted documents in TIFF (Group IV) format accompanied by OCR with the metadata and information required by relevant document type in subparts (a)(i) through (a)(v) above.  For example, if the redacted file was originally an attachment to an email, provide the metadata and information specified in subpart (a)(iii) above.

(b)   Submit data compilations in electronic format, specifically Microsoft Excel spreadsheets or delimited text formats, with all underlying data un-redacted and all underlying formulas and algorithms intact.  Submit data separately from document productions.

(c)   Produce electronic file and TIFF submissions as follows:

(i)   For productions over 10 gigabytes, use hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data in USB 2.0 or 3.0 external enclosure.

(ii)   For productions under 10 gigabytes, CD-ROM (CD-R, CD-RW) optical disks and DVD-ROM (DVD+R, DVD+RW) optical disks for Windows-compatible personal computers, and USB 2.0 Flash Drives are acceptable storage formats.

(iii)   <u>All documents produced in electronic format shall be scanned for and free of viruses prior to submission.  The Commission will return any infected media for replacement, which may affect the timing of the Company's compliance with this Request.</u>

Goshorn to DeVore
August 5, 2019
Page 13

      (iv)    Encryption of productions using NIST FIPS-Compliant cryptographic hardware or software modules, with passwords sent under separate cover, is strongly encouraged.

   (d)    Each production shall be submitted with a transmittal letter that includes the FTC matter number; production volume name; encryption method/software used; list of custodians and document identification number range for each; total number of documents; and a list of load file fields in the order in which they are organized in the load file.

   (e)    If the Company intends to utilize any de-duplication or email threading software or services when collecting or reviewing information that is stored in the Company's computer systems or electronic storage media, or if the Company's computer systems contain or utilize such software, the Company must contact a Commission representative to determine, with the assistance of the appropriate government technical officials, whether and in what manner the Company may use such software or services when producing materials in response to this Request.

II.    All documents responsive to this Request:

   (a)    shall be produced in complete form, un-redacted unless privileged, and in the order in which they appear in the Company's files;

   (b)    shall be marked on each page with corporate identification and consecutive document control numbers when produced in TIFF format (e.g, ABC-00000001);

   (c)    if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

   (d)    shall be produced in color where necessary to interpret the document (if the coloring of any document communicates any substantive information, or if black-and-white photocopying or conversion to TIFF format of any document (e.g., a chart or graph), makes any substantive information contained in the document unintelligible, the Company must submit the original document, a like-colored photocopy, or a JPEG format TIFF);

   (e)    shall be accompanied by an index that identifies: (i) the name of each Person from whom responsive documents are submitted; and (ii) the corresponding consecutive document control number(s) used to identify that Person's documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that, Commission representatives determine prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request; and

Goshorn to DeVore
August 5, 2019
Page 14

    (f)      shall be accompanied by an affidavit of an officer of the Company stating that the copies are true, correct, and complete copies of the original documents.

# EXHIBIT 14

CONFIDENTIAL
AMAZON.COM, INC.
FTC File No. 211-0135

### AMAZON.COM, INC.'S RESPONSE TO THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIAL ISSUED ON JULY 9, 2021

*Submitted February 14, 2022*

Amazon.com, Inc. (also referred to herein as "Amazon" or the "Company") hereby responds to the Request for Additional Information and Documentary Material ("Second Request") issued by the Federal Trade Commission (the "Commission" or "FTC") on July 9, 2021, pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "Act"), and as modified by the following communications (collectively, "Modification Letters") (*see* Exhibit B):

- November 1, 2021 email from Nick Bush to Addison Thompson (Covington & Burling LLP)

- November 3, 2021 letter and attachment from Kelly Fabian to James Dean (Covington & Burling LLP)

- November 22, 2021 letter from Kelly Fabian to James Dean

- December 13, 2021 letter and appendix from Kelly Fabian to Addison Thompson

The Second Request relates to the proposed acquisition of MGM Holdings Inc. ("MGM") by Amazon (the "Proposed Transaction").

Amazon has submitted documents and data responsive to the Second Request, with productions made on October 20, 2021 (sample data production), November 8 (sample data production), November 11, November 22, December 1, December 7, December 16, December 23, December 29, January 4, 2022, January 7, January 10, January 11, January 18, January 20, January 24, January 27, February 2, February 3, February 4, February 7, February 9, February 11, and February 14 (*see* corresponding cover letters at Exhibit C). Enclosed is an index of responsive documents submitted by the Company that provides document control numbers by custodian, as called for by Instruction 6(e) (*see* Exhibit D).

Amazon has made diligent efforts to identify and withhold or redact privileged documents as appropriate. If this or any other Amazon submission contains any records or communications that are protected by the attorney-client privilege, the attorney work product doctrine, or any other privileges or protections, Amazon has produced those materials inadvertently. Amazon does not waive its privileges and protections as to those materials, and requests that the Commission promptly return any such materials under Fed. R. Evid. 502(b), Fed. R. Civ. P. 26(b)(5)(B), and any other applicable rules and regulations.

Written responses to each specification of the Second Request, which have been prepared with the assistance of counsel, are provided below and in the exhibits submitted in the enclosed disc. Because they are generally too voluminous to be printed efficiently, the Company has submitted or is submitting the data files and all other exhibits to this response on discs solely in their native electronic formats or as PDF files (as appropriate), and has not printed or submitted them in hard copy.

Responsive information has been provided to the extent it is in the Company's possession, custody, or control and could reasonably be determined from information maintained in the ordinary course of business. Defined terms are used in the written responses solely for ease of reference, and their use should not be construed as an admission by the Company as to the accuracy, completeness, or validity of such definitions.

Certain information called for by the Second Request has previously been provided to the Commission in the Company's Premerger Notification and Report Form and its accompanying exhibits, dated June 9, 2021, as well as other submissions, letters, and presentations dated June 23,

CONFIDENTIAL
AMAZON.COM, INC.
FTC File No. 211-0135

2021, July 7, July 27, August 5, August 20, August 27, September 15, September 22, October 1, October 7, October 8, October 18, October 20, October 21, October 25, October 27, November 5, November 8, November 10, November 18, November 19, November 22, November 23, December 1, December 2, December 8, December 10, December 14, December 30, January 3, 2022, January 4, January 5, January 12, January 14, January 20, January 24, and February 3 (*see* Exhibit E)[1], all of which are hereby incorporated by reference.

With this submission, the Company encloses the certifications required by Section 803.6 of the implementing rules for the Act, 16 C.F.R. § 803.6 (*see* Exhibit A). The Company's certification of compliance is effective February 14, 2022.

