# Exhibit A

*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0657

DISTRICT OF COLUMBIA, APPELLANT,

v.

AMAZON.COM, INC., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CA-001775-B)

(Hon. Hiram E. Puig-Lugo, Motions Judge)

(Argued December 7, 2023                    Decided August 22, 2024)

*Caroline S. Van Zile*, Solicitor General, with whom *Brian L. Schwalb*, Attorney General, *Graham E. Phillips*, Deputy Solicitor General, and *Jeremy R. Girton*, Assistant Attorney General, were on the brief for appellant.

*Kannon K. Shanmugam*, with whom *Karen L. Dunn*, *William A. Isaacson*, *Paul D. Brachman*, *Amy J. Mauser*, and *Martha L. Goodman*, Paul, Weiss, Rifkind, Wharton & Garrison LLP were on the brief, for appellee.

*Eric F. Citron* filed a brief for Antitrust Law Professors and Economists as *amici curiae* in support of appellant.

*Victoria Sims* filed a brief for the Committee to Support the Antitrust Laws as *amicus curiae* in support of appellant.

*Sandeep Vaheesan* filed a brief for Open Markets Institute as *amicus curiae* in support of appellant.

*Tyler S. Badgley*, *Jonathan D. Urick*, *Adam G. Unikowsky*, and *Mary E. Marshall* filed a brief for the Chamber of Commerce of the United States of America and the D.C. Chamber of Commerce as *amici curiae* in support of appellee.

*David L. Meyer* filed a brief for Federal City Council as *amicus curiae* in support of appellee.

Before BECKWITH and DEAHL, *Associate Judges*, and FISHER, *Senior Judge*.

BECKWITH, *Associate Judge*: The District of Columbia sued Amazon.com alleging that certain Amazon policies amounted to illegal restraints of trade under the District's antitrust laws. Claiming that these practices stifled competition, reduced consumer choice, and led to increased prices across online marketplaces, the District sought to enjoin Amazon from using them.

Defending its policies as prohibitions against discrimination and price gouging that actually foster competition, Amazon moved to dismiss the District's first amended complaint. The trial court granted Amazon's motion, concluding that the District failed to plausibly allege that the challenged policies had anticompetitive effects. On appeal, the District challenges the trial court's order on grounds that the court misconstrued the elements of a restraint-of-trade claim and failed to accept the District's factual allegations as true. We hold that the District alleged sufficient facts to survive the motion to dismiss and therefore reverse the judgment of the Superior Court.

**I.**

Amazon.com operates the world's largest online retail marketplace. According to the District's first amended complaint, Amazon is consumers' go-to platform for online shopping, where two thirds of people begin their search for new products and where nearly three quarters "go directly" once they have settled upon a specific product to buy.   In addition to selling things directly to consumers on its online platform, Amazon contracts with third-party merchants seeking to sell their products on Amazon and also buys products from wholesale suppliers—known as first-party sellers—that it then sells to consumers, sometimes under its own brand. In many cases, these third-party sellers and first-party sellers offer the same products on other online platforms, including on their own websites.

The District's complaint takes aim at three aspects of the agreements Amazon requires certain merchants to enter into that the District says run afoul of D.C. law prohibiting restrictive trade policies and monopolies.   *See* D.C. Code § 28-4502 (stating that "[e]very contract . . . in restraint of trade or commerce" is illegal); § 28-4503 (making it unlawful to monopolize or attempt to monopolize trade or commerce in the District).   The first two—which the District regards as "most-

favored-nation" agreements[1]—involve the third-party sellers.  The "price parity provision," which was in effect until 2019, required these sellers to agree to contract terms that prohibited them from offering their products through other online marketplaces, including their own websites, at a lower price than that offered on Amazon.  According to the complaint, this provision "artificially raised the price of goods to consumers across online marketplaces" because third-party sellers "were forced to incorporate Amazon's high fees and commissions into their product prices not only when selling through Amazon's marketplace, but also when selling through competing online marketplaces."

