UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ET AL., | CASE NO. 2:23-cv-01495-JHC |
| Plaintiffs, | SEALED ORDER ON DEFENDANT'S MOTION TO DISMISS & PLAINTIFFS' MOTION TO BIFURCATE |
| v. | |
| AMAZON.COM, INC., a corporation, | |
| Defendant. | |

# I

## INTRODUCTION

This matter comes before the Court on Amazon's Motion to Dismiss (MTD), Dkt. # 127, and Plaintiffs' Motion to Bifurcate, Dkt. # 167.

The Federal Trade Commission (FTC) and the states and territories of New York, Connecticut, Pennsylvania, Delaware, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, Oklahoma, Oregon, Puerto Rico, Rhode Island, Vermont, and Wisconsin, by and through their Attorneys General, (collectively, Plaintiffs) sue Amazon.com, Inc. for allegedly violating Section 2 of the Sherman Act, 15 U.S.C.

§ 2; Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a); and state antitrust and consumer protection laws.

Amazon moves to dismiss the Amended Complaint.[1]  Dkt. # 127.  The rules require the Court, in ruling on the MTD, to construe the Amended Complaint in the light most favorable to Plaintiffs, to accept all well-pleaded facts as true, and to draw all reasonable inferences in their favor.  Applying these standards, for the reasons discussed below, the Court DENIES Amazon's MTD as to Plaintiffs' claims under Section 2 of the Sherman Act and Section 5(a) of the FTC Act.  The Court GRANTS in part and DENIES in part Amazon's MTD as to the state-law claims.  And the Court GRANTS the Motion to Bifurcate.

## II
### BACKGROUND

Plaintiffs request equitable relief against Amazon to undo and prevent its alleged unfair methods of competition that they say violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 2 of the Sherman Act, 15 U.S.C. § 2, and state antitrust and consumer protection laws.  Dkt. # 171 at 5.[2]

In the Amended Complaint, Plaintiffs allege that Amazon possesses "monopoly power in two markets: (1) the online superstore market and (2) the market for online marketplace services."  Dkt. # 171 at 44.  While these markets are distinct, Plaintiffs also allege that "the relationship and feedback loops between the two relevant markets can create powerful barriers to entry in both markets."  *Id.* at 45.  They say that "Amazon illegally maintains its monopolies through an interrelated course of conduct that blocks competition."  *Id.* at 85.  They say,

---

[1] The parties' briefing is excellent, and the Court finds oral argument unnecessary.
[2] Under the scheduling order on Amazon's Motion to Dismiss the Amended Complaint (Dkt. # 175), Amazon's MTD (Dkt. # 127), Plaintiffs' opposition (Dkt. # 149), and Amazon's reply (Dkt. # 178) are all deemed to apply to the Amended Complaint (Dkt. ## 170 (SEALED), 171).

1
2
3
4
5

"Amazon deploys a series of anticompetitive practices that suppress price competition and push prices higher across much of the internet by creating an artificial price floor and penalizing sellers that offer lower prices off Amazon"—known as Amazon's "anti-discounting strategy." *Id.* at 85, 87.  And they say, "Amazon coerces sellers into using its fulfillment service to obtain Prime eligibility and successfully sell on Amazon." *Id.* at 85–86.

6
7
8
9
10
11
12
13
14
15
16

Plaintiffs allege that, through its anti-discounting strategy, Amazon seeks to ensure that third-party retailers do not offer their products for lower prices elsewhere on the internet. *Id.* at 11.  They contend that Amazon "execute[s] its anti-discounting strategy" through "a variety of tactics." *Id.* at 87.  First, according to Plaintiffs, Amazon employs a "price-surveillance group" that monitors the internet for third-party Amazon Marketplace sellers who sell items on the Marketplace but offer the same items for lower prices at other online stores. *Id.*  They say that this price-surveillance group allows Amazon to identify such third-party Marketplace sellers who offer lower prices elsewhere and "systematically punish[ ] sellers when Amazon detects a lower price on other online stores." *Id.* at 89.  And they say that Amazon "punishes" the sellers by depriving them of access to the Amazon "Buy Box,"[3] imposing detrimental contractual obligations, or even banishing the third-party seller from the Marketplace. *Id.* at 89.

17
18
19
20
21

Plaintiffs also allege that, using the same "extensive surveillance network," Amazon "detect[s] and deter[s] discounting, artificially inflat[es] prices on and off Amazon, and depriv[es] rivals of the ability to gain scale by offering lower prices." *Id.* at 102.  They highlight that a former member of Amazon's leadership team made comments that apparently show that

22
23
24

---

[3] The "Buy Box" is "the display from which a shopper can 'Add to Cart' or 'Buy Now' an Amazon-selected offer for a product.  Nearly 98% of Amazon sales are made through the Buy Box and, as Amazon internally recognizes, eliminating a seller from the Buy Box causes that seller's sales to 'tank.'"  Dkt. # 171 at 9.

SEALED ORDER ON DEFENDANT'S MOTION TO
DISMISS & PLAINTIFFS' MOTION TO BIFURCATE - 3

1   the goal of this strategy is to "deter[] rivals from discounting."  Dkt. # 149 at 12 (citing Dkt. #

2   171 at 103) (former CEO of Amazon's Worldwide Consumer business, Jeff Wilke, explained,

3   the "anti-discounting algorithm enables Amazon to avoid a 'perfectly competitive market' in

4   which rivals continually lower their prices, benefitting shoppers but competing away profits."

5   He added that "Amazon uses a 'game theory approach' where Amazon will 'never move first'

6   when it comes to lowering prices. If Amazon detects a price change in either direction by a

7   monitored online store or marketplace seller, Amazon will copy that change in price to the

8   penny. The net effect, Mr. Wilke predicated, is that 'prices will go up.'").

9

10       Second, Plaintiffs allege that Amazon has "hiked average fulfillment fees to sellers" and

11   "effectively forces sellers to purchase its fulfillment services to access the full reach of

12   Amazon's marketplace services that Prime eligibility unlocks."  Dkt. # 171 at 83.  They say that

13   this "one-two punch of high fees and seller threats forces sellers to use their inflated Amazon

14   prices as a price floor everywhere else they sell online."  *Id.* at 98.  Also, Plaintiffs state that

15   Amazon conditions Prime eligibility on sellers using its Fulfillment by Amazon (FBA) service.[4]

16   *Id.* at 109.  This requirement, Plaintiffs assert, "(1) rais[es] the costs for sellers of using multiple

17   sales channels and (2) artificially stunt[s] the growth of independent fulfillment providers[,]"

---

[4] Fulfillment by Amazon is Amazon's fulfillment and delivery services that it sells to third-party sellers. Dkt. # 171 at 43. "'Fulfillment refers to the process of preparing items for shipping to 'fulfill online orders.' Fulfillment involves storing, picking (retrieving from storage), packaging, and preparing items purchased from online retail stores for delivery." *Id.* "'Delivery' refers to the specific process of transporting a package from a fulfillment center to a customer's chosen address." *Id.* "When a seller uses FBA, Amazon charges the seller for storing their items and charges the seller a fee based on the dimensions and weight of the product when it is purchased." *Id.* at 44.

Amazon Prime is a subscription program where customers pay for various benefits, including "free two-day shipping" on Prime eligible purchases. *Id.* at 37–38.  Prime members spend more on Amazon than non-members, and Amazon recognized that "there is a causal and substantial increase to a customer's annual spend with Amazon—buying more frequently and across a broader set of categories." *Id.* at 39.  In 2021, a significant percentage of U.S. households were enrolled in Prime and Amazon projected that number to grow in 2024.  *Id.* at 42.  "Prime eligibility is critical for sellers in part because of the enormous reach of Amazon's Prime subscription program." *Id.* at 12.  Plaintiffs say that "Amazon requires sellers" to use FBA to be Prime eligible.  *Id.*

1    thus "denying rivals the ability to gain the scale needed to compete meaningfully against

2    Amazon." *Id.* at 121.

3          Third, Plaintiffs point to Amazon's "Project Nessie" algorithm, allegedly "designed to

4    raise prices on and off Amazon" by "predict[ing] the likelihood that the online store or stores

5    offering the lowest price for a given product would follow an Amazon price increase." *Id.* at

6    128.  Plaintiffs allege that, with this information, Amazon "increased [its] products' prices when

7    those price hikes were most likely to be followed" and after "successfully induc[ing] the other

8    online store to raise its price, Amazon continued to sell the product at the now-inflated price."

9    *Id.*  Amazon began using this program in 2014 and has allegedly turned Project Nessie "'on' and

10   'off' at least eight times between 2015 and 2019" during periods "of increased media focus and

11   customer traffic." *Id.* at 129–30.  Further, Plaintiffs assert that "Amazon paused Project Nessie

12   in 2019 only when regulatory scrutiny, including the Federal Trade Commission's initiation of

13   the investigation that led to this Complaint, caused Amazon to superficially change or conceal

14   many of its practices." *Id.* at 130.  Plaintiffs say that, although Project Nessie is currently

15   paused, "[t]here are no technical barriers to Amazon resurrecting—or even expanding—its use of

16   Project Nessie" and, in fact, in "January 2022, the CEO of Worldwide Amazon Stores, Doug

17   Herrington, asked about turning on '[o]ur old friend [Project] Nessie, perhaps with some new

18   targeting logic' to juice profits for Amazon's Retail arm." *Id.*

19

20         Plaintiffs filed their Complaint on September 26, 2023, Dkt. ## 1, 3 (SEALED); and filed

21   their Amended Complaint, which joins the Commonwealth of Puerto Rico and the State of

22   Vermont as Plaintiffs, on March 14, 2024, Dkt. ## 170 (SEALED), 171.  Plaintiffs bring 20

23   counts:

24

- Count I: Monopoly Maintenance of the Online Superstore Market under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 2 of the Sherman Act, 15 U.S.C. § 2;

- Count II: Monopoly Maintenance of the Online Marketplace Services Market under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 2 of the Sherman Act, 15 U.S.C. § 2;

- Count III: Unfair Method of Competition under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

- Count IV: Unfair Method of Competition under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

- Count V: Monopoly Maintenance of the Online Superstore Market under Section 2 of the Sherman Act, 15 U.S.C. § 2;

- Count VI: Monopoly Maintenance of the Online Marketplace Services Market under Section 2 of the Sherman Act, 15 U.S.C. § 2;

- Count VII: Violations of Connecticut State Law: Connecticut Antitrust Act, Conn. Gen. Stat. § 35-27 and  Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b *et seq.*;

- Count VIII: Violations of Maine State Law: Maine Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, § 1102;

- Count IX: Violations of Maryland State Law: Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-201 *et seq.*;

- Count X: Violations of Michigan State Law: Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*;

- Count XI: Violations of the Nevada State Law:  Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060;

- Count XII: Violation of New Jersey State Law: New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1 to -19;

- Count XIII: Violation of New Jersey State Law: New Jersey Consumer Fraud Act (NJCFA),N.J. Stat. Ann. § 56:8-4(b);

- Count XIV: Violation of New Jersey State Law: the NJCFA, N.J. Stat. Ann. § 56:8-2;

- Count XV: Violations of New York State Law: N.Y. Exec. Law § 63(12);

- Count XVI: Violations of Oklahoma State Law: Oklahoma Antitrust Reform Act, Okla. Stat. tit. 79, §§ 201, *et seq.*, and Oklahoma Consumer Protection Act, Okla. Stat. til. 15, §§ 751, *et seq.*;

- Count XVII: Violations of Oregon State Law; Oregon Antitrust Law, Or. Rev. Stat. §§ 646.705 to 646.836;

- Count XVIII: Violations of Pennsylvania State Law: Pennsylvania's Unfair Trade Practices and Consumer Protection Law (PUTPCPL), 73 Pa. Cons. Stat. § 201-2, § 201-3, § 201-4 and Pennsylvania antitrust common law;

- Count XIX: Violations of Rhode Island Law: Rhode Island Antitrust Act, 6 R.I. Gen. Laws § 6-36-1, *et seq.* and Rhode Island Deceptive Trade Practices Act (RIDTPA), 6 R.I. Gen. Laws § 6-13.3-1, *et seq.*; and

- Count XX: Violations of Wisconsin State Law: Wisconsin's Antitrust Act, Wis. Stat. §§ 133.03 *et seq.*

Dkt. # 171 at 130–58.