Amazon has made a diligent, good-faith effort to substantially comply with the Second Request. In particular, and as further described in Amazon's January 5, 2022 letter, Amazon has agreed to search the files of all custodians requested by the FTC, including the search of various non-custodians' names and email addresses as specified by the FTC. As a result, Amazon has searched the files of 77 custodians (which after factoring in predecessors and successors includes 132 people, *see* Exhibit F) pursuant to the document review processes described in letters sent by Covington & Burling LLP to Staff, dated October 8, October 18, December 1 (supplemented with an Excel spreadsheet sent by email on December 8), and January 5-and has produced all responsive non-privileged material identified in that document review process. To the extent that the FTC believes that Amazon is required to search the files of additional custodians or to employ additional search terms, Amazon provides the following statement of reasons for non-compliance pursuant to 16 C.F.R. § 803.3(d): it would be costly, time consuming, and unduly burdensome for Amazon to search the files of additional custodians or add additional search terms, particularly in light of the low likelihood that such additions would result in the production of unique, responsive information or would otherwise be meaningfully relevant to the Commission's analysis of the Proposed Transaction. Amazon respectfully submits that this information is not necessary to come into substantial compliance within the meaning of the Act.

Instruction 2 of the Second Request requires the production of all responsive documents up to 45 calendar days prior to the Company's date of compliance, except for Specifications 22, 44, 47, and 48, for which the date is 21 calendar days prior to compliance. Amazon, in consultation with its eDiscovery vendor, Consilio LLC ("Consilio"), determined it was not possible to comply fully with this instruction and provides the following statement of reasons for non-compliance pursuant to 16 C.F.R. § 803.3(d). As described above, Amazon has collected documents from 132 people and from over 20 total sources (including email, Chime, Box, laptops, Work Docs, SharePoint, Slack, Quip, H Drive, Amazon Drive, mobile phones, hard copy documents, Asana, OneNote, Evernote, Salesforce, external hard drives and USBs, Smartsheets, Google Drive, OneDrive, Wrike, and AWS S3). Before responsive material is produced, these documents must be collected, processed, added to a review database, reviewed, redacted (where appropriate) and logged for privilege (and/or PII) if applicable, processed for production pursuant to Instruction 4 of the Second Request, copied to a hard drive, and shipped to the Commission. Amazon and Consilio determined that this multi-step and time-consuming process could not be completed within the 45 day requirement in light of the number of custodians and data sources involved. After diligent efforts to determine what was possible to collect as close to compliance as feasible and to prioritize the document repositories most likely to have information responsive to the Second Request, Amazon refreshed all custodians' email and Chime collections 60 days prior to compliance and refreshed the FTC-named priority custodians'[2] email,

---

[1] Exhibits and appendices are included in Exhibit E except where they are so voluminous as to make inclusion impractical (*e.g*., large Excel files).

[2] Identified in Megan Henry's November 18, 2021 email to Tom Barnett (Covington & Burling LLP) and Mandy Reeves (Latham & Watkins LLP), the priority custodians are: Jeff Bezos, Jeff Blackburn,

Chime, and mobile collections 45 days prior to compliance. It was determined that no custodial documents could go through the process of collection through production within 21 days of compliance; however, Amazon was able to meet the 21 day requirement for Specifications 47 and 48 (neither of which involved a custodial collection). To the extent that the Commission believes that Amazon is required to conduct more current searches of custodial documents, which as explained above Amazon has determined is not feasible, Amazon respectfully submits that such responsive information, which by definition was created months after the Proposed Transaction was announced, would not be meaningfully relevant to the Commission's analysis of the Proposed Transaction and is not necessary to come into substantial compliance within the meaning of the Act.

As identified in the responses below and enclosed, there are certain instances where Amazon either does not keep the information requested by the Commission or where collection or assembly of the requested information would be highly burdensome, particularly in light of the limited probative value of such information, or where the information no longer exists. For these specifications, Amazon has provided available information and an explanation as to why some information may no longer be available. To the extent the Commission has requested figures that Amazon is unable to estimate reasonably, or has requested information that cannot be compiled without undertaking a burden disproportionate to the information's probative value, Amazon has not provided the requested figures and/or information, and provides the following statement of reasons for non-compliance pursuant to 16 C.F.R. § 803.3(d): it would be costly, time consuming, and unduly burdensome for Amazon to provide additional figures, data, and/or information, particularly in light of the low likelihood that additional information would be meaningfully relevant to the Commission's analysis of the Proposed Transaction. Amazon respectfully submits that responses to the requests in question are not necessary to come into substantial compliance within the meaning of the Act. Moreover, to the extent the Commission takes the position that such information is required by the request, Amazon respectfully submits that such requests are beyond the scope of the Commission's authority under the Act.

The responses below and enclosed contain proprietary, competitively sensitive, and highly confidential information regarding the Company and its operations. Accordingly, the Company requests that these responses and the enclosed materials, as well as the information contained therein, be afforded the fullest confidentiality protections available pursuant to all applicable laws, rules, and regulations, including, without limitation, 5 U.S.C. §§ 552(b)(4), 552(b)(7)(A)-(C), 15 U.S.C. § 18a(h), 15 U.S.C. § 57b-2(c), and the Commission Rules of Organization, Procedure, and Practice, 16 CFR Subchapter A (pts. 0-16). In the event that either body of Congress or an authorized committee or subcommittee thereof requests disclosure of any of these documents or information, the Company requests ten business days' prior written notice in order to ensure continued confidential treatment. Amazon further requests: (1) the legally required notice prior to any disclosure of the information contained in any of these responses, and (2) the destruction of all materials submitted upon completion of the Commission's investigation.

While Amazon employees rely principally on email, Chime, and other enterprise applications for their business-related communications, Amazon is aware of eight custodians with potentially responsive communications on a messaging application called Signal.[3] Amazon has collected and produced these messages where available and responsive. Signal uses "state-of-the-art end-to-end

---

Mike Hopkins, Jay Marine, Jennifer Salke, Chris Evans, Carlo Bertucci, Neil Lindsay, Mark Eamer, and Marc Aldrich.

[3] The eight custodians are Carlo Bertucci, Jeff Bezos, Jeff Blackburn, Mike Hopkins, Andy Jassy, Peter Krawiec, Jay Marine, and Jennifer Salke.

CONFIDENTIAL
AMAZON.COM, INC.
FTC File No. 211-0135

encryption" to ensure that conversations remain secure.[4] Signal is used by business leaders, government officials, and other high-profile individuals because its encrypted, secure platform provides privacy protections and protects against hacking.[5] While not their primary tool for work communication, certain Amazon executives began using Signal for these privacy and security benefits. As illustrated by the widely-reported hacking of an Amazon executive's personal phone, Amazon's executive leaders are targets for individual and/or nation-state actors who seek to intercept sensitive business communications. Apps like Signal offer protection against not only the interception of communications, but also against improper access to information if a mobile device is lost or stolen for several reasons: (i) the messages are encrypted end-to-end as well as when stored on devices, (ii) they typically require two-factor authentication, and (iii) they reduce the amount of data stored on the device.