In response to scrutiny from Congress and government regulators, Amazon

---

[1] Neither party specifically defines a most-favored-nation agreement, though Amazon, in arguing that the label is applied incorrectly here, provides an example: "A most-favored-nation provision with a supplier would mean that Amazon would receive the supplier's best price, a price at least equivalent to that offered to others." Br. of Appellee at 29-30 (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1807b1 (4th & 5th eds., 2021 Cumulative Supp.)).  In the context of this case, the District describes most-favored-nation agreements as those in which sellers agree that the price of any product they sell on Amazon will be "the lowest price available for that product on any online platform, even if other platforms charge lower fees."

removed the price parity provision from its U.S. contracts in 2019 and replaced it with the so-called "fair pricing policy." Under the fair pricing policy—characterized in the complaint as "an effectively identical substitute" for the price parity provision—Amazon will sanction third-party sellers who "harm[] consumer trust" by setting a price on a product or service on Amazon "that is significantly higher than recent prices offered on or off Amazon."[2] Both policies ultimately harm these sellers, consumer choice, and competition, the District's complaint alleges, by causing higher commissions and fees to third-party sellers and lower profits than would occur in a competitive market.

The third practice targeted by the District's complaint is Amazon's use of "minimum margin agreements" that require first-party sellers to guarantee Amazon an agreed-upon minimum profit for the products Amazon purchases wholesale and sells retail on Amazon's online marketplace. If, for example, Amazon identifies a lower price for a product on a competing online marketplace, it will lower its price

---

[2] The sanctions in question are that Amazon will "remove the Buy Box"—referring to the seller's eligibility to place the featured offer on any product page, "remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminate[] selling privileges." The fair pricing policy states that Amazon "regularly monitors" the prices of items and shipping on the platform "and compares them with other prices available to our customers" to identify any prices that "harm[] customer trust."

to match, and the first-party seller must pay Amazon for any corresponding loss in profit margin.

The District's original complaint against Amazon challenged the former price parity provision and the fair pricing policy as violations of the District's antitrust laws. Amazon moved to dismiss, and in response, the District filed the operative amended complaint alleging four violations of the D.C. Antitrust Act: First, the District asserts, Amazon's price parity provision and fair pricing policy restrain trade in violation of D.C. Code § 28-4502 by establishing Amazon's price as the price floor across online marketplaces. Second, Amazon's minimum margin agreements also violate section 28-4502 by incentivizing first-party sellers to increase their prices on other online marketplaces to avoid owing any loss of profit margin to Amazon—what the District calls "true up" payments. Third, Amazon's anticompetitive conduct constitutes maintenance of an unlawful monopoly as prohibited by D.C. Code § 28-4503. And fourth, to the extent Amazon has not already established a monopoly, "Amazon's anticompetitive conduct constitutes an attempt to achieve a monopoly in violation of D.C. Code § 28-4503." For relief, the District seeks a declaratory judgment and an injunction against Amazon's anticompetitive acts as well as civil penalties and damages.

Amazon again moved to dismiss under Super. Ct. Civ. R. 12(b)(6) for failure

to state a claim, arguing, among other things, that the District failed to allege any "plausible relevant product market in which competition was harmed" and failed to show that the challenged policies had anticompetitive effects.  The trial court orally granted Amazon's motion.  Relying on the pleading standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the court evaluated the terms of the fair pricing policy, concluding that "sellers are free to set prices" and that "the only limit" in the policy is that sellers "cannot set a price that is significantly higher than recent prices offered on or off Amazon."  The court did not agree with the District that prohibiting sellers from *raising* their prices on Amazon created an implicit limit on sellers' ability to offer *lower* prices on other online marketplaces.  The court stated that nothing in the fair pricing policy expressly created a floor on prices and that neither the word "floor" nor the word "lower" appeared anywhere in the policy.  As for the District's allegations that Amazon's practices lead to higher prices, the court dismissed them as "conclusory." The court did not address the District's monopolization and attempted monopolization claims or its allegations regarding the price parity provision or the minimum margin agreements.  It subsequently denied a motion for reconsideration

and the District's alternative request to file a second amended complaint.[3]