Amazon moves to dismiss the Amended Complaint.  Dkt. ## 127, 175.  For the Sherman Act claims, Amazon contends that Plaintiffs fail to allege anticompetitive conduct and anticompetitive effects.  Dkt. # 127 at 8–9, 15–22.  For the "standalone" FTC Act claims, Amazon asserts that the Court may not, in the first instance, "determine whether conduct that would not otherwise violate the antitrust laws is 'unfair' under Section 5 of the FTC Act."  *Id.* at 10.  Amazon also contends that Count IV, which challenges Project Nessie under Section 5 of the FTC Act, should be dismissed for two additional and independent reasons: (1) it is untimely and (2) it is "irreconcilable with settled Section 5 precedent."  *Id.* at 11.  Finally, Amazon contends that the state-law claims "fail for several, often overlapping, reasons," *id.* at 11, the details of which this Order addresses below, *infra* Section III.C.

# III

## DISCUSSION

A defendant may move to dismiss when the complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), courts construe the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  Courts must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.  *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  But courts are not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 677–78.  "In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (internal citation omitted).

A.     MTD: Section 2 Sherman Act Claims

Counts I, II, V, and VI challenge Amazon's alleged "monopoly maintenance and unfair methods of competition under Section 2 of the Sherman Act, 15 U.S.C. § 2."  Dkt. # 149 at 13. Plaintiffs assert that,

> Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

Dkt. # 171 at 133 (Count I), 134 (Count II), 136–37 (Count V), 137–38 (Count VI).  Plaintiffs also contend that while each category of conduct is "anticompetitive in its own right," the "interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process."  Dkt. # 171 at 133 (Count I), 134 (Count II), 137 (Count V), 138 (Count VI).[5]

---

[5] Amazon challenges this "'synergistic'" and "'holistic[]' . . . approach to antitrust liability" on Reply.  Dkt. # 178 at 5.  The Court need not consider arguments made for the first time on reply.  *Cf. Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("[W]e decline to consider new issues raised for the first time in a reply brief.").  But also, because the Court concludes that the Amended Complaint plausibly alleges anticompetitive conduct with respect to the individual forms of conduct outlined by Plaintiffs, it need not reach, at this point, the issue whether Defendants' conduct should be considered cumulatively.  *See infra* III.A.2.

Amazon says that Plaintiffs (1) fail "to allege anticompetitive conduct" because the conduct challenged in the Amended Complaint are "well-established forms of competition," and (2) fail to allege "plausible anticompetitive effects." Dkt. # 127 at 8–9, 16–22.

For claims under Section 2 of the Sherman Act,

> It is settled law that this offense requires, in addition to the possession of monopoly power in the relevant market, "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. . . . To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.

*Verizon Commc'ns Inc. v. L. Offs. Of Curtis v. Tinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). Thus, "[a] Section 2 monopolization claim 'has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *Grinnell Corp.*, 384 U.S. at 570–71).[6] To satisfy the second element, a plaintiff "must show that the defendant acquired or maintained its monopoly through anticompetitive conduct." *Id.* "Anticompetitive conduct consists of acts that 'tend[ ] to impair the opportunities of rivals' and 'do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way.'" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008)).

---

[6] Amazon asserts that while "Plaintiffs . . . must prove that Amazon has monopoly power in a properly defined antitrust market, and the [Amended] Complaint's highly gerrymandered market is unlikely to survive that test[,] . . . [t]hat factual dispute need not be resolved in this motion." Dkt. # 127 at 8. Thus, this Order does not address the first element.

1.      Amazon's Procompetitive Justifications are Inapt on a Motion to Dismiss.

Amazon says that "[e]ach policy challenged by the [Amended] Complaint is facially procompetitive, and Plaintiffs' efforts to obstruct such procompetitive conduct would chill retail competition and harm consumers." Dkt. # 127 at 16.  But "whether the alleged procompetitive benefits of the [challenged conduct] outweigh its alleged anticompetitive effects [(i.e., procompetitive justifications)] is a factual question that the district court cannot resolve on the pleadings." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022); *see also United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1067 & n.16 (N.D. Cal. 2014).  A procompetitive justification "may be used to rebut Plaintiffs' claims once a *prima facie* case has been established, but the Court need not consider such rebuttals on a motion to dismiss." *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 992 (W.D. Wash. 2022); *see also De Coster v. Amazon.com, Inc.*, No. C21-693RSM, 2023 WL 372377, at *3 (W.D. Wash. Jan. 24, 2023); *Floyd v. Amazon.com, Inc.*, No. C22-1599-JCC, 2023 WL 3891973, at *5 (W.D. Wash. June 8, 2023); *Brown v. Amazon.com, Inc.*, No. 2:22-cv-00965-JHC, 2023 WL 5793303, at *4 (W.D. Wash. Sept. 7, 2023).  Thus, to the extent Amazon challenges Plaintiffs' Section 2 Sherman Act claims with procompetitive justifications, those arguments are inapt at this stage.

2.      Plaintiffs Plausibly Allege that Amazon's Conduct is Individually Anticompetitive.

As for Plaintiffs' specific allegations of anticompetitive conduct, Amazon asserts that each category of conduct is lawfully competitive.  The three categories of conduct, as described by Amazon, include (1) competing on price (i.e., discount-matching practice), (2) competing by offering a better in-store experience, and (3) competing through better delivery experiences. Dkt. # 127 at 8–9.

1   Amazon asserts that the first category of conduct—above-cost discounting—is per se

2   lawful.  Dkt. # 178 at 5.  It contends that the second and third categories, while not per se lawful,

3   are "commonplace in retail and have facially procompetitive attributes."  Dkt. # 178 at 5.

4       a.    Amazon's Anti-Discounting Practices

5   Amazon asserts that its anti-discounting practice is per se legal under *Brooke Group*

6   *Limited v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).  Dkt. # 127 at 17–18.

7   There, the Supreme Court explained that Section 2 of the Sherman Act condemns "predatory

8   pricing when it poses a dangerous probability of actual monopolization."  *Id.* at 222 (internal

9   citation and quotation marks omitted).  There are "two prerequisites" to state a predatory pricing

10  claim under Section 2 of the Sherman Act.  *Id.*  "First, a plaintiff seeking to establish competitive

11  injury resulting from a rival's low prices must prove that the prices complained of are below an

12  appropriate measure of its rival's costs."  *Id.*  And second, the plaintiff must show "that the

13  competitor had . . . under § 2 of the Sherman Act, a dangerous probability, of recouping its

14  investment in below-cost prices."  *Id.* at 224.

15  As to the first prerequisite, the Supreme Court explained that the reasoning in two prior

16  decisions, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S 104 (1986) and *Matsushita Electric*

17  *Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), while not resolving the question of

18  "whether recovery should *ever* be available . . . when the pricing in question is above some

19  measure of incremental cost," "suggests that only below-cost prices should suffice."  *Brooke*

20  *Grp.*, 509 U.S. at 223 (internal quotation marks omitted).  And the Supreme Court has "rejected

21  elsewhere the notion that above-cost prices that are below general market levels or the costs of a

22  firm's competitors inflict injury to competition cognizable under the antitrust laws."  *Id.* (citing

23  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990)); *see also Weyerhaeuser Co.*

24  *v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007) ("We were particularly wary

of allowing recovery for above-cost price cutting because allowing such claims could, perversely, chill legitimate price cutting, which directly benefits consumers." (internal citation and quotation omitted)).

Plaintiffs disagree with Amazon's description of its pricing practices and assert that "Amazon designed its anti-discounting tactics to deprive rivals of scale and exert control over pricing at rival stores, with the intention of deterring sellers and rivals from lowering prices." Dkt. # 149 at 18 (citing Compl. ¶¶ 262–65, 316, 328, 365). Plaintiffs state that the price-cost test outlined in *Brooke Group* "only matters when a plaintiff seek[s] to establish competitive injury resulting from a rival's low prices." Dkt. # 149 at 22 (citing *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, No. C-10-4429 EMC, 2011 WL 1225912, at *8–10 (N.D. Cal. Apr. 1, 2011) ("[*Brooke Grp.*] line of cases is inapposite" when the claim at issue "is not a predatory pricing claim"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 279 (3d Cir. 2012) ("[*Brooke Grp.*] line of cases is inapposite" when the claim is not a "predatory pricing claim"); *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 493 (5th Cir. 2022) (*Brooke Grp.* inapplicable because plaintiff "isn't challenging . . . low or below-cost pricing," but rather claims defendant is "manipulating prices in a way that excludes competitors from the market")). The Court agrees with Plaintiffs that they do not assert a predatory pricing claim and thus *Brooke Group* does not foreclose the type of Section 2 Sherman Act claim that they bring here.

Plaintiffs adequately allege that Amazon's anti-discounting practices "stifle price competition." Dkt # 149 at 18. Specifically, they aver that Amazon's actions that prevent third-party sellers "from offering discounts on other sites are anticompetitive because they foreclose price competition from those sellers elsewhere." *Id.* (citing Compl. ¶¶ 17, 285). Plaintiffs assert that "Amazon tells sellers that they will be punished if Amazon detects a lower price on any other online store." Dkt. # 171 at 92. These penalties include, for example, taking away a

seller's access to Amazon's Buy Box "when Amazon finds a lower price on another online store for an item being sold by a seller on Amazon," *id.* at 89, or "demoting them in search results," *id.* at 93.  Plaintiffs say,

> Amazon's penalties effectively deter sellers from offering prices elsewhere that are lower than their prices on Amazon, even where their costs are lower through other online sales channels.  That in turn limits the ability of other online superstores to offer prices lower than those on Amazon, hindering the growth of would-be rivals and denying them the scale necessary to compete.

*Id.* at 93.  The effect of these practices, Plaintiffs allege, is that the price on Amazon's marketplace, "which often includes Amazon's bloated fees[,] effectively becomes the price floor market-wide."  Dkt. # 149 at 19 (citing Compl. ¶¶ 17, 309–12).

Plaintiffs also allege that, when Amazon acts as the seller (i.e., a first-party seller), it "uses its extensive surveillance network to block price competition by detecting and deterring discounting, artificially inflating prices on and off Amazon, and depriving rivals of the ability to gain scale by offering lower prices."  Dkt. # 171 at 102.  Plaintiffs allege that,

> Amazon disciplines rivals by immediately copying—but never undercutting—prices.  If and when the lowest price by a monitored online store or marketplace seller increases (or the product goes out of stock), Amazon automatically increases its Retail price to copy the new lowest price, whether that is a higher price offered by the same online store or marketplace seller it had been copying or a price offered on a different website. If Amazon detects a "lowest price" drop, Amazon automatically copies that move. And if the "lowest price" increases, Amazon automatically copies again without even considering whether it could earn more business by continuing to offer shoppers the lower price.