As part of its security protections, Signal has a "disappearing message" feature that auto-deletes messages on both the sender's and recipient's devices. This feature was active during some portion of some custodians' use, and it is possible that some responsive communications were not available for collection and production. Given Signal's end-to-end encryption, Amazon understands that any messages that were not preserved cannot be recovered. The number of potentially responsive documents that were not preserved is almost certainly a *de minimis* percentage of the overall production universe in this matter.

Amazon produced responsive Signal messages for seven of these custodians, which include a total of 1,226 Signal messages from March 2020 through January 2022.[6] With respect to the eighth custodian, Mr. Bertucci, Amazon forensically imaged his phone on September 20, 2021, and refreshed the image on January 4, 2022, as part of the document collection process. When Mr. Bertucci's phone was imaged in September 2021, Amazon did not understand that he occasionally used Signal for work-related communications and therefore did not collect such messages at that time. After the September 20 phone collection, Mr. Bertucci deleted a number of his infrequently used apps, including Signal. Amazon subsequently determined from its review of documents collected from other custodians that Mr. Bertucci used Signal for some business-related communications. By that time, however, Mr. Bertucci had already deleted the Signal app. Given Signal's security protections, there was no way to recover or restore the lost Signal messages.

---

[4] *See* Signal, https://signal.org/en/.

[5] *See* Letter from Senator Ron Wyden to The Honorable Frank Larkin, May 9 2017, https://www.documentcloud.org/documents/3723701-Ron-Wyden-letter-on-Signal-encrypted-messaging.html; Shawn Snow, Kyle Rempfer, and Meghann Myers, "Deployed 82nd Airborne unit told to use these encrypted messaging apps on government cell phones," Military Times, Jan. 23 2020, https://www.militarytimes.com/flashpoints/2020/01/23/deployed-82nd-airborne-unit-told-to-use-these-encrypted-messaging-apps-on-government-cellphones/; Jon Porter, "Signal becomes European Commission's messaging app of choice in security clampdown," The Verge, Feb. 24 2020, https://www.theverge.com/2020/2/24/21150918/european-commission-signal-encrypted-messaging.

[6] Due to Signal's method of encryption, Amazon—in close consultation with its eDiscovery vendor—has not identified a reliable way to collect native data from Signal that preserves and exports all metadata. In particular, Amazon's eDiscovery vendor determined in September 2021 that in connection with a prior update to Apple's iOS system, Signal messages cannot be collected as part of a device's forensic image. As a result, Signal messages can be collected now only by taking screenshots of messages, which is the method that Amazon employed.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 88

**CONFIDENTIAL**
**AMAZON.COM, INC.**
**FTC File No. 211-0135**

Ultimately, Amazon produced 70 Signal communications involving Mr. Bertucci collected from other custodians' phones.

# EXHIBIT 15



**SIDLEY AUSTIN LLP**
**1501 K STREET, N.W.**
**WASHINGTON, D.C. 20005**
**+1 202 736 8000**
**+1 202 736 8711 FAX**

AMERICA • ASIA PACIFIC • EUROPE

**+1 202 736 8396**
**RKEELING@SIDLEY.COM**

March 22, 2024

**By Email**

Emily Bolles, Esq.
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
ebolles@ftc.gov

      Re:    FTC v. Amazon.com, Inc., Case No. 2:23-cv-01495-JHC (W.D. Wash.) –
              Amazon's Production of Documents in Response to the Plaintiffs' Requests for
              Production of Documents

Dear Emily:

    I write on behalf of our client, Amazon.com, Inc. ("Amazon"), in response to the
Plaintiffs' Requests for Production of Documents ("Requests").  Today we are making a fifth
production of documents via Secure File Transfer in response to these Requests.



**Request for Production No. 24**
    Production Volume AMZN-RTL-FTC-VOL005 bearing the Bates numbers AMZN-RTL-
FTC-00019804 - AMZN-RTL-FTC-00020143 contains screenshots of Signal messages
responsive to Request No. 24, which were previously made available for the FTC's in-person
review. As discussed, please find attached a table showing each screenshot requested in Appendix

# SIDLEY

Page 2

A to RFP 24 with its corresponding Bates stamp in this production, or a notation that the screenshot has been withheld as privileged. In addition, Amazon has produced additional screenshots that provide context to the Plaintiffs' request.  Amazon makes this production without prejudice to its ability to further supplement this production throughout the litigation.

\*\*\*

Amazon designates this letter CONFIDENTIAL in accordance with the Protective Order. The information transmitted herewith has also been designated in accordance with the Protective Order.

This production should not be construed as a waiver of any protection from disclosure or confidential treatment accorded by law. Amazon intends to rely on and invoke any such protection as appropriate. If protected documents or information are inadvertently produced, Amazon reserves the right to notify the Plaintiffs, stating the basis for such protection and requesting the Plaintiffs promptly return or destroy the identified materials.

Sincerely,

Enclosure

Robert D. Keeling

## Bates Stamps Corresponding To RFP 24 Appendix A

| Citation in FTC's Appendix A | Bates Number |
|---|---|
| Amazon-FTC-CID_09903722 | AMZN-RTL-FTC-00019804 |
| Amazon-FTC-CID_09903723 | AMZN-RTL-FTC-00019805 |
| Amazon-FTC-CID_09903724 | AMZN-RTL-FTC-00019806 |
| Amazon-FTC-CID_09903725 | AMZN-RTL-FTC-00019807 |
| Amazon-FTC-CID_09903978 | AMZN-RTL-FTC-00019808 |
| Amazon-FTC-CID_09903979 | AMZN-RTL-FTC-00019809 |
| Amazon-FTC-CID_09903980 | AMZN-RTL-FTC-00019810 |
| Amazon-FTC-CID_09903981 | AMZN-RTL-FTC-00019811 |
| Amazon-FTC-CID_09903982 | AMZN-RTL-FTC-00019812 |
| Amazon-FTC-CID_09903983 | AMZN-RTL-FTC-00019813 |
| Amazon-FTC-CID_09903984 | AMZN-RTL-FTC-00019814 |
| Amazon-FTC-CID_09903985 | AMZN-RTL-FTC-00019815 |
| Amazon-FTC-CID_09903986 | AMZN-RTL-FTC-00019816 |
| Amazon-FTC-CID_09903987 | AMZN-RTL-FTC-00019817 |
| Amazon-FTC-CID_09903998 | AMZN-RTL-FTC-00019818 |
| Amazon-FTC-CID_09904033 | AMZN-RTL-FTC-00019819 |
| Amazon-FTC-CID_09904034 | AMZN-RTL-FTC-00019820 |
| Amazon-FTC-CID_09904035 | AMZN-RTL-FTC-00019821 |
| Amazon-FTC-CID_09904036 | AMZN-RTL-FTC-00019822 |
| Amazon-FTC-CID_09904037 | AMZN-RTL-FTC-00019823 |
| Amazon-FTC-CID_09904038 | AMZN-RTL-FTC-00019824 |
| Amazon-FTC-CID_09904039 | AMZN-RTL-FTC-00019825 |
| Amazon-FTC-CID_09904040 | AMZN-RTL-FTC-00019826 |
| Amazon-FTC-CID_09904211 | AMZN-RTL-FTC-00019827 |
| Amazon-FTC-CID_09904237 | AMZN-RTL-FTC-00019828 |
| Amazon-FTC-CID_09904275 | AMZN-RTL-FTC-00019829 |
| Amazon-FTC-CID_09904276 | AMZN-RTL-FTC-00019830 |
| Amazon-FTC-CID_09904277 | AMZN-RTL-FTC-00019831 |
| Amazon-FTC-CID_09904278 | AMZN-RTL-FTC-00019832 |
| Amazon-FTC-CID_09904363 | AMZN-RTL-FTC-00019833 |
| Amazon-FTC-CID_09904377 | AMZN-RTL-FTC-00019835 |
| Amazon-FTC-CID_09904381 | AMZN-RTL-FTC-00019836 |