## II.

On appeal, the District levels several challenges against the trial court's ruling granting Amazon's motion to dismiss.  We review a trial court's dismissal of a complaint de novo.  *Bell v. First Invs. Servicing Corp.*, 256 A.3d 246, 251 (D.C. 2021).  "We accept the allegations of the complaint as true, and construe all facts and inferences in favor of the plaintiff."  *Grayson v. AT&T Corp.*, 15 A.3d 219, 228 (D.C. 2011) (en banc) (quoting *Solers, Inc. v. John Doe*, 977 A.2d 941, 947 (D.C. 2009)) (internal brackets omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "plead

---

[3] In this order, the trial court addressed and rejected the District's claim that Amazon's minimum margin agreements restrain trade in violation of D.C. Code § 28-4502 after stating that it found no mention in the complaint of the name of any third-party seller or wholesale supplier, the name of any item for sale, the price point for any item, or "any language of warning" from Amazon to a third-party seller or first-party seller.  With regard to the District's claims involving illegal maintenance of a monopoly and attempted monopolization in violation of D.C. Code § 28-4503, the court concluded that "merely controlling a dominant share of the market does not satisfy pleading requirements for antitrust actions, particularly in pandemic times when online delivery sales have increased."  It further found that the fact that "sellers are free to migrate to other platforms as market dynamics continue to unfold" undercut the District's characterization of Amazon's monopoly power.  Because the court found that the District's complaint contained "conclusory statements devoid of factual information to support its claims of anticompetitive conduct and harm," it denied the District's request to reconsider the dismissal of these counts.

'enough facts to state a claim to relief that is plausible on its face,'" *Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016) (quoting *Twombly*, 550 U.S. at 570), meaning "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 371 (D.C. 2015)). While "this standard 'does not require detailed factual allegations,' it does 'demand[] more than an unadorned, the-defendant-unlawfully-harmed me accusation.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). If the complaint contains sufficient factual allegations, "the case must not be dismissed even if the court doubts the plaintiff will ultimately prevail." *Id.* (quoting *Doe v. Bernabei & Watchel, PLLC*, 116 A.3d 1262, 1266 (D.C. 2015)).

### III.

This case involves the sufficiency of claims brought under the D.C. Antitrust Act. The D.C. Council passed the Antitrust Act in 1980 "to promote the unhampered freedom of commerce and industry" by "prohibiting restraints of trade and monopolistic practices." D.C. Code § 28-4501(b). The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when

interpreting the D.C. Antitrust Act.  *See* D.C. Code § 28-4515 ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes.").

## A.       Restraint of Trade Under D.C. Code § 28-4502

We turn first to the District's contention that it stated plausible violations of D.C. Code § 28-4502, the provision in the Antitrust Act prohibiting restraint of trade. To establish a claim under this section, the District must show that there is a "concerted action" that "unreasonably restrains trade."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010).   In this case, Amazon does not meaningfully dispute that the challenged contracts—the price parity provision, the fair pricing policy, and the minimum margin agreements—are express written agreements that satisfy the requirement of concerted action under section 28-4502.[4]

---

[4] Amazon has at times during this litigation suggested that the District has to show more than an express written agreement to plausibly allege "concerted action" in this case.  It states in its brief, for example, that the District "utterly failed to allege any facts demonstrating that the written policy reveals a 'conscious commitment' to 'an unlawful objective.'"  Br. of Appellee at 26 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *see also id*. at 27 n.7.  This argument is undeveloped, and by the time of oral argument Amazon was wholly focused on the plausibility of the District's allegations of anticompetitive effect, not its allegations

We therefore focus our analysis upon the adequacy of the District's allegations that these agreements amounted to unreasonable restraints on trade.