*Id.* at 103–04.  As mentioned above, Plaintiffs also point to this statement by a former Amazon executive: "Amazon designed this system to deliberately avoid a 'perfectly competitive market' in which stores undercut each other to win customers."  Dkt. # 149 at 21 (citing Compl. ¶ 327); *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (reasoning that in a Section 2 Sherman Act monopolization claim, "evidence of intent is . . . relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or

'anticompetitive'").  Plaintiffs allege that "Amazon uses all of its various anti-discounting programs—and the combined power of its Marketplace and Retail arms—to limit price competition and comparison shopping for the hundreds of billions of dollars in goods sold annually in the relevant markets."  Dkt. # 171 at 106.

Taking Plaintiffs' well-pleaded facts as true, and drawing all reasonable inferences in their favor, the Court concludes that the Amended Complaint adequately alleges that the challenged discounting practices are anticompetitive for purposes of their Section 2 Sherman Act claim.  *See Dreamstime.com, LLC*, 54 F.4th at 1137 ("Anticompetitive conduct consists of acts that tend[ ] to impair the opportunities of rivals and do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way." (internal quotation marks and citation omitted) (alterations in original)).

b.      Amazon's "Featuring" Practices

As to the second category—"offering a better in-store experience"—Amazon asserts,

> By featuring offers it thinks a customer will like, Amazon reduces the inconvenience and time associated with sorting through many offers, without taking away consumers' ability to do so if they would prefer. And by not featuring offers when it knows a competitor is offering a better price in another store, Amazon both builds trust with consumers and facilitates the comparison-shopping that the Complaint itself acknowledges is necessary for retailers to compete.

Dkt. # 127 at 18.  Amazon says, "Amazon's Featured Offer and [Amazon's Standards for Brands (ASB)] policies are procompetitive practices aimed at encouraging third-party sellers, who are responsible for setting their own prices in Amazon's store, to offer low prices."[7]  *Id.* at 20.

---

[7] A "Featured Offer" is the offer that Amazon chooses to display when an item is offered for sale on the marketplace by more than one seller.  Dkt. # 171 at 29–30.  "When there are multiple offers for a single item, Amazon uses the 'Featured Merchant Algorithm' to choose one offer to display in the Buy Box. Amazon calls this displayed offer the 'Featured Offer.' Being chosen as the Featured Offer is commonly known as 'winning' the Buy Box."  *Id.*

1   Amazon relies on *Dreamstime.com, LLC*, 54 F.4th at 1141, in which the Ninth Circuit held that

2   favoring contractual partners is "not anticompetitive conduct under Section 2 [of the Sherman

3   Act]." Dkt. # 127 at 11–12.

4        Plaintiffs dispute Amazon's contention that Amazon's "anti-discounting policies are

5   'facially procompetitive' because they improve the in-store experience." Dkt. # 149 at 19.

6   Plaintiffs argue that, through its anti-discounting strategy, Amazon hides the best deals from

7   customers when a seller offers the "best deal" for a product on Amazon but offers the same

8   product for a lower price on another website. *Id.* at 18–19. They contend that Amazon's threats

9   to "bury discounting sellers in its search results or conceal those sellers' prices, even if a seller's

10  price is the best deal available on Amazon," are anticompetitive. *Id.* at 19 (citing Compl. ¶¶ 16,

11  283). Plaintiffs say that the cases Amazon cites, including *Dreamstime.com, LLC*, 54 F.4th

12  1130, are inapposite to Amazon's contention, because by actively deterring sellers from offering

13  a lower price on another site, Amazon does not actually steer customers to good deals. Dkt. #

14  149 at 19.

15       The Court agrees with Plaintiffs. First, as discussed above in Section III.A.1, Amazon's

16  procompetitive justifications—including with respect to its "featuring" practices—are improper

17  to consider at this stage. *See PLS.Com, LLC*, 32 F.4th at 839. Second, *Dreamstime.com, LLC*,

18  54 F.4th 1130 is distinguishable. In the pertinent portion of *Dreamstime.com, LLC*, 54 F.4th

19  1141, cited by Amazon, the Ninth Circuit quoted a passage from the Supreme Court's decision in

20

21          Amazon designates certain third-party sellers as ASB sellers. *Id.* at 93. ASB sellers are subject

22  to additional contractual requirements "to ensure that their products' prices on other online stores are as
    high or higher than their prices on Amazon at least 95% of the time." *Id.* at 94. ASB contracts also
    require ASB sellers "to sell most of their selection on Amazon," "to have nearly all of their inventory in-

23  stock and ready for sale to Amazon customers," and "to use Amazon's fulfillment service for the vast
    majority of their products." *Id.* at 94–95. Amazon unilaterally designates sellers as ASB sellers and "[i]n

24  2021, 55% of Amazon Marketplace sales were by ASB sellers." *Id.* at 94.

*United States v. Colgate & Co.*, which states, "*In the absence of any purpose to create or maintain a monopoly*, the [Sherman Act] does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom [it] will deal." 250 U.S. 300, 307 (1919) (emphasis added). This section of *Dreamstime.com, LLC*, 54 F.4th at 1141, stands for the unremarkable principle that an allegation that a defendant favors certain contractual partners is not enough by itself to adequately plead anticompetitive conduct. Here, Plaintiffs have not merely alleged that Amazon favors certain sellers over others. They have alleged that Amazon actively deters third-party sellers from offering lower prices for their products on sites other than Amazon's. Dkt. #171 at 89–90. This suffices to state a claim under Section 2 of the Sherman Act, which requires a plaintiff to show that a defendant possessing monopoly power engaged in anticompetitive conduct with an "intent to control prices or exclude competition in the relevant market." *Dreamstime.com, LLC*, 54 F.4th at 1137 (quoting *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 736 (9th Cir. 1979)); *see also* Dkt. # 149 at 19 (citing Compl. ¶¶ 16, 277, 283).

Taking Plaintiffs' well-pleaded facts as true, and drawing all reasonable inferences in their favor, the Court concludes that the Amended Complaint adequately alleges that Amazon's "featuring" practices "tend[ ] to impair the opportunities of rivals and do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way." *Dreamstime.com, LLC*, 54 F.4th at 1137 (internal quotation marks and citation omitted).

c. Amazon's "Fulfillment by Amazon" and Prime Badge Policies

Regarding the third category—delivery experience—Amazon asserts that "[t]he [Amended] Complaint . . . attacks procompetitive conduct when it alleges that Amazon displays

the Prime badge to third-party sellers only if they enlist Amazon to handle fulfillment under the FBA program."[8]  Dkt. # 127 at 19.  But again, "whether the alleged procompetitive benefits of the [conduct] outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings."  *PLS.Com, LLC*, 32 F.4th at 839; Dkt. # 149 at 17.

Amazon also asserts that it does not "condition the Prime Badge on use of FBA," and that third-party sellers can gain a Prime Badge though Amazon's Seller Fulfilled Prime (SFP) program.  Dkt. # 127 at 13 n.3.  Amazon explains,

> In 2015, Amazon created a program called [SFP], Compl. ¶ 398, which it maintains today, *id.*, ¶ 409.  SFP permits third-party sellers to obtain the Prime badge on offers even if they do not use FBA.  The Complaint misleadingly states that Amazon "shuttered SFP" in 2019, *id.*, but elsewhere acknowledges that Amazon merely paused "*new enrollment* in SFP," *id.* ¶ 404, a temporary step taken to address speed and performance issues. Amazon has reopened new enrollment in SFP. *See* Seller Fulfilled Prime, https://sell.amazon.com/programs/seller-fulfilled-prime.

*Id.*

But the Amended Complaint alleges that "Amazon maintains its monopolies . . . by coercing sellers to use FBA," by "generally conditioning [access to Prime eligibility] on use of Amazon's" FBA.  Dkt. # 171 at 109.  According to Plaintiffs, "many sellers would prefer to use an independent fulfillment provider that would allow them to more easily fulfill orders placed on both Amazon and non-Amazon marketplaces."  *Id.* at 110.  And as "the former head of FBA put it, '[s]ellers may not have wanted to buy fulfillment [from Amazon]' but they did so in order to 'buy increased sales' that come with Prime eligibility."  *Id.* at 112.  This conduct, Plaintiffs allege, forces "sellers who do not want to sell solely through Amazon [to] split their physical inventory by putting inventory for Amazon orders into FBA and inventory for non-Amazon

---

[8] "Amazon displays a 'Prime Badge' to show Prime subscribers which items are eligible for the prepaid unlimited shipping included in the Prime subscription."  Dkt. # 171 at 39.

orders in a different fulfillment network." *Id.* at 115.  As a result, "[s]plitting inventory among

multiple fulfillment networks raises the costs for sellers to offer products for sale through

multiple sales channels." *Id.*

Plaintiffs also allege,

> In contrast to independent fulfillment providers, Amazon's FBA service only
> fulfills orders placed on Amazon's Marketplace.  Sellers cannot use FBA to fulfill
> orders off Amazon.  To fulfill orders off Amazon, sellers can pay an additional fee
> for a separate Amazon fulfillment service.  But unlike independent fulfillment
> providers, this Amazon fulfillment service does not provide custom packaging,
> standard integration with non-Amazon platforms, or visibility into the separate but
> complementary delivery process.

*Id.* at 119.

As for SFP, Plaintiffs allege that while "SFP was an immediate hit among sellers,"

"internally certain Amazon executives feared SFP was '[s]trategically risky' because it could

'seriously imper[i]l FBA[,]'" and they "were concerned that SFP was an independent fulfillment

provider 'enabler' that could help independent fulfillment providers 'get to scale,' which could

then benefit 'other retailers." *Id.* at 122–23.  In 2019, Amazon stopped "new enrollment in SFP"

but, wanting to "minimize any potential backlash from SFP sellers . . . let sellers already in SFP

remain while blocking all new enrollment." *Id.* at 123–24.  But "Amazon communicated to

those sellers . . . that it expected them to fulfill orders themselves, rather than using independent

fulfillment providers.  Most remaining SFP sellers have since left or been disqualified from the

program." *Id.* at 124.  Plaintiffs also allege while

> Amazon recently announced plans to reopen SFP enrollment . . . to enroll in the
> program, sellers would need to meet rigorous pre-qualification criteria to enroll in
> a 30-day SFP trial, after which Amazon will determine whether they may
> participate in SFP.  Amazon's communications about upcoming changes to the SFP
> program continue to indicate that sellers would need to fulfill Prime orders
> themselves, without using independent fulfillment providers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

*Id.* at 125.  Plaintiffs allege that, when they filed their Amended Complaint, SFP enrollment had remained closed.  *Id.*  Amazon says that it has reopened new enrollment in SFP, Dkt. # 127 at 13 n.3, but, even if this is true, on an MTD the court limits its consideration to the facts alleged in the complaint.  *Livid Holdings Ltd.*, 416 F.3d at 946.

Viewing the facts alleged in the Amended Complaint in the light most favorable to Plaintiffs, the Court concludes that the Amended Complaint's description of SFP adequately supports Plaintiffs' allegations that Amazon effectively requires third party sellers to use FBA to qualify for a Prime Badge.  Plaintiffs plausibly allege that the challenged conduct is anticompetitive.  And again, any procompetitive justifications for Amazon's FBA and Prime Badge Policies are improper to consider at this stage.  *See PLS.Com, LLC*, 32 F.4th at 839. Taking Plaintiffs well-pleaded facts as true, they have plausibly alleged that Amazon's FBA and Prime Badge practices "tend[ ] to impair the opportunities of rivals and do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way."  *Dreamstime.com, LLC*, 54 F.4th at 1137 (internal quotation marks and citation omitted).

Given the analysis above, the Court concludes that the Amended Complaint states a claim of anticompetitive monopoly maintenance under Section 2 of the Sherman Act.