| Citation in FTC's Appendix A | Bates Number |
|---|---|
| Amazon-FTC-CID_09904382 | AMZN-RTL-FTC-00019837 |
| Amazon-FTC-CID_09904395 | AMZN-RTL-FTC-00019839 |
| Amazon-FTC-CID_09904398 | AMZN-RTL-FTC-00019840 |
| Amazon-FTC-CID_09904403 | AMZN-RTL-FTC-00019841 |
| Amazon-FTC-CID_09904416 | AMZN-RTL-FTC-00019842 |
| Amazon-FTC-CID_09904417 | AMZN-RTL-FTC-00019843 |
| Amazon-FTC-CID_09904418 | AMZN-RTL-FTC-00019844 |
| Amazon-FTC-CID_09904419 | AMZN-RTL-FTC-00019845 |
| Amazon-FTC-CID_09904422 | AMZN-RTL-FTC-00019848 |
| Amazon-FTC-CID_09904462 | AMZN-RTL-FTC-00019849 |
| Amazon-FTC-CID_09904491 | AMZN-RTL-FTC-00019850 |
| Amazon-FTC-CID_09904547 | AMZN-RTL-FTC-00019851 |
| Amazon-FTC-CID_09904646 | AMZN-RTL-FTC-00019852 |
| Amazon-FTC-CID_09904737 | AMZN-RTL-FTC-00019853 |
| Amazon-FTC-CID_09904764 | AMZN-RTL-FTC-00019854 |
| Amazon-FTC-CID_09904766 | AMZN-RTL-FTC-00019855 |
| Amazon-FTC-CID_09904773 | AMZN-RTL-FTC-00019857 |
| Amazon-FTC-CID_09904780 | AMZN-RTL-FTC-00019861 |
| Amazon-FTC-CID_09904781 | AMZN-RTL-FTC-00019862 |
| Amazon-FTC-CID_09904782 | AMZN-RTL-FTC-00019863 |
| Amazon-FTC-CID_09904783 | AMZN-RTL-FTC-00019864 |
| Amazon-FTC-CID_09904784 | AMZN-RTL-FTC-00019865 |
| Amazon-FTC-CID_09904785 | AMZN-RTL-FTC-00019866 |
| Amazon-FTC-CID_09904798 | AMZN-RTL-FTC-00019867 |
| Amazon-FTC-CID_09904825 | AMZN-RTL-FTC-00019868 |
| Amazon-FTC-CID_09904850 | AMZN-RTL-FTC-00019869 |
| Amazon-FTC-CID_09904851 | AMZN-RTL-FTC-00019870 |
| Amazon-FTC-CID_09904854 | AMZN-RTL-FTC-00019873 |
| Amazon-FTC-CID_09904855 | AMZN-RTL-FTC-00019874 |
| Amazon-FTC-CID_09904856 | AMZN-RTL-FTC-00019875 |
| Amazon-FTC-CID_09904859 | AMZN-RTL-FTC-00019878 |
| Amazon-FTC-CID_09904860 | AMZN-RTL-FTC-00019879 |
| Amazon-FTC-CID_09904861 | AMZN-RTL-FTC-00019880 |
| Amazon-FTC-CID_09904865 | AMZN-RTL-FTC-00019881 |

| Citation in FTC's Appendix A | Bates Number |
|:---:|:---:|
| Amazon-FTC-CID_09904867 | AMZN-RTL-FTC-00019883 |
| Amazon-FTC-CID_09904878 | AMZN-RTL-FTC-00019884 |
| Amazon-FTC-CID_09904884 | AMZN-RTL-FTC-00019887 |
| Amazon-FTC-CID_09904886 | AMZN-RTL-FTC-00019888 |
| Amazon-FTC-CID_09904887 | AMZN-RTL-FTC-00019889 |
| Amazon-FTC-CID_09904888 | AMZN-RTL-FTC-00019890 |
| Amazon-FTC-CID_09904889 | AMZN-RTL-FTC-00019891 |
| Amazon-FTC-CID_09904890 | AMZN-RTL-FTC-00019892 |
| Amazon-FTC-CID_09904917 | AMZN-RTL-FTC-00019893 |
| Amazon-FTC-CID_09904961 | AMZN-RTL-FTC-00019894 |
| Amazon-FTC-CID_09904962 | AMZN-RTL-FTC-00019895 |
| Amazon-FTC-CID_09904963 | AMZN-RTL-FTC-00019896 |
| Amazon-FTC-CID_09904964 | AMZN-RTL-FTC-00019897 |
| Amazon-FTC-CID_09904965 | AMZN-RTL-FTC-00019898 |
| Amazon-FTC-CID_09904966 | AMZN-RTL-FTC-00019899 |
| Amazon-FTC-CID_09904967 | AMZN-RTL-FTC-00019900 |
| Amazon-FTC-CID_09904968 | AMZN-RTL-FTC-00019901 |
| Amazon-FTC-CID_09904969 | AMZN-RTL-FTC-00019902 |
| Amazon-FTC-CID_09904970 | AMZN-RTL-FTC-00019903 |
| Amazon-FTC-CID_09904971 | AMZN-RTL-FTC-00019904 |
| Amazon-FTC-CID_09904972 | AMZN-RTL-FTC-00019905 |
| Amazon-FTC-CID_09904973 | AMZN-RTL-FTC-00019906 |
| Amazon-FTC-CID_09904974 | AMZN-RTL-FTC-00019907 |
| Amazon-FTC-CID_09904975 | AMZN-RTL-FTC-00019908 |
| Amazon-FTC-CID_09904976 | AMZN-RTL-FTC-00019909 |
| Amazon-FTC-CID_09904977 | AMZN-RTL-FTC-00019910 |
| Amazon-FTC-CID_09904978 | AMZN-RTL-FTC-00019911 |
| Amazon-FTC-CID_09905030 | AMZN-RTL-FTC-00019912 |
| Amazon-FTC-CID_09905031 | AMZN-RTL-FTC-00019913 |
| Amazon-FTC-CID_09905032 | AMZN-RTL-FTC-00019914 |
| Amazon-FTC-CID_09905033 | AMZN-RTL-FTC-00019915 |
| Amazon-FTC-CID_09905034 | AMZN-RTL-FTC-00019916 |
| Amazon-FTC-CID_09905035 | AMZN-RTL-FTC-00019917 |
| Amazon-FTC-CID_09905057 | AMZN-RTL-FTC-00019918 |