Whether the agreements are unreasonable can be shown in one of two ways—the per se rule or the rule of reason.  *Ohio v. Am. Express*, 585 U.S. 529, 541 (2018). Under the per se standard, certain agreements are per se illegal because they "always or almost always tend to restrict competition and decrease output."  *Id.* (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)).  The rule of reason, on the other hand, requires "a fact-specific assessment of market power and market

---

of concerted action.  In any event, the Supreme Court has said more recently that stating a claim under section 1 of the Sherman Act (and thus under D.C. Code § 28-4502) "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  And as *Monsanto* itself notes, the "conscious commitment" standard is satisfied by "evidence"— including circumstantial evidence—"that tends to exclude the possibility of independent action."  *Monsanto*, 465 U.S. at 768.  There is clear evidence of that here by way of the written agreements, and indeed, courts have held that circumstantial evidence suggesting an agreement is "superfluous in light of the direct evidence in . . . the agreement itself."  *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 289-90 (4th Cir. 2012); *see also De Coster v. Amazon.com*, *Inc*., No. C21-693RSM, 2023 WL 372377, at *4 (W.D. Wash. Jan. 24, 2023) (concluding, in a class action lawsuit challenging Amazon's price parity provision and fair pricing policy under the Sherman Act, that the plaintiffs plausibly alleged concerted action where "the third-party merchants are active participants who set their prices and otherwise engage with Amazon's policies in an active, albeit allegedly unwilling, way").  Even if the District is required to allege that Amazon intended the unlawfulness of its scheme, at this stage of the proceedings the circumstances described in the complaint plausibly suggest that Amazon intends to restrain trade in the specific manner alleged.

structure . . . to assess the restraint's actual effect on competition." *Id.* (internal quotation marks and brackets omitted).  Although the District contends that aspects of Amazon's conduct satisfy each standard, we need only consider whether the complaint stated a plausible antitrust claim under either theory, and if it did, then leave to "later stages in the litigation" the determination which theory will apply to the challenged agreements.  *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 837 (9th Cir. 2022); *see, e.g., Robertson v. Sea Pines Real Est. Cos.,* 679 F.3d 278, 292 (4th Cir. 2012) (because application of the rule of reason is fact-intensive, it is "best conducted with the benefit of discovery" rather than at a motion to dismiss stage.); *PBTM LLC v. Football Nw, LLC*, 511 F.Supp.3d 1158, 1178 (W.D. Wash. 2021) ("courts typically need not decide which standard to apply at the pleading stage").

To state a claim under the rule of reason, the District must point either to direct or indirect evidence to allege "that the challenged restraint has a substantial anticompetitive effect that harms consumers." *Am. Express*, 585 U.S. at 541.  A party relying on direct evidence must allege "'actual detrimental effects [on competition]' such as reduced outputs, increased prices, or decreased quality in the relevant market." *Id.* at 542 (quoting *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986)).  While the District alleges that within the online marketplace, Amazon's implementation and enforcement of its policies lead to increased prices,

stifled innovation, and reduced consumer choice—all allegations of direct evidence of anticompetitive effects, *see Am. Express*, 585 U.S. at 541—we turn to the District's indirect evidence.  To plead a claim under the rule of reason using indirect evidence a plaintiff must plausibly allege both that (1) the defendant has market power and (2) that the restraint harms competition.  *Id.* at 542.

## *Market Power*

We have little difficulty concluding that the District's first amended complaint adequately alleges that Amazon exerts substantial market power in the online retail marketplace.  According to the complaint, Amazon accounts for between fifty and seventy percent of all online purchases in the United States, where the second and third largest competitors, Walmart.com and eBay, "have online marketplace shares in the single digits."  Amazon also generates revenue through direct retail sales— competing directly against online multi-seller marketplaces as well as with more than half of the third-party sellers on Amazon by offering various products under its own brand name, including mattresses, light bulbs, cookware, computer accessories, luggage, exercise equipment, and motor oil.  Amazon hosts millions of third-party sellers on its platform, while Walmart.com and eBay host only a fraction of that many sellers, despite charging lower fees and commissions.  Even though "Walmart.com charges no setup, subscription, or listing fees, only a referral fee on each sale" and has significantly lower fulfillment and delivery fees, and even though

eBay "generally offers at least fifty free product listings before charging its $0.35 product listing fees, and generally sets its commissions well below Amazon's," Amazon "has seen little seller attrition"—something the complaint flags as "further evidence of its market power."