B.      MTD: Section 5 FTC Act Claims

Plaintiffs bring Counts III and IV under Section 5 of the FTC Act, 15 U.S.C. § 45(a). Dkt. # 149 at 13–14.  Count III alleges that "Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection," violate Section 5 of the FTC Act as they are "anticompetitive and exclusionary."  Dkt. # 171 at

135.  Count IV alleges that Amazon's "Project Nessie" constitutes an unfair method of competition. *Id.* at 135–36.

Amazon says that Counts III and IV should be dismissed for two reasons: first, because "[t]he FTC may not use Section 5 of the FTC Act to condemn practices that are lawful under 'well forged' Sherman Act doctrine,"; and second, because the FTC "improperly attempt[s] to side-step the procedures the FTC must use to develop new policy and instead ask this Court to do what no federal district court has done: become an administrative-policy-maker for the FTC by defining new meanings of 'unfair' competition." Dkt. # 127 at 23.  Amazon further challenges Count IV as untimely and contradicting settled precedent. *Id.* at 25.

        1.      Count III: Conduct Challenged Under Section 2 of the Sherman Act may also be Challenged Under Section 5 of the FTC Act.

Amazon asserts that because Plaintiffs bring a Section 5 FTC Act claim in addition to its Sherman Act claims for the same conduct, the Court must grant its MTD on the Section 5 claims if it denies the MTD on the Sherman Act claims.  Amazon argues that "[t]he FTC included Count III in the alternative out of concern that its Sherman Act claims premised on that same conduct would fail; if those claims were in fact valid, Count III would be surplusage." Dkt. # 178 at 9.  But Amazon cites no authority to support its contention that, if the Sherman Act claims were valid, the FTC Act claims based on the same conduct should be dismissed.

Section 5 of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a).  These methods may include practices that violate the Sherman Act. *F.T.C. v. Cement Inst.*, 333 U.S. 683, 694–95 (1948).  In *F.T.C. v. Qualcomm Inc.*, the court determined that the FTC adequately stated a claim under Section 5 of the FTC Act because it adequately alleged that Qualcomm's conduct violated Sections 1 and 2 of the Sherman Act. No. 17-CV-002200-LHK, 2017 WL 2774406, at *9 (N.D. Cal. June 26, 2017).  Plaintiffs say

1    that "Amazon's arguments for dismissal of the monopolization claims fail for the" same reasons

2    Plaintiffs provide regarding their Section 2 Sherman Act claims.  Dkt. # 149 at 26.  Their

3    reasoning, Plaintiffs assert, "is justification enough to reject Amazon's passing argument

4    regarding Count III."  *Id.*  The Court agrees.  Because Plaintiffs have adequately alleged that

5    Amazon's conduct violates Section 2 of the Sherman Act, the FTC has also adequately stated a

6    claim under Section 5 of the FTC Act.  *See Qualcomm Inc.*, 2017 WL 2774406, at *9.

7            2.       Count IV: Project Nessie Claim under Section 5 of the FTC Act Survives
                     the Motion to Dismiss.
8

9            Amazon challenges Count IV on three independent grounds: first, that Plaintiffs may not

10   bring a "standalone" claim when the Court must define "new meanings of 'unfair' competition"

11   under Section 5 of the FTC Act; second, that "the FTC's legal basis for attacking [Project]

12   Nessie contradicts settled precedent under both the Sherman Act and the FTC Act"; and third,

13   that the claim is untimely.  Dkt. # 127 at 23, 25.  For the reasons below, the Court determines

14   that Plaintiffs have plausibly alleged facts to support a Section 5 challenge to Project Nessie.

15           a.       Standalone FTC Act Section 5 claim

16           Amazon says that the Section 5 claim fails because the Court cannot determine whether

17   Amazon's actions regarding Project Nessie are "unfair" methods of competition.  Dkt. # 127 at

18   23–24.  Amazon contends that the FTC cannot bring a "standalone" Section 5 claim—a claim

19   not "premised on a violation of some other well-developed source of law"—before a district

20   court because "label[ing] a practice unfair is a determination of policy or judgment which the

21   agency alone is authorized to make in its administrative forum."  *Id.* at 24 (quoting *F.T.C. v.*

22   *Sperry & Hutchinson Co.*, 405 U.S. 233, 249 (1972)) (internal quotations omitted).

23           Relying on *Sperry & Hutchinson*, Amazon argues that the FTC Act requires the FTC to

24   declare a practice unlawful through "statutorily prescribed procedures for determining whether

the challenged conduct is 'unfair'" before it can bring a case in federal court.  Dkt. # 127 at 24.

In that case, the Supreme Court explained that "[a] court cannot label a practice 'unfair' under

[Section 5 of the FTC Act].  It can only affirm or vacate an agency's judgment to that effect."

405 U.S. at 249.  The Supreme Court reasoned that Congress did not define "unfair practices"

and instead chose to "leave it to the [FTC] to determine what practices were unfair."  *Id.* at 240.

But *Sperry & Hutchinson* does not hold that district courts cannot determine whether a

defendant's action is "unfair" in a "standalone" case.  There, the Supreme Court "said nothing

about the need for the FTC to 'declare' a law 'unfair' or 'abusive' before proceeding to

litigation."  *Consumer Fin. Prot. Bureau v. D & D Mktg., Inc.*, No. CV 15-9692 PSG (EX), 2017

WL 5974248, at *5 (C.D. Cal. Mar. 21, 2017) (citing *Sperry & Hutchinson*, 405 U.S. at 239.).

The pertinent discussion in *Sperry & Hutchinson* arose in the context of the Supreme Court's

decision to remand the case to the FTC instead of the Fifth Circuit; the Supreme Court remanded

the case to the FTC so that the agency could determine whether the practice was unfair through

its adjudicatory process.  405 U.S. at 245.  Further, Section 13(b) of the FTC Act, which was

added after the Supreme Court decided *Sperry & Hutchinson*, authorizes the FTC to bring a

lawsuit in a district court to enjoin "any provision of law enforced by the [FTC]" and allows the

FTC to seek a permanent injunction "in proper cases . . . after proper proof."  15 U.S.C. § 53(b).

Amazon says that this case is not a "proper case" for the FTC to pursue in federal district court

under Section 13(b).  Dkt. # 127 at 24 (citing 15 U.S.C. § 53(b)).  But the Ninth Circuit has

interpreted Section 13(b) to mean that a district court has "authority to grant a permanent

injunction against violations of *any provisions of law enforced by the Commission*."  *F.T.C. v.*

*Evans Prod. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985) (quoting *F.T.C. v. H. N. Singer, Inc.*, 668

F.2d 1107, 1113 (9th Cir. 1982) (emphasis added)).  In *F.T.C. v. Surescripts, LLC*, a case

Amazon cites, the district court for the District of Columbia determined that the case was "proper" because the FTC grounded its argument in caselaw and did "not seek to rely on its agency expertise to develop the law."  424 F. Supp. 3d 92, 98 (D.D.C. 2020).

Here, as discussed below in Section III.B.2.c., the FTC's argument is supported by the caselaw: courts have laid out standards by which this Court can determine whether Amazon's conduct is unfair in this situation.  Further, the FTC does not rely on its own interpretation of the FTC Act in this case.[9]

b.      Timeliness of claim

The FTC may seek an injunction when the defendant's conduct "is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission."  15 U.S.C. § 53(b).  Amazon asserts that the Amended Complaint is untimely because Amazon is not currently using Project Nessie and there is no sign that Amazon is "about to" revive it.  Dkt. # 127 at 27.  Plaintiffs say that the challenged conduct is "likely to recur."  Dkt. # 149 at 29.

"[I]n the Ninth Circuit, if a violation of the FTC Act has ceased, an injunction will issue under § 53(b) if the FTC has reason to believe that the past conduct is 'likely to recur.'"  *F.T.C. v. Elec. Payment Sols. of Am. Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at *9 (D. Ariz. Aug. 28, 2019) (citing *Evans Prods. Co.*, 775 F.2d at 1087).  "[A]n inference arises from illegal past conduct that future violations may occur. The fact that illegal conduct has ceased does not foreclose injunctive relief."  *Elec. Payment Sols. of Am. Inc.*, 2019 WL 4287298, at *9 (internal citation omitted).

---

[9] Amazon stresses that the FTC announced a change in its internal policy for Section 5 enforcement.  Dkt. # 127 at 23.  But the FTC's internal policy is inapt here; neither side argues that the Court should look to these policy statements in interpreting the Section 5 of the FTC Act.

SEALED ORDER ON DEFENDANT'S MOTION TO
DISMISS & PLAINTIFFS' MOTION TO BIFURCATE - 24

Plaintiffs allege that Amazon strategically "turned Project Nessie on and off" to avoid scrutiny during two busy shopping periods: Prime Day and the winter holiday shopping season. Dlkt. # 171 at 129–30.  "Amazon turned Project Nessie 'on' and 'off' at least eight times between 2015 and 2019." *Id.* at 130.  Further, Plaintiffs allege that "Amazon paused Project Nessie in 2019 only when regulatory scrutiny, including the Federal Trade Commission's initiation of the investigation that led to this Complaint, caused Amazon to superficially change or conceal many of its practices." *Id.*  Lastly, Plaintiffs allege:

> Amazon considered running experiments in 2020 and 2021 to improve Project Nessie's effectiveness with an eye towards turning it back on. These discussions picked up steam in late 2021 and early 2022 as inflation threatened to dent Amazon's profitability. In January 2022, the CEO of Worldwide Amazon Stores, Doug Herrington, asked about turning on "[o]ur old friend [Project] Nessie, perhaps with some new targeting logic" to juice profits for Amazon's Retail arm.

*Id.*

As alleged, Amazon's past actions show capability and willingness to turn Project Nessie back on.  This suffices to show that Plaintiffs' claim is timely under 15 U.S.C. § 53(b).

###### c.    Unfair competition under the FTC Act

Amazon asserts that settled precedent does not support "a theory of liability based upon other firms' uncoordinated conduct in response to Amazon's unilateral setting of its own price[s]" through Project Nessie, and thus the Complaint did not state a claim for "unfair methods of competition" under Section 5.  Dkt. # 127 at 25.  Plaintiffs disagree, saying that the "prohibition of 'unfair method[s] of competition' in Section 5 of the FTC Act reaches beyond the prohibitions in the Sherman Act."  Dkt. # 149 at 26.

"The standard of 'unfairness' under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws, but

also practices that the Commission determines are against public policy for other reasons."

*F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (internal citations omitted).

Section 5 encompasses "incipient violations of [the Sherman Act], and conduct which, although

not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their

spirit." *E.I. du Pont de Nemours & Co. v. F.T.C.* (*Ethyl*), 729 F.2d 128, 136–37 (2d Cir. 1984)

(internal citations omitted).

Amazon says that "parallel pricing, ubiquitous throughout the economy, is lawful in the

absence of an anticompetitive agreement, which the Complaint nowhere alleges." Dkt. # 127 at

26.[10]  Both sides rely on *Ethyl*.  In *Ethyl*, the Second Circuit laid out the standard for determining

whether parallel pricing without conclusion is unfair under Section 5.  729 F.2d at 139.  It

explained that "[t]he mere existence of an oligopolistic market structure in which a small group

of manufacturers engage in consciously parallel pricing of an identical product does not violate

the antitrust laws."  *Id.* (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S.

537, 541 (1954)).  But the court also explained that,

> [i]n our view, before business conduct in an oligopolistic industry may be labelled
> "unfair" within the meaning of § 5 a minimum standard demands that, absent a tacit
> agreement, *at least some indicia of oppressiveness must exist such as (1) evidence
> of anticompetitive intent or purpose* on the part of the producer charged, or (2) the
> absence of an independent legitimate business reason for its conduct. . . . business
> practices are not "unfair" in violation of § 5 unless those practices either have an
> anticompetitive purpose or cannot be supported by an independent legitimate
> reason.