| Citation in FTC's Appendix A | Bates Number |
|---|---|
| Amazon-FTC-CID_09905058 | AMZN-RTL-FTC-00019919 |
| Amazon-FTC-CID_09905059 | AMZN-RTL-FTC-00019920 |
| Amazon-FTC-CID_09905060 | AMZN-RTL-FTC-00019921 |
| Amazon-FTC-CID_09905067 | AMZN-RTL-FTC-00019922 |
| Amazon-FTC-CID_09905068 | AMZN-RTL-FTC-00019923 |
| Amazon-FTC-CID_09905069 | AMZN-RTL-FTC-00019924 |
| Amazon-FTC-CID_09905070 | AMZN-RTL-FTC-00019925 |
| Amazon-FTC-CID_09905071 | AMZN-RTL-FTC-00019926 |
| Amazon-FTC-CID_09905072 | AMZN-RTL-FTC-00019927 |
| Amazon-FTC-CID_09905073 | AMZN-RTL-FTC-00019928 |
| Amazon-FTC-CID_09905075 | AMZN-RTL-FTC-00019929 |
| Amazon-FTC-CID_09930044 | AMZN-RTL-FTC-00019930 |
| Amazon-FTC-CID_09930045 | AMZN-RTL-FTC-00019931 |
| Amazon-FTC-CID_09930082 | AMZN-RTL-FTC-00019932 |
| Amazon-FTC-CID_09930090 | AMZN-RTL-FTC-00019933 |
| June 9, 2023, In-Person Review Binder, Tab 1, 8/26/2020 | AMZN-RTL-FTC-00019934–38 |
| June 9, 2023, In-Person Review Binder, Tab 10 | Withheld for privilege; to be noted on Amazon's privilege log. |
| June 9, 2023, In-Person Review Binder, Tab 14, 6/5/2020 | AMZN-RTL-FTC-00019939 |
| June 9, 2023, In-Person Review Binder, Tab 21 | AMZN-RTL-FTC-00019940–41 |
| June 9, 2023, In-Person Review Binder, Tab 26, 11/4/2020 | AMZN-RTL-FTC-00019942–43 |
| June 9, 2023, In-Person Review Binder, Tab 29 | AMZN-RTL-FTC-00019944–46 |
| June 9, 2023, In-Person Review Binder, Tab 42, 3/16/2022 | AMZN-RTL-FTC-00019947–52 |
| June 9, 2023, In-Person Review Binder, Tab 5, 12/23/2021 | AMZN-RTL-FTC-00019953–54 |
| June 9, 2023, In-Person Review Binder, Tab 51, 2/27/2022 to end | AMZN-RTL-FTC-00019955–63 |
| June 9, 2023, In-Person Review Binder, Tab 52, 3/1/22 to end | AMZN-RTL-FTC-00019964–20047 |
| June 9, 2023, In-Person Review Binder, Tab 54 | AMZN-RTL-FTC-00020048–78 |
| June 9, 2023, In-Person Review Binder, Tab 55 | AMZN-RTL-FTC-00020079–97 |
| Amazon_FTC_Review_00000940-943 | AMZN-RTL-FTC-00020098–101 |
| Amazon_FTC_Review_00001178-1202 (starting at 3/5/2022) | AMZN-RTL-FTC-00020102–26 |
| Amazon_FTC_Review_00001293 | AMZN-RTL-FTC-00020127 |
| Amazon_FTC_Review_00000895-916 (starting at 8/29/2019) | AMZN-RTL-FTC-00020128–36 |
| Amazon_FTC_Review_00001289-1291 | AMZN-RTL-FTC-00020138–40 |

# EXHIBIT 16

LAW OFFICES

## WILLIAMS & CONNOLLY LLP*

CONSTANCE T. FORKNER
(202) 434-5846
cforkner@wc.com

680 MAINE AVENUE SW
WASHINGTON, DC 20024
202.434.5000
WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 29, 2024

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

<u>Via Email</u>

Emily Bolles, Esq.
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20590
ebolles@ftc.gov

Re:   *FTC v. Amazon.com, Inc.*, Case No. 2:23-cv-01495-JHC (W.D. Wash.)

Dear Emily:

I write to follow up on our March 6 and March 8, 2024 meet and confers, and portions of your March 22 letter ("Pltfs. Mar. 22 Ltr."), regarding Amazon's December 14, 2023 Responses and Objections ("Objections") to the Plaintiffs' First Set of Requests for Production ("Requests"). To the extent portions of your March 22 letter are not addressed below, Amazon will follow up as soon as it is able.



WILLIAMS & CONNOLLY LLP®
Emily Bolles, Esq.
March 29, 2024
Page 4

**Request Nos. 7 and 26**

Request No. 7 seeks "[a]ll documents constituting or relating to policies . . . about the use of Collaborative Work Environments or Messaging Applications."  Request No. 26 seeks overlapping policy documents that Amazon produced in response to Plaintiffs' Investigational Hearing 2.7(h) request.  Amazon already has committed to producing documents responsive to these Requests through September 26, 2023.  *See* Ltr. from C. Forkner to E. Bolles at 6 (February 7, 2024).  In your letter dated March 22, 2024, you requested that Amazon produce policy versions past the date of the Complaint.

Plaintiffs have yet to explain how official Company policies governing employee communication and device application standards past the date of the Complaint relate to their allegations.  Nevertheless, in the interest of compromise and without waiving its Objections, Amazon agrees to produce the latest, non-duplicative versions of official Company policies requested by the Plaintiffs' in response to Requests Nos. 7 and 26 through December 31, 2023.



WILLIAMS & CONNOLLY LLP®
Emily Bolles, Esq.
March 29, 2024
Page 7

We are available to meet and confer as necessary to discuss the issues outlined above.