We are not persuaded by Amazon's contention that the District's way of defining the market—as "online retail marketplaces"—is facially implausible because it excludes brick-and-mortar retail stores where consumers can buy similar or identical products.  In Amazon's view, the alleged market must include all products "reasonably interchangeable by consumers for the same purposes."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  Amazon raised a similar argument in a federal antitrust suit with many similarities to the present case, and the federal court rejected it.  In *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp.3d 975, 988-92 (W.D. Wash. 2022), consumers brought a putative class action against Amazon for violating sections 1 and 2 of the Sherman Act and identified "the market at issue as the U.S. retail ecommerce market."  There, the court found that the plaintiffs "alleged sufficient facts to support a distinction between the ecommerce retail market and the physical retail market, even though the same products may be available in both."  *Id.*; *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (stating that within a "broad market, well defined submarkets may exist which, in themselves, constitute product markets for antitrust

purposes."). Other courts are aligned with that view, and we agree. *See, e.g.*, *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008) (stating that the fact that a customer might cross shop in different markets does not mean there is no definable market); *Distance Learning Co. v. Maynard*, No. 19-cv-03801, 2020 WL 2995529, at *7 (N.D. Cal. June 4, 2020) (noting the distinction between the market for online traffic schools and brick-and-mortar schools).

The District's first amended complaint offers a plausible basis for its contention that Amazon possesses market power in online product submarkets and in the broader online marketplace.

### *Restraint on Competition*

Amazon's primary contention in this appeal is that the District's complaint is deficient in alleging any anticompetitive effects from the agreements. It characterizes the challenged agreements as prohibitions against discrimination and price gouging that reflect Amazon's efforts to bargain for lower prices from its suppliers so it can offer lower prices to consumers on its online store. The District's contrary allegations, it says, are purely speculative.

The District counters, as to the fair pricing policy in particular, that regardless of the agreement's outward focus on preventing "significantly higher prices" on Amazon, it is still implicit in the agreement that a seller cannot offer their product

for less elsewhere because doing so would render the price on Amazon higher than the competitor's price.

And in any event, the District argues, courts must look past the bare terms of the agreement to the effects of the agreement in the real world. Specifically, the District points to allegations in its complaint that third-party sellers regularly increase their prices to avoid Amazon's sanctions and that Walmart "routinely fields requests" from third-party sellers to raise prices on its online platform because those sellers "worry that a lower price on Walmart's online marketplace will jeopardize their status on Amazon's marketplace." According to the District's complaint, that concern is not unfounded, as Amazon aggressively enforces the fair pricing policy through "an extensive network of electronic surveillance" and "employees to monitor the prices of products" on other online platforms. And third-party sellers—most of whom "believe that to successfully sell online, it is imperative that they have a presence on Amazon's online marketplace"—have every incentive to avoid Amazon's sanctions.

The District alleges that Amazon's fees[5] can be as high as forty percent of a

---

[5] According to the District's complaint, Amazon's basic fee, its "referral fee," is fifteen percent on most products but it can be higher on some products, such as

product's total retail price and that the fair pricing policy drives sellers to effectively incorporate those same fees into its prices even when another platform charges considerably lower fees.  By way of example, consider a seller of widgets who can turn a profit by selling a widget for $60.  If Amazon's commissions and fees are forty percent of whatever price the seller lists those widgets at, then the merchant will need to list that widget on Amazon for $100 to incorporate the forty percent in fees and commissions in order to still recover the $60 necessary to make a profit. The merchant theoretically could sell its widgets at a steep discount on its own website (for $60) or on another platform that charges only ten percent of the list price in commissions and fees (for $67)—all while still turning a profit.  But doing so would run afoul of Amazon's fair pricing policy, and as a result, the District alleges, sellers instead incorporate Amazon's high commissions and fees into the price of their goods across all platforms, leaving consumers to pay artificially inflated prices on competitor platforms.