---

[10] Amazon cites *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th
Cir. 2015), for the proposition that allegations of parallel conduct do not suffice to state a claim.  But this
case concerns a Section 1 Sherman Act conspiracy claim, not a Section 2 monopoly claim.  *Id.*  And the
section of the case opinion cited by Amazon addresses whether certain alleged conduct sufficed to claim a
*conspiracy*.  *Id.*

1

2

3

*Id.* at 139–40 (emphasis added).  Thus, to state a claim for an "unfair method of competition" under Section 5, Plaintiffs must allege "evidence of anticompetitive intent or purpose" in Amazon's execution of Project Nessie.

4

5

6

7

8

9

10

11

Plaintiffs allege that when Amazon began testing Project Nessie, "[t]hese early experiments showed that 'in many cases competitors match us at the higher price.'"  Dkt. # 171 at 127.  Plaintiffs also allege "Amazon *realized* that it could increase its prices while reducing the risk of shoppers finding a lower price off Amazon if Amazon focused its price increases on products sold by competitors that were matching Amazon's prices."  *Id.* at 127–28 (emphasis added).  "*Armed with the knowledge* that others would likely follow its price hikes, Amazon could charge shoppers higher prices while minimizing the chance that shoppers would catch on."  *Id.* at 128 (emphasis added).

12

13

14

Taking Plaintiffs' factual allegations as true and construing them in the light most favorable to Plaintiffs, the Court determines that these allegations suffice to allege anticompetitive intent and purpose.

15

C.     MTD: State Law Claims

16

17

The remaining claims—Counts VII–XX—are brought under various state laws.  Dkt. # 149 at 14.

18

1.       The State-Law Equivalents Survive with the Sherman Act claims.

19

20

21

22

23

24

Amazon argues that, for the same reasons Plaintiffs' Sherman Act claims should be dismissed, so too should "all Counts brought solely under state equivalents of the Sherman Act"—specifically, "Counts VIII (Maine), IX (Maryland), X (Michigan), XI (Nevada), XII-XIII (New Jersey), XVII (Oregon), and XX (Wisconsin).  Dkt. # 127 at 27.  And it argues the same for all "Counts that raise multiple causes of action . . . to the extent they allege violations of the

state equivalents of the Sherman Act—Counts VII (Connecticut), XVI (Oklahoma), and XIX (Rhode Island)."  Dkt. # 127 at 27.  As discussed above, *supra* Section III.A., the Sherman Act claims survive.  Thus, this argument fails.

       2.      Pennsylvania Common Law Claim.

Amazon asserts that Count XVIII, Section B, fails because "the conduct alleged here (monopolization under Section 2) is not cognizable under Pennsylvania common law, which only prohibits "unreasonable 'restraint[s] of trade'—i.e., agreements between two entities addressed by Section 1 of the Sherman Act." Dkt. # 127 at 28 (citing *N. Secs. Co. v. United States*, 193 U.S. 197, 404 (1904) (Holmes, J., dissenting)).  Amazon cites 7 Antitrust Laws and Trade Regulation § 138.03 (2d ed.), which states,

> There is no Pennsylvania equivalent of Section 2 of the Sherman Act, which governs monopolization offenses.  Under common law principles, monopolies have been declared contrary to public policy in Pennsylvania.  However, the pronouncements on monopolies were made in the context of horizontal restraint of trade cases.  There are no cases concerning unilateral monopolization under Pennsylvania common law.

Pennsylvania responds that "[c]ourts have long held" that Pennsylvania common law proscribes monopolization.  Dkt. # 149 at 33.  But none of the authorities cited by the state directly rebuts Amazon's assertion that monopolization under Section 2 of the Sherman Act is not cognizable under Pennsylvania common law.  In *P. C. Weist Co. v. Weeks*, the Supreme Court of Pennsylvania stated, "[m]onopolies of any sort have never been favorites with the law.  They were held by the common law to be against public policy, because against common right."  35 A. 693, 693 (Pa. 1896).  But *P. C. Weist Co.* does not concern a Section 2-type monopolization claim.  Similarly, an order in *In re Condemnation by Susquehanna Area Reg'l Airport Auth.* states, "[t]here exists at Common Law a cause of action sounding in Anti-trust as elaborated by the Pennsylvania Supreme Court in *Schwartz v. Laundry & Linen Supply Drivers' Union, Local*

*187*, 14 A.2d 438 (Pa. 1940)."  No. 2005-CV-1282-CN, (Pa. C.P. Dauphon Cnty. Aug. 14, 2006) (Attached at Exhibit A in Dkt. # 150).  But this order does not specify what antitrust law it is referring to; it simply makes a general statement about the relationship between Pennsylvania common law and antitrust law.  Also, *Schwartz* involved a Section 1 Sherman Act claim, not a Section 2 monopoly claim.  *See* 14 A.2d at 440–41.  Finally, while *F.T.C. v. Shkreli* does concern Section 1 and Section 2 Sherman Act claims *and* Pennsylvania common law, that case refers to a state-law claim "under Pennsylvania's common law doctrine against unreasonable restraint of trade"—*not* monopolization.  581 F. Supp. 3d 579, 629 (S.D.N.Y. 2022).

Pennsylvania has cited no authority, nor has the Court identified any, that shows that Pennsylvania common law has a counterpart to Section 2 of the Sherman Act.  Thus, the Court concludes that Count XVIII, Section B, fails to state a claim.

3.      Consumer Protection Statutes.

Five states—New Jersey, Pennsylvania, Oklahoma, Connecticut, and Rhode Island— bring claims under their consumer protection statutes.  Dkt. # 171 at 144–45 (Count XIV – New Jersey), 148–54 (Count XVIII, Section A – Pennsylvania), 146–147 (Count XVI – Oklahoma), 138–39 (Count VII – Connecticut), 155 (Count XIX – Rhode Island).

Amazon says that Plaintiffs fail to state claims under these consumer protection statutes because the Amended Complaint Plaintiffs "allege[s] in general and conclusory terms that Amazon has somehow deceived consumers by calling its prices 'low' and its marketplace 'competitive.'  That is insufficient even to allege deception, let alone the other necessary elements of such a claim, such as reliance or materiality."  Dkt. # 127 at 28 (internal citation omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Plaintiffs respond that "[o]nly New Jersey, Oklahoma, and Pennsylvania raised deception claims" and that, along with these deception claims, all five states have alleged other claims under their consumer protection statutes, which prohibit unfair trade practices, unfair methods of competition, and unconscionable commercial practices.  Dkt. # 149 at 30–31.  Amazon says that Pennsylvania and Rhode Island do not state claims for "unfair methods of competition" because "unfair methods of competition" and "unfair or deceptive acts or practices" are identical under those states' laws, and neither state has adequately pleaded deception.  Dkt. # 127 at 29.  Amazon also says that Connecticut does not state a claim for "unfair methods of competition" because its deficient antitrust allegations bar recovery for antitrust violations under Connecticut's consumer protection statute.  *Id.*  More generally, Amazon says that Plaintiffs "unfairness" or "unconscionability" claims are not adequately pleaded because Plaintiffs "do not explain the nature of such claims; they appear simply to presume that any antitrust violation also is a consumer-protection violation."  Dkt. # 178 at 12.

Below, the Court considers whether New Jersey, Oklahoma, and Pennsylvania state claims for deception under their consumer protection statutes.  The Court also considers whether all five states have stated claims for unfair trade practices, unconscionable commercial practices, or unfair methods of competition under their consumer protection statutes.

a.      New Jersey Consumer Protection Statute – Count XIV

In Count XIV, the Amended Complaint alleges that Amazon violated New Jersey's Consumer Fraud Act (NJCFA), N.J. Stat. Ann. § 56:8-2, which prohibits "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact . . . in connection with the sale or advertisement of any merchandise."  The Amended Complaint

says that "Amazon engaged in unconscionable commercial practices and deception, and made misrepresentations" by: (1) "[r]aising, maintaining and stabilizing the prices of products in its online superstore market at artificially high levels"; (2) "[r]epresenting that it 'seek[s] to be the Earth's most customer-centric company' and creating and perpetuating a reputation for having low or the lowest prices, while intentionally and strategically raising prices on various products to the detriment of consumers and for reasons unrelated to cost, supply, and demand"; and (3) "[d]epriving consumers of diversity of selection and free and open markets."  Dkt. # 170 at 144–45.

*Deception.*  Amazon says that the allegations that it deceived its customers by claiming that it was a consumer friendly company do not suffice to state a claim for deception under the NJCFA because the averments are conclusory and fail to meet the standard for deception.  Dkt. # 127 at 28 (citing *Island Mortg. of N.J &. Perennial Lawn Care, Inc. v. 3M*, 860 A.2d 1013, 1016 (N.J. Super. Ct. 2004)).

New Jersey responds that the allegations are not conclusory and meet the "applicable pleading standards" because "[a]dvertising best and lowest prices while artificially raising them—as with Project Nessie—constitutes deception."  Dkt. # 149 at 31–32.  In support of this argument, New Jersey points to Amazon's mission statement that it "seek[s] to be the Earth's most customer-centric company.'"  *Id.*  Amazon counters that "the Complaint identifies no statement by Amazon that it would always offer the "lowest prices" for all products."  Dkt. # 178 at 12.  Amazon says that its mission statement "is neither deceptive nor actionable."  *Id.*  (citing *Rodio v. Smith*, 587 A.2d 621, 624 (N.J. 1991)).

The Court agrees with Amazon.  "The capacity to mislead is the prime ingredient of all types of consumer fraud."  *Cox v. Sear Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994).  Under

the NJCFA "there is indeed a distinction between misrepresentations of fact actionable under the CFA and mere puffing about a product or a company that will not support relief." *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 177 (N.J. Super. Ct. App. Div. 2003) (citing *Rodio*, 123 N.J. at 352). In *Rodio*, the New Jersey Supreme Court held that the slogan "You're in good hands with Allstate" was not deceptive, or a false representation that the insurance company was looking out for the consumer's best interest, because the slogan "is nothing more than puffery." 123 N.J. at 352; *see also N.J. Citizen Action*, 842 A.2d at 177 (determining that drug advertisement which promised "you . . . can lead a normal nearly symptom-free life again" was not deceptive, but was "merely [an] expression[] in the nature of puffery and thus [was] not actionable"); *Nickerson v. Quaker Grp.*, No. A-6253-06T5, 2008 WL 2600720, at *11 (N.J. Super. Ct. App. Div. July 3, 2008) (determining that a contractor's quality guarantee was not deceptive because the word "quality" was used "without elaboration"). Further, the NJCFA does not require one "to charge the same prices for products, sold through different distribution channels, at different times, in the absence of some specific representation promising to do so." *Silver v. Pep Boys-Manny, Moe & Jack of Delaware, Inc.*, No. CV1700018FLWLHG, 2018 WL 1535285, at *5 (D.N.J. Mar. 29, 2018). Under the NJCFA, a defendant's failure to disclose a variable price structure "only becomes relevant when juxtaposed against [the defendant's] advertising." *Leon v. Rite Aid Corp.*, 774 A.2d 674, 680 (N.J. Super. Ct. App. Div. 2001).