Sincerely,

*Connie Forkner*

Constance T. Forkner

cc:   Susan A. Musser, Edward H. Takashima, Daniel A. Principato, Colin M. Herd, FTC
      Michael Jo, New York State Office of the Attorney General
      Timothy D. Smith, Oregon Department of Justice
      Molly A. Terwilliger, Morgan, Lewis & Bockius LLP
      Robert Keeling, Sidley Austin LLP

# EXHIBIT 17



UNITED STATES OF AMERICA
**Federal Trade Commission**
WASHINGTON, DC 20580

Emily K. Bolles
Bureau of Competition
Attorney
(202) 326-3633
ebolles@ftc.gov

February 7, 2024

**By Electronic Mail**

Constance T. Forkner
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
cforkner@wc.com

Re: *Federal Trade Commission, et al. v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC

Dear Connie:

I write to follow up on our meet and confers on January 5 and January 9, 2024, related to Plaintiffs' First Set of Requests for Production to Amazon ("Plaintiffs' First Set of RFPs").



STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 102

*Federal Trade Commission, et al. v. Amazon.com, Inc.*
No. 2:23-cv-01495-JHC



**RFP No. 25**

We understand Amazon's position is that its document preservation notices are protected from discovery. Plaintiffs agree that, as long as certain conditions are met, the general rule is that document preservation notices are privileged and protected as work product. *See, e.g.*, *Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL 2413631, at *5 (D.N.J. Aug. 4, 2009). But there are exceptions to that general rule, including where a party has engaged in spoliation. *Id.* During Plaintiffs' pre-Complaint investigation, it became clear that Amazon has likely engaged in spoliation of at least some Signal messages. The contents of Amazon's document preservation notices are relevant to that issue. *See id.* at *2 ("[P]laintiffs are entitled to know which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end."). Plaintiffs asked an Amazon corporate representative about Amazon's document preservation notices, including whether the notices specifically referenced ephemeral messaging, during the investigation. *See* 2.7(h) IH Tr. of Amazon (Robert Stangler), at 108:15-111:2 (Oct. 7. 2022). Amazon's position was that the contents of the document preservation notices were privileged, and it had not prepared the witness to be able to answer questions about the contents of the notices. *Id.*

Given the above, Plaintiffs' position remains that Amazon must produce all requested litigation holds, preservation notices, or similar documents. Please confirm whether Amazon's position has changed by **February 14.**



*Federal Trade Commission, et al. v. Amazon.com, Inc.*
No. 2:23-cv-01495-JHC



      Plaintiffs request a meet and confer about Plaintiffs First Set of RFPs on Friday, February 16, after Amazon has produced the information requested in this letter by February 14.

                             Sincerely,

                             */s/ Emily K. Bolles*

                             Emily K. Bolles

# EXHIBIT 18

# Facebook and Microsoft, smelling blood in the water, clash with Apple amid antitrust probes

finance.yahoo.com/news/apple-app-store-antitrust-facebook-202125609.html

Apple (AAPL) is facing off against its fellow tech giants Facebook (FB) and Microsoft (MSFT) about the iPhone maker's App Store policies in a showdown that comes just as a week after Apple CEO Tim Cook and Facebook CEO Mark Zuckerberg, among other CEOs, appeared before a House Judiciary hearing about Big Tech's market power.

The dustup has to do with Apple's responses to Facebook's new Facebook Gaming app and Microsoft's xCloud cloud gaming app. Both companies submitted their apps for review and had them rejected by Apple for violating the App Store's terms of service.



Apple CEO Tim Cook testifies remotely via videoconference during a U.S. House Judiciary Subcommittee on Antitrust, Commercial and Administrative Law hearing on "Online Platforms and Market Power" in this screengrab made from video as the committee meets on Capitol Hill, in Washington, U.S., July 29, 2020. U.S. House Judiciary Committee via REUTERS

Now Facebook and Microsoft, smelling blood in the water, are hitting back, calling out Apple with statements that echo the kinds of complaints antitrust investigators have heard from other developers who say Apple is hurting competition and consumers. And that could be a problem for Apple in the long run.

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 106

"The audience for [last week's hearings] was not just a domestic audience, it was an international audience, it included competitors, third parties, and competition authorities," explained former Federal Trade Commission Chairman William Kovacic.

"So [Apple knows] that every time they twitch now, they will have close scrutiny from many different eyes including quite a few astute observers," added Kovacic, who now serves as a law professor at George Washington University, where he specializes in global competition.

## Shots across the bows

Apple's current antitrust problems stem directly from its App Store policies and how it enforces them. App developers, Spotify (SPOT) being one of the most prominent, have complained to investigators and regulators about Apple's app review guidelines, saying they aren't applied evenly.

Developers have also taken issue with the 30% commission Apple collects on app sales through the App store, saying it's unfair because Apple sells competing apps, like its Apple Music service, and doesn't have to pay a commission to itself. Apple also operates its own gaming service called Apple Arcade, which is available as a subscription and lets users play games across their iPhones, iPads, and Mac computers.

Investigators are looking at whether Apple's tight control over the App Store, which is the only means developers have to get their apps on the company's iOS devices, stifles innovation and unfairly targets competing apps.

Cook denied such accusations during a recent hearing before the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law, pointing to the fact that the App Store has helped generate 1.9 million jobs and is host to 1.7 million apps, of which Apple only competes with a few dozen.

Facebook and Microsoft are well aware of the accusations Apple is facing, and appeared to purposely use language supporting the argument that Apple is operating an illegal monopoly in their surprisingly public responses to Apple's decision.



Facebook CEO Mark Zuckerberg testifies remotely during a House Judiciary subcommittee hearing on antitrust on Capitol Hill on Wednesday, July 29, 2020, in Washington. (Mandel Ngan/Pool via AP)

"Even on the main Facebook app and Messenger, we've been forced to bury Instant Games for years on iOS," Vice president of Facebook Gaming Vivek Sharma said in a statement following Apple's decision to reject the portion of the Facebook Gaming app that allowed gamers to play Instant Games.

"This is shared pain across the games industry, which ultimately hurts players and devs and severely hamstrings innovation on mobile for other types of formats, like cloud gaming. And while it's disheartening to deliver only part of the Facebook Gaming app experience on iOS, our gaming creators have asked for it for awhile. We thank them for waiting this long."

None other than Facebook COO Sheryl Sandberg even hit out at Apple saying in a statement, "Unfortunately, we had to remove gameplay functionality entirely in order to get Apple's approval on the standalone Facebook Gaming app – meaning iOS users have an inferior experience to those using Android."

Microsoft, meanwhile, issued a statement through a spokesperson specifically saying that Apple treats gaming apps differently than other apps.



Microsoft CEO Satya Nadella. (AP Photo/Elaine Thompson, File)

"Apple stands alone as the only general purpose platform to deny consumers from cloud gaming and game subscription services like Xbox Game Pass," a spokesperson said. "And it consistently treats gaming apps differently, applying more lenient rules to non-gaming apps even when they include interactive content."