These allegations draw a direct link between the agreements and their

---

clothing.  Sellers can either fulfill their own orders or choose a "Fulfillment by Amazon" (FBA) option.  When a seller chooses to have its order fulfilled by Amazon, Amazon charges the seller "additional fees to handle inventory, ship the product to the consumer, collect payments, process returns, and credit the seller's account."  The District alleges that many sellers pay Amazon a forty percent sales commission, which includes these FBA charges on top of additional fees.

anticompetitive effects, the District contends, and the trial court was required to accept them for their truth.  We are persuaded.  In a case relying on far more ambiguous evidence of an agreement than the written contracts at issue here, the Supreme Court in *Monsanto Co. v. Spray-Rite Serv. Corp.* affirmed the jury's finding of a price-fixing scheme based on (1) testimony stating that the company pressured two distributors to maintain a suggested retail price and (2) a newsletter discussing the company's efforts to "get the market place in order."  465 U.S. 752, 765-66 (1984) (internal brackets omitted) ("It is reasonable to interpret this newsletter as referring to an agreement or understanding that distributors and retailers would maintain prices, and Monsanto would not undercut those prices on the retail level and would terminate competitors who sold at prices below those of complying distributors.").  Here, it is similarly reasonable to look past the express terms of the fair pricing policy to glean its effects on competition. *See id.*  And as the District plausibly alleges, in practice, both the price parity provision and the fair pricing policy force third-party sellers to incorporate Amazon's high fees and commissions by prohibiting third-party sellers from offering a higher price for their products on Amazon than on any other online marketplace, thereby artificially

raising the price of goods for consumers.[6]

As for the District's allegations regarding the minimum margin agreements, the court did not address this claim in its oral ruling, but in denying the District's motion for reconsideration the court concluded that the District's complaint was insufficient because it did not name specific third-party and first-party sellers.  But "*Iqbal* and *Twombly* do not require a plaintiff to prove his case in the complaint," *Robertson*, 679 F.3d at 291, and "[s]pecific facts are not necessary" to survive a motion to dismiss, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  *See also Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) ("Plaintiffs [are] not required to mention a specific time, place or person involved in each conspiracy allegation").  The complaint "need only 'give the defendant fair notice of what

---

[6] The District also takes issue with the trial court's reliance upon language in the Supreme Court's decision in *Iqbal*—specifically, a reference to "lawful, unchoreographed free market behavior"—to support its conclusion that Amazon's agreements were not anticompetitive.  The Court in *Iqbal* was describing the Court's concern in *Twombly* that certain parallel conduct that might be consistent with an unlawful agreement "was not only compatible with, but was indeed more likely explained by, lawful, unchoreographed free market behavior."  556 U.S. at 680.  As the District points out, this concern is not relevant to the circumstances here, where the District challenges Amazon's express written contracts with first-party and third-party sellers and the existence of an agreement is not in dispute.  *See Robertson*, 679 F.3d at 290 ("*Twombly*'s requirements with respect to allegations of illegal parallel conduct are inapplicable, where, as here," the agreements are not in dispute.).

the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93

(quoting *Twombly*, 550 U.S. at 555).

Here, the complaint alleges that Amazon's minimum margin agreements

"reduce other online marketplaces' ability to compete with Amazon by offering

lower prices to consumers" because first-party sellers "have an incentive to maintain

higher prices on other online marketplaces" to avoid triggering Amazon's minimum

profit margin protection and owing potentially millions of dollars to Amazon in "true

up" payments.   Thus in effect, Amazon's minimum margin agreements force

suppliers to incorporate the minimum margin guarantee into the product price for

consumers, creating an inflated resale price and restricting competition.  In *Frame-*

*Wilson*, the court analyzed similar allegations of anticompetitive conduct and found

that Amazon's fair pricing policy and price parity provision plausibly "result in the

suppression of competition and increase of prices on external platforms."  591 F.