Here, the Amended Complaint does not point to any specific statement, promise, or advertisement guaranteeing that Amazon offered the lowest prices. And, as alleged, Amazon's

1  actions as to Project Nessie are not deceptive.  Thus, the Amended Complaint fails to state a

2  claim for deception under the NJCFA.[11]

3        *Unconscionable commercial practices and misrepresentation*.  New Jersey says that

4  "Amazon does not directly challenge New Jersey's misrepresentation and unconscionable

5  commercial practices allegations," so the claim "must survive."  Dkt. # 149 at 32.  In its Reply,

6  Amazon responds that "[a]lthough the Complaint describes its consumer-protection claims solely

7  in terms of deception, these five states also wish to assert UDAP-style 'unfairness' or

8  'unconscionability' claims.  But even now they do not explain the nature of such claims; they

9  appear simply to presume that any antitrust violation also is a consumer-protection violation."

10  Dkt. # 178 at 12 (citing *Sickles v. Cabot Corp.*, 877 A.2d 267, 277 (N.J. Super. Ct. App. Div.

11  2005)).

12        In New Jersey, courts have rejected NJCFA claims where the only legal theory "is that

13  defendants' alleged monopolistic conduct constitutes an unconscionable commercial practice."

14  *Sickles*, 877 A.2d at 277.  The court in *Sickles* noted that the plaintiff "failed to set forth any

15  factual allegations to demonstrate a capacity to mislead as there is nothing inherently misleading

16  in defendants' alleged acts of controlling the supply and overcharging for the price-fixed

17  products."  *Id.* (internal quotation marks omitted).  The court defined "unconscionable

18  commercial practice" "as acts lacking 'good faith, honesty in fact, and observance of fair

19  dealing.'"  *Id.* (quoting *Cox*, 647 A.2d at 462).  The court noted that the "[c]apacity to mislead is

20

21

22

23        ───────────────

        [11] Plaintiffs also say that "reliance and materiality" are not "required in government enforcement
actions" in New Jersey.  Dkt. # 149 at 31 (citing *Cox*, 647 A.2d at 462; *Leon*, 774 A.2d at 680).  The
Court need not reach this argument.

24

the prime ingredient of deception or an unconscionable commercial practice." *Id.* (quoting *Fenwick v. Kay Am. Jeep, Inc.*, 371 A.2d 13, 16 (N.J. 1977)).

Given the foregoing, the Court agrees with Amazon that the Amended Complaint does not state a claim for unconscionable commercial practices and misrepresentation under the NJCFA.

      b.      Pennsylvania Consumer Protection Statute – Count XVIII, Section A

Pennsylvania's Unfair Trade Practices and Consumer Protection Law (PUTPCPL), §§ 201-1 to 201-10, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Cons. Stat. § 201-3(a).  In Count XVIII, Section A, the Amended Complaint alleges that Amazon violated the PUTPCPL in two ways. Dkt. # 171 at 148–49.  First, it alleges that Amazon engaged in unfair methods of competition and unfair acts or practices by impairing consumer choice and competition in violation of 73 Pa. Cons. Stat. § 201-2(4)(xxi) with its monopolistic behavior.  The Amended Complaint says that Amazon's conduct violates this provision of the PUTPCPL by violating Section 2 of the Sherman Act, Section 5 of the FTC Act, Pennsylvania antitrust common law,[12] and by "engaging in any conduct which causes substantial injury to consumers."  Dkt. # 171 at 151.

Second, the Amended Complaint alleges that "Amazon deceptively misrepresented to the Commonwealth of Pennsylvania and consumers that Amazon's pricing in the online superstore market and the market for online marketplace services was competitive and fair."  Dkt. # 171 at

---

[12] As discussed above, the Court rejects Pennsylvania's antitrust claim based on common law. *See* Section III.C.2.

1  151.  It alleges that Amazon's conduct was deceptive in violation of 73 Pa. Cons. Stat. § 201-

2  2(4)(v), (vii), and (xxi).

3       Amazon says that the Amended Complaint fails to state a claim for deception under the

4  PUTPCPL for the same reasons that the Amended Complaint failed to state a claim under

5  NJCFA.  Dkt. # 127 at 28 (citing *Hunt v. U.S. Tobacco Co.*, No. CIV.A. 06-1099, 2006 WL

6  2619806, at *2 (E.D. Pa. Sept. 11, 2006), *vacated on other grounds*, 538 F.3d 217 (3d Cir. 2008),

7  *as amended* (Nov. 6, 2008)).

8       Under the PUTPCPL, "deception need not be an outright false statement; representations

9  of implied claims that are false is deceptive even if the explicit claims are true."  *Com. ex rel.*

10  *Corbett v. Peoples Benefit Servs., Inc.*, 895 A.2d 683, 694 (Pa. Commw. Ct. 2006) (citing *Miller*

11  *v. Am. Fam. Publishers*, 663 A.2d 643 (N.J. Super. Ct. Ch. Div. 1995)).  "However, '[w]here the

12  impression created by [a] statement is one of exaggeration or overstatement expressed in broad

13  language, it may be deemed non-actionable puffery [under the PUTPCPL].'"  *Piccioli v. Faust*

14  *Heating & A/C Co.*, 299 A.3d 877 (Pa. Super. Ct. 2023) (quoting *Commonwealth by Shapiro v.*

15  *Golden Gate Nat'l Senior Care, LLC*, 194 A.3d 1010, 1023 (Pa. 2018)).  Statements that are

16  "patently hyperbolic or excessively vague" are not actionable under the PUTPCLP.  *Id.*  On the

17  other hand, "where a plaintiff establishes that a statement contains believable, inaccurate

18  statements of fact, the statement falls beyond the reach of a puffery defense."  *Id.*

19       Here, Amazon's mission statement claiming to be "Earth's most customer-centric

20  company" is both broad and vague.  This statement alone does not suffice to support a claim for

21  deception under the PUTPCPL.  Thus, the Court dismisses the deception claim under Count

22  XVIII.

23

24

Amazon also argues that the Amended Complaint fails to state a claim for unfair competition because the PUTPCPL defines "unfair and deceptive acts and practices" and "unfair methods of competition" the same way, so these claims fail for the same reasons.  Dkt. # 127 at 29.  But Pennsylvania courts distinguish between unfair and deceptive.  Specifically, "an act or practice need not be deceptive in order to be declared 'unfair.'"  *Com. Ex rel. Zimmerman v. Nickel*, 26 Pa. D. & C.3d 115, 120 (Pa. Com. Pl. 1983).  In determining whether an act is unfair, Pennsylvania courts look to the definition of "unfair" under the FTC Act:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous, (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Id.* at 120–21 (quoting *Sperry & Hutchinson*, 405 U.S. at 244–45 n.5).

Amazon also says that the Amended Complaint fails to state a claim for "unfairness" because courts in Pennsylvania have rejected antitrust violations as a basis for an action under the PUTPCPL.  Dkt. # 178 at 12 (citing *Anadarko Petrol. Corp. v. Commonwealth*, 206 A.3d 51, 60 (Pa. Commw. Ct. 2019), *aff'd in part, rev'd in part on other grounds sub nom. Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934 (Pa. 2021)).

In *Anadarko Petroleum Corporation*, the court noted that the PUTPCPL "is not designed to render *all* antitrust violations actionable and that the scope of actionable antitrust behavior under the [PUTPCPL] is narrower than under federal antitrust law."  206 A.3d at 60 (emphasis in original).  The court added that "monopolistic behavior, joint ventures, or market sharing agreements . . . are not *per se* unlawful for purposes of the [PUTPCPL]."  *Id.*  "Consequently, the only manner in which these activities can give rise to viable [PUTPCPL] actions is if they fit within one of the categories of behavior deemed, by rule or in the Law itself, 'unfair methods of

1    competition' or 'unfair or deceptive acts or practices.'" *Id.*; *see also F.T.C. v. Vyera Pharms.,*

2    *LLC*, 479 F. Supp. 3d 31, 51 (S.D.N.Y. 2020) (determining that the plaintiff failed to state a

3    claim under the PUTPCPL while also determining that plaintiff stated a claim under Section 2 of

4    the Sherman Act).

5        The Amended Complaint alleges that Amazon's conduct falls under these definitions of

6    unfair: (1) "Representing that goods or services have sponsorship, approval, characteristics,

7    ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship,

8    approval, status, affiliation or connection that he does not have," 73 Pa. Stat. § 201-2(4)(v); and

9    (2) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of

10   confusion or of misunderstanding," *id.* at (xxi).  "The question of what conduct is prohibited by

11   sections (v) and (xxi) of the [PUTPCPL] is a matter of statutory interpretation." *Commonwealth*

12   *by Shapiro*, 194 A.3d at 1027.

13       Here, similar to the discussion above, *supra* Section III.C.3.a., the Amended Complaint

14   does not allege "fraudulent or deceptive conduct" to state a claim under Section (xxi) of the

15   PUTPCPL and it does not allege that Amazon made misrepresentations to state a claim under

16   Section (v) of the PUTPCPL.  Thus, Pennsylvania fails to state a claim under the PUTPCPL.

17           c.    Oklahoma Consumer Protection Statute – Count XVI

18

19       In Count XVI, the Amended Complaint alleges that Amazon violated Oklahoma's

20   Consumer Protection Act (OCPA), Okla. Stat. tit. 15, §§ 751, *et seq.*  It says, "[t]he acts alleged

21   in the Complaint constitute unfair or deceptive trade practices, within the meaning of" Okla. Stat.

22   tit. 15, § 752.  Dkt. # 171 at 147.  Oklahoma law defines "deceptive trade practice" as "a

23   misrepresentation, omission or other practice that has deceived or could reasonably be expected

24   to deceive or mislead a person to the detriment of that person. Such a practice may occur before,

1   during or after a consumer transaction is entered into and may be written or oral."  Okla. Stat. tit.

2   15, § 752(13).  Oklahoma law defines "unfair trade practice" as "any practice which offends

3   established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or

4   substantially injurious to consumers."  *Id.* at (14).

5          Amazon says that the Amended Complaint fails to state a claim for deception under the

6   OCPA because the allegations are too general and conclusory, and that the Amended Complaint

7   does not allege materiality and reliance.  Dkt. # 127 at 28.  Amazon says that its "general pledge"

8   that "seek[s] to be Earth's most customer-centric company" is "neither deceptive nor

9   actionable."  Dkt. # 178 at 12.

10         The Court agrees with Amazon as to the deception claim.  Amazon's mission statement

11  does not deceive or mislead a person to believe that Amazon would always have the lowest

12  prices.  Because the Amended Complaint points to no other statements or practices by Amazon,

13  the Court determines that it fails to state a claim for deception under the OCPA.[13]

14

15         The Amended Complaint also alleges that Amazon violated the OCPA by committing

16  unfair trade practices, which are defined differently from deceptive trade practices.  *See* Okla.

17  Stat. tit. 15, § 752(13), (14).  Amazon's MTD does not argue that the Amended Complaint fails

18  to state a claim for unfair trade practices under the OCPA.  *See* Dkt. # 127 at 28–29.  In its

19  Reply, Amazon says that courts have rejected antitrust violations as a basis for "unfairness"

20  claims, but it cites no authority from Oklahoma courts on this issue.  Dkt. # 178 at 12.  In *In re*

21  *New Motor Vehicles Canadian Exp. Antitrust Litig.*, the court determined that plaintiffs failed to

22  state a claim under the OCPA where they alleged antitrust violations but were barred from

23  _____

    [13] Oklahoma says that reliance and materiality are not required here.  Dkt. # 149 at 31.  The Court
24  need not reach this argument.

1    recovering under antitrust law because they lacked antitrust standing as indirect purchasers. 350

2    F. Supp. 2d 160, 199 (D. Me. 2004) (citing *Major v. Microsoft Corp.*, 60 P.3d 511, 513 (Okla.

3    Civ. App. 2002)). But the court noted that the alleged antitrust violations otherwise constituted

4    unfair trade practices under the OCPA. *Id.*

5        Thus, as to Oklahoma's claims, while the Court accepts Amazon's argument as to the

6    alleged deceptive practices, it rejects the company's argument as to the alleged unfair practices.