Those statements were each crafted specifically to hit Apple where it hurts when it comes to the antitrust investigations into the App Store.

Apple, for its part, points specifically to two sections of the App Store policy that the Facebook and Microsoft apps violate. Microsoft, the company says, violates Apple's policies regarding remote desktop clients, while Facebook violates terms for HTML 5 games and bots.

## Apple's will need to respond

With Facebook and Microsoft clearly appealing to arguments that Apple is using its market power against competitors, the Cupertino-based company will need to prove its moves are intended to benefit consumers, Kovacic explained.

"To me the crucial question would be how well developed is the justification that [Apple is] going to present for the current policy. How convincing is that story going to be, not just to insiders who watch the sector carefully, but to this larger audience that's now watching every

single move, as well as law enforcement authorities around the world that are now watching this."

According to Kovacic, Apple will have to show that its current policies provide a significant benefit to its users. The company may also be able to rely on the fact that the relationship between leading enterprises is changing, and that they are each now competing against each other in similar industries.

Apple is all but certain to face additional challenges from competitors as the antitrust investigations into its App Store continue, and it'll need the right answers if it's to escape unscathed.

*Got a tip? Email Daniel Howley at **dhowley@yahoofinance.com** over via encrypted mail at **danielphowley@protonmail.com**, and follow him on Twitter at **@DanielHowley**.*

# EXHIBIT 19

his copy is for your personal, non commercial use only Distribution and use of this material are governed by our Subscriber Agreement and by copyright law For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/amazon restricts advertising competitor device makers roku arlo 11600786638

TECH

# Amazon Restricts How Rival Device Makers Buy Ads on Its Site

Some makers of smart speakers, video doorbells and other hardware hit roadblocks buying key ads in search results; gadgets made by e-commerce giant get edge

*By Dana Mattioli* [Follow] *, Patience Haggin* [Follow] *and Shane Shifflett* [Follow]

Sept. 22, 2020 11:03 am ET

Amazon.com Inc. AMZN ▲ is limiting the ability of some competitors to promote their rival smart speakers, video doorbells and other devices on its dominant e-commerce platform, according to Amazon employees and executives at rival companies and advertising firms.

The strategy gives an edge to Amazon's own devices, which the company regards as central to building consumer loyalty. It puts at a disadvantage an array of gadget makers such as Arlo Technologies Inc. ARLO ▲ that rely on Amazon's site for a significant share of their sales.

The e-commerce giant routinely lets companies buy ads that appear inside search results, including searches for competing products. Indeed, search advertising is a lucrative part of the company's business. But Amazon won't let some of its own large competitors buy sponsored-product ads tied to searches for Amazon's own devices, such as Fire TV, Echo Show and Ring Doorbell, according to some Amazon employees and others familiar with the policy.

Roku Inc., ROKU -0.74% ▼ which makes devices that stream content to TVs, can't even buy such Amazon ads tied to its own products, some of these people said. In some cases, Amazon has barred competitors from selling certain devices on its site entirely.

The policies show the conflicts between Amazon's large e-commerce platform for sellers and its role as a product manufacturer in its own right. While traditional retailers buy inventory from manufacturers and resell it to consumers, limiting the number of vendors they can work with, Amazon's platform has more than a million businesses and entrepreneurs selling

directly to Amazon's shoppers. Amazon accounts for 38% of online shopping in the U.S. and roughly half of all online shopping searches in the U.S. start on Amazon.com.

**Amazon's digital-advertising business**, moreover, ranks behind only that of Google and Facebook Inc. That first page of search results can make or break a seller, with the majority of Amazon shoppers buying from the company's first page of search results.

In response to a request for comment, Amazon didn't directly address the question of whether or not it hobbles rivals' marketing. Instead, it said that it is common practice among retailers to choose which products they promote on their websites.

"News flash: retailers promote their own products and often don't sell products of competitors," said Amazon spokesman Drew Herdener in a written statement. "**Walmart** refuses to sell [Amazon brands] Kindle, Fire TV, and Echo. Shocker. In the Journal's next story they will uncover gambling in Las Vegas."

But the restrictions Amazon has put in place mean that products sold directly by Roku often don't appear atop search results for Roku's own products. In tests conducted by The Wall Street Journal in August, searches for Roku products frequently displayed sponsored product advertisements for Roku competitors, and Rokus offered by resellers. Many of the searches displayed Amazon's Fire TV product atop the results, with a banner saying "Featured from our brands."

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 113



Amazon CEO Jeff Bezos testified to Congress in July about Amazon's business practices and the tactics of its private-label brands. PHOTO: GRAEME JENNINGS/PRESS POOL

Amazon already is facing scrutiny over its treatment of competing sellers on its site. In July, CEO Jeff Bezos testified to Congress about Amazon's business practices and the tactics of its private-label brands. The Federal Trade Commission, Justice Department, European Union and Canadian regulators are also looking into Amazon's business practices.

In April, the Journal reported that Amazon's private-label employees used data from its third-party merchants to create competing Amazon-branded products.

Amazon has had success in recent years selling its own hardware, including Kindle e-readers, Echo smart speakers and Fire TV streaming devices. Amazon employees involved in advertising decisions said the policies for dealing with competing device makers are a deliberate part of Amazon's strategy for promoting its own products.

Like many platforms, Amazon allows bidders to buy advertising to try to ensure their products appear at the top of search results. This includes purchasing the right to appear in search results for the products of rivals, a standard industry practice. When a company purchases such ads on Amazon, the products appear in the search results and are labeled as "Sponsored."

In the case of competing device makers, Amazon's devices team flagged some of the biggest to its advertising team to restrict them from buying ads tied to keywords for Amazon-branded products, according to the employees involved in advertising decisions. Amazon's largest rivals in certain categories, which it calls "Tier 1 Competitors," are unable to buy Amazon-specific keywords, those people said, while lesser competitors are allowed to buy the keywords.

STOJILKOVIC DECL ISO AMAZON'S OPP. TO PLTFS' MTC - Page 114

When the devices team launches a new product, part of its strategy for bringing it to market is to determine which keywords to suppress in advertising, the people said. Employees are told to mark any discussion of this practice internally at Amazon with "privileged and confidential" in the subject line of emails so that regulators cannot access them, the people said.

An Amazon spokesman said that employees are instructed to mark emails as privileged only when seeking legal counsel.