Supp.3d at 991-92.  Like in that case, here the District's allegations of suppressed

competition and higher prices on other online platforms—which include the cost of

the product itself plus the cost of Amazon's mandatory fees—are sufficient to

suggest that the agreements produce anticompetitive effects in the relevant markets.

*Id.; see also W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3d

Cir. 2010) (holding that the complaint plausibly alleged that a "conspiracy resulted

in increased premiums and reduced output in the market for health insurance").

By failing to accept the allegations in the complaint as true, the trial court set too high a bar for the District's complaint.  The District adequately pled that Amazon's agreements imposed an unreasonable restraint of trade under the rule of reason.

### B.        Monopolization Under D.C. Code § 28-4503

Lastly, the District argues that the trial court erred in dismissing its claims alleging that Amazon's anticompetitive conduct insulates its monopoly power or threatens to create a monopoly over online marketplaces.  *See* D.C. Code § 28-4503. The elements of an illegal monopoly claim are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power" through anticompetitive means.  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  A claim of attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  "Monopoly power is the power to control prices or exclude competition."  *Du Pont*, 351 U.S. at 391.  "The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output."  *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 434 (3d Cir. 2016) (quoting *Broadcom Corp. v.*

*Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007)).  More commonly, it can be shown through indirect evidence of the firm's dominant market share and barriers to entry.  *Id.* at 436*; see Fed. Trade Comm'n v. Facebook, Inc.*, 581 F.Supp.3d 34, 43 (D.D.C. 2022).

Here, the District alleged both direct and indirect evidence.  As for direct evidence, the complaint alleged that "Amazon's dominance among online marketplaces" allows it to charge supracompetitive fees to its sellers, and despite competitors like Walmart.com or eBay charging significantly lower fees, "Amazon has seen little seller attrition" or corresponding loss of market share.  The trial court discounted these allegations, stating in its denial of reconsideration that "[i]f other online marketplaces charge lower fees than [Amazon], including charging lower commission, sellers may simply choose not to sell on [Amazon's] marketplace."  But accepting the District's allegations as true—as is required on a motion to dismiss—sellers have limited options other than Amazon if they want to reach the majority of online consumers.

As for indirect evidence, the complaint states that Amazon is the platform for online shopping where "[m]ost Americans overwhelmingly turn . . . as the first place they buy anything online."  Citing statistics, the complaint alleges that "[s]ellers are more likely to choose Amazon to gain access to the hundreds of millions of

customers to whom they can sell" and "[b]uyers are more likely to choose Amazon than a competitor because it has amassed millions of sellers from whose products a buyer can choose."  In total, the District alleged that Amazon controls at least fifty to seventy percent of all online retail sales.

The trial court characterized this allegation as "an admission that thirty to fifty percent of the market is beyond Amazon's control."  But the District did not need to show that Amazon controls the entire relevant market to plausibly allege that Amazon has established a monopoly or is attempting to monopolize.  Although there is no magic number, it is well established that an entity can exert monopoly power over market price with less than full market share.  *See Grinnell Corp.*, 384 U.S. at 571 (noting that control of eighty-seven percent of the market "leaves no doubt" that defendant held monopoly power); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (stating that two-thirds of market was sufficient to constitute monopoly).

Viewed as a whole, the District's allegations about Amazon's market share and maintenance of its market power through the challenged agreements plausibly suggest that Amazon either already possesses monopoly power over online marketplaces or is close to a "dangerous probability of achieving monopoly power." *Spectrum*, 506 U.S. at 447; *see also id.* at 455 (proving "dangerous probability of actual monopolization" generally requires "a definition of the relevant market and

examination of market power").

## IV.

For the foregoing reasons, we hold that the District has alleged sufficient facts to overcome Amazon's motion to dismiss.  We therefore reverse the trial court's dismissal of the District's complaint and remand for further proceedings consistent with this opinion.  In light of our disposition, we need not address the District's contention that the trial court abused its discretion in denying its request to file a second amended complaint.

*So ordered.*