7                    d.       Connecticut Consumer Protection Statute – Count VII

8        In Count VII, the Amended Complaint alleges that Amazon violated Connecticut's

9    Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. §§ 42-110b, *et seq.* The CUTPA

10   provides, "No person shall engage in unfair methods of competition and unfair or deceptive acts

11   or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a); *see also*

12   Conn. Gen. Stat. § 42-110b(b) ("It is the intent of the legislature that in construing subsection (a)

13   of this section, the commissioner and the courts of this state shall be guided by interpretations

14   given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal

15   Trade Commission Act (15 USC 45(a)(1)), as from time to time amended.")

16       Connecticut concedes that the Amended Complaint does not state a claim for deception

17   under Connecticut law. Dkt. # 149 at 30. Amazon says that the Amended Complaint also does

18   not state a claim for unfair methods of competition "because its claim stands only upon its

19   deficient antitrust allegations," and the "'[f]ailure to state a claim under the antitrust act bars

20   recovery for an antitrust violation under CUTPA,' no matter how it characterizes Amazon's

21   acts." Dkt. # 127 at 29 (quoting *Lavoie v. Bayer Corp.*, No. X01CV01010168392, 2002 WL

22   230962, at *10 (Conn. Super. Ct. Jan. 23, 2002)).

But because the Amended Complaint states a claim under Section 2 of the Sherman Act, *supra* Section III.A., Section 5(a) of the FTC Act, *supra* Section III.B., and Connecticut state antitrust laws, *supra* Section III.C.1., it also states a claim for unfair methods of competition under CUTPA.

e.     Rhode Island Consumer Protection Statute – Count XIX

In Count XIX, the Amended Complaint alleges that Amazon violated Rhode Island Deceptive Trade Practices Act (RIDTPA), 6 R.I. Gen. Laws § 6-13.1-1, *et seq*.  RIDTPA provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."  6 R.I. Gen. Laws. § 6-13.1-2.  The Amended Complaint says, "Amazon's actions as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices."  Dkt. # 171 at 155.

Amazon says that the Amended Complaint fails to state a claim for deceptive trade practices under the RIDTPA because the allegations are general and conclusory, and because Rhode Island does not allege reliance and materiality.  Dkt. # 127 at 28.  Rhode Island concedes that the Amended Complaint does not state a claim for deception but argue that it alleges violations of the RIDTPA in "multiple and distinct ways."  Dkt. # 149 at 30.

Amazon says that the Amended Complaint fails to state a claim under RIDTPA for unfair methods of competition and unfair acts or practices because Rhode Island does not "define 'unfair methods of competition' any differently than [it] define[s] 'unfair or deceptive acts or practices,' and so these allegations fail" for the same reasons as the deception claim.  Dkt. # 127 at 29.  But the Amended Complaint does not lump all aspects of the RIDTPA claims together, and the elements of a claim for unfair acts or practices and unfair methods of competition are distinct from the elements for a deceptive act or practice.  *See Long v. Dell, Inc.*, 93 A.3d 988,

1000 (R.I. 2014) (holding that deceptive trade practices and unfair trade practices are distinct under Rhode Island law).

In determining whether a practice violates the RIDTPA, Rhode Island courts give "due consideration and great weight . . . to the interpretations of the [Federal Trade Commission] and the federal courts relating to § 5(a) of the Federal Trade Commission Act." *Id.* (quoting Section 6–13.1–3). In considering whether a practice is "unfair," Rhode Island courts consider the three *Ames* factors:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;
>
> (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Id.* (quoting *Ames v. Oceanside Welding  Towing Co.,* 767 A.2d 677, 681 (R.I. 2001)). "The plaintiffs need not establish every factor, and they may prove unfairness by showing that a trade practice meets one factor to a great degree or two or three factors to a lesser degree." *Id.* at 1001.

The Court determines that the Amended Complaint states a claim under the RIDTPA. Amazon cites no authority showing that Rhode Island does not consider violations of Section 2 of the Sherman Act and Section 5 of the FTC Act "unfair." Violations of Section 2 of the Sherman Act are considered "unfair methods of competition" under Section 5(a) of the FTC Act. *See Cement Inst.,* 333 U.S. at 694; *see also Meijer, Inc. v. Abbott Lab'ys*, 544 F. Supp. 2d 995, 1008 (N.D. Cal. 2008) (stating that violations of the Sherman Act are likely also violations of the North Carolina Unfair Trade Practices Act). Several courts have also determined that alleged

violations of Section 1 of the Sherman Act and the equivalent provision of the Rhode Island

Antitrust Act state a claim for unfair trade practices under the RIDTPA.  *See In re Lipitor*

*Antitrust Litig.*, 336 F. Supp. 3d 395, 426 (D.N.J. 2018) (determining that plaintiffs alleged

unfair conduct under RIDTPA because they "allege[d] anticompetitive conduct, which resulted

in consumers purchasing Lipitor at a premium rate," in violation of the Rhode Island Antitrust

Act); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129,

1145 (N.D. Cal. 2008) (determining that the plaintiffs stated a claim for unfair trade practices

under the RIDTPA by alleging violations of Section 1 of the Sherman Act).

        4.        "Territorially limited" State Laws.

        Amazon asserts that Plaintiffs "Maryland, New Jersey, and Oklahoma rely on state laws

with language limiting their territorial reach (e.g., 'within this state')."  Dkt. # 127 at 29 (citing

Md. Code Ann., Com. Law § 11-204(a)(2); N.J. Stat. Ann. § 56:9-4(a); and Okla. Stat. tit. 79,

§ 203(B)[14]).  Amazon says that these statutes do not "captur[e] conduct that is predominantly

interstate in nature."  Dkt. # 127 at 29 (citing *Md. Staffing Servs., Inc. v. Manpower, Inc.*, 936 F.

Supp. 1494, 1504–05 (E.D. Wis. 1996); *New Jersey v. Lawn King, Inc.*, 375 A.2d 295, 303 (N.J.

Super. Ct. Law. Div. 1966), *rev'd on other grounds*, 404 A.2d 1215 (N.J. Super. Ct. App. Div.

1979); and *Young v. Seaway Pipeline, Inc.*, 576 P.2d 1148, 1151 (Okla. 1977)).  Amazon claims

that because the Amended Complaint only "allege[s] monopolization . . . of nationwide

markets," Counts IX (Maryland) and XII (New Jersey) should be dismissed, and Count XVI

---

[14] Md. Code Ann., Com. Law § 11-204(a)(2) ("A person may not . . . Monopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce"); N.J. Stat. § 56:9-4(a) ("It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State"); and Okla. Stat. tit. 79, § 203(B) ("It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state.").

1

2

(Oklahoma) should be dismissed "with respect to the alleged violations of the Oklahoma Antitrust Reform Act," Okla. Stat. tit. 79, § 203.  Dkt. # 129 at 30.

3

4

5

6

7

Plaintiffs counter that the "plain meaning of [the] phrase ['within the state'] requires only that the challenged conduct affect markets within these States; it does not preclude liability when markets outside these States are *also* affected."  Dkt. # 149 at 32 (emphasis in original) (citing *California v. Infineon Techs. AG*, No. C 06–4333 PJH, 2008 WL 1766775, at *8 (N.D. Cal. Apr. 15, 2008)).

8

9

          a.      Maryland Antitrust Law – Count IX

10

11

12

13

14

15

16

17

18

19

20

To state a claim under the Maryland Antitrust Act, a plaintiff must allege that economic activity within the State of Maryland is affected.  Although the Maryland Antitrust Act "should [not] be read as reaching conduct that is exclusively intrastate in nature," the presence of substantial interstate economic activity can foreclose a plaintiffs' claim.  *California v. Infineon Tech. AG*, 531 F. Supp. 2d 1124, 1156 (N.D. Cal. Aug. 31, 2007).  In *Infineon Tech*, the court concluded that plaintiffs' allegation that defendants "engaged in the business of marketing and selling [product] throughout the United States" was "not sufficient" to state a claim under Maryland antitrust law.  *Id.*  The court explained that this allegation concerns "essentially interstate economic activity" and that it "sweeps too broadly—and without any distinction among the forty plaintiff States—to credibly suggest that economic activity within the State of Maryland has been affected in any way, thereby triggering [the Act's] protection for economic activity occurring within the State." *Id.*

21

22

23

24

In *Infineon Techs.*, 2008 WL 1766775, at *8, the progeny of *Infineon Tech.*, 531 F. Supp. 2d 1124, after plaintiffs amended their complaint in response to the court's dismissal, defendants again moved to dismiss, claiming in part that plaintiffs' continued to fail to allege intrastate

activity sufficient for a claim under the Maryland Antitrust Act.  Plaintiffs had amended their

allegations to include "that economic activity within the State of Maryland was affected."

*Infineon Techs.*, 2008 WL 1766775, at *8.[15]  The court deemed the amended allegations

satisfactory, explaining that

> allegations of conduct or economic activity within the state satisfy [Maryland antitrust law], even if interstate conduct is also alleged. Accordingly, even though defendants are correct that much of the conduct alleged by plaintiffs is interstate in nature—e.g., defendants' shipment of DRAM products to Maryland originated out of state—this does not impact the court's ultimate finding that intrastate activity has been alleged, in view of plaintiffs' allegations that some unlawful conduct took place in Maryland, via the direct sale of artificially high DRAM to Maryland entities, who bought DRAM at those artificially high prices.

*Id.*

Here, Maryland contends that "Amazon's anticompetitive conduct, though nationwide in

scope, occurred in part or had effects 'within' these States."  Dkt. # 149 at 32.  But the Amended

Complaint does not  contain any allegations about whether Amazon's actions affect economic

activity within the state.  Dkt. # 171 at 140.  Thus, the Amended Complaint fails to state a claim

under Maryland law.

    b.    New Jersey Antitrust Law – Count XII

Amazon cites one case for its argument that the New Jersey Antitrust Act does not

capture "conduct that is predominantly interstate in nature."  Dkt. # 127 at 29–30 (citing *Lawn

King, Inc.*, 375 A.2d at 303)).  But this case does not stand for such a proposition.  Instead, it

analyzes whether conduct may be considered "interstate" for purposes of Sherman Act claims.

---

[15] The court wrote, "Among other things, the third amended complaint now alleges: that during the relevant period, DRAM was in the regular continuous and substantial flow of intrastate commerce in Maryland; that State of Maryland government entities, including the University System of Maryland, purchased in excess of $100 million worth of DRAM-containing computers; that defendant Micron, through its subsidiary Crucial Technologies, sold DRAM directly to the University of Maryland and other Maryland government entities; and that the State, its agencies and subdivisions, residents and businesses, paid artificially high prices for DRAM-containing computers and equipment than they otherwise would have in a competitive market."  *Infineon Techs.*, 2008 WL 1766775, at *8.

*Lawn King, Inc.*, 375 A.2d at 303.  *Lawn King* does not discuss the territorial limitations, if any, of New Jersey's antitrust statute, nor does it discuss whether the conduct alleged had intrastate impacts, if that is even a requirement under New Jersey law.  Neither side has cited any authority interpreting this provision in the New Jersey Antitrust Act, and the Court has identified no legal authority.  Thus, the Court looks to the plain language of the New Jersey Antitrust Act.  *See In re D.J.B.*, 83 A.3d 2, 5 (N.J. 2014) (in interpreting a statute under New Jersey law, "courts look first to the plain language of the statute").