### Hardware Hits
Top vendors by shipments, 2Q 2020

| SMART SPEAKERS | DIGITAL MEDIA STREAMERS | VIDEO DOORBELLS |
|---|---|---|
| 1. Amazon | 1. Roku | 1. Amazon Ring |
| 2. Google | 2. Amazon | 2. Google Nest |
| 3. Apple | 3. Apple | 3. SkyBell |
| 4. Harman Kardon/JBL | 4. Google | 4. Vivint |

Source: Strategy Analytics

Documents released after July's congressional hearing indicate that Amazon told Apple Inc. AAPL **1.62%** ▲ that it gives its own devices favorable treatment. The documents said Amazon's own products have "competing ads removed from search," product detail pages and checkout pages. As part of negotiations with Apple, Amazon offered it "content, search and navigation equivalent to what Amazon has for its own products," the documents said.

An Amazon spokesman said that for some keywords related to Amazon devices, Amazon may offer more limited ad inventory.

Roku, based in San Jose, Calif., is the biggest maker of streaming-media players in the U.S., according to research firm Strategy Analytics. As a device maker and a platform for streaming content, it competes directly with Amazon's Fire TV devices. Amazon is the second-largest streaming-device maker with its line of Fire TV products.

Roku has been blocked from buying sponsored product advertisements on Amazon for years, although resellers of Roku products are able to buy Roku keywords for such ads, according to people familiar with the matter and documents reviewed by the Journal.

In Journal searches conducted in August for "Roku Ultra," a streaming box with headphones the company now sells for $99.88, the top result was a sponsored ad from TiVo, a rival

streaming-device maker.

Two other sponsored results followed. One listing was from a seller called "AMAZING WAREHOUSE DEAL" that was selling the Ultra for $119.99. The other, from seller iPuzzle Online, bundled the Ultra with a 6-foot HDMI cable for $165.

To purchase a Roku Ultra from Roku, a buyer would have had to scroll down to the fourth result, where it sold for $89.88, according to the Journal review.



Amazon Fire TV Cube



Roku Ultra

PHOTOS: AMAZON; ROKU

In another search by the Journal on Amazon for "Roku Streaming Stick," Amazon featured its Fire TV products four times under "Featured from our brands" on the first page of search results, which generally show about 20 to 25 results. The Fire TV products showed up twice more on the first page of results.

By comparison, a search for "Fire TV" at around the same time showed an Amazon "Fire TV" banner across the site's search results, with the Amazon logo followed by three Amazon products sold by Amazon. There were no sponsored results in that search, the analysis showed.

Amazon limits competitors' advertisements by using up to five of the 12 spaces typically sold as advertisements to highlight its own offerings, according to a Journal analysis of search results. For six days, the Journal downloaded search results for 67 keywords describing Amazon products and those by competing brands including Google, Roku and Arlo.

Netgear Inc., based in San Jose, is able to buy the keywords of rival makers of Wi-Fi routers on Amazon. For the past year and a half, the company hasn't been able to buy search ads keyed to "eero," Amazon's own brand of router, that appear on the first page of results, according to people familiar with the matter. Amazon bought eero in early 2019.

Facebook hadn't been able to buy sponsored ads using Amazon Echo-related keywords for some time, according to a person familiar with the matter. The social-media company makes a

5/2/24, 9 36 AM
Case 2:23-cv-01495-JHC Document 234 Filed 05/13/24 Page 117 of 123
Amazon restricts advertising competitor device makers roku arlo

device called Facebook Portal that competes directly with Amazon's Echo Show device. Facebook has been able to buy keywords for other competitors, the person said.

Amazon started its advertising unit in 2012, allowing sellers on its site to bid on keywords used in search queries. With more than a million sellers competing on Amazon, many selling similar or identical items, its sponsored-product advertisements business became an important way for sellers to ensure that their items got to the top of the first page of search results.

Last year, the Amazon unit that includes its advertising business brought in $14.1 billion in revenue. Amazon will capture 17.1% of the $54.37 billion U.S. search-ad market, research firm eMarketer estimated in June 2020.

According to Amazon's advertising website, any seller is eligible to buy keywords for its sponsored-search advertisements. Some types of products are prohibited from being advertised in sponsored products, its website says. Amazon's own products aren't on the list of keywords or categories restricted for sponsored-product advertisements.

An Amazon spokesman said advertisers can bid on or buy Amazon keywords.

Amazon blocked Google from selling its Chromecast streaming devices, which compete with Fire TV, for more than a year, the people said. Google said in December 2017 that it was pulling its YouTube online-video service from some Amazon devices in retaliation for Amazon refusing to sell many Google products. In 2019, Google reversed course.



'When somebody buys an Amazon device, they become a better Amazon customer,' said Dave Limp, head of the company's devices business. PHOTO: CHLOE COLLYER/BLOOMBERG NEWS

STOJILKOVIC DECL ISO AMAZON'S
OPP. TO PLTFS' MTC - Page 117

Amazon's device business has been a priority for Mr. Bezos. "When somebody buys an Amazon device, they become a better Amazon customer," said Dave Limp, head of the company's devices business, in an interview last year. Amazon can build services attached to those devices, he explained, enabling it to sell the gadgets at a low price. "We don't have to make money when we sell you the device," he said.

Amazon's acquisition of Ring shows how its ownership can change a device-maker's fortunes on its site.

Before that deal, Arlo Technologies, which makes smart security products and doorbells, was the market leader for smart security devices. Emails in 2017 between Amazon's management team discussing a potential acquisition of Ring referenced Arlo's top position at the time. Ring held the second sales position, followed by Google Nest and startup Blink, according to the emails, which were disclosed as part of a congressional hearing.

"To be clear, my view here is that we're buying market position   not technology," Mr. Bezos wrote that Dec. 15. "And that market position and momentum is very valuable." Amazon bought smart camera and doorbell startup Blink in late 2017 and purchased Ring a few months later in early 2018.

Since then, Arlo has been unable to buy keywords on Amazon's sponsored product advertisements for Ring products, said people familiar with the matter. Amazon's Ring devices, though, have appeared at the top of the search results for "Arlo," in banner placements touting "Featured from our brands" showing a suite of Ring Doorbell devices.

Arlo's team raised this issue with Amazon's advertising team, the people said. Arlo was concerned that it could buy keywords for competitors like Eufy and Wyze, but not for Amazon's own brands such as Ring and Blink, the people said. The advertising team apologized to Arlo executives, and said that there was nothing they could do about the issue, the people said.

*Jeff Horwitz contributed to this article.*



Amazon headquarters in Seattle. PHOTO: STEPHEN BRASHEAR/EPA/SHUTTERSTOCK

**Write to** Dana Mattioli at dana.mattioli@wsj.com, Patience Haggin at patience.haggin@wsj.com and Shane Shifflett at Shane.Shifflett@wsj.com

*Appeared in the September 23, 2020, print edition as 'Amazon Restricts Ad Buying by Rivals'.*

# EXHIBIT 20

# FILED UNDER SEAL

# EXHIBIT 21

# FILED UNDER SEAL

# EXHIBIT 22

# FILED UNDER SEAL

# EXHIBIT 23

# FILED UNDER SEAL