The New Jersey Antitrust Act provides, "It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market *within this State*."  N.J. Stat. Ann. § 56:9-4(a) (emphasis added).  The plain language of the statute does not limit its scope to markets only within New Jersey, as Amazon argues.  It merely requires that the monopolistic conduct has an impact within the state, regardless of the impact in other states.

Here, the Amended Complaint alleges, "In the operation of its business, Amazon engaged in numerous commercial practices that violate the New Jersey Antitrust Act, including, but not limited to, N.J. Stat. Ann. § 56:9-4, monopolizing, or attempting to monopolize a part of trade or commerce within the state."  Dkt. # 171 at 143.  This allegation suffices to state a claim under New Jersey law.[16]

---

[16] Other federal courts that have interpreted similar terms in other state antitrust laws, without any controlling precedent, have come to the similar conclusions.  *See, e.g.*, *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 396 (E.D. Pa. 2010) (determining that Michigan stated a claim for a monopolization claim "within that state" under the Michigan Antitrust Reform Act when neither side sited any "authority mandating the interpretation that [the Michigan Antitrust Reform Act] does not apply where monopolistic activity is both interstate and local" and determining that the allegation that the plaintiff "manufactured and sold substantial amounts of Wellbutrin SR in a continuous and uninterrupted flow of commerce across state and national lines" was sufficient to state a claim); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d at

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

c.      Oklahoma Antitrust Law – Count XVI

Amazon cites one case in arguing that Oklahoma's Antitrust Reform Act only "captur[es]" conduct that is predominantly interstate in nature."  Dkt. # 127 at 30 (citing *Young*, 576 P.2d at 1151).  But this case involves the issue whether state or federal courts have proper jurisdiction to address "certain types of antitrust violations."  *Young*, 576 P.2d at 1151.  It does not address the interpretation of the term "within this state" in Oklahoma's Antitrust Reform Act, Okla. Stat. tit. 79, § 203(B).  The Court has identified no legal authority interpreting the term "within the state" in Oklahoma's Antitrust Reform Act.  Thus, the Court looks to the plain language of Oklahoma's Antitrust Reform Act.  *See Stricklen v. Multiple Inj. Tr. Fund*, 542 P.3d 858, 865–66 (Okla. 2024)

Oklahoma's Antitrust Reform Act provides, "It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market *within this state*."  Okla. Stat. tit. 79, § 203(B) (emphasis added).  This language is almost identical to the provision of the New Jersey Antitrust Act analyzed above.  The Court determines that the plain language of the statute does not limit its scope to markets only within Oklahoma, as Amazon argues.  It merely requires that the monopolistic conduct has an impact within the state, regardless of the impact in other states.

The Amended Complaint alleges that "Amazon was at all times relevant hereto engaged in trade and commerce within the State of Oklahoma."  Dkt. # 171 at 146.  This allegation suffices to state a claim under Oklahoma's Antitrust Reform Act.

171–72 (determining that Nevada sufficiently "allege[d] that a part of the conspiracy was conducted in the State of Nevada" by "alleging concerted action among the manufacturers and Nevada dealers, a conspiracy contemplating vehicle sales in Nevada at higher prices because of the exclusion of Canadian vehicles").

1

2

     5.     New York's Executive Law § 63(12) Claim—Count XV—Survives
     Amazon's MTD.

3

     "New York alleges that Amazon violated New York Executive Law § 63(12), which

4

prohibits 'persistent . . . illegality in the carrying on, conducting or transaction of business.'"

5

Dkt. # 149 at 34.  It says that "'any conduct which violates state *or federal* law or regulation is

6

actionable under Executive Law § 63(12).'"  Dkt. # 149 at 34 (quoting *Shkreli*, 581 F. Supp. 3d

7

at 627–28 (cleaned up, emphasis added)).  And thus, New York says that because Amazon's

8

conduct violates Section 2 of the Sherman Act and Section 5 of the FTC Act, it may bring a

9

claim under Executive Law § 63(12).  Dkt. # 171 at 145–46.

10

     Amazon argues that the claim under New York's Executive Law § 63(12) claim should

11

be dismissed for the "same reasons" the Section 2 Sherman Act and Section 5 FTC Act claims

12

should be dismissed.  Dkt. # 127 at 30.  And Amazon argues that "New York is precluded from

13

pursuing its FTC claims under Section 63(12) because Section 5 of the FTC Act preempts any

14

state law purporting to authorize a non-federal party—here, the NYAG—to bring a claim under

15

the statute."  Dkt. # 127 at 30 (citing *O'Donnell v. Bank of Am., Nat'l Ass'n*, 504 F. App'x 566,

16

568 (9th Cir. 2013) and *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir.

17

1974)).

18

     To the extent Amazon's argument to dismiss Count XV rests on a dismissal of the

19

Section 2 Sherman Act and Section 5 FTC Act claims, the Court rejects it.  As explained above,

20

Plaintiffs' Section 2 Sherman Act and Section 5 FTC Act claims survive Amazon's MTD.  *See*

21

*supra* Section III.B.

22

     In its preemption argument, Amazon says that because there is no private right of action

23

under the FTC Act and only the FTC can enforce the FTC Act, the Amended Complaint does not

24

state a claim under New York Executive Law § 63(12) for a violation of Section 5 of the FTC

1    Act.  Dkt. # 27 at 30.  In making this argument, Amazon relies on *Alfred Dunhill Ltd.*, in which

2    the Second Circuit said, "the provisions of the Federal Trade Commission Act may be enforced

3    only by the Federal Trade Commission."  499 F.2d at 237.  But the Second Circuit made that

4    statement in the context of holding that the FTC Act does not include a private right of action for

5    individuals, not in the context of preemption.  *Id.*

6           New York counters that New York Executive Law § 63(12) is a substantive state law that

7    overlaps with the FTC Act, and the FTC Act has "never . . . . been an obstacle to suits premised

8    on overlapping state statutes or on common law."  Dkt. # 149 at 34 (quoting *United States v.*

9    *Philip Morris Inc.*, 263 F. Supp. 2d 72, 78 (D.D.C. 2003)).  Amazon asserts that New York

10   Executive Law § 63(12) is not an independent source of state law, but a "procedural device that

11   enables the New York Attorney General to enforce substantive prohibitions contained in other

12   laws," in this case the FTC Act and the Sherman Act.  Dkt. # 178 at 13.

13          New York Executive Law § 63(12) provides,

14
15          Whenever any person shall engage in repeated fraudulent or illegal acts or
            otherwise demonstrate persistent fraud or illegality, the attorney general may apply
16          . . . for an order enjoining the continuance of such business activity or of any
            fraudulent or illegal acts . . . . The word "fraud" or "fraudulent" as used herein shall
17          include any device, scheme or artifice to defraud and any deception,
            misrepresentation, concealment, suppression, false pretense, false promise or
18          unconscionable contractual provisions. The term "persistent fraud" or "illegality"
            as used herein shall include continuance or carrying on of any fraudulent or illegal
19          act or conduct. The term "repeated" as used herein shall include repetition of any
            separate and distinct fraudulent or illegal act, or conduct which affects more than
20          one person.

21   New York courts have interpreted this provision broadly, determining that "[a]ny conduct which

22   violates State or Federal law or regulation is actionable under" New York Executive Law

23   § 63(12).  *People ex rel. Vacco v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 856 (Sup.

24   Ct. 1999).  The court in *Vacco* also noted that, to state a claim under New York Executive Law

§ 63(12), plaintiffs must also show that the defendant's actions are "repeated." *Id.* While New York has incorporated violations of federal statutes into its definition of "fraudulent or illegal acts," it also added the requirement of repetition. Thus, this statute is more than just a "procedural device" to allow the New York Attorney General to enforce the FTC Act.

Further, Amazon has not cited, nor has the Court identified, any legal authority to support its position that New York Executive Law § 63(12) is preempted by the FTC Act. There are multiple cases in which courts determined that plaintiffs violated both New York Executive Law § 63(12) and the FTC Act with no mention of preemption. *See F.T.C. v. Roomster Corp.*, 654 F. Supp. 3d 244, 264 (S.D.N.Y. 2023); *Shkreli*, 581 F. Supp. 3d at 627.

Thus, New York states a claim under Executive Law § 63(12).

D.     Motion to Bifurcate

Federal Rule of Civil Procedure 42(b) authorizes a court to conduct separate proceedings on separate issues "[f]or convenience, to avoid prejudice, or to expedite and economize." The Court believes that holding separate proceedings on liability and remedies will be more convenient for the Court and may expedite and economize this litigation.

**IV**

**CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part the MTD[17] as follows:

A.     Regarding the Sherman Act claims, Counts I, II, V, and VI, DENIES the motion;

---

[17] Plaintiffs filed two notices of supplemental authority. Dkt. ## 267, 272. Amazon objects to both on the ground that Plaintiffs used the notices to advance arguments. Dkt. ## 271, 274. Neither the supplemental authorities nor the descriptions of them affect the legal analysis herein. Thus, the Court need not address this issue.

B.      Regarding the FTC Act claims, Counts III and IV, DENIES the motion;

C.      Regarding the claims under state law equivalents of the Sherman Act,[18] Counts VIII (Maine), X (Michigan), XI (Nevada), XII-XIII (New Jersey), XVII (Oregon), XX (Wisconsin), VII (Connecticut), XVI (Oklahoma), and XIX (Rhode Island), DENIES the motion;

D.      Regarding the Pennsylvania common law claim, Count XVIII, Section B, GRANTS the motion and DISMISSES the claim with prejudice as it could not possibly be cured by the allegation of other facts;

E.      Regarding the claims under New Jersey's consumer protection statute, Count XIV, GRANTS the motion and DISMISSES the claims without prejudice;

F.      Regarding the claim under Pennsylvania's consumer protection statute, Count XVIII, Section A, GRANTS the motion and DISMISSES the claims without prejudice;

G.      Regarding the claim under Oklahoma's consumer protection statute, Count XVI, GRANTS only as to deceptive acts and practices, which claims the Court DISMISSES without prejudice, and DENIES as to unfair trade practices;

H.      Regarding the claim under Rhode Island's consumer protection statute, Count XIX, DENIES the motion;

I.      Regarding the claim under Connecticut's consumer protection statute, Count VII, DENIES the motion;

J.      Regarding the challenge as to territorially limited state antitrust laws, GRANTS the motion as to Maryland, Count IX, and DISMISSES Count IX without

---

[18] Other than Maryland's, which this order addresses below.

prejudice, and DENIES it as to New Jersey, Count XII, and Oklahoma, Count XVI;

K. Regarding the claim under New York Executive Law § 63(12), Count XV, DENIES the Motion; and

L. GRANTS Plaintiffs until October 31, 2024, leave to file a Second Amended Complaint as to any claims dismissed without prejudice.

Further, regarding Plaintiffs' Motion to Bifurcate, the Court ORDERS:

A. The bench trial identified in the Case Scheduling Order (Dkt. #159) will address only Amazon's liability under the FTC Act, Sherman Act, and the state laws implicated by Plaintiffs' Amended Complaint.

B. If the Court renders a decision finding Amazon liable, the Court will schedule a conference to address how to proceed on remedies.

C. Nothing in this Order shall (a) alter the Parties' respective abilities to offer evidence relevant to Amazon's liability at trial nor alter the burden of proof, persuasion, or production to establish each and every element of liability, justifications, or defenses, or (b) limit the scope of fact discovery in this case.

The Court provisionally files this order under seal. The Court DIRECTS the parties to file a joint statement, on or before October 14, 2024, indicating what redactions, if any, should be included in the public version of the order.

Dated this 30th day of September, 2024.

_John H. Chun_
John H. Chun
United States District Judge