THE HONORABLE JOHN. H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,
STATE OF NEW YORK, STATE OF
CONNECTICUT, COMMONWEALTH OF
PENNSYLVANIA, STATE OF DELAWARE,
STATE OF MAINE, STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MICHIGAN, STATE OF
MINNESOTA, STATE OF NEVADA, STATE
OF NEW HAMPSHIRE, STATE OF NEW
JERSEY, STATE OF NEW MEXICO, STATE
OF OKLAHOMA, STATE OF OREGON,
COMMONWEALTH OF PUERTO RICO,
STATE OF RHODE ISLAND, STATE OF
VERMONT, and STATE OF WISCONSIN,

　　　　　　Plaintiffs,

　　v.

AMAZON.COM, INC., a corporation,

　　　　　　Defendant.

Case No. 2:23-cv-01495-JHC

**DECLARATION OF CARL R. METZ
IN SUPPORT OF AMAZON'S RULE
12(C) MOTION FOR JUDGMENT ON
THE PLEADINGS AS TO THE FTC'S
CLAIMS**

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1    I, Carl R. Metz, declare as follows:

2    1.    I am an attorney with the law firm of Williams & Connolly LLP, counsel for

3    Defendant Amazon.com, Inc. ("Amazon").  The matters set forth herein are true and correct to the

4    best of my knowledge and, if called as a witness, I could testify competently thereto

5    2.    Amazon's Rule 12(c) Motion for Judgment on the Pleadings as to the FTC's Claims

6    (the "Motion"), contains citations to legislative history and court filings that counsel for Amazon

7    obtained from government records.  To ease the Court's review of the Motion and supporting

8    material, Amazon hereby submits the following excerpts that are cited in its brief.  Should the

9    Court wish to review the entirety of any document that has been submitted only as an excerpt,

10    counsel for Amazon is prepared to make a supplemental submission of those materials.

11    3.    Attached as **Appendix A** is an excerpt from the Brief for the Appellee Federal

12    Trade Commission, filed in Case Nos. 80-4508 and 81-4119, *FTC v. H.N. Singer* (U.S.C.A. 9th

13    Circuit).  This brief was obtained from the archived files of the Clerk of the Court for the Ninth

14    Circuit.

15    4.    Attached as **Appendix B** is an excerpt from the Memorandum of Points and

16    Authorities in Opposition to Defendant's Motion to Dismiss, filed by Plaintiff the Federal Trade

17    Commission in Case No. 92-cv-1364, *FTC v. Abbott Laboratories* (D.D.C.).  This memorandum

18    was obtained from the archived files of the Clerk of the Court for the U.S. District Court for the

19    District of Columbia.

20    5.    Attached as **Appendix C** is an excerpt from the Senate's Report Number 90-1311,

21    90th Congress, Second Session, June 21, 1968.  This report was obtained from the HeinOnline

22    research database.

23    6.    Attached as **Appendix D** is an excerpt from the Congressional Record, 93rd

24    Congress, daily edition, July 10, 1973.  This record was obtained from the HeinOnline research

25    database.

26

DECLARATION OF CARL R. METZ IN SUPPORT
OF AMAZON'S RULE 12(C) MOTION FOR
JUDGMENT ON THE PLEADINGS AS TO THE
FTC'S CLAIMS
(Case No. 2:23-cv-01495-JHC) - 2

1    7.    Attached as **Appendix E** is an excerpt from the Congressional Record, 93rd

2  Congress, daily edition, November 12, 1973.  This record was obtained from the HeinOnline

3  research database.

4    8.    Attached as **Appendix F** is the Senate's Report Number 93-151, 93rd Congress,

5  First Session, May 14, 1971.  This report was obtained from the HeinOnline research database.

6    9.    Attached as **Appendix G** is the House of Representatives' Conference Report

7  Number 93-624, 93rd Congress, First Session, October 31, 1973.  This report was obtained from

8  the HeinOnline research database.

9    10.    Attached as **Appendix H** is an excerpt from the record of the Hearings before the

10  Senate Committee on Commerce, Science, and Transportation, 98th Congress, First Session on

11  the Reauthorization of the Federal Trade Commission, held on March 16, 17, and 18, 1983.  This

12  record was obtained from the HeinOnline research database.

13    I declare under penalty of perjury that the foregoing is true and correct to the best of my

14  knowledge.

15    Executed on December 6, 2024 in Washington, D.C.

16

17    By: /s/ Carl R. Metz
        Carl R. Metz

18

19

20

21

22

23

24

25

26

DECLARATION OF CARL R. METZ IN SUPPORT
OF AMAZON'S RULE 12(C) MOTION FOR
JUDGMENT ON THE PLEADINGS AS TO THE
FTC'S CLAIMS
(Case No. 2:23-cv-01495-JHC) - 3

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

# Appendix A

NOS. 80-4508, 81-4119

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

v.

H. N. SINGER, INC., ET AL.,

Defendants

and

MICHAEL QUINLAN and JAMES EARL WEIHOFF,

Defendants-Appellants.

Appeal from a Preliminary Injunction
Issued by the United States District Court
for the Northern District of California

_____

BRIEF FOR APPELLEE FEDERAL TRADE COMMISSION

_____

ERNEST J. ISENSTADT
Acting General Counsel

HOWARD E. SHAPIRO
Deputy General Counsel

JUDITH D. FORD
Regional Director

W. DENNIS CROSS
Assistant General Counsel

LAURENCE O. MASSON
BEVERLY A. WEE
Attorneys

EDWARD F. GLYNN, JR.
Attorney

Federal Trade Commission
450 Golden Gate Avenue
San Francisco, CA  94102

Federal Trade Commission
Pennsylvania Avenue at
Sixth Street, N.W.
Washington, D.C.  20580

Attorneys for Appellee Federal Trade Commission

RECEIVED
RICHARD H. DEANE
CLERK, U.S. COURT OF APPEALS

JUN 29 1981

FILED  JUN 29 1981
DOCKETED
DATE          INITIAL

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .    iii

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . .    1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . .    2

  Prior Proceedings . . . . . . . . . . . . . . . . . . . . .    3

THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . .    4

  A.  The Defendants. . . . . . . . . . . . . . . . . . . . .    4

  B.  Singer's Advertisements and Sales
      Literature. . . . . . . . . . . . . . . . . . . . . . .    5

  C.  Investor Contact With Singer Personnel. . . . . . . . .    15

  D.  The Failure to Perform. . . . . . . . . . . . . . . . .    18

THE FRANCHISE RULE. . . . . . . . . . . . . . . . . . . . . .    25

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . .    27

  I.  THE DISTRICT COURT PROPERLY ISSUED A
      PRELIMINARY INJUNCTION UNDER RULE 65,
      FED. R. CIV. P. FREEZING THE DEFENDANTS'
      ASSETS. . . . . . . . . . . . . . . . . . . . . . . . .    27

      A.  The Preliminary Injunction Issued
          Under Rule 65(a), Fed. R. Civ. P. . . . . . . . . .    27

      B.  The District Court Properly Utilized
          the Remedy of Preliminary Injunction
          to Safeguard its Ability Ultimately
          to Award Redress . . . . . . . . . . . . . . . . .    29

          (i)    The District Court has the power to
                 Award Redress Under Both Section 13(b)
                 and Section 19 of the FTC Act. . . . . . . .    30

          (ii)   The Authority of Federal District
                 Courts to Freeze Assets by a Preliminary
                 Injunction is Well Established . . . . . .      34

          (iii)  The Assets of Defendant Singer have
                 been Dissipated and the Remaining
                 Assets are likely to be Dissipated . . . .     36

Page

    (iv)   The Assets of the Individual
Defendants are likely to be Concealed
and Dissipated if a Freeze is not
Granted. . . . . . . . . . . . . . . .   38

II.   THE PROVISIONS OF THE PRELIMINARY INJUNCTION
REQUIRING FILING OF DOCUMENTS VIOLATES
NEITHER DEFENDANTS' FIFTH AMENDMENT RIGHTS
NOR THE FEDERAL RULES . . . . . . . . . . . . . . .   40

III.   THE ABSENCE OF DETAILED FINDINGS OF FACT
DOES NOT REQUIRE REMAND TO THE DISTRICT
COURT . . . . . . . . . . . . . . . . . . . . . . . .   43

    A.   Defendant Quinlan . . . . . . . . . . . . . . .   44

    B.   Defendant Wiehoff . . . . . . . . . . . . . . .   46

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . .   50

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

No. 80-4508, 81-4119

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

v.

H. N. SINGER, INC., et al., Defendants

and

MICHAEL QUINLAN and JAMES EARL WEIHOFF,

Defendants-Appellants.

Appeal from a Preliminary Injunction Issued By
the United States District Court,
Northern District of California

BRIEF FOR APPELLEE FEDERAL TRADE COMMISSION

## ISSUES PRESENTED

1.    Whether a district court, presented with strong and substantially uncontroverted evidence of involvement of two individuals in a scheme to defraud purchasers of franchises, may issue a preliminary injunction in an action under Sections 13(b) and 19 of the Federal Trade Commission Act, freezing those individuals' assets in aid of a possible order for statutory restitution to the defrauded investors.

2.    Whether the preliminary injunction issued comports with the requirements of the Federal Rules of Civil Procedure.

ARGUMENT

I. THE DISTRICT COURT PROPERLY ISSUED A PRELIMINARY
   INJUNCTION UNDER RULE 65, FED. R. CIV. P. FREEZING
   THE DEFENDANTS' ASSETS

The complaint in this action contains two counts:  Count I
alleges violations of the Franchise Rule and proceeds under
Sections 19(a)(1) and (b) of the FTC Act, 15 U.S.C. §§ 57b(a)(1)
and (b); Count II alleges violations of Section 5(a) of the
FTC Act, 15 U.S.C. § 45(a) and proceeds under § 53(b).  The
bulk of appellants' brief (Br. 12-33) attacks the Commission's
exercise of its statutorily-established enforcement powers under
Section 13(b) and attempts to distinguish the settled case
law recognizing the power of a district court to award ancillary
relief under its plenary equity jurisdiction.  Indeed, throughout
their brief, defendants evidence a total misunderstanding of
the basis of the district court's issuance of the preliminary
injunction.

A. The Preliminary Injunction Issued Under
   Rule 65(a), Fed. R. Civ. P

The defendants argue (Br. 12) that the "court failed to
indicate in its findings and conclusions whether the preliminary
injunction was issued pursuant to the authority contained in
Section 13(b) FTC Act, 15 U.S.C. § 53(b) or under Rule 65, F.R.C.P.
without regard to * * * [Section 13]."  That statement is simply
wrong.  On the first page of the preliminary injunction the
court states that the motion for preliminary injunction was
made "pursuant to Rule 65, Fed. R. Civ. P."  Defendants' argument
apparently rests entirely on a deliberate attempt to confuse

27

a Rule 65 preliminary injunction issued in a permanent injunction proceeding under Section 13(b), such as the one here, with a preliminary injunction in aid of a Commission administrative proceeding which is directly authorized by the first part of Section 13(b). At the very page in the record cited by defendants (Excerpts at 8; CR 95 at 4) in support of their argument, the district court pointed out this difference, and rejected defendants' attempt at obfuscation.

Section 13(b), enacted in 1973 C. 408, Pub. L. No. 93-153, 87 Stat. 3927 embraces two distinct remedial alternatives. First, it authorizes the Commission to seek a preliminary injunction to halt ongoing or threatened violations of the laws enforced by the Commission during the pendency of administrative procedures under Section 5(b) of the FTC Act, 15 U.S.C. § 45(b). This aspect of Section 13(b) was the principal focus of the legislative history and has been the principal application of Section 13(b) in practice. See, e.g., FTC v. Exxon Corp., 636 F.2d 1336, 1343 (D.C. Cir. 1980); FTC v. Food Town Stores, Inc., 539 F.2d 1339 (4th Cir. 1976) (Winter, J.); FTC v. Atlantic Richfield Co., 549 F.2d 289 (4th Cir. 1977).

Second, Section 13(b) granted the Commission for the first time authority to enforce the law by proceeding directly in district court for final relief: "[I]n proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." The legislative history explains the Congressional intent underlying this provision (S. Rep. 31):

[T]he Commission will have the ability, in the

routine fraud case, to merely seek a permanent
injunction in those situations in which it does
not desire to further expand upon the prohibitions
of the Federal Trade Commission Act through the
issuance of a cease-and-desist order.  Commission
resources will be better utilized, and cases can
be disposed of more effeciently.

Section 13(b) is available to assist the Commission in
enforcing "any provision of law enforced by the Federal Trade
Commission."  Section 13(b)(1), 15 U.S.C. § 53(b)(1).  Among
those provisions of law is Section 5 of the FTC Act.  The Com-
mission brought this action under the permanent injunction
provision of Section 13(b) because the violations of the FTC
Act were clear and indisputable, and there was no need to expand
upon the prohibitions of the FTC Act in administrative proceedings.

Where, as here, the Commission files a plenary action in
district court, it may move for appropriate preliminary relief
under the Federal Rules.  Defendants' argument to the contrary
is based on a misreading of the plain language of the statute.

B.    The District Court Properly Utilized the Remedy
      of Preliminary Injunction to Safeguard its
      Ability Ultimately to Award Redress

Defendants Quinlan and Wiehoff devote a substantial portion
of their argument (Br. 18-33) to an attack on the district court's
ability to award "redress, by way of restitution or damages,
ancillary to the permanent injunction authorized by Section 13(b)
[of the] FTC Act, 15 U.S.C. § 53(b) * * *" (Br. 18).  Consequently,
defendants argue, the court may not make preliminary injunction
orders in aid of an ultimate remedy it does not possess.

We demonstrate below that defendants' argument flies in
the face of settled precedent in the Supreme Court and recent

29

holdings of this and other courts of appeals.  But this Court

need not even reach defendants' argument on this point.  Defendants

have totally ignored the court's express authority to order

redress under Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b)

which is the basis of Count I of the complaint in this action.

Even if the district court had no authority to award redress

under its inherent equitable authority, invoked in a permanent

injunction proceeding under Section 13(b) (on which Count II

of the complaint is based)--which is not the case--it plainly

had the power to protect, through preliminary injunction, its

authority to award redress under Section 19(b).

> (i)  The District Court Has the Power to Award
>      Redress Under Both Section 13(b) and Section 19
>      of the FTC Act

The district courts are empowered to order restitution

and other necessary relief to injured persons for violations

of Commission Trade Regulation Rules (15 U.S.C. § 57b (a)(1)).

A district court, as a court of equity, can also award ancillary

relief to those who have been injured by unfair or deceptive

acts or practices in violation of the general proscriptions

of Section 5 of the FTC Act (15 U.S.C. § 45(a)); the Court's

equity power derives from its jurisdiction to issue injunctions

under 15 U.S.C. § 53(b).

Consumer redress for violations of Commission Trade Regulation

Rules is expressly provided for in Section 19 of the FTC Act, 15

U.S.C. § 57b, which provides in pertinent part:

> (a)(1) If any person, partnership, or corporation
> violates any rule under this Act respecting unfair or
> deceptive acts or practice (other than an interpretive

rule, or a rule violation of which the Commission has
provided is not an unfair or deceptive act or practice
in violation of section 5(a)), then the Commission may
commence a civil action against such person, partnership,
or corporation for relief under subsection (b) in a United
States district court or in any court of competent
jurisdiction of a State.

    *   *   *   *

(b)  The court in an action under subsection (a) shall
have jurisdiction to grant such relief as the court finds
necessary to redress injury to consumers or other
persons, partnerships, and corporations resulting from
the rule violation or the unfair or deceptive act or
practice, as the case may be.  Such relief may include,
but shall not be limited to, rescission or reformation
of contracts, the refund of money or return of property,
the payment of damages, and public notification respecting
the rule violation or the unfair or deceptive act or practice,
as the case may be; except that nothing in this subsection
is intended to authorize the imposition of any exemplary
or punitive damages.  [Emphasis supplied.]

Apart from its express authority under Section 19, a federal

district court can also award redress as ancillary relief in

a proceeding under a federal statute providing for equitable

injunctive relief.  E.g., Mitchell v. Robert DeMario Jewelry,

Inc., 361 U.S. 288 (1960); Porter v. Warner Holding Co., 328

U.S. 395 (1946); ICC v.  B&T Transporation Co., 613 F.2d 1182

(1st Cir. 1980); CFTC v.  Hunt, 591 F.2d 1211, 1221 (7th Cir. 1979);

SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103-05 (2nd

Cir. 1972).  In Porter, the Supreme Court reviewed a denial

of a request for restitution brought under the Emergency Price

Control Act of 1942 by the Price Administrator for rents collected

by a landlord in excess of the federal statutory level.  In

reversing an order denying the Price Administrator the authority

to seek an award of restitution, the Court stated:

Thus the Administrator invoked the jurisdiction of

the district court to enjoin acts and practices made
illegal by the Act and to enforce compliance with the
Act.  Such a jurisdiction is an equitable one.  Unless
otherwise provided by statute, all the inherent
equitable powers of the District Court are available
for the proper and complete exercise of that juris-
diction.  And since the public interest is involved
in a proceeding of this nature, those equitable powers
assume an even broader and more flexible character
than when only a private controversy is at stake.

                            . . .

  Moreover, the comprehensiveness of this equitable
jurisdiction is not to be denied or limited in the absence
of a clear and valid legislative command.  Unless a statute
in so many words, or by a necessary and inescapable inference,
restricts the court's jurisdiction in equity the full scope
of that jurisdiction is to be recognized and applied.
"The great priciples of equity, securing complete justice,
should not be yielded to light inferences, or doubtful
construction."  Brown v. Swann, 10 Pet. 497, 503.  See also
Hecht Co. v. Bowles, supra, 330.

  It is readily apparent from the foregoing that a decree
compelling one to disgorge profits, rents or property
acquired in violation of the emergency Price Control
Act may properly be entered by a District Court once
its equity jurisdiction has been invoked under under
§ 205(a).

[Id., 328 U.S. at 397-99.]

The power of federal district courts to award ancillary equitable

relief, including restitution, regardless of whether the statutory

basis for the equitable action explicitly provides for the ancillary

equitable relief, is now well settled.  E.g., SEC v. Wencke,

622 F.2d 1363, 1369 (9th Cir. 1980);  Los Angeles Trust Deed &

Mortgage Exchange v. SEC, 285 F.2d 162, 180 (9th Cir. 1960);

CFTC v. Hunt, supra, 591 F.2d 1211, 1222; SEC v. Texas Gulf

Sulphur Co., 446 F.2d 1301, 1307-08 (2nd Cir. 1971).

     In ICC v. B & T Transportation Co., 613 F.2d 1182 (1st Cir.

1980), the First Circuit recently addressed the question of

whether,in the absence of express statutory authority, it could

                            32

the sale involved only the sale of a corporate shell. [113]

Defendant Wiehoff asserts that he left the employ of H.N. Singer, Inc. early in December of 1979. However the travel records of the Des Plaines Travel Agency for the Singer account indicate that defendant Wiehoff traveled in and out of Chicago, Illinois, Los Angeles, California, and points in Australia and England on the account billed to Hot Box Products, a Division of H.N. Singer, Inc., during December and January of 1980. [114] Like defendant Quinlan, defendant Wiehoff provides only a vague reference to his recent employment, stating that he was "in the fast food business."[115] The uncontradicted evidence, including articles of incorporation of companies owned and directed by defendants Wiehoff and Quinlan, establish that these "fast food" businesses sold fraudulent business offerings to investors and disappeared overnight.[116]

## CONCLUSION

The preliminary injunction, as modified, should be affirmed in all respects.

Respectfully submitted,

ERNEST J. ISENSTADT
Acting General Counsel

---

[113]   Smoler, ¶ 6, Exhibits A, B [CR. 22].

[114]   Hoffman, 8/12/80, Exhibit E, pp. 4, 8, 14 [CR. 24].

[115]   Wiehoff, ¶ 8 [CR. 21] .

[116]   Davis, Hoffman, Stackhouse I [CR. 8].

HOWARD E. SHAPIRO
Deputy General Counsel

W. DENNIS CROSS
Assistant General Counsel

EDWARD F. GLYNN, JR.
Attorney

Federal Trade Commission
Pennsylvania Avenue at
  Sixth Street, N.W.
Washington, D.C.  20580
Telephone:  (202) 523-3674

JUDITH D. FORD
Regional Director

LAURENCE O MASSON
Attorney

BEVERLY A. WEE
Attorney

Federal Trade Commission
450 Golden Gate Avenue
San Francisco, CA  94102
Telephone:  (415) 556-1270

# Appendix B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

CLERK

```
                                    )
FEDERAL TRADE COMMISSION,           )
                                    )
                 Plaintiff,         )
                                    )
        v.                          )      Civil Action No.
                                    )      92-1364 (GAG)
ABBOTT LABORATORIES,                )
                                    )
                 Defendant.         )
                                    )
```

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

James M. Spears
General Counsel

Jay C. Shaffer
Deputy General Counsel

Ernest J. Isenstadt
Assistant General Counsel

David C. Shonka
D.C. Bar No. 224676
Attorney
Office of the General Counsel
202-326-2436

Kevin J. Arquit
Director
Bureau of Competition

James C. Egan, Jr.
Director for Litigation

Michael E. Antalics
Assistant Director

Richard B. Dagen
D.C. Bar No. 388115
Patricia Schultheiss
David Inglefield
Attorneys
Bureau of Competition
202-326-2662

Attorneys for Plaintiff
Federal Trade Commission
Washington, D.C.  20580

Dated:  August 10, 1992

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   I.   THE COURT HAS JURISDICTION OVER
      THE SUBJECT MATTER . . . . . . . . . . . . . . . 6

      A. Section 13(b) Vests This Court With
         Subject Matter Jurisdiction In Cases
         Involving Unfair Methods of Competition . . . . 6

      B. The "Proper Case" Proviso in Section 13(b)
         Does Not Divest This Court of Subject Matter
         Jurisdiction . . . . . . . . . . . . . . . . . . 12

  II.  EACH COUNT OF THE COMMISSION'S COMPLAINT
      STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED . . 17

      A. Count I . . . . . . . . . . . . . . . . . . . . 17

      B. Count II . . . . . . . . . . . . . . . . . . . . 21

 III. EQUITABLE RELIEF IS APPROPRIATE IN THIS CASE . . . . 23

      A. A Permanent Prohibitory Injunction And
         Ancillary Equitable Relief Are Necessary to
         Restrain Future Unlawful Conduct by Abbott
         and to Redress its Unlawful Conduct . . . . . . 23

      B. Section 13(b) Authorizes This Court to Order
         Equitable Monetary Relief . . . . . . . . . . . 28

      C. This is Not an Action by the United
         States for Damages under Section 4A
         of the Clayton Act . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . 39

FILED
AUG 17
NANCY M. MAYER WHITTINGTON
CLERK

FILED

AUG 1 1 1992

NANCY M. MAYER WHITTINGTON
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION, )
)
Plaintiff, )
)
v. )  Civil Action No.
)  92-1364 (GAG)
ABBOTT LABORATORIES, )
)
Defendant. )
)

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

### PRELIMINARY STATEMENT

This matter is before the Court on a motion to dismiss a complaint of the Federal Trade Commission ("Commission") against Abbott Laboratories ("Abbott").  The Commission's complaint seeks a permanent injunction and ancillary equitable relief, including restitution.  The complaint alleges that Abbott, the largest producer of infant formula in the United States, responded to an invitation by the Commonwealth of Puerto Rico to provide infant formula and participate in the Commonwealth's Special Supplemental Food Program for Women, Infants and Children ("WIC program") by "conspir[ing] or combin[ing] with others to fix, stabilize, or otherwise manipulate" bids.  Complaint ¶ 11.  The complaint also alleges that Abbott "with anticompetitive intent or without an independent legitimate business reason, provided information that showed to competing bidders that defendant

B.   The "Proper Case" Proviso in Section 13(b) Does Not
     Divest This Court of Subject Matter Jurisdiction.

Defendant wrongly suggests that the term "proper case"
excludes "unfair methods of competition" from the "provisions of
law" that the Commission may enforce pursuant to Section 13(b).
As discussed above, nothing in the statute permits any
distinction to be drawn between competition matters and consumer
protection matters.  Moreover, contrary to Abbott's assertion,
the legislative history of the permanent injunction proviso does
not support Abbott's contention that this Court lacks subject
matter jurisdiction.  As we have indicated, supra, there is no
legislative history relating to the permanent injunction proviso
as enacted.  The discussion of "proper case" that Abbott relies
on extensively is found in the Senate Report on the proposed
Magnuson-Moss Warranty -- Federal Trade Commission Improvements
Act of 1973 (S. Rep. No. 151, 93d Cong., 1st Sess. 30-31 (1973)).
But these legislative materials were created before Section 13(b)
was imported into Section 408(f) of the Trans-Alaska Pipeline
Authorization Act and expanded to include unfair methods of
competition (see pp. 8-10, supra).  The extension of Section
13(b) to include "any provision of law enforced" by the
Commission precludes exclusive reliance on the legislative
history from the earlier bill regarding "proper case."

We submit that Section 13(b) leaves it for the Commission to
determine when the circumstances are appropriate ("proper") to
seek permanent injunctive relief instead of a preliminary

injunction pending an administrative proceeding.  Section 13(b) vests the Commission with broad prosecutorial discretion to determine the means by which it will pursue a particular violation of law.  E.g., FTC v. Universal-Rundle Corp., 387 U.S. 244 (1967).  Of course, when the Commission brings suit for a permanent injunction, the court must determine, after considering the evidence and in the exercise of its equitable discretion, whether equitable relief is warranted.[11]

Even if "proper case" is viewed as a term of jurisdictional limitation, the legislative history cited by Abbott firmly supports the Commission's pursuit of a permanent injunction in a case (such as this one) that involves price fixing.  The relevant passage from the Magnuson-Moss Warranty -- FTC Improvements Act legislative history, quoted in its entirety in both Singer, 668 F.2d at 1110-11, and FTC v. World Vacation Travel Brokers, Inc., 861 F.2d at 1027-28, provides several illustrative, but not exhaustive, examples of situations where a permanent injunction would be appropriate.  Specifically, the Report indicates that the permanent injunction proviso could properly be invoked (1)

---

[11]    We believe, therefore, that the Commission's mere choice of forum (district court instead of administrative proceeding) is properly regarded as a matter reserved to the Commission's prosecutorial discretion, reviewable at most for clear abuse.  However, if the court interprets the words "proper case" as establishing a jurisdictional standard, the Court should accord deference to the standard employed by the Commission -- the agency responsible for implementing Section 13(b) -- as evinced by its choice in deciding whether to pursue violations of trade regulation law in court or by administrative complaint. See e.g., Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837 (1984); Atlantic Rfg. Co. v. FTC, 381 U.S. at 367-68.

in those situations in which it does not desire to further
expand upon the prohibitions of the Federal Trade Commission
Act," such as "in the routine fraud case,"[12] and (2) in cases
where a court may be reluctant to grant temporary relief absent
an assurance that the Court can set a definite hearing date for
final disposition of the case. S. Rep. 151, 93d Cong., 1st Sess.
30-31. In considering this legislative history, the court in
World Travel concluded:

> We believe it is quite clear that Congress at least expected
> that the FTC could rely on this proviso when it sought to
> halt a straightforward violation of section 5 that required
> no application of the FTC's expertise to a novel regulatory
> issue through administrative proceedings.

861 F.2d at 1028.[13]

Under this standard, where the Commission seeks to exercise

its expertise and authority to expand or clarify the law,

---

[12]    Interestingly, Abbott strenuously argues that the
Commission's authority to seek permanent injunctions is chiefly
limited to "'routine' fraud" cases (Abbott Mem. at 13), but
subsequently acknowledges the Commission's success in obtaining
permanent injunctions in cases involving "'routine' consumer
protection claims" (id. at 14).

[13]    The court was fully cognizant that Section 5 prohibits
not only deceptive advertising and other violations of consumer
protection laws, but also unfair methods of competition. 861
F.2d at 1024, 1029. Indeed, in analyzing the appropriate
standard for the issuance of a preliminary injunction, the
Seventh Circuit relied on merger cases interpreting Section
13(b). Id. at 1029 (citing FTC v. Warner Communications, Inc.,
742 F.2d at 1160; FTC v. Weyerhaeuser Co., 665 F.2d at 1082).

    Not surprisingly, other courts relying on this
legislative history have found that a permanent injunction may be
obtained under Section 13(b) against violations of any provision
of law enforced by the Commission. E.g., FTC v. Evans Products
Co., 775 F.2d at 1086; FTC v. Virginia Homes Manufacturing Corp.,
509 F. Supp. at 54 ("§ 13(b) by its very terms applies to
violations of any provision of law enforced by the FTC").

administrative adjudication is appropriate.[14]  Conversely, where
the Commission determines that application of its administrative
expertise is not necessary to the resolution of a case, Section
13(b) permits it to proceed by direct action in district court.

Thus, even the legislative history cited by Abbott shows
that this is a "proper case" for a permanent injunction and
ancillary equitable relief under Section 13(b).  This case does
not require any application of the Commission's special
expertise.  Count I of the complaint alleges a conspiracy to fix
rebate bids in Puerto Rico, a per se violation of the antitrust
laws.  See e.g., Catalano, Inc. v. Target Sales, Inc., 446 U.S.
643 (1980); United States v. Socony-Vacuum Oil Co., 310 U.S. 150
(1940).  The special expertise of the Commission is not needed to
decide per se cases, and accordingly Abbott's argument that this
is not a "proper" case has no application to Count I of the
Commission's complaint.  The allegations in Count I involve legal
principles as well established as those applying to "routine
fraud cases."[15]  The Commission does not seek to expand upon or

---

[14]    It was precisely because of the Commission's broad
adjudicatory discretion that the Ninth Circuit in Heater v. FTC,
503 F.2d 321 (9th Cir. 1974), held that the FTC Act could not be
read to authorize the Commission to order restitution in an
administrative proceeding, based upon what might be a newly-
defined violation of law.  As the Ninth Circuit later indicated,
this concern is inapplicable where the Commission seeks relief in
the first instance from the district court, thereby surrendering
its ability to determine by adjudication the governing rule of
law and relying, instead, on the court's application of existing
precedent and established equitable principles.  See, FTC v.
Evans Products Co., 775 F.2d 1084, 1087 n.1 (9th Cir. 1985).

[15]    Abbott has not disputed that Count I states an
established cause of action as pleaded.

clarify the substantive prohibitions of the FTC Act, and is therefore properly before this Court to seek a permanent injunction against defendant's bid rigging in the federal WIC program.

The Commission also does not seek to expand upon the prohibitions of the FTC Act with respect to the allegations in Count II of the complaint. Count II charges that Abbott, with anticompetitive intent or without an independent legitimate business reason, provided information to its competitors showing that Abbott intended to bid in a manner that would support an open market, rather than a sole source, system (see n.1, supra). The Commission's complaint seeks to have this Court evaluate the evidence under the standard articulated by the Second Circuit in E.I. Du Pont de Nemours & Co. v. FTC, ("Ethyl"), 729 F.2d 128, 139-40 (2d Cir. 1984),[16] to determine whether Abbott has in fact engaged in an unfair method of competition in violation of Section 5. This Court is fully capable of applying existing law to determine whether Abbott's conduct was undertaken with an anticompetitive intent or purpose, or without an independent legitimate business reason.

Section 13(b) of the FTC Act vests this Court with jurisdiction over the subject matter of this action, and the

---

[16]    The allegation purposefully tracks the language of that decision, in which the Second Circuit said that business conduct in an oligopoly can violate Section 5, even absent tacit agreement, if some indicia of oppressiveness exists, such as "(1) evidence of anticompetitive intent or purpose on the part of the producer charged, or (2) the absence of an independent legitimate business reason for its conduct." 729 F.2d at 139.

16

in _Illinois Brick_, which concerns the Court's construction of
Section 4A of the Clayton Act, detracts from the power of this
Court to grant equitable relief in this case.

## CONCLUSION

For the above-stated reasons, defendant's motion to dismiss
should be denied.

Respectfully submitted,

James M. Spears
General Counsel

Jay C. Shaffer
Deputy General Counsel

Ernest J. Isenstadt
Assistant General Counsel

Kevin J. Arquit
Director
Bureau of Competition

James C. Egan, Jr.
Director for Litigation

Michael E. Antalics
Assistant Director

David C. Shonka
D.C. Bar No. 224676
Attorney
Office of the General Counsel
202-326-2436

Richard B. Dagen
D.C. Bar No. 388116
Patricia Schultheiss
David Inglefield
Attorneys
Bureau of Competition
202-326-2662

Attorneys for Plaintiff
Federal Trade Commission
Washington, D.C.  20580

Dated:  August 10, 1992

39

# Appendix C

# Calendar No. 1290

| 90TH CONGRESS } | SENATE | { | REPORT |
|---|---|---|---|
| 2d Session } | | { | No. 1311 |

## DECEPTIVE SALES ACT OF 1968

JUNE 21 (legislative day, JUNE 19), 1968.—Ordered to be printed

Mr. MAGNUSON, from the Committee on Commerce,
submitted the following

# REPORT

[To accompany S. 3065]

The Committee on Commerce, to which was referred the bill (S. 3065) to amend the Federal Trade Commission Act, as amended, by providing for temporary injunctions or restraining orders for certain violations of that Act, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

## PURPOSE

S. 3065 would amend section 13 of the Federal Trade Commission Act to authorize the Federal Trade Commission to enjoin, in the U.S. District Court, unfair or deceptive acts or practices, within the meaning of section 5 of the FTC Act, when necessary for the protection of consumers.

## NEED

At the present time, when the Federal Trade Commission takes action against a person who it has strong reason to believe is engaged in an unfair or deceptive act or practice which violates section 5 of the FTC Act, it may have to wait for a period of up to 3 years before it can issue a final cease and desist order. During this time, large numbers of consumers may be lured into participating in schemes which ultimately will defraud them of hundreds of dollars. For certain fraudulent operators, recognizing this deficiency in FTC procedures, may deliberately eke out the maximum period of grace afforded by exercising their complete procedural rights in order to continue to milk their deceptive schemes. As President Johnson stated when proposing this Deceptive Sales Act in his Consumer Message last February: "In matters so flagrantly deceptive, the consumer and the honest businessman deserve greater—and speedier—protection." The Commission

must have available an effective means of stopping unscrupulous practices when they are discovered.

This amendment, by authorizing the FTC to seek injuctive relief pending final adjudication of the case on its merits, will make available to the Commission the same procedures presently available to a private litigant in a Federal court. Where a private party demonstrates to a court that continuation of an adverse party's conduct will result in irreparable harm or injury, he may be able to obtain injunctive relief until the merits of the case are resolved. This bill would authorize the FTC, acting on behalf of consumers, to obtain similar traditional judicial relief in order to move quickly to prevent severe and irreparable economic harm or physical injury. As an agency of the Federal Government, however, the Federal Trade Commission would not be required to file a bond.

## PROVISIONS

S. 3065 would amend section 13 of the FTC Act to enable the Federal Trade Commission, whenever it has reason to believe that a person is engaged in, or is about to engage in, "any act or practice in commerce within the meaning of section 5 [of the FTC Act] which is unfair or deceptive to the consumer" to seek injunctive relief in the U.S. district court.

The present section 13 of the act confers this authority upon the Commission in connection with the false advertising of food, drugs, devices, and cosmetics, which is prohibited by section 12 of the act. S. 3065 would preserve the Commission's authority to seek injunctive relief in that area, while also conferring this authority upon the Commission in other proceedings involving consumer fraud.

In Committee, an amendment which would restrict the Commission to obtain preliminary injunctions only (and thereby deny it authority to seek a temporary restraining order) was defeated. The Committee understands, however, that the Commission, in any proceeding under this amended section 13, will observe the requirements of rule 65 of the Federal Rules of Civil Procedure relating to the issuance of injunctions. For rule 65(a) clearly requires that notice and a hearing be granted an adverse party before a preliminary injunction can be issued, and rule 65(b) is explicit on the safeguards which must be met in those instances where a temporary restraining order, which can be issued for no more than 10 days and is renewable only once, is issued without notice to the adverse party. The note on this subsection (b) by the Advisory Committee which helped draft rule 65 indicates that where formal notice cannot be given, informal notice, such as a telephone call, should be attempted. The Committee agrees that the Commission should make a serious effort to notify the adverse party informally in advance of such proceedings when formal notice cannot be given and understands that this is Commission policy.

In a letter to the committee, Chairman Dixon of the Federal Trade Commission has stated:

> The practice of the Commission has been, and is, to comply with the requirements of rule 65 of the Federal Rules of Civil Procedure. Accordingly, in seeking a temporary re-

straining order, where statutory authority has been given to the Commission, we attempt in all instances to give notice in writing, or at least by telephone, to the party who would be affected by such an order, or his attorney, of the Commission's intention to seek an order from the district court.

Should S. 3065 be enacted, the Commission will continue this practice.

As stated earlier, the committee believes strongly that this procedure should be followed.

The committee also expressed concern that a party whose conduct was wrongfully enjoined might suffer severe economic injury, yet have no redress against the Federal Government, since rule 65(c) of the Federal Rules does not require any Federal agency to post bond, and in any action against the Government to recover damages, the defense of sovereign immunity could be asserted. It suggested, therefore, that in light of this possible difficulty, it would be desirable for the Committee on the Judiciary to review the provisions of the Federal Tort Claims Act for the purpose of providing appropriate relief.

## Costs

The adoption of this bill will involve no additional costs for the Government.

## Agency Comments

The following comments were received from interested agencies:

Federal Trade Commission.
*Washington, D.C., March 27, 1968.*

Hon. Warren G. Magnuson,
*Chairman, Committee on Commerce,*
*U.S. Senate,*
*Washington, D.C.*

Dear Mr. Chairman : This is in response to your letter of March 5, 1968, requesting a report by the Federal Trade Commission on S. 3065, 90th Congress, second session, a bill to amend the Federal Trade Commission Act, as amended, by providing for temporary injunctions or restraining orders for certain violations of that act.

The bill would amend section 13(a) of the Federal Trade Commission Act so as to grant authority to the Commission, when it has reason to believe that a party is engaged in, or is about to engage in, any act or practice in commerce which is unfair or deceptive to the consumer, to bring suit in a district court of the United States, whenever such action would be in the interest of the public, to temporarily enjoin such an unfair or deceptive act or practice pending the issuance of a complaint by the Commission under section 5 and until such time as such complaint is dismissed by the Commission or set aside by the court on review, or the order of the Commission has become final within the meaning of section 5.

This is the same power which is now given to the Commission by section 13(a), with reference to the dissemination of false advertisements for food, drugs, therapeutic devices or cosmetics violative of section 12 of the act, and it would thus be enlarged to cover unfair or

4

deceptive acts or practices worked upon the consumer respecting other products.

The same power which the Commission now has by virtue of section 13(a) of the act, is also granted to it by section 7(b) of the Wool Products Labeling Act of 1939 (15 U.S.C. 68e), by section 9(b) of the Fur Products Labeling Act (15 U.S.C. 69g), by section 6(a) of the Flammable Fabrics Act (15 U.S.C. 1195), and by section 8 of the Textile Fiber Products Identification Act (15 U.S.C. 70f), with reference to violations of certain sections of these acts. The extension of this power as proposed in S. 3065 would significantly enhance the Commission's enforcement efforts.

The Commission makes every effort to expedite its proceedings. However, our experience has been that considerable time may elapse before an unfair or deceptive act or practice worked upon the consumer may be finally enjoined by issuance of a crease-and-desist order which has been approved by the courts. A study which was made of the time element involved in several recent litigated cases relating to products which would be covered by S. 3065, such as auto engines and shock absorbers, paint, water filtration units, aluminum siding, and a swim aid device, showed that approximately 3 years ensued, on the average, from the date complaint was issued until our order to cease and desist was affirmed by the courts.

It is desirable, in our view, that some balance be achieved in protecting the rights of those who would sell their goods by unfair and deceptive means and the concomitant right of the consuming public to be free from unfair and deceptive practices. S. 3065 would accomplish this, and, in our opinion, this is a most cogent and persuasive reason for its enactment. The principles which are reflected in this bill were endorsed by the President in his message "To Protect the Consumer Interest" which was made to the Congress on February 6, 1968. The practices involved ranged from deceptively failing to disclose conditions on supposedly unconditional guarantees to advertising that a swimming aid would render the user unsinkable when in fact he remained quite sinkable. In the latter case the Court of Appeals for the Ninth Circuit noted, in sustaining the Commission's decision, "If a nonswimmer or a poor swimmer, equipped with [the device] should 'swim as far as you please,' as one of the * * * advertisements invited him to do, he might never get back." In almost all of these cases the company whose practices were challenged continued to do substantial business with the public using the practices which were found to be misleading and deceptive. For example, one company continued to sell aluminum siding to homeowners at the rate of $400,000 per year using a variety of deceptive representations including promise of a bonus or commission for the privilege of showing the purchaser's home as a model to other prospective purchasers, but no prospective purchasers would ever be brought around and so no bonus would ever be earned. Another company continued to sell paint at a rate in excess of $12 million per year while representing deceptively that the second can of paint purchased was free with the purchase of each can of paint at the regular price, when in fact the regular price was the price of two cans of paint.

The authority now granted the Commission under section 13(a) of the act has been upheld by the courts. *Federal Trade Commission*

5

v. *Rhodes Pharmacal Co.*, 191 F. 2d 744 (7th Cir. 1951). (See also *Federal Trade Commission v. National Health Aids*, 108 F. Supp. 340 (D. Md. 1952).) The reasoning of the court of appeals in upholding the statutory power of the Commission to enjoin the dissemination of false advertising of food, drugs, devices or cosmetics is equally applicable to S. 3065. In the *Rhodes* case the court cited (p. 747) with approval its decision in the case of *International Art Co. v. Federal Trade Commission*, 109 F. 2d 393 (7th Cir. 1940), stating that "To protect the purchasing public against deceptive methods and misrepresentations by which purchasers are deceived, is in the public interest."

Also, in the *Rhodes* case the court, referring to its decision in *Federal Trade Commission v. Thomsen-King & Co.*, 109 F. 2d 516 (7th Cir. 1940), noted that section 13(a) giving the power to seek injunctions was a necessary part of the plan to prevent fraud and fraudulent commerce through fraudulent advertisements, and was written for the purpose of preventing the ineffectuality of proceedings before the Commission due to the offender's collecting the spoils incident to improper practices."

If the consumer through the issuance of temporary injunctions by a district court is to be protected from false advertising of food, drugs, devices or cosmetics, he should with equal force, we think, be so protected from what the seventh circuit in the *Thomsen-King* case called "fraudulent commerce" and which S. 3065 calls "deceptive sales."

The bill provides safeguards for the protection of respondents in the requirement that "proper cause be shown." This was spelled out in the *Rhodes* case that the Commission show "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the Commission to believe that the defendants were engaged in the dissemination of false advertisements of a drug in violation of the act." If the bill is enacted, this requirement, of course, will be just as applicable to acts or practices unfair or deceptive to the consumer.

The Commission endorses S. 3065.

The Bureau of the Budget advises that enactment of this bill would be in accord with the program of the President.

By direction of the Commission.

Commissioner Elman's views are set forth in the attached separate statement. This statement was presented to the Commission at the close of business on March 26, 1968, and has not been considered by the Commission.

PAUL RAND DIXON, <em>Chairman.</em>

---

### SEPARATE STATEMENT OF COMMISSIONER ELMAN

I join in endorsing the proposed Deceptive Sales Act of 1968, which would amend the Federal Trade Commission Act by authorizing a Federal district court to issue a temporary injunction or restraining order in any case where the defendant is charged with engaging in business practices which are unfair or deceptive to the consumer, and the court finds, upon a "proper showing," that the granting of an injunction *pendente lite* would be in the public interest.

# Appendix D

CONGRESSIONAL RECORD

Proceedings and Debates of the 93d Congress

LD-4a (Rev. Jan. 71)

SENATE

| BILL | DATE | PAGE(S) |
|---|---|---|
| S. 1081 | July 10, 1973 | S12967–13008<br>S13012–13013 |

**ACTION:**

**Alaska Pipeline:** Senate continued consideration of S. 1081, to establish a Federal policy granting rights-of-way across Federal lands, and, by 78 yeas to 11 nays, agreed to Jackson amendment No. 306, to grant to the Federal Trade Commission full power and legal author-

ity to enable it to identify and prevent unfair methods of competition and anticompetitive conduct.

Page S 12967

By unanimous consent, it was agreed that when Senate resumes consideration of this bill at an hour not later than 2 p.m. on Wednesday, July 11, debate will be limited to 30 minutes each on Jackson amendments numbered 314 and 315, and will be limited to 20 minutes on an amendment to be offered by Senator Pastore, following disposition of which Senator Mondale will be recognized to call up an amendment, with debate limitation thereon of not to exceed 10 hours, with vote to occur thereon at an hour not later than 1 p.m. on Friday, July 13, and that not later than 1 p.m. on Thursday and not later than 11 a.m. on Friday Senate will resume consideration of the said Mondale amendment; following disposition of which Senator Gravel will be recognized to call up his amendment, with vote thereon to occur at 11 a.m. on Tuesday, July 17; that there will be not to exceed 16 hours time limitation on the bill; that time be limited on any amendment to 1 hour, with 30 minutes on amendments in the second degree; that vote on an amendment to be offered by Senator Haskell will occur not later than 10 a.m. on Tuesday, July 17; that vote on question of final passage of the bill will occur not later than 12 noon on Tuesday, July 17.

Pages S 13012–S 13013

Pages S 12967–S 13008, S 13012–S 13013

## FEDERAL LANDS RIGHT-OF-WAY ACT OF 1973

Mr. MANSFIELD. Mr. Present, I ask unanimous consent that the unfinished business be laid before the Senate.

The PRESIDING OFFICER. The Chair lays before the Senate the unfinished business, S. 1081, which the clerk will state by title.

The bill was stated by title, as follows:

A bill (S. 1081) to authorize the Secretary of the Interior to grant rights-of-way across Federal lands where the use of such rights-of-way is in the public interest and the applicant for the right-of-way demonstrates, the financial and technical capability to use the right-of-way in a manner which will protect the environment.

Mr. MANSFIELD. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. JACKSON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

### AMENDMENT NO. 306

Mr. JACKSON. Mr. President, I call up my amendment No. 306 and ask for its immediate consideration.

The PRESIDING OFFICER. The amendment will be stated.

The legislative clerk proceeded to read the amendment.

Mr. JACKSON. Mr. President, I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment will be printed in full in the RECORD.

Mr. JACKSON's amendment (No. 306) is as follows:

S. 1081

### TITLE III—SUBPENA AND INJUNCTIVE RELIEF

#### FINDINGS

SEC. 301. (a) The Congress hereby finds that the investigative and law enforcement responsibilities of the Federal Trade Commission have been retricted and hampered because of inadequate legal authority to enforce subpenas and to seek preliminary injunctive relief to avoid unfair competitive practices.

(b) The Congress further finds that as a direct result of this inadequate legal authority significant delays have occurred in a major investigation into the legality of the structure, conduct, and activities of the petroleum industry, as well as in other major

investigations designed to protect the public interest.

## PURPOSE

Sec. 302. It is the purpose of this Act to grant the Federal Trade Commission the requisite authority to insure prompt enforcement of the laws the Commission administers by granting statutory authority to directly enforce subpenas issued by the Commission and to seek preliminary injunctive relief to avoid unfair competitive practices.

Sec. 303. Section 5(1) of the Federal Trade Commission Act (15 U.S.C. 45) (1)) is amended by striking subsection (1) and inserting in lieu thereof the following new paragraph:

"(1) Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States or by the Commission in its own name by any of its attorneys designated by it for such purpose. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission."

Sec. 304. Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by adding at the end thereof the following new subsection:

"(m) Whenever in any civil proceeding involving this Act the Commission is authorized or required to appear in a court of the United States, or to be represented therein by the Attorney General of the United States, the Commission may elect to appear in its own name by any of its attorneys designated by it for such purpose."

Sec. 305. Section 6 of the Federal Trade Commission Act (15 U.S.C. 46), is amended by adding at the end thereof the following proviso: "*Provided*, That the exception of 'banks and common carriers subject to the Act to regulate commerce' from the Commission's powers defined in clauses (a) and (b) of this section, shall not be construed to limit the Commission's authority to gather and compile information, to investigate, or to require reports or answers from, any such corporation to the extent that such action is necessary to the investigation of any corporation, group of corporations, or industry which is not engaged or is engaged only incidentally in banking or in business as a common carrier subject to the Act to regulate commerce."

Sec. 306. Section 13 of the Federal Trade Commission Act (15 U.S.C. 53) is amended by redesignating "(b)" as "(c)" and inserting the following new subsection:

"(b) Whenever the Commission has reason to believe—

"(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

"(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction may be dissolved by the court and be of no further force and effect: *Provided further,* That in proper cases the Commission may seek, and, after proper proof, the court may issue a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business."

Sec. 307. Section 16 of the Federal Trade Commission Act (15 U.S.C. 56) is amended to read as follows:

"Sec. 16. Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under section 14 or under subsection (1) of section 5 of this Act, shall—

"(a) certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection; or

"(b) itself cause such appropriate proceedings to be brought."

Mr. JACKSON. Mr. President, this amendment will give to the Federal Trade Commission major new statutory authority which is designed to enable the Commission to carry out its mandate to protect the public interest through prompt and aggressive enforcement of the laws it administers.

The need for this legislation was brought to my attention in connection with the Interior Committee's study of national fuels and energy policy.

Questions were raised by the committee staff as to the present ability and legal authority of the Commission to deal with situations comparable to the current petroleum emergency. On June 15, following discussion between the Interior Committee staff and the staff of the Federal Trade Commission, Mr. Ronald M. Dietrich, General Counsel to the Commission, wrote me a letter on this matter. The General Counsel's letter noted that, while the Commission's investigative powers are broad enough to discover problem situations such as those existing in the petroleum industry, there are shortcomings. The letter states that:

The shortcomings of the Commission's present power are in the potential for delay in existing subpena enforcement procedures and in its inability to obtain preliminary relief once the problem has been fully discovered.

The Commission has sought for a long time to have two specific powers to increase its ability to deal in an expeditious manner with such important problems. These two powers are the statutory authority to seek directly in the federal district courts preliminary injunctions against the continuation of anticompetitive conduct ("unfair methods of competition") as well as deceptive practices, and the corresponding statutory authority to proceed to federal district court itself to enforce its own subpenas and to require reports from businesses under Section 6(b) of the Federal Trade Commission Act. At the present time, proposed legislation, S. 356 and H.R. 20, contain language which would give the Commission power to seek preliminary injunctions in deceptive practice situations.

But they do not include the corresponding power to restrain the continuance of anticompetitive conduct. The power to seek such preliminary injunctions should, in my opinion, be available to the Commission in both deceptive practices and in anticompetitive conduct situations.

Mr. President, the purpose of the amendment I am introducing today is to grant the Federal Trade Commission the full range of powers and legal authority it needs to both identify and prevent unfair methods of competition and anticompetitive conduct.

On June 26, 1973, I introduced this legislation in the form of a bill, S. 2074, the Subpena and Injunctive Relief Amendments Act of 1973. At that time I had introduced into the RECORD the text of the correspondence on the FTC investigation of the petroleum industry and the investigation under way by the Permanent Investigations Subcommittee.

Because of the urgent need for this legislation and in view of the fact that similar authority was passed by the Senate in the last Congress as a part of the Magnuson-Moss Warranty Act, I am offering this measure as an amendment to S. 1081, the Federal Lands Right-of-Way Act of 1973.

I hope that the Senate will act favorably on this amendment.

Mr. President, I ask unanimous consent at this point to have printed in the RECORD a statement that I made yesterday in connection with this matter at a press conference.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

STATEMENT BY SENATOR HENRY M. JACKSON, JULY 9 PRESS CONFERENCE ON THE FUEL CRISIS

1. BACKGROUND OF THE FTC REPORT

On May 31 of this year, I asked the Federal Trade Commission to furnish me with a report on the relationship between the structure of the petroleum industry and the critical fuel shortages facing the nation.

My purpose in requesting this report was to ascertain whether the serious and widespread shortages of gasoline, diesel, propane and heating oil were in any manner "contrived". Serious allegations have been made over the past six months in many quarters that there is a deliberate attempt underway on the part of the major integrated oil companies to drive independent refiners, distributors and marketers out of business; to obtain monopoly control of new markets; to cut loose obligations to serve low profit markets; to force major price increases for all fuels; and to obtain the repeal of environmental legislation.

Equally serious allegations have been made that the nature and structure of the industry, when coupled with timid enforcement of inadequate Federal laws and policy, have created a situation in which shortage situations were inevitable and taking advantage of independents and consumers was predictable.

I stated in my May 31 letter to the FTC that "On the basis of available evidence I do not charge or allege conspiracy." I further stated that the purpose of the report was "to get a detailed, objective and judicial judgment on the issues which have been raised in connection with the current fuels crisis."

Late Friday afternoon the report was delivered to my office.

## 2. IMPORTANCE OF THE FTC REPORT

Entitled "Preliminary Federal Trade Commission Staff Report On Its Investigation Of The Petroleum Industry," the FTC report is an important document. It is the first step forward in what will be a long and difficult—and, I believe, successful—effort to bring purpose, equity and balance to Federal energy policies which govern the structure, behavior and performance of the nation's energy industries.

The FTC report is an important document because it sets the stage for sweeping reforms—reforms which should have been implemented long ago.

The FTC report lays the foundation and states the case for repeal of the oil depletion allowance: tax equity, promotion of competition, and greater economic efficiency.

The FTC report demonstrates that the nation must take direct and positive action—such as the recent Senate action in adopting a Mandatory Fuels Allocation program—if we are to maintain the independent sector of the oil industry as a viable competitive force. By insisting on their survival, we will assure the survival of competition and forestall the forces of cartel and monopoly.

The FTC report documents the need—the absolute necessity—to guard against the establishment of any oil import quota system, which benefits only the major oil companies, supports artificially high prices and serves as a barrier to new competitors from entering the market.

The report also indicates that major oil company ownership of pipelines gives the companies an important weapon to control the crude oil produced by independent oil producers and the raw material supply to independent refiners.

The report concludes that it is essential that the nation must develop a program to insure fair competition, and implies that this program may require divestiture of major oil company pipelines and refineries.

The report also concludes that there is "cooperative" rather than "competitive" conduct on all levels in which the large oil vertically integrated companies interrelate.

This is the first time that a report by an agency of the Executive Branch has formally concluded that time honored and, until now, almost sacrosanct Federal oil policies have benefited the major oil companies while working hardship on the average American and the independent small businessman.

The FTC staff report does not say that the present gasoline shortage was deliberately contrived by the major oil companies. It does not blame the shortage entirely upon the anti-competitive structure and behavior of the petroleum industry. It does, however, indicate clearly that vertical integration, concentration and market control had an important role in creating the shortage. The report also says that the major oil companies are indeed using the shortage to eliminate competition and to increase their relative shares in all three sectors of the industry—production, refining and marketing.

The most important implication of the report as a whole is that the anti-competitive features of the petroleum industry do not flow from technical or economic necessity, nor are they the creation of a classical conspiracy in restraint of trade. Concentration and market power in the oil industry are largely the result of government policy. The report states, "The federal and state governments, with the force of law do for the major companies that which would be illegal for the companies to do for themselves."

In other words, many Federal programs and policies have enabled the major oil companies to function at will and with few restraints at the expense of the American consumer and the independent distributors and small oil businesses.

The report identifies the depletion, oil import controls, state prorationing, and—surprisingly—Cost of Living Council price controls as policies that have had anti-competitive results.

The staff report does not recommend specific legislative action. But if it can withstand careful scrutiny, as I believe that in many respects it will, its analysis has many profound implications for National Energy Policy.

For example, if the report is correct, the controversial tax preferences for oil and gas production—the depletion allowance, intangible drilling expenses, and foreign tax credits—are not very effective as incentives to increase petroleum production. But they do encourage vertical integration and economic concentration: they create a profit squeeze on independent refiners; and they make it impossible to find out exactly how profitable the major oil companies are. It is obvious that the Congress must take a hard new look at the oil industry's special tax treatment, and consider phasing it out in favor of more efficient and equitable incentives.

It is apparent that the regulation of pipelines by the Interstate Commerce Commission has not been adequate to prevent a whole range of anti-competitive effects from the concentrated ownership of transportation facilities by the largest companies. The FTC report provides a strong case for divorcement of oil transportation from production and refining. Congress must take a new and very hard look at this question.

The Senate's National Fuels and Energy Policy Study, of which I am Chairman, will look closely at each of these and other related areas and I will be introducing substantive legislation to effectuate fundamental policy changes where the facts dictate they are guaranteed and in the public interest.

That being said, however, the report has shortcomings. It is an abstract and theoretical document. It is written in the language of economists. It lacks hard-hitting and specific recommendations for corrective action which many believe are necessary, and anticipated the report would contain.

The report makes no reference to the nation's changing supply pattern, to growing international problems faced by major oil companies, to OPEC,* nor to other international events which will have major impacts on competition and the structure of the petroleum industry.

The report does not contain specific references to the legality of, or motivation behind any specific activities of companies and individuals which may have been factors in causing the current fuel shortages. In this respect, it must be assumed that the FTC staff has made recommendations to the Commission on these and other matters which may result in major law enforcement actions. Therefore, it is entirely proper not to include in this report specific allegations, facts, theories of law and other pertinent information contained in the more detailed report and staff recommendations now pending before the Commission.

## 3. NEED FOR CONGRESSIONAL INVESTIGATION AND ACTION

What clearly emerges from the report is that Congress must provide the leadership in the reform of the nation's fuel and energy policies.

I am convinced more than ever before of the necessity for a full-scale Senate investigation into the fuel situation, an investigation that is fair, constructive and responsible, yet one that pulls no punches in assessing blame where it is deserved, and in laying the basis for legislative action.

For this reason, the on-going inquiry into the causes of this current fuel crisis by the Senate Permanent Subcommittee on Investigations will continue to go forward utilizing all available resources.

At my direction, Subcommittee staff members are at the FTC offices this morning to begin a review of all information and documents that were gathered by the FTC preparatory to this report and the larger report on the petroleum industry which the Commission is now considering.

In seeking definitive answers to all questions and in attempting to pinpoint responsibility, the Subcommittee will receive all testimony under oath. This is consistent with the Subcommittee's rules and procedures. In addition, when appropriate and if necessary, subpoenas will be issued to obtain any documentation needed to develop all of the facts necessary to Congressional and public understanding.

Hearings by the Subcommittee will be announced later this week.

## 4. RELEASE OF FTC STAFF REPORT

As those who have followed this matter know, one of my major purposes in requesting this report was to obtain a detailed and objective judgment on the many issues, charges and allegations which have been raised in connection with the current fuels crisis. I had hoped that early public release of the report would make the facts known and clear the air of any charges and allegations of conspiracy, monopoly, price fixing and taking unfair advantage which are unfounded or which have no basis in fact. I had also hoped that the report would focus on those causes of the fuel shortage which are amenable to early and effective action by the Congress, the Administration and the industry and point the way to ending this critical shortage.

The American consumer has a very large stake in this matter and is entitled to know, at the earliest possible date, the causes of the shortages and the price increases which have hit at his pocketbook and caused great inconvenience.

Equally important, the Congress has both a right and a responsibility to know so that any needed remedial action which goes to the substance of the problem may be taken and the compelling temptation to engage in unproductive witch hunts for scapegoats may be resisted.

I regret to inform those of you here today that a request to me in Chairman Engman's letter of transmittal of last Friday makes release of the report at this time impractical. The last paragraph of the letter reads as follows:

"While the Commission recognizes its obligation to honor your Committee's request for information, I must emphasize that the Commission would not make this report public and therefore we ask that *care be taken to avoid unnecessary publicity which could jeopardize any future law enforcement action by the Commission in this area.*" (Emphasis added.)

I did not expect such a caveat would accompany the report at the time I requested its preparation. But in view of Chairman Engman's concern as expressed in his letter I feel that release at this time, without further clarification, would not be responsible. And I must make note here that there was a release by an unidentified source to one of the newsservices over the weekend.

At the same time, however, I must candidly acknowledge that my review of the report and the analysis provided to me by the Committee staff lawyers and economists does *not* disclose any specific information about identifiable companies, events or activities which could reasonably be construed to either jeopardize Commission law enforcement activities or to prejudice in any manner the rights or legal defenses of any com-

*Organization of Petroleum Exporting Countries.

S 12970 **CONGRESSIONAL RECORD — SENATE** *July 10, 1973*

pany or individual against whom legal action might be taken in the future.

I have accordingly written Chairman Engman that I would appreciate being informed as to what particular information, if any, should be deleted from the report before release to the Congress, the media and the public to avoid any prejudice to the Government's case or cases and to the rights of any persons or companies that may be named as defendants in legal proceedings. I have asked for this information by 10:00 a.m. on Friday, July 13, 1973.

I will carefully consider Chairman Engman's suggestions in making my determination as Chairman of the Permanent Subcommittee on Investigations, as to whether all or only a portion of this report will be released by my office.

(Copies of Chairman Engman's July 6 letter of transmittal and my response of July 9 are attached.)

### 5. AMENDMENTS TO THE FEDERAL TRADE COMMISSION ACT

To facilitate the Federal Trade Commission's ongoing investigation into the structure and conduct of the energy industries, I will be offering an amendment on the Senate floor later in the week to greatly enlarge the Commission's powers.

This amendment will grant new authority to enable the Commission to carry out its mandate to protect the public interest through prompt and aggressive enforcement of the laws it administers.

The shortcomings in the Commission's present powers lie *first*, in the inordinate procedural delays which are caused by the Commission's lack of authority to enforce its own subpoenas; and *second*, in the fact that the Commission lacks authority to obtain preliminary injunctive relief to prohibit anticompetitive practices, deception and unfair methods of competition when they are found to be taking place.

The amendment I propose will grant to the Commission the legal authority to go directly to the Federal Courts to seek subpoena enforcement and to obtain preliminary injunctive relief. This authority will circumvent the delays experienced in the past when the Commission was required to request and persuade the Justice Department to go to Federal Court on the Commission's behalf.

FEDERAL TRADE COMMISSION,
*Washington, D.C., July 6, 1973.*
Hon. HENRY M. JACKSON,
*Chairman, Interior and Insular Affairs Committee, U.S. Senate, Washington, D.C.*
DEAR MR. CHAIRMAN: As Chairman of the Senate Interior and Insular Affairs Committee and the Senate Permanent Subcommittee on Investigations of the Committee on Government Operations, you have requested a report on the relationship between the structure of the petroleum and related industries and the current shortage of petroleum products.

In response to that request, I am enclosing a copy of a preliminary staff report to the Commission prepared at my direction. This report is based upon the comprehensive investigation of the petroleum industry which the staff began in late 1971. This report has not been evaluated or approved by the Commission, and the findings and conclusions contained in the report do not necessarily reflect the views of the Commission.

While the Commission recognizes its obligation to honor your Committee's request for information, I must emphasize that the Commission would not make this report public and therefore we ask that care be taken to avoid unnecessary publicity which could jeopardize any future law enforcement action by the Commission in this area.

Sincerely yours,
LEWIS A. ENGMAN,
*Chairman.*

Mr. JACKSON. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The second assistant legislative clerk proceeded to call the roll.

Mr. JACKSON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. HELMS). Without objection, it is so ordered.

Mr. JACKSON. Mr. President, I ask for the yeas and nays on the amendment.

The yeas and nays were ordered.

Mr. JACKSON. Mr. President, I do not believe there are any further requests for time to debate this amendment.

The PRESIDING OFFICER. The question is on agreeing to amendment No. 306 of the Senator from Washington (Mr. JACKSON).

On this question, the yeas and nays have been ordered, and the clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. ROBERT C. BYRD. I announce that the Senator from Indianapolis (Mr. BAYH), the Senator from Idaho (Mr. CHURCH), and the Senator from Utah (Mr. Moss) are necessarily absent.

I further announce that the Senator from Washington (Mr. MAGNUSON), the Senator from Wyoming (Mr. McGEE), and the Senator from Alabama (Mr. SPARKMAN) are absent on official business.

I also announce that the Senator from Mississippi (Mr. STENNIS) is absent because of illness.

I further announce that, if present and voting, the Senator from Washington (Mr. MAGNUSON) would vote "yea."

Mr. SCOTT of Pennsylvania. I announce that the Senator from Massachusetts (Mr. BROOKE), the Senator from Arizona (Mr. GOLDWATER), and the Senator from New York (Mr. JAVITS) are necessarily absent.

The Senator from Michigan (Mr. GRIFFIN) is absent on official business.

If present and voting, the Senator from New York (Mr. JAVITS) would vote "yea."

The result was announced—yeas 78, nays 11, as follows:

[No. 274 Leg.]

YEAS—78

| | | |
|---|---|---|
| Abourezk | Fong | Montoya |
| Aiken | Fulbright | Muskie |
| Allen | Gravel | Nelson |
| Baker | Gurney | Nunn |
| Beall | Hart | Pastore |
| Bellmon | Hartke | Pearson |
| Bennett | Haskell | Pell |
| Bentsen | Hatfield | Percy |
| Bible | Hathaway | Proxmire |
| Biden | Helms | Randolph |
| Brock | Hollings | Ribicoff |
| Burdick | Huddleston | Roth |
| Byrd, | Hughes | Saxbe |
| Harry F., Jr. | Humphrey | Schweiker |
| Byrd, Robert C. | Inouye | Scott, Pa. |
| Cannon | Jackson | Stafford |
| Case | Johnston | Stevens |
| Clark | Kennedy | Stevenson |
| Cook | Long | Symington |
| Cotton | Mansfield | Talmadge |
| Cranston | Mathias | Tower |
| Dole | McClellan | Tunney |
| Domenici | McClure | Weicker |
| Eagleton | McGovern | Williams |
| Eastland | McIntyre | Young |
| Ervin | Metcalf | |
| Fannin | Mondale | |

NAYS—11

| | | |
|---|---|---|
| Bartlett | Dominick | Scott, Va. |
| Buckley | Hansen | Taft |
| Chiles | Hruska | Thurmond |
| Curtis | Packwood | |

NOT VOTING—11

| | | |
|---|---|---|
| Bayh | Griffin | Moss |
| Brooke | Javits | Sparkman |
| Church | Magnuson | Stennis |
| Goldwater | McGee | |

So Mr. JACKSON's amendment (No. 306) was agreed to.

Mr. JACKSON. Mr. President, I move that the Senate reconsider the vote by which the amendment was agreed to.

Mr. HANSEN. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. MONDALE. Mr. President, within the next few days, the Senate will take up consideration of the Mondale-Bayh amendment to the Federal rights-of-way bill, S. 1081.

When I submitted that amendment, I remarked on the need for intensive negotiations and an impartial study before Congress made a decision on the routing of Alaskan oil. In addition, I warned that there would not be two oil pipelines coming from Alaska's North Slope within the foreseeable future.

Subsequent events have merely redoubled the need for this amendment. Last week, the State Department released documents received from the government of Canada which clearly indicated that an earlier State Department letter stating that "there is no alternative to the proposed Alaskan pipeline at this time" was in error. While the Canadian documents frankly discussed the areas of difficulty for a Canadian pipeline, they also revealed a willingness to cooperate, if we in Congress give indications of real interest in such a route.

Second, contained in those Canadian documents—which the State Department revealed only after numerous requests to do so—was a clear indication that the Canadian Government would not negotiate with us for a second oil pipeline if we choose to route one oil pipeline through Alaska. Therefore, the choice which we must make is whether we in Congress will make a decision on the routing of Alaskan oil on the basis of adequate negotiations with the Canadian Government and adequate study of the economic, environmental, and national security factors involved. We will inevitably be choosing one pipeline or the other, with virtually no prospect of a second oil pipeline for years to come. We must make that choice carefully, and we can make that choice without delaying the delivery of Alaskan North Slope oil.

Mr. President, I ask unanimous consent that my remarks on introduction of amendment 240 to S. 1081 be reprinted at this point in the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

Mr. MONDALE. Mr. President, on behalf of myself and Senator Bayh, Mansfield, Haskell, Stevenson, Percy, Proxmire, McIntyre, Stafford, Nelson, Abourezk, Case, Clark, Hathaway, Hughes, Kennedy, Muskie, and Pell, I am introducing an amendment to S. 1081,

# Appendix E

Reached in Kifissia, Greece, by telephone, Metaxa, a Greek citizen, refused to answer questions about why he contributed to the American political campaign.

"Send me a letter on official stationery and I will ask my lawyer what I can answer you," said Metaxa.

The letter was sent on Oct. 4, but no answer has been received.

Though it is not presently known whether Pappas brought foreign contributions to the CRP from abroad, he made seven round trips by plane between April 27 and Dec. 13, 1972, from Athens to Washington on CRP business. In addition, Pappas was in Paris and Switzerland on CRP business only a week before the 1972 election in America.

Hart believes that political contributions from foreign sources should be prohibited by law.

"I tend to think they should (because) the test of a candidate's viability to run ought to rest on support from domestic sources alone," he said.

From information provided him by The News, Hart has posed a series of questions to be explored by Acting Atty. Gen. Robert Bork and by Comptroller General Elmer B. Staats of the GAO.

Staats is overall director of the GAO's watchdog Office of Federal Elections.

After advising Bork and Staats about the defense contract to Vardinoyiannis, Hart asked them to recommend "what changes in law would be required, if any, to prohibit such contributions (to American political campaigns from foreign sources) in the future?"

Specifically, Hart asked why Section 611 of the U.S. Criminal Code does not already cover cases such as the one involving Vardinoyiannis.

That's the section prohibiting contractors with the federal government from contributing to federal political campaigns. The penalty is a maximum of five years in prison or a fine of $5,000, or both.

Section 601 also makes it illegal to knowingly solicit contributions from contractors, which could bear directly on fund-raisers such as Pappas, if he solicited such funds for the CRP.

Hart said that depending on the answers he gets from the Justice Department and GAO, he might pass on the information to newly-appointed Special Prosecutor Leon Jaworski and to the Senate Watergate Committee.

Concerned that large loopholes in the law could allow international businesses to secretly make illegal corporate donations through foreign sources to U.S. political candidates, Hart also said he might refer the matter for study to the Senate subcommittee on multinational corporations.

---

ORGANIZED LABOR LAUNCHES DRIVE FOR THE IMPEACHMENT OF PRESIDENT NIXON

## HON. CHARLES B. RANGEL
### OF NEW YORK
### IN THE HOUSE OF REPRESENTATIVES
### *Thursday, November 8, 1973*

Mr. RANGEL. Mr. Speaker, once again, as has occurred so often in our history, the Nation's workers are providing the cutting edge of our national conscience. Recognizing that the President has in large measure forfeited his right to national leadership, the AFL–CIO has launched a nationwide campaign for the impeachment of President Nixon. As Members of the body to which this campaign will be addressed in the days and weeks ahead, we all should carefully consider the reasons which underlie this call by our Nation's largest labor union body. I place in the Congressional Record, for the attention of my colleagues, the AFL–CIO position on why Richard M. Nixon must be impeached—now:

WHY RICHARD M. NIXON MUST BE IMPEACHED—NOW

On October 22, the AFL–CIO at its convention unanimously adopted a resolution calling for the resignation of President Richard M. Nixon.

The resolution said that Mr. Nixon's resignation was necessary for the restoration of our badly battered democratic institutions.

If Mr. Nixon does not resign, the resolution said, "we call upon the House of Representatives forthwith to initiate impeachment proceedings against him."

Since then, Mr. Nixon has announced that he does not intend to resign.

The AFL–CIO therefore calls for his immediate impeachment.

As we said in the convention resolution, "Impeachment is not a prospect we contemplate with pleasure. No decent American can derive any partisan satisfaction whatever from the misfortune of his nation. And surely the American labor movement is not interested in aiding any reckless attacks on the Presidency. We are especially concerned about the office of the Presidency in these times of grave danger on the international front.

"But the cause of peace and freedom in the world cannot survive a discredited Presidency. Our allies' best hope—mankind's best hope—lies in the strength of our democratic institutions.

"Justice must be done, the risks of not doing it being more than democracy can safely bear."

Richard M. Nixon must be impeached—now—because:

He has caused an erosion of public confidence in our democratic system of government.

He instituted in the name of national security a plan which violated civil liberties through domestic political surveillance, espionage, wiretapping, burglary, eavesdropping, opening of mail, and military spying on civilians.

He created a special and personal secret police, answerable only to the White House, to operate totally outside the constraints of law.

He and his subordinates interfered with the freedom of the press—which our Constitution guarantees—by means of wiretaps, FBI investigations, and threats of punitive action.

He secretly recorded conversations in his office without advising participants in those conversations that they were being recorded. He then sought to deny the evidence on those tapes to the courts.

He has violated the Constitution of the United States and his sworn obligation to see that the laws "be faithfully executed."

He has used the office of the Presidency to attempt to put himself above the law.

He has consistently lied to the American people.

He has, by his actions and through the actions of his subordinates—for which he has accepted responsibility—brought dishonor on the office of the Presidency.

He has repeatedly promised the American people full revelation of the facts in the Watergate affair—and he has repeatedly sought to keep those facts from the public, from the courts, from the Congress, and from the special prosecutor.

He has used the office of the Presidency for personal enrichment.

He secretly curtailed the FBI investigation of the Watergate break-in.

He involved the CIA in the coverup of the Watergate affair.

He sought to suppress—and for a time did suppress—the facts of the burglary of the office of Daniel Ellsberg's psychiatrist from the judge in the Ellsberg trial.

He interfered with the administration of justice by offering this judge the directorship of the FBI.

He intervened in the antitrust suit against International Telephone and Telegraph to impose a settlement agreeable to the corporation, after which the corporation agreed to underwrite $400,000 of the cost of the 1972 Republican National Convention.

He and his subordinates sought to use the power of the White House, the Justice Department, the Internal Revenue Service, the Securities and Exchange Commission and other government agencies to punish a list of political enemies.

Officials of his campaign committee and his personal attorney extorted illegal campaign contributions from corporations which were dependent on maintaining the good will of the government.

Officials of his campaign committee received large campaign contributions from the dairy industry, which was seeking and later received lucrative dairy price support increases and dairy import concessions.

Until Richard Nixon is removed from office, we will not be able to get Watergate behind us. We will not be able to proceed with sober and constructive solutions to our economic and social problems at home or to the dangers of war in the world.

The first step in the impeachment process already has been taken: resolutions calling for the impeachment of the President have been introduced in the House of Representatives and referred to the House Judiciary Committee. The next step is for the committee to investigate. If it recommends impeachment, the committee sends to the House floor a resolution and articles of impeachment which specify the charges against the President.

If the House by majority vote approves the articles of impeachment, they are sent to the Senate for trial. If two-thirds of the Senate, with the Chief Justice of the United States presiding, find the President guilty of any of the charges, he is removed from office.

What is now necessary is that the House of Representatives and the House Judiciary Committee be made aware of the need for urgency in voting the impeachment of the President. Toward this end, each union member should now write his Congressman AND Chairman Peter Rodino of the House Judiciary Committee—at the House Office Building, Washington, D.C. 20515—and urge their support of impeachment.

---

# HOUSE OF REPRESENTATIVES—*Monday, November 12, 1973*

The House met at 12 o'clock noon.
The Chaplain, Rev. Edward G. Latch, D.D., offered the following prayer:

*With righteousness shall the Lord judge the world and the people with equity.*—Psalms 98:9.

Eternal Father of our spirits, we thank Thee for the refreshment of sleep and the restoration of soul our rest provides

that with renewed strength we may meet the challenging tasks of this new day.

Amid all the labors of these hours keep our hearts with Thee as we act on behalf of our beloved land facing national and international problems which tax our spirits to the utmost. Give to us and to all America the realization that whatever the future holds of marvel or surprise, goodness and truth, justice and mercy abide and that in Thee and in Thee alone is the strength of our Nation and the future of our world.

During these weeks which try men's souls save us from fear, deliver us from futility and make us worthy of these times which cry aloud for wisdom, integrity, and character.

In the spirit of Christ we pray. Amen.

## THE JOURNAL

The SPEAKER. The Chair has examined the Journal of the last day's proceedings and announces to the House his approval thereof.

Without objection, the Journal stands approved.

There was no objection.

## MESSAGE FROM THE SENATE

A message from the Senate by Mr. Sparrow, one of its clerks, announced that the Senate had passed bills of the following titles, in which the concurrence of the House is requested:

S. 2641. An act to confer jurisdiction upon the district court of the United States for certain civil actions brought by the Senate Select Committee on Presidential Campaign Activities, and for other purposes; and

S. 2645. An act to amend Public Law 93–60 to increase the authorization for appropriations to the Atomic Energy Commission in accordance with section 261 of the Atomic Energy Act of 1954, as amended, and for other purposes.

## CALL OF THE HOUSE

Mr. GROSS. Mr. Speaker, in order to get this place warmed up, I make the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. O'NEILL. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The call was taken by electronic device, and the following Members failed to respond:

[Roll No. 573]

| | | |
|---|---|---|
| Alexander | Culver | Jarman |
| Andrews, N.C. | Davis, Ga. | Jones, N.C. |
| Archer | Davis, Wis. | Jones, Tenn. |
| Ashley | de la Garza | Jordan |
| Baker | Dellenback | Karth |
| Beard | Dellums | Keating |
| Bevill | Downing | Kluczynski |
| Biaggi | Dulski | Lehman |
| Blackburn | Flood | Lent |
| Blatnik | Flynt | Macdonald |
| Bolling | Fuqua | Mathias, Calif. |
| Brooks | Gray | Matsunaga |
| Buchanan | Green, Oreg. | McCormack |
| Burke, Calif. | Griffiths | McEwen |
| Chappell | Hammer- | McKay |
| Chisholm |   schmidt | Mills, Ark. |
| Clancy | Hanley | Minshall, Ohio |
| Clark | Hanna | Mitchell, Md. |
| Clausen, | Hays | Moakley |
|   Don H. | Heinz | Mosher |
| Conte | Hosmer | Murphy, N.Y. |
| Conyers | Huber | Nix |
| Crane | Hudnut | O'Hara |

| | | |
|---|---|---|
| Patman | Ruth | Waldie |
| Podell | Ryan | Walsh |
| Powell, Ohio | Slack | Whitten |
| Price, Tex. | St Germain | Williams |
| Rangel | Staggers | Wolff |
| Reid | Stephens | Wright |
| Roberts | Stokes | Young, Ill. |
| Rodino | Symington | Young, S.C. |
| Roncalio, N.Y. | Teague, Tex. | Young, Tex. |
| Rosenthal | Thornton | |
| Rostenkowski | Ullman | |

The SPEAKER. On this rollcall 335 Members have recorded their presence by electronic device, a quorum.

By unanimous consent, further proceedings under the call were dispensed with.

## CONFERENCE REPORT ON S. 1081, AMENDING SECTION 28 OF THE MINERAL LEASING ACT OF 1920, AND TO AUTHORIZE THE TRANS-ALASKA PIPELINE

Mr. MELCHER. Mr. Speaker, I call up the conference report on the Senate bill (S. 1081) to authorize the Secretary of the Interior to grant rights-of-way across Federal lands where the use of such rights-of-way is in the public interest and the applicant for the right-of-way demonstrates the financial and technical capability to use the right-of-way in a manner which will protect the environment, and ask unanimous consent that the statement of the managers be read in lieu of the report.

The Clerk read the title of the Senate bill.

The SPEAKER. Is there objection to the request of the gentleman from Montana?

Mr. STEIGER of Arizona. Mr. Speaker, reserving the right to object, is it my understanding that Members will be protected if there is a motion to recommit the conference report pending the waiving of the reading of the report?

The SPEAKER. The Chair will advise that that comes after the previous question is ordered on the conference report.

Mr. STEIGER of Arizona. Mr. Speaker, I withdraw my reservation.

The SPEAKER. Is there objection to the request of the gentleman from Montana?

There was no objection.

The Clerk read the statement.

(For conference report and statement see proceedings of the House of November 7, 1973.)

Mr. MELCHER (during the reading). Mr. Speaker, I ask unanimous consent that the further reading of the statement be dispensed with.

The SPEAKER. Is there objection to the request of the gentleman from Montana?

There was no objection.

The SPEAKER. The gentleman from Montana (Mr. MELCHER) will be recognized for 30 minutes, and the gentleman from Arizona (Mr. STEIGER) will be recognized for 30 minutes.

The Chair recognizes the gentleman from Montana.

Mr. MELCHER. Mr. Speaker, the joint statement contains many detailed comments and explanations about specific provisions of the bill recommended by the conferees. I hope the Members have read the joint statement carefully.

The conference report was signed by all of the conferees from both the House and the Senate and represents many hours of work and reflects a genuine effort to compromise differences without sacrificing basic provisions in both the Senate bill and the House amendment. We wanted a strong bill, and I believe we have it.

With respect to the general law governing oil and gas rights-of-way, all of the statutory guidelines in the House amendment were retained and some additional guidelines from the Senate bill were added.

With respect to the trans-Alaska pipeline, the provisions of the House amendment and the Senate bill were very similar and a merger of the two was easy.

With respect to the provisions of the Senate bill that do not relate directly to oil and gas pipelines, the most controversial ones involve stripper wells, the authority of the Federal Trade Commission to enforce its own orders directly rather than through the Attorney General, and the authority of the independent regulatory agencies to collect the information they need in order to carry out their regulatory functions without hindrance from the Office of Management and Budget.

Under the conference report the Comptroller General will review requests for information to prevent duplication but will have no authority to determine whether the agency needs information.

Mr. Speaker, there is a question today that confronts the House as to whether or not we want to move the trans-Alaska pipeline bill to the President's desk. If there is a motion to recommit that would interfere with that, it is interfering with solving the problem of getting the bill finally on the President's desk.

There will be arguments made, I suppose, that the House conferees agreeing to the Senate language dealing with the Federal Trade Commission and the provision limiting the authority of the Office of Management and Budget are somehow not compatible with this bill. These are relevant matters to assist regulatory agencies to carry out their duties.

I would say to the House that the larger issue is to move the bill so that we can have a start on the construction of the pipeline and get moving on tapping the Alaskan vast crude oil supplies.

I think that is the issue facing the House today, and I urge all of the Members of the House to vote for the conference report as it is.

The campaign launched by the National Chamber of Commerce and industrial giants against the FTC provision in attempts to convince small business that they would be better served by the deletion of the FTC provision in this bill would be parallel if Goliath had been able to talk David into using a small pebble in a sling or better yet had conned David into throwing away his sling and meeting in hand-to-hand combat. The FTC provision would broaden the authority of the Commission to investigate conglomerate business and would add muscle to their traditional role of eliminating unfair competitive prac-

tices that stifle, strangle or eliminate small business operations.

The Office of Management and Budget's screening of questionnaires by regulatory agencies has delayed in many instances the regulatory agencies' ability to gather the information that they seek. These questionnaires in general are directed at big businesses and do not involve middle or small-sized businesses. Certainly the overwhelming majority of small businesses across the country are not involved in the questionnaires that are sent out by the regulatory agencies.

Very few of the requests to the Office of Management and Budget for clearance of questionnaires come from the independent regulatory commissions. Most of the clearance requests come from agencies of the executive branch. Under the provisions of S. 1081, OMB would continue its control over those executive branch agency questionnaires.

Senator METCALF has made available to me the data just provided him by the regulatory commissions on their experience with OMB questionnaire clearance. It shows the following:

REGULATORY REQUESTS FOR OMB CLEARANCE OF QUESTIONNAIRES PURSUANT TO FEDERAL REPORTS ACT

| Agency | 1973 | 1972 | 1971 | 1970 | 1969 |
|---|---|---|---|---|---|
| (1) CAB (as of Oct. 3, 1973)... | 11 | 19 | 18 | 7 | 17 |
| (2) FCC (as of Nov. 1, 1973)... | 10 | 12 | 18 | 14 | 17 |
| (3) FPC (as of Oct. 29, 1973)... | 4 | 11 | 6 | 5 | 1 |
| (4) FMC (as of Oct. 30, 1973)... | 1 | 1 | 0 | 1 | 0 |
| (5) FTC (as of Sept. 13, 1973). | 24 | 40 | 19 | 27 | 17 |
| (6) ICC (as of Oct. 4, 1973)... | 2 | 6 | 5 | 3 | 3 |
| (7) SEC (as of Oct. 4, 1973)... | 1 | 5 | 7 | 15 | 52 |
| Total... | 53 | 94 | 73 | 72 | 107 |

Mr. Speaker, I shall elaborate briefly on the responses of the agencies.

CAB—None of its questionnaires were modified, delayed, or disapproved during any of these 5 years.

FCC—Fifteen of its questionnaires were modified during the 5 years. Nine of the 15 dealt with equal employment opportunity and employment. Three dealt with ownership of broadcast companies and CATV systems.

FMC—None of its four requests, made over a 5-year period, were disapproved or changed.

FPC—None of its questionnaires were disapproved outright. Several, reported the FPC, were suspended, and others were returned to the FPC after OMB consulted with industry advisers and other respondents. Then FPC revised them, after which they were usually approved by OMB. The figures listed above for FPC do not include routine extension of previously approved reporting forms.

ICC—OMB held up clearance of one of its forms, dealing with freight car ownership. The Association of American Railroads proposed changes which were accepted by the ICC and OMB.

SEC—The Securities and Exchange Commission reported only minor modifications to forms it proposed.

FTC—During the 5-year period 29 FTC forms were modified. Many of the modified questionnaires dealt with mergers, the enemy industry, questionable advertising, financial reporting of large companies, and the concentration of economic power. Those are big business matters, areas in which large companies used their influence with OMB's advisory committees to keep agencies from asking legitimate questions which the large companies do not want to answer. The issue is not the burden on small business—relatively few questions are asked of small businesses by the independent regulatory commissions. The issue is—shall we free the independent regulatory commissions from the control of OMB and its cozy corporate colleagues.

Although the hearings of the Committee on Interior and Insular Affairs did not cover these subjects of the FTC, OMB, and stripper wells in detail, the need for these provisions is well documented in our committee files and in voluminous correspondence from all sectors of the public. Moreover, I have been in touch with the standing committees of the House that would normally handle these subjects, and I believe there is a general consensus that the modified Senate provisions recommended by the conferees are appropriate for inclusion in S. 1081. These provisions are an important part of the package compromise that the conference committee regarded as necessary in order to complete action on the pipeline bill.

While these provisions could have been left for consideration by separate bills, the conferees regarded them as essential to the prompt enactment of a trans-Alaska pipeline bill, which is sorely needed, and to a general revision of the oil and gas pipeline legislation. Moreover, most of the conferees regarded these provisions as fully justified on their merits.

The Federal Trade Commission provision has been questioned because the authority of the Commission to represent itself in court will take away from the Attorney General the right to prevent the Commission from harassing the business community by unnecessary and unwarranted litigation and the issuance of subpenas for records. The short answer to that objection is that Congress has established the Federal Trade Commission as an independent regulatory agency to investigate and enforce the laws under its jurisdiction, and that the Attorney General is interfering with the Commission's legitimate activities. Congress never intended that the Attorney General would supervise the Commission and in effect veto its investigative and law enforcement activities. If the Commission should abuse its authority, corrective action should be taken by Congress, and not by the Attorney General.

Another answer to this objection is that there is no basis for a finding or assumption that the Federal Trade Commission will harass the business community. Congress expects the Commission to exercise its statutory authority in a responsible manner, and no evidence to the contrary has been offered. The charge is unsubstantiated speculation.

One of the objections to the amendment to the Federal Reporting Services Act is that the Office of Management and Budget needs the authority to control the information gathering activities of the independent regulatory agencies in order to protect the business community from unreasonable requests and unreasonable expense.

A short answer to that objection is that Congress requires regulatory agencies to act responsibly in the public interest without unduly burdening business, but Congress also expects the regulatory agencies to collect the information they need in order to carry out their statutory responsibilities. Congress did not expect the Office of Management and Budget to be an omniscient authority to decide what the agencies need. Again, any abuse of discretion by the agencies should be corrected by Congress rather than by a superexecutive in the executive branch.

I would like to address briefly the question of the relevance of sections 408 and 409 to the Alaskan pipeline measure. These provisions are in every way as relevant to a rational overall energy policy as the pipeline measure itself.

Within the past 6 to 8 months every Member of this Congress has received desperate pleas from the small independent businessman at every level of the petroleum industry. This past summer hundreds of independent gasoline marketers perished as a result of the petroleum shortage. This was a truly tragic event because the majority of these marketers up to the time of the shortage were efficient and profitable firms. And more important to all of us consumers, they were a consistent source of price competition in an industry that has a chronic tendency to behave like a cartel.

This winter hundreds of independent heating oil distributors may face the same fate. The demise of any significant number of these firms could have quite drastic consequences, since major oil companies do not have the present capability to take over their distribution functions.

In these circumstances the Alaskan pipeline bill is a welcome measure. It will, at least to some extent, alleviate the oil shortage. But it will not prevent the further cartelization of the petroleum industry. It will not prevent the shortage from being manipulated in order to drive out the independent refiners and marketers.

Of course, there are some who will say that these concerns for competition are outdated or at best irrelevant in times of drastic shortage. But this is nonsense. All that is necessary is to recall the classic objections to monopoly and monopolistic practices. They reduce output; they encourage inefficiency, and they raise prices. These, of course, are matters of even greater concern in times of extreme shortage. The shortage only makes monopoly and monopolistic practices all the more intolerable.

Competition can only be maintained by vigorous, informed, and intelligent application of the antitrust laws. And the agency which has developed the greatest expertise and shown consistent concern for competition in the energy area is the Federal Trade Commission. This was just recognized by this Congress when it appropriated a million dollars to enable the FTC to conduct a major study of the energy industry.

It is, therefore, wholly proper that, as part of our efforts to deal with the en-

ergy problem, we remove the unnecessary procedural roadblocks that hamper the FTC in acting in a quick and effective manner. And we must not only remove the roadblocks to quick adjudication of antitrust violations but also those which prevent the quick handling of the investigative tasks assigned by the Congress.

The disaster that befell the independent gasoline marketers this past spring is dramatic of why the FTC needs additional powers to enable it to act quickly. In fact, it was this event that gave a new sense of urgency to the effort to give the Commission the power to seek injunctions. As the gasoline shortage forced hundreds of independent refiners and marketers to close their doors or drastically curtail their business, the profits, prices, and market shares of the major oil companies soared.

Even the most blatant evidence that the shortage had been manipulated by the majors would have done the independents little good. There was simply no way that the Commission could have acted in time. The fact that the Commission can take an action that may in number of years stop the anticompetitive practices is small consolation to the man whose business is being destroyed today. For many small businessmen in the petroleum industry, it is already too late. But the lesson should not be repeated.

The FTC provision could very well be the best protection that we could assure small business people to avoid unfair competitive practices from conglomerate interests. The trend of conglomerates swallowing small businesses is by itself a long range policy that could eliminate competition in many areas and in many industries and businesses.

FTC officials have made comments on this subject.

The Federal Trade Commision has to exercise it powers as a friend of the small businessman.

ANTITRUST—GENERAL

Over the years the Federal Trade Commission has been particularly concerned with the welfare of the small businessman. Many of the Commission's specific statutory enforcement missions have as a major objective the protection and maintenance of a competitive climate in which opportunities for small businessmen to compete are preserved and fostered. The Commission has acted on behalf of the small businessman in a number of areas:

The Commission has challenged mergers which would have resulted in high industry concentration and high barriers to entry which would have made it more difficult for smaller competitors to compete in particular markets. The Commission has always been concerned that small independent businessmen being gobbled up by the large and dominant firms in a particular industry.

Similarly, in the area of industry concentration, the Commission also has been concerned lest one firm or a small number of firms become so large as to achieve a dominant share of a particular market through predatory or anticompetitive business practices, to the detriment of small independent businesses who must compete with them.

Finally, the Commission is on the lookout for predatory and anticompetitive practices which violate the specific statutes enforced by the Commission. For example, in the franchising area the Commission has acted against franchisors who coerced their franchisees—who often are small independent businessmen—to purchase unwanted products as a condition of keeping their franchise The Commission also has proceeded prices or allowances not available to their suppliers to grant them discriminatory prices or allowances not available to their smaller competitors. Such abusive actions are a violation of the Robinson-Patman Act and also of the Federal Trade Commission Act. The Robinson-Patman Act was enacted to provide equality of business opportunity for all businesses, small and large, and to protect small, independent businesses from the predatory activities of large buyers. The Supreme Court has noted:

> The Robinson-Patman Act was enacted ... to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power. *F.T.C.* v. *Henry Brock & Co.,* 363 U.S. 166.

In enforcing its statutory responsibilities the Federal Trade Commission thus has been in the forefront protecting the rights of small businessmen, and the proposed amendments will enable the Commission to do this job more effectively.

ANTITRUST—SPECIFIC EXAMPLES FROM CURRENT ACTIVITIES

We need only look at a number of current complaints filed by the Commission and several recent decisions handed down by the Commission to see that current Commission activities will have a very positive impact as far as the small businessman is concerned.

PETROLEUM INDUSTRY CASE

Perhaps the most significant complaint recently filed by the Commission is against eight major integrated oil companies, Exxon Corp., et al., docket 8934. The Commission's complaint charges that the respondent companies have combined to monopolize refining and have maintained monopoly power over refining.

This case is of tremendous significance to gasoline station operators who often are independent small businessmen. The complaint alleges for example that the eight companies have followed a common course of action in refusing to sell gasoline to independent marketers. One alleged effect is that the gasoline shortage has fallen with particular severity where independent refiners and marketers are primarily located. As a result many small independent marketers have been forced to close retail outlets and significantly curtail operations.

If the Commission's case is successful one expected effect is that entry barriers will be lowered and it will be easier for small independent marketers to compete with the large integrated oil companies.

TBA CASES

Another Commission action designed to benefit gasoline station operators is its case against Phillips Petroleum. The Commission's complaint in this matter

alleges that Phillips' lease agreements with its dealers allow Phillips to arbitrarily cancel dealers on 10 days written notice. This cancellation provision enables the company to coerce its dealers to purchase Phillips' tires, batteries, and accessories—TBA—and to require stated minimum gasoline purchases. As a result, the complaint alleges that Phillips' dealers are coerced into contracts depriving them of control of their business operations and their choice of suppliers. If the Commission's action is successful, dealers will be protected against arbitrary cancellations and requirements that they deal exclusively in Phillips' TBA. The Phillips case is a continuation of a long series of Commission cases in the TBA area designed to protect station operators from being coerced into purchasing unwanted lines.

FRANCHISING

Also significant are the Commission's activities in the franchising area. For example, the Commission recently ruled that the Chock Full O'Nuts Corp. illegally restrained competition by requiring its franchisees to purchase various food items from Chock Full O'Nuts. The Commission's order will give the company's franchisees greater freedom in selecting their own suppliers and controlling their own purchases. The Commission also obtained a consent order involving related restrictions on franchisees in its action against the Tastee-Freez Co. These orders can be expected to have an important impact on franchisees, who usually are small businessmen.

SHOPPING CENTER CASES

Another area of Commission activity which will benefit the small businessman is the Commission's program in the shopping center area. The Commission has proceeded against anticompetitive lease provisions which give major tenants, usually large department store chains, the right to veto other tenants. The Commission has recently received many complaints from small independent businesses who were denied access to major regional shopping centers because of such restrictive lease provisions. It is the Commission's objective to eliminate such lease provisions and benefit small competitors through selective litigation and establishing important legal precedent regarding shopping centers.

XEROX

Other Commission actions if successful also may benefit the small businessman significantly. For example, one of the purposes of the Commission's suit against Xerox for alleged monopolization of the office copier market is to lower the cost of copiers. This will benefit businesses small and large as well as consumers.

RECIPROCITY CASES

The Commission's activities in the area of reciprocity also will aid small businesses to compete with large conglomerate firms which have in the past attempted to use their purchasing leverage in one market to generate sales for products sold in other markets. Small independent firms without such purchasing power were put at an unfair disadvantage. Illustrative is an order recently obtained by the Commission

against the Southland Corp., which bans reciprocal dealing in the future. The Commission's complaint in this matter alleged that the company used the purchasing leverage of its 7-Eleven stores to obtain sales for its chemical division.

### CONSUMER PROTECTION—GENERAL

Many Federal Trade Commission activities are aimed at encouraging competition by providing information in the marketplace. Whenever a large competitor, for example, the manufacturer of a major brand, attains an unfair advantage through advertising over smaller competitors, the Commission's actions to remove false and deceptive claims from that advertising, and to require comparative material information, directly aiding the small businessman.

A good example is the FTC's action in the three cases involving analgesic advertising. The complaints charge the manufacturers of Anacin, Bayer Aspirin, Bufferin, Excedrin, and Vanquish with: First, exaggerated claims of superiority; second, unfounded "mood claims"; third, misuse of scientific tests and studies; fourth, misuse of medical endorsements; and fifth, failure to disclose names of common ingredients. The FTC effort is directed at the largest companies. To the extent that FTC action alters the behavior of these large companies, smaller businessmen can more effectively function in the market.

### CONSUMER PROTECTION—SPECIFIC EXAMPLES FROM CURRENT ACTIVITIES

### PROPOSED RULE ON FRANCHISING

The enormous growth of franchising in the American economy can be attributed to the fact that many Americans still seek the opportunity to become self-employed small businessmen. According to the Department of Commerce in its report "Franchising in the Economy 1971–73," franchise sales of goods and services are expected to reach a record level of $156 billion in 1973 and will involve over 466,000 business establishments including over 80,000 franchisors and 385,000 franchisees. Retail franchising in 1973 is expected to account for about 30 percent of all retail sales in the United States.

Franchising is perceived as a way to attain self-employment by reducing the risk of failure frequently associated with starting a small business. The risk is reduced by the services and expertise provided by the franchisor.

It is important to note that franchisees or prospective franchisees are consumers who are in need of protection and assistance from public agencies such as the Federal Trade Commission. They are not sophisticated businessmen accustomed to dealing with complex contract matters or financial statements. Rather, they are small businessmen and businesswomen who will invest or have invested their savings and have incurred debt to purchase a franchise.

Prof. U. B. Ozanne and Shelby D. Hunt, of the University of Wisconsin, in their study entitled "The Economic Effects of Franchising," point out that the characteristics of the typical franchisee are persons of commendable energy but with limited financial resources. They can scarcely afford expensive legal or financial review of franchisor prospectuses

during negotiation for the purchase of a franchise. It is this group which needs some help from agencies like the Federal Trade Commission.

While franchise ventures fail for a variety of reasons, such failures all too frequently occur because the franchisee does not have sufficient facts upon which to make a sound evaluation of the franchise prior to entering into the agreement, or because he does not fully understand the terms of the franchise agreement with its investment requirements, fees, sometimes oppressive cancellation clauses, and various other restrictions. Franchisees have come to the realization that the franchise agreement can be used by the franchisor as an instrument of abuse.

In order to put the prospective small businessman in the best position to invest and thereafter to operate successfully, the proposed rule would (1) require the franchisor to provide certain vital information which a prospective franchisee should have before him in analyzing whether a particular franchise arrangement is best for him, and (2) provide additional protection to investors, such as the provisions relating to cooling off, and the prohibition of the use of waiver of rights and defense clauses after the franchise agreement has been entered into.

### BUSINESS OPPORTUNITIES PROGRAM

Sellers of business opportunities are a significant factor in encouraging the growth of small businesses in this country. Each year millions of Americans, many of whom are socially and economically disadvantaged and many of whom are possessed of such advantages, invest in opportunities to increase their earning power. The former invest in opportunities that are, by and large, virtually worthless while the latter invest in opportunities that are of some potential worth for future earnings but which may be unduly risky. High-pressure sales techniques involving misrepresentations as to earning potential and failure to disclose kinds of risk have resulted in substantial economic loss to small businessmen.

Several cases are aimed at the relatively small segment of this industry which sells virtually worthless business opportunities to low-income victims for sums ranging from $1,000 to $5,000 and ignores all laws until it is caught. Given the "fly-by-night" character of such firms and their general lack of stability, FTC's effort is targeted to secure significant relief. That relief includes affirmative disclosure of earnings, prospective restitution, and 10-day cooling-off periods. Examples of these cases are Koscot Interplanetary, Inc., et al., which is presently in litigation and Bestline, in which the staff is seeking civil penalties for violation of a final order.

In addition, the FTC has often taken enforcement action designed to protect the honest small businessman from his less ethical competitors. For example, the Commission recently moved against a number of carpet dealers which the Commission had reason to believe were using techniques such as "bait and switch" ads and deceptive pricing claims to lure customers away from honest advertisers. To do this more systematically, a comprehensive program has been initiated under which similar operations at the local and regional levels will be subject to scrutiny and action where warranted. The Commission's regional offices have been instructed to take action as soon as possible.

Finally, Mr. President, I want to assure Members of the House that I have inquired into a rumor which has concerned some Members that the Alaska pipeline matter was being investigated by the Watergate special prosecutor.

When this rumor first reached me, I wrote Assistant Attorney General Henry Peterson whether there was any truth in it. He assured me no such inquiry was underway.

I include in the RECORD my letter of inquiry to him and his reply:

OCTOBER 26, 1973.

Hon. HENRY E. PETERSEN,
*Assistant Attorney General,*
*U.S. Department of Justice,*
*Washington, D.C.*

DEAR MR. PETERSEN: This is an inquiry whether the Justice Department knows of or is investigating reports of any impropriety connected with the proposed Alaskan pipeline. As you know, the Alaska pipeline bill has passed both the House and the Senate and has been in conference for several weeks. The conference concluded their meetings last week and we are preparing the report of the members.

I have had inquiries from reporters whether the special prosecutor or grand jury is looking into some matter in connection with the pipeline.

As Chairman of the conference I wish to be certain before we act on the report in the House that there has been no cause to believe some impropriety may have occurred in connection with the proposed pipeline or pipeline bill. If anything has been brought to the attention of the Justice Department, Special Prosecutor Archibald Cox, or members of his staff, we need to know of it.

It is possible that the Conference Report will be considered in the House next Thursday. I would appreciate a reply from you prior to that time.

Best regards.

Sincerely,

JOHN MELCHER,<br>
Chairman of the Conference Committee.

OCTOBER 26, 1973.

DEAR CONGRESSMAN MELCHER: In response to your inquiry of October 26 as to whether the Department of Justice or the Special Prosecutor's Force is investigating any alleged impropriety in connection with the proposed Alaskan pipeline, this is to advise you that there is no such investigation. Indeed, to my knowledge, there has been only one complaint which on preliminary examination of the complainant was considered to be without support.

Sincerely,

HENRY PETERSEN,<br>
Assistant Attorney General.

Mr. Speaker, I now yield 4 minutes to the distinguished gentleman from Florida, the chairman of the full committee (Mr. HALEY.)

Mr. HALEY. I thank the gentleman for yielding.

Mr. Speaker, we have come here today to determine whether you want to have a pipeline in Alaska or not.

I know there has been a good bit of misinformation about what this conference report will do, but, Mr. Speaker, the need for final action on the bill is

urgent in order that the trans-Alaskan pipeline may be constructed without further delay.

Construction has been delayed for years by litigation, and our national interest now requires a clear-cut and unequivocal policy decision taken by Congress. This bill is a decision by Congress that the trans-Alaska pipeline shall be built at the earliest possible time. That decision is binding on the Federal courts and on the executive branch. Every effort has been made to forestall further litigation designed to thwart the will of the Congress.

The conference committee met many times, and it has produced a good compromise that preserves substantially all of the House amendment, which was in the nature of a substitute for the provisions of the Senate bill. A compromise, however, involves concessions by both sides, and the final product truly represents a melding of the Senate and House provisions.

The guidelines governing the grant of oil and gas pipeline rights-of-way across Federal lands spell out in statutory form policies that formerly were left to administrative determination.

The mandatory directions with respect to the trans-Alaska pipeline makes the congressional policy clear beyond any reasonable doubt.

Some of the provisions of the Senate bill that are not directly related to oil and gas pipeline rights-of-way were accepted by the conferees, with modifications, after careful examination of their merit. The most controversial of those provisions relate to the right of the Federal Trade Commission to represent itself in court—now, what is wrong with that, allowing an agency of the Government after it asks the Justice Department to take proper measures to get into court, if they do not do it, why should not that agency be able to go directly to the courts?

Plus the right of all independent regulatory agencies to collect facts they need without prior approval of the Office of Management and Budget. While these subjects could have been left for treatment in separate legislation, they were a part of the Senate bill as it came to the House, and they are a part of a carefully tailored compromise package. In my opinion, that package should be accepted. A rejection of any part of the conference report will reject the entire report, and the urgently needed pipeline legislation will be imperiled.

Mr. Speaker, I urge that the conference report be approved.

Mr. SIKES. Mr. Speaker, will the gentleman from Florida yield?

Mr. HALEY. I yield to the gentleman from Florida.

Mr. SIKES. Mr. Speaker, as my distinguished friend, the gentleman from Florida (Mr. HALEY) knows, I have a great confidence in his recommendations. I know that the gentleman has studied this matter very carefully, but I believe that a number of us in the House have had a considerable number of communications from our constituents in our respective States and districts who are quite concerned about the possibility of additional Federal regulations, particularly over small businesses in our areas.

Would the gentleman from Florida tell us how much additional Federal regulations would be possible for the average business under this measure as agreed upon by the conferee?

Mr. HALEY. Mr. Speaker, may I say to my distinguished colleague, the gentleman from Florida, Mr. SIKES, that in my humble opinion there will be no great impact on small business. A great deal of thought has gone into this piece of legislation. I believe the gentleman from Florida knows who is in the situation here of trying to defeat this legislation, because this may cost them some money. The American people are entitled to know, and they should be protected, and agencies of the Federal Government should have the right to go into the courts and correct these things if necessary.

The SPEAKER. The time of the gentleman has expired.

Mr. MELCHER. Mr. Speaker, I yield 1 additional minute to the gentleman from Florida (Mr. HALEY), the chairman of the full committee.

Mr. SIKES. Mr. Speaker, would the gentleman yield further on that point?

Mr. HALEY. I yield to the gentleman from Florida.

Mr. SIKES. If I understand the answer given by the gentleman from Florida correctly, he feels there would be additional regulatory effect only on a very few major business concerns which are directly involved in the program; is that correct?

Mr. HALEY. That is correct. They have that right now. The only thing that this is going to take away from is if the Department of Justice does not move in a reasonable time, that agency can go into the courts and assert its rights and bring forth the facts.

Mr. MARTIN of Nebraska. Mr. Speaker, will the gentleman yield?

Mr. HALEY. I yield to the gentleman from Nebraska.

Mr. MARTIN of Nebraska. I thank the gentleman for yielding.

I am afraid the gentleman is a little bit mixed up here in his answer to the gentleman. He talks about the FTC Amendment, and I believe the gentleman from Florida was addressing himself to the amendment in regard to reporting businesses which would be affected.

Mr. Speaker, every business in the United States, from the pop and mom store up to A.T. & T. and all other corporations would be affected. I am sorry to differ with the gentleman, but that is the actual fact with regard to this amendment. It would affect small business and every business in the United States.

The SPEAKER. The time of the gentleman has expired.

Mr. STEIGER of Arizona. Mr. Speaker, I yield myself 5 minutes.

Mr. Speaker, I ask unanimous consent that the remarks of Mr. CRAIG HOSMER, ranking member-designate of the Committee on Interior, in support of the pending motion to recommit be inserted at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Arizona?

There was no objection.

Mr. HOSMER. Mr. Speaker, I want to speak in general support of the conference report authorizing construction of the trans-Alaskan pipeline and updating our laws dealing with rights-of-way for oil and gas pipelines across Federal lands. But as much as I support the pipeline, I am unable to support it today as it has been intermixed with matter which, under these rules, would be nongermane.

I support a motion to recommit the conference report with instructions to delete the provisions extraneous to the pipeline issue. In doing so I trust and hope the other body will respond to these instructions and permit the Nation to get on with this sorely needed project promptly.

This country is in desperate need of the petroleum resources lying under Alaska's North Slope. The construction of this pipeline would provide no immediate relief for our substantial short-term energy crises. But it is a step in the right direction. It is tragic to think that, but for a small group of short-sighted people who doggedly roadblocked the pipeline, our country could already be using these much needed oil reserves. Had construction of the pipeline started in 1969 we would not now be thinking of closing schools, living in cold homes, and of unemployment resulting from lack of fuel for our factories.

The potential flow of oil from Alaska is upward of 2 million barrels per day. What does this mean in terms of the current Middle Eastern oil cutoff? In 1972, this country was importing slightly over 4 percent or 700,000 barrels per day of our domestic consumption from the Arab world. By country, this breaks down as follows:

| | Barrels per day |
|---|---|
| Saudi Arabia | 189,600 |
| Iran | 141,800 |
| Libya | 122,600 |
| Algeria | 92,500 |
| United Arab Emirates | 73,400 |
| Kuwait | 44,800 |
| Bahrain | 14,800 |
| Egypt | 8,400 |
| Other Arab | 12,000 |
| Total | 699,900 |

The figures for 1973 show that our imports from the Middle East and North Africa moved up to more than 8 percent of domestic consumption. While there is no breakdown immediately available, the U.S. Bureau of Mines estimates, for the first half of calendar year 1973, that we were filling our oil supply needs as follows:

| | Percent |
|---|---|
| Domestic sources | 74.3 |
| Canada | 8.9 |
| Middle East and North Africa | 8.1 |
| Caribbean | 2.1 |
| Rest of the world | 5.9 |
| Total | 100.0 |

There has been no need to subject this country to the oil blackmail of the Arab world. The importance of the North Slope oil seems rather elementary.

Despite the facts of this simple arithmetic there are those xenophobic few who will continue to fight construction of the trans-Alaskan oil pipeline by fair means and foul. I can understand the logic of those who want to build a pipeline to bring oil to the Midwest, but such a pipeline is further down the road. The conference has authorized and requested the President to proceed with negotiations with Canada on this matter. Further, the Secretary of the Interior is authorized and directed to determine the feasibility of a line through Canada.

What I cannot understand is the faulty logic of those who would relish the thought of winning the battle to leave the oil under the North Slope. To preserve the 7,680 acres that would be occupied by the pipeline seems an inordinate price to pay for fuel rationing, cold homes, cold schools, and blackmail by the Arab world.

I am certain we can be assured of added litigation to try to delay further the building of this much needed pipeline. We can also be assured of continual harassment as construction proceeds. We can only hope the intent of the Congress is clear in that we will direct this pipeline to be constructed and completed without further action under the National Environmental Policy Act of 1969. In the event the intent is not clear the conference report has spelled out the way such litigation is to be handled. There is incorporated a modified version of the House-passed language expediting the litigation to the Supreme Court.

If this pipeline can be started next spring, and we, as a nation, undertake reasonable energy conservation measures we can effectively weather the current fuel shortages. But this petroleum problem is only one aspect of the much broader problem we are facing in our energy policy. Perhaps this slow first step on the trans-Alaskan oil pipeline will cause us to take the subsequent steps needed to effectively use atomic energy powerplants, oil shales, deepwater ports, and our large coal reserves. The great hue and cry to preserve the environment has helped bring us to the point where we cannot travel to enjoy what we preserve, where soon we will have to close businesses and factories for lack of fuel, where we cannot adequately heat or light our homes and schools, where we have allowed those to whom we have given aid and made wealthy bring this great Nation to the brink of major crisis.

Finally, Mr. Speaker, I want to tell the House my specific differences with the report of the conference. The House has never adequately considered such matters as confirmation of the Director of the Energy Policy Office (sec. 404), it has not considered it at all, the same is true as to confirmation of the head of the Mining Enforcement and Safety Administration (sec. 405), the expansion of the authority of the Federal Trade Commission (sec. 408) or the authority it is proposed to transfer from OMB to GAO over collection of information sought by the independent Federal regulatory agencies (sec. 409). A conference report dealing with oil and gas pipeline is no place to try to enact such sweeping legislation. The provisions relating to the Federal Trade Commission and the reporting services for business information were amendments adopted on the floor of the other body and pertain to the economic, security, and welfare of the people of this great Nation. Propositions of this magnitude, which take the form of floor amendments, without full considerate and deliberate attention cannot be allowed.

If the House allows this urgently needed pipeline to be held hostage by the other body, we are, in effect, allowing the House to be blackmailed and this pipeline to be held hostage. This House passed a bill dealing with oil and gas pipeline rights-of-way and authorizing the immediate construction of an Alaskan pipeline. If we pass this conference report as it stands we will accede to this blackmail and will truly become a second-class body.

Mr. Speaker, I recall these words spoken by the great Winston Churchill:

If you will not fight for the right when you can easily win without bloodshed, you may have to fight when there is no hope of victory because it is better to perish than to live as slaves.

In this case victory is no easy matter, but it is a necessary matter unless we intend again and again to submit to the will and the whims of the other body like slaves.

Perhaps the problems caused by these amendments from the other body will cause us to pass our own bills and send them over so we will not be asked to accept a lot of nongermane language from the conference. That is a stupid and unnecessary procedure. We must stand now for our rights.

I will support strongly passage of an Alaskan pipeline bill and amendments to our outdated rights-of-way laws across Federal lands. I just as strongly urge you to support the recommital motion instructing the conferees to delete the objectionable provisions.

Mr. STEIGER of Arizona. Mr. Speaker, there are, as with every issue that confronts us, particular ones that generate interest. There are several things at stake here that go beyond the phrasing of the language. Basically, Mr. Speaker, the reason we are confronted with this division within the House at this point is a very simple one. The Senate, in their haste to pass the pipeline bill, adopted some language which dramatically revised the Federal Trade Commission and its activities and dramatically revised the method of requiring small business, all business, to make reports to that Government agency. The Senate did so without any hearings, without any knowledge of what the language did, the importance of the language, and they did it because they knew that the pipeline was a critical piece of legislation that this Nation must have.

It is a simple case of the Senate sticking this language in here.

Mr. Speaker, the language that I will propose in the motion to recommit is very specific. It will not cause any delay in the process of the passage of the pipeline beyond that which has already been created, and it will assert once and for all the legislative sounding that I think everybody in this House wants. There have been no hearings in this body or the other body on the import of this language. This language is totally far reaching. It affects all business; it makes a totally autonomous agency under the Federal Trade Commission, an agency with no precedent, I might add.

Above all, I think the most important thing is that it was done with a certain knowledge that because of our concern over the energy crisis, we probably would not be concerned with what appeared to be innocuous language. I will tell the House exactly what happened. I will tell the House the business community was very late in being aroused over the problem. That is why we have been bombarded by the business community.

I will tell the chairman that they were late, but the language was inappropriate. It could not stand by itself. It will go down in defeat in an up or down vote in this House.

What I am going to ask the House to do is confirm language which would restore the FTC to its present status and restore the reported practice, with slight modification, to its present status. This is not a matter of parochial pride or House pride versus Senate pride. This is a very basic issue. Should the House accept a totally inappropriate amendment to a bill simply because that bill is desperately needed at this time of an energy crisis? The answer is, I will tell the Members, a resounding no.

By adopting this language which I propose to offer in the motion to recommit, then the Senate will know we are locked into this position. They want the pipeline bill as much as we do. Then we can proceed in an orderly fashion.

Mr. Speaker, I urge the Members to support the pending motion to recommit.

Mr. LATTA. Mr. Speaker, will the gentleman yield?

Mr. STEIGER of Arizona. I yield to the gentleman from Ohio.

Mr. LATTA. I thank the gentleman for yielding.

Mr. Speaker, I think that the action taken by the majority of the conferees on this conference report is reprehensible. It is high time that this House takes steps to make certain that the rules of this House are not circumvented as they were in this case.

We have a serious parliamentary situation here and it needs correcting. The rules of the House were previously amended with the membership believing they would have an opportunity to vote on these nongermane Senate amendments brought back to the House by our conferees. To preclude the House from passing on these nongermane amendments, the conferees have substituted the Senate bill for the House-passed bill. At the present time, I am serving on a subcommittee of the Rules Committee which is delving into these devious methods of circumventing the rules of this House. Hopefully, we will report rules changes which will end these practices.

In the instant case, the House of Representatives passed this needed Alaskan pipeline legislation before we went on recess in August. I must ask the House now: Where has this legislation been all this time? Did my Democratic friends

who were in the majority in this conference committee not know how important this bill was to the welfare of the country and that an energy crisis was fast approaching?

I think the American people will be asking this question. Why was this legislation not immediately agreed to by the conferees and returned to the House? It should have been so reported. Everyone knows this but do they know how the legislation was being held captive in order for some to insert antibusiness, anticonsumer amendments for reasons known only to the sponsors?

At the present time, American business spends too much of its time—and cost—in completing all too many duplicate reports requested by the Federal Government. This duplication costs money and the consumer must and is paying for it when he or she purchases an American-made product. Let us give the consumer a break and return this conference report to committee with instructions to delete these costly, nongermane amendments.

Mr. STEIGER of Arizona. I thank my friend, the gentleman from Ohio.

Mr. Speaker, I would like to explain to the House the rather unique position I find myself in, because the gentleman from Ohio has raised it. I am a signer of the conference report and I want to tell the House exactly why I signed it and why I now will offer a motion to recommit. We simply did not have the votes in the conference to take the offending language out. I thought the only remedy was to offer the motion to recommit to this whole House. I thought it was not fair to the Nation or to the House simply to arbitrarily hold up passage of the pipeline bill which I think is essential.

Mr. Speaker, I yield 3 minutes to the distinguished gentleman from Nebraska, the ranking minority member of the Rules Committee (Mr. MARTIN).

Mr. MARTIN of Nebraska. Mr. Speaker, I thank the gentleman for yielding.

Mr. Speaker, this body has been subjected for many years to amendments that are not germane to legislation under consideration, amendments which have been adopted by the other body. In 1970 in our Reorganization Act we attempted to correct this matter. We adopted a rule in the House that any nongermane amendment adopted by the other body and coming back in a conference report would require a separate vote on the floor of the House. Due to the parliamentary situation today, however, we are not allowed a separate vote on these nongermane amendments. That violates the spirit of the rules of the House. Unless the rules of the House are adhered to, the Congress, as an institution, is in its declining days.

Let me point out two of the major amendments. One is in regard to the FTC which provides that every time the Department of Justice does not act within 10 days on FTC cases, they automatically go over to the FTC for action.

The second amendment is an extremely important amendment to every businessman. I want the Members to mark this. It applies to every businessman—not only the large corporations in the country but it will apply from the mom-

and-pop stores on up, because it amends a 1942 act, Mr. Speaker, and takes away from the OMB the power to review and approve requests from the agencies to send questionnaires out to all business. It transfers the power from the OMB to GAO but it omits from the present law the requirement that the OMB has to approve before the department or agency is to send the questionnaire out. So it means every agency of the Government and every department of the Government, at will, can request information from business without the approval of anyone. Under the present law approval is required of OMB.

In the recommittal motion I understand the conferees will be instructed to omit these two sections from the bill. Approval of the recommittal motion will not delay construction of the Alaskan pipeline. The recommittal motion will simply instruct the House conferees to not accept these two nongermane amendments. The conference can resume immediately and approve the bill without these two amendments in a matter of minutes. If delay occurs, it would rest solely on the chairman of the Interior Committee of the body, as well as the chief conferee of the House. I hope the recommittal motion is adopted.

Mr. MELCHER. Mr. Speaker, I yield myself 30 seconds.

The gentleman from Ohio and the gentleman from Nebraska who have just spoken are members of the Rules Committee which gave to the House the rule that brought the pipeline bill to the floor, so they were authors of the rule that made it in order to substitute the House language for the Senate-passed bill. I find nothing wrong with that procedure. It has been used by the same Rules Committee with these two gentlemen concurring for years. I find that their protesting now on nongermane amendments does not apply since this is the language that was in the Senate bill and all of the Senate passed bill became germane under the rules of the House.

Mr. Speaker, I yield 3 minutes to the gentleman from Indiana (Mr. MADDEN).

(Mr. MADDEN asked and was given permission to revise and extend his remarks, and include extraneous matter.)

Mr. MADDEN. Mr. Speaker, on August 2, about 3 months ago, the Congress defeated a crippling amendment to the Alaska pipeline bill by a vote of 221 to 198. The same day, the Congress voted final passage of the Alaska pipeline legislation by a substantial margin.

Our Nation is suffering the most critical energy crisis in its history. We have heard the President, on television last week, lay down stringent regulations to cope with the fuel scarcity for this coming winter. We may have to ration gasoline within the next few months.

Through the well-organized lobby of special interests which have no regard for the convenience and comfort of about 200 million Americans, these special interest groups are conducting a telephone, telegraph, and mail lobby on the Members of Congress to sidetrack the Alaska pipeline legislation, with the hope that eventually billions will be spent by our Government constructing a pipeline down through the central part of Canada

and give Canada, and eventually Great Britain, something to say about the multibillions of barrels of oil in our own domain up in Alaska.

This pipeline should be constructed so that the world's great deposit of oil is under complete control of the United States. It is estimated that the U.S. energy needs will be increased almost 75 percent now and the next 15 years. The increase since 1962 for petroleum products alone has been 55 percent. It is also estimated that by the year 2000 the total energy needs will have increased 166 percent over 1972.

It is now necessary that we act immediately to take advantage of this mammoth discovery of petroleum in Alaska, and it will provide great relief for the United States within the next couple of years after this American-controlled Alaska pipeline is completed.

John W. Scott, prominent attorney of Washington, D.C., and former Assistant Attorney General of the United States, wrote me the following letter, dated September 6, 1973, which I hereby submit with my remarks.

WASHINGTON, D.C.,
*September 6, 1973.*

Hon. RAY J. MADDEN,
*House of Representatives,*
*Rayburn Building,*
*Washington, D.C.*

DEAR RAY: May I suggest that the public interest urgently requires that the legislation relating to the proposed Alaskan Pipeline contain language which will assure the American people that the fuel so urgently needed in the United States will not be diverted elsewhere. In this regard, I believe the following language would accomplish this result:

"No petroleum, natural gas, liquid hydrocarbons or petroleum products or commodities of any kind transported by or moved through any pipeline constructed, owned or operated by any person, firm or corporation pursuant to the provisions of this Act shall be pledged, bartered, traded, sold, or otherwise disposed of, or made available to anyone for use other than within the States of Alaska, Hawaii, and the continental limits of the United States. It is the express legislative intention that the reserves of petroleum, natural gas and liquid hydrocarbons transported through any pipeline constructed pursuant to this Act shall be utilized solely within said States of Hawaii, Alaska and/or the Continental United States."

Trusting that you had a pleasant visit back in Indiana, I am with kind personal regards

Cordially,
JOHN W. SCOTT,
*Attorney at Law.*

I am also enclosing with my remarks a letter dated August 1, in the form of a statement by the AFL–CIO executive council on the Alaska pipeline:

STATEMENT—AFL–CIO

The Senate is to be commended for passage of S. 1081, introduced by Senator Henry M. Jackson, to clear the way for prompt construction of the Alaska pipeline and early development of one of our largest domestic reserves of petroleum—Alaska's North Slopes. The Jackson bill, as amended by Senators Gravel and Stevens, would hasten construction of the pipeline by obviating the necessity of further judicial review.

The Interior and Insular Affairs Committee of the U.S. House of Representatives has reported out favorably a bill (H.R. 9130) by Congressman John Melcher of Montana, which is similar to the Senate-approved

measure. We urge the House to pass this bill this week.

It is imperative in the interests of the American economy, national security and America's balance of trade that this nation develop this domestic reserve of oil to reduce dependence on petroleum imports.

The AFL-CIO strongly supports construction of the trans-Alaska pipeline because it is the fastest, most economically feasible and most secure method of transporting oil from the North Slope fields to the rest of the United States.

This Congressional action is necessary to legalize many other oil and gas pipelines in all regions of the country which, as a result of a recent court decision, are technically illegal. Unless legal remedy is promptly provided, the pipelines could be enjoined and the energy crisis worsened.

H.R. 9130 would permit early start of work on the Alaska pipeline by solving the right-of-way problem while providing strict environmental safeguards and stringent liability requirements if damage should result from the pipeline authorization.

H.R. 9130 also deals with the problem of judicial review in provisions similar to the Senate version. Other provisions of the bill would insure that the Alaskan oil be used in America's domestic markets and would authorize a feasibility study of a second pipeline across Canada while construction proceeds on the Alaska line.

We urge passage of H.R. 9130 by the House so that American workers can get about the job of building the pipeline and related plant construction and U.S. shipyards can speed building of the 33 new U.S. flag tankers which would be manned by American seamen in the carriage of this oil which is so badly needed to relieve the nation's energy crisis.

Mr. Speaker, now is the time to pass this House-Senate conference report authorizing the Alaska pipeline, so that our Nation can immediately start releasing 206 million people from being blackmailed by the Middle East and provide sufficient energy fuel for generations to come. I have received hundreds of letters from my congressional district, 90 percent of which are urging that the United States have complete control over this Alaska pipeline investment and enact a bill as reported by the conference committee. Secretary of Interior Morton, at 100 percent for passing the Alaska pipeline bill as reported by the conference committee.

Mr. MELCHER. Mr. Speaker, I yield 1 minute to the gentlewoman from Missouri (Mrs. SULLIVAN).

Mrs. SULLIVAN. Mr. Speaker, as chairman of the House Committee on Merchant Marine and Fisheries, I have a particular interest in section 204(c) of S. 1081, the trans-Alaska pipeline bill. This section establishes a structure of strict liability upon any vessel from which there occurs a spill of petroleum while engaged in the carriage of products from the Alaskan pipeline to the lower 48 States. I wish to commend the conferees for their foresight in addressing themselves to this problem, and I wish to compliment the chairman of the conference and the floor manager, Congressman MELCHER, for the inclusion of an insurable limitation of vessel liability, and for the inclusion in the conference report, on page 29, of language which expresses the hope that the appropriate committees of the House and Senate which will be considering the more general subject of

marine liability will harmonize the liability provisions of section 204(c) with the liability provisions of any general legislation that may be developed.

Mr. Speaker, I wish to assure the House that our committee, at the appropriate time, will address itself to the problem as contemplated by the conference report to bring into harmony implementing legislation of any international conferences on pollution liability, together with existing Federal law in this area and the liability section of the bill before us today.

In the past several months, our committee and the Interior Committee have had many areas of mutual concern and we have worked these problems out in a very satisfactory manner. This is just one more example of committee cooperation. I want to thank Mr. MELCHER and the conferees for recognizing the legitimate areas of jurisdictional consideration of other committees and I again compliment Mr. MELCHER and the conferees on a job well done on a very difficult and controversial, yet necessary and critical piece of legislation.

Mr. MELCHER. Mr. Speaker, I yield 2 minutes to the gentleman from Wyoming (Mr. RONCALIO).

Mr. RONCALIO of Wyoming. Mr. Speaker, I find many things about the conference report which I do not like but I am going to vote for it anyway, and I ask others who have some similar feeling to vote for this also.

Mr. Speaker, I resent—I deeply resent the fact that at 10 o'clock today we did not even know what the language was to be of this recommittal. I got home to Wyoming about a month ago, and I recognized from the managers of the conference that the head of the OMB had injected himself into this matter and had asked that there be changes made in this legislation.

I announced in Wyoming and asked that Mr. Ash of OMB please not inject himself in legislative proceedings and let us pass this bill and get a pipeline built. I deeply resent the fact that he would not allow the Federal Trade Commission to continue its objective search for truth, which is to ferret out price fixing and other illegal practices, that might be engaged in by the major oil companies who will use this line.

Mr. Speaker, the people do not believe us any more. They do not believe the President. They do not believe the spokesmen for the oil companies, and they do not believe Mr. Ash, either. They want someone whom they do believe in, with guts, to tell the truth and pursue the facts today as to what is going on in Alaska.

Why can we not build a pipeline and allow the Federal Trade Commission to do its investigative job? I resent the Office of Management and Budget sticking its nose into my business, and if this conference report is returned, I will vote against the Alaska pipeline in objection to what Mr. Ash has done to our prerogatives.

Mr. STEIGER of Arizona. Mr. Speaker, I yield 1 minute to the gentleman from Nebraska (Mr. MARTIN).

Mr. MARTIN of Nebraska. Mr. Speaker, in response to the chairman of the

Rules Committee, I would just like to correct a statement he made a few moments ago.

In introduced a resolution which would have provided the House with an opportunity to vote on four nongermane amendments in this bill two of which concern the Federal Trade Commission and the reporting amendments.

The gentleman refused to allow a vote in the Rules Committee because one Member was absent, and he advised the Committee on Rules that we would not have a vote because one member was out of town and could not be there, and requested that he be protected on the rollcall.

I talked to the absent gentleman this morning, and he told me he did not know anything about the matter of being protected on the vote. We had a similar situation the following day in the Rules Committee, but I will not go into the details of what happened after that.

Mr. Speaker, again I want to urge the Members of the House to vote for the recommittent to remove the FTC sections from this bill, which properly belong to the Committee on Interstate and Foreign Commerce; and the reporting section, which belongs to the Committee on Government Operations.

Mr. MELCHER. Mr. Speaker, I yield 1 minute to the gentleman from Indiana (Mr. MADDEN).

Mr. MADDEN. Mr. Speaker, this conference report was before the Rules Committee by a motion of Congressman MARTIN demanding a rule for a separate bill was brought up on a motion by Mr. MELCHER, and it was votes on two Senate additions and was tabled by a voice vote of 8 to 6 and sent back for the conference report to be voted approval on the floor of the House.

The gentleman must be mixed up with some other bill, I might say to my good friend from Nebraska.

Mr. MARTIN of Nebraska. Mr. Speaker, I demand time, because that is a complete misstatement of the facts. There was not any vote taken in the Rules Committee on my resolution.

Mr. Speaker, I include below a transcript of the Rules Committee meeting last Tuesday, November 6 when my resolution concerning separate vote on nongermane amendments to the Alaskan pipeline bill was discussed in the Rules Committee. You will note that there was no vote taken on my resolution:

TRANSCRIPT OF RULES COMMITTEE HEARING, NOVEMBER 6, 1973

Mr. YOUNG. Now let's take up something confusing.

The CHAIRMAN. Wait a minute. As far as this pipeline is concerned, like I stated before, Mr. Murphy's father is ill and he requested that we not take the matter up while he is absent. He will be back here the rest of this week, maybe. His father has had a heart attack and he is in serious condition.

Mr. Martin?

Mr. MARTIN. It seems strange to me, we have had half a dozen votes here this afternoon and there was no request on the gentleman's part from Illinois to be protected on these other votes.

It seems to me rather odd that this should be brought up at this time in view particularly of this conference report that has been

brought up and can be called up at the floor at any time.

This matter of postponing it until next week means we will not be able to take any action on the resolution at all.

The CHAIRMAN. There is a bill down there now on the pipeline.

Mr. MARTIN. This was scheduled today. I think it should be taken up and discussed and voted on.

The CHAIRMAN. I would like to answer you on that. Mr. Murphy lives in Chicago. He is probably much interested in the fact that it is time for this country to get busy with the law that they passed here on creating a pipeline and start working on it and get some fuel down here because there will be millions of people in his area that probably will be freezing in the next few years if we don't get some fuel down here. That is why we would like to get the pipeline rolling. We have passed a bill on that.

Mr. QUILLEN. There was an election in New York and the gentleman from New York came down here to be at this meeting.

The CHAIRMAN. My gracious. I realize that.

Mr. QUILLEN. I remember when there was a death in Tennessee, nobody would protect me.

The CHAIRMAN. There will be no vote on it until Mr. Murphy releases me.

Mr. MARTIN. I move that the chairman's ruling be overruled. I make such a motion and call for a roll call vote.

Mr. DELANEY. I don't like to vote on it, but if I have to, I will.

Mr. LATTA. Roll call.

Mr. QUILLEN. I think we should have this pipeline bill. It is a national emergency situation.

The CHAIRMAN. Yes. Let me say this: Another reason why we should not vote on it, besides Mr. Murphy's situation, is this: We will read here in the morning paper, "Congressmen in general and the Rules Committee in particular, have been vigorously lobbied by the divided business community," House sources said yesterday.

"The Chamber of Commerce attacked the disputed provisions as highly objectionable and argued that they could impede the bill's final passage. The Administration—here is where the rival comes—the Administration is also divided. OMB Director Roy L. Ash said he would recommend a veto of the bill if it contains the provisions strengthening the FTC and weakening OMB."

Listen to this Congressman Pepper, "The Secretary of the Interior, he is the man in charge, not Ash, the Secretary of the Interior, Rogers C. B. Morton, said last week he disagrees and would recommend that the President sign the bill" if that bill is downstairs passed.

"There has been no indication from the White House that the President would veto the bill if it contains the disputed provisions. Capitol Hill sources say President Nixon's choice for Vice President, Leader Jerry Ford, has lent his support to the Conference Committee."

That bill is downstairs waiting to be voted on.

"Jerry Ford, Minority Leader, is for it, the next Vice President is for it, and it is the contention that there should be one vote, up or down, on the entire pipeline bill. So has Speaker Carl Albert, from these sources," and so on.

What is your motion?

Mr. MARTIN. I move to overrule the chairman's ruling in regard to a vote on this resolution on H. Res. 669.

The CHAIRMAN. Roll call.

Mr. DELANEY. I ask Mr. Martin to reconsider that. It is a question of whether the ruling is up—

Mr. SISK. I move to table it, Mr. Chairman.

The CHAIRMAN. All in favor of Mr. Sisk's motion signify by saying aye; those opposed? No.

The yeas have it.

Mr. SISK. Is there any other business pending?

Mr. LONG. I move that we adjourn.

The CHAIRMAN. We will meet at 2:00 o'clock on the Budget bill.

(Whereupon, at 1 p.m., the committee recessed, to reconvene subject to the call of the chair.)

Mr. STEIGER of Arizona. Mr. Speaker, I yield such time as he may consume to the gentleman from Pennsylvania (Mr. WILLIAMS).

Mr. WILLIAMS. Mr. Speaker, I thank the gentleman for yielding to me.

Mr. Speaker, I take exception to the remarks made by the gentleman from Montana (Mr. MELCHER) to the effect that it is the fault of the Rules Committee that we have this problem before us today. Actually, he is one of the conferees that reported out this Alaskan pipeline bill with substantial nongermane amendments.

As far as my distinguished colleague, the gentleman from Indiana (Mr. MADDEN) is concerned, I want to say to him that if the Senate wants to put through legislation changing the FTC and changing business-reporting practices, let us allow them to be men and stand up and do it. Let us not resort to this subterfuge we are asked to accept here today.

Mr. Speaker, we are voting on the Alaskan pipeline bill, and there is no sense in letting the Senate hold this bill hostage. If we vote to strike these nongermane amendments, that will place the responsibility right where it belongs, on the other body. They can hold it up if they want to, and then they can take the blame from the American people.

Mr. STEIGER of Arizona. Mr. Speaker, I yield 7 minutes to the gentleman from Alaska (Mr. YOUNG).

Mr. YOUNG of Alaska. Mr. Speaker, I will say to my colleagues that we are faced today with a decision whether we are going to develop a source of oil delivered to the South 48 States in the next 3 years.

Now, I have heard comments on the floor about what the Senate did that was wrong and what the House did that was wrong, and we are casting blame on both sides. But the facts are that we need this oil.

Alaska needs a pipeline, and believe me, we all need the pipeline.

Now, some of my colleagues have said that because of these other provisions, the bill should go back to the conferees. I can assure the Members that if it does go back to the conferees, there is a good chance and a possibility that there will not be any action taken by the conference committee until possibly the middle of January.

Now, to many of us this may not seem like a long period of time. However, I have lived in the Arctic of Alaska. It is a reality that we will not proceed with the construction before March, which means a lead time of at least 3 months. We will lose a full year of construction time, which puts the oil on line 5 years from now and not 3 years from now. I do not believe this Nation can afford that, and I do not believe any of us can afford that.

Mr. Speaker, there have been many accusations made concerning what the Senate has done, and I will admit, because of an oversight, that we did accept the Senate's number and title and everything that is germane under the House rules.

The decisions will have to be made by the Members here today. Whether we are going to have Alaskan oil within 3 or 5 years, that is our decision.

I am thoroughly convinced that a recommitment motion, if it is adopted, will put us in the 5-year bracket.

Mr. Speaker, if the gentleman from Montana will answer a few questions which I would like to put at this time, I will appreciate it.

Mr. MELCHER. Mr. Speaker, I would be glad to respond, if the Gentleman will yield.

Mr. YOUNG of Alaska. Under section 28(D), is the Secretary or agency head required to conduct a hearing prior to making a finding that a right-of-way wider than 50 feet is necessary?

Mr. MELCHER. No.

Mr. YOUNG of Alaska. That section provides that the reasons for such a finding be recorded. It is my understanding that the Secretary may record his reasons in the right-of-way permit, the Bureau of Land Management public land records, an environmental impact statement, or any other public document.

Mr. MELCHER. That is correct.

Mr. YOUNG of Alaska. Is the final determination under section 28(H)(2) that a plan of construction, operation and rehabilitation submitted complies with section 28 within the sole discretion of the Secretary or other agency head?

Mr. MELCHER. Yes.

Mr. YOUNG of Alaska. Are the procedures for suspension and termination provided in section 28(O) applicable to the trans-Alaska pipeline?

Mr. MELCHER. Yes.

Mr. YOUNG of Alaska. Is my understanding correct that the common carrier requirement contained in section 28(R) is not intended to apply to the component parts of a pipeline system not directly involved in the transportation of oil or natural gas to market. For example, related facilities such as access roads, airstrips, electric lines, and fuel lines for supplying power to pumping stations, would not be subject to this requirement?

Mr. MELCHER. Yes.

Mr. YOUNG of Alaska. Is it correct that the regulations provided for in section 28(X)(1) specifying the extent to which holders of right-of-way would be liable to third parties is not meant to supersede or preempt State law with respect to third party liability but is intended only to apply to those lands, such as Federal enclaves, for which there is no applicable State law governing third party liability?

Mr. MELCHER. I would agree with your interpretation in general, but would state it a little differently. The second sentence of section 28(X)(L) applies only to geographic areas where the United States has exclusive legislative jurisdiction. Those are areas where the State laws do not apply. The law with respect to third party liability within such areas must therefore be provided by Federal

legislation. This sentence will have no application in Alaska, because there are no exclusive jurisdiction areas in Alaska.

Mr. YOUNG of Alaska. Does the general preclusion of judicial review contained in section 203(D) cover not only the issuance and the procedures followed in issuing all rights-of-way, permits, leases, and other authorizations for the trans-Alaska pipeline system, but also any terms and conditions contained therein and any further authorizations, such as notices to proceed, which would be issued in the course of construction of the pipeline.

Mr. MELCHER. Yes.

Mr. YOUNG of Alaska. Would the liability imposed by section 204(A)(5) upon the holder of the permit or right-of-way for the trans-Alaska pipeline cease when construction under the rights-of-way and permits issued to the State is completed and the holder is no longer a contractor of the State?

Mr. MELCHER. Yes.

Mr. YOUNG of Alaska. Am I correct in understanding there is nothing in this report that precludes the Secretary of the Interior from granting to the State the necessary authorizations for the construction of airstrips and roads as mentioned in the environmental impact statement—pages 27, 28, 29, volume I, and elsewhere—that are necessary and related facilities of the pipeline?

Mr. MELCHER. Yes, you are correct.

Mr. YOUNG of Alaska. Am I correct that this bill does not intend to confer exclusive jurisdiction in any areas where the State would have traditional jurisdiction? Alaska may exercise its established and traditional powers as a sovereign State and as a landlord for the State portion of the pipeline route?

Mr. MELCHER. You are generally correct, but I would phrase the situation differently. This bill confers on the Federal Government no exclusive legislative jurisdiction in terms of jurisdiction over a geographic area. Moreover, the bill does not preempt any particular subject-matter field of legislation. Alaska may exercise its concurrent legislative jurisdiction over the land covered by the pipeline right-of-way, as determined by other principles of law, to the extent it does not conflict with this bill. In case of conflict, the Federal law with respect to the Federal right-of-way will prevail.

Mr. YOUNG of Alaska. I thank my good chairman of the Subcommittee on Public Lands and compliment him on his activities not only as chairman of that subcommittee but as chairman of the conference committee.

At this time I yield to the gentleman from Pennsylvania (Mr. WILLIAMS).

Mr. WILLIAMS. I take extreme exception to your timetable. You said that if we do not pass this bill the way it is, it will not be passed until some time next year.

Mr. YOUNG of Alaska. Just a moment for a correction. I did not say next year as far as the bill is concerned. I said as far as beginning construction of the pipeline is concerned.

Mr. WILLIAMS. When you come in with nongermane amendments adopted in the Senate, even though every Member of this House is in favor of building the pipeline, do you think the Members of the other body want to go home for their Thanksgiving Day recess and for a sine die adjournment, especially those Senators running next year, when they are holding up the pipeline? I say to you the answer is, "No."

Mr. YOUNG of Alaska. I say to you that I do not know what the other body is thinking at this time, because if they had been thinking, they might not have passed this legislation in this manner.

Mr. STEIGER of Arizona. Mr. Speaker, I yield such time as he may consume to the gentleman from Illinois (Mr. COLLIER).

Mr. COLLIER. Mr. Speaker, I thank the gentleman for yielding. I have one question. Is it true that the reporting provisions provided in the Senate bill which now included in the conference report, exempts, and I repeat, exempts in its application information that is sought by the Internal Revenue Service, the Comptroller of the Currency, the Bureau of the Public Debt, the Bureau of Accounts, the Division of Foreign Funds Control of the Treasury Department, information sought from banks by Federal Bank supervisory agencies, the General Accounting Office, all divisions of the District of Columbia, and it also excludes, does it not, any information that is requested by other independent regulatory agencies? In other words, are not all of these things excluded in what is required in filing this report?

Mr. STEIGER of Arizona. Mr. Speaker, if the gentleman will yield, I will respond to the question asked by the gentleman from Illinois by telling the gentleman that section 409 deals with the information as it appears in the conference report, and removes the prerogative of making a judgment as to whether the information is necessary for whatever agency is producing it. It removes that from the Office of Management and Budget, and places it in the hands of the GAO with no exemptions the gentleman from Illinois has recited.

I will also advise the gentleman from Illinois that under the law as it is now written before the adoption of the conference report the OMB had the prerogative of rejecting agency requests for information. GAO under this new authorization does not have the right to reject any requests by any agency of any business establishments, large or small. Therein I believe lies the dramatic difference between the existing law and the proposed law in the conference report, and the one that is going to do a great deal of harm to all of our constituents.

I will tell the gentleman from Illinois, and also the gentleman from Pennsylvania, that I disagree very strongly with the gentleman from Alaska (Mr. YOUNG) as to the legislative delay that is going to be caused by the motion to recommit. I will also advise my colleagues that the Senate and House Members do not want to be responsible for their constituencies being out in the cold this winter, so that I cannot imagine a delay of over a day or two at the most, so I do not believe that we would be holding for ransom the desires of our constituents and adopt language which would not be responsible language, to say the least. I do not know where the gentleman from Illinois got the idea that there were exemptions for the agencies the gentleman has recited, but the gentleman is in error.

Mr. COLLIER. I thought the act itself specifically did so.

Mr. STEIGER of Arizona. As it is now written?

Mr. COLLIER. Yes, that it specifically exempts from its application this information.

Mr. STEIGER of Arizona. If the gentleman will yield further, I am unable to respond to the question asked by the gentleman from Illinois because I do not know what the act is, as it is now written, even though I was a party to accepting the new language which amended it. And that, I submit, is the basic defect of this bill, that those of us on the conference committee had no idea what we were amending, so therefore we could not be responsible if we had the will or the wit to act.

Mr. COLLIER. Then the gentleman is saying that all of this information which may be required by existing law from all of those agencies that I have suggested, may now be asked to be duplicated by the Federal Trade Commission under this act?

Mr. STEIGER of Arizona. I will tell the gentleman that the act is entitled, in the conference report, "Information For Independent Regulatory Agencies." Now, I read that as meaning not only the Federal Trade Commission, but also the Federal Power Commission and all the other regulatory agencies, and my answer would be yes to the gentleman's interragatory. And I will tell the gentleman that those individual businesses would not now be exempt from those questions asked by the agencies the gentleman cited.

Mr. COLLIER. All these other agencies?

Mr. STEIGER of Arizona. All these other agencies.

Mr. COLLIER. I thank the gentleman.

Mr. STEIGER of Arizona. Mr. Speaker, I yield 3 minutes to the distinguished gentleman from New York, the ranking minority members on the Committee on Government Operations (Mr. HORTON).

Mr. HORTON. Mr. Speaker, I rise in support of the motion to recommit. I should like at the same time to say that I feel very strongly about getting the trans-Alaskan pipeline completed as quickly as possible. I voted for the bill after much soul-searching when it came to the House. I feel very strongly about supporting the bill that passed the House and building the pipeline as expeditiously as possible.

But I also feel that if we adopt this conference bill without the motion to recommit, we would be passing nongermane Senate amendments, amendments which ought to have gone through the

House and been handled by the appropriate committees of the House before we voted on them.

I should like to talk just a moment about section 409, which amends the Federal Reports Act.

Section 409 of this bill would allow the regulatory agencies to collect whatever information they desired from businesses or individuals. I think this provision would be most unwise, and should be deleted from this conference bill.

This provision, another of the non-germane Senate amendments, was never considered by the House. I doubt any of the conferees of the Interior Committees have ever studied this issue, since the Federal Reports Act which is being amended is within the jurisdiction of the jurisdiction of the Government Operations Committees. I am familiar enough with the issues involved to say to my colleagues that you would be opening Pandora's box by allowing this provision to go through.

The Federal Reports Act of 1942 sets up a system whereby agencies wishing to collect information from the public are required to justify their requests to an outside agency, the Office of Management and Budget. This review was required because we found the agencies often were collecting not only duplicative, but also unnecessary information. Since this review system has been established, my committee has been called upon to amend the law on several occasions. But we have always been called upon to further limit the number of information requests made by the Federal Government.

I can say to my colleagues that I have never been told that the present system allows too few requests for information. If Members have seen problems in the reports control system, they have always been that too many requests are permitted. Business, in particular, is going bankrupt trying to respond to all the requests for information being submitted by the Federal Government. Section 409 would only increase the burden imposed on business.

I do not mind criticizing OMB when it deserves it, but the evidence just does not support the charge that OMB is using the Federal Reports Act to stifle the regulatory agencies. If Members feel this is the case, I would be the first to insist that hearings be held on OMB's stewardship of this reports control function.

If OMB is no longer adequately performing this function, we should consider fundamental changes in the system. Certainly, though, I doubt very much my committee would recommend developing two duplicative bureaucracies to perform the function of determining whether reports would be duplicative. Nor do I believe my committee would recommend that this executive function be given to the General Accounting Office, which is an arm of the Congress. Changes may be necessary in the reports control function, but not the changes made by this conference bill.

Last Wednesday, November 7, I put in the CONGRESSIONAL RECORD at page 36311, a statement on the provisions in this conference bill that I felt had to be amended or deleted. Included in that material was an explanation of needed changes in sections 404 and 405 of the conference bill.

Section 404 of the bill, as reported by the conference, would require Senate confirmation of the Director of the Energy Policy Office. Section 405 would require Senate confirmation of the head of the Mining Enforcement and Safety Administration. Whether appointments to these two offices should be subject to Senate confirmation is not the issue here, because this bill will do much more than just require Senate confirmation. Since the incumbents would not qualify for their offices once Senate confirmation of their appointments is required, they would be removed from their offices upon enactment of this bill. Moreover, if an incumbent were nominated to fill his present office, he could be removed at any time by a majority vote of the Senate. I strongly recommend that these two provisions be either deleted or amended to apply only to future appointments of these offices.

Also included in that material was a letter from the Comptroller General discussing the proposed transfer of Federal reports control for the regulatory agencies to GAO.

The Comptroller General of the General Accounting Office wrote this:

I am frankly disturbed about the provision because it would establish an executive function in the General Accounting Office. In the past the Congress has avoided placing operating responsibilities of this type in the GAO because of our responsibility for advising the Congress as to how the executive agencies carry out their responsibilities. We cannot carry out an operating function and, at the same time, provide the Congress with an evaluation of it which would be considered as objective and unbiased. I believe that is the situation we face in connection with this amendment.

Mr. WAGGONNER. Mr. Speaker, will the gentleman yield?

Mr. HORTON. I yield to the gentleman from Louisiana.

Mr. WAGGONNER. I thank the gentleman for yielding.

What the gentleman has apprised us of, has just occurred to me would be a very important point, and that is that this entire question may be unconstitutional, inasmuch as the General Accounting Office is an arm of the legislative branch of the Government. Here we have the Executive assigning the legislative branch a function in the administration of the law. Will the gentleman comment on that point?

Mr. HORTON. I certainly appreciate the gentleman's comments. I do not know whether it is constitutional or unconstitutional, but I do think it creates a problem. The appropriate committee of the House, the Committee on Government Operations, ought to have an opportunity to have witnesses come in and testify on this subject. But if we vote today on this bill without supporting the motion to recommit, we are just going to be acting, I think, haphazardly.

Now, today the administration has sent another letter, this time to the gentleman from Arizona (Mr. STEIGER), also objecting to the inclusion of the Federal reports control changes. Roy Ash said in this letter:

The President shares the great concern expressed by Members of Congress regarding the need to begin construction of an Alaskan pipeline without further delay. The painstaking work by the Congress on a bill to permit immediate pipeline construction is an example of bipartisan cooperation at its best.

It is precisely because your efforts so clearly reflect an appreciation of the urgent need for an Alaskan pipeline that we are concerned about the inclusion of provisions extraneous to the larger intent of this legislation. Moreover, I am convinced that these provisions have great potential for mischief, and as presently drawn, would alter in the most fundamental way the present regulatory process. This is a position of long-standing, and not an eleventh hour objection.

We particularly believe that the amendments contained in Sections 408 and 409 of the proposed legislation should be considered separately and at length. We pledge our support and cooperation in the process; however, such a process should not be permitted to hamper the immediate passage of the Alaskan pipeline bill.

In the spirit of compromise which has distinguished the proceedings on this legislation so far, I hope you will work out a bill without these extraneous provisions as soon as possible.

Mr. Speaker, the Federal Reports Act was intended to control the paperwork burden laid on the public by Federal agencies. The regulatory agencies want to be free to do as they wish, ask what they wish, of whom they wish, in any way they wish. If we allow them to do so, we will be creating a huge loophole in the Federal reports control system.

Mr. Speaker, I think it is fair to say that if we pass this conference bill as is, we will be pulling down the barriers to a paperwork avalanche.

I urge the Members to support the motion to recommit.

Mr. MELCHER. Mr. Speaker, I yield 3 minutes to the gentleman from Arizona (Mr. UDALL).

Mr. UDALL. Mr. Speaker, I was one of those who opposed the construction of the Alaskan pipeline without the Nation first taking a good, hard look at the Canadian alternative. I think the country made a mistake in not looking at the Canadian alternative and in not going that route.

But I am here today to say that we are going to make a grave mistake if we support the motion to recommit and if we do not send this legislation on to the Senate this afternoon and on to the White House for this signature.

I want to make just two or three points. I know a number of my friends who have been identified with the environmental movement, among whom there seems to be a feeling that maybe since they were opposed to the Alaskan pipeline, they can show it by supporting the motion to recommit and voting against the bill.

We will never get a better bill from the environmental standpoint. As the temperatures go down this winter, the pressure to cut further environmental protection standards is going to increase. We actually improved the environmental protection features of this legislation in conference. We have strict liability provisions written in now. We took out the "act of God" exemption which would have limited liability for earthquakes in a pipeline crossing the most earthquake-prone region of the world.

That great man, Mr. JOHN SAYLOR, who is no longer with us, was one of the strongest environmental supporters. He signed the conference report. In my opinion he would be here today voting against the motion to recommit.

Second, there is a lot of concern about small business. We have had telegrams saying we will make a serious mistake if we vote against the motion to recommit in terms of these new provisions. All we are doing in the bill is changing from the OMB—and I did not think there were many great admirers of the OMB here in the Congress—to the General Accounting Office, thus giving an arm of Congress the right to approve and make determinations as to the adequacy of these reporting requirements.

The gentleman from Illinois (Mr. FINDLEY) asked me about the effect of section 409 on the business community's right to comment on questionnaires and reports that may be required by the Federal Trade Commission—a right currently assured by OMB practice.

It is certainly my desire—and as far as I can tell the will of the conferees—that the GAO afford business organizations the opportunity to comment on proposed reports and questionnaires. The chairman of the FTC, Mr. Engman, recently stated in a letter to Senator JACKSON that "close coordination between OMB and GAO will be necessary," and that he sees "no reason to suspect that GAO will be less diligent in protecting the businessman than OMB has been." Moreover, he assured the Senator from Washington that the Commission is receptive to constructive suggestions for its line of business forms.

The FTC is trying to do something about too much monopoly in the oil business, is trying to meet the fears expressed in this country that the big oil businesses are using the shortage of gasoline to squeeze out the small independent retailers who have written letters to every Member of Congress asking that these provisions be retained in the bill.

Let me underline one other point. The gentleman from Alaska (Mr. YOUNG) stood in the well and asked for us to vote down the motion to recommit and send this bill off for final passage today. The point he made needs to be underlined. In Alaska we have a short construction season. If we vote this up for recommittal today, the whole conference report, which contains a great many tradeoffs, will be open. The chairman of the Senate committee has indicated there is going to be a long, long new conference while we renegotiate all these complicated tradeoffs and the balanced agreements we made in this conference report. If

we vote for recommittal we are talking about bringing this bill back here in January or February and we are talking about the probable loss of 1 year of construction. We are not talking about losing a month's time but a year's time in construction.

So if Members are for action to meet the energy crisis, they will vote down the motion to recommit and they will vote for the conference report.

I would like to elaborate on why I take the position I do. First I believe the bill to be a stronger one than the House-passed. The bill does have some problem areas, but those are generally items that I opposed at the time they were considered in the House.

From the outset I realized that we must have the Alaskan oil and that the debate should instead focus on the safest and most practical route. I opposed the Alaskan route proposal because I did not believe that the Canadian alternative was given an adequate hearing. I still believe that the trans-Alaskan route was decided for us by the oil companies and the administration. I am deeply concerned about the conduct of our State Department regarding the Canadian Government's position and I firmly believe that this matter should be thoroughly investigated.

I am, however, encouraged by several improvements in the legislation that came out of the conference. First, we wrote a strong liability provision for the Alaskan pipeline and the marine leg from Valdez to other U.S. ports. Section 204 of the report provides that the Alaskan pipeline permit holder shall be strictly liable without regard to fault for all damages that result from a pipeline related incident along the right-of-way. This includes damages to Alaskan Natives for any losses they might sustain by disruptions in their subsistence economy that are caused by the pipeline. It will apply, for example, if the pipeline disturbs a caribou migration or if an oil spill in a river ruins a salmon run. The conferees set a limit of $50 million for liability of the pipeline permit holder to any third party for any one incident.

For the marine leg, from Valdez to ports in the lower 48 States, the conferees agreed that there should be strict liability for any spills. The first $14 million for clean up and damages is to be assessed against the ship owner and the rest—up to $100 million per incident—is to be paid out of a fund which will be created by a 5 cents-per-barrel levy on all oil transported through the pipeline.

This is a landmark provision for environmental protection and one that may well mark the standard for future oil spills everywhere. It is admittedly forcing a tougher liability standard on Alaskan oil than exists for other oil, but the House has consistently maintained that the environmental risks of transporting this oil were significantly greater. The oil companies have, in turn, consistently promised that both the pipeline and sea leg were safe. We are doing no more than holding them to this promise.

Second, the House conferees agreed to accept a compromise version of the Senate proposed amendments to expand the

Federal Trade Commission's authority. The controversy over the oil shortages and the role the oil companies played in this brought to light the problems the FTC has had obtaining the information it needs to fulfill its statutory obligation and protect the public interest. Under section 408, as adopted by the conferees, the FTC will have subpena and injunctive power and will be able to initiate, prosecute, and appeal violations of the Federal trade laws. The FTC must first apply to the Attorney General who will have 10 days to act on the FTC's proposed action after which the FTC may act if the Attorney General chooses not to proceed. This is important, for the delays that occurred in investigating the practices of the oil companies during recent months severely limited the Commission's effectiveness.

The conference report also provides that Alaskan oil must be allocated equitably among the States. In short, this oil is not just to benefit the west coast, but the entire Nation.

Another provision gives the Senate authority to advise and consent in the selection of the Director of Energy Policy and the head of the Mining Enforcement and Safety Administration.

The report also:

Authorizes advance payments for Alaskan Natives out of revenues due them under the Alaskan Native Claims Settlement Act.

Exempts stripper wells producing less than 10 barrels per day from controls under the 1970 Economic Stabilization Act.

Requires implementation of Coast Guard regulations for vessel construction standards and directs the establishment of a vessel traffic control system for Valdez, Alaska.

Deletes the House buy American amendment.

Deletes the House provision prohibiting foreign labor on the pipeline.

Deletes the act of God defense to strict liability, thus insuring that the pipeline permit holder will be liable for earthquake caused damage.

Deletes the Senate bill's provision that would prevent the Secretary from requiring private power companies to wheel public power over power lines that cross Federal lands.

These provisions and deletions, in my opinion, strengthen the report. It is the product of long and deliberate discussions by the conferees under the able leadership of the conference chairman, Mr. MELCHER.

There are, however, provisions in the final bill that I do not agree with and which detract from its basic rationality.

Mr. Speaker, I find particularly disturbing the provisions in title II which attempt to override the National Environmental Policy Act of 1969. These provisions were approved by both Houses of Congress after bitter debate and thus the conferees were bound to include them in the final bill. Yet the end result is still unfortunate.

The congressional finding in section 203 that the Secretary need take no further action under NEPA is a serious mistake which casts a shadow over this act.

If we really wish to amend or limit the thrust of the National Environmental Policy Act, we should say so and do it openly.

Moreover, we are stating that NEPA has been satisfied, a finding that is properly left to the judicial branch. The fact is, Congress has never really scrutinized the Secretary's decision nor the voluminous impact statement to determine if NEPA had been satisfied. The clear issue that is still regretfully framed for decision in the courts is: Can Congress make such a determination that one of its laws has been complied with?

I understand, Mr. Speaker, our need to have the Alaskan oil as soon as possible and thus the need to prevent any further unnecessary delays. I do not favor, however, short circuiting the American judicial process and casting aside our well established system of judicial review in the process.

First, I point out that it was only 4 years ago that this Congress made the momentous policy decision that concern for the environment was to be a major consideration in all future Federal decisionmaking. Yet here we have the first real major test of our will to stand behind this historic law and we are found wanting—we are saying that the procedural and substantive safeguards that we have established in NEPA are to be brushed aside. I think we have overreacted.

Certainly the impact statement is formidable in its complexity and volume and most assuredly the possibilities of an alternative route through Canada were discussed in this statement. Yet we all know—as the House hearings discovered—that the Canadian route was not seriously considered by the administration. This, I submit, is the real reason—indeed, the necessity—of overriding NEPA. The pipeline boosters do not want a court examining the decisionmaking process and the consideration of alternatives. I have faith in the courts and in the wisdom of NEPA and I would like to have seen this Congress defend the policy decision it made in NEPA and to abide by the results in the courts.

There is much to be said for the Canadian route, not only because it does not include a sea leg through dangerous northern waters and is not within an area of high seismic activity, but because the oil would flow to the Midwest—the area that needs it most. I certainly hope that other major energy decisions we must make in the future will not be made in the same manner.

In addition to the NEPA issue, I am concerned about additional provisions of section 203 which are aimed at minimizing the possibility of judicial review.

Recognizing the constitutional problems and fearing they jeopardized the legislation, the administration urged during the conference that the total preclusion of judicial review be relaxed to include a review of due process claims and those claims alleging that the Secretary had acted outside the scope of his authority. Other than these claims—and any challenge to the constitutionality of this act, all of which must be filed in 60 days—judicial review of any decision approving the construction of the pipeline under any law is precluded. This is another dangerous precedent even if it withstands constitutional attack, for it effectively insulates from review all kinds of decisions that are yet to be made by any number of Federal officers about different aspects of the pipeline during its construction. I do not think Congress, in all its wisdom, can look ahead and make such a bold determination. Nor, do I think it is fair to make a potential litigant rush his case into court under the pressure of this unique 60-day statute of limitations.

The disruption of the normal judicial process does not, however, stop here. Section 203(d) places jurisdiction of any such claim in a single Federal district court. This provision was not in the House bill and the Senate bill contained no comparable provision. The language added in conference is ambiguous at best. It appears to narrow the choice of a forum and to preclude a suit—in the District Court for the District of Columbia, for example—if a claim is first filed elsewhere. It also would divest the District of Columbia District Court of its present jurisdiction over the case if a claim is filed elsewhere. It is no secret that corporate defendants would rather avoid the Federal bench in the District of Columbia whenever possible.

Even more objectionable is the fact that the only appeal from this Federal district court is directly to the Supreme Court, bypassing the circuit court of appeals. While the former House proposal for a three-judge court also received a good amount of well-deserved criticism, the single-judge, direct-appeal provision is almost unprecedented. It is a radical provision that the judiciary will surely criticize harshly, for it tampers with the appellate process and was done without any input by the judicial community or appropriate committees of the Congress.

Moreover, the report may not even provide for review by the Supreme Court. The language does not require review by the Supreme Court but is instead permissive. The only statute which requires direct review by the Supreme Court from a single district court does so only if that court has held that a Federal statute is unconstitutional. There is no guarantee that the Supreme Court must hear this case if the district court upholds the Congress. The Supreme Court does have the power to reach down for a case if in its discretion it chooses to do so, but this is a doubtful proposition. Thus, we have a situation where a single Federal judge may soon decide that this law is constitutional and the Supreme Court will not have to accept review. The language of section 203(d) does not, in my opinion, require they do so.

There is yet another controversial provision in section 203(d) of the bill. Language was added in conference, which was not in the House-passed bill, that prevents the Federal court that does hear a claim under this act from issuing any kind of temporary injunctive relief. My feeling is that this is an uncalled for and onerous departure from our normal judicial procedure. We are telling the Federal district court that it cannot, under any circumstances, use its inherent equitable powers to issue a temporary injunction. Again, I think we have gone too far.

These are all serious problems which detract from the rest of the bill. They are a product of the crisis atmosphere under which this legislation was considered. I for one do not believe the Alaskan timetable is justification for such a gross departure from our appellate process. It is clear that the oil will not be flowing for years and there is the very distinct possibility that antitrust litigation will further delay activities on the North Slope. The bill does not affect the antitrust laws and serious questions remain as to whether these laws have been violated.

A primary goal of this legislation—and one that took a back seat to the Alaskan right-of-way during deliberations in the House—was to amend the Mineral Leasing Act of 1920. It was this law that the court in Wilderness Society against Morton held had been violated and which in turn led to this legislation.

The act has been amended to do the following:

First. It gives the Secretary broader authority to grant rights-of-way across Federal lands. The important change is that the Secretary can grant a right-of-way wider than the previous 50-foot limit if he finds it necessary to do so for construction or environmental reasons. This change is to negate the narrow holding in the Wilderness Society decision.

Two. This act will apply to rights-of-way only for oil and gas pipelines across most Federal lands. The Secretary has broad authority to promulgate regulations concerning the issuance, duration, and termination of the permits. The environmental standards included in the original House bill are also returned.

Three. The costs of right-of-way applications will be borne by the applicant who must also provide a bond or other security where the Secretary deems it necessary.

Four. All pipelines and related facilities are to be considered common carriers and cannot discriminate as to oil and gas products carried whether produced on Federal or non-Federal land.

Five. The Secretary shall review the need for a system of right-of-way corridors which would minimize environmental damages and submit his findings to Congress.

Six. Existing right-of-way permits may be confirmed by the Secretary if they comply—to the extent practical—with this act.

Seven. The Secretary shall promulgate regulations as to liability standards for the permitholder's liability to the United States, including, in his discretion, strict liability. Liability to third parties injured by pipeline incidents will be left to State law except on Federal enclaves under the exclusive jurisdiction of the Federal Government.

Eight. It provides for reporting annually to the Congress on the administration of this title and when an application for a right-of-way is made that will exceed 24 inches.

Nine. It also directs the Secretary of Transportation to inspect all pipelines and facilities on Federal lands annually for safety purposes and to report to Con-

gress and the administration on any safety or environmental hazards.

Finally, the bill requests that negotiations with Canada be undertaken to explore the feasibility of other pipelines across Canada and the arrangements which must accompany any such agreements. The President is directed to report to Congress on the results of these deliberations.

This is an important provision and one welcomed by those of us in Congress that have felt all along that the Canadian route might well be the better alternative.

There were tradeoffs that necessarily had to be made in this legislation. Both Houses of Congress had decided that the need for oil far outweighed even any possible delays in getting it to our refineries and automobiles. The oil will be consumed and the North Slope fields some day depleted, but the Arctic wilderness will, of course, never be the same. Perhaps we are irrevocably committed by our industrial and mobile society to making these environmental sacrifices. I remain, however, optimistic that we can keep our perspective and search for alternatives that will be more in the spirit of the National Environmental Policy Act's promise that we "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."

Mr. MELCHER. Mr. Speaker, I yield 2 minutes to the chairman of the Appropriations Subcommittee on Public Works and chairman of the Permanent Select Committee on Small Business, the gentleman from Tennessee (Mr. EVINS).

Mr. EVINS of Tennessee. Mr. Speaker, I rise in support of the conference report on the Alaska pipeline bill.

As we all know, the Nation is facing a severe energy crisis which has been intensified by the cutback on oil exports.

The alternative route through Canada does not appear to be a reasonable solution to the problem since it is estimated that the use of this route would occasion a delay of 4 years, would involve construction of a pipeline twice as long as that to the coast and would also involve the payment of royalties to the Canadian Government.

There is a great and urgent need to get on with the task of developing the Alaskan oilfields and transporting the oil by the most direct and shortest route possible to the United States.

This conference report will accomplish this objective.

There has been some discussion of the so-called nongermane amendments included in this report by the Senate.

The Senate by its rule can adopt such amendments and after reviewing the amendments to this bill, I can find no solid basis for objection to the conference report at this time.

These miscellaneous provisions include an amendment to the Ports and Waterways Act of 1972 providing for vessel construction standards and establishment of a vessel traffic control system for the Port of Valdez—where the oil would be piped for water shipment to the continental United States.

This provision would provide additional protection for the environment and lessen the chances of oil spillage and pollution—I can see no objection to this provision.

Another Senate provision would require Senate confirmation of the Director of the Energy Policy Office and the Director of the Mining Enforcement and Safety Administration.

This provision which represents an attempt to restore some of the proper and appropriate powers and prerogatives of the Congress should be accepted.

Another Senate provision provides that the first sale of oil and gas from stripper wells—involving not more than 10 barrels a day—would be exempt from price restraints of the Economic Stabilization Act of 1970.

This appears to be a reasonable provision and hopefully would stimulate new oil and gas exploration and discovery.

One provision would provide for advancement payments to Natives under the Alaska Native Claims Settlement Act—this appears just and reasonable.

Another Senate amendment would strengthen the powers of the Federal Trade Commission to fight deceptive trade practices and would allow regulatory agencies to send questionnaires to business without approval of the Office of Management and Budget. Under the bill the General Accounting Office would provide advisory screening services of proposed questionnaires.

May I say that I have introduced similar legislation to strengthen the powers of the Federal Trade Commission in its efforts to curb false and deceptive trade practices. It is manifestly untrue that these provisions represent the death knell of small business in America.

I see no justification for a budget bureau having censorship control over regulatory agencies which are creatures of the Congress—the GAO can provide ample screening and coordination of questionnaires.

Therefore, I favor the major thrust of the bill, the construction of the Alaska pipeline, because of the energy crisis.

And I support the conference report with the amendments, because they are reasonable, equitable, and serve the public interest.

Mr. MELCHER. Mr. Speaker, I yield 1 minute to the gentleman from Iowa (Mr. SMITH).

Mr. SMITH of Iowa. Mr. Speaker, we have heard a great deal today about the technicalities and the rules and so forth. I think it is time we hear just as much about the plight of the small businessmen.

As a member of the Permanent Select Committee on Small Business for several years, I have been exposed to example after example of anticompetitive and predatory practices on the part of big business against small businessmen in the oil business and the dairy business and other businesses.

A provision in this bill would permit the FTC to secure injunctions on their own as necessary. By the time the FTC goes through the procedure of the cease-and-desist order and obtains a final court order to that effect, these small businessmen are sometimes long since gone and they are out of business for 2 or 3 years. If we are going to preserve small business in this country it is time for us to do something now and do it in this bill instead of waiting another 10 years for the appropriate committees to report out that legislation—which they have not reported out in the last 10 years.

The Federal Trade Commission is charged by its statute with assuring fair, free, and honest competition in the marketplace, but their ability to do so has been limited. The primary tool they have been authorized to use is the cease-and-desist order. As a practical matter, a determined and aggressive corporate giant can postpone the final date of such an order for years after the first complaint is issued. During this period millions of consumers may be misled by its false advertising and honest competing businessmen are unlikely to survive unless they are possessed of resources of extraordinary size. Mergers may be completed and the merged companies and markets so changed that the competitive situation can never be restored. Small businessmen especially are at a great disadvantage.

The situation may be equally bad for dealers and franchisees who may see their life savings wiped out before the abuse is finally stopped. All of the areas within the Commission's jurisdiction support examples of anticompetitive and anticonsumer practices whose short range results are simply not reversible by the eventual cease-and-desist order issued months or even years after the practice has ceased to be necessary.

Without injunctive powers the Federal Trade Commission frequently is left with having to impose remedies that are conspicuously inadequate. Even in instances where the anticompetitive nature of the conduct is obvious, the FTC lacks the power to provide the sort of immediate remedy needed to insure the survival of small business. Even the consent order procedure takes time. And firms determined to pursue an illegal course of action are unlikely to consent to strong remedies. The Commission may rule the conduct illegal but during this operation the patient may die. A timely example is the spring curtailment of gasoline to independent marketers by the integrated oil companies. Though that action may ultimately be ruled illegal by subsequent court proceedings, there is little hope of saving the small independent gasoline dealers who already have been forced out of business. Armed with authority to seek injunctions at the incipiency of the curtailment the Commission would have been in a position to prevent the collapse of much of the independent sector of the retail gasoline industry.

There are innumerable areas where the Commission, with the aid of these powers, could halt anticompetitive practices at an early stage, preventing significant damage to small business. Large-scale predatory pricing in geographic markets has been a time-honored means by which large, subsidized companies

eliminate effective competition from small business in a market. Dominant national producers of retail products have engaged in prolonged price wars, featuring sales below cost, extensive consumer and trade promotions, and massive advertising in order to either prevent the entry of new competitors or inhibit aggressive marketing by smaller regional and local producers. Their expensive campaigns cannot be matched by the smaller competitors, and the campaign frequently forces the smaller firm out of the market. An injunction during the initial stage of such campaigns is needed to save the smaller producers.

There are countless situations where this power would be used to benefit both the small businessman and the consumer. It is a common practice for cosmetic companies to force upon the small retail drug stores a "full line" of cosmetic items when the druggist only wants one high turnover, inexpensive cosmetic product. The coercive tying of the high-profit, inexpensive item with a "full line" of expensive, low-volume products clogs the druggist's shelf space and reduces his capacity to sell competing products of other cosmetic producers.

The local recreation equipment distributor who wishes to carry a certain brand of recreation equipment is forced to accept other parts and accessories which may be of low quality or too expensive for the distributor's purposes. A small producer may have his excellent product disparaged through the advertising of a dominant competitor with extensive national advertising which the small producer is unable to match. *L. G. Balfour Co.* v. *F.T.C.*, 442 F.2d 1 (7th Cir. 1971).

In the petroleum industry gasoline retailers are induced to carry only tires, batteries, and accessories produced by a company partially owned by a dominant oil company.

The practice in many sectors of enforcing suggested and artificial retail prices in situations where the retailer must reduce the price in order to be competitive, suggests the need for immediate action to stem the demise of the small, minimally financed retailer.

A last example is franchising, which now encompasses over 500,000 small businesses. Franchisees have been prey to many anticompetitive practices which unduly burden the small "Mom and Pop" business. For instance, it is common to require the franchisee not only to purchase the right to use the trade name, but to accept a variety of items from the franchisor which are expensive and could be purchased at a lower price from a third party.

The sophisticated means by which dominant sellers and buyers may injure small business and the consumer are almost limitless. Experience teaches that the cumbersome adjudicative processes of the Federal district court and the FTC are ill-suited to assist small business at its time of greatest peril—when larger, better financed competition seeks to destroy or hinder competition. The injunctive provisions of this bill provide a sorely needed means by which the small businessman can be aided at the incipient stage of such conduct.

The example of where this power is needed could be multiplied endlessly. The recent case of the advertiser who planned to enclose sample razor blades in the Sunday paper without adequate protection for children is typical of the protection consumers need. A cease-and-desist order against this advertiser would do nothing to aid the children injured by this thoughtless practice. False advertising campaigns usually have a "life expectancy" shorter than the proceedings necessary to order their cessation.

The very existence of the power to seek injunctions will halt many of these abuses. The inability of the Commission to do anything practical for their survival is at the heart of the failure of many small businessmen to complain or resist the predatory practices of their larger competitors and suppliers. The possibility of injunction should give serious second thoughts to those who plan a quick "killing" and withdrawal before retribution occurs.

Without this injunction power consumers have no protection at all during the pendency of the suit and competitors must have sufficient resources to survive or to finance the complex litigation necessary to assert their rights. Two recent cases, the IBM-Telex case in Texas and the ITT Continental-Homestead Baking case in Denver indicate the continuing existence of predatory practices in the American economy and the tremendous strain of such practices to even the most well heeled of competitors. In these cases the victims were sufficiently well off that they could afford the enormous legal costs necessary to assert their rights. There is no similar protection available to either consumers or less well heeled victims.

This is not to indicate that there will not be serious and careful checks upon the use of this injunctive power. The Commission itself will not be empowered to issue injunctions. It will have to go to a U.S. district court judge and establish a series of carefully delineated preconditions before the judge will be empowered to issue an injunction. Among these requirements is that the Commission must establish a probability of success before the injunction will issue. This requirement alone will prevent the power from being used in frivolous and insubstantial cases. It is only good sense that where there is a probability that the act will eventually be found illegal and the perpetrator ordered to cease, that some method be available to protect innocent third parties while the litigation winds its way through final decision.

For these reasons, I urge adoption of the conference report and defeat of the motion to recommit.

Mr. MELCHER. Mr. Speaker, I yield 2 minutes to the gentleman from California (Mr. JOHNSON), a member of the committee.

(Mr. JOHNSON of California asked and was given permission to revise and extend his remarks, and include extraneous material.)

Mr. JOHNSON of California. Mr. Speaker, we have had this legislation before the House here for a number of years. It was brought to the Committee on Interior and Insular Affairs. We have

worked on it since January this year and we are here today with the conference report that was worked out with the conferees. All conferees signed the report. Everything that is here before us today is germane under the rules of Congress.

We used the Senate bill. The Senate bill was brought to test here on the floor. We amended our House provisions into it and sent it back to them.

Now we have perfected a bill that would get the Alaskan pipeline on its way and allow for some oil to flow within a period of 5 years from Alaska into the 48 States.

I believe if we are going to recommit this today, we are going to go through the whole process all over again, because when we meet in a conference between the Senate and the House, there are certain things to compromise on.

The FTC is an agency of our Government set up for certain purposes and the Office of Management and Budget is another agency of the Government. It does not have too much in the way of jurisdiction over the matters that the Federal Trade Commission actually has under its jurisdiction.

I believe placing this under GAO is going to give us a better operation to give better protection to the small businessman throughout the United States.

I do want to place at this point, Mr. Speaker, with unanimous consent, my analysis of section 408 and section 409 in the RECORD, as well as a letter from the Federal Trade Commission in support of the provisions that are in this bill.

My analysis is as follows:

ANALYSIS—SECTION 408 OF SECTION 1081

Subsections 408(a) and (b)—These subsections are prefatory, setting out in preamble form the findings and purpose which justify the need for the specific amendments contained in Section 408.

Subsection 408(c)—This subsection would amend Section 5(1) of the Federal Trade Commission Act by increasing from $5,000 to $10,000 the civil penalty for violation of final orders of the Federal Trade Commission. The proposed increased maximum fine is in the nature of a modernization rather than a revision, made necessary by twenty-five years of inflation since the $5,000 limit was prescribed in 1938. This provision in no way affects the Commission's substantive authority.

Subsection 408(d)—This subsection is designed to eliminate the delays which are necessarily incident to the Commission's required reliance upon the Attorney General to represent the Commission in the Federal courts. It would leave undisturbed the Attorney General's present authority to represent the Commission in the courts, but would authorize the Commission to appear by its own attorneys and in its own name should the Attorney General not take the action proposed by the Commission within 10 days. Such representation would be authorized in all civil proceedings arising under the Federal Trade Commission Act and would include among other actions, petitions for injunctions pendente lite, actions to enforce subpoenas, and civil penalties for failure to furnish reports required by Commission orders entered pursuant to Section 208 of the Federal Trade Commission Act. For many years prior to 1968, when its authority to do so was put in doubt by the holding in *Federal Trade Commission* v. *Guignon*, 390 F. 2d 323 (8th Cir. 1968), the Commission enforced its own subpoenas in the Federal courts. The enactment of Section 408(d)

would restore this subpoena enforcement power to the Commission. A number of other independent agencies (including the SEC, ICC, and CPSC) are already empowered to handle most or all of their own litigation.

Subsection 408(e)—This subsection would narrow the exemption from the Commission's investigative and information gathering authority which now applies to federally regulated banks and common carriers by providing that this exemption will not preclude such investigative activities where necessary to the investigation of a corporation, group of corporations, or industry which is not, or only incidentally, engaged in banking or common carrying. This provision could have been quite useful, for example, in the Commission's recent investigation of the petroleum industry, at it would clarify the Commission's authority to compel production of data from pipeline companies, notwithstanding their common carrier status.

Subsection 408(f)—This subsection would authorize the Commission to seek temporary or permanent restraints of imminent or actual violations of the laws under its enforcement cognizance. When vigorously contested, the Commission's cease and desist order proceedings must be measured in terms of years, despite the serious public injury which can continue during their pendency. In especially aggravated cases, it is essential that the Commission have authority to prevent the aggregation of serious public harm during the period required for the Commission to complete cease and desist order proceedings and attendant appeals. Prompt judicial determination of the relative merits of the respondent's right to continue a questioned course of conduct versus the public need for an immediate injunction has the further dual advantage of assuring due process to the respondent and, if the injunction is granted, of eliminating any incentive for action by a respondent taken for purposes of delay. Enactment of this section would provide the Commission with comparable authority to that already possessed by the Attorney General in antitrust cases.

Subsection 408(q)—This is a technical amendment which brings Section 16 of the Federal Trade Commission Act into conformity with subsection 408(d).

---

Analysis—Section 409 of S. 1081

Section 409—Under this section the General Accounting Office replaces the Executive Office of the President (Office of Management and Budget) as the screening and clearinghouse authority for processing identical information gathering questionnaires directed to more than nine persons which are originated by the independent Federal regulatory agencies. Advice to such agencies concerning such questionnaires submitted to the GAO for clearance would be advisory rather than mandatory and the GAO would be required to communicate such advice within 45 days.

In amending the Federal Reports Act Section 409 is precisely tailored to eliminate undue delay and to remove control, or the appearance of control, by the Executive branch over the investigative and enforcement activities of the independent regulatory agencies without sacrificing the important goals which prompted the enactment of that Act in 1942. There will thus be no hiatus in the program to safeguard the business community from redundancy and arbitrariness in the collection of data by the Government, as the General Accounting Office will perform all of the functions of OMB which are necessary to achieve that end.

Federal Trade Commission,
*Washington, D.C., November 9, 1973.*
Hon. Harold T. Johnson,
*House of Representatives,*
*Washington, D.C.*

Dear Congressman Johnson: In your let-

ter of November 2, 1973, you asked for my views on the significance and practical impact of those provisions of S. 1081 which involve the authority of the Federal Trade Commission and the administration of the Federal Reports Act.

As I have previously stated, I believe that Section 408 of the bill, if enacted, would greatly enhance the Commission's effectiveness in discharging its Congressional mandate to prevent unfair and deceptive business practices and unfair methods of competition. The major provisions of this section would:

(1) authorize the Commission, after notifying and consulting with the Department of Justice, to represent itself in civil proceedings arising under the FTC Act, provided the Department does not take action proposed by the Commission within 10 days;

(2) authorize the Commission to go into federal court to seek temporary injunctions to prevent the continuation of particularly aggravated violations of the laws under its jurisdiction, pending the completion of the lengthy administrative proceedings and appeals which lead to a final cease-and-desist order; and

(3) increase from $5,000 to $10,000 the maximum civil penalty for violation of Commission orders—a modernization made necessary by 25 years of inflation since the $5,000 limit was enacted in 1938.

Each of these provisions is essentially a "gap-filling" measure; none would increase the Commission's substantive jurisdiction in any respect. This becomes evident when one realizes that a number of other independent agencies (including the SEC, ICC, and the CPSC) are already empowered to handle most or all of their own litigation, and that for many years prior to 1968, when its authority to do so was put in doubt by the holding in *FTC* v. *Guignon*, 390 F.2d 323 (8th Cir. 1968)), the Commission enforced its own subpoenas in the federal courts. In addition, the Commission already possesses the authority to seek preliminary injunctions under the FTC Act in cases involving the advertising of food, drugs, and cosmetics, and the Department of Justice, with whom the Commission shares responsibility for enforcing the antitrust laws, already has such authority under the Clayton and Sherman Acts. Each of these provisions has been the subject of hearings before Committees of both Houses of Congress, and each was incorporated, albeit in a more modest form, in S. 1219 and H.R. 6313, Administration proposal submitted to the 92d Congress.

In view of these facts, I consider the concern apparently being displayed by certain segments of the business community over Section 408 to be totally misplaced. While the added authority provided by this provision would undoubtedly increase the Commission's efficiency, I see no threat of any kind to the responsible businessman. To the extent that the Commission could be more effective in preserving free and open competition, this can only redound to the benefit of the entire system of free enterprise, and particularly to that of small business. It might be noted in this regard that the occasion for incorporating these provisions in the present legislation was the realization by yourself and other Members of Congress, at the time of the acute gasoline shortage last spring, that because it lacked the authority to seek preliminary injunctions the Commission would have been completely powerless to aid the small gasoline retailer, distributor, or refiner, even assuming there had been proof of the most blatant anticompetitive behavior by their major competitors.

Section 409 of the bill simply transfers from OMB to GAO the administration of the Federal Reports Act insofar as the independent regulatory agencies are concerned. While it is true that GAO would not have

the veto power over agency requests for information currently possessed by OMB, I see in this omission no cause for alarm on the part of the business community. The Federal Reports Act was enacted to protect businessmen from duplicative and unnecessarily burdensome information requests from the federal government. Since the vast majority of such requests originate from within the Executive Branch, rather than the independent agencies, OMB will continue to bear the major responsibility in this regard. With respect to the independent agencies, it seems eminently reasonable, if they are to be truly "independent," that their proposed requests for information be passed upon by an agency responsible to the Congress, instead of by OMB. Close coordination between OMB and GAO will of course be necessary, but I see no reason to suspect that GAO will be less diligent in protecting the businessman than OMB has been.

As considerable attention has apparently been focused upon a particular FTC questionnaire with regard to which we have requested OMB approval, the proposed "line of business" form for reporting corporate financial statistics, I would emphasize not only that this questionnaire would go only to the largest of the nation's corporations, but also that the Commission is most receptive to constructive suggestions for modification of the form in order to insure that the costs of compliance will not be excessive.

In conclusion, I would reiterate that the provisions in question, while designed to close several long-overlooked gaps in the Commission's law enforcement authority, in no way extend its substantive reach, nor subject to sanctions any conduct or practice not already covered by the laws under the Commission's jurisdiction. If enacted, they will mean significant benefits for the American consumer and the small businessman, and a greater return on his dollar for the individual taxpayer.

Sincerely,

Lewis A. Engman,
*Chairman.*

Mr. MELCHER. Mr. Speaker, I yield 1 minute to the gentleman from Minnesota (Mr. Frenzel).

Mr. FRENZEL. Mr. Speaker, I will vote to recommit the Alaska pipeline bill to the conference committee, and I urge my colleagues to do likewise. I would have preferred a separate vote on each nongermane amendment, but our leadership has found a way to deny us those votes. Therefore we have only the alternative of the motion to recommit.

Rarely a week ago this House faced a similar situation. A needed bill, the military authorization bill, came from conference with a nongermane Senate amendment. We yielded to the Senate, thereby flaunting our own rules and obviously encouraging the Senate to indulge in further whimsical activities.

Time after time we have been blackmailed into accepting nongermane Senate amendments to the debt ceiling bills.

Today we are asked to accept four Senate amendments, clearly nongermane, to a bill we all want passed as quickly as possible. The old Senate blackmail seems likely to triumph again.

If we vote to recommit, we can get a bill back today.

If we do not vote to recommit, we ratify, without debate or discussion, or even reading, nongermane matters pending before one of our committees which the House has not even considered. In the name of expediency we will be abdi-

*November 12, 1973*    CONGRESSIONAL RECORD — HOUSE    **36611**

cating our responsibilities to legislate responsibly. Worse, we will have conceded our authority to the Senate.

In times when we bemoan the erosion, or the pilfering of our prerogatives, how dare we vote to throw them away ourselves? How can we tell our constituents that the legislative branch is carrying out its responsibilities if we cannot even following our own rules.

In this case, I believe the unworthiness of the amendments are less important than the need to uphold the prerogatives of the House. The pipeline bill itself is essential. I support the pipeline bill strongly on a basis of need, but the Senate amendments are lacking in merit.

Sections 404 and 405, which would allow the Senate to disapprove, or fire, the incumbent directors of both the Office of Energy Policy and the Mining Enforcement and Safety Administration are unpleasant enough. I seem to remember the House going through the motions on a similar OMB bill, not too long ago. These alone could cause major problems. But sections 408 and 409 are far more objectionable. Section 408 would authorize the Federal Trade Commission to take its enforcement actions directly into the Federal courts if the Justice Department does not act within 10 days. Presently the Commission is entitled to seek a preliminary injunction for situations where a threat to individual safety is raised by dangerous flammable products or false advertising of foods, drugs, and cosmetics. This bill would grant them the right to take action, which they alone would enforce, pending the outcome of their own internal administrative proceeding. The recommit motion provides 60 days, which makes more sense.

This section also grants the FTC the authority to examine and require reports from banks and common carriers in the course of investigations which are not directed at either banks or common carriers.

Section 408 should be considered on its own merits by a committee of this House. The Senate has already passed similar provisions on to us in this FTC warranties bill. S. 356 now H.R. 7917 is in markup in the Commerce Committee. We need that committee's recommendations.

Section 409 also has nothing to do with the construction of our badly needed pipeline; 409 transfers from the Office of Management and Budget to the Government Accounting Office the authority to review questionnaires and report forms required of private industry by the independent regulatory agencies. Under the existing Federal Reports Act, the agencies coordinate with OMB.

To eliminate unnecessary reports, and to reduce the burden and cost of reporting, OMB's authority also includes the obligation to hold hearings and to solicit public reaction. In section 408 there are no provisions for holding public hearings, or rejecting conflicting or burdensome reports, or protecting confidential company data from foreign or domestic competitors. In this provision, GAO is only an advisory body. We are granting the agencies a license to run roughshod over our individual firms.

Many people seem to have the mistaken impression that this bill will only have serious effects upon our big business conglomerates. This is not so. The effect upon small business throughout the country could be drastic. In a Senate report of April 17, 1973, we note that as of December 31, 1971, there were 5,298 different types of these forms, and that various businesses were forced to allocate an estimated 130.5 million man-hours per year, not including tax forms, on Federal paper. And that it cost our small businesses an estimated $18 billion yearly to fill out these forms.

Mr. Speaker, I ask today that this body stand up today for itself. I ask that it not pretend it is a branch office of the other body. I ask it to stand up for its own rules. Senatorial courtesy may be a revered custom on the other side of this building, but it has no place in careful lawmaking. I hope this House votes to recommit. Let us prove that we are not content to be Senate doormats forever.

Mr. MELCHER. Mr. Speaker, I yield 1 minute to the gentleman from Pennsylvania (Mr. VIGORITO), a member of the committee.

Mr. VIGORITO. Mr. Speaker, I wonder if we realize how serious a problem we are facing today. We have a crisis. It is an energy crisis. It is an oil crisis, because oil provides 50 percent of our total energy needs as of today.

In 1970 we had a daily oil production of 11-million barrels.

In 1971 we had 10-million barrels daily production.

In 1972 we had 9.4-million barrels.

This year we are producing oil at the rate of 9.3-million barrels of oil. By the time we complete the Alaska pipeline, we may be down to 7-million barrels.

It is most urgent that we proceed now with the pipeline in Alaska.

Mr. MELCHER. Mr. Speaker, I yield 30 seconds to the gentleman from Michigan (Mr. DINGELL).

Mr. DINGELL. Mr. Speaker, as my colleagues will recall, I opposed the legislation when it was before the House previously. I wish to announce to this body and to my colleagues that I intend to support the conference report, and that I intend to vote against the motion to recommit the conference report.

Mr. Speaker, I rise in support of the conference report (No. 93–617, Oct. 31, 1973) on S. 1081. It is tragic that the American people must forego environmental protection and safeguards afforded by the National Environmental Policy Act of 1969 and the judicial system under the threat of an oil crises. This crises has arisen, in part, because the shieks of the Middle East are trying to bludgeon us into supporting them 100 percent in their long struggle with Israel, and in part because this Government's energy policies and planning have been dictated by the oil and minerals industry and their handmaidens in the executive branch.

I shudder to think where we would be today if Congress had not passed NEPA and dedicated public-minded citizens had not looked at the judicial branch to force the oil-industry-dominated Interior De-

partment to go slow on the approval of a pipeline across Alaska. Indeed, the safeguards and procedural requirements included in title II of the conference report would not have evolved, if it were not for NEPA and the courts.

I am not at all certain that title II of this conference report, particularly section 203, will survive a court test. But I am satisfied that Congress, at least, in rescuing the executive branch in this so-called energy crisis, has taken some giant steps to protect the public interest and our environment. Let us all hope that Interior's experts and those of the oil industry are correct that a pipeline can be built and operated safely.

Mr. Speaker, title I of the conference report is a vast improvement over earlier versions. This title, I am convinced, could not have been enacted in Congress with such haste if it were not for the fact that it is piggybacked on the Alaska pipeline title.

Section 28(a) authorizes pipeline rights-of-way across all "Federal lands," except National Park System lands, Indian trust lands, and OCS lands.

Thus, it is possible that such pipelines could cross National Wildlife Refuge System and Wilderness System lands. Section 28(b), however, requires, as to Federal reservations—which include, but are not limited to, lands of the above two systems, the National Forest System, the National Grasslands, Scenic Trails, and military reservations—a determination which quite clearly must be in writing and made available to the public that such right-of-way "would be inconsistent with the purposes of the reservation." This is helpful.

Sections 28 (f), (h), and (k) all provide for the issuance of regulations. These regulations are subject to the rule-making procedures of 5 U.S.C. 553. The regulations must be published and promulgated before any new applications are considered.

Section 28(h) (1) contains a disclaimer that section 28 does not in any way affect the requirements of NEPA. Thus, NEPA applies to section 28 pipeline right-of-way applications and actions. In addition, the environmental impact statement requirements of section 102(2) (C) of NEPA also applies to such applications and actions where they meet the criteria of that section of NEPA.

Section 28(h) (2) requires applicants "for a new project which may have a significant impact on the environment" which includes any application for a right-of-way across any Federal reservation or part thereof shall "submit a plan of construction," et cetera. It is my understanding that the public will have an opportunity to review the plan and to comment on it in writing and at the public hearings concerning, among other things, its adequacy in terms of compliance with this section.

Sections 28 (i) and (j) relate to certain disclosure and technical and financial capability requirements. It is my understanding, based on the language of the conference report, that any data obtained under these two sections must be available to the public. Fortunately,

there is no basis in the conference report for any claim by the Secretary of the Interior or the applicant that such data be kept confidential. I hope none is made.

Section 28(k) of the conference report, page 4 states:

The Secretary or agency head by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local government agencies and the public adequate notice and an opportunity to comment upon right-of-way applications filed after the date of enactment of this subsection.

In discussing this section, the conferees note that it "does not require public hearings that would duplicate the public participation procedures required by" NEPA. The "public participation procedures" reference of the conferees is somewhat confusing, since NEPA itself does not require public hearings in connection with section 102(2) (C) of NEPA. But Executive Order 11514 (March 5, 1970) which implements NEPA requires all Federal agencies to develop "procedures to insure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties." These "procedures" must include, "whenever appropriate, provision for public hearings." Thus, it is my understanding that, unless a public hearing is held pursuant to the NEPA environmental impact statement process, as supplemented by the above Executive order, in connection with a pipeline application, a public hearing on such application under section 28(k) will always be "appropriate."

At this juncture, I note that section 28(p) provides for the joint use of rights-of-way. This provision is quite timely and important, because I understand that there exists a proposal to transport-natural gas by pipeline from Prudhoe Bay in Alaska to the lower 48 States. One company is preparing even now to apply to the Federal Power Commission for authority to construct such a line through a route that would pass through a national wildlife area in Alaska. Another company wants to run the line along the trans-Alaska pipeline route. It is my understanding that Interior officials are looking at five alternative routes, but these two companies have paid scant attention to all five, let alone thoroughly evaluating each one. Section 28(p) can quite properly be the basis for Interior or the public requiring both companies and Interior and the FPC to fully evaluate each route. We do not want or need another Alaska oil-pipeline debacle from the Interior Department.

Section 28(g) directs that Interior "shall impose" safety requirements for workers in the construction of all pipelines, including the Alaska pipeline, and for the purpose of protecting the public, including the environment. This provision applies to any ratification or confirmation of any existing right-of-way under section 28(t). I expect that Interior will consult with the Departments of Transportation and Labor regarding these safety requirements and will publish them for public comment before adoption and revision thereof.

Section 28(w) (3) requires annual inspection by DOT "of all pipelines and associated facilities" on Federal lands now and in the future and the prompt reporting of potential leaks and safety problems. Those reports will, of course, be available to the public. This is an important provision, and I intend to learn from DOT and Interior what procedures will be developed to fully carry it out and when the first inspections will begin.

Mr. Speaker, I note with great pleasure the provisions of titles III and IV of the conference report. Both of these titles are of extreme importance and I applaud the conferees for including them in the final version of the bill.

I am particularly pleased to see the provision which requires confirmation of the director of the Energy Policy Office and the head of Interior's Mining Enforcement and Safety Administration. I feel certain that at these confirmation hearings the Senate will have an opportunity to delve deeply into the operations of both of these officials. The Director of the Energy Policy Office has been called the Czar of Energy Policy within the executive branch, yet I understand that he has only 21 employees to carry out this function and to deal with the many agencies of government that have energy responsibilities. It is astounding to me that this director could carry out this function effectively with only 21 people. I am therefore asking Director Love to provide to me his estimates of the number of people needed to run the office properly and at the same time provide to me a statement of the number of people delegated from other Federal agencies on a temporary basis to run the Energy Policy Office.

I am also pleased to see the various provisions of this bill relating to the Federal Trade Commission. I note that the Director of the Office of Management and Budget has threatened veto on this bill because of this FTC provision and some other features of this legislation. It is my hope that the Congress makes it clear to the administration that should the President veto this bill the congressional deep freeze for the trans-Alaska pipeline bill may be more permanent than the permafrost in Alaska. In my opinion the merits of this bill would disappear rapidly if any of the provisions of title III and IV were excised. Such a veto would be a severe blow to the public and efforts to defuse the energy crisis.

Mr. Speaker, some Members of the House who are opposed to the FTC provisions in the Alaskan oil and gas pipeline conference report suggest that this legislation will somehow turn the FTC from a small independent agency with basic Federal antitrust and consumer protection responsibilities into the scourge of the small businessman. I am unable to discern how anything in this legislation could possibly have such an effect. The bill makes no changes whatever in the substantive powers of the FTC. It does, on the other hand, allow the Commission to exercise the powers it now has in a more efficient and less bureaucratic manner. It seems wholly irresponsible to trifle with the security of the Nation over such matters.

Indeed, I believe that the opposition to this particular part of this Alaska oil and gas pipeline legislation, specifically the proposal to recommit the bill in order to kill the FTC housekeeping improvements section, is based on a fundamental misconception about what is good for the small and medium-sized businesses which form the core of the American economy.

The antitrust enforcement efforts of the Commission have been helpful in protecting the small businessman from being swallowed up by the anticompetitive practices of many industrial giants in this country. I cannot imagine any small businessman opposing the work which the Commission has done in the antitrust field.

People who purport to represent the small businessman have suggested to me that the pipeline bill would allow the regulatory agencies to avalanche small businesses with new paperwork requirements by transferring the oversight responsibility of information demands from OMB to the GAO. Would anyone seriously portray OMB as the small businessman's representative? In fact, the OMB review procedure dealing with Federal data collection efforts has been dominated by big business interests. One look at the lists of representatives attending the past OMB review meetings, and the OMB advisory committees' implementation of the Federal Reports Act, will illustrate this point. Does anyone suggest that representatives from the Nation's giant corporations represent the small businessman?

What does this bill really do to the powers of the Federal Trade Commmission? It will permit the FTC to go to court and ask for injunctions to restrain violations of the laws it enforces. I am fully confident that the U.S. courts are capable of determining when an injunction may be necessary to protect the public.

The bill would allow the FTC to go to court on its own behalf, rather than through the Justice Department. The administration opposes this change because it would reduce the Department's control over Federal litigation. Since when is the Justice Department supposed to control the enforcement litigation of the independent regulatory agencies? Or are they supposed to be independent only until one of the regulated forces an issue into the courts?

It has also been argued recently that the powers of the FTC are somehow not germane to the Nation's energy crisis. Nothing could be further from the truth. This is precisely the time when we desperately need a strong and efficient FTC to insure that the antitrust laws are enforced in order to assure that no anticompetitive practices restrict output by the energy sector of the economy.

In summary, I believe that it would be irresponsible to recommit this measure for further consideration. No new issues have arisen. No new facts are known. The Nation's security deserves congressional action to solve the energy crisis, not more delay.

Mr. STEIGER of Arizona. Mr. Speaker, I yield such time as he may consume to the gentleman from Ohio (Mr. MILLER).

*November 12, 1973*    CONGRESSIONAL RECORD — HOUSE    36613

Mr. MILLER. Mr. Speaker, if the House gives in to the Senate by accepting the nongermane amendments to S. 1081, the trans-Alaskan pipeline authorization conference report, it will have moved that much closer toward undermining the sound legislative procedures upon which we have operated and been guided by.

These amendments, sections 408 and 409, were never considered or voted upon when this bill was before the House. The other body stowed them on board the pipeline bill knowing how important that construction authorization is in meeting the Nation's energy needs in the very near future.

This take-it-or-leave-it proposition we are handed subverts the will of the House to the whim of the Senate. Surely it cannot be in the national interest for one House of Congress to be able to foist its will on the other. When laws are enacted, they should reflect a consensus of the Congress through its deliberate, thorough, and open debate. I am afraid the American people are being denied that here today by legislative bulldozing.

If the aim of the Congress is to fool the American people through slight-of-hand, then this conference report is a classic.

Mr. STEIGER of Arizona. Mr. Speaker, I yield such time as he may consume to the gentleman from Kansas (Mr. SKUBITZ).

Mr. SKUBITZ. Mr. Speaker, there are very few Members of this House who desire to delay the construction of the Alaskan pipeline. I support the pipeline. It is my feeling, however, that the conference report contains a number of nongermane amendments that originated in the other body. This House has had no adequate consideration of any of the matters contained in section 404, 405, 408 or 409 of the conference report.

I support the motion to recommit the conference report to the committee of conference with instructions to the Managers to insist on deletion of these four sections. Should this motion to recommit fail, however, I will support passage of the conference report.

I want to commend the conference committee for giving relief to the small stripper well operators. These producers operate well producing 10 barrels or less per day and would, under this legislation, be given relief from the price stabilization rulings of the Cost of Living Council. I offered a similar amendment to the oil allocation bill which came before the House Committee on Interstate and Foreign Commerce and was reported in September. That committee in its wisdom accepted my amendment.

I do not believe recommitting this conference report will endanger the Alaskan pipeline. The members of the other body are reasonable men and will not hold the pipeline hostage for these nongermane amendments. I support recommitting this conference report.

Mr. MELCHER. Mr. Speaker, I yield 30 seconds to the gentleman from West Virginia (Mr. HECHLER).

Mr. HECHLER of West Virginia. Mr. Speaker, the coal miners of the Nation support one of the nongermane Senate amendments requiring confirmation of the head of the Mining Enforcement and Safety Administration. This amendment was added in the other body by West Virginia's Senator ROBERT C. BYRD. Those supporting the motion to recommit would weaken certain provisions added by the other body to protect the consumers of this Nation.

I oppose the motion to recommit. I hope that motion will be defeated. I shall reluctantly support the final passage of the conference report, which is an improvement over the bill which originally passed the House.

Mr. STEIGER of Arizona. Mr. Speaker, I yield myself 2 minutes.

Mr. Speaker, I would say in response to the earlier remarks by the gentlewoman from Missouri (Mrs. SULLIVAN) that the vessel liability provision was troublesome to many of the conferees. I, for one, felt that we were not fully aware of all of the implications of the provision or how it would affect pending international conventions. It certainly is my understanding that all of the conferees agreed that this area should be carefully reviewed by the appropriate committees when legislation implementing the pending conventions is considered to make sure that the liability imposed by that legislation will apply to all U.S.-flag vessels, including vessels carrying oil from Valdez, Alaska.

Mr. Speaker, again, if I may, and I know that everybody here recognizes the significance of the pipeline, the environmental, and the energy needs, but I hope that in the heat of the moment, and in the concerns of the day, we do not lose sight of what is at stake here in this motion to recommit.

Mr. Speaker, what we are doing here, in my view, is in the face of the absence of any testimony, any analysis, any study by staff or Member; we are asking the House, in accepting the conference report unamended, to accept language which it does not understand. It seems to me, Mr. Speaker, that on that basis alone we should adopt the motion to recommit, for the purpose of the integrity of the House, of the legislative process.

Mr. Speaker, it is entirely fallacious to state that to vote for the motion to recommit is to delay the pipeline for a year. That is simply not the case. We are talking about a day or two. This week we are going to resolve this thing, and we are not talking about any year's delay. They cannot get started until March anyway. We can have this thing on the President's desk by next week.

Please do not be seduced into opposing the motion to recommit on the basis of delay. I will guarantee that there will be a vote on the final passage of the conference report, for those who might be persuaded that, by voting for the motion to recommit, they will be interpreted as being opposed to the conference report. I can understand that political problem, and I assure the Members that there will be a vote on final passage of the conference report, win or lose the motion to recommit.

Mr. MELCHER. Mr. Speaker, I yield 4 minutes to the gentleman from Georgia (Mr. LANDRUM).

Mr. LANDRUM. Mr. Speaker, I believe that in all of my experience I have never seen the people all over the Nation as concerned and as disturbed and as alarmed as they are today about so many things, and particularly about the fuel crisis or the energy crisis that confronts us.

We are being charged from every corner of this Nation with having been derelict in our duties to build an energy program that would make this Nation independent of the natural resources of other nations.

Finally, we came to the point this year of passing what is known as the Alaskan pipeline bill, and all of us are being told that the earliest that we can possibly see any flow of fuel, raw fuel, through this line is 3 years.

A few moments ago I listened to the gentleman from Alaska (Mr. YOUNG) say that in his opinion if this conference report is recommitted, it will delay the construction of the Alaskan pipeline from the estimated 3 years at the present time to not less than 5 years. Two years is an awfully long time to be cold or to have rationed gasoline.

Therefore, I have asked the gentleman from Montana to let me have the opportunity to say this and to put this question to him:

Does the gentleman from Montana have an opinion, and if he does have an opinion, what is it, concerning the delay of the Alaskan pipeline, as associated with a motion to recommit this conference report?

Mr. MELCHER. Mr. Speaker, I am delighted to answer the question which has been put to me by the gentleman from Georgia, and the answer, I will tell the Members, is as follows:

Further delay brought by the motion to recommit will mean more than a delay of days; it could mean a delay of weeks.

The inclusion of the amendments by the Senate constitutes part and parcel of the Senate-passed bill. They were in the bill when it came over to the House, and we in the conference committee have agreed to them, because they were in the legislation when it was passed. The other body is not going to back down from its decision quickly.

Whatever compromise could be arrived at in conference between the House and Senate conferees will not be resolved just between now and Thanksgiving or perhaps just between now and Christmas. We may be talking about weeks of delay, because there would have to be a compromise from the Senate's position.

That being the case, it could very well be, as the gentleman from Alaska has warned us, that there could be a delay of construction time of 6 months to a year on the start of construction on the pipeline in Alaska because of the necessity of starting when the permafrost is frozen this winter.

I urge the House to reject the motion to recommit and permit final passage of the bill to permit as rapid a start on the pipeline as possible.

Mrs. HOLT. Mr. Speaker, I rise to urge my colleagues to recommit S. 1081, the Trans-Alaskan Pipeline Authorization

Conference Report with instructions to delete sections 408 and 409.

Both of these nongermane amendments, in my opinion, suffer from serious substantive and procedural defects. Section 408 would dramatically expand the authority of the Federal Trade Commission by allowing it to take its enforcement actions directly into Federal courts if the Department of Justice does not act within 10 days. This will set a precedent for similar autonomy for all other Federal regulatory agencies and the end result of such autonomy will be haphazard and uncoordinated Federal litigation efforts.

The second amendment, section 409, would delete OMB authority under the Federal Reports Act of 1942 to review requests for business information by the regulatory agencies. This authority would be transferred to the General Accounting Office but the role of the GAO would only be an advisory one, with no power to prevent duplicative efforts by these agencies.

These amendments significantly expand regulatory agencies' powers in all areas. While all of us may support the concept of independent regulatory authorities, I think that it is important to recognize that a thin line separates proper regulation from bureaucratic overregulation. I strongly suspect that the implementation of sections 408 and 409 of this conference report would thrust us across this line into the area of overregulation.

My second objection to these amendments is the manner in which they arrived before this body for consideration. Despite the importance of these amendments, the appropriate committee has not had an opportunity to review them, nor have any hearings been held. It would seem to me that this body is doing a great disservice to itself and to the Nation if it allows far-reaching legislation of this nature to slip through without proper discussion and review, and if it permits the established legislative process to be circumvented in this manner.

These amendments should be given serious consideration on their own merits, and should not be attached to a bill as important as the Alaska pipeline project. It would be a tragedy if these amendments cause construction of the pipeline to be further delayed.

I strongly urge my colleagues to join me in recommitting the conference report with instructions to delete sections 408 and 409.

Mr. HANRAHAN. Mr. Speaker, the importance of this legislative item which we are considering today cannot be emphasized strongly enough. The trans-Alaska pipeline will provide the Nation with resources on which it will heavily depend for the years to come. Energy-saving measures are important too; however, in the long run, we are going to need the ready and dependable oil from Alaska's North Slope.

I think the conferees have, for the most part, acted wisely. They have recognized the need for the immediate construction of the pipeline system, and the conference report reflects this wisdom. In the years to come the United States must become self-sufficient for its energy sources. Recent experience in the Middle East makes this necessity particularly clear. The Alaska pipeline is the soundest and most expedient way to assure this self-sufficiency. For this reason I am supporting today's conference report, as I did the original House bill. This support, however, should not be construed as representing 100 percent agreement with all the provisions of the conference report.

My most serious objection is to the section concerning "limitations on exports." This body was very deliberate in writing provisions to insure that Alaskan oil would not be sold abroad if it were needed domestically. Such insurance is only logical.

The mechanism in the House version to limit oil exports was a prohibition on all oil transported over rights-of-way through Federal lands unless affirmatively authorized by concurrent resolution. This was strong language, but strong language was necessary to prevent oil from being exported until Congress gave a definite "go-ahead." Under the basic Senate language adopted by the conferees, however, exports can proceed unless Congress disapproves by use of the concurrent resolution. This means that once the President has given notice that oil exports will not endanger the national interest or diminish the U.S. supply of oil, exports can begin and continue unless Congress disapproves. This scheme is another chapter in the continuing story of the erosion of congressional authority.

I bring this clause to the attention of my colleagues because I believe it will create the necessary opportunity for oil companies to export their product, an opportunity which I am afraid will be exploited too readily. With the prevailing worldwide demand for oil, richer, more lucrative markets will quickly be found outside the United States. And the losers will be the U.S. consumer who will be without sufficient oil.

One part of the problem is that hard and fast data on oil supplies is hard to come by; the industry itself is the primary collector and disseminator of such information. Based primarily on its estimates, the President will make the decision to allow oil exports.

A second aspect of the procedure which disturbs me is the fact that exports can take place immediately after the President gives notice of his intention to allow them. If Congress later decides to disapprove of these exports, much of the damage will already have been done. And if Congress does not act within 60 days, the damage will be even greater.

I am sincerely disappointed that the conferees did not choose to assert itself and allow Congress to assume some of its legitimate authority. Congress should retain authority to forbid exports unless, and until, it makes the determination that oil exports would not harm domestic supplies. This type of orderly procedure is clearly the most responsible, and the only type of action that our citizens will tolerate.

Mr. HOGAN. Mr. Speaker, I rise in support of the conference report on S. 1081, the trans-Alaskan pipeline authorization. This proposed legislation is a result of an extensive 2-year study conducted by the Department of Interior and has undergone an exhaustive deliberation of both the House and Senate Committees on Interior and Insular Affairs. This proposed legislation is by no means perfect and it may not satisfy each and every desire of every interest, but it is, like much of life today, a compromise between the demands of our Nation for its energy and the counterbalancing demands for ecological preservation.

The need for bringing fuels into the country and to increase our domestic production is conceded by all. Meeting projected demands will require both stern conservation measures and the maximization of resource acquisition. If we abandon the North Slope oil, or prolong indefinitely its delivery to market, there is no doubt in my mind that we will damage our economy and will further increase the energy dilemma in our country. This bill goes about as far as a bill can go in satisfying both demands, that for increased energy supply and that for minimum hazard to our environment.

The argument has been levied that further study and further advancement of engineering technology is necessary before the pipeline can be built to withstand the hazards of the North Slope. However, the study of the trans-Alaskan pipeline was the most extensive environmental study ever undertaken by the Government. The final environmental impact statement which was released in March 1972 required 175-man years of study by the Department of Interior and other agencies at a cost in excess of $9 million.

Congress has been kept fully appraised of the trans-Alaska pipeline system since its very conception when it was first considered 4 years ago. It is evident that Congress most now resolve this problem in a manner acceptable to the American consumer, after giving considerable attention to all necessary measures to protect the environment. I believe that this bill will meet the desired criteria that the Congress has been striving to achieve for the past 4 years.

Mr. Speaker, we are a Nation that is presently highly dependent upon fossil fuels. America's energy needs today are supplied overwhelmingly by fossil fuels, with oil and gas providing 77 percent. There are all kinds of estimates on fossil fuel reserves and a confusing array of predictions on how long they will last under varying degrees of husbandry. One thing is certain, fossil fuels are finite.

The construction of the Alaska pipeline will undoubtedly help to alleviate our short-term energy situation. The estimates call for at least 600,000 barrels per day to come through the pipeline in the first year, or 3 percent of our daily needs, and about 1,200,000 barrels per day will be pumped for the next 4 years working up to a capacity of 2 million barrels after 5 years.

While the construction of the pipeline

is essential to meet our present energy demands it should not be construed to mean it will solve our energy shortage or even attempt to solve it. Rather, it should serve to remind us that we must develop a national energy policy and should centralize all energy related research projects in one central agency. At least 9 of the 11 Cabinet departments presently are exercising varying degrees of regulation over the energy industries and as a result there have been instances of uncoordinated and sometimes contradictory actions.

The announced cut-off of Arab oil will drastically affect the lives of all Americans and repercussions are already being felt. Major airlines have begun to drop flight to save fuel. The administration is reviewing plans for rationing gasoline to motorists. Legislation has been proposed to impose 50 mile per hour speed limits on our highways. Efforts are being made to convert oil and gas burning powerplants to coal. All of these changes should tell us that we must devote our full attention developing alternate sources of energy.

Our country has the manpower and ability to achieve any goal it sets forth. This is best emphasized in the development of our space program and our desire to land a man on the Moon. On May 25, 1961, President Kennedy announced in a special message to the Congress on "Urgent National Needs," that the United States would make every effort to land a man on the Moon by the end of the decade. By redirecting and pumping new technology into our space program we achieved this historic event on July 21, 1969.

I firmly believe that the need exists today to centralize our energy research projects and coordinate a national energy policy. This should be one of the major goals of the 1970's. We as a Nation should accept this challenge and should do so with full force.

I am reminded of the words of the philosopher George Santayana who once wrote that—

Those who do not understand history are doomed to repeat it.

Let us hope that we have learned that we cannot depend as heavily as we have in the past on one particular source of energy but that we must develop alternate sources which can be utilized to meet our increasing demands.

Mr. Speaker, the need for the construction of the trans-Alaska pipeline is evident and I urge the Members of this body to adopt the conference report as the initial step in meeting our energy needs. We must then strive to formulate a national energy policy and work to develop alternate forms of energy to release our dependence on fossil fuels.

Mr. RODINO. Mr. Speaker, I rise in support of the conference report (H. Rept. No. 93–617) on S. 1081. The amendments to the Federal Trade Commission Act and to the Federal Reporting Services Act that title IV of S. 1081 would effectuate, provide the Federal Trade Commission with some of the additional powers it needs to protect the public from antitrust violations and economic deceptive practices and from the disastrous impact these have on our free enterprise system.

Enactment of the proposed legislation is clearly in the public interest. During recent hearings before many House subcommittees, including my own Subcommittee on Monopolies and Commercial Law during its food price investigations, many have testified that more vigilant enforcement of the antitrust laws would have saved consumers moneys calculated in the billions of dollars. S. 1081, as reported by its distinguished conference committee, would reduce significantly procedural and organizational barriers presently hampering the effectiveness of the FTC in the discharge of its antitrust legislative mandates.

The FTC was selected by the Congress as one of the two major protectors of the public interest and national policies expressed in the antitrust laws. S. 1081 would equip the Commission with the means necessary to promote as well as to protect the important goals of our antitrust laws and the free enterprise system.

Moreover, as the energy and oil pipeline background and features of S. 1081 evidence, the legislation under consideration involves aspects of the public confidence in its representative form of government to cope with widespread and growing causes of critical shortages in food, newsprint, and other commodities, as well as in oil and petroleum products.

My distinguished colleague JOHN MELCHER and the conference committee that he chaired labored under difficult and pressure-laden circumstances. I believe that they are especially to be commended for the expeditious manner in which they have delivered this important legislation to the House.

Mr. BINGHAM. Mr. Speaker, when the Alaska pipeline bill was before this House on August 2, I voted against it. I was disturbed by a number of provisions in the bill which I felt should have been amended, especially the provision overriding the normal requirements of the National Environmental Policy Act and the failure of the legislation to require a high priority study of the trans-Canadian alternative route before proceeding with the trans-Alaska pipeline.

Today I shall vote for the conference report on the bill. I am doing so because the dimensions of the energy crisis have become clearer in the intervening months. The boycott by Arab oil-producing states has underlined the urgent need for the United States to achieve as rapidly as possible a position where it will no longer be dependent on oil supplies from such unreliable sources and will no longer be subjected to such outrageous attempted blackmail.

I am also less enthusiastic about the possibility of a trans-Canadian alternative than I was in August. During the intervening months, no practical proposal for a Canadian pipeline has been made. More important, the recent action by the Canadian Government drastically increasing the tax on oil for export has brought home the realization that Canada too has interests of her own which she may choose to pursue and which may not be the same as ours. In other words, the argument in favor of an all United States route for bringing down the badly needed north slope oil has been made to seem compelling.

I remain strongly opposed to the NEPA-override provision of the bill. This provision is not only unnecessary, but in my view may cause serious delays in the construction of the pipeline because of the almost inevitable challenge to this provision in the courts. However, a vote against the conference report on this ground at this late stage would seem to be a futile gesture.

An additional reason for supporting the conference report is that the bill now contains desirable provisions adopted in the Senate strengthening the powers of the Federal Trade Commission. I am of course opposed to any effort to delete these provisions from the bill.

Mr. ANDERSON of Illinois. Mr. Speaker, I intend to vote for the conference report on the trans-Alaskan pipeline authorization, and against any motion to recommit the bill to conference. I do want to make clear, however, that I had intended to support a rule for this bill which would have permitted separate House votes on the controversial sections of the bill which were added by the other body. Unfortunately, we were precluded in the Rules Committee from even voting on such a rule. I have, in the past, made quite clear my opposition to the practice by the other body of complicating conferences by the addition of what would have been nongermane amendments in this body. Ordinarily, we would have been permitted that opportunity on this conference report under clause 4 of House rule XXVIII. But, due to the manner in which the original House resolution on this bill was written, these controversial provisions are not technically considered nongermane, and thus, without a special rule providing for a separate vote on these provisions in the conference report, we are confronted with the unpalatable alternative of either voting the entire conference report up or down, or sending the bill back to conference with instructions to delete all four sections.

This puts us in a most difficult position, especially in view of the energy crisis and the need to begin immediate construction of the Alaskan pipeline. Sending this bill back to conference now with instructions on all four sections would not only make it difficult to resolve those issues with the other body, but would, in effect, open the entire conference report to renegotiation and further prolonged delays in the final enactment.

While it is conceivable that the conferees could resolve all these differences before this session adjourns, it is also conceivable that reopening the conference on the bill could involve a delay carrying into early next year. I am informed that a further delay in action on this bill could well result in setting back construction of the pipeline by a year due to seasonal and logistical problems connected with Alaska's severe winters.

I do not think we in the Congress want to bear the responsibility for delaying for another year our access to this vitally needed North Slope oil. If we send this bill on to the President now

and the rights-of-way are granted by the Interior Department by the end of this year, the pipeline should be completed by sometime in 1977. If, on the other hand, we recommit this bill to conference, the pipeline may not be completed until sometime in 1978.

I very much regret that the provisions which are in dispute; namely, sections 404, 405, 408, and 409, will not be given full and thorough consideration in this body, both by the appropriate committees and the full House. This is obviously the orderly and responsible way to approach such substantial and controversial issues. I also deeply regret that we are not given an opportunity in the Rules Committee to at least vote on a rule which would have permitted a separate debate and vote on each of these issues in considering this conference report. And in this regard, I might add, I would hope our Rules Subcommittee, under the able leadership of the gentleman from California (Mr. SISK), will soon bring to us a revised rule which will plug the loophole under which these amendments were allowed to slip through conference without being subject to the procedures of clause 4 of rule XXVIII. But all this is now water under the bridge, and we must now decide on what are our overriding national responsibilities and priorities. For these reasons, I urge immediate adoption of the conference report.

Ms. HOLTZMAN. Mr. Speaker, it is with many substantial reservations that I will vote for the conference report on S. 1081, the Alaskan pipeline authorization. Although we are in the middle of an energy crisis it is not at all clear that the oil that will become available because of this pipeline construction will relieve the crisis in any meaningful way. For one thing, it will be many years before the oil is available. Also, the Alaska route will serve to increase the already abundant oil supply in our Western States and will offer little help to the oil-starved States in the Northeast and Midwest.

I feel the major problem with this bill is that it forecloses for the moment the alternative of the Canadian route for the pipeline that would be of benefit to the heavily populated Northeast. A second major problem is that this bill eliminates any judicial review of environmental considerations and I do not favor abandoning application of environmental standards lest we create environmental chaos.

Nevertheless, the conferees did make some improvements in this bill, such as strengthening the powers of the Federal Trade Commission by giving it authority to enforce subpenas and to seek preliminary injunctive relief to avoid unfair competitive practices. I was also pleased with an amendment to the Federal Reporting Services Act that would enable Federal regulatory agencies to gather information from the industries they regulate without having to obtain prior approval from the Office of Management and Budget.

Mr. HARRINGTON. Mr. Speaker, the conference report to the Alaska pipeline bill, which I will vote against, represents the kind of up-against-the-wall, shotgun approach which has regrettably come to characterize decisionmaking in the energy area. It is an approach which has been developed by the oil industry and perfected by the administration in order to force policies upon the Congress and the public, policies which otherwise would be given more careful scrutiny.

Although the passage of this bill will not ease our Nation's supply shortage this winter, or next winter, or even the winter after that, the measure has been presented to Congress as an immediate solution to an urgent problem.

Congress was not asked to formulate a policy but rather to rubberstamp a fait accompli. An examination of the pipeline's history bears out this analysis. A consortium of private oil companies determined the most profitable route for the pipeline; acquired the land; built the road along it; stacked hundreds of miles of pipe along the route; brought in millions of dollars of heavy equipment; made arrangements with the State of Alaska for payments of royalties; and then, and only then, asked Congress for permission to build the line.

The administration aided the consortium in its effort by refusing to examine any alternative routes to the one proposed by the private companies, and by misleading Members of Congress as to the willingness of the Canadian Government to participate in a joint venture.

Today's expected vote will not only reflect congressional acquiescence to private initiative in the name of expediency, but will also mirror the underlying problem chiefly responsible for the present energy crisis.

I am referring to the complete breakdown of the market system, which, when operating properly, assures the equitable allocation of resources at the best price to consumers. Construction of the pipeline violates free market principles. In a competitive market, supplies are channeled to areas of greatest demand. But the Alaska pipeline will not supply oil to the drastically undersupplied upper Midwest and east coast. It delivers to the more self-sufficient west coast. This will force the majority of Americans to remain dependent on foreign supplies which are both less dependable and more expensive, or force them to develop offshore reserves, at great environmental risk which might otherwise not be necessary.

A competitive market structure would channel low-cost supplies to areas where the need is greatest, and where the cost is highest. The Alaska pipeline does just the opposite. The east coast, where multimillion-dollar profits are being made, will remain dependent on high-priced oil.

The energy crisis was created by an industry structure out of touch with the marketplace, and by an administration acting without foresight and in the interests of the oil industry. It was not caused by a lack of resources, which we have in abundance, or by consumer demand, which has increased at a steady rate over the last 15 years.

Rather, as the Federal Trade Commission reported, the energy crisis was created through the market manipulation of the largest oil companies, acting in concert to keep supplies down and prices up. The building of the Alaska pipeline will only reinforce this problem.

Until the Congress realizes that basically cosmetic proposals like the Alaska pipeline will not solve the energy crisis, the American consumer can look forward to many years of getting less energy for more money. The crisis will only be solved when we take a hard look at the cause of the shortages and act to correct the institutional structure which created it.

There are a number of positive steps the Government can take to deal with the problem. We can authorize a U.S. fuel corporation—a publicly owned corporation to develop energy reserves on public lands—thereby assuring adequate supplies of energy and at the same time providing a yardstick against which the fairness of other energy prices can be measured.

We can set up an allocation system that will assure all regions of the country equitable supplies at equitable prices. We can institute anti-trust actions against the largest oil companies, thereby returning the industry to a more competitive posture. This, more than anything else, will solve the energy crisis.

In the meantime, we can demand from the oil industry complete and accurate information on the availability of energy supplies. Since we do not know how much oil and gas reserves we have and whether or not the oil companies are utilizing these resources to their fullest possible extent, any attempt we make at policy formulation is sheer guesswork—a situation which the oil industry takes great comfort in.

These then are some positive policies we can formulate to deal with the energy crisis. But in order to implement these policies the Congress must declare its independence from the oil industry. If we do not, the day will shortly come when, as in Alaska, the oil companies will haul their rigs to the beaches of the east coast, stack their pipes along our tidal marshlands, close the gas stations along our highways, and then say to us in Congress, "The time has come for you to decide to let us drill off our shores." And what choice will we have?

Mr. DRINAN. Mr. Speaker, I intend to vote today in favor of the Alaska pipeline bill (S. 1081) and against any effort to delete sections 408 and 409 of the bill.

Unfortunately, our need to obtain fuel from the north slope of Alaska is ahead of our knowledge of facts about fuel supply and production costs. The expected fuel shortage this winter, the Middle East crisis, Canada's recent announcement to tax oil exports to the United States at an increase of 400 percent, and the inadequate domestic oil reserves prompt me to vote in favor of this bill. The passage of the pipeline authorization bill today will authorize immediate construction of the Alaska pipeline, expand the minimum width of rights-of-way for oil and gas pipelines, and include important provisions designed to strengthen the powers of the Federal Trade Commission and limit the authority of the Office of Management and

Budget. These latter provisions are of special importance.

The Federal Trade Commission will be granted the authority to enforce subpenas issued by the Commission and to seek preliminary injunctive relief to avoid unfair competitive practices. Section 408 strengthens the Federal Trade Commission by providing it with the authority to represent itself in all civil proceedings connected with enforcement of the laws under its jurisdiction after notifying the Attorney General. This changes the current law, where the Federal Trade Commission must rely upon the Attorney General or the Justice Department whenever it needs to go to Federal court.

The bill also amends the Federal Reporting Services Act to enable Federal regulatory agencies to gather information from the industries they regulate without having to seek prior approval from the Office of Management and Budget. Presently, the Office of Management and Budget, which is an arm of the White House, is able to block Federal regulatory agencies from carrying out responsibilities delegated to them by Congress. OMB usually prevents the gathering of information from regulated industries after consulting with its powerful Business Advisory Council. This council consists of representatives of the industries from whom the information is being sought. The abuses of such a system are obvious. The present bill, in section 409, authorizes the General Accounting Office to index all available information and to review all proposed surveys. This procedure will prevent businesses, particularly small ones, from being burdened with unnecessary requests. It is not the intention of this legislation to create a great increase in burdensome paperwork, which would not be in the interests of the business community. The House and Senate conferees gave full and deliberate consideration to sections 408 and 409 before agreeing to these provisions. They are important to consumers in our country. They will enable regulatory agencies in general and the FTC in particular, to do the job which Congress intended for them without excessive dependence on the executive offices.

The oil from Alaska's north slope is of vital importance to the well-being of the American people. I have some very serious misgivings about this bill. I am not in total agreement with its provisions concerning proceedings under the National Environmental Protection Act and concerning the right of judicial review. I hope that the exception to the National Environmental Protection Act standards which we make in this legislation will not be considered a degradation of the vitally important environmental laws that have been developed by the Congress. I do not believe that the energy crisis sacrificing these environmental protection measures. I am, however, aware that recommittal of this bill to conference may result in the killing of important antitrust and consumer protection provisions, but will not improve the environmental sections. Accordingly, I cast my

vote today in favor of the pipeline in this time of serious national energy crisis.

Mr. VANIK. Mr. Speaker, among the provisions in the conference report which we are considering today, is a section permitting independent agencies—such as the Federal Trade Commission—to seek information from businesses without prior approval from the Office of Management and Budget. The provision requires that the independent agency obtain the certification of the General Accounting Office that the information is not already available and that it is being obtained "with a minimum burden" upon business.

Mr. Speaker, I certainly support efforts to reduce the amount of Government paperwork required of the private sector, and in hearings this spring, I pointed out that there appeared to be a woeful lack of coordination between forms required by the IRS and the Census Bureau.

But it is also true that we need more information. The energy information sources of the FPC are unbelievably bad and must be improved. In areas of public policy, such as taxation and business growth patterns, the Federal Government and the Congress are operating hopelessly in the dark.

To obtain information on who is producing what—and what the production entails—the Federal Trade Commission has proposed an annual line of business report programs. In an age of mergers, conglomerates, and multinational corporations, it has become impossible to determine who is manufacturing and controlling product lines. Such information is vital for tax policy and effective antitrust and FTC policy.

On August 3, 1973, the FTC asked the Office of Management and Budget for authority to proceed with annual line of business information gathering. Despite the fact that this FTC effort will not burden small business in any way and will only involve some 2,000 of America's very largest corporations, the FTC request has not yet been approved.

The amendment in the conference report will permit faster action on these requests and remove these independent, quasijudicial agencies from the very political control of the Office of Management and Budget.

Mr. Speaker, the importance and benefit of information to the independent agencies is very well stated in the FTC's statement of purpose requesting authorization to proceed with the annual line of business report program:

## II. Benefits of the Program

### A. THE ROLE OF INFORMATION IN THE ECONOMY

Information plays a critical role in the efficient working of a free enterprise economy. Generally speaking, the greater the amount of information which is possessed by all the groups which are interested in a given market, the more efficiently the market will work. Other things being equal, then, society stands to reap benefits from the dissemination of information.

The benefits of the dissemination of information must be weighed against its cost, of course. One potentially serious cost of the uncontrolled disclosure of information is associated with the dampening of incentives by private parties to discover new basic

knowledge or to innovate. This hazard is substantially mitigated by the protection afforded by the patent, copyright, and trademark laws.

Assuming that the ability to recoup the private costs of the discovery and development of new products and technologies is reasonably well protected by these laws, attention can be turned to some specific ways in which various groups in society may benefit from the data collection and publication activities of the LB Program.

### B. POTENTIAL BENEFICIARIES OF LINE OF BUSINESS DATA

The first group of users of meaningful data on separate categories of goods and services are the buyers of those goods and services. With data on sales, costs, profits, and assets, buyers are able to form judgments concerning the appropriateness of price/cost margins and profit rates.

These data will also be of great value to small business firms. The size of the expenditure needed to acquire useful financial information means that large enterprises can better afford to engage in information search. To the extent that the search and reliability analysis of available public and private sources is productive of useful information, smaller firms, to whom this type of information service is essentially unavailable, are disadvantaged. If reliable data were available from a public source, on the other hand, small firms would be able to make use of them at minimal cost.

Established firms are significant users of published data on profitability and other aspects of performance for industry categories. Most of the 4,500 private individual subscribers of the QFR quarterly publication are corporations. The LB data will be extremely useful to these firms. It will be possible for a firm to compare the performance of each of its lines of business with the performance of lines of business of other firms which produce similar products. Potential competitors, both large and small, would benefit greatly from the LB data. Firms which have resources which they wish to invest in some activity, whether they are newly organized or already established, will seek those activities which offer the greatest return for the investment. Where data on the actual returns which established producers are earning in various industries are not available, or where the available data are of poor quality because of the intermingling of primary and secondary product data, incorrect choices of investment alternatives will be made. And that will result in an inefficient allocation of the total resources which are at the disposal of society.

The labor movement also has an interest in data on sales, costs, and profits for individual industry categories. The evaluation of the share of total sales or receipts which goes to labor can be performed efficiently only if such data are available. These data will also facilitate comparisons of labor's share among different industries. And finally, for those companies where laborers are organized on a product, or craft, basis, data on sales, costs, and profits on a line of business basis are essential to the efficient working of the bargaining process. Organized labor groups have the same need for information in dealing with suppliers and processors.

Mr. GUDE. Mr. Speaker, the issues before the House are complex and intertwined. There is the question of energy supplies and energy needs. There is the question of sections 408 and 409 of the conference version of S. 1081, which relate to the powers of the FTC, and other Federal agencies, vis-a-vis the business community and other departments and agencies of the Federal Government.

There is the serious question of the environment involved here.

I have fought long and hard with numerous of our colleagues over many months, indeed, over many years, in order to find the best way for America to obtain needed oil supplies from the Alaskan North Slope, and at the same time protect, to the fullest extent practical, the environment of Alaska, and of the west coast coastal areas.

The problems confronting us combine all of these, and add certain new twists. Sections 408 and 409 of the conference bill provide excellent consumer protective powers and should be left intact. In fact, it can be argued that, if the FTC had had such powers 6 months ago, many small, independent gasoline businesses would still be in business.

A vote against recommittal would be quite cut and dried on this point, if the legislation did not contain the provisions exempting the pipeline project from NEPA. While many of us would favor retention of sections 408 and 409, we would be pleased to see the anti-NEPA language removed.

However, the reality of the present situation is that, were the bill sent back to conference, we would be presented not only with the anti-NEPA language intact when it came back, but also with two strong consumer oriented sections deleted. Therefore, the best course available to us is to oppose sending the bill back to conference.

I believe that we can say that many of us have fought a good fight for the environment. I am distressed over certain provisions in the legislation which I believe set poor precedents which might well encourage future "end-runs" around NEPA. I shall continue to fight efforts which would seek case-by-case exemptions from some or all of the provisions of NEPA. However, we are now faced with the realization that, if we vote this bill down today, it will be back before us in the very near future in the same form, minus the consumer protective provisions.

The final passage of this conference report, in its present form is only preferable when one considers the alternatives.

Mr. MITCHELL of Maryland. Mr. Speaker, as we confront the energy crisis, let us make sure that all of our efforts to solve this crisis include strategies to maximize employment and enterprise opportunities for black citizens. The multimillion dollar trans-Alaskan pipeline project offers us a great opportunity to spur minority employment and minority enterprise. I am pleased to note that my colleague, Congresswoman Burke has already approached the Secretary of the Interior on this subject. I submit for the Record her recent letter to Secretary Morton. I wholeheartedly endorse her approach.

The letter follows:

Congress of the United States,
House of Representatives,
*Washington, D.C., November 7, 1973.*
Hon. Parren J. Mitchell,
*Cannon House Office Building,*
*Washington, D.C.*

Dear Congressman Mitchell: In response to your inquiry concerning my intention in offering the Equal Employment Opportunity amendment to S. 1081, the Trans-Alaskan

Pipeline bill, I thought it would be helpful if I provided you with the following background information.

The Conference Report to S. 1081 contains this amendment in Section 403. It calls upon the Secretary of Interior to promulgate rules and regulations concerning the establishment and enforcement of an affirmative action program in all activities relating to the pipeline. I want to call your attention to the remarks which I made on the House floor during the debate of this bill regarding the intended scope and purpose of this bill. The statement appears in the *Congressional Record* of August 2, 1973 at Page 27652, and the relevant portions begin on Page 27654 thereof.

To summarize briefly my intent in proposing this amendment, I intended to have the Secretary of Interior develop regulations which would insure, among other things, that minorities and minority business enterprises were provided, to the maximum extent possible, opportunity to participate in all activities connected with the construction, operation, and maintenance of the pipeline.

This provision should also insure that minority owned construction firms, supply and material companies, transportation companies, contract consultants, engineering, architectural and managing consultating firms, as well as minority workers, will have an opportunity to participate fully in this venture. And there are many types of activities in which these enterprises should be allowed to participate, including both the actual construction, operation and repair of the pipeline, as well as the incidental and supporting activities. In the latter category, I had in mind a full range of activities including, but not limited to, storage refining and processing facilities, designing and management of logistical supply for all related facilities, worker residence transportation networks and facilities, office buildings, schools and medical facilities.

In developing the substance of these regulations, it is my intention to have the Secretary of Interior draw upon the full range of Federal affirmative action programs, adopting the broadest and most inclusive provisions possible.

I have listed a few of these programs in my August 2, 1973 Floor statement. These programs include, but are not limited to, affirmative action policies and programs under Executive Orders 11246 and 11625, Government Procurement Contracts, Minority Business Enterprises' subcontracting procedures, Small Business Set Asides and the like.

I also spoke about the enforcement procedures which were intended by my amendment. These should include the most flexible, but the most firm, enforcement procedures existing under Titles VI and VII of the Civil Rights Act of 1964, Executive Orders 11246 and 11625, and similar Federal enforcement mechanisms.

I hope this has provided you with a clearer understanding of the scope and purpose of this Equal Opportunity amendment to the Trans-Alaskan Pipeline bill. I hope that as the Secretary of Interior develops the appropriate rules and regulations implementing this section of the bill, he will call upon all parties affected by this amendment to receive their suggestions for implementing this provision.

If I may be of any further assistance to you regarding this matter, please do not hesitate to call upon me.

With best personal regards, I am

Sincerely yours,
Yvonne Brathwaite Burke,
*Member of Congress.*

Statement of the Honorable Parren J. Mitchell on the Declaration of Independence by the Guinea Government

Wire service reports claim today that

PAIGC has declared independence from Portugal. Luiz Cabral, brother of the late Amilcar, is reported to head a fifteen member council of state.

If this information is correct, I would like to add my name; in fact place it at the top of the list, of those calling for United Nations recognition of the Cabral government. A first step for those of us in the United States who are concerned about the liberation of oppressed peoples throughout the world is to demand that our country be one of the first to recognize the new government.

This will not be easy. It would be a decision on the part of foreign policy-makers in this country to make clear to Portugal that the ideals of the American Revolution do still bear and have consequence on our relations with foreign states. It will not be easy because within the foreign policy establishment in our country, the race question is considered (when it is considered) to be a side issue one far down on the priority list that shapes national security.

Just as recently as two months ago, I charged, during the floor debate over the Mutual Development and Cooperation Act of 1973, that this country takes three times as much money out of Africa. We need to turn that situation around. Or at least get some parity going. A first step in that direction would be the recognition of the Cabral government. A second step would be bilateral discussions on development assistance.

The news of independence then should be accepted with a commitment to push for United States and United Nations recognition as well as with exhilaration. The PAIGC has been fighting for years for territory that is rightfully theirs. Our fight in this country to make America's ideals its practice has also been a long fight. The cry in Africa rightfully is "independence". The cry here in America can only be "recognition".

Mr. ROYBAL. Mr. Speaker, I rise in opposition to the conference report on S. 1081 known as the trans-Alaska pipeline bill. The passage of this bill could signal the beginning of the demise of the ecological movement whose continued growth is necessary for man's survival. The action we take here today is the culmination of a well planned, calculated lobbying effort that has completely overridden the processes of thought and rational deliberation that are usually found in this Chamber.

The most distressing aspect of this bill is the section that declares that the Interior Department's environmental impact statement on the pipeline satisfactorily complies with the requirements of the National Environmental Policy Act. This section bars a court review of the findings made in that report.

The action of Congress in barring a coordinate and coequal branch of Government from carrying out its constitutional functions is always suspect on its face. What is more disheartening in this case, is that both friend and foe to this legislation are sure that it will result in grave ecological damage to the land.

The proposed route of the pipeline crosses one of the most active and high risk earthquake zones in the world. Any violent movement of the earth's crust would rupture the pipeline and cause irreparable damage to the Alaskan tundra. Second, the oil will have to be carried on part of its journey by oil tankers. It is a statistical certainty that there will be oil spills and that the marine pollution will have catastrophic effects. The bill even admits this certainty by specifying that the oil companies will have ab-

solute liability for the damages. But it is time for this Congress to learn that money will not repair the ecological damage that the oil will inflict on the land and sea.

Further this bill is being presented as a means of alleviating the energy crisis that is growing worse daily. Yet the truth of the matter is that even if we acted to-day, the first drop of oil would not pass through the pipeline until 1978 and it would not reach full capacity until 1980. The passage of this bill will not heat homes in New England this winter or next; it will not provide the gasoline to power the cars in cities such as Los Angeles in the near future. The pipeline will not end the energy crisis and it is time that the interest groups stop telling the people that this bill is a panacea to cure the ills of our society.

The Congress is doing nothing but ratifying the wishes of the oil groups. These special interest groups determined the most profitable route for the pipeline, acquired the land, built the road along it, stacked the pipe along the road and then as an after thought came to get congressional approval for the decision they had already made.

Congress has again been forced into a corner with a gun cocked at its head. It has decided to submit to the oil lobby rather than protect ecological interests.

Mr. MELCHER. Mr. Speaker, I move the previous question on the conference report.

The previous question was ordered.

MOTION TO RECOMMIT OFFERED BY MR. STEIGER OF ARIZONA

Mr. STEIGER of Arizona. Mr. Speaker, I offer a motion to recommit.

The SPEAKER. Is the gentleman opposed to the conference report?

Mr. STEIGER of Arizona. I am, Mr. Speaker, in its present form.

The SPEAKER. The Clerk will report the motion to recommit.

The Clerk read as follows:

Mr. STEIGER of Arizona moves to recommit the conference report on the bill S. 1081 to the committee of conference, with instructions to the managers on the part of the House to insist on disagreement to title III and to sections 601 and 602 of the Senate bill.

Mr. MELCHER. Mr. Speaker, I move the previous question on the motion to recommit.

The previous question was ordered.

The SPEAKER. The question is on the motion to recommit.

The question was taken; and the Speaker announced that the noes appeared to have it.

Mr. STEIGER of Arizona. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The vote was taken by electronic device, and there were—yeas 162, nays 213, present 1, not voting 57, as follows:

[Roll No. 574]

YEAS—162

| | | |
|---|---|---|
| Abdnor | Bauman | Burgener |
| Andrews, N.C. | Bray | Burke, Fla. |
| Andrews, | Breckinridge | Burleson, Tex. |
| N. Dak. | Brinkley | Butler |
| Archer | Broomfield | Byron |
| Armstrong | Brown, Mich. | Camp |
| Ashbrook | Brown, Ohio | Carter |
| Ashley | Broyhill, N.C. | Casey, Tex. |
| Baker | Broyhill, Va. | Cederberg |

| | | |
|---|---|---|
| Chamberlain | Jarman | Rhodes |
| Clancy | Johnson, Pa. | Riegle |
| Clawson, Del | Jones, Okla. | Robinson, Va. |
| Cochran | Kazen | Robison, N.Y. |
| Collins, Tex. | Keating | Rogers |
| Conable | Ketchum | Rose |
| Conlan | Kuykendall | Rousselot |
| Coughlin | Landgrebe | Runnels |
| Crane | Latta | Ruppe |
| Daniel, Dan | Lott | Sarasin |
| Daniel, Robert | Lujan | Satterfield |
| W., Jr. | McClory | Scherle |
| de la Garza | McCollister | Schneebeli |
| Dellenback | McEwen | Shuster |
| Denholm | McKinney | Sikes |
| Dennis | McSpadden | Skubitz |
| Derwinski | Madigan | Snyder |
| Devine | Mahon | Spence |
| Dickinson | Mann | Steelman |
| Dorn | Martin, Nebr. | Steiger, Ariz. |
| Edwards, Ala. | Martin, N.C. | Steiger, Wis. |
| Erlenborn | Mathias, Calif. | Stuckey |
| Esch | Mathis, Ga. | Symms |
| Fisher | Mayne | Talcott |
| Fountain | Michel | Taylor, Mo. |
| Frenzel | Milford | Teague, Calif. |
| Frey | Miller | Teague, Tex. |
| Froehlich | Mizell | Thone |
| Gettys | Moorhead, | Thornton |
| Ginn | Calif. | Treen |
| Goldwater | Mosher | Veysey |
| Gonzalez | Myers | Waggonner |
| Gross | Nelsen | Wampler |
| Grover | Nichols | White |
| Gubser | O'Brien | Whitehurst |
| Hammond | Parris | Wiggins |
| Hansen, Idaho | Passman | Williams |
| Harsha | Pickle | Wilson, |
| Harvey | Poage | Charles, Tex. |
| Hastings | Powell, Ohio | Wyatt |
| Hillis | Preyer | Wylie |
| Hinshaw | Price, Tex. | Wyman |
| Holt | Quie | Young, Ill. |
| Horton | Quillen | Zion |
| Hunt | Railsback | Zwach |
| Hutchinson | Rarick | |
| | Regula | |

NAYS—213

| | | |
|---|---|---|
| Abzug | Edwards, Calif. | Leggett |
| Adams | Eilberg | Litton |
| Addabbo | Eshleman | Long, La. |
| Anderson, | Evans, Colo. | Long, Md. |
| Calif. | Evins, Tenn. | McCloskey |
| Anderson, Ill. | Fascell | McDade |
| Annunzio | Findley | McFall |
| Arends | Fish | Macdonald |
| Aspin | Flood | Madden |
| Badillo | Flowers | Mailliard |
| Bafalis | Foley | Mallary |
| Barrett | Ford, Gerald R. | Maraziti |
| Bell | Ford, | Mazzoli |
| Bennett | William D. | Meeds |
| Bergland | Forsythe | Melcher |
| Biaggi | Fraser | Metcalfe |
| Biester | Frelinghuysen | Mezvinsky |
| Bingham | Fulton | Minish |
| Blatnik | Gaydos | Mink |
| Boggs | Giaimo | Mitchell, Md. |
| Boland | Gibbons | Mitchell, N.Y. |
| Bowen | Gilman | Moakley |
| Brademas | Goodling | Mollohan |
| Brasco | Grasso | Montgomery |
| Breaux | Gray | Moorhead, Pa. |
| Brotzman | Green, Pa. | Morgan |
| Brown, Calif. | Gude | Moss |
| Burke, Mass. | Gunter | Murphy, Ill. |
| Burlison, Mo. | Haley | Natcher |
| Burton | Hamilton | Nedzi |
| Carey, N.Y. | Hansen, Wash. | Obey |
| Carney, Ohio | Harrington | O'Neill |
| Clay | Hawkins | Owens |
| Cleveland | Hébert | Patten |
| Cohen | Hechler, W. Va. | Pepper |
| Collier | Heckler, Mass. | Perkins |
| Collins, Ill. | Heinz | Pettis |
| Corman | Helstoski | Peyser |
| Cotter | Henderson | Pike |
| Cronin | Hicks | Price, Ill. |
| Culver | Hogan | Pritchard |
| Daniels, | Holifield | Randall |
| Dominick V. | Holtzman | Rangel |
| Danielson | Howard | Rees |
| Davis, Ga. | Hungate | Reuss |
| Davis, S.C. | Ichord | Rinaldo |
| Delaney | Johnson, Calif. | Rodino |
| Dellums | Johnson, Colo. | Roe |
| Dent | Jones, Ala. | Roncallo, Wyo. |
| Diggs | Jordan | Rooney, N.Y. |
| Dingell | Karth | Rooney, Pa. |
| Donohue | Kastenmeier | Rosenthal |
| Drinan | Kemp | Roush |
| Dulski | King | Roy |
| Duncan | Koch | Roybal |
| du Pont | Kyros | Ryan |
| Eckhardt | Landrum | Sandman |

| | | |
|---|---|---|
| Sarbanes | Steed | Whalen |
| Schroeder | Steele | Widnall |
| Sebelius | Stratton | Wilson, Bob |
| Seiberling | Stubblefield | Wilson, |
| Shipley | Studds | Charles H., |
| Shoup | Sullivan | Calif. |
| Shriver | Taylor, N.C. | Winn |
| Sisk | Thompson, N.J. | Wolff |
| Slack | Thornton, Wis. | Wydler |
| Smith, Iowa | Tiernan | Yates |
| Smith, N.Y. | Towell, Nev. | Yatron |
| Staggers | Udall | Young, Alaska |
| Stanton, | Van Deerlin | Young, Fla. |
| J. William | Vander Jagt | Young, Tex. |
| Stanton, | Vanik | Zablocki |
| James V. | Vigorito | |
| Stark | Walsh | |

ANSWERED "PRESENT"—1

Ware

NOT VOTING—57

| | | |
|---|---|---|
| Alexander | Griffiths | Nix |
| Beard | Hammer- | O'Hara |
| Bevill | schmidt | Patman |
| Blackburn | Hanley | Podell |
| Bolling | Hanna | Reid |
| Brooks | Hays | Roberts |
| Buchanan | Hosmer | Roncallo, N.Y. |
| Burke, Calif. | Huber | Rostenkowski |
| Chappell | Hudnut | Ruth |
| Chisholm | Jones, N.C. | St Germain |
| Clark | Jones, Tenn. | Stephens |
| Clausen, | Kluczynski | Stokes |
| Don H. | Lehman | Symington |
| Conte | Lent | Ullman |
| Conyers | McCormack | Waldie |
| Davis, Wis. | McKay | Whitten |
| Downing | Matsunaga | Wright |
| Flynt | Mills, Ark. | Young, S.C. |
| Fuqua | Minshall, Ohio | Young, Tex. |
| Green, Oreg. | Murphy, N.Y. | |

So the motion to recommit was rejected.

The Clerk announced the following pairs:

Mrs. Green of Oregon with Mrs. Griffiths.

Mr. Hays with Mr. Young of Texas.

Mr. Matsunaga with Mr. Hosmer.

Mr. Young of South Carolina with Mr. Downing.

Mr. Beard with Mr. Flynt.

Mr. Brooks with Mr. Huber.

Mr. Chappell with Mr. Hanley.

Mr. Clark with Mr. Fuqua.

Mrs. Chisholm with Mr. Waldie.

Mr. Reid with Mr. Hanna.

Mr. Podell with Mr. Blackburn.

Mr. Rostenkowski with Mr. Hudnut.

Mr. Kluczynski with Mr. Buchanan.

Mr. St Germain with Mr. Jones of North Carolina.

Mr. Stokes with Mr. Symington.

Mr. Conyers with Mr. Lehman.

Mr. Murphy of New York with Mr. Don H. Clausen.

Mr. Nix with Mr. O'Hara.

Mr. Alexander with Mr. Conte.

Mr. Bevill with Mr. Davis of Wisconsin.

Mrs. Burke of California with Mr. McKay.

Mr. McCormack with Mr. Lent.

Mr. Mills of Arkansas with Mr. Minshall of Ohio.

Mr. Roberts with Mr. Roncallo of New York.

Mr. Whitten with Mr. Jones of Tennessee.

Mr. Hammerschmidt with Mr. Patman.

Mr. Stephens with Mr. Ruth.

Mr. Ullman with Mr. Wright.

The result of the vote was announced as above recorded.

The SPEAKER. The question is on the conference report.

Mr. MELCHER. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The vote was taken by electronic device, and there were—yeas 361, nays 14, present 1, not voting 57, as follows:

[Roll No. 575]

YEAS—361

| | | |
|---|---|---|
| Abdnor | Adams | Anderson, |
| Abzug | Addabbo | Calif. |

Anderson, Ill.
Andrews, N.C.
Andrews,
  N. Dak.
Annunzio
Archer
Arends
Armstrong
Ashbrook
Ashley
Badillo
Bafalis
Baker
Barrett
Bauman
Bell
Bennett
Bergland
Biaggi
Biester
Bingham
Blatnik
Boggs
Boland
Bowen
Breaux
Breckinridge
Brinkley
Broomfield
Brotzman
Brown, Mich.
Brademas
Brasco
Bray
Brown, Ohio
Broyhill, N.C.
Broyhill, Va.
Burgener
Burke, Fla.
Burke, Mass.
Burleson, Tex.
Burlison, Mo.
Butler
Byron
Camp
Carney, Ohio
Carter
Casey, Tex.
Cederberg
Chamberlain
Clancy
Clawson, Del
Clay
Cleveland
Cochran
Cohen
Collier
Collins, Ill.
Collins, Tex.
Conable
Conlan
Corman
Cotter
Coughlin
Crane
Cronin
Culver
Daniel, Dan
Daniel, Robert
  W., Jr.
Daniels,
  Dominick V.
Danielson
Davis, Ga.
Davis, S.C.
de la Garza
Delaney
Dellenback
Denholm
Dennis
Dent
Derwinski
Devine
Dickinson
Diggs
Dingell
Donohue
Dorn
Drinan
Dulski
Duncan
du Pont
Eckhardt
Edwards, Ala.
Eilberg
Erlenborn
Esch
Eshleman
Evans, Colo.
Evins, Tenn.
Fascell
Findley
Fish
Fisher
Flood
Flowers
Foley

Ford, Gerald R.
Ford,
  William D.
Forsythe
Fountain
Fraser
Frelinghuysen
Frenzel
Frey
Froehlich
Fulton
Gaydos
Gettys
Gialmo
Gibbons
Gilman
Ginn
Goldwater
Gonzalez
Goodling
Grasso
Gray
Green, Pa.
Gross
Grover
Gubser
Gude
Gunter
Guyer
Haley
Hamilton
Hanrahan
Hansen, Idaho
Hansen, Wash.
Harsha
Harvey
Hastings
Hawkins
Hébert
Hechler, W. Va.
Heckler, Mass.
Heinz
Helstoski
Henderson
Hicks
Hillis
Hinshaw
Hogan
Holifield
Holt
Horton
Howard
Hungate
Hunt
Hutchinson
Ichord
Jarman
Johnson, Calif.
Johnson, Colo.
Johnson, Pa.
Jones, Ala.
Jones, Okla.
Jordan
Karth
Kazen
Keating
Kemp
Ketchum
King
Koch
Kuykendall
Kyros
Landrum
Latta
Leggett
Litton
Long, La.
Lott
Lujan
McClory
McCloskey
McCollister
McDade
McEwen
McFall
McKinney
McSpadden
Macdonald
Madden
Madigan
Mahon
Mailliard
Mallary
Mann
Maraziti
Martin, Nebr.
Martin, N.C.
Mathias, Calif.
Mathis, Ga.
Mayne
Mazzoli
Meeds
Melcher
Metcalfe
Mezvinsky
Michel

Milford
Miller
Minish
Mitchell, Md.
Mitchell, N.Y.
Mizell
Moakley
Mollohan
Montgomery
Moorhead,
  Calif.
Moorhead, Pa.
Morgan
Mosher
Moss
Murphy, Ill.
Myers
Natcher
Nedzi
Nelsen
Nichols
O'Brien
O'Neill
Owens
Parris
Passman
Patten
Pepper
Perkins
Pettis
Peyser
Pickle
Pike
Poage
Powell, Ohio
Preyer
Price, Ill.
Price, Tex.
Pritchard
Quie
Quillen
Railsback
Randall
Rangel
Rarick
Rees
Regula
Rhodes
Riegle
Rinaldo
Robinson, Va.
Robison, N.Y.
Rodino
Roe
Rogers
Roncalio, Wyo.
Rooney, N.Y.
Rooney, Pa.
Rose
Rosenthal
Roush
Rousselot
Roy
Runnels
Ruppe
Ryan
Sandman
Sarasin
Sarbanes
Satterfield
Scherle
Schneebeli
Schroeder
Sebelius
Seiberling
Shipley
Shoup
Shriver
Shuster
Sikes
Sisk
Skubitz
Slack
Smith, Iowa
Smith, N.Y.
Snyder
Spence
Staggers
Stanton,
  J. William
Stanton,
  James V.
Steed
Steele
Steelman
Steiger, Ariz.
Steiger, Wis.
Stratton
Stubblefield
Stuckey
Studds
Sullivan
Symms
Talcott
Taylor, Mo.
Taylor, N.C.
Teague, Calif.

Teague, Tex.
Thompson, N.J.
Thomson, Wis.
Thone
Thornton
Tiernan
Towell, Nev.
Treen
Udall
Ullman
Van Deerlin
Vander Jagt
Vanik
Veysey
Vigorito

Waggonner
Walsh
Wampler
Whalen
White
Whitehurst
Widnall
Wiggins
Williams
Wilson, Bob
Wilson,
  Charles H.,
  Calif.
Wilson,
  Charles, Tex.

Winn
Wolff
Wyatt
Wydler
Wylie
Wyman
Yates
Yatron
Young, Alaska
Young, Fla.
Young, Ga.
Young, Ill.
Zablocki
Zion
Zwach

## NAYS—14

Aspin
Brown, Calif.
Burton
Dellums
Edwards, Calif.

Harrington
Kastenmeier
Landgrebe
Long, Md.
Mink

Obey
Reuss
Roybal
Stark

### ANSWERED "PRESENT"—1

Ware

### NOT VOTING—57

Alexander
Beard
Bevill
Blackburn
Bolling
Brooks
Buchanan
Burke, Calif.
Carey, N.Y.
Chappell
Chisholm
Clark
Clausen,
  Don H.
Conte
Conyers
Davis, Wis.
Downing
Flynt
Fuqua

Green, Oreg.
Griffiths
Hammer-
  schmidt
Hanley
Hanna
Hays
Hosmer
Huber
Hudnut
Jones, N.C.
Jones, Tenn.
Kluczynski
Lehman
Lent
McCormack
McKay
Matsunaga
Mills, Ark.
Minshall, Ohio

Murphy, N.Y.
Nix
O'Hara
Patman
Podell
Reid
Roberts
Roncallo, N.Y.
Rostenkowski
Ruth
St Germain
Stephens
Stokes
Symington
Waldie
Whitten
Wright
Young, S.C.
Young, Tex.

So the conference report was agreed to.

The Clerk announced the following pairs:

Mrs. Green of Oregon with Mr. Young of Texas.

Mr. Hays with Mr. Carey of New York.

Mr. Matsunaga with Mrs. Burke of California.

Mr. Murphy of New York with Mr. Mills of Arkansas.

Mr. Conyers with Mr. Lehman.

Mrs. Chisholm with Mr. Symington.

Mr. Waldie with Mr. Flynt.

Mr. Rostenkowski with Mr. Young of South Carolina.

Mr. Podell with Mr. Beard.

Mr. Brooks with Mr. Hudnut.

Mr. Chappell with Mr. Davis of Wisconsin.

Mr. Fuqua with Mr. Blackburn.

Mr. Hanley with Mr. Minshall of Ohio.

Mr. Hanna with Mr. Roncallo of New York.

Mr. Kluczynski with Mr. Hammerschmidt.

Mr. McCormack with Mr. Buchanan.

Mr. Alexander with Mr. Hosmer.

Mr. Reid with Mr. Don H. Clausen.

Mr. O'Hara with Mr. Lent.

Mr. Nix with Mr. McKay.

Mrs. Griffiths with Mr. Roberts.

Mr. Clark with Mr. Huber.

Mr. Bevill with Mr. Stephens.

Mr. Conte with Mr. Whitten.

Mr. Wright with Mr. Ruth.

Mr. Downing with Mr. Jones of Tennessee.

Mr. Stokes with Mr. Jones of North Carolina.

Mr. Patman with Mr. St Germain.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

---

## GENERAL LEAVE

Mr. MELCHER. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks on the conference report just agreed to.

The SPEAKER. Is there objection to the request of the gentleman from Montana?

There was no objection.

## COMMUNICATION FROM THE CLERK OF THE HOUSE

The SPEAKER laid before the House the following communication from the Clerk of the House of Representatives:

NOVEMBER 9, 1973.

Hon. CARL ALBERT,
*The Speaker, House of Representatives.*

DEAR MR. SPEAKER: I have the honor to transmit herewith a sealed envelope from the White House, received in the Clerk's office at 5:52 p.m. on Thursday, November 8, 1973, and said to contain a message from the President on energy.

With kind regards, I am,

Sincerely,

W. PAT JENNINGS,
*Clerk, House of Representatives.*
By W. Raymond Colley.

## REPORT ON THE ENERGY CRISIS— MESSAGE FROM THE PRESIDENT OF THE UNITED STATES (H. DOC. NO. 93–187)

The SPEAKER laid before the House the following message from the President of the United States; which was read, referred to the Committee of the Whole House on the State of the Union, and ordered to be printed:

*To the Congress of the United States:*

As America has grown and prospered in recent years, our demands for energy have begun to outstrip available supplies. Along with other major industrialized nations, we are now faced with the prospect of shortages for several years to come.

Two years ago, in the first energy message ever sent to the Congress by a President of the United States, I called attention to the looming energy problem. Since that time, I have repeatedly warned that the problem might become a full-blown crisis, and seeking to minimize shortages, I have taken a number of administrative steps to increase supplies and reduce consumption. Earlier this year, I also sent more than a half dozen urgent legislative proposals to the Congress. While none of these has yet been enacted, I am hopeful at least several of the measures will be ready for my signature before year's end.

Unfortunately, the energy crisis that once seemed a distant threat to many people is now closing upon us quickly. We had expected moderate shortages of energy this winter, but four weeks ago, when war broke out in the Middle East, most of our traditional suppliers in that area cut off their shipments of oil to the United States. Their action has now sharply changed our expectations for the coming months.

Largely because of the war, we must face up to the stark fact that we are heading toward the most acute shortages of energy since the Second World War. Of the 17 million barrels of oil a day that we would ordinarily consume this winter, more than 2 million barrels a day will no longer be available to us. Instead of a shortage of approximately 2–3 per-

Appendix F

Calendar No. **143**

| 93D CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 93–151 |
|---|---|---|

# MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT

## R E P O R T

OF THE

## SENATE COMMITTEE ON COMMERCE

ON

## S. 356

TO PROVIDE DISCLOSURE STANDARDS FOR WRITTEN CONSUMER PRODUCT WARRANTIES AGAINST DEFECT OR MALFUNCTION; TO DEFINE FEDERAL CONTENT STANDARDS FOR SUCH WARRANTIES; TO AMEND THE FEDERAL TRADE COMMISSION ACT IN ORDER TO IMPROVE ITS CONSUMER PROTECTION ACTIVITIES; AND FOR OTHER PURPOSES.



MAY 14, 1973.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

83–010                    WASHINGTON : 1973

# CONTENTS

_____

| | Page |
|---|---|
| Summary and purpose | 2 |
| Brief Description | 2 |
| Background and Need | 4 |
|     Consumer product warranties | 4 |
|         Background | 4 |
|         Needs | 6 |
|     Federal Trade Commission improvements | 8 |
| Section by Section Analysis | 11 |
|     Title I | 11 |
|         Definitions | 11 |
|         Disclosure requirements | 15 |
|         Designation of warranties | 16 |
|         Federal standards for warranty | 17 |
|         Full and limited warranties of a consumer product | 19 |
|         Service contracts | 20 |
|         Designation of representatives | 20 |
|         Limitation on disclaimer of implied warranties | 21 |
|         Federal Trade Commission | 21 |
|         Private remedies | 22 |
|         Government enforcement | 24 |
|         Saving provision | 25 |
|         Scope | 25 |
|         Effective date | 26 |
|     Title II | 26 |
|         Expanded Federal Trade Commission jurisdiction | 26 |
|         Civil penalties | 27 |
|         Consumer redress | 27 |
|         Penalty for violation of cease and desist order | 29 |
|         Commission self-representation | 29 |
|         Expansion of jurisdiction | 29 |
|         Securing of documentary evidence | 30 |
|         Reporting requirements | 30 |
|         Expansion of jurisdiction | 30 |
|         Injunctions | 30 |
|         Enforcement proceedings | 31 |
|         Financial institutions | 31 |
|         Legislative rulemaking | 32 |
| Text of S. 356, as reported | 32 |
| Costs | 45 |
| Record vote | 46 |
| Changes in existing law | 46 |
| Agency comments | 53 |

(III)

# Calendar No. 143

| 93D CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 93–151 |
|---|---|---|

## MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT

MAY 14, 1973.—Ordered to be printed

Mr. MAGNUSON, from the Committee on Commerce,
submitted the following

# REPORT

[To accompany S. 356]

The Committee on Commerce to which was referred the bill (S. 356) to provide minimum disclosure standards for written consumer product warranties against defect or malfunction; to define minimum Federal content standards for such warranties; to amend the Federal Trade Commission Act in order to improve consumer protection activities; and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

(1)

2

## SUMMARY AND PURPOSE

S. 356, the "Magnuson-Moss Warranty Federal Trade Commission Improvement Act," is designed to help the American consumer to find and enforce greater reliability in the tangible personal property he buys for "personal, family, or household purposes." Title I of the bill sets forth disclosure and designation standards for written warranties on each consumer product that costs the consumer more than $5; defines Federal contents standards for full warranties; and provides meaningful consumer remedies for the breach of written warranty and written service contract obligations. Title II of the bill improves the Federal Trade Commissions ability to deal with unfair consumer acts and practices "affecting" interstate commerce by granting the Commission the power to: (1) seek preliminary or permanent injunctions, (2) initiate actions in district courts seeking specific redress for consumers injured by unfair or deceptive acts or practices, and (3) secure civil penalties for knowing violations of the Federal Trade Commission Act. In addition, title II authorizes the Commission to represent itself in court and makes more uniform the operation of the F.T.C. Act as it applies to financial institutions.

It is the purpose of this bill to improve the position of the consumer in the marketplace by making the Federal agency responsible for his economic well being (the F.T.C.) more effective and by delineating with specificity the duties which suppliers of consumer products assume when offering warranties or service contracts in writing on consumer products. In addition, this bill aims to increase the ability of the consumer to make more informed product choices and to enable him to economically pursue his own remedies when a supplier of a consumer product breaches a voluntarily assumed warranty or service contract obligation.

## BRIEF DESCRIPTION

Title I of S. 356 requires the supplier of a consumer product costing more than $5 who chooses to warrant in that product writing to clearly and conspicuously disclose the contents of that warranty and to designate the warranty as either a "full" warranty in compliance with Federal standards, or to describe the warranty with easily understood language indicating the specific limitations. Title I would prohibit a supplier offering a warranty in writing from disclaiming his implied warranties. Thus, the present misleading practice of using very limited express waranties to reduce consumer rights which would have been available but for the disclaimer of implied warranties is prohibited by title I.

If a supplier fails to honor his warranty or service contract promises, the consumer can avail himself of certain specified remedies. If that supplier has provided a bona fide informal dispute settlement mecha-

3

nism by which disputes between suppliers and consumers are to be resolved, then the consumer would utilize the informal dispute settlement mechanism before pursuing other avenues of redress. If a supplier does not have an informal dispute settlement mechanism for resolving consumer complaints, or if the consumer is not satisfied with the results obtained in any informal dispute settlement proceeding, the consumer can pursue his legal remedies in a court of competent jurisdiction, provided that he has afforded the supplier a reasonable opportunity to cure the breach. Such pursuit is made economically feasible by the provision in the bill which awards reasonable attorneys fees (based on actual time expended) and court costs to any successful consumer litigant. In addition to authorizing private consumer remedies, the bill provides that any violation of title I is a violation of the Federal Trade Commission Act. The Federal Trade Commission or the Attorney General can seek preliminary injunctions against persons violating such provisions.

Title II would authorize the Federal Trade Commission to seek either a preliminary or permanent injunction against parties committing acts or practices which are unfair or deceptive to consumers. Title II would also authorize the Commission to assess civil penalties (up to $10,000 per violation) against those suppliers of consumer products who knowingly commit unfair or deceptive acts or practices in violation of Section 5(a)(1) of the Federal Trade Commission Act. Such penalties could be compromised, mitigated, or settled if the Commission provides a public statement of its reasons for such action and the court approved the compromise, mitigation, or settlement.

In order to redress consumer injury resulting from violations of the Federal Trade Commission Act, the Commission is authorized to initiate civil actions in United States district court seeking reasonable and appropriate consumer redress. While redress under this provision could not include exemplary or punitive damages, relief could include recission, reformation, refunding of money, return of property, or other appropriate relief for those injured by an unfair or deceptive act or practice.

Title II of S. 356 expands the Federal Trade Commission's jurisdiction beyond activities "in" interstate commerce to those acts or practices "affecting" interstate commerce. The Commission is authorized to act through its own attorneys in situations in which it is now represented by the Attorney General of the United States.

Finally, title II of S. 356 removes the present exemption for banks from the Federal Trade Commission Act. In order to make the prohibitions against unfair or deceptive acts or practices in the consumer credit field uniform, all financial institutions are made subject to those provisions of the Federal Trade Commission Act relating to unfair or deceptive acts or practices to consumers. Enforcement powers under this section, however, are mandatorily delegated to the various Federal financial regulatory institutions, with the proviso that the Commission, pursuant to section 553 of Title 5 of the United States Code, may request and shall receive redelegation of those enforcement powers if it is shown that they are not being effectively carried out by the relevant Federal financial regulatory agency.

4

## BACKGROUND AND NEED

### CONSUMER PRODUCT WARRANTIES

*Background*

In response to a growing tide of complaints regarding automobile warranties, the Federal Trade Commission instituted a field investigation in 1965 to see if in fact there was a significant failure of performance on the part of automobile manufacturers to live up to their warranty promises.

While the Federal Trade Commission investigation was being conducted. Senator Magnuson and Senator Hayden introduced warranty legislation late in 1967 which covered automobiles and appliances. These bills required suppliers to disclose clearly and conspicuously the terms of their warranties. The Magnuson bill would have established an advisory council on guarantees, warranties, and servicing to conduct a comprehensive study and investigation of the adequacy of performance of guarantees and the extent of difficulty in securing competent servicing of consumer products. No action was taken on these bills in the 90th Congress.

In response to the proposed warranty legislation, and as an extension of its initial investigative effort, the Federal Trade Commission asked its staff to prepare a comprehensive report on automobile warranty practices. That report was published in October of 1968 and concluded among other things that, "performance of manufacturers and dealers under the warranty has not achieved the levels implied by the warranty, and failure to perform up to warranted standards has been encountered in the manufacture and the preparation of cars for delivery to consumers." The report went on to conclude that, "in servicing under the warranty an excessive amount of service does not meet the standards of consumer acceptability, and replacement of cars which have revealed serious malfunctions and which cannot be repaired by the dealer is infrequent."

While the Federal Trade Commission was attempting to shed some light on the automobile warranty problem, a task force on appliance warranties and services designed to accomplish the purposes of Senator Magnuson's proposed advisory council was created. The task force consisted of the Secretaries of Commerce and Labor, the Chairman of the Federal Trade Commission, and the Special Assistant to the President for Consumer Affairs. Not only was this task force supposed to study the warranty problem, but it was also supposed to encourage voluntary action on the part of industry and determine the need for Federal legislation. In January 1969, the task force published a report which included comprehensive recommendations of the various participants. The report concluded that—

> There are a number of problems associated with major appliance warranties. However, the underlying and basic problem which must be solved, is how to persuade or compel a manufacturer or retailer to provide the purchaser of a major appliance with a meaningful guarantee which they will honor in both letter and spirit subsequent to the sale.

5

The task force then recommended that:

> At the end of one year, if it appears that substantial progress is not being made toward the solution of these problems, the mentioned officials should consider the nature and scope of legislation necessary to achieve the desired results.

In anticipation of the possible need for legislation, Senator Magnuson began to discuss possible legislative proposals in early 1969. On October 27, 1969, Senator Magnuson and Senator Moss introduced the Consumer Products Guarantee Act (S. 3074). On October 30, 1969, President Nixon, in his consumer message, reconstituted the Task Force on Appliance Warranties and Services and asked it to report on the problem.

Initial hearings on S. 3074 were held in late January 1970. At that time the Federal Trade Commission promised to submit its report on the Automobile warranty soon; the Task Force on Appliance Warranties and Services said it would report to the Committee in March.

On February 19, 1970, the Federal Trade Commission issued its automobile warranties report which advocated Federal legislation to solve automobile warranty and service problems. The Commission proposed enactment of "a new and comprehensive Automobile Quality Control Act, which would give statutory recognition to the public utility obligations of automobile manufacturers and provide for minimum standards of quality, durability, and performance of new automobiles and all parts thereof, and which would place a statutory obligation on manufacturers to provide consumers with defect-free automobiles in compliance with such standards and to repair defective automobiles and automobile parts which do not conform to such standards." In short, the Commission advocated the creation of a mandatory statutory warranty through the direct regulation of product quality.

In March of 1970 the Administration gave testimony before the Congress which emphasized the need for Federal warranty legislation covering a wide range of consumer products. After careful study, the Senate Commerce Committee amended the Magnuson-Moss bill to incorporate certain constructive suggestions of the Administration, industry, and consumer witnesses and ordered S. 3074 reported. The reported bill was passed by the Senate unanimously on July 1, 1970. Although the House held hearings on S. 3074 and related bills, no action was taken by the House prior to the adjournment of the 91st Congress.

The warranty provisions of S. 3074 were reintroduced in the 92d Congress in a refined form along with the Federal Trade Commission Reform Proposals discussed below as the "Consumer Product Warranties and Federal Trade Commission Improvements Act of 1971" (S. 986). The Committee again held extensive hearings on the warranty and the Federal Trade Commission reform proposals, and following intensive executive consideration of S. 986, the Committee ordered the bill reported to the floor of the Senate.

The Administration was also active in the warranty field. The President indicated in his consumer message of February 24, 1971, that he would propose a "Fair Warranty Disclosure Act" to provide for clearer warranties and prohibit the use of deceptive warranties. This

proposal was transmitted by the Attorney General on March 8, 1971, and introduced by Senator Magnuson on March 12, 1971, by request, as S. 1221.

After consideration on the floor, S. 986 passed the Senate by a vote of 72 to 2; this marked the second time that the Senate had overwhelmingly approved comprehensive warranty legislation. Unfortunately, the House was not able to move rapidly enough to report and pass a companion piece of legislation before the end of the 92d Congress.

A refined version of this same bill was introduced by Chairman Magnuson and Senator Moss in the 93d Congress on January 12, 1973, as S. 356. In lieu of holding further hearings on this proposal, the committee solicited comments from all those interested in the legislation. After further refinements, the Committee unanimously ordered the legislation reported to the floor of the Senate.

*Needs*

For many years warranties have confused and misled the American consumers. A warranty is a complicated legal document whose full essence lies buried in myriads of reported legal decisions and in complicated State codes of commercial law. The consumers' understanding of what a warranty on a particular product means to him frequently does not coincide with the legal meaning.

This was not always the case. When the use of a warranty in conjunction with the sale of a product first become commonplace, it was typically a concept that the contracting parties understood and bargained for, usually at arms length. One could decide whether or not to purchase a product with a warranty, and bargain for that warranty accordingly. Since then, the relative bargaining power of those contracting for the purchase of consumer products has changed radically. Today, most consumers have little understanding of the frequently complex legal implications of warranties on consumer products. Typically, a consumer today cannot bargain with consumer product manufacturers or suppliers to obtain a warranty or to adjust the terms of a warranty voluntarily offered. Since almost all consumer products sold today are typically done so with a contract of adhesion, there is no bargaining over contractual terms. S. 356 attempts to remedy some of the defects resulting from this gross inequality in bargaining power, and return the sense of fair play to the warranty field that has been lost through the years as the organizational structure of our society has evolved. The warranty provisions of S. 356 are not only designed to make warranties understandable to consumers, but to redress the ill effects resulting from the imbalance which presently exists in the relative bargaining power of consumers and suppliers of consumer products.

The warranty provisions of S. 356 are designed to meet four basic needs:

(1) The need for consumer understanding.
(2) The need for minimum warranty protection for consumers,
(3) The need for assurance of warranty performance, and
(4) The need for better product reliability.

First, the bill is designed to promote consumer understanding. Far too frequently, suppliers of consumer products fail to communicate to

the consumer what, in fact, they are offering him in that small piece of paper proudly labeled "warranty". The consumer really does not know what to expect from the warranty offered. Whom should he notify if his product stops working during the warranty period? What are his responsibilities after notification? How soon can he expect a fair replacement? Will repair or replacement cost him anything? There is a great need to generate consumer understanding by clearly and conspicuously disclosing the terms and conditions of the warranty and by telling the consumer what to do if his guaranteed product becomes defective or malfunctions.

Second, the bill is designed to insure consumers certain basic protections when they purchase consumer products which have written warranties. Normally when goods are sold, the law provides that certain warranties by implication accompany the sale of these goods. For example, the law usually implies a warranty of fitness for ordinary use or, when the seller knows that the goods are to be used by the buyer for a particular purpose, the law implies a warranty of fitness for a particular purpose. The law allows the seller to disclaim his implied warranties only by using such words as "as is" or "without fault" or by disclaiming the implied warranties when issuing an express warranty. These rules do no injustice to commercial buyers who are sophisticated in the ways of the marketplace and can judge the import of the express warranty and the meaning of the disclaimer of the implied warranty. Unfortunately, the ordinary purchaser of consumer products does not know the meaning of words in an express warranty which state, for example, "this warranty is in lieu of any other express warranties or the implied warranties of merchantability or fitness." In this situation a consumer's rights may, without his knowledge, be limited rather than expanded when a supplier of consumer products gives him a piece of paper with a bold claim of warranty written across the top. The issuance of a limited express warranty while simultaneously disclaiming implied warranties has become an increasingly common practice which results in many cases in a document which could be more accurately described as a limitation on liability rather than a warranty. Therefore, there is a need to prohibit the disclaimer of implied warranties when a supplier of consumer products guarantees his products in writing.

The third major problem concerning warranties confronting consumers today relates to warranty enforcement. Even in the relatively rare situation where the consumer fully understands the meaning of a warranty, and there has been no disclaimer of the implied warranties, he frequently is in no better position because the warrantor does not live up to the promises he has made. Because enforcement of the warranty through the courts is prohibitively expensive, there exists no currently available remedy for consumers to enforce warranty obligations. If warrantors who did not perform as promised suffered direct economic detriment, they would have strong incentives to perform. Therefore there is a need to insure warrantor performance by monitarily penalizing the warrantor for non-performance—and awarding that penalty to the consumer as compensation for his loss. One way to effectively meet this need is by providing for reasonable attorneys fees and court costs to successful consumer litigants, thus making con-

sumer resort to the courts feasible. It is hoped that by making court actions feasible, suppliers will be encouraged to develop workable informal dispute settlement procedures for the expeditious settlement of consumer complaints.

In the final analysis, many warranty problems could be cured if products were made sufficiently reliable to last the length of the warranty period and beyond. Thus, there is a basic need to stimulate better product design and quality control for the production of more reliable products. One way of accomplishing this is by making it economically rewarding for producers of consumer products to build reliability into their products.

Under present marketing conditions, the consumer has available to him little or no information about the product reliability potential of any consumer product he buys. He cannot look to the length of the warranty period as a possible indicator of product reliability, because variance in warranty terms and performance permits producers of less reliable products to compete on ostensibly the same terms of duration as producers of more reliable products. Both producers may use the rubrick "warranty" and offer identical duration periods, but one producer might warrant parts only and require the consumer to mail the product to the plant while the other producer might provide for repair without charge and fix the product in the home. Only when the rules of the warranty game are clarified so that the consumer can look to the warranty duration of the guaranteed product as an indicator of product reliability (because all costs of breakdown have been internalized) will consumers be able to differentiate on the basis of price between more reliable and less reliable products. This ability to differentiate should produce economic rewards from increased sales and reduced service costs for the producer of more reliable products.

Before the duration of the warranty can become a useful comparative gauge of product reliability, it is necessary to clearly designate for the consumer whether the warrantor of the product is willing to assume all costs connected with the repair or replacement of the warranted product and whether he is willing to absorb all consumer costs incidental to any failure to live up to the promises of free and timely repair or replacement. Only a warrantor giving this type of "full" warranty is in a position to increase his profit, by making product reliability or service capability improvements. Furthermore, to the extent that consumer choice in the marketplace is guided by the desire for product reliability measured by the duration of the warranty, there will be an incentive for suppliers of consumer products to offer full warranties of relatively long duration. Therefore, there is a need to identify for the consumer which products are fully warranted and to create standards for "full" warranties.

### FEDERAL TRADE COMMISSION IMPROVEMENTS

In 1938 the Wheeler-Lea Trade Commission Act expanded the powers of the Federal Trade Commission to cover "unfair or deceptive acts or practices in commerce." The purpose of this expanded authority, in the words of the House Committee report, was to make "the consumer, who may be injured by an unfair trade practice, of

9

equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor." Congress, however, did not accompany this broad grant of authority with a concomitant expansion of the Commission's powers of enforcement, except partially in the limited area of food, drug and cosmetic advertising.

Thus the sole enforcement weapon available to the FTC to police the vast majority of consumer frauds, deception, and cheating has been the cease and desist order. Even in 1938, a minority of the House Committee reporting the Wheeler-Lea Act recognized and decried the inadequacy of such a limited enforcement power:

> * * * Unless the disseminator of a false advertisement knows at the time of the dissemination that he may at some time in the future be held accountable by a criminal or civil penalty action for the unlawful dissemination, he will not be deterred from such dissemination. It is just this deterring effect that is lacking when dependence is placed upon cease and desist orders for enforcement.

Their fears proved well founded. Each subsequent decade has brought forth indictments of the FTC's incapacity to enforce section 5(a)(1) of the Federal Trade Commission Act.

In the 90th Congress, Chairman Magnuson introduced and the Senate passed S. 3065, the "Deceptive Sales Act", which would have given the FTC authority to seek preliminary injunctions to bring unfair or deceptive practices to a halt immediately in appropriate circumstances. The House did not act. This legislation was reintroduced in substantially identical form in the 91st Congress, on May 26, 1969, by Consumers Subcommittee Chairman Moss and Chairman Magnuson, as S. 2246.

On October 31, 1969, President Nixon, in his consumer message to Congress, called for "expanded powers for a revitalized Federal Trade Commission, to enable it to protect consumers promptly and effectively." The Administration's "Consumer Protection Act of 1969" was introduced by Chairman Magnuson, together with Senators Baker, Griffin, Prouty, and Scott as S. 3201, on December 3, 1969.

The Consumer Subcommittee of the Commerce Committee commenced hearings on these proposals shortly after the introduction of S. 3201, receiving the testimony of Mrs. Knauer, Consumer Advisor to the President, and Assistant Attorney General McLaren on behalf of the Administration. The Subcommittee also sought the benefit of the experience of each Commissioner of the FTC individually.

Commissioner Philip Elman, in testimony before the Committee, explained how the FTC's regulatory anemia was related to its dependence upon cease and desist orders:

> * * * [A]s to most products and services offered the public, the principle protection for the consumer is left to the Federal Trade Commission and its limited power to prohibit unfair and deceptive practices solely through issuance of orders to cease and desist having only prospective effect. Unless and until an order based on past violations is issued, no penalties, criminal or civil, can be imposed for practices that

10

violate the law, no matter how flagrant and harmful to the public. And even as to respondents under order, they are subject to civil penalties only if violations of the order are proved in a new, separate proceeding brought by the attorney general in a federal court. Finally, while injured consumers are given a private right of action under a few statutes (e.g., the Consumer Credit Protection Act), no recovery of damages may be had under the FTC act even when they result from unfair and deceptive practices which violate an outstanding order to cease and desist.

And Commissioner Mary Gardner Jones strongly concurred:

* * * [W]hat we need are stronger sanctions. A cease and desist order is not enough to create the kind of deterrent that one needs so that in fact business will police itself, because no agency, state or federal, can police violations of law. What you depend on is for the community to police itself. But in order for a community to police itself, you have to have effective sanctions.* * *

Burgeoning public impatience with the Commission in the consumer conscious 1960's—fueled by revelations of bureaucratic ineptitude and consumer neglect—led President Nixon in April, 1969, to seek from the American Bar Association a "professional appraisal of the present efforts of the FTC in the field of consumer protection." The ABA responded with a landmark study performed by a special commission under the Chairmanship of Miles W. Kirkpatrick. Among other things, the Kirkpatrick Commission concluded:

* * * We believe that effective law enforcement in this area requires the creation of new procedural devices, including a right in the FTC, in appropriate situations, to seek preliminary injunctions against deceptive practices, and some form of private relief for or on behalf of consumers injured by such practices.

FTC Chairman Casper Weinberger, who had taken the reigns of the Commission at the moment in its 50 year history when it had reached its nadir in public esteem and confidence, on behalf of a unanimous Commission, sought new powers from Congress. In addition to authority to obtain preliminary injunctions, Chairman Weinberger asked for (1) authority to assess civil penalties for existing violations of law, (2) authority to assess civil penalties for violations of existing commission orders, and (3) authority to award damages to consumers injured by acts or practices found by the commission to violate the law.

Chairman Weinberger told the Committee that these provisions "represent extremely important proposals, the enactment of which will enable the Commission to give the country's consumers the protection from unfair and deceptive practices to which they are entitled." Support for these statements has been restated by both succeeding Chairmen, Miles W. Kirkpatrick, and Louis A. Engman.

Although S. 3201 was reported to the floor too late in the second session of the 91st Congress to receive floor action, Chairman Magnuson and Senator Moss renewed their efforts to improve the Federal Trade

Commission Act in the 92d Congress through the introduction of the "Consumer Products Warranties and Federal Trade Commission Improvements Act of 1971," which combined the warranty provisions discussed above with the FTC reforms.

After extensive consideration of this legislation, the Committee reported it favorably to the floor of the Senate, where it passed by a vote of 72 to 2. In the rush of business surrounding the end of the 92nd session, the House was unable to act.

On January 12, 1973, Chairman Magnuson and Senator Moss introduced S. 356, a refined version of the same legislation. Comments on the bill were solicited, and after further refinements, the legislation was ordered reported to the floor of the Senate.

## SECTION-BY-SECTION ANALYSIS

### TITLE I

*Definitions (section 101)*

(1) As used in title I, "Commission" means the Federal Trade Commission.

(2) The term "consumer product" is limited to tangible personal property, not realty. Furthermore, to qualify as a consumer product, the tangible personal property must normally be used for either personal, family, or household purposes.

There are many products which are used for both personal and business purposes. For example, a typewriter is clearly a consumer product when used in the home by members of the family. It is not uncommon, however, for typewriters to be purchased by businessmen for exclusively business purposes. This may create an ambiguous situation in many instances. To the extent that there is any necessary ambiguity in the term "consumer product," the ambiguity should be resolved in favor of coverage. Personal or family use of a typewriter is not uncommon; therefore, for the purposes of this title, a typewriter would be considered a "consumer product" if any question arose. Of course, the Federal Trade Commission could exempt a warrantor from the disclosure and labeling provisions of the bill to the extent that he sells consumer products to persons for use in their businesses.

The term "consumer product" is also defined to include property which is intended to be attached to, or installed in, real property—without regard to whether it is so attached or installed. An appliance which has been attached to or installed in real property might no longer be considered "tangible personal property" for purposes other than this bill because the appliance may become a fixture, and thus be characterized as realty rather than personalty. The definition of "consumer product" insures that fixtures which are normally used for personal, family or household purposes will be covered by the act without regard to whether the object in question would be considered realty or personalty for some other purpose.

The term "consumer product" is limited in subsection (2) of section 101 by the sentence, "not withstanding the foregoing, the provisions of 102 and 103 of this title affecting consumer products apply only to consumer products each of which actually costs the purchaser more than $5." This language has the effect of excluding products costing $5 or less from the disclosure and designation requirements of title I.

12

However, any such excluded consumer product remains subject to the provisions of the Federal Trade Commission Act, and, if it is warranted in writing, to the other sections of this title, particularly section 110. A written warranty on a consumer product costing $5 or less which meets Federal standards for warranties under section 104 of this title may be designated a "full" warranty, although there is no requirement that it be so labeled. Of course, if such a warranty did not meet Federal standards, the prohibitions of the Federal Trade Commission Act against unfair or deceptive acts would prohibit it from being labeled as a "full" warranty.

(3) The term "consumer" is defined in subsection (3) of section 101 as the first retail buyer of any consumer product; any person to whom such product is transferred for use for personal, family, or household purposes during the effective period of time of a written warranty or service contract which is applicable to such product; and any other person who is entitled by the terms of such written warranty or service contract or by operation of law to enforce the obligations of such warranty or service contract. The use of the term person is meant in its most all-inclusive sense; for example, a corporation purchasing a color television set may be deemed to be a "consumer" within the meaning of this act.

The intent of the definition is to make clear that the supplier is not entitled to specify which classes of people may enforce the obligations of the warranty or service contract so long as the product is transferred for use for personal, family, or household purposes during the term of the warranty or service contract. Voluntarily assumed warranty or service contract obligations extend at least to the first purchaser and any subsequent transferee during the obligation period who uses the product for personal, family, or household purposes. Because the term "consumer" designates the scope of the warranty obligation, it also includes any other person who may enforce the obligations of the warranty or service contract either by operation of law or by the terms of the warranty or service contract.

The definition of consumer is not intended to include persons who utilize consumer products for commercial purposes. For instance, a clothes washer might be purchased by a consumer and subsequently transferred within the warranty period to a person who installs the machine in a commercial laundromat. The subsequent transferee would not be a consumer, since the product is not being used for personal, family, or household purposes.

(4) The concept of "reasonable and necessary maintenance" is defined in subsection (4) of Section 101, and is used in Section 104(d). If a supplier can show that a consumer has failed to provide reasonable and necessary maintenance, he is entitled to avoid his duties to repair or replace a malfunctioning or defective warranted consumer product if the lack of reasonable and necessary maintenance caused the malfunction or defect. "Reasonable" maintenance means that maintenance which the consumer could be expected to perform or have performed, given the skills he or she may be expected to possess and the tools normally available to a consumer, or the availability of maintenance facilities. "Necessary" maintenance includes the concept of reasonable maintenance but goes further to require that the reasonable

maintenance be necessary in order to keep the consumer product operating in a predetermined manner and performing its intended function.

(5) The term "repair" is defined in subsection (5) of Section 101 to include not only repair in the normal sense of correcting a malfunctioning consumer product, but also replacement of that malfunctioning product with a new consumer product or a component thereof which is identical or equivalent to the malfunctioning consumer product or component. The term is used in Section 104 in defining the duties of suppliers meeting Federal standards for warranties. To that extent, the concept of repairs set forth in subsection (5) of section 101 has direct applicability only to a "full" warranty. However, it is possible that in the context of a warranty other than a "full" warranty, the definition of repair in this bill might serve as a guide to the meaning of the word "repair".

(6) The term "replacement" is defined in subsection (6) of section 101. This term has direct applicability only to "full" warranties but might also serve as a guide in other warranty situations. The term includes the normal concept of replacement and requires that such replacement be with a new consumer product. The term also includes the refunding of the actual purchase price of the consumer product if repair or replacement is not commercially practicable or if the purchaser is willing to accept such refund in lieu of repair or replacement. In other words, the purchaser is required to accept a refund in lieu of repair or replacement if such repair and replacement it not commercially practicable; on the other hand, if repair and replacement is commercially practicable the consumer may, if he desires, accept such refund in lieu of repair or replacement if it is offered. This would allow the supplier, when he decides that neither repair nor replacement is commercially practicable, to refund the purchase price. A supplier could decide that repair or replacement is not commercially practicable, for example, in a situation of supplier-consumer disagreement over such things as whether reasonable and necessary maintenance has been performed, or whether misuse has occurred. This allows the supplier to make a business decision as to when neither replacement in kind nor repair is commercially practicable and to instead refund the purchase price.

Of course, when a product is to be replaced, the consumer is obliged to make the defective product "available" to the supplier. If the product is portable, the consumer might have to return the product to the point of purchase. In making a product "available" the consumer is required to free that product of any liens or incumbrances, but in those situations where fixtures are to be replaced, the consumer should be under no obligation to make the malfunctioning consumer product available free and clear of any liens or incumbrances attached to it because it is part of the real property. It would be impracticable to require the consumer to pay off the mortgage on his house in order to be eligible for replacement. The substitution of one such fixture for another should result in the transfer of the security interest on the defective product to the new consumer product so that the interest of the secured party would not be prejudiced.

14

(7) The term "supplier" is defined in subsection (7) of Section 101 as any person (including any partnership, corporation, or association) engaged in the business of making a consumer product or service contract available to consumers, either directly or indirectly. This definition would include all persons in the distribution chain including the component supplier, the manufacturer, the distributor, and the retailer.

Because the definition of "supplier" excludes those persons not regularly engaged in the business of making consumer products available to consumers, the warranty provisions of S. 356 do not apply to periodic private transactions.

(8) The term "warrantor" is defined in subsection (8) of section 101 as any supplier or any other party who gives a warranty in writing. Thus, a party not selling a product but offering a warranty on the product for the benefit of a consumer would be a warrantor.

(9) The term "warranty" is defined in subsection (9) of section 101 as including guarantee, and to warrant is to guarantee.

(10) The term "warranty in writing" or "written warranty" is defined in subsection (10) of section 101. Depending upon whether or not the warranty incorporates at a minimum the uniform Federal standards for warranty set forth in section 104, it may be either a "full warranty" or a "limited warranty".

(11) The words "warranty in writing against defect or malfunction of a consumer product" are defined in subsection (11) of section 101. A warranty in writing against defect or malfunction is one in which there is a written affirmation of fact or promise made "at the time of sale". Therefore, as applied to advertising, only point of sale advertising could be found to create a warranty in writing under the terms of this definition. Of course, this is not the case with respect to the broader category of express warranty as used in section 110(d). In order to create a warranty in writing against defect or malfunction of a consumer product under this section, the written affirmation or promise must relate to the nature of the material or workmanship and promise or affirm that such material or workmanship is defect free or will meet a specified level of performance for a particular period of time.

For example, a written statement given at the time of sale that a particular clothes washer would "effectively wash clothes" would create a "warranty in writing against defect or malfunction of the consumer product" if that statement became part of the basis of the bargain between the supplier and the purchaser. This statement would represent a "promise" that the "material or workmanship" of the product are such that it will "meet a specified level of performance", namely washing clothes effectively. Alternatively, a warranty in writing against defect or malfunction of the consumer product could arise if the supplier undertakes in writing to refund, repair, replace, or take other remedial action with respect to the sale of a consumer product in the event that the product fails to meet specifications set forth in the undertaking. For example, the supplier might state: "if this washer doesn't wash clothes effectively, I will refund its purchase price." Since this represents an undertaking in writing to refund the purchase price of the product if the product fails to wash clothes effectively, a warranty in writing against defect or malfunction of a

15

consumer product would have been created. In any event, any written affirmation, promise or undertaking discussed above would have to become part of the basis of the bargain between the supplier and the purchaser to qualify as a "warranty in writing against defect or malfunction of a consumer product".

(12) The term "without charge" is defined in subsection (12) of section 101. In section 104 a supplier making a "full" warranty and thus necessarily meeting or exceeding Federal standards must repair or replace any malfunctioning or defective consumer product within a reasonable time and "without charge". Normally a warrantor who assumes the obligation to remedy a defect or malfunction within a reasonable time and "without charge" would not assess a consumer with any cost attendant to the discharge of the warranty obligations. For example, the warrantor could not require the purchaser to return a consumer product by mail if the consumer had to pay for the postage or it was very difficult to mail. Likewise, if a repair facility was located at an unreasonable distance, it would normally be expected that the supplier would bear the cost of transporting the product to that facility. (See discussion of section 104, infra.)

The term does not necessarily mean that the warrantor must necessarily compensate the purchaser for incidental expenses, however, if the supplier can affirmatively demonstrate that such expenses should be borne by the purchaser. (See section 104, infra.)

Subsection 12 of section 101, however, does affirmatively require the warrantor to compensate the purchaser for any reasonable, incidental expenses resulting from the warrantor's failure to repair or replace within a reasonable time the malfunctioning or defective consumer product. Such incidental expenses may also be compensated if the warrantor imposes any unreasonable duties upon the purchaser as a condition of servicing, repair or replacement. (The use of the term incidental expenses here is not to be confused with the concept of incidental or consequential damages, which are to be governed by state law. See section 113(c).)

*Disclosure Requirements (section 102)*

Section 102 of title I outlines disclosure requirements for suppliers of consumer products who offer warranties in writing or service contracts in writing. Suppliers are required to disclose fully and conspicuously in simply and readily understood language the terms and conditions of their warranties. The Federal Trade Commission is authorized to detail these disclosure requirements in accordance with procedures set forth in section 109 of title I.

Enumerated in section 102 are certain informational areas which the Federal Trade Commission is to consider when promulgating disclosure regulations. These guidelines exemplify information that would promote consumer understanding of warranties both at the time of the sale and when the product breaks down. For example, subparagraph (h) of paragraph (2) of subsection (a) of section 102 suggests that the warrantor tell the consumer on what days and during what hours he will perform his obligations in case of defect or malfunction. For instance, if a refrigerator breaks down, a consumer could consult his warranty to ascertain whether the warrantor had emergency service on Saturdays or Sundays. This information, coupled

with that in subparagraph i) relating to the period of time it would take the warrantor to effect repair or replacement, would enable the consumer to know what to expect and to take necessary precaution against the spoilage of food in the interim before the necessary repairs could be completed. Such information would also be useful to the consumer in making a product selection at the time of sale. One may be more prone to purchase products from a supplier who provides emergency service for such items as refrigerators.

The Committee is of the belief that the informal dispute resolving mechanisms encouraged in section 110 will be useful for the redress of grievances only when their existence is known. Subparagraphs (j) and (k) suggests that the consumer should be notified of his ability to seek redress through both any informal dispute settlement mechanisms that the warrantor may offer or through legal remedies made economically feasible because of provision for recovery of reasonable costs, including attorney's fees based on actual time expended. Furthermore, if the warrantor is required to inform the consumer of his rights in the event the warrantor fails to perform, the Committee believes that the warrantor will have greater incentive to perform as promised.

Of course, the items of information suggested for disclosure in Section 102(a)(2)(A) through (K) are not intended to be either mandatory or exclusive. The Commission may well determine, in accordance with section 109, that disclosure of additional items of information may be appropriate. For instance, it may well be that for some products, disclosure of what constitutes "reasonable and necessary maintenance" would be appropriate.

Section 102(a)(1) authorizes the Federal Trade Commission to determine the manner and form in which information pertaining to any written warranty should be presented and displayed in advertising, labeling, point-of-sale material, or other representations in writing. Subsection (b) makes explicit the fact that the Commission is not authorized by this title to prescribe the duration of warranties given or to require that a product or its components be warranted. While it is the intent of the Committee that the Commission under authority of title I of this bill may not prescribe the substance of written warranties, except to the extent provided in section 104, this limitation is to be read in conjunction with the savings provision in section 112 which says that, "Nothing contained in this title shall be construed to repeal, invalidate, or supersede the Federal Trade Commission Act (15 U.S.C. 41 et. seq.) or any statute defined as an Anti-Trust Act." Furthermore, the Commission is expressly granted the authority to prescribe rules requiring warranty or service contract periods to be extended to compensate the consumer for the time during which the warranted use of his product was lost as a result of a defect or malfunction. As stated in section 102(b), such an extension should not occur unless the consumer is denied the use of his product at least ten days. The ten-day figure should be cumulative over the duration of the warranty period, since otherwise the purpose of any such rule could be circumvented.

*Designation of Warranties (section 103)*

Section 103 of title I requires suppliers who warrant in writing their consumer products to clearly and conspicuously designate such war-

ranties in a manner that will enable consumers to readily discern the type of warranty being given. If a warranty meets the Federal standards set forth in Section 104, and does not limit the liability of the warrantor for consequential damages, then it is to be conspicuously designated as a "full (statement of duration)" warranty. For example, an appliance guaranteed for a full year in accordance with Section 103(a) (1) would have a warranty headed with the designation: "full one year warranty." If a warranty in writing limits the liability of the warrantor for consequential damages, but in all other respects meets the requirements set forth in Section 104, then it shall be labeled as a "full (statement of duration) warranty (remedy limited to free repair or replacement within a reasonable time, without charge)". If a warranty in writing does not meet Federal standards, it would be designated in such a way as to clearly indicate to the consumer the fact that it is a "limited" as opposed to a "full" warranty. The designation should indicate the limited scope of the coverage afforded. For example, a warranty on an appliance might be designated as a "parts only warranty", or a warranty on an article of clothing might be headed "colorfastness only". The Federal Trade Commission, in Section 109, is empowered to define in detail the designation requirements for limited warranties.

There are several exceptions to the designation requirements set forth in section 103. First, if a product costs the purchaser $5 or less, a warranty on that product does not need to be designated in accordance with section 103. Second, the Federal Trade Commission may, pursuant to section 109, exempt a supplier from complying with the designation requirements in section 103. Finally, section 103(b) excludes from the designation requirements of Section 103 "expressions of general policy concerning customer satisfaction which are not subject to any specific limitations." For example, a statement such as "satisfaction guaranteed or your money back" does not have to be designated as a full or partial warranty. Section 103(b) also exempts such general policy statements from the provisions of sections 102 and 104 of title I. In order to be eligible for exemption, a general policy statement must not be subject to any "specific" limtiations. The word "specific" is included in **order to protect** a supplier from a consumer who uses a product for 10 years and then complains of dissatisfaction with the product. A refusal of a supplier to honor such an expression of dissatisfaction from a consumer who has used a product without expressing his objections for 10 years would not amount to a "specific" limitation on the general policy concerning consumer satisfaction.

In those situations where the purchaser may obtain both written statements or representations not subject to any specific limitations as well as specific warranties in writing from the same supplier of a consumer product, the written statement or representation not subject to any specific limitations should control unless the warranty in writing clearly and conspicuously excludes the guarantee of consumer satisfaction. (See also section 110(d)(2)). In any event, any statement or representation falling within the exclusion contained in section 103(b) would remain subject to the provisions of the Federal Trade Commission Act and to section 110 of title I.

*Federal Standards for Warranty (section 104)*

The minimum duties which a supplier must assume when giving a "full" warranty are described in section 104 of title I. At a mini-

mum, the supplier must promise to repair or replace any malfunctioning or defective consumer product covered by the warranty, within a reasonable time, and without charge. In addition, the warrantor is prohibited from imposing any duties other than notification upon the purchaser as a condition of securing repair or replacement of a consumer product covered by a warranty meeting Federal standards, unless the warrantor can affirmatively demonstrate that additional duties would be reasonable.

The words "repair," and "replace," are defined with specificity in section 101 of title I. The concept of "reasonable time" cannot be precisely defined. The amount of time which is reasonable will vary according to the customary time for repair of similar consumer products, the location of the defective consumer product in relation to the repair facility, the consumer's day to day need for the product, and other factors. The term "without charge" is defined in paragraph 12 of section 101 of title I. In order to add certainty and specificity to the relationship between the supplier and the purchaser, the Federal Trade Commission is empowered under Section 109(e) to define, to the extent possible, the duties imposed upon the supplier who decides to fully warrant his products. Such rules and regulations would be promulgated in accordance with the procedures set forth in section 109 of title I.

In determining whether a supplier can impose duties other than notification upon the purchaser, a court or the Commission would compare the magnitude of the economic burdens "necessarily" imposed upon a warrantor against the magnitude of the burdens of inconvenience and expense "necessarily" imposed upon the purchaser. The word "necessarily" requires a court or the Commission to explore the alternatives available to the supplier and the purchaser before weighing the supplier's burden against the purchaser's burden. As an illustration, suppose the manufacturer of a small, portable consumer product offers a "full" warranty but requires the consumer to personally deliver the product to a service center in case of malfunction or defect. The supplier might argue that this is a reasonable burden because it would be cheaper for the purchaser to bring the product to the service center than it would be for the supplier to maintain a pick-up system. Before evaluating the reasonableness of the duty imposed by the supplier, a court or the Commission should explore alternative methods of returning the product to the service center for repair.

For example, it may be less costly to all parties concerned to use the mails or a private delivery service to transport the malfunctioning or defective product. If this were so, then placing the burden of personal delivery to the service center upon the consumer would be unreasonable. Further analysis may be necessary, however, in order to determine what type of mailing duty or delivery to the private carrier would be reasonable. For example, the warrantor in the above example might change his warranty to require the purchaser to mail the defective or malfunctioning consumer product to a service center for repair. If the average rate of return for repair or replacement of the product is one for every hundred sold and if the average cost for mailing that product to the service center is $1.00, the supplier's economic burden would be $1.00 per hundred sold, assuming he already absorbs the cost of mailing the product back to the consumer. In all likelihood, this

cost would be passed on to purchasers of these products by charging 1¢ more per product. If the supplier pays the cost of the return mailing, then the cost to the one purchaser out of one hundred who has to send his product for repair would be his time in having to package and mail the product plus the 1¢ increase in purchase price. The remaining 99¢ would be paid by other purchasers, and the price of the product involved would reflect both its acquisition and complete warranty cost. If the consumer was required to pay the mailing charge, then his expense would be his time required to package and mail the product plus the $1.00 mailing charge; this would impose a burden on him which would be one hundred times greater. The burden on the supplier, however, would remain relatively constant in either situation. A requirement for the consumer to pay the mailing cost would, therefore, be unreasonable because the magnitude of the burden imposed upon the consumer in relation to the magnitude of the burden imposed upon the supplier is so much greater.

Subsection (b) of section 104 gives the purchaser or consumer the right to demand and receive replacement of a consumer product which has needed repair an unreasonable number of times during the warranty period. The provision is designed to rectify the situation where a consumer has received a product which turns out to be a "lemon", or where the supplier's repair system is so ineffectual that defects are not corrected even though the product is repeatedly returned for repair. In the face of continual malfunctions of the consumer product, the ability to continue to return the product for repair is insufficient recourse for the consumer. In order to give specificity to the language "unreasonable number of times during the warranty period," the Federal Trade Commission, in section 109(e), has been directed to "define in detail" the provisions of subsection (d) of section 104. This would allow the FTC by rule to establish what in fact is "an unreasonable number of times" for different categories of consumer products. A full refund of the purchase price in lieu of replacement with a new product would satisfy the requirements of this section if the supplier determined that repair or replacement was not commercially practicable in the circumstances. In either case, the burden of depreciation is to fall upon the supplier. (See discussion of section 101(6), supra.)

Subsection (c) of section 104 states that the full warranty duties assumed by a supplier extend to the consumer. "Consumer" is defined in section 101(3).

Subsection (d) of section 104 states that a supplier does not have to repair or replace a consumer product which malfunctions or becomes defective during the warranty period if he can sustain the burden of proof and show that damage, while in the possession of the purchaser, (opposed to damage in transit prior to the possession, for example), or unreasonable use caused the product to malfunction or become defective. (See discussion of "reasonable and necessary maintenance" supra, at section 102.)

*Full and Limited Warranties of a Consumer Product (section 105)*

Section 105 states that the warranty provisions in S. 356 would not prohibit the selling of both full, full (with limitation of liability for consequential damages), and limited warranties if such warranties are clearly and conspicuously differentiated. For example, a consumer

20

product might be sold with a "full one year warranty—remedy limited to free repair or replacement within a reasonable time, without charge". The supplier might also offer free parts replacement for an additional year. That limited warranty might be labeled a "two year free parts replacement guarantee." In other words, the measures of time for the limited warranty would run from the time of purchase to the end of the warranty period. In the example given the limited warranty during the first year would actually be subsumed under the full warranty.

*Service Contracts (section 106)*

Section 106 provides that a supplier may sell a service contract to the purchaser in lieu of, or in addition to, the warranty. Section 106 requires that a service contract fully and conspicuously disclose in simple and readily understood language its terms and conditions. The Federal Trade Commission is authorized to prescribe the manner and form in which the terms of service contracts should be clearly and conspicuously disclosed. The effect of this section is to require the same sort of disclosure requirements on both service contracts and warranties so that both will be fully understandable to the consumer.

*Designation of Representatives (section 107)*

In hearings before the Committee in the 92d Congress, concern was expressed that warrantors might be prevented from delegating to representatives the performance obligations assumed under a written warranty. Section 107 states that nothing in title I shall be construed to prevent any warrantor from making any "reasonable and equitable arrangements" for representatives to perform warranty duties.

The Committee did not intend to allow warrantors to make unjust or inequitable arrangements under which representatives would be bound to perform warranty duties. The phrase "reasonable and equitable arrangements" is intended to make clear that, to the extent a supplier asks or requires another party to assume responsibilities under the warranty, that party is not to be victimized by unreasonable or inequitable arrangements. Hence one of the purposes of this section is to insure that the manufacturer does not escape his liability under this title by shifting responsibility to dealers, wholesalers, retailers, or others in the chain of distribution. Since manufacturers have primary control over the quality of products, the intent of this section is to place full responsibility on them, while at the same time allowing others, such as dealers, to perform services related to warranties if they are equitably compensated. Therefore, this section also states that "no such arrangements shall relieve the warrantor of his direct responsibility to the purchaser or necessarily make the representative a co-warrantor." For example, the Federal Trade Commission has reported that some of the problems associated with automobile warranties in the past may have resulted from the failure of auto manufacturers to reasonably and equitably compensate their dealers for warranty work.

Nothing in section 107 is intended to dictate the method of compensation for warranty or service contract work, so long as whatever method used insures that such compensation is equitable. For instance, the supplier could build into the wholesale price the cost of warranty service and then compensate dealers who perform the warranty obligations by direct payment for services performed; or the manufacturer could establish a low wholesale price that excludes the cost of war-

ranty service and a dealer who performs the warranty obligation could receive his compensation out of the dollar margin between the wholesale and retail price. While both methods could be examples of compensation which would satisfy the requirements of section 107 so long as the particular arrangements are "reasonable and equitable," direct payments would be the more likely method to meet the test.

While a manufacturer can issue a warranty that says certain authorized service representatives will repair or replace the defective product, the consumer has recourse directly against the manufacturer as warrantor, if these representatives fail to perform. The manufacturer could not defend against an action for failure to perform by arguing that the designated representative, not the manufacturer, was responsible for the failure of performance.

*Limitation on Disclaimer of Implied Warranties (section 108)*

Subsection (a) of section 108 prohibits a supplier (defined in paragraph 7 of Section 101) from disclaiming implied warranties such as the warranties of merchantibility or fitness, thereby building a base of protection for consumers whose products are warranted in writing. This subsection is designed to eliminate the practice of giving an express warranty while simultaneously disclaiming implied warranties. This practice has often had the effect of limiting the rights of the consumer rather than expanding them, as he might be led to believe.

Subsection (b) of section 108 has been included in the bill to clarify the relationship between implied warranties and express warranties. The subsection states that implied warranties may not be limited as to duration either expressly or impliedly through a designated warranty in writing or other express warranty. This provision clarifies the relationship between express and implied warranties on consumer products, by maintaining the independence of one from the other. This will mean that the implied warranties, created by operation of law, can only be limited by operation of law and not "expressly or impliedly" by an express warranty. As a result, suppliers and consumers are placed on equal footing when determining how long a particular implied warranty lasts. Through negotiation between consumer and supplier (and ultimately through determination by courts if that becomes necessary) the duration of an implied warranty such as the warranty of fitness for ordinary use would be established. Thus, a consumer whose warranty in writing for one year is unenforceable because the warranted product malfunctioned one year and six days after the time of purchase might still have recourse against the supplier for warranty of fitness for ordinary use.

It is not the intent of the Committee to alter in any way the manner in which implied warranties are created under the Uniform Commercial Code. For instance, an implied warranty of fitness for particular purpose which might be created by an installing supplier is not, in many instances, enforceable by the consumer against the manufacturing supplier. The Committee does not intend to alter currently existing state law on these subjects.

*Federal Trade Commission (section 109)*

The Federal Trade Commision is required to promulgate rules and regulations to facilitate the implementation of certain aspects of title

22

I. The Commission is to define in detail the disclosure requirements for warranties set out in 102, and to define the disclosure requirements for service contracts as provided in section 106; it is to determine when a warranty in writing does not have to be designated in accordance with section 103, and to define in detail the disclosure requirements of section 103 (2) (a); and it is to define in detail the duties set forth in section 104 (a), (b), and (c), and to define their applicability to warrantors of different categories of consumer products with "full" warranties.

Section 109 also sets forth in the procedure which the Federal Trade Commission is required to follow in establishing these rules. The language describing the type of procedure which the Commission is to follow in promulgating rules represents a compromise between simple informal rulemaking procedures and the more complex, complicated, and time consuming formal hearing procedures contained in sections 556 and 557 of title 5 of the United States Code. But for the qualifying words "structured so as to proceed as expeditiously as practicable," the Commission would be bound to follow at all times the formal hearing procedure when carrying out its rulemaking responsibilities. The qualifying words, however, have been added to indicate the Committee's desire not to require a formal oral hearing with cross examination as a part of all proceedings. It is the intent of the Committee to afford interested parties, both consumers and industry representatives, greater procedural rights than accorded under section 553. Therefore, the Committee provides for a public record and an opportunity for an agency hearing which assures judicial review on the basis of "substantial evidence." (See section 706 of title 5 of the United States Code.)

As to the type of public record developed and the form of agency hearing provided, the Committee is of the opinion that the Federal Trade Commission can best determine the type of proceeding it should hold so as to promulgate rules as expeditiously as practicable. The Committee desires to avoid the abuse of cross examination by interested parties which delays unduly the rulemaking process. Therefore, it is anticipated that expeditious rulemaking would not normally include formal hearings. But an opportunity for all interested persons to participate in the rulemaking should be afforded. In many situations, in the Committee's view, interested persons could submit all or part of the evidence in written form. The Committee also expects the Federal Trade Commission to exercise vigorously its discretion which permits it "as a matter of policy . . . to provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence." (See subsection (b) of section 556 of title 5 of the United States Code.) Such Commission action would avoid unwarranted delays caused by repetitious testimony offered by parties with essentially common interests.

*Private Remedies (section 110)*

Section 110 spells out the remedies available to the purchaser of consumer products. A purchaser can utilize informal dispute settlement procedures established by suppliers or, having afforded a supplier a reasonable opportunity to cure, may resort to formal adversary

proceedings with reasonable attorney's fees available if successful in the litigation (including settlement).

Subsection (a) of section 110 declares that it is the policy of Congress to encourage the development of informal dispute settlement mechanisms. If a supplier develops such a mechanism, then the "consumer" as defined in title I is required to utilize such mechanism as part of the opportunity given the supplier to cure a breach prior to resorting to formal legal action. The Federal Trade Commission is empowered to promulgate guidelines for the establishment of these informal dispute settlement mechanisms and is required to supervise them on its own initiative or when petitioned by an interested party to insure their bona fide operation. This provision is not intended to require the Commission to review individual disputes but only to require them to oversee generally dispute settlement mechanisms.

Subsection (b) authorizes any "consumer" (defined in section 101 (3)) to sue for breach of warranty or service contract in an appropriate district court, but any such suit shall be subject to the jurisdictional requirements of section 1331 of title 28 of the United States Code. In effect, this means a person or at this time a class of persons must show individual damages of ten thousand dollars or more in order to bring suit in a Federal court.

But any "consumer" damaged by the failure of a supplier to comply with any obligations assumed under an express or implied warranty or service contract subject to this title—i.e. a warranty in writing, a service contract in writing, an express warranty (defined in section 110(d)(1)), or implied warranties—may sue in any State or District of Columbia court of competent jurisdiction. Thus, for the most part, the Federal rights created by title I of this bill will be enforced in State rather than Federal courts.

As previously mentioned, prior to commencing any proceeding authorized by title I a purchaser must afford the supplier a reasonable opportunity to cure any breach, including the utilization of any bona fide informal dispute settlement mechanism. Any purchaser who utilizes an informal dispute settlement mechanism would not be prevented from seeking formal judicial relief following such utilization. Of course in a class action suit only representatives of the class would have to avail themselves of any bona fide informal dispute settlement mechanism on behalf of the class before the class action suit could be instituted.

In order to preserve the status quo as to the eligibility under State law for participation in class actions, subsection (b) of section 110 provides that "nothing in this subsection shall be construed to change in any way the jurisdictional or venue requirements of any State." Because Federal rights would be enforced in State courts, some might argue that limitations that certain States impose on participation in class action litigation, would not be valid. The above-mentioned language preserves such limitations but does not affect the requirement that suits authorized by title I may not be maintained until a purchaser or his representative first utilizes any bona fide informal dispute settlement mechanism which the supplier has provided.

Subsection (c) of section 110 provides for the recovery of court costs and reasonable attorney's fees in the event a "consumer", as de-

fined in title I, is successful in a suit for breach of an express or implied warranty or service contract obligation. This provision would make economically feasible the pursuit of remedies by consumers in State and Federal courts. It should be noted that an attorney's fee is to be based upon actual time expended rather than being tied to any percentage of the recovery. This requirement is designed to make the pursuit of consumer rights involving inexpensive consumer products economically feasible. Of course, where small claims courts are available and function adequately in resolving consumer disputes, the Committee encourages their use; and to the extent legal representation is not necessary in such courts, attorney's fees would probably not be available.

Subsection (d) of section 110 defines an "express warranty" in a manner paralleling the Uniform Commercial Code's definition. If a consumer product accompanied by a warranty in writing or service contract in writing has been expressly warranted outside the writing, then the purchaser can enforce the terms of that warranty against the supplier actually making it and recover court costs and reasonable attorney's fees. For example, a salesman selling a consumer product warranted in writing for one year who said: "I guarantee that this product will perform perfectly for 5 years" would be deemed to have created an express warranty. If he was not acting as an agent for the retailer or manufacturer in making that statement, only the salesman himself would be the warrantor, and the purchaser would have recourse only against the salesman in enforcing the terms of the express warranty. Of course an affirmation merely of the value of the consumer product or service or a statement purporting to be merely the supplier's opinion or commendation would not create an express warranty.

*Government Enforcement (section 111)*

Subsection (a) of section 111 states that any failure to comply with the requirements imposed by or pursuant to title I shall be considered a violation of section 5 of the Federal Trade Commission Act.

Paragraph (1) of subsection (b) of section 111 gives the district courts of the United States jurisdiction to restrain violations of title I in an action brought by the Attorney General or the Commission. Any temporary restraining order or preliminary injunction would be issued by a District Court without bond. Such restraining order or preliminary injunction may be dissolved if a complaint is not filed within a reasonable time after issuance as specified by the court. Provision is made for joining other parties as the court deems appropriate, and to that end nationwide service of process is provided for.

Paragraph (2) of subsection (b) of section 111 authorizes the Attorney General to serve a civil investigative demand upon any person "under investigation" who may be in the possession, custody or control of documentary material relative to any violation of title I. The procedures to be followed in serving civil investigative demands are set out in detail in section 111. It is important to note that such demand may be served only on persons who are under investigation. This burden, however, should not be great because the Attorney General, believing anyone to be in possession of documentary material relevant to any violation of this title, could put that person under investigation

prior to the serving of a demand in order to comply with the "under investigation" requirement.

*Savings Provision (section 112)*

This section states the authority of the Federal Trade Commission under the Federal Trade Commission Act is in no way superseded by this title. This provision also assures that those products not specifically covered under this bill because of the $5 exemption applicable to section 102 and 103 are, nevertheless, subject to the Federal Trade Commission's power to proscribe unfair and deceptive acts or practices. (*See also* section 113(c)).

*Scope (section 113)*

Subsection (a) of this section states that the provisions of the bill and the powers granted to both the Federal Trade Commission and to the Attorney General extend to the sale of consumer products and services "affecting" interstate commerce as well as those "in" interstate commerce. This subsection would make the rights and remedies in title I available to low income consumers within our cities who are often victimized by acts only "affecting" interstate commerce. A proviso was included in subsection (a) to make clear that the operation of this Act is not to interfere with the operation of other Federal laws, such as the Clean Air Act.

Subsection (b) of section 113 specifies the way in which title I would interact with State laws regulating warranty practices. States would be preempted from requiring labeling or disclosure requirements that differed from those prescribed pursuant to title I of this bill. This was designed to insure that suppliers of consumer products would not have to print warranties in conformance with the many possible State and Territorial disclosure formulas or labeling procedures. Rules of the Federal Trade Commission detailing disclosure and designation requirements pursuant to sections 102 and 109 would preempt any different State requirements. Any rules defining "full" warranty duties (section 104) would constitute preemptive national standards for warranties unless the Commission permitted a State to deviate from those rules in a manner prescribed in the rule.

Because title I of this bill allows a supplier to give a warranty or not as he chooses and because it allows him to define the contents of any warranty given (as long as it is not unfair or deceptive or does not contain a disclaimer or limitation on the duration of implied warranties), the Committee has not been willing to follow the suggestion of those affected persons who asked that federal legislation totally preempt State action. The Committee was of the opinion that States should be free to determine that, for the protection of their citizens, a higher level of warranty protection would be required. Of course, the way in which any mandatory warranty protection would be required to be presented would have to be consistent with federal disclosure and designation standards. Furthermore, to the extent a supplier offers a "full" warranty in compliance with Federal standards, he is protected against the imposition of additional burdens by a State unless the Federal Trade Commission, in exercising its rulemaking authority, permits such imposition in accordance with the considerations set out in section 113(b).

26

For the purposes of illustration, it would probably be consistent with the provisions of subsection (b) of section 113 for a State to determine that all widgets sold in that State must contain a "Parts Only Warranty" for one year or a "Full One Year Warranty". In other words, a State can work within the provisions of this bill, and the rules and regulations implementing it, to advance the interests of consumers within its borders by mandating coverages which the Federal bill describes but does not mandate.

Subsection (c) of section 113 states that nothing in title I changes State law which allows a person to recover consequential damages for injury to the person resulting from a breach of warranty, or any State law which restricts the ability of a warrantor to limit his liability for consequential damages. For instance, since section 2-719 of the Uniform Commercial Code permits the limitation of remedies only when such a provision is included in the warranty, any limitation on incidental or consequential damages would have to be clearly disclosed in accordance with section 103.

## Effective date (section 114)

Section 114 sets forth the timing for implementation of title I. The effective date is six months after the date of enactment, except that any of those portions of title I which can not reasonably be met without the promulgation of rules, shall take effect six months after the promulgation of such rules by the Federal Trade Commission (with an additional six month extention possible). The Commission is to promulgate such rules as soon as possible, but no event later than one year after the date of enactment of this Act. The time limitations contained in section 114 regarding the promulgation of rules by the Commission apply only to the promulgation of initial rules and do not restrict the Commission's rule-making activity in the warranty area *in futuro*.

Comments received by the Committee on this section expressed fears that a rule or regulation might be applied to merchandise manufactured prior to its effective date. The intent of the Committee is clear that, "this title shall take effect six months after the date of its enactment but shall not apply to consumer products manufactured prior to such effective date." Furthermore, any rules promulgated by the Commission would not take effect until six months after their final promulgation, except that the Commission may provide an additional six months so that suppliers can bring their written warranties into compliance. Thus any product manufactured prior to these effective dates would not have to comply with either the provisions of the Act or rules promulgated by the Commission.

## TITLE II

## Expanded Federal Trade Commission Jurisdiction (section 201)

Section 201 of this title expands the Federal Trade Commission's jurisdiction from acts and practices "in" interstate commerce to those "affecting" interstate commerce. This expansion of the Commission's jurisdiction is intended to permit more effective policing of the marketplace by bringing within reach practices which are unfair or deceptive and which, while local in character, nevertheless have an adverse impact upon interstate commerce.

27

In considering certain arguments against expansion of the Commission's jurisdiction, the Committee was mindful of the danger of making the Commission alone responsible for eradicating fraud and deceit in every corner of the marketplace. This is not the Committee's intent in expanding the jurisdiction of the Commission. State and local consumer protection efforts are not to be supplanted by this expansion of jurisdiction. In many situations the Commission, through its Consumer Advisory Boards and expanded field office operations would work concurrently with State and local governments to attack in their incipiency flagrant consumer abuses. However, this expansion of jurisdiction, in conjunction with the authority to seek injunctive relief, will enable the Commission to move against local consumer abuses where State or local consumer protection programs are non-existent or where fly-by-night operators hit one local area and then quickly move on to another before local officials can take action. (For similar expansion of authority see section 206 and 209 of title II of this bill.)

*Civil Penalties (section 202)*

This section of the bill authorizes the Federal Trade Commission, through its own attorneys, to initiate civil actions to recover penalties against any person (including partnerships, corporations, or other entities) who commits an act or engages in a practice which he knows is unfair or deceptive to consumers and prohibited by section 5(a)(1). The maximum penalty recoverable would be $10,000 per violation, but this penalty could be settled if the Commission publicly stated its reasons and the court approved the settlement.

It should be noted that the word "consumer" as used in title II is not related to the definition of that term in title I. The use of the word "consumer" in title II is to be read in its broadest sense and is not limited to those persons defined in section 101(3) of title I of S. 356.

In any civil action initiated under authority of the amendment to the Federal Trade Commission Act set forth in this section, the Commission would have to show "actual knowledge or knowledge fairly implied from objective circumstances." A violation of a Commission rule would in most cases constitute a violation with "knowledge fairly implied from objective circumstances" unless the person against whom the action was brought could show why he should not have been expected to have knowledge of the Commission rule or that the rule itself is invalid.

The civil penalty which can be imposed is $10,000 "for each such violation." The Commission would have to judge what constituted "each such violation" in the particular case, but "each such violation" would not necessarily be each product unfairly or deceptively sold. The focus, in the opinion of the Committee, should be on the decision-making process of the person against whom the penalty is sought, the number of different decisions he made and the harm generated by those decisions.

*Consumer Redress (section 203)*

After a cease-and-desist order is made final, the Commission may seek remedial relief on behalf of consumers injured by the specific

28

unfair or deceptive act or practice which was the subject of the cease-and-desist proceeding in an action initiated in Federal district court. This provision would enable the Commission to more adequately protect consumers by affording them specific redress for their injuries. At the present time, cease-and-desist orders have prospective application only and afford no specific consumer redress to consumers who have been injured. A proceeding for consumer redress under section 203 could seek relief only for injury sustained as a result of the particular unfair or deceptive act or practice which was the subject of the cease and desist order.

In granting new powers to the Commission, section 203 does not in any way purport to supplant private actions by consumers. The Committee's intent in giving these remedial powers was (1) to reinforce the Commission's credibility in policing the marketplace by authorizing sanctions which could realistically be expected to inhibit unlawful business practices, and (2) to enable the Commission, where its investigation of an act or practice revealed damage to consumers, to utilize the results of that investigation for the benefit of the damaged parties.

The nature of the relief the Commission could obtain from the court on behalf of consumers would be limited only by the nature of the injury done and the remedial powers of the court. The enumeration in section 203 of the types of relief available are advisory only and would not limit the Commission in pleading or the court in acting to fashion other appropriate remedial relief. It is clear, however, that no punitive or exemplary damages are authorized under this section.

This section would not affect whatever power the Commission may have under section 5 of the FTC Act to fashion relief in its initial cease-and-desist order, such as corrective advertising or any other remedy, which may be appropriate to terminate effectively unfair or deceptive acts or practices. Likewise, there is no intent on the part of the Committee to disturb the Commission's power to compel restitution by its own order when such restitution is necessary to terminate a continuing violation of section 5 of the Federal Trade Commission Act. Section 203 is applicable to those situations where the Commission acts to make specific consumers whole and is not intended to supplant general actions by the Commission which are designed to dissipate the prior effects of unfair or deceptive acts or practices.

The court is expressly authorized to give notice reasonably calculated, under all the circumstances, to appraise all consumers allegedly injured by the defendant's acts, of the pendency of the action for redress under section 203. While an action under section 203 is not a class action, it may be useful for the court to be guided by some of the provisions of Federal Rule of Civil Procedure 23. It is anticipated that those consumers actually receiving notice under this provision would be considered parties by representation in a section 203 action and bound by any judgment therein as if they were actual parties. Therefore, in any subsequent suit brought by such consumers under State law, they would be bound under the doctrine of collateral estoppel, as to issues actually litigated and necessarily determined in the section 203 action.

It is anticipated that a final cease-and-desist order will be given the same effect in a subsequent action for redress under section 203 that a government obtained antitrust decree is given in a subsequent private treble damage action. In that situation, the government obtained decree (including an FTC order) is given only prima facie effect and is thus at least rebuttable. It is not the intent of the Committee to encourage respondents to resist the finalization of cease-and-desist orders because of fear of the effects of an FTC order in a possible consumer redress action under section 203. This effect would be both unfortunate for the Federal Trade Commission, resulting in further delays in FTC proceedings, and unfair to the respondents, who would have to conduct themselves before the FTC with too strong an eye on the possible effect of the FTC cease and desist order in a subsequent consumer redress action under section 203. Thus, it is anticipated that a final cease-and-desist order would be given prima facie effect in a subsequent action under section 203, as is already the case under section 5(a) of the Clayton Act (see 15 U.S.C. 16(a)).

Finally, section 203 makes clear that the court has the power to consolidate an action under section 203 with any other action requesting the same or substantially the same relief upon motion of any party.

### Penalty for Violation of Cease and Desist Order (section 204)

This section increases the potential penalty for violation of an order of the Commission from $5,000 to $10,000. The FTC may seek such penalty through its own attorneys rather than relying upon the Justice Department. In addition to increasing the penalty, this section authorizes the Commission to seek mandatory injunctions against persons in violation of a Commission order for whom the threat of economic penalty is more apparent than real because they have no available resources with which to pay the penalty.

### Commission Self-Representation (section 205)

This section insures that the Commission will be able to represent itself in any civil proceeding involving the Federal Trade Commission Act. At the present time, the Commission must, in many situations, rely on the Department of Justice, which has been sluggish in the past in enforcing regulatory agency decisions in Federal courts. Similar authority to litigate to enforce independent agency determinations is already enjoyed by the National Labor Relations Board (see 29 U.S.C. 154(a)).

In addition to the representational authority specifically provided the Commission by sections 202, 203, 204, 207, 208, and 210 in actions to redress consumer grievances, and to enforce Commission orders, penalties, and subpoenas, the Committee intends to permit the Commission to conduct and control all other litigation involving Commission action under the FTC Act, whether the Commission be acting as plaintiff or defendant. Without intending any limitation, the Committee has in mind, for instance, actions seeking injunctions, declaratory judgments or other relief.

### Expansion of Jurisdiction (section 206)

See discussion in section 201 supra.

30

*Securing of Documentary Evidence (section 207)*

This section is basically designed to simplify the securing of documentary evidence and testimony. It authorizes the Commission to seek documentary evidence from any "party"; under the present terms of the Federal Trade Commission Act such evidence may be obtained only from "corporations".

As authorized in sections 202 and 205, the Commission may act through its own attorneys to enforce the Federal Trade Commission Act. Section 207 permits the FTC to use its own attorneys "to invoke the aid of a court in requiring the attendance and testimony of witnesses and the production of documentary evidence" and authorizes the Commission to go to court in its own behalf to seek "writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission issued under this Act."

*Reporting Requirements (section 208)*

This section streamlines reporting requirements under the Federal Trade Commission Act. The Commission is authorized to seek a civil penalty against any corporation which fails to file any annual or special report required by the Federal Trade Commission Act. Currently, a more complicated procedure involving the Department of Justice is necessary.

*Expansion of Jurisdiction (section 209)*

See discussion in section 201 supra.

*Injunctions (section 210)*

This section would permit the Commission to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer, and thus prohibited by section 5 of the Federal Trade Commission Act. The purpose of section 210 is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded.

Section 210 authorizes the granting of a temporary restraining order or a preliminary injunction without bond pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5. The test the Commission would have to meet in order to secure this injunctive relief is similar to the test it must already meet when attempting to secure an injunction against false advertising of food, drugs, devices, or cosmetics. (See 15 USC 53(a).)

Provision is also made in section 210 for the Commission to seek and, after a hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be

assured of a early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently.

*Enforcement Proceedings (section 211)*

This section permits the Commission to enforce penalties under the Federal Trade Commission Act. It is similar in concept to sections 202 and 205.

*Financial Institutions (section 212)*

This section removes from the Federal Trade Commission Act the presently existing exemption for banks insofar as unfair or deceptive acts or practices affecting commerce are concerned. The intent of the Committee in taking this action is to remove the anticompetitive situation which exists at present because some financial institutions are regulated for consumer protection purposes by the Federal Trade Commission and some are not, even though both types of institutions are offering substantially the same services to consumers. Second, presently existing Federal financial regulatory agencies either do not have the power or the desire to promulgate and enforce strong and uniform rules and regulations prohibiting unfair or deceptive acts or practices in the consumer credit field. The report of the National Commission on Consumer Finance has recommended that a single agency be given the power to promulgate rules and regulations in this area. It makes little sense to have agencies whose primary duty is to insure the solvency and liquidity of the institutions under their jurisdiction promulgating rules and regulations the violation of which may provide for potentially substantial civil penalties. The assumption of an active consumer protection role by such an agency could have a detrimental effect on the very solvency of the institution which the agency is required to protect. Furthermore, just as the Federal Reserve Board is authorized under the Truth In Lending Act to prescribe rules and regulations dealing with credit cost disclosure which apply to all creditors, it makes sense that the Commission should be empowered to issue rules and regulations to prevent unfair or deceptive acts or practices on the part of all business enterprises, including financial institutions.

The Federal Trade Commission would not issue rules or regulations in areas which are already adequately covered by the Federal Reserve Board's regulations under the Truth in Lending Act. If the Commission's legislative rulemaking authority is affirmed, then such rules would apply to financial institutions in the same manner as they would to all business enterprises. (See discussion of rulemaking, infra.)

Section 212 requires that the Commission consult with the various Federal financial regulatory agencies listed therein prior to prescribing rules and regulations. Furthermore, section 212 requires the Commission to delegate the power to enforce these rules and regulations to the

32

various Federal financial regulatory institutions listed therein. The Commission, however, may at any time by rule in accordance with section 553 of title 5 of the United States Code, request and receive redelegation of the enforcement powers under this section from any agency. This provision was included in order to insure that there is strong and uniform enforcement of the rules and regulations prohibiting unfair or deceptive acts or practices in the consumer credit field.

*Legislative Rulemaking*

During the 92d Congress, the Magnuson-Moss Warranty-FTC bill (S. 986) as passed by the Senate contained a provision reaffirming the legislative rulemaking authority of the Commission. A similar provision was included in S. 356 as introduced in the 93d Congress, but in a letter to Chairman Magnuson dated March 26, 1973, Chairman Engman informed the committee that:

> * * * the commission has concluded that it should await the imminent court decision and seek additional legislative authority only in the event of an adverse decision. The Commission, therefore, recommends that section 206 be deleted from the bill. Such a course will not jeopardize Commission rulemaking, and, in the meantime, American consumers can begin to reap the benefits associated with prompt enactment of the less controversial amendments provided in the legislation before this committee.

In accordance with the Commission's recommendation, the Committee deleted the rulemaking provisions from S. 356 in executive session.

Chairman Magnuson has pledged, however, to reintroduce legislation granting the Commission the power to promulgate legislative rules in the event of a decision by the courts which is adverse to the Commission on this issue. In other words, the deletion of rulemaking powers by the Committee is not to be read in any way as a reversal of the Senate's position in the 92d Congress, when it passed legislation by a vote of 72–2 which expressly conferred legislative rulemaking power upon the Commission.

## TEXT OF S. 356 AS REPORTED

A BILL TO provide disclosure standards for written consumer product warranties against defect or malfunction; to define Federal content standards for such warranties; to amend the Federal Trade Commission Act in order to improve its consumer protection activities; and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Magnuson-Moss Warranty-Federal Trade Commission Improvement Act.

## TITLE I—CONSUMER PRODUCT WARRANTIES

### DEFINITIONS

SEC. 101. As used in this Title—

(1) "Commission" means the Federal Trade Commission.

(2) "Consumer product" means any tangible personal property

any real property regardless of whether it is so attached or installed. Notwithstanding the foregoing, the provisions of sections 102 and 103 of this title affecting consumer products apply only to consumer products each of which actually costs the purchaser more than five dollars.

(3) "Consumer" means the first buyer at retail of any consumer product; any person to whom such product is transferred for use for personal, family, or household purposes during the effective period of which is normally used for personal, family, or household purposes, including any such property intended to be attached to or installed in time of a written warranty or service contract which is applicable to such product; and any other person who is entitled by the terms of such written warranty or service contract or by operation of law to enforce the obligations of such warranty or service contract.

(4) "Reasonable and necessary maintenance" consists of those operations which the purchaser reasonably can be expected to perform or have performed to keep a consumer product operating in a predetermined manner and performing its intended function.

(5) "Repair" may, at the option of the warrantor include replacement with a new, identical or equivalent consumer product or component(s) thereof.

(6) "Replacement" or "to replace", as used in section 104 of this title, means in addition to the furnishing of a new, identical or equivalent consumer product (or component(s) thereof), the refunding of the actual purchase price of the consumer product—

(1) if repair is not commercially practicable; or

(2) if the purchaser is willing to accept such refund in lieu of repair or replacement.

If there is replacement of a consumer product, the replaced consumer product (free and clear of all liens and encumbrances) shall be made available to the supplier.

(7) "Supplier" means any person (including any partnership, corporation, or association) engaged in the business of making a consumer product or service contract available to consumers, either directly or indirectly. Occasional sales of consumer products by persons not regularly engaged in the business of making such products available to consumers shall not make such persons "suppliers" within the meaning of this title.

(8) "Warrantor" means any supplier or other party who gives a warranty in writing.

(9) "Warranty" includes guaranty; to "warrant" means to guarantee.

(10) "Warranty in writing" or "written warranty" means a warranty in writing against defect or malfunction of a consumer product.

(A) "Full warranty" means a written warranty which incorporates the uniform Federal standards for warranty set forth in section 104 of this title.

(B) "Limited warranty" means a written warranty subject to the provisions of this title which does not incorporate at a minimum the uniform Federal standards for warranty set forth in section 104 of this title.

(11) A "warranty in writing against defect or malfunction of a consumer product" means:

(A) any written affirmation of fact or written promise made at the time of sale by a supplier to a purchaser which relates to the

nature of the material or workmanship and affirms or promises that such material or workmanship is defect-free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing to refund, repair, replace, or take other remedial action with respect to the sale of a consumer product if such product fails to meet the specifications set forth in the undertaking,

which written affirmation, promise, or undertaking becomes part of the basis of the bargain between the supplier and the purchaser.

(12) "Without charge" means that the warrantor(s) cannot assess the purchaser for any costs the warrantor or his representatives incur in connection with the required repair or replacement of a consumer product warranted in writing. The term does not mean that the warrantor must necessarily compensate the purchaser for incidental expenses. However, if any incidental expenses are incurred because the repair or replacement is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the purchaser as a condition of securing repair or replacement, then the purchaser shall be entitled to recover such reasonable incidental expenses in any action against the warrantor for breach of warranty under section 110(b) of this title.

## DISCLOSURE REQUIREMENTS

SEC. 102. (a) In order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products, the Commission is authorized to issue rules, in accordance with section 109 of this title, which may—

(1) prescribe the manner and form in which information with respect to any written warranty shall be clearly and conspicuously presented or displayed when such information is contained in advertising, labeling, point-of-sale material, or other representations in writing; and

(2) require the inclusion in any written warranty, in simple and readily understood language, fully and conspicuously disclosed, items of information which may include, among others:

(A) clear identification of the name and address of the warrantor;

(B) identity of the class or classes of persons to whom the warranty is extended;

(C) the products or parts covered;

(D) a statement of what the warrantor will do in the event of a defect or malfunction—at whose expense—and for what period of time;

(E) a statement of what the purchaser must do and what expenses he must bear;

(F) exceptions and exclusions from the terms of the warranty;

(G) the step-by-step procedure which the purchaser should take in order to obtain performance of any obligation under the warranty, including the identification of any class of persons authorized to perform the obligations set forth in the warranty;

(H) on what days and during what hours the warrantor will perform his obligations;

(I) the period of time within which, after notice of malfunction or defect, the warrantor will under normal circumstances repair, replace, or otherwise perform any obligations under the warranty;

(J) the availability of any informal dispute settlement procedure offered by the warrantor and a recital that the purchaser must resort to such procedure before pursuing any legal remedies in the courts; and

(K) a recital that any purchaser who successfully pursues his legal remedies in court may recover the reasonable costs incurred, including reasonable attorney's fees.

(b) Nothing in this title shall be deemed to authorize the Commission to prescribe the duration of warranties given or to require that a product or any of its components be warranted, except that the Commission may prescribe rules pursuant to section 553 of title 5, United States Code, that the term of a warranty or service contract shall be extended to correspond with any period in excess of a reasonable period (not less than ten days) during which the purchaser is deprived of the use of a product by reason of a defect or malfunction. Except as provided in section 104 of this title, nothing in this title shall be deemed to authorize the Commission to prescribe the scope or substance of written warranties.

(c) No warrantor of a consumer product may condition his warranty of such product on the consumer's using, in connection with such product, any article or service which is directly or indirectly identified by brand, trade, or corporate name; except that the prohibition of this subsection may be waived by the Commission if it finds that the imposition of such a condition is reasonable and in the public interest.

DESIGNATION OF WARRANTIES

SEC. 103. (a) Any supplier warranting in writing a consumer product shall clearly and conspicuously designate such warranty as provided herein unless exempted from doing so by the Commission pursuant to section 109 of this title:

(1) If the written warranty incorporates the uniform Federal standards for warranty set forth in section 104 of this title, and does not limit the liability of the warrantor for consequential damages, then it shall be conspicuously designated as "full (statement of duration)" warranty, guaranty, or word of similar meaning. If the written warranty incorporates the uniform Federal standards for written warranty set forth in section 104 of this title and limits or excludes the liability of the warrantor for consequential damages as permitted by applicable State law, then it shall be conspicuously designated as "full (statement of duration)" warranty, guaranty, or word of similar import. "(Liability for consequential damages limited; remedy restricted to free repair or replacement within a reasonable time, without charge)", or as otherwise prescribed by the Commission pursuant to section 109 of this title.

(2) If the written warranty does not incorporate the Federal standards for warranty set forth in section 104 of this title, then it shall be designated in such manner so as to indicate clearly and conspicuously the limited scope of the coverage afforded.

36

(b) Written statements or representations, such as expressions of general policy concerning customer satisfaction which are not subject to any specific limitations shall not be deemed to be warranties in writing for purposes of sections 102, 103, and 104 of this title but shall remain subject to the provisions of the Federal Trade Commission Act and section 110 of this title.

### UNIFORM FEDERAL STANDARDS FOR WRITTEN WARRANTY

SEC. 104. (a) Any supplier warranting in writing a consumer product must undertake at a minimum the following duties in order to be deemed to have incorporated the uniform Federal standards for written warranty—

(1) to repair or replace any malfunctioning or defective consumer product covered by such warranty;

(2) within a reasonable time; and

(3) without charge.

In fulfilling the above duties, the warrantor shall not impose any duty upon a purchaser as a condition of securing such repair or replacement other than notification unless the warrantor can demonstrate that such a duty is reasonable. In a determination by the Commission or a court of whether or not any such additional duty or duties are reasonable, the magnitude of the economic burden necessarily imposed upon the warrantor (including costs passed on to the purchaser) shall be weighed against the magnitude of the burdens of inconvenience and expense necessarily imposed upon the purchaser.

(b) If repair is necessitated an unreasonable number of times during the warranty period the purchaser shall have the right to demand and receive replacement of the consumer product.

(c) The above duties extend from the warrantor to the consumer.

(d) The performance of the duties enumerated in subsection (a) of this section shall not be required of the warrantor if he can show that damage while in the possession of the purchaser or unreasonable use (including failure to provide reasonable and necessary maintenance) caused any warranted consumer product to malfunction or become defective.

### FULL AND LIMITED WARRANTIES OF A CONSUMER PRODUCT

SEC. 105. Nothing in this title shall prohibit the selling of a consumer product which has both full, full (with limitation of liability for consequential damages) and limited warranties if such warranties are clearly and conspicuously differentiated.

### SERVICE CONTRACTS

SEC. 106. Nothing in this title shall be construed to prevent a supplier from selling a service contract to the purchaser in addition to or in lieu of a warranty in writing if the terms and conditions of such contract are fully and conspicuously disclosed in simple and readily understood language. The Commission is authorized to determine, in accordance with section 109 of this title, the manner and form in which the terms and conditions of service contracts shall be clearly and conspicuously disclosed.

DESIGNATION OF REPRESENTATIVES

Sec. 107. Nothing in this title shall be construed to prevent any warrantor from making any reasonable and equitable arrangements for representatives to perform duties under a written warranty except that no such arrangements shall relieve the warrantor of his direct responsibilities to the purchaser nor necessarily make the representative a cowarrantor.

LIMITATION ON DISCLAIMER OF IMPLIED WARRANTIES

Sec. 108. (a) There shall be no express disclaimer of implied warranties to a purchaser if any written warranty or service contract in writing is made by a supplier to a purchaser with regard to a consumer product.

(b) For purposes of this title, implied warranties may not be limited as to duration expressly or impliedly through a designated warranty in writing or other express warranty.

FEDERAL TRADE COMMISSION

Sec. 109. The Commission is authorized to establish rules pursuant to section 553 of title 5, United States Code, upon a public record after an opportunity for an agency hearing structured so as to proceed as expeditiously as practicable to—

(a) prescribe the manner and form in which information with respect to any written warranty shall be disclosed and the items of information to be included in any written warranty as provided in section 102 of this title;

(b) prescribe the manner and form in which terms and conditions of service contracts shall be disclosed as provided in section 106 of this title;

(c) determine when a warranty in writing does not have to be designated in accordance with section 103 of this title;

(d) define in detail the disclosure requirements in paragraph (2) of subsection (a) of section 103 of this title; and

(e) define in detail the duties set forth in subsections (a), (b), and (c) of section 104 of this title and their applicability to warrantors of different categories of consumer products with "full" warranties.

PRIVATE REMEDIES

Sec. 110. (a) Congress hereby declares it to be its policy to encourage suppliers to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms. Such informal dispute settlement procedures should be created by suppliers in cooperation with independent and governmental entities pursuant to guidelines established by the Commission. If a supplier incorporates any such informal dispute settlement procedure in any written warranty or service contract, such procedure shall initially be used by any consumer to resolve any complaint arising under such warranty or service contract. The bona fide operation of any such dispute settlement procedure shall be subject to review by

the Commission on its own initiative or upon a written complaint filed by any injured party.

(b) Any purchaser damaged by the failure of a supplier to comply with any obligations assumed under a written warranty or service contract in writing subject to this title may bring suit for breach of such warranty or service contract in an appropriate district court of the United States subject to the jurisdictional requirements of section 1331 of title 28, United States Code. Any purchaser damaged by the failure of a supplier to comply with any obligations assumed under an express or implied warranty or service contract subject to this title may bring suit in any State or District of Columbia court of competent jurisdiction. Prior to commencing any legal proceeding for breach of warranty or service contract under this section, a purchaser must have afforded the supplier a reasonable opportunity to cure the alleged breach and must have used the informal dispute settlement mechanisms, if any, established under subsection (a) of this section. Nothing in this subsection shall be construed to change in any way the jurisdictional or venue requirements of any State.

(c) Any purchaser who shall finally prevail in any suit or proceeding for breach of an express or implied warranty or service contract brought under section (b) of this section shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by such purchaser for or in connection with the institution and prosecution of such suit or proceeding, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

(d)(1) For the purposes of this section, an "express warranty" is created as follows:

(A) Any affirmation of fact or promise made by a supplier to the purchaser which relates to a consumer product or service and becomes part of the basis of the bargain creates an express warranty that the consumer product or service shall conform to the affirmation or promise.

(B) Any description of a consumer product which is made part of the bargain creates an express warranty that the consumer product shall conform to the description.

(C) Any sample or model which is made part of the basis of the bargain creates an express warranty that the consumer product shall conform to the sample or model.

It is not necessary to the creation of express warranty that the supplier use formal words such as "warranty" or "guaranty" or that he have a specific intention to make a warranty. An affirmation merely of the value of the consumer product or service or a statement purporting to be merely the supplier's opinion or commendation of the consumer product or service does not by itself create a warranty.

(2) Only the supplier actually making an affirmation of fact or promise, a description, or providing a sample or model shall be deemed to have created an express warranty under this section and any rights arising thereunder may only be enforced against such supplier and no other supplier.

GOVERNMENT ENFORCEMENT

SEC. 111. (a) It shall be unlawful and a violation of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) for any person (including any partnership, corporation, or association) subject to the provisions of this title to fail to comply with any requirement imposed on such person by or pursuant to this title or to violate any prohibition contained in this title.

(b)(1) The district courts of the United States shall have jurisdiction to restrain violations of this title in an action by the Attorney General or by the Commission by any of its attorneys designated by it for such purpose. Upon a proper showing, and after notice to the defendant, a temporary restraining order or preliminary injunction shall be granted without bond: *Provided, however,* That if a complaint is not filed within such period as may be specified by the court after the issuance of the restraining order or preliminary injunction, the order or injunction may, upon motion, be dissolved. Wherever it appears to the court that the interests of justice require that other persons should be parties in the action, the court may cause them to be summoned whether or not they reside in the district in which the court is held, and to that end process may be served in any district.

(2)(A) Whenever the Attorney General has reason to believe that any person under investigation may be in possession, custody, or control of any documentary material, relevant to any violation of this title, he may, prior to the institution of a proceeding under this section cause to be served upon such person, a civil investigative demand requiring such person to produce the documentary material for examination.

(B) Each such demand shall—

(i) state the nature of the conduct alleged to constitute the violation of this title which is under investigation;

(ii) describe the class or classes of documentary material to be produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;

(iii) prescribe a return date which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

(iv) identify the custodian to whom such material shall be furnished.

(C) No demand shall—

(i) contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued by a court of the United States in a proceeding brought under this section; or

(ii) require the production of any documentary evidence which would be privileged from disclosure if demanded by a subpena duces tecum issued by a court of the United States in any proceeding under this section.

(D) Any such demand may be served at any place within the territorial jurisdiction of any court of the United States.

(E) Service of any such demand or of any petition filed under subparagraph (G) of this subsection may be made upon any person, partnership, corporation, association, or other legal entity by—

(i) delivering a duly executed copy thereof to such person or to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such person, partnership, corporation, association, or entity;

(ii) delivering a duly executed copy thereof to the principal office or place of business of the person, partnership, corporation, association, or entity to be served; or

(iii) depositing such copy in the United States mails, by registered or certified mail duly addressed to such person, partnership, corporation, association, or entity at its principal office or place of business.

(F) A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

(G) The provisions of sections 4 and 5 of the Antitrust Civil Process Act (15 U.S.C. 1313, 1314) shall apply to custodians of material produced pursuant to any demand and to judicial proceedings for the enforcement of any such demand made pursuant to this section: *Provided, however,* That documents and other information obtained pursuant to any civil investigative demand issued hereunder and in the possession of the Department of Justice may be made available to duly authorized representatives of the Commission for the purpose of investigations and proceedings under this title and under the Federal Trade Commission Act, subject to the limitations upon use and disclosure contained in section 4 of the Antitrust Civil Process Act (15 U.S.C. 1313).

SAVING PROVISION

SEC. 112. Nothing contained in this title shall be construed to repeal, invalidate, or supersede the Federal Trade Commission Act (15 U.S.C. 41 et seq.) or any statute defined as an Antitrust Act.


SCOPE

SEC. 113. (a) The provisions of this title and the powers granted hereunder to the Commission and the Attorney General shall extend to all sales of consumer products and service contracts affecting interstate commerce: *Provided, however,* That such provisions and powers shall not be exercised in such a manner as to interfere with warranties applicable to consumer products, or components thereof, created and governed by other Federal law.

(b) Labeling, disclosure, or other requirements of a State with respect to written warranties and performance thereunder, not identical to those set forth in section 102, 103, or 104 of this title or with rules and regulations of the Commission issued in accordance with the procedures set forth in section 109 of this title, or with guidelines of the Commission, shall not be applicable to warranties complying therewith. However, if, upon application of an appropriate State agency, the Commission determines (pursuant to rules issued in accordance with the Federal Trade Commission Act, as amended) that any requirement of such State (other than a labeling or disclosure requirement) covering any transaction to which this title applies—

(1) affords protection to consumers greater than the requirements of this title; and

(2) does not unduly burden interstate commerce,

then transactions complying with any such State requirement shall be exempt from the provisions of this title to the extent specified in such determination for so long as such State continues to administer and enforce effectively any such greater requirement.

(c) Nothing in this title shall be construed to supersede any provision of State law regarding consequential damages for injury to the person or any State law restricting the ability of a warrantor to limit his liability for consequential damages.

#### EFFECTIVE DATE

SEC. 114. (a) Except for the limitations in subsection (b) of this section, this title shall take effect six months after the date of its enactment but shall not apply to consumer products manufactured prior to such effective date.

(d) Those requirements in this title which cannot be reasonably met without the promulgation of rules by the Commission shall take effect six months after the final publication of such rules which shall be published (subject to future amendment or revocation) as soon as possible but no later than one year after the date of enactment of this Act: *Provided*, That the Commission, for good cause shown, may provide designated classes of suppliers up to six months additional time to bring their written warranties into compliance with rules promulgated under this title.

(c) The Commission shall promulgate initial rules for initial implementation of this title, including guidelines for the establishment of informal dispute settlement procedures pursuant to section 110(a) of this title, as soon as possible after enactment but in no event later than one year after the date of enactment of this Act.

## TITLE II—FEDERAL TRADE COMMISSION IMPROVEMENTS

SEC. 201. Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by striking out the words "in commerce" wherever they appear and inserting in lieu thereof "affecting commerce".

SEC. 202. Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)) is amended by inserting after paragraph (6) as amended by section 212 of this title the following new paragraph:

"(7) The Commission may initiate civil actions in the district courts of the United States against persons, partnerships, or corporations engaged in any act or practice which is unfair or deceptive to a consumer and is prohibited by subsection (a)(1) of this section with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by subsection (a)(1) of this section, to obtain a civil penalty of not more than $10,000 for each such violation. The Commission may comprise, mitigate, or settle any action for a civil penalty if such settlement is accompanied by a public statement of its reasons and is approved by the court."

42

SEC. 203. Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)) is amended by inserting after paragraph (7) as added by section 202 of this title the following new paragraph:

"(8) After an order of the Commission to cease and desist from engaging in acts or practices which are unfair or deceptive to consumers and proscribed by section 5(a)(1) of this Act has become final as provided in subsection (g) of this section, the Commission, by any of its attorneys designated by it for such purpose, may institute civil actions in the district courts of the United States to obtain such relief as the court shall find necessary to redress injury to consumers caused by the specific acts or practices which were the subject of the proceeding pursuant to subsection (b) of this section and the resulting cease-and-desist order, including, but not limited to, rescission or reformation of contracts, the refund of money or return of property, public notification of the violation, and the payment of damages, except that nothing in this section is intended to authorize the imposition of any exemplary or punitive damages. The court shall cause notice to be given reasonably calculated, under all of the circumstances, to apprise all consumers allegedly injured by the defendant's acts of the pendency of such action. No action may be brought by the Commission under this subsection more than two years after an order of the Commission upon which such action is based has become final. Any action initiated by the Commission under this subsection may be consolidated as the court deems appropriate with any other action requesting the same or substantially the same relief upon motion of a party to any such action.

SEC. 204. Section 5(l) of the Federal Trade Commission Act (15 U.S.C. 45(l)) is amended by striking subsection (l) and inserting in lieu thereof the following new paragraph:

"(l) Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States or by the Commission in its own name by any of its attorneys designated by it for such purpose. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission."

SEC. 205. Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by adding at the end thereof the following new subsection:

"(m) Whenever in any civil proceeding involving this Act the Commission is authorized or required to appear in a court of the United States, or to be represented therein by the Attorney General of the United States, the Commission may elect to appear in its own name by any of its attorneys designated by it for such purpose."

Sec. 206. Section 6 of the Federal Trade Commission Act (15 U.S.C. 46) is amended by striking out the words "in commerce" wherever they appear and inserting in lieu thereof "in or whose business affects commerce".

Sec. 207. Section 9 of the Federal Trade Commission Act (15 U.S.C. 49) is amended by—

> (a) deleting the word "corporation" in the first sentence of the first unnumbered paragraph and inserting in lieu thereof the word "party";

> (b) inserting after the word "Commission" in the second sentence of the second unnumbered paragraph the phrase "acting through any of its attorneys designated by it for such purpose": and

> (c) deleting the fourth unnumbered paragraph and inserting in lieu thereof the following:

"Upon the application of the Attorney General of the United States or of the Commission, acting through any of its attorneys designated by it for such purpose, the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission issued under this Act."

Sec. 208. Section 10 of the Federal Trade Commission Act (15 U.S.C. 50) is amended by deleting the third unnumbered paragraph and inserting in lieu thereof the following:

"If any corporation required by this Act to file any annual or special report shall fail to do so within the time fixed by the Commission for filing such report, then, if such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure. Such forfeiture shall be payable into the Treasury of the United States and shall be recoverable in a civil suit brought by the Attorney General or by the Commission, acting through any of its attorneys designated by it for such purpose, in the district where the corporation has its principal office or in any district in which it does business."

Sec. 209. Section 12 of the Federal Trade Commission Act (15 U.S.C. 52) is amended by striking out the words "in commerce" wherever they appear and inserting in lieu thereof "in or having an effect upon commerce".

Sec. 210. Section 13 of the Federal Trade Commission Act (15 U.S.C. 53) is amended by redesignating "(b)" as "(c)" and inserting the following new subsection:

"(b) Whenever the Commission has reason to believe—

> "(1) that any person, partnership, or corporation is engaged in, or is about to engage in, any act or practice which is unfair or deceptive to a consumer, and is prohibited by section 5, and

> "(2) that the enjoining thereof pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any

such act or practice. Upon a proper showing that such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however*, That if a complaint under section 5 is not filed within such period as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction may be dissolved by the court and be of no further force and effect: *Provided further*, That in proper cases the Commission may seek, and, after proper proof, the court may issue a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business."

Sec. 211. Section 16 of the Federal Trade Commission Act (15 U.S.C. 56) is amended to read as follows:

"Sec. 16. Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under section 14 or under subsection (1) of section 5 of this Act, it shall—

"(a) certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection; or

"(b) itself cause such appropriate proceedings to be brought."

Sec. 212. (a) Section 5(a)(6) of the Federal Trade Commission Act (15 U.S.C. 45(a)(6)) is amended—

(1) by striking out "banks,"; and

(2) by adding at the end thereof before the period a colon and the following:

"*Provided however*, That with respect to financial institutions such authority shall only be exercised to prevent unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer)"

(b) Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by adding at the end of subsection (m), added by section 205 of this title, the following two new subsections—

"(n) Rules and regulations prescribed by the Commission in carrying out the authority conferred by this section with respect to unfair or deceptive acts or practices (including acts or practices which are unfair or deceptive to a consumer) shall, insofar as they apply to or affect any financial institution as defined in section 5(o)(3) of this Act, be issued only after consultation with—

"(1) the Comptroller of the Currency, if the institution is a national bank or a bank operating under the code of law of the District of Columbia;

"(2) the Board of Governors of the Federal Reserve System, if the institution is a member bank of the Federal Reserve System (other than a bank referred to in paragraph (1));

"(3) the Board of Directors of the Federal Deposit Insurance Corporation, if the institution is a bank the deposits of which are insured by such corporation (other than a bank referred to in paragraph (1) or (2));

"(4) the Federal Home Loan Bank Board, if the institution is a member of a Federal Home Loan Bank or the accounts of which are insured by the Federal Savings and Loan Insurance Corporation; or

"(5) the Administrator of the National Credit Union Admin-

istration, if the institution is a credit union the accounts of which are insured by such Administrator.

"(o) (1) The power of the Commission to prevent financial institutions from using unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer), pursuant to paragraph (6) of subsection (a) of this section, shall be delegated by the Commission, subject to paragraph (2) of this subsection, to—

"(A) the Comptroller of the Currency, if the institution is a national bank or a bank operating under the code of law of the District of Columbia;

"(B) the Board of Governors of the Federal Reserve System, if the institution is a member bank of the Federal Reserve System (other than a bank referred to in paragraph (A));

"(C) the Board of Governors of the Federal Deposit Insurance Corporation, if the institution is a bank the deposits of which are insured by such corporation (other than a bank referred to in paragraph (A) or (B));

"(D) the Federal Home Loan Bank Board, if the institution is a member of a Federal Home Loan Bank or the accounts of which are insured by the Federal Savings and Loan Insurance Corporation; or

"(E) the Administrator of the National Credit Union Administration, if the institution is a credit union the accounts of which are insured by such Administrator.

"(2) At any time by rule in accordance with section 553 of title 5, United States Code, the Commission may request and shall receive redelegation of the power to prevent particular financial institutions regulated by a particular agency described in paragraph (1) of this subsection from using unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer) from any agency to which such power has been delegated in accordance with such paragraph, upon a finding that such redelegation is necessary to prevent any such financial institutions from using unfair or deceptive acts or practices.

"(3) As used in this section, the term "financial institution" means—

(A) any bank the deposits of which are insured by the Federal Deposit Insurance Corporation;

(B) any Savings and Loan Association the accounts of which are insured by the Federal Savings and Loan Insurance Corporation;

(C) any thrift or home financing institution which is a member of a Federal Home Loan Bank; or

(D) any credit union the accounts of which are insured by the Administrator of the National Credit Union Administration."

## Costs

The committee estimates that costs for implementation of title I of S. 356 would be as follows:

Average additional cost per year for five years following enactment:

| | |
|---|---|
| Staff attorneys | $375,000 |
| Clerical personnel | 84,000 |
| Equipment, etc. | 92,000 |
| Total | 551,000 |

It is estimated that cost for implementation of title II of S. 356 would be as follows:

Average additional cost per year for five years following enactment:

| | |
|---|---:|
| Staff attorneys | $100,000 |
| Clerical personnel | 30,000 |
| Equipment, etc. | 20,000 |
| Total | 150,000 |

The letter from Lewis A. Engman, Chairman of the Federal Trade Commission to Chairman Magnuson estimating costs follows:

FEDERAL TRADE COMMISSION,
*Washington, D.C.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Commerce,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in response to the request of your staff for an estimate of the additional cost which will be attributable to the enactment of S. 356.

It is estimated that Title I (Consumer Product Warranties) will result in an average additional cost per year for five years following enactment as follows:

| | |
|---|---:|
| Staff attorneys | $375,000 |
| Clerical personnel | 84,000 |
| Equipment, etc. | 92,000 |
| Total | 551,000 |

Total annual additional average cost of Title I for five years: $551,000 per year.

It is estimated that Title II (FTC Act amendments) will result in an average additional cost per year for five years following enactment as follows:

| | |
|---|---:|
| Staff attorneys | $100,000 |
| Clerical personnel | 30,000 |
| Equipment, etc. | 20,000 |
| Total | 150,000 |

Total annual additional average cost of Title II for five years: $150,000 per year.

Total annual additional average cost of Title I and Title II for five years: $701,000 per year.

Sincerely,

LEWIS A. ENGMAN, *Chairman.*

## VOTE IN COMMITTEE ON MOTION TO ORDER S. 986 TO BE REPORTED

A quorum being present, the Chairman moved, without objection, to order S. 986 to be reported. There being no objection, the bill was ordered to be reported.

## CHANGES IN EXISTING LAW

In compliance with Subsection (4) of Rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill as reported are shown as follows (existing law proposed to be omitted is

enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman) :

SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT, AS AMENDED
(15 U.S.C. 45)

(a) (1) Unfair methods of competition [in] *affecting* commerce, and unfair or deceptive acts or practices [in] *affecting* commerce, are hereby declared unlawful.

\*     \*     \*     \*     \*     \*     \*

(6) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except [banks,] common carriers subject to the Acts to regulate commerce, air carriers, and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition [in] *affecting* commerce and unfair or deceptive acts or practices [in] *affecting* commerce: *Provided however, that with respect to financial institutions such authority shall only be exercised to prevent unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer).*

*(7) The Commission may initiate civil actions in the district courts of the United States against persons, partnerships, or corporations engaged in any act or practice which is unfair or deceptive to a consumer and is prohibited by subsection (a)(1) of this section with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair and deceptive and is prohibited by subsection (a)(1) of this section, to obtain a civil penalty of not more than $10,000 for each such violation. The Commission may compromise, mitigate, or settle any action for a civil penalty if such settlement is accomplished by a public statement of its reasons and approved by the court.*

*(8) After an order of the Commission to cease and desist from engaging in acts or practices which are unfair or deceptive to consumers and proscribed by section 5(a)(1) of this Act has become final as provided in subsection (g) of this section, the Commission, by any of its attorneys designated by it for such purpose, may institute civil actions in the district courts of the United States to obtain such relief as the court shall find necessary to redress injury to consumers caused by the specific acts or practices which were the subject of the proceeding pursuant to subsection (b) of this section and the resulting cease-and-desist order, including, but not limited to, recission or reformation of contracts, the refund of money or return of property, public notification of the violation, and the payment of damages, except that nothing in this section is intended to authorize the imposition of any exemplary or punitive damages. The court shall cause notice to be given reasonably calculated, under all of the circumstances, to apprise all consumers allegedly injured by the defendant's acts of the pendency of such action. No action may be brought by the Commission under this subsection more than two years after an order of the Commission upon*

*which such action is based has become final. Any action initiated by the Commission under this subsection may be consolidated as the court deems appropriate with any other action requesting the same or substantially the same relief upon motion of a party to such action.*

(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice [in] *affecting* commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. * * *

\*    \*    \*    \*    \*    \*    \*

(l) Any person, partnership, or corporation who violates an order of the Commission [to cease and desist] after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than [$5,000] *$10,000* for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the [United States.] *Attorney General or the Commission in its own name by any of its attorneys designated by it for such purpose.* Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense. *In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.*

(m) *Whenever in any civil proceeding involving this Act the Commission is authorized or required to appear in a court of the United States, or to be represented therein by the Attorney General of the United States, the Commission may elect to appear in its own name by any of its attorneys designated by it for such purpose.*

(n) *Rules and regulations prescribed by the Commission in carrying out the authority conferred by this section with respect to unfair or deceptive acts or practices (including acts or practices which are unfair or deceptive to a consumer) shall, insofar as they apply to or affect any financial institution as defined in section 5(o)(3) of this Act, be issued only after consultation with—*

(1) *the Comptroller of the Currency, if the institution is a national bank or a bank operating under the code of law of the District of Columbia;*

(2) *the Board of Governors of the Federal Reserve System, if the institution is a member bank of the Federal Reserve System (other than a bank referred to in paragraph (1));*

(3) *the Board of Directors of the Federal Deposit Insurance Corporation, if the institution is a bank the deposits of which are insured by such corporation (other than a bank referred to in paragraph (1) or (2));*

*(4)* the Federal Home Loan Bank Board, if the institution is a member of a Federal Home Loan Bank or the accounts of which are insured by the Federal Savings and Loan Insurance Corporation; or

*(5)* the Administrator of the National Credit Union Administration, if the institution is a credit union the accounts of which are insured by such Administrator.

*(o)(1)* The power of the Commission to prevent financial institutions from using unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer), pursuant to paragraph (6) of subsection (a) of this section, shall be delegated by the Commission, subject to paragraph (2) of this subsection, to—

*(A)* the Comptroller of the Currency, if the institution is a national bank or a bank operating under the code of law of the District of Columbia;

*(B)* the Board of Governors of the Federal Reserve System, if the institution is a member bank of the Federal Reserve System (other than a bank referred to in paragraph (A));

*(C)* the Board of Governors of the Federal Deposit Insurance Corporation, if the institution is a bank the deposits of which are insured by such corporation (other than a bank referred to in paragraph (A) or (B));

*(D)* the Federal Home Loan Bank Board, if the institution is a member of a Federal Home Loan Bank or the accounts of which are insured by the Federal Savings and Loan Insurance Corporation; or

*(E)* the Administrator of the National Credit Union Administration, if the institution is a credit union the accounts of which are insured by such Administrator.

*(2)* At any time by rule in accordance with section 553 of title 5, United States Code, the Commission may request and shall receive redelegation of the power to prevent particular financial institutions regulated by a particular agency described in paragraph (1) of this subsection from using unfair or deceptive acts or practices affecting commerce (including acts or practices which are unfair or deceptive to a consumer) from any agency to which such power has been delegated in accordance with such paragraph, upon a finding that such redelegation is necessary to prevent any such financial institutions from using unfair or deceptive acts or practices.

*(3)* As used in this section, the term "financial institution" means—

*(A)* any bank the deposits of which are insured by the Federal Deposit Insurance Corporation;

*(B)* any Savings and Loan Association the accounts of which are insured by the Federal Savings and Loan Insurance Corporation;

*(C)* any thrift or home financing institution which is a member of a Federal Home Loan Bank; or

*(D)* any credit union the accounts of which are insured by the Administrator of the National Credit Union Administration.

\*        \*        \*        \*        \*        \*        \*

SECTION 6 OF THE FEDERAL TRADE COMMISSION ACT (15 U.S.C. 46)

That the commission shall also have power—

(a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in *or whose business affects* commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships.

(b) To require by general or special orders, corporations engaged in *or whose business affects* commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing * * *

\*        \*        \*        \*        \*        \*        \*

SECTION 9 OF THE FEDERAL TRADE COMMISSION ACT (15 U.S.C. 46)

That for the purposes of this Act the commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any [corporation] *party* being investigated or proceeded against; and the commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. * * *

Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the commission *acting through any of its attorneys designated by it for such purpose* may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

\*        \*        \*        \*        \*        \*        \*

Upon the application of the Attorney General [of the United States] *or the Commission, acting through any of its attorneys designated by it for such purpose,* [at the request of the Commission,] the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission [made in pursuance thereof] *issued under this Act.*

\*        \*        \*        \*        \*        \*        \*

SECTION 10 OF THE FEDERAL TRADE COMMISSION ACT (15 U.S.C. 50)

\*        \*        \*        \*        \*        \*        \*

If any corporation required by this Act to file any annual or special report shall fail so to do within the time fixed by the Commission for filing 【the same, and】 *such report, then, if* such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure, 【which】 *such* forfeiture shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit 【in the name of the United States】 brought *by the Attorney General or by the Commission, acting through any of its own attorneys designated by it for such purpose*, in the district where the corporation has its principal office or in any district in which it shall do business. 【It shall be the duty of the various United States attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures. The costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States.】

\*      \*      \*      \*      \*      \*      \*

SECTION 12 OF THE FEDERAL TRADE COMMISSION ACT (15 U.S.C. 52)

(a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—
   (1) by United States mails, or in *or having an effect upon* commerce by any means, for the purpose of inducing or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics; or
   (2) By any means, for the purpose of inducing or which is likely to induce directly or indirectly, the purchase in *or having an effect upon* commerce of food, drugs, devices, or cosmetics.
(b) The dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in *or having an effect upon* commerce within the meaning of section 5.

SECTION 13 OF THE FEDERAL TRADE COMMISSION ACT (15 U.S.C. 53)

(a) Whenever the Commission has reason to believe—
   (1) that any person, partnership, or corporation is engaged in, or is about to engage in, the dissemination or the causing of the dissemination of any advertisement in violation of section 12, and
   (2) that the enjoining thereof pending the issuance of a complaint by the commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or the order of the Commission to cease and desist made thereon has become final within the meaning of section 5, would be to the interest of the public,
the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States or in the United States court of any Territory, to enjoin the dissemination or the causing of the dissemination of such advertisement. Upon proper showing a temporary injunction or restraining order shall be granted

52

without bond. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

(b) *Whenever the Commission has reason to believe—*

(1) *that any person, partnership, or corporation is engaged in, or is about to engage in, any act or practice which is unfair or deceptive to a consumer, and is prohibited by section 5, and*

(2) *that the enjoining thereof pending the issuance of a complaint by the Commission under section 5 and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5, would be to the interest of the public—*

*the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: Provided, however, That if a complaint under section 5 is not filed within such period as may be specified by the court after the issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.*

⟦(b)⟧ (*c*) Whenever it appears to the satisfaction of the court in the case of a newspaper, magazine, periodical, or other publication, published at regular intervals—

(1) that restraining the dissemination of a false advertisement in any particular issue of such publication would delay the delivery of such issue after the regular time therefor, and

(2) that such delay would be due to the method by which the manufacture and distribution of such publication is customarily conducted by the publisher in accordance with sound business practice, and not to any method or device adopted for the evasion of this section or to prevent or delay the issuance of an injunction or restraining order with respect to such false advertisement or any other advertisement, the court shall exclude such issue from the operation of the restraining order or injunction.

Section 16 of the Federal Trade Commission Act as Amended,
(15 U.S.C. 56)

Sec. 16. Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under Section 14 or under subsection (1) of Section 5 *of this Act*, it shall—

(*a*) certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings for the enforcement of the provisions of such section or subsection ⟦.⟧; *or*

(*b*) *itself cause such appropriate proceedings to be brought.*

## Agency Comments

Comments were requested from the following agencies and departments on February 20, 1973:

> Department of Commerce
> Federal Trade Commission
> General Accounting Office
> Department of Justice
> Office of Consumer Affairs

As of May 2, 1973, only the Federal Trade Commission had commented on S. 356. The comments of the Commission follow:

Federal Trade Commission,
*Washington, D.C., March 26, 1973.*

Hon. Warren G. Magnuson,
*Chairman, Committee on Commerce,*
*U.S. Senate, Washington, D.C.*

Dear Mr. Chairman: This is in response to your request for the Commission's comments on S. 356 dealing with consumer product warranties and Federal Trade Commission Act amendments.

As the Commission has previously provided the Committee with its detailed views on S. 986, a nearly identical measure passed by the Senate during the 92d Congress, this report will address only those areas in which the bill or the Commission's position has been significantly modified. Where appropriate, we propose specific modifications which the Commission believes will serve to strengthen and clarify the Act.

### TITLE I—CONSUMER PRODUCT WARRANTIES

The Commission reaffirms its belief that the provisions of Title I will benefit both consumers and businessmen. By establishing uniform standards of content and clarity for warranties on goods moving in interstate commerce, the legislation should help to improve product integrity and bring warranty performance into line with consumer expectations. Everyone stands to gain from the resulting enhancement of consumer confidence in industry. The Commission therefore enthusiastically supports the objectives and substance of Title I, and would add to its previous comments in only two areas.

The Commission strongly supports the language which has been added to Section 102(b) of the bill, providing that the Commission may prescribe rules for extending the period of time a warranty is in effect to correspond with any unreasonable period of time during which the consumer is deprived of the use of a product by reason of a defect or malfunction. Extending the warranty period where a consumer is deprived of use of the product for an unreasonable time period should generally encourage prompt action by the warrantor and should bring an end to the ploy occasionally encountered whereby some unscrupulous manufacturers and repair facilities avoid their warranty obligations by deliberate procrastination until the warranty term has expired.

In addition, the Commission would urge inclusion in S. 356 of a new provision along the lines of Section 102(c) of H.R. 20, the corresponding bill in the House. This section provides that no warrantor of a

consumer product may unreasonably condition his warranty on the consumer's using, in connection with such product, any article or service which is identified by brand name. This provision addresses the anticompetitive practice which the Commission has opposed in numerous court actions wherein a manufacturer uses a warranty unreasonably to tie his supplementary products or services to the warranted product. This leaves the consumer in the undesirable posture of losing his warranty protection if he purchases the supplementary items from another and perhaps less expensive source—even if he does so in complete ignorance of the warranty's provisions.

## TITLE II—FEDERAL TRADE COMMISSION IMPROVEMENTS

The Commission regards the FTC Act improvements as the most important consumer legislation now pending in Congress. It is convinced that the public should be afforded without delay the benefit of basic improvements to the FTC Act which have so long been considered and reconsidered. For years, the Commission has sought preliminary injunction authority to counter the misuse for purposes of delay of the due process mechanisms which are part of the Commission's procedures. For at least as long, the Commission has been trying unsuccessfully to achieve autonomy in the handling of its own litigation in the Federal courts. The attainment of these two objectives—preliminary injunction authority and autonomy in litigation matters—would in itself be a milestone achievement for the consumer.

### PRELIMINARY RESTRAINTS

The supplementation of its enforcement tools by the acquisition of authority to seek preliminary injunctions has long been a prime target in the Commission's program to streamline its procedures. The denial of consumer relief during the pendency of cease-and-desist proceedings, which average more than a year, and frequently require from three to five years, would be averted by use of injunctions in cases where this delay causes unusual harm.

While section 210 of this bill might afford considerable relief, it falls short of its potential by conditioning restraining orders and injunctions upon a showing by the Commission of "the same conditions and principles as injunctive relief against conduct or threatened conduct that will cause loss or damage as granted by courts of equity." Several considerations support the Commission's preference for a legislatively defined injunction based upon the criterion of public interest rather than upon traditional equity standards.

The equitable test requires proof of irreparable injury, no adequate remedy at law, and probability of success on the merits of the case-in-chief. Meeting such a standard is time-consuming and can involve proceedings which take on the dimensions of a trial. In view of the Commission's limited resources, this could significantly impair the usefulness of the injunctive approach. If provided with a more reasonably attainable standard, however, the Commission would be able to extend incipiency relief to many more cases where public harm is unduly aggravated by the continuance of a consumer abuse.

55

Accordingly, the Commission endorses the standard already contained in section 13(a) of the Federal Trade Commission Act, under which the Commission may seek an injunction against the false advertising of food, drugs, devices, and cosmetics. In *Federal Trade Commission* v. *Rhodes Pharmacal Co.*, 191 F. 2d 744 (9th Cir. 1951), the court construed that statutory "cause shown" standard to mean that ". . . all the Commission had to show was a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the Commission to believe that the defendants were engaged in the dissemination of false advertisements of a drug in violation of the Act." Thus, the court viewed the statute as vesting in the Commission the real authority to determine the questions of public interest, necessity, and "reason to believe"—determinations to be made before seeking the injunction in court.

This standard for obtaining preliminary injunctions is by no means without precedent outside the Federal Trade Commission Act. Various statutes establish similar standards as the grounds upon which injunctions may be obtained by other agencies. For example, under the Securities Exchange Act, 15 U.S.C. § 78 u(e), the Securities and Exchange Commission is authorized to seek injunctions "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder . . . ."

Similarly, the National Labor Relations Board, under the National Labor Relations Act, 29 U.S.C. § 160(j), is authorized, upon issuance of a complaint ". . . charging that any person has engaged in or is engaging in an unfair labor practice . . ." to petition a United States district court for appropriate temporary relief or a restraining order. The district court is given jurisdiction ". . . to grant to the Board such temporary relief or restraining order as it deems just and proper."

The Food, Drug, and Cosmetic Act is yet another statute which provides authority to obtain injunctions upon meeting a statutory standard rather than upon traditional equitable grounds. It provides that for "cause shown," the district courts of the United States may restrain violations of section 331 of the Act. In bringing suits to obtain injunctions under this statute, the Justice Department has not been required to meet the traditional equitable standard.

Additional precedent for a statutory standard may also be found in both the Interstate Commerce Act, 49 U.S.C. § 5(8), authorizing the district courts to issue writs of injunction "upon complaint of the [Interstate Commerce] Commission alleging a violation of any of the provisions of the section . . ." and the Federal Communications Act, 47 U.S.C. § 36, authorizing the district courts, at the suit of the United States to enjoin the landing of cable in violation of sections 34–39 of Title 47, when the cable ". . . is about to be or is landed or is being operated without a license. . . ." Neither statute includes any requirement that the traditional equitable standard be met before the court may issue the injunction.

Thus, it is clear that, in seeking a statutory standard for obtaining injunctions, the Commission is seeking a grant of authority which

Congress has in the past deemed necessary for other government agencies to enforce effectively statutes under their jurisdicton. Its necessity, in terms of effective enforcement of the Federal Trade Commission Act, is compelling. Based on these considerations the Commission supports the injunctive provisions of H.R. 20 which would clothe the Commission with injunctive authority substantially similar to section 13 of the Federal Trade Commission Act. It is recommended that the provisons of section 204 of H.R. 20 be substituted for the language now contained in section 209 of S. 356.

### COMMISSION REPRESENTATION IN COURT PROCEEDINGS

The Commission strongly endorses the various sections of the bill which would afford it direct access to the courts. Specifically, S. 356 would authorize the Commission to appear in court in its own name and through its own attorneys in the following proceedings:

(a) Civil actions to supplement cease-and-desist orders with remedies to redress consumer grievances (Sec. 203).

(b) Civil actions to enforce cease-and-desist order violations (Sec. 204).

(c) Civil actions to enforce its own subpoenas (Sec. 207(b)).

(d) Civil penalty actions for failure to furnish reports required by Commission order (Sec. 208).

(e) Petitions for injunctions pendente lite and restraining orders (Sec. 210).

There are a number of compelling reasons supporting the Commission's firm conviction that it should have this authority to conduct its own litigation. In almost every case which is referred to the Justice Department, the investigation, pleadings, and briefs have been prepared by the Commission's staff. The additional hours which are required by both Justice Department and Commission personnel to brief trial attorneys are duplicative and nonproductive, and sometimes add greatly to the time required to dispose of Commission action.

In addition to this added time factor, further delay is attributable to the heavy caseload of the Justice Department's own cases and those of other agencies in the U.S. Attorneys' Offices. All of these cases are in competition for U.S. Attorneys' attention, and matters considered important to the Commission must often yield to the urgency of other matters. While these and other delays are often welcome by a respondent, they greatly hinder the Commission's efforts to expedite final disposition of its cases.

The Commission, therefore, firmly believes that it should have autonomy not only as regards those types of litigation covered by the provisions listed above, but over the entirety of its civil litigation under the Act. To accomplish this, we would leave undisturbed the Attorney General's present authority to represent the Commission in court proceedings, but would amend S. 356 to permit the Commission to elect to represent itself in all such matters. This arrangement would enable the Justice Department to continue to represent the Commission in these circumstances in which such representation would be in the overall interest of the Government, and would save valuable attorney hours in both agencies, expedite litigation, and make uniform the present ragged pattern of the Commission's representational authority.

RULEMAKING

Rulemaking authority is, of course, an essential and highly useful regulatory tool which has long been relied upon by the Commission. The drafters of the Federal Trade Commission Act imposed a broad mandate on the Commission to empower it to define with specificity harmful practices. They recognized that specific legislative definition was undesirable since precise definitions would not withstand the ingenuity of those hoping to evade the law.

The Commission—as have other administrative agencies, such as the SEC, the FPC and the FCC—has found that rulemaking is often the best method for filling in gaps in its broad mandate. Agencies which have insisted on utilizing adjudication for broad policymaking have been consistently criticized. Some of the most recent criticism comes from the Ash Council Report, which found that administrative agencies "should rely less on the case-by-case approach to policy formulation and move increasingly in the direction of rulemaking, especially informal rulemaking and other expeditious procedures" (p. 49). The Administrative Conference has recently adopted a recommendation which strongly advocates simple, flexible and efficient rulemaking. Rulemaking is an efficient technique by which the Commission can perform its law enforcement function. Adjudication of necessity forecloses from participation others in a group who may be ultimately subject to the rule of law laid down by a case. Rulemaking on the other hand enables participation in the development of the law by all individuals who are concerned with it. Moreover, there is reason to believe that responsible businessmen will welcome and voluntarily comply with an agency's interpretation of the law if it is presented clearly and in a readily accessible form.

Recognizing its advantages, courts have upheld rulemaking authority for all of the major administrative agencies, and hence rulemaking has become a cornerstone in the administrative process. The Commission is confident that its rulemaking authority will be upheld by the court of appeals in its decision in the pending *National Petroleum Refiners Ass'n* case.

During the last session of the Congress the Commission supported legislative reaffirmation of its rulemaking authority because it recognized that the doubt created by the possibility of judicial challenge could significantly hinder its use of the rulemaking function for some unknown time. But now, a year and a half later, a judicial resolution of this uncertainty seems imminent and the re-evaluation of legislative priorities is necessary.

The Commission is becoming increasingly apprehensive that the controversy over rulemaking authority could unnecessarily jeopardize the rapid passage of the other essential, but less controversial provisions in the legislation under consideration. Experience over the past several years has demonstrated that the procedural aspects of rulemaking are so complex that the time required for their thorough analysis and the search for a consensus solution far exceeds that necessary to the thorough consideration of the other components of the legislation.

In view of the pending litigation, moreover, the Commission would oppose any statutory rulemaking provision limiting the flexibility of

58

our present authority. The Commission recognizes the need to achieve a balance between procedural efficiency and procedural safeguards and feels that judicial affirmation of the Commission's rulemaking authority will provide the flexibility needed to develop procedures which strike this essential balance.

For these reasons, the Commission has concluded that it should await the imminent court decision and seek additional legislative authority only in the event of an adverse decision. The Commission, therefore, recommends that section 206 be deleted from the bill. Such a course will not jeopardize Commission rulemaking, and, in the meantime, American consumers can begin to reap the benefits associated with prompt enactment of the less controversial amendments provided in the legislation before this committee.

Sincerely,

LEWIS A. ENGMAN, *Chairman*.

O

# Appendix G

| 93D CONGRESS<br>1st Session | HOUSE OF REPRESENTATIVES | REPORT<br>No. 93-624 |
|---|---|---|

# AMENDING SECTION 28 OF THE MINERAL LEASING ACT OF 1920, AND TO AUTHORIZE THE TRANS-ALASKA PIPELINE

---

NOVEMBER 7, 1973.—Ordered to be printed

---

Mr. MELCHER, from the committee of conference,
submitted the following

## CONFERENCE REPORT

[To accompany S. 1081]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 1081) to authorize the Secretary of the Interior to grant rights-of-way across Federal lands where the use of such rights-of-way is in the public interest and the applicant for the right-of-way demonstrates the financial and technical capability to use the right-of-way in a manner which will protect the environment, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows::

That the Senate recede from its disagreement to the amendment of the House and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment insert the following:

## *TITLE I*

*SECTION 101. Section 28 of the Mineral Leasing Act of 1920 (41 Stat. 449), as amended (30 U.S.C. 185), is further amended to read as follows:*

### *"Grant of Authority"*

*"SEC. 28. (a) Rights-of-way through any Federal lands may be granted by the Secretary of the Interior or appropriate agency head for pipeline purposes for the transportation of oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom to any applicant possessing the qualifications provided in section 1 of this Act, as amended, in accordance with the provisions of this section.*

### *"Definitions"*

*"(b)(1) For the purposes of this section 'Federal lands' means all lands owned by the United States except lands in the National Park*

2

*System, lands held in trust for an Indian or Indian tribe, and lands on the Outer Continental Shelf. A right-of-way through a Federal reservation shall not be granted if the Secretary or agency head determines that it would be inconsistent with the purposes of the reservation.*

"*(2) 'Secretary' means the Secretary of the Interior.*

"*(3) 'Agency head' means the head of any Federal department or independent Federal office or agency, other than the Secretary of the Interior, which has jurisdiction over Federal lands.*

## "*Inter-Agency Coordination*

"*(c)(1) Where the surface of all of the Federal lands involved in a proposed right-of-way or permit is under the jurisdiction of one Federal agency, the agency head, rather than the Secretary, is authorized to grant or renew the right-of-way or permit for the purposes set forth in this section.*

"*(2) Where the surface of the Federal lands involved is administered by the Secretary or by two or more Federal agencies, the Secretary is authorized, after consultation with the agencies involved, to grant or renew rights-of-way or permits through the Federal lands involved. The Secretary may enter into interagency agreements with all other Federal agencies having jurisdiction over Federal lands for the purpose of avoiding duplication, assigning responsibility, expediting review of rights-of-way or permit applications, issuing joint regulations, and assuring a decision based upon a comprehensive review of all factors involved in any right-of-way or permit application. Each agency head shall administer and enforce the provisions of this section, appropriate regulations, and the terms and conditions of rights-of-way or permits insofar as they involve Federal lands under the agency head's jurisdiction.*

## "*Width Limitations*

"*(d) The width of a right-of-way shall not exceed fifty feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities) unless the Secretary or agency head finds, and records the reasons for his finding, that in his judgment a wider right-of-way is necessary for operation and maintenance after construction, or to protect the environment or public safety. Related facilities include but are not limited to valves, pump stations, supporting structures, bridges, monitoring and communication devices, surge and storage tanks, terminals, roads, airstrips and campsites, and they need not necessarily be connected or contiguous to the pipe and may be the subjects of separate rights-of-way.*

## "*Temporary Permits*

"*(e) A right-of-way may be supplemented by such temporary permits for the use of Federal lands in the vicinity of the pipeline as the Secretary or agency head finds are necessary in connection with construction, operation, maintenance, or termination of the pipeline, or to protect the natural environment or public safety.*

3

### "*Regulatory Authority*

"(f) Rights-of-way or permits granted or renewed pursuant to this section shall be subject to regulations promulgated in accord with the provisions of this section and shall be subject to such terms and conditions as the Secretary or agency head may prescribe regarding extent, duration, survey, location, construction, operation, maintenance, use, and termination.

### "*Pipeline Safety*

"(g) The Secretary or agency head shall impose requirements for the operation of the pipeline and related facilities in a manner that will protect the safety of workers and protect the public from sudden ruptures and slow degradation of the pipeline.

### "*Environmental Protection*

"(h)(1) Nothing in this section shall be construed to amend, repeal, modify, or change in any way the requirements of section 102(2)(C) or any other provision of the National Environmental Policy Act of 1969 (Public Law 91–190, 83 Stat. 852).

"(2) The Secretary or agency head, prior to granting a right-of-way or permit pursuant to this section for a new project which may have a significant impact on the environment, shall require the applicant to submit a plan of construction, operation, and rehabilitation for such right-of-way or permit which shall comply with this section. The Secretary or agency head shall issue regulations or impose stipulations which shall include, but shall not be limited to: (A) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land; (B) requirements to insure that activities in connection with the right-of-way or permit will not violate applicable air and water quality standards nor related facility siting standards established by or pursuant to law; (C) requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety; and (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes. Such regulations shall be applicable to every right-of-way or permit granted pursuant to this section, and may be made applicable by the Secretary or agency head to existing rights-of-way or permits, or rights-of-way or permits to be renewed pursuant to this section.

### "*Disclosure*

"(i) If the applicant is a partnership, corporation, association, or other business entity, the Secretary or agency head shall require the applicant to disclose the identity of the participants in the entity. Such disclosure shall include where applicable (1) the name and address of each partner, (2) the name and address of each shareholder

4

owning 3 per centum or more of the shares, together with the number and percentage of any class of voting shares of the entity which such shareholder is authorized to vote, and (3) the name and address of each affiliate of the entity together with, in the case of an affiliate controlled by the entity, the number of shares and the percentage of any class of voting stock of that affiliate owned, directly or indirectly, by that entity, and, in the case of an affiliate which controls that entity, the number of shares and the percentage of any class of voting stock of that entity owned, directly or indirectly, by the affiliate.

### "Technical and Financial Capability

"(j) The Secretary or agency head shall grant or renew a right-of-way or permit under this section only when he is satisfied that the applicant has the technical and financial capability to construct, operate, maintain, and terminate the project for which the right-of-way or permit is requested in accordance with the requirements of this section.

### "Public Hearings

"(k) The Secretary or agency head by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local government agencies and the public adequate notice and an opportunity to comment upon right-of-way applications filed after the date of enactment of this subsection.

### "Reimbursement of Costs

"(l) The applicant for a right-of-way or permit shall reimburse the United States for administrative and other costs incurred in processing the application, and the holder of a right-of-way or permit shall reimburse the United States for the costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities on such right-of-way or permit area and shall pay annually in advance the fair market rental value of the right-of-way or permit, as determined by the Secretary or agency head.

### "Bonding

"(m) Where he deems it appropriate the Secretary or agency head may require a holder of a right-of-way or permit to furnish a bond, or other security, satisfactory to the Secretary or agency head to secure all or any of the obligations imposed by the terms and conditions of the right-of-way or permit or by any rule or regulation of the Secretary or agency head.

### "Duration of grant

"(n) Each right-of-way or permit granted or renewed pursuant to this section shall be limited to a reasonable term in light of all circumstances concerning the project, but in no event more than thirty years. In determining the duration of a right-of-way the Secretary or agency head shall, among other things, take into consideration the cost of the facility, its useful life, and any public purpose it serves. The Secre-

5

*tary or agency head shall renew any right-of-way, in accordance with the provisions of this section, so long as the project is in commercial operation and is operated and maintained in accordance with all of the provisions of this section.*

### "Suspension or Termination of Right-of-Way

"(o)(1) *Abandonment of a right-of-way or noncompliance with any provision of this section may be grounds for suspension or termination of the right-of-way if (A) after due notice to the holder of the right-of-way, (B) a reasonable opportunity to comply with this section, and (C) an appropriate administrative proceeding pursuant to title 5, United States Code, section 554, the Secretary or agency head determines that any such ground exists and that suspension or termination is justified. No administrative proceeding shall be required where the right-of-way by its terms provides that it terminates on the occurrence of a fixed or agreed upon condition, event, or time.*

"(2) *If the Secretary or agency head determines that an immediate temporary suspension of activities within a right-of-way or permit area is necessary to protect public health or safety or the environment, he may abate such activities prior to an administrative proceeding.*

"(3) *Deliberate failure of the holder to use the right-of-way for the purpose for which it was granted or renewed for any continuous two-year period shall constitute a rebuttable presumption of abandonment of the right-of-way: Provided, That where the failure to use the right-of-way is due to circumstances not within the holder's control the Secretary or agency head is not required to commence proceedings to suspend or terminate the right-of-way.*

### "Joint Use of Rights-of-Way

"(p) *In order to minimize adverse environmental impacts and the proliferation of separate rights-of-way across Federal lands, the utilization of rights-of-way in common shall be required to the extent practical, and each right-of-way or permit shall reserve to the Secretary or agency head the right to grant additional rights-of-way or permits for compatible uses on or adjacent to rights-of-way or permit area granted pursuant to this section.*

### "Statutes

"(q) *No rights-of-way for the purposes provided for in this section shall be granted or renewed across Federal lands except under and subject to the provisions, limitations, and conditions of this section. Any application for a right-of-way filed under any other law prior to the effective date of this provision may, at the applicant's option, be considered as an application under this section. The Secretary or agency head may require the applicant to submit any additional information he deems necessary to comply with the requirements of this section.*

### "Common Carriers

"(r)(1) *Pipelines and related facilities authorized under this section shall be constructed, operated, and maintained as common carriers.*

6

"(2)(A) The owners or operators of pipelines subject to this section shall accept, convey, transport, or purchase without discrimination all oil or gas delivered to the pipeline without regard to whether such oil or gas was produced on Federal or non-Federal lands.

"(B) In the case of oil or gas produced from Federal lands or from the resources on the Federal lands in the vicinity of the pipeline, the Secretary may, after a full hearing with due notice thereof to the interested parties and a proper finding of facts, determine the proportionate amounts to be accepted, conveyed, transported or purchased.

"(3)(A) The common carrier provisions of this section shall not apply to any natural gas pipeline operated by any person subject to regulation under the Natural Gas Act or by any public utility subject to regulation by a State or municipal regulatory agency having jurisdiction to regulate the rates and charges for the sale of natural gas to consumers within the State or municipality.

"(B) Where natural gas not subject to State regulatory or conservation laws governing its purchase by pipelines is offered for sale, each such pipeline shall purchase, without discrimination, any such natural gas produced in the vicinity of the pipeline.

"(4) The Government shall in express terms reserve and shall provide in every lease of oil lands under this Act that the lessee, assignee, or beneficiary, if owner or operator of a controlling interest in any pipeline or of any company operating the pipeline which may be operated accessible to the oil derived from lands under such lease, shall at reasonable rates and without discrimination accept and convey the oil of the Government or of any citizen or company not the owner of any pipeline operating a lease or purchasing gas or oil under the provisions of this Act.

"(5) Whenever the Secretary has reason to believe that any owner or operator subject to this section is not operating any oil or gas pipeline in complete accord with its obligations as a common carrier hereunder, he may request the Attorney General to prosecute an appropriate proceeding before the Interstate Commerce Commission or Federal Power Commission or any appropriate State agency or the United States district court for the district in which the pipeline or any part thereof is located, to enforce such obligation or to impose any penalty provided therefor, or the Secretary may, by proceeding as provided in this section, suspend or terminate the said grant of right-of-way for noncompliance with the provisions of this section.

"(6) The Secretary or agency head shall require, prior to granting or renewing a right-of-way, that the applicant submit and disclose all plans, contracts, agreements, or other information or material which he deems necessary to determine whether a right-of-way shall be granted or renewed and the terms and conditions which should be included in the right-of-way. Such information may include, but is not limited to: (A) conditions for, and agreements among owners or operators, regarding the addition of pumping facilities, looping, or otherwise increasing the pipeline or terminal's throughput capacity in response to actual or anticipated increases in demand; (B) conditions for adding or abandoning intake, offtake, or storage points or facilities; and (C) minimum shipment or purchase tenders.

## "Right-of-Way Corridors

"(s) In order to minimize adverse environmental impacts and to prevent the proliferation of separate rights-of-way across Federal

7

lands, the Secretary shall, in consultation with other Federal and State agencies, review the need for a national system of transportation and utility corridors across Federal lands and submit a report of his findings and recommendations to the Congress and the President by July 1, 1975.

### "Existing Rights-of-Way

"(t) The Secretary or agency head may ratify and confirm any right-of-way or permit for an oil or gas pipeline or related facility that was granted under any provision of law before the effective date of this subsection, if it is modified by mutual agreement to comply to the extent practical with the provisions of this section. Any action taken by the Secretary or agency head pursuant to this subsection shall not be considered a major Federal action requiring a detailed statement pursuant to section 102(2)(C) of the National Environmental Policy Act of 1970 (Public Law 90–190; 42 U.S.C. 4321).

### "Limitations on Export

"(u) Any domestically produced crude oil transported by pipeline over rights-of-way granted pursuant to section 28 of the Mineral Leasing Act of 1920, except such crude oil which is either exchanged in similar quantity for convenience or increased efficiency of transportation with persons or the government of an adjacent foreign state, or which is temporarily exported for convenience or increased efficiency of transportation across parts of an adjacent foreign state and reenters the United States, shall be subject to all of the limitations and licensing requirements of the Export Administration Act of 1969 (Act of December 30, 1969; 83 Stat. 841) and, in addition, before any crude oil subject to this section may be exported under the limitations and licensing requirements and penalty and enforcement provisions of the Export Administration Act of 1969 the President must make and publish an express finding that such exports will not diminish the total quantity or quality of petroleum available to the United States, and are in the national interest and are in accord with the provisions of the Export Administration Act of 1969: Provided, That the President shall submit reports to the Congress containing findings made under this section, and after the date of receipt of such report Congress shall have a period of sixty calendar days, thirty days of which Congress must have been in session, to consider whether exports under the terms of this section are in the national interest. If the Congress within this time period passes a concurrent resolution of disapproval stating disagreement with the President's finding concerning the national interest, further exports made pursuant to the aforementioned Presidential findings shall cease.

### "State Standards

"(v) The Secretary or agency head shall take into consideration and to the extent practical comply with State standards for right-of-way construction, operation, and maintenance.

### "Reports

"(w)(1) The Secretary and other appropriate agency heads shall report to the House and Senate Committees on Interior and Insular

8

*Affairs annually on the administration of this section and on the safety and environmental requirements imposed pursuant thereto.*

"(2) *The Secretary or agency head shall notify the House and Senate Committees on Interior and Insular Affairs promptly upon receipt of an application for a right-of-way for a pipeline twenty-four inches or more in diameter, and no right-of-way for such a pipeline shall be granted until sixty days (not counting days on which the House of Representatives or the Senate has adjourned for more than three days) after a notice of intention to grant the right-of-way, together with the Secretary's or agency head's detailed findings as to terms and conditions he proposes to impose, has been submitted to such committees, unless each committee by resolution waives the waiting period.*

"(3) *Periodically, but at least once a year, the Secretary of the Department of Transportation shall cause the examination of all pipelines and associated facilities on Federal lands and shall cause the prompt reporting of any potential leaks or safety problems.*

"(4) *The Secretary of the Department of Transportation shall report annually to the President, the Congress, the Secretary of the Interior, and the Interstate Commerce Commission any potential dangers of or actual explosions, or potential or actual spillage on Federal lands and shall include in such report a statement of corrective action taken to prevent such explosion or spillage.*

*"Liability*

"(x) (1) *The Secretary or agency head shall promulgate regulations and may impose stipulations specifying the extent to which holders of rights-of-way and permits under this Act shall be liable to the United States for damage or injury incurred by the United States in connection with the right-of-way or permit. Where the right-of-way or permit involves lands which are under the exclusive jurisdiction of the Federal Government, the Secretary or agency head shall promulgate regulations specifying the extent to which holders shall be liable to third parties for injuries incurred in connection with the right-of-way or permit.*

"(2) *The Secretary or agency head may, by regulation or stipulation, impose a standard of strict liability to govern activities taking place on a right-of-way or permit area which the Secretary or agency head determines, in his discretion, to present a foreseeable hazard or risk of danger to the United States.*

"(3) *Regulations and stipulations pursuant to this subsection shall not impose strict liability for damage or injury resulting from (A) an act of war, or (B) negligence of the United States.*

"(4) *Any regulation or stipulation imposing liability without fault shall include a maximum limitation on damages commensurate with the foreseeable risks or hazards presented. Any liability for damage or injury in excess of this amount shall be determined by ordinary rules of negligence.*

"(5) *The regulations and stipulations shall also specify the extent to which such holders shall indemnify or hold harmless the United States for liability, damage, or claims arising in connection with the right-of-way or permit.*

**9**

"(6) *Any regulation or stipulation promulgated or imposed pursuant to this section shall provide that all owners of any interest in, and all affiliates or subsidiaries of any holder of, a right-of-way or permit shall be liable to the United States in the event that a claim for damage or injury cannot be collected from the holder.*

"(7) *In any case where liability without fault is imposed pursuant to this subsection and the damages involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage occurred.*

### "*Antitrust Laws*

"(y) *The grant of a right-of-way or permit pursuant to this section shall grant no immunity from the operation of the Federal antitrust laws.*"

## TITLE II

### SHORT TITLE

SEC. 201. *This title may be cited as the "Trans-Alaska Pipeline Authorization Act".*

### CONGRESSIONAL FINDINGS

SEC. 202. *The Congress finds and declares that:*

(a) *The early development and delivery of oil and gas from Alaska's North Slope to domestic markets is in the national interest because of growing domestic shortages and increasing dependence upon insecure foreign sources.*

(b) *The Department of the Interior and other Federal agencies, have, over a long period of time, conducted extensive studies of the technical aspects and of the environmental, social, and economic impacts of the proposed trans-Alaska oil pipeline, including consideration of a trans-Canada pipeline.*

(c) *The earliest possible construction of a trans-Alaska oil pipeline from the North Slope of Alaska to Port Valdez in that State will make the extensive proven and potential reserves of low-sulfur oil available for domestic use and will best serve the national interest.*

(d) *A supplemental pipeline to connect the North Slope with a trans-Canada pipeline may be needed later and it should be studied now, but it should not be regarded as an alternative for a trans-Alaska pipeline that does not traverse a foreign country.*

### CONGRESSIONAL AUTHORIZATION

SEC. 203. (a) *The purpose of this title is to insure that, because of the extensive governmental studies already made of this project and the national interest in early delivery of North Slope oil to domestic markets, the trans-Alaska oil pipeline be constructed promptly without further administrative or judicial delay or impediment. To accomplish this purpose it is the intent of the Congress to exercise its constitutional powers to the fullest extent in the authorizations and directions herein made and in limiting judicial review of the actions taken pursuant thereto.*

10

*(b) The Congress hereby authorizes and directs the Secretary of the Interior and other appropriate Federal officers and agencies to issue and take all necessary action to administer and enforce rights-of-way, permits, leases, and other authorizations that are necessary for or related to the construction, operation, and maintenance of the trans-Alaska oil pipeline system, including roads and airstrips, as that system is generally described in the Final Environmental Impact Statement issued by the Department of the Interior on March 20, 1972. The route of the pipeline may be modified by the Secretary to provide during construction greater environmental protection.*

*(c) Rights-of-way, permits, leases, and other authorizations issued pursuant to this title by the Secretary shall be subject to the provisions of section 28 of the Mineral Leasing Act of 1920, as amended by title I of this Act (except the provisions of subsections (h)(1), (k), (q), (w) (2), and (x)); all authorizations issued by the Secretary and other Federal officers and agencies pursuant to this title shall include the terms and conditions required, and may include the terms and conditions permitted, by the provisions of law that would otherwise be applicable if this title had not been enacted, and they may waive any procedural requirements of law or regulation which they deem desirable to waive in order to accomplish the purposes of this title. The direction contained in section 203(b) shall supersede the provisions of any law or regulation relating to an administrative determination as to whether the authorizations for construction of the trans-Alaska oil pipeline shall be issued.*

*(d) The actions taken pursuant to this title which relate to the construction and completion of the pipeline system, and to the applications filed in connection therewith necessary to the pipeline's operation at full capacity, as described in the Final Environmental Impact Statement of the Department of the Interior, shall be taken without further action under the National Environmental Policy Act of 1969; and the actions of the Federal officers concerning the issuance of the necessary rights-of-way, permits, leases, and other authorizations for construction and initial operation at full capacity of said pipeline system shall not be subject to judicial review under any law except that claims alleging the invalidity of this section may be brought within sixty days following its enactment, and claims alleging that an action will deny any rights under the Constitution of the United States, or that the action is beyond the scope of authority conferred by this title, may be brought within sixty days following the date of such action. A claim shall be barred unless a complaint is filed within the time specified. Any such complaint shall be filed in a United States district court, and such court shall have exclusive jurisdiction to determine such proceeding in accordance with the procedures hereinafter provided, and no other court of the United States, of any State, territory, or possession of the United States, or of the District of Columbia, shall have jurisdiction of any such claim whether in a proceeding instituted prior to or on or after the date of the enactment of this Act. Any such proceeding shall be assigned for hearing at the earliest possible date, shall take precedence over all other matters pending on the docket of the district court at that time, and shall be expedited in every way by such court. Such court shall not have*

*jurisdiction to grant any injunctive relief against the issuance of any right-of-way, permit, lease, or other authorization pursuant to this section except in conjunction with a final judgment entered in a case involving a claim filed pursuant to this section. Any review of an interlocutory or final judgment, decree, or order of such district court may be had only upon direct appeal to the Supreme Court of the United States.*

*(e) The Secretary of the Interior and the other Federal officers and agencies are authorized at any time when necessary to protect the public interest, pursuant to the authority of this section and in accordance with its provisions, to amend or modify any right-of-way, permit, lease, or other authorization issued under this title.*

### LIABILITY

*Sec. 204. (a)(1) Except when the holder of the pipeline right-of-way granted pursuant to this title can prove that damages in connection with or resulting from activities along or in the vicinity of the proposed trans-Alaskan pipeline right-of-way were caused by an act of war or negligence of the United States, other government entity, or the damaged party, such holder shall be strictly liable to all damaged parties, public or private, without regard to fault for such damages, and without regard to ownership of any affected lands, structures, fish, wildlife, or biotic or other natural resources relied upon by Alaska Natives, Native organizations, or others for subsistence or economic purposes. Claims for such injury or damages may be determined by arbitration or judicial proceedings.*

*(2) Liability under paragraph (1) of this subsection shall be limited to $50,000,000 for any one incident, and the holders of the right-of-way or permit shall be liable for any claim allowed in proportion to their ownership interest in the right-of-way or permit. Liability of such holders for damages in excess of $50,000,000 shall be in accord with ordinary rules of negligence.*

*(3) In any case where liability without fault is imposed pursuant to this subsection and the damages involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage occurred.*

*(4) Upon order of the Secretary, the holder of a right-of-way or permit shall provide emergency subsistence and other aid to an affected Alaska Native, Native organization, or other person pending expeditious filing of, and determination of, a claim under this subsection.*

*(5) Where the State of Alaska is the holder of a right-of-way or permit under this title, the State shall not be subject to the provisions of subsection 204(a), but the holder of the permit or right-of-way for the trans-Alaska pipeline shall be subject to that subsection with respect to facilities constructed or activities conducted under rights-of-way or permits issued to the State to the extent that such holder engages in the construction, operation, maintenance, and termination of facilities, or in other activities under rights-of-way or permits issued to the State.*

*(b) If any area within or without the right-of-way or permit area granted under this title is polluted by any activities conducted by*

12

or on behalf of the holder to whom such right-of-way or permit was granted, and such pollution damages or threatens to damage aquatic life, wildlife, or public or private property, the control and total removal of the pollutant shall be at the expense of such holder, including any administrative and other costs incurred by the Secretary or any other Federal officer or agency. Upon failure of such holder to adequately control and remove such pollutant, the Secretary, in cooperation with other Federal, State, or local agencies, or in cooperation with such holder, or both, shall have the right to accomplish the control and removal at the expense of such holder.

(c) (1) Notwithstanding the provisions of any other law, if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans-Alaska Pipeline Liability Fund established by this subsection, shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages, including clean-up costs, sustained by any person or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.

(2) Strict liability shall not be imposed under this subsection if the owner or operator of the vessel, or the Fund, can prove that the damages were caused by an act of war or by the negligence of the United States or other governmental agency. Strict liability shall not be imposed under this subsection with respect to the claim of a damaged party if the owner or operator of the vessel, or the Fund, can prove that the damage was caused by the negligence of such party.

(3) Strict liability for all claims arising out of any one incident shall not exceed $100,000,000. The owner and operator of the vessel shall be jointly and severally liable for the first $14,000,000 of such claims that are allowed. Financial responsibility for $14,000,000 shall be demonstrated in accordance with the provisions of section 311 (p) of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1321 (p) before the oil is loaded. The Fund shall be liable for the balance of the claims that are allowed up to $100,000,000. If the total claims allowed exceed $100,000,000, they shall be reduced proportionately. The unpaid portion of any claim may be asserted and adjudicated under other applicable Federal or state law.

(4) The Trans-Alaska Pipeline Liability Fund is hereby established as a non-profit corporate entity that may sue and be sued in its own name. The Fund shall be administered by the holders of the trans-Alaska pipeline right-of-way under regulations prescribed by the Secretary. The Fund shall be subject to an annual audit by the Comptroller General, and a copy of the audit shall be submitted to the Congress.

(5) The operator of the pipeline shall collect from the owner of the oil at the time it is loaded on the vessel a fee of five cents per barrel. The collection shall cease when $100,000,000 has been accumulated in the Fund, and it shall be resumed when the accumulation in the Fund falls below $100,000,000.

(6) The collections under paragraph (5) shall be delivered to the Fund. Costs of administration shall be paid from the money paid to the Fund, and all sums not needed for administration and the satisfaction of claims shall be invested prudently in income-producing securi-

**13**

ties approved by the Secretary. Income from such securities shall be added to the principal of the Fund.

(7) *The provisions of this subsection shall apply only to vessels engaged in transportation between the terminal facilities of the pipeline and ports under the jurisdiction of the United States. Strict liability under this subsection shall cease when the oil has first been brought ashore at a port under the jurisdiction of the United States.*

(8) *In any case where liability without regard to fault is imposed pursuant to this subsection and the damages involved were caused by the unseaworthiness of the vessel or by negligence, the owner and operator of the vessel, and the Fund, as the case may be, shall be subrogated under applicable State and Federal laws to the rights under said laws of any person entitled to recovery hereunder. If any subrogee brings an action based on unseaworthiness of the vessel or negligence of its owner or operator, it may recover from any affiliate of the owner or operator, if the respective owner or operator fails to satisfy any claim by the subrogee allowed under this paragraph.*

(9) *This subsection shall not be interpreted to preempt the field of strict liability or to preclude any State from imposing additional requirements.*

(10) *If the Fund is unable to satisfy a claim asserted and finally determined under this subsection, the Fund may borrow the money needed to satisfy the claim from any commercial credit source, at the lowest available rate of interest, subject to approval of the Secretary.*

(11) *For purposes of this subsection only, the term "affiliate" includes—*

   (A) *Any person owned or effectively controlled by the vessel owner or operator; or*

   (B) *Any person that effectively controls or has the power effectively to control the vessel owner or operator by—*

      (i) *stock interest, or*

      (ii) *representation on a board of directors or similar body, or*

      (iii) *contract or other agreement with other stockholders, or*

      (iv) *otherwise; or*

   (C) *Any person which is under common ownership or control with the vessel owner or operator.*

(12) *The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a business trust, or an unincorporated organization.*

### ANTITRUST LAWS

SEC. 205. *The grant of a right-of-way, permit, lease, or other authorization pursuant to this title shall grant no immunity from the operation of the Federal anti-trust laws.*

### ROADS AND AIRPORTS

SEC. 206. *A right-of-way, permit, lease, or other authorization granted under section 203(b) for a road or airstrip as a related facility of the trans-Alaska pipeline may provide for the construction of a public road or airstrip.*

**14**

### TITLE III—NEGOTIATIONS WITH CANADA

SEC. 301. The President of the United States is authorized and requested to enter into negotiations with the Government of Canada to determine—

(a) the willingness of the Government of Canada to permit the construction of pipelines or other transportation systems across Canadian territory for the transport of natural gas and oil from Alaska's North Slope to markets in the United States, including the use of tankers by way of the Northwest Passage;

(b) the need for intergovernmental understandings, agreements, or treaties to protect the interests of the Governments of Canada and the United States and any party or parties involved with the construction, operation, and maintenance of pipelines or other transportation systems for the transport of such natural gas or oil;

(c) the terms and conditions under which pipelines or other transportation systems could be constructed across Canadian territory;

(d) the desirability of undertaking joint studies and investigations designed to insure protection of the environment, reduce legal and regulatory uncertainty, and insure that the respective energy requirements of the people of Canada and of the United States are adequately met;

(e) the quantity of such oil and natural gas from the North Slope of Alaska for which the Government of Canada would guarantee transit; and

(f) the feasibility, consistent with the needs of other sections of the United States, of acquiring additional energy from other sources that would make unnecessary the shipment of oil from the Alaska pipeline by tanker into the Puget Sound area.

The President shall report to the House and Senate Committees on Interior and Insular Affairs the actions taken, the progress achieved, the areas of disagreement, and the matters about which more information is needed, together with his recommendations for further action.

SEC. 302. (a) The Secretary of the Interior is authorized and directed to investigate the feasibility of one or more oil or gas pipelines from the North Slope of Alaska to connect with a pipeline through Canada that will deliver oil or gas to United States markets.

(b) All costs associated with making the investigations authorized by subsection (a) shall be charged to any future applicant who is granted a right-of-way for one of the routes studied. The Secretary shall submit to the House and Senate Committees on Interior and Insular Affairs periodic reports of his investigation, and the final report of the Secretary shall be submitted within two years from the date of this Act.

SEC. 303. Nothing in this title shall limit the authority of the Secretary of the Interior or any other Federal official to grant a gas or oil pipeline right-of-way or permit which he is otherwise authorized by law to grant.

### TITLE IV—MISCELLANEOUS

#### VESSEL CONSTRUCTION STANDARDS

SEC. 401. Section 4417a of the Revised Statutes of the United States (46 U.S.C. 391a), as amended by the Ports and Waterways Safety Act

*of 1972 (86 Stat. 424, Public Law 92–340), is hereby amended as follows:*

*"(C) Rules and regulations published pursuant to subsection (7) (A) shall be effective not earlier than January 1, 1974, with respect to foreign vessels and United States-flag vessels operating in the foreign trade, unless the Secretary shall earlier establish rules and regulations consonant with international treaty, convention, or agreement, which generally address the regulation of similar topics for the protection of the marine environment. In absence of the promulgation of such rules and regulations consonant with international treaty, convention, or agreement, the Secretary shall establish an effective date not later than January 1, 1976, with respect to foreign vessels and United States-flag vessels operating in the foreign trade, for rules and regulations previously published pursuant to this subsection (7) which he then deems appropriate. Rules and regulations published pursuant to subsection (7)(A) shall be effective not later than June 30, 1974, with respect to United States-flag vessels engaged in the coastwise trade.".*

### VESSEL TRAFFIC CONTROL

*SEC. 402. The Secretary of the Department in which the Coast Guard is operating is hereby directed to establish a vessel traffic control system for Prince William Sound and Valdez, Alaska, pursuant to authority contained in title I of the Ports and Waterways Safety Act of 1972 (86 Stat. 424, Public Law 92–340).*

### CIVIL RIGHTS

*SEC. 403. The Secretary of the Interior shall take such affirmative action as he deems necessary to assure that no person shall, on the grounds of race, creed, color, national origin, or sex, be excluded from receiving, or participating in any activity conducted under, any permit, right-of-way, public land order, or other Federal authorization granted or issued under title II. The Secretary of the Interior shall promulgate such rules as he deems necessary to carry out the purposes of this subsection and may enforce this subsection, and any rules promulgated under this subsection, through agency and department provisions and rules which shall be similar to those established and in effect under title VI of the Civil Rights Act of 1964.*

### CONFIRMATION OF THE DIRECTOR OF THE ENERGY POLICY OFFICE

*SEC. 404. The Director of the Energy Policy Office in the Executive Office of the President shall be appointed by the President, by and with the advice and consent of the Senate: Provided, That if any individual who is serving in this office on the date of enactment of this Act is nominated for such position, he may continue to act unless and until such nomination shall be disapproved by the Senate.*

### CONFIRMATION OF THE HEAD OF THE MINING ENFORCEMENT AND SAFETY ADMINISTRATION

*SEC. 405. The head of the Mining Enforcement and Safety Administration established pursuant to Order Numbered 2953 of the Secretary of the Interior issued in accordance with the authority provided by section 2 of Reorganization Plan Numbered 3 of 1950 (64 Stat. 1262) shall be appointed by the President, by and with the advice and con-*

sent of the Senate: *Provided,* That if any individual who is serving in this office on the date of enactment of this Act is nominated for such position, he may continue to act unless and until such nomination shall be disapproved by the Senate.

## EXEMPTION OF FIRST SALE OF CRUDE OIL AND NATURAL GAS OF CERTAIN LEASES FROM PRICE RESTRAINTS AND ALLOCATION PROGRAMS

SEC. 406. (a) The first sale of crude oil and natural gas liquids produced from any lease whose average daily production of such substances for the preceding calendar month does not exceed ten barrels per well shall not be subject to price restraints established pursuant to the Economic Stabilization Act of 1970, as amended, or to any allocation program for fuels or petroleum established pursuant to that Act or to any Federal law for the allocation of fuels or petroleum.

(b) To qualify for the exemption under this section, a lease must be operating at the maximum feasible rate of production and in accord with recognized conservation practices.

(c) The agency designated by the President or by law to implement any such fuels or petroleum allocation program is authorized to conduct inspections to insure compliance with this section and shall promulgate and cause to be published regulations implementing the provisions of this section.

## ADVANCE PAYMENTS TO ALASKA NATIVES

SEC. 407. (a) In view of the delay in construction of a pipeline to transport North Slope crude oil, the sum of $5,000,000 is authorized to be appropriated from the United States Treasury into the Alaska Native Fund every six months of each fiscal year beginning with the fiscal year ending June 30, 1976, as advance payments chargeable against the revenues to be paid under section 9 of the Alaska Native Claims Settlement Act, until such time as the delivery of North Slope crude oil to a pipeline is commenced.

(b) Section 9 of the Alaskan Native Claims Settlement Act is amended by striking the language in subsection (g) thereof and substituting the following language: "The payments required by this section shall continue only until a sum of $500,000,000 has been paid into the Alaska Native Fund less the total of advance payments paid into the Alaska Native Fund pursuant to section 407 of the Trans-Alaska Pipeline Authorization Act. Thereafter, payments which would otherwise go into the Alaska Native Fund will be made to the United States Treasury as reimbursement for the advance payments authorized by section 407 of the Trans-Alaskan Pipeline Authorization Act. The provisions of this section shall no longer apply, and the reservation required in patents under this section shall be of no further force and effect, after a total sum of $500,000,000 has been paid to the Alaska Native Fund and to the United States Treasury pursuant to this subsection.".

## FEDERAL TRADE COMMISSION AUTHORITY

SEC. 408. (a)(1) The Congress hereby finds that the investigative and law enforcement responsibilities of the Federal Trade Commission have been restricted and hampered because of inadequate legal authority to enforce subpenas and to seek preliminary injunctive relief to avoid unfair competitive practices.

(2) *The Congress further finds that as a direct result of this inadequate legal authority significant delays have occurred in a major investigation into the legality of the structure, conduct, and activities of the petroleum industry, as well as in other major investigations designed to protect the public interest.*

(b) *It is the purpose of this Act to grant the Federal Trade Commission the requisite authority to insure prompt enforcement of the laws the Commission administers by granting statutory authority to directly enforce subpenas issued by the Commission and to seek preliminary injunctive relief to avoid unfair competitive practices.*

(c) *Section 5(l) of the Federal Trade Commission Act (15 U.S.C. 45(l)) is amended by striking subsection (l) and inserting in lieu thereof:*

"(l) *Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.*"

(d) *Section 5 of the Federal Trade Commission Act (15 U.S.C. 45) is amended by adding at the end thereof the following new subsection:*

"(m) *Whenever in any civil proceeding involving this Act the Commission is authorized or required to appear in a court of the United States, or to be represented therein by the Attorney General of the United States, the Commission may elect to appear in its own name by any of its attorneys designated by it for such purpose, after formally notifying and consulting with and giving the Attorney General 10 days to take the action proposed by the Commission.*"

(e) *Section 6 of the Federal Trade Commission Act (15 U.S.C. 46), is amended by adding at the end thereof the following provisio:* "*Provided, That the exception of 'banks and common carriers subject to the Act to regulate commerce' from the Commission's powers defined in clauses (a) and (b) of this section, shall not be construed to limit the Commission's authority to gather and compile information, to investigate, or to require reports or answers from, any such corporation to the extent that such action is necessary to the investigation of any corporation, group of corporations, or industry which is not engaged or is engaged only incidentally in banking or in business as a common carrier subject to the Act to regulate commerce.*"

(f) *Section 13 of the Federal Trade Commission Act (15 U.S.C. 53) is amended by redesignating "(b)" as "(c)" and inserting the following new subsection:*

"(b) *Whenever the Commission has reason to believe—*

"(1) *that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and*

"(2) *that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by*

18

*the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—*

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further,* That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business."

(g) *Section 16 of the Federal Trade Commission Act (15 U.S.C. 56) is amended to read as follows:*

"SEC. 16. Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under section 14 or under subsection (l) of section 5 of this Act, it shall—

"(a) certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection; or

"(b) after compliance with the requirements with Section 5(m), itself cause such appropriate proceedings to be brought."

### GENERAL ACCOUNTING OFFICE AUTHORITY

SEC. 409. (a) *Section 3502 of title 44, United States Code is amended by inserting in the first paragraph defining "Federal agency" after the words "the General Accounting Office" and before the words "nor the governments" the words "independent Federal regulatory agencies,".*

(b) *Chapter 35 of title 44, United States Code, is amended by adding after section 3511 the following new section:*

## "§ 3512. *Information for independent regulatory agencies*

"(a) *The Comptroller General of the United States shall review the collection of information required by independent Federal regulatory agencies described in section 3502 of this chapter to assure that information required by such agencies is obtained with a minimum burden upon business enterprises, especially small business enterprises, and other persons required to furnish the information. Unnecessary duplication of efforts in obtaining information already filed with other Federal agencies or departments through the use of reports, questionnaires, and other methods shall be eliminated as rapidly as practicable. Information collected and tabulated by an independent regulatory agency shall, as far as is expedient, be tabulated in a manner to maximize the usefulness of the information to other Federal agencies and the public.*

19

"(b) In carrying out the policy of this section, the Comptroller General shall review all existing information gathering practices of independent regulatory agencies as well as requests for additional information with a view toward—

"(1) avoiding duplication of effort by independent regulatory agencies, and

"(2) minimizing the compliance burden on business enterprises and other persons.

"(c) In complying with this section, an independent regulatory agency shall not conduct or sponsor the collection of information upon an identical item from ten or more persons, other than Federal employees, unless, in advance of adoption or revision of any plans or forms to be used in the collection—

"(1) the agency submitted to the Comptroller General the plans or forms, together with the copies of pertinent regulations and of other related materials as the Comptroller General has specified; and

"(2) the Comptroller General has advised that the information is not presently available to the independent agency from another source within the Federal Government and has determined that the proposed plans or forms are consistent with the provision of this section. The Comptroller General shall maintain facilities for carrying out the purposes of this section and shall render such advice to the requestive independent regulatory agency within forty-five days.

"(d) While the Comptroller General shall determine the availability from other Federal sources of the information sought and the appropriateness of the forms for the collection of such information, the independent regulatory agency shall make the final determination as to the necessity of the information in carrying out its statutory responsibilities and whether to collect such information. If no advice is received from the Comptroller General within forty-five days, the independent regulatory agency may immediately proceed to obtain such information.

"(e) Section 3508(a) of this chapter dealing with unlawful disclosure of information shall apply to the use of information by independent regulatory agencies.

"(f) The Comptroller General may promulgate rules and regulations necessary to carry out this chapter."

### EQUITABLE ALLOCATION OF NORTH SLOPE CRUDE OIL

SEC. 410. The Congress declares that the crude oil on the North Slope of Alaska is an important part of the Nation's oil resources, and that the benefits of such crude oil should be equitably shared, directly or indirectly, by all regions of the country. The President shall use any authority he may have to insure an equitable allocation of available North Slope and other crude oil resources and petroleum products among all regions and all of the several States.

### SEPARABILITY

SEC. 411. If any provision of this Act or the applicability thereof is held invalid the remainder of this Act shall not be affected thereby.

20

And the House agree to the same.

That the Senate recede from its disagreement to the amendment of the House to the title of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the amendment of the House to the title of the bill insert the following:

*"To amend section 28 of the Mineral Leasing Act of 1920, and to authorize a trans-Alaska oil pipeline, and for other purposes".*

And the House agree to the same.

> JAMES A. HALEY,
> HAROLD T. JOHNSON,
> MORRIS K. UDALL,
> JOHN MELCHER,
> SAM STEIGER,
> DON YOUNG,
> CRAIG HOSMER,
> *Managers on the Part of the House.*
>
> HENRY M. JACKSON,
> ALAN BIBLE,
> J. BENNETT JOHNSTON, Jr.,
> FLOYD K. HASKELL,
> PAUL J. FANNIN,
> CLIFFORD P. HANSEN,
> MARK O. HATFIELD,
> *Managers of the Part of the Senate.*

# JOINT STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 1081) to authorize the Secretary of the Interior to grant rights-of-way across Federal lands where the use of such rights-of-way is in the public interest and the applicant for the right-of-way demonstrates the financial and technical capability to use the right-of-way in a manner which will protect the environment, submit this joint statement in explanation of the effect of the language agreed upon by the managers and recommended in the accompanying conference report.

## I. Major Provisions

The language agreed upon by the Conference Committee differs from the bill enacted by the Senate and the amendment enacted by the House in the following respects:

1. The Senate bill enacted a completely new system for granting rights-of-way across Federal lands. It applied to rights-of-way for many different purposes.

The House amendment applied only to rights-of-way for oil and gas pipelines. It took the form of an amendment to section 28 of the Mineral Leasing Act of 1920, which is the principal authority for granting oil and gas pipeline rights-of-way across public lands.

The Conferees adopted the House approach, but expanded it to include pipelines for oil, gas, synthetic liquid or gaseous fuels and refined products therefrom in anticipation of developments in coal gasification and liquification, oil shale, and tar sands. It is the understanding of the Conferees, however, that the House will consider broader right-of-way legislation in connection with other bills that are presently pending.

2. The Senate bill applied to all lands owned by the United States except five specified categories. The House amendment retained the present language of the Mineral Leasing Act of 1920, which applies to "public lands, including forest reserves." The meaning of this phrase is not completely clear, but it clearly does not apply to lands acquired by the United States, as distinguished from the public domain.

The Conferees adopted the Senate approach, but excluded three categories rather than five categories of land. The three categories excluded are the National Park System, the Outer Continental Shelf, and Indian lands. The two categories of land that were not excluded are the National Wildlife Refuge System and the National Wilderness Preservation System, both of which are presently subject to the Mineral Leasing Act. The Conferees provided, however, that rights-

of-way through reserved areas may not be granted if they would be inconsistent with the purposes of the reservation.

3. The Conferees combined and adopted the guidelines governing the grant of rights-of-way that were contained in the Senate bill and in the House amendment. The two sets of guidelines, while different in some respects, are compatible, and both are intended to spell out in greater statutory detail policies that were formerly left to administrative determination. None of the House guidelines was omitted.

4. Both the Senate bill and the House amendment provided for the immediate grant of a Trans-Alaska oil pipeline right-of-way without further proceedings under the National Environmental Protection Act and with only a limited right of judicial review. The Conferees merged the provisions of the two Houses without making major substantive changes.

5. Both the Senate bill and the House amendment provided for further study and negotiations with respect to possible additional oil and gas pipelines from the North Slope of Alaska, through Canada, to the Midwest. The Conferees merged the provisions of the two Houses without making substantial changes. The results of the negotiations and investigations are intended to serve as comparative information in the evaluation of the best possible methods for future transportation of North Slope energy resources to United States markets, and the bill is not intended to confer any special status on a trans-Canada route in the selection process for future pipelines.

6. The Senate bill had a number of miscellaneous provisions that were not directly related to oil pipeline rights-of-way. The House amendment had no comparable provisions. The Conferees' action was as follows:

(a) The Senate provision amending the Ports and Waterways Safety Act of 1972 with respect to vessel construction standards, and the provision directing the Coast Guard to exercise its present authority to establish a vessel traffic control system for the Valdez area, were adopted.

(b) The provisions requiring Senate confirmation of the Director of the Energy Policy Office in the Executive Office of the President, and the head of the Mining Enforcement and Safety Administration, were adopted.

(c) The provision exempting the first sale of oil and gas from stripper wells from the price restraints of the Economic Stabilization Act of 1970, and from any allocation program, was adopted. A stripper well is defined as a well with an average daily production during the preceding month of not more than ten barrels. In order to qualify for the exemption the lease must be operating at a maximum feasible rate of production and in accord with recognized conservation practices.

(d) The provision amending the Alaska Native Claims Settlement Act and providing for advance payments to Natives was adopted, after reducing the amount of the advance payments from $7,500,000 each six months to $5,000,000, after delaying the starting time for the payments from the beginning of fiscal year 1975 to the beginning of fiscal year 1976, and after deleting the provision making the advance payments a gift if transportation of oil through the pipeline does not commence by December 31, 1976.

23

(e) The provision amending the Federal Trade Commission Act was adopted, with amendments. It increased the civil penalty for violating a final order of the Commission, gave the Commission broader authority to initiate injunction actions and enforce subpoenas, and gave the Commission authority to represent itself in court if the Attorney General failed to do so after ten days notice.

(f) The provision amending the Federal Reports Act was adopted. It substituted the Comptroller General for the Office of Management and Budget in reviewing questionnaires proposed to be issued by independent Federal regulatory agencies. The regulatory agency will determine whether it needs the information, but it may not send its questionnaire if the Comptroller General determines that the information is already available from another source within the Federal Government.

(g) The provision giving the President broad authority to take any action necessary to insure an equitable allocation of crude oil and petroleum products among the various regions and States was adopted after it was amended to require the President to use his existing authority to accomplish that objective.

7. The House amendment contained (a) a provision prohibiting any form of discrimination in connection with any activity on the trans-Alaska pipeline, (b) a provision limiting the employment of foreign nationals for work on the trans-Alaska pipeline, and (c) a "buy-American" provision for the construction, operation, and maintenance of the trans-Alaska pipeline. The Senate bill had no comparable provisions. The Conferees adopted the first provision and dropped the second and third.

8. The Senate bill and the House amendment had different provisions regarding the liability of the owner or operator of an oil pipeline for damages resulting from its construction and operation. The Senate bill had one provision which related to pipelines on rights-of-way granted under the general law, and which applied only to damages incurred by the United States. The Senate had another provision which related to damages incurred by Alaska Natives in connection with the trans-Alaska pipeline. The House amendment had three provisions which related only to the trans-Alaska oil pipeline. One related to damages to anyone that were caused by the activities of the pipeline owner along the route of the pipeline. A second provision related to damages to anyone from discharges of oil from vessels owned or controlled by the pipeline owner in violation of the Federal Water Pollution Control Act. A third provision related to damages sustained by Alaska Natives.

The Conferees adopted modified versions of all of these provisions. One provision is of general application and appears in section 28(x). It requires the Secretary or agency head to specify the extent to which the holder of a right-of-way or permit shall be liable to the United States for damage or injury incurred in connection with the right-of-way. Joint regulations by the agencies involved, as authorized in section 28(c), are contemplated by the Conferees. Strict liability without regard to fault may be imposed, but a maximum dollar limitation must be stated, and liability in excess of this amount may be determined under ordinary rules of negligence.

24

The second provision is in section 204. It relates only to the trans-Alaska pipeline, and is in three parts. Subsection (a) imposes on the holder of the right-of-way or permit strict liability without regard to fault, and without regard to ownership of the land or resource involved if the land or resource is relied upon for subsistence or economic purposes, for damages or injury in connection with or resulting from activities along or in the vicinity of the pipeline right-of-way. Strict liability is limited to $50,000,000 for any one incident, and liability for damages in excess of that amount will be determined in accordance with ordinary rules of negligence.

Subsection (b) imposes on the holder of a right-of-way or permit liability for the full cost of control and removal of the pollutant of any area that is polluted by operations of the holder.

Subsection (c) imposes on the owner or operator of a vessel that is loaded with any oil from the trans-Alaska pipeline strict liability without regard to fault for damages sustained by any person as the result of discharges of oil from such vessel. Strict liability is limited to $100,000,000 for any one incident. The owner or operator is liable for the first $14,000,000. A Trans-Alaska Pipeline Liability Fund, which is created by the bill, is liable for the balance of the allowed claims up to $100,000,000. The portion of any valid claim not payable by the Fund may be asserted and adjudicated under other applicable Federal or State law.

The Fund will accumulate and maintain not less than $100,000,000 derived from the collection of a fee of five cents per barrel at the time the oil is loaded on the vessel, from income from invested funds, and from borrowed money if needed.

Strict liability under subsection (c) will cease when the oil is first brought ashore at a port under the jurisdiction of the United States, and the subsection applies only to vessels engaged in coastwise transportation, including transportation to and beyond deepwater ports.

9. Both the Senate bill and the House amendment contained provisions limiting the export of crude oil and making such exports subject to congressional oversight. The Senate bill applied only to oil from the North Slope of Alaska. The House amendment applied to all oil transported over rights-of-way through Federal lands. The Conferees adopted the House language.

The Senate bill provided for disapproval of proposed exports by joint resolution of the Congress. The House amendment prohibited proposed exports unless affirmatively authorized by a concurrent resolution of the Congress. The Conferees adopted the Senate language after changing "joint resolution" to "concurrent resolution."

The Conferees also adopted an exception intended to take care of oil exchanges and transportation involving Canada and Mexico.

## II. Comments Regarding Specific Provisions

1. Section 28(e), which authorizes the grant of temporary permits for the use of Federal lands "in the vicinity of the pipeline" is not intended to restrict unnecessarily the placement of temporary construction or maintenance facilities such as construction camps, storage areas, communications sites and soil disposal areas, but to permit them to be placed wherever convenient to construction activities.

25

The term "temporary" relates to duration and imposes no limitation on the type of facility or activity which may be allowed. Thus, slope cuts and fills, berm construction, access facilities and other permanent changes in terrain are permissible. The Secretary or agency head may require, as a condition of such temporary permits, removal of structures and rehabilitation of the area.

This section will overcome an interpretation of the United States Court of Appeals for the District of Columbia in the case of *Wilderness Society* v. *Morton* (Feb. 9, 1973).

2. Section 28(f) contemplates that general regulations governing the grant of rights-of-way or permits will be issued by the Secretary or agency head. This does not preclude the grant of rights-of-way or permits in advance of the issuance of the regulations and the inclusion of appropriate conditions and stipulations to carry out the purposes of the Act.

3. Section 28(g), relating to pipeline safety, is not intended to require the Secretary or agency head to impose safety requirements that would duplicate requirements of the Secretary of Labor or the Secretary of Transportation under other law.

4. Section 28(h), relating to environmental protection, does not require the plan for construction, operation, and rehabilitation of the right-of-way or permit area to be a final one, since all details and conditions cannot be known at the time of application. However, the plan should be a description in as much detail as the state of the planning for the particular project will permit and must be adequate enough for the Secretary or agency head to make an informed judgment on the application and on the need for imposing any special terms and conditions which the public interest may require. Information called for pursuant to this section which is already on file with respect to applications pending on the date of enactment need not be refiled.

5. Section 28(k) does not require public hearings that would duplicate the public participation procedures required by the National Environmental Policy Act. It also permits a public hearing to cover all aspects of a pipeline proposal, regardless of whether one or more rights-of-way or permits, or whether one or more agencies, are involved.

6. Section 28(l) requires reimbursement of costs incurred in processing an application. These costs include the cost of preparing an environmental impact statement. It also requires payment annually in advance of the fair market rental value of the right-of-way or permit. This value can be based on any combination of factors that might reasonably be considered by a landowner in a free market, when determining the price to be asked for the right to use or cross his land.

7. Section 28(m) authorizes the Secretary or agency head to require a right-of-way or permit holder to furnish a bond or other satisfactory security. The term "security" is not used in a technical sense but may include any undertaking which gives adequate assurance that all obligations of the grantee will be met. Such flexibility is needed because some grantees may not be legally able to post such security, and in other cases a requirement of technical security may be impossible or unnecessary to comply with. Flexibility also permits the Secretary or agency head to require more than one type of security.

8. Section 28(p), relating to joint uses of a right-of-way, gives the Secretary or agency head sufficient control to prevent any hazardous or technologically inoperable placement of various facilities.

9. Section 28(t) permits the Secretary or agency head to ratify and confirm the validity of existing rights-of-way for oil or gas regardless of the statutory authority under which they were granted. It is needed because of the possible application of the decision of the United States Court of Appeals in *The Wilderness Society, et al. v. Morton, et al.*

The conferees expect that previously granted rights-of-way should be confirmed only after careful study and the fullest possible compliance with the provisions of Section 28 as amended by this Act.

10. Section 28(v), relating to State standards, is included because rights-of-way frequently cross from State or private land into Federal land and back into State or private land. Different construction, operation, and maintenance standards may apply. This section is intended to assure that the Secretary or agency head will carefully consider State standards and comply with them in the interest of uniform practice throughout the State where such compliance is practical in the judgment of the Secretary or agency head. The section is not intended to require that those standards be followed in every case.

11. Section 203(b) provides new and independent statutory authorization and direction for the issuance, administration and enforcement of all rights-of-way, permits, leases and other authorizations necessary for or related to construction, operation and maintenance of the trans-Alaska pipeline system as generally described in the Final Environmental Impact Statement of the Department of the Interior dated March 20, 1972. It is a plenary grant of authority to the appropriate Federal agencies. All grants of rights-of-way, leases, permits, and other authorizations for the use of Federal lands shall be made under the authority of this subsection, rather than under other provisions of law.

After years of delay and protracted litigation on this matter, Congress has determined that the national interest requires a clear-cut and unequivocal policy decision on the pipeline. Congress has decided that an oil pipeline is necessary to move North Slope oil to domestic markets in the lower forty-eight States. This title implements that national policy decision.

In adopting this title, Congress intends to exercise its constitutional powers to the fullest extent necessary to achieve the objective of this title and to make this policy binding upon the Executive Branch and on the Federal courts.

Congress has decided, as a matter of national policy, that the appropriate Federal authorizations shall be issued. The Secretary and other Federal officials have no discretion in this matter. Congress does, however, require that applicable standards of substantive law be followed in connection with these authorizations, and vests liberal discretion in the Executive Branch to determine the conditions and stipulations to be incorporated into the necessary authorizations and the specific facilities to be authorized.

This subsection also identifies the "trans-Alaska oil pipeline system" as that system is generally described in the Secretary of the Interior's Final Environmental Impact Statement of March 20, 1972. The sub-

27

ject of that statement was a 48-inch diameter pipeline system with an ultimate capacity of 2 million barrels a day throughput for which a right-of-way and other permit applications were filed by a number of oil companies which had purchased leases on the North Slope of Alaska. This provision is intended to generally specify the facilities to be authorized and their general location. This provision is not, however, to be narrowly construed. If environmental conditions or new technological developments warrant, new facilities or changes in route or in location of proposed facilities are authorized so long as they are required or appropriate for the construction and operation at full capacity of the trans-Alaska pipeline system as generally described in the impact statement.

The route of the trans-Alaska pipeline will cross lands under the jurisdiction of more than one Federal agency. The Congress intends in Title II that the Secretary of the Interior will issue the right-of-way over all such Federal lands.

12. Section 203(c) provides that, if under any other statute a Federal agency could have issued an authorization relating to the construction of the trans-Alaska pipeline system, the agency shall still issue such authorization, but it shall act under the authority of subsection 203(b) of this Title and not under the authority of the other statute. Authorizations issued under subsection 203(b) shall contain all those provisions that the supplanted statute would have required, and may include any provisions which were authorized but not required by the supplanted statute.

Authorizations issued by the Secretary of the Interior shall follow the applicable provisions of Section 28 of the Mineral Leasing Act, as it is amended by Title I of this Act, except as provided in subsection 203(c). Not all of the Section 28 provisions will be applicable. The determination of applicability is left to the Secretary's judgment.

13. Section 203(d) provides for construction and completion of the pipeline system without further proceedings under National Environmental Policy Act of 1969. Section 202(d) of the House amendment and section 502(d) of the Senate bill contained a declaration that the actions of the Secretary of Interior heretofore taken with respect to the proposed trans-Alaska pipeline shall be regarded as satisfactory compliance with the provisions of the National Environmental Policy Act of 1969. Section 502(d) of the Senate bill also applied to the actions of other Federal agencies and officers, and referred not only to the National Environmental Policy Act of 1969, but also to "all other applicable laws." The Conferees did not adopt this declaration because they considered it as unnecessary and subject to misinterpretation. Inasmuch as section 203(d) of the Conference Report directs that the actions necessary for construction and completion of the trans-Alaska pipeline system shall be taken without further action under the National Environmental Policy Act, a declaration with respect to the effect to be accorded prior actions was not regarded as necessary or material.

Section 203(d) also limits the grounds for judicial review of Federal actions relating to issuance and implementation of all rights-of-way, permits, leases and other authorizations necessary or appropriate for completion of construction of the trans-Alaska pipeline, and its initial operation at full capacity of 2,000,000 barrels throughput per day (i.e., actions under 203(b) and 203(e)).

The permissible grounds for judicial review are limited to constitutional questions and questions of federal actions beyond the scope of authority conferred by Title II. Congress intended such grounds to be construed very narrowly, in keeping with the purpose stated in 203(a). This purpose also underlies the jurisdictional and procedural provisions in Section 203(d), which are designed to assure the most prompt possible resolution of any case involving the trans-Alaska pipeline, and to assure that issuance of the rights-of-way, permits, leases or other authorizations cannot be enjoined except pursuant to a final judgment.

14. Section 204(c) provides, for vessels that transport North Slope oil in the coastal trade, liability standards that are much stricter than those that apply to vessels that transport other oil in the coastal or foreign trade.

It is expected that tankers as large as 250,000 deadweight tons will transport North Slope crude to ports on the West Coast of the United States and elsewhere. Oil discharges from vessels of this size could result in extremely high damages to property and natural resources, including fisheries and amenities, especially if the mishap occurred close to a populated shoreline area.

Under the Limitation of Liability Act of 1851 (46 U.S.C. 183), the owner of a vessel is entitled to limit his liability for property damage caused by the vessel to the value of the vessel and its cargo. The value determination is made *after* the incident causing the damage. It is therefore quite possible for injured parties to go uncompensated if a vessel and its cargo are totally lost.

In the Water Quality Improvement Act of 1970 (33 U.S.C. 1161 et seq.), Congress expanded the liability of a vessel carrying oil to cover Federal government cleanup costs up to the lesser of $100 per ton or $14 million. Under that Act, damages are imposed without regard to the fault of the owner or operator, thereby creating a strict liability to United States Government for cleanup costs. However, State governments and private parties are still obliged to proceed under maritime law, subject to the limits of liability contained in that body of law.

The Conferees concluded that existing maritime law would not provide adequate compensation to all victims, including residents of Canada, in the event of the kind of catastrophe which might occur. Consequently, the Conferees established a rule of strict liability for damages from discharges of the oil transported through the trans-Alaska Pipeline up to $100,000,000.

Strict liability is primarily a question of insurance. The fundamental reason for the limits placed on liability in the Federal Water Quality Improvement Act stemmed from the availability, or non-availability, of marine insurance. Without a readily available commercial source of insurance, liability without a dollar limitation would be meaningless and many independent owners could not operate their vessels. Since the world-wide maritime insurance industry claimed $14 million was the limit of the risk they would assume, this was the limit provided for in the Federal Water Quality Improvement Act. There has been no indication that this level has since increased.

Accordingly, the Conferees adopted a liability plan which would make the owner or operator strictly liable for all claims (for both

clean-up costs and damages to public and private parties) up to $14 million. This limit would provide an incentive to the owner or operator to operate the vessel with due care and would not create too heavy an insurance burden for independent vessel owners lacking the means to self-insure.

Financial responsibility up to this limit would have to be demonstated before the vessel could be loaded with oil. Since the Federal Water Quality Improvement Act has an existing mechanism for establishing proof of financial responsibility, reference was made to the appropriate provision (13 U.S.C. 1321(p)). Such provision would be used to the extent it is consistent with the purposes of this Act; for example, references to tonnage limitations would not apply. Claims for clean-up costs would take precedence over other claims thereby preserving the provisions of the Federal Water Quality Improvement Act.

All claims over $14 million up to the $100 million ceiling would be asserted against the Trans-Alaska Pipeline Liability Fund established by the bill.

The owners of oil loaded onto tankers at Valdez will pay the Fund five cents per barrel until there is $100 million in the Fund. Payments would resume at any time the Fund fell below $100 million. (The Fund is described in more detail under Major Provisions.) Thus, the owners of the oil would have an incentive to select carefully vessels to carry their oil. Moreover, such owners would then share the risk associated with transporting the oil on water.

The Fund is not precluded from proceeding against the owner or operator of the vessel or other third parties, if either or both were negligent or caused the discharged.

The States are expressly not precluded from setting higher limits or from legislating in any manner not inconsistent with the provisions of this Act.

The Conferees hope that the appropriate committees of the House and Senate which are considering the more general subject of marine liability will harmonize the liability provisions of the Trans-Alaska Pipeline Authorization Act and the liability provisions of any general legislaton that may be developed.

15. Section 406, relating to stripper oil wells, was a Senate floor amendment to S. 1081. The Conferees have adopted the general concept of the floor amendment, but have added new provisions to insure that the exemption is narrowly defined and prudently administered, and to insure that the incentive being granted is properly limited in accord with congressional intent.

The purpose of exempting small stripper wells—wells whose average daily production does not exceed ten barrels per well—from the price restraints of the Economic Stabilization Act (now in Phase IV) and from any system of mandatory fuel allocation is to insure that direct or indirect price ceilings do not have the effect of resulting in any loss of domestic crude oil production from the premature shutdown of stripper wells for economic reasons.

As of January 1, 1973, there were 350,000 stripper wells producing ten barrels a day or less. Stripper wells account for 71 percent of all of the oil wells in this country, but produce an average of only 3.6

30

barrels per day, or only 13 percent of total U.S. domestic crude production.

Many stripper wells are of only marginal economic value. When the costs of their operation exceed the value of their production, they are shut in, and a known and developed crude oil reserve is lost to U.S. production. Removing Phase IV price restraints from these marginal stripper wells has the effect of increasing the value of the crude oil they produce by about $1.30 per barrel (the difference between $4.02, the current per-barrel ceiling average under Phase IV, and $5.32, the per-barrel average price for "new" domestic crude oil production which is not subject to Phase IV). This price incentive will encourage owners and operators of stripper wells to maintain production and to keep these wells in operation for longer periods of time than would be possible if the value of their crude oil production were determined under Phase IV price ceilings. This increased incentive will, it is anticipated, permit stripper well operators to make new investments in the eligible wells and improve the gathering and other facilities for moving this oil to market.

The words "first sale" in Section 406(a) refer to the initial sale from the producer to a refiner, oil broker or other party. Thereafter, the exemption expires and any applicable provision of the Economic Stabilization Act or any mandatory allocation program may apply.

The exemption also runs only to "crude oil and natural gas liquids." It does not run to natural gas produced by these wells. Natural gas production and pricing continue to be regulated by the Federal or State agency having jurisdiction over the particular wells involved.

The Congress intends that the provisions of this section will be strictly enforced and regulated by the administering agency to insure that the limited exemption of this class of wells for the express purposes described above is not in any way broadened. To achieve this, Congress authorizes on-site inspections to insure compliance. Congress also directs that the administering agency shall promulgate regulations to implement the provisions of this section before it becomes operative. The Conferees expect the administering agency to utilize State data regarding production volumes, and to provide by regulation safeguards against the manipulation or gerrymandering of lease units in a manner that evades the price control and allocation programs.

These regulations shall be so designed as to provide safeguards against any abuse, over-reaching or altering of normal patterns of operations to achive a benefit under this section which would not otherwise be available. Congress specifically intends that the regulations shall, among other things, prevent any "gerrymandering" of leases to average down high production wells with a number of low production stripper wells to remove the high production wells from price ceilings. The *sole* purpose and objective of this Section 406 is to keep stripper wells—those producing less than ten barrels per day—in production and to insure that the crude oil they produce continues to be available for U.S. refineries and U.S. consumers. It is not intended to confer any benefit on the owners and operators of wells producing in excess of ten barrels per day.

The Congress also intends that the regulations provide appropriate limitations and provisions in the definition of "lease" to insure that an administratively workable system is established which does not permit abuse.

16. Section 408(f) relates to the standard of proof to be met by the Federal Trade Commission for the issuance of a temporary restraining order or a preliminary injunction. It is not intended in any way to impose a totally new standard of proof different from that which is now required of the Commission. The intent is to maintain the statutory or "public interest" standard which is now applicable, and *not* to impose the traditional "equity" standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner. This latter standard derives from common law and is appropriate for litigation between private parties. It is not, however, appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief.

The inclusion of this new language is to define the duty of the courts to exercise independent judgment on the propriety of issuance of a temporary restraining order or a preliminary injunction. This new language is intended to codify the decisional law of *Federal Trade Commission* v. *National Health Aids*, 108 F. Supp. 340, and *Federal Trade Commission* v. *Sterling Drug, Inc.*, 317 F.2d 669, and similar cases which have defined the judicial role to include the exercise of such independent judgment. The conferees did not intend, nor do they consider it appropriate, to burden the Commission with the requirements imposed by the traditional equity standard which the common law applies to private litigants.

17. Section 409(a) exempts "independent Federal regulatory agencies" from the provisions of the Federal Reporting Services Act. In general, the Reporting Services Act provides that Federal agencies may not collect information from ten or more persons without having first obtained the advance approval and clearance of the Office of Management and Budget. The term "Federal agencies" has been construed to include the independent Federal regulatory agencies for the purposes of the Reporting Services Act.

The purpose of Section 409(a) is to preserve the independence of the regulatory agencies to carry out the quasi-judicial functions which have been entrusted to them by the Congress. The intent of this section is not to encourage a proliferation of detailed questionnaires to industry, small business or other persons which could result in unnecessary and unreasonable expense. Any legitimate need for information in carrying out the statutory responsibilities of these agencies would, however, be carried out even though responses may entail some expense and inconvenience.

The purpose of this section is to insure that the existing clearance procedure for questionnaires or requests for data does not become, inadvertently or otherwise, a device for delaying or obstructing the investigations and data collection necessary to carry out the important regulatory functions assigned to the independent agencies by the Congress.

The Congress intends the term "independent Federal regulatory agencies" as used in Section 409(a) to include, but not necessarily be limited to, the following agencies:

Civil Aeronautics Board,
Federal Communications Commission,
Atomic Energy Commission (insofar as its regulatory and adjudicative functions are concerned),
Federal Trade Commission,
Interstate Commerce Commission,
Securities and Exchange Commission, and
Federal Power Commission.

Subsection 409(b) provides a procedure for advance review which is designed to insure that information required by independent Federal regulatory agencies is obtained with a minimum burden upon business enterprises, especially small businesses, and other persons required to furnish such information.

The Comptroller General of the General Accounting Office is charged with the review responsibility. Since this will be a new function for the General Accounting Office, the Comptroller General has informed the Congress that he will need until July 1, 1974 to enable him to obtain the staff which will be required to carry out the full responsibilities provided for in Section 409(b). This is satisfactory to the Congress so long as appropriate interim arrangements are made to carry out the Section 409(b) review of the Federal agencies which should not or cannot be delayed until July 1, 1974.

JAMES A. HALEY,
HAROLD T. JOHNSON,
MORRIS K. UDALL,
JOHN MELCHER,
SAM STEIGER,
DON YOUNG,
CRAIG HOSMER,
*Managers on the Part of the House.*

HENRY M. JACKSON,
ALAN BIBLE,
J. BENNETT JOHNSTON, Jr.,
FLOYD K. HASKELL,
PAUL J. FANNIN,
CLIFFORD P. HANSEN,
MARK O. HATFIELD,
*Managers of the Part of the Senate.*

○

Appendix H

S. Hrg. 98-75

# FEDERAL TRADE COMMISSION REAUTHORIZATION

# HEARINGS

BEFORE THE

## COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION UNITED STATES SENATE

NINETY-EIGHTH CONGRESS

FIRST SESSION

ON

REAUTHORIZATION OF THE FEDERAL TRADE COMMISSION

MARCH 16, 17, AND 18, 1983

### Serial No. 98-19

Printed for the use of the
Committee on Commerce, Science, and Transportation

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1983

19-548 O

46

local one. On the other hand, it is not appropriate for the Commission to substitute its judgment that a rule of reason standard is appropriate for the decisions of the Supreme Court requiring a per se standard. The argument that Congress intended the "public interest" language in Section 5 to give the Commission this discretion is legally unsound and, if carried to its logical conclusion, would mean that the Commission could substitute its judgment on any issue for the Supreme Court's.

Chairman Miller has argued that resale price maintenance is harmful only if it leads to collusion at the maufacturer or dealer level. While I agree that these situations are harmful, I do not agree that they are the only cases where harm to competition occurs. Moreover, the evidentiary difficulties in proving collusion or the promotion of interdependent pricing are formidable (and I suspect Chairman Miller would require even more proof than I would on these points). Consequently, a policy that the FTC would only pursue RPM cases where collusion is shown is likely to result in few if any RPM cases. I fact, that is precisely the record of this administration. The only RPM orders issued since October, 1981 resulted from cases which were essentially completed when Chairman Miller arrived.

An excellent example of the refusal to enforce the law governing RPM is a consent agreement currently pending at the Commission, which has not been acted upon for almost two years, as indicated in response to Senator Ford's question at the March 16 hearing. The agreement was signed by the staff and the respondent in July 1981. Unfortunately, by the time the staff forwarded the consent agreement for Bureau review, a new Chairman and Bureau Director arrived. As a result, the agreement was sent back and forth between the Bureau and the staff for a year. It was forwarded to the Commission in September 1982 and has been awaiting Commission action since then. A refusal to act on this executed agreement—not on the basis that resale price maintenance has not occurred, but on the basis of a different economic standard than the Supreme Court has set down—is a refusal to enforce the law.

I assume the figures requested in this question will be forwarded by the Chairman.

——————

FEDERAL TRADE COMMISSION,
OFFICE OF THE COMMISSIONER,
*Washington, D.C. April 6, 1983.*

Hon. BOB PACKWOOD,
*Chairman, Committee on Commerce, Science, and Transportation,*
*U.S. Senate, Washington, D.C.*

DEAR SENATOR PACKWOOD: I appreciate the opportunity to respond to your request for a positive legislative agenda to strengthen the FTC. As I indicated at the hearing on March 16, it was a similar invitation in 1969 by the Senate Commerce Committee which led eventually to the passage of much of the consumer legislation of the 1970's.

There are six areas in which I believe new legislation could accomplish a great deal. In some, the FTC has had a record of achievement which needs to be continued and strengthened. In others, previous statutory amendments to the FTC have left some unanticipated "gaps" which suggest statutory changes. I have included as an appendix possible statutory language for each recommendation.

### NEW AUTOMOBILE DEFECTS AND WARRANTY PERFORMANCE

The Commission during the late 70's pursued cases against automobile manufacturers for refusing to disclose known defects in new vehicles. In 1978, the Commission issued a consent order in *Ford*, Docket No. 9105, which required Ford to reimburse consumers for a piston design defect caused by inadequate lubrication. In addition, the Commission order required Ford to provide information to future buyers concerning other major mechanical defects in Ford vehicles that were discovered through its internal quality control system. Since then, the Commission has issued orders requiring disclosure of major defects in new cars sold by American Honda, Volkswagen, and Chrysler. In some of these cases, in addition to ordering disclosure of product information, the Commission required the payment of redress to purchasers who had incurred significant repair and replacement costs as a result of the undisclosed defect. Presently, the Commission is considering a possible settlement of a complaint filed against General Motors in 1980 for allegedly failing to disclose known major defects in the transmission, camshaft and diesel fuel performance of millions of GM cars.

47

Notwithstanding this record of past accomplishments, no new auto defects cases have been brought during the present FTC Administration. In order to insure that the FTC stays active in this important area, and to make clear the duties of auto manufacturers under Section 5, I propose an amendment which would direct the Commission to initiate a rulemaking proceeding concerning defects in new automobiles. This amendment would recognize the economic importance of auto purchases to all consumers. For many individuals, the purchase of an automobile is the first or second most expensive purchase they will ever make. It can be among the most rewarding, but as the FTC cases illustrate, it can also be among the most aggravating when the vehicle suddenly and prematurely breaks down at great expense to the owner. Damages can run into the thousands of dollars, and sometimes require replacement of the vehicle. If they occur following the expiration of the owner's warranty, or if the manufacturer fails to perform its warranty obligations promptly and adequately the individual consumer can suffer substantial out-of-pocket loss and may be effectively denied recovery due to the high costs of taking private legal action. In addition, consumers are often frustrated by the time and inconvenience required for dealers to perform warranty service, and in fact frequently complain that their new vehicle is never restored to a new car condition even after repeated trips to the dealer. Consequently, in addition to standards for disclosure of auto defects, the Commission should consider a rule concerning performance of new car warranties. While Congress has previously considered "lemon law" legislation which included provisions for warranty performance, a Commission rulemaking proceeding would have the advantage of providing an opportunity for all interested parties to furnish information for the rulemaking record and for consideration of a variety of possible approaches.

In summary, given the industrywide scope of these problems and the need to harmonize standards of conduct in the Commission's various individual orders pertaining to auto defect disclosures, it is now appropriate for the Commission to initiate an industrywide rulemaking proceeding to establish uniform obligations of manufacturers in this area under Section 5 of the FTC Act. In such a proceeding, the Commission would examine the records of its auto defect investigations to date and other relevant sources of information, invite extensive written and oral public comment, and determine on the basis of its findings whether to promulgate a uniform set of defect disclosure and warranty performance standards, applicable to all auto manufacturers, in the form of a trade regulation rule.

### CLARIFICATION OF THE COMMISSION'S INJUNCTION AUTHORITY

The Commission's authority under section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to seek preliminary and permanent injunctions in federal district court was created in 1973 by Section 408(f) of the Trans-Alaska Pipeline Authorization Act, Public Law No. 93–153. Because the legislative history of this provision, which was added by Senator Jackson as a floor amendment, is very limited, questions of interpretation have created enforcement problems for the Commission.

One question is whether a district court is limited in a preliminary injunction action brought by the Commission to ordering only the cessation of an illegal act or practice. Overruling a district court decision adopting a narrow interpretation of its authority, the U.S. Court of Appeals for the Fifth Circuit ruled last year that all of the inherent equitable powers of a district court are available to it in a preliminary injunction action under Section 13(b). In particular, the court found that a district court may order ancillary relief that is "reasonably necessary" to prevent the dissipation of assets that may constitute part of the relief eventually ordered in a consumer redress action under Section 19 of the FTC Act. *FTC* v. *Southwest Sunsites, Inc.*, 665 F. 2d 711 (5th Cir. 1982), cert. denied, 102 S.Ct 2236 (1982). This decision was very important to the Commission, because a company's assets may be totally depleted by its executives and stockholders during the lengthy administrative proceeding that preceeds a Section 19 action, if the Commission is powerless to restrain the disposition of those assets. In a somewhat analogous decision in the antitrust area, the the Court of Appeals for the District of Columbia Circuit held in 1981 that in the case of a challenged merger, a district court may issue a hold separate order under its inherent equitable powers. *FTC* v. *Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981). I propose that Congress spare the Commission further litigation on this issue and clarify the language of Section 13(b), consistent with the existing caselaw, to make clear that courts have broad powers in granting ancillary relief under 13(b).

A second major uncertainty that has inhibited enforcement actions under Section 13(b) is what constitutes a "proper case" for a permanent injunction. The Conference Report on the Pipeline Act does not even mention permanent injunctions. The

Senate Report on S. 356, from which Senator Jackson's provision was derived, contains only the following explanation:

"Provision is also made in section 210 for the Commission to seek and, after a hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be assured of a early hearing on the merits.

"Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently." Senate Rept. 93–151 (93d Congress, 1st session 31 (1973)).

To date, the Commission has limited itself to seeking permanent injunctions in a handful of "routine fraud cases," the only example of a "proper case" contained in the Senate Report discussion. However, the Commission's efforts to seek immediate, permanent relief in district courts for clear violation of Section 5 should not be so restricted. Deceptive advertising cases, for example, could also fit within Congress' intent to provide efficient relief in situations in which the Commission "does not desire to further expand upon the prohibitions of the Federal Trade Commission Act."

I urge the Congress to encourage wider use of the efficient permanent injunction mechanism by replacing the current language of 13(b) with a new Section 13(c) that identifies the proper cases for permanent relief as those where the Commission determines, in its discretion, that further development of the law in a Section 5 administrative proceeding is unnecessary to establish that a law violation has occurred. In application, this would mean that whenever the Commission concludes that the meaning of the law is sufficiently clear that liability can readily be determined in a district court proceeding, a permanent injunction can be sought.

My proposed language for a new Section 13(c) would also remedy several other problems that have arisen in interpreting Section 13(b). First, it would make it absolutely clear, consistent with the plain language of the current provision, that permanent injunctions may be sought in antitrust as well as consumer protection cases. Because S. 356 limited the Commission's authority to seek injunctions to consumer protection cases, all the legislative history on the Commission's permanent injunction authority (quoted above) pertains to consumer protection actions. As a result, the Commission has declined to date to seek permanent injunctions in unfair methods of competition cases, despite the fact that 13(b) as actually passed does not contain the limiting language from S. 356. It is my feeling that many antitrust cases, for example, an ongoing price-fixing scheme, are appropriate candidates for permanent injunctions. If the Commission's authority to act is made more explicit, that showing of Congressional intent will compel the Commission to give more consideration to possible use of that authority in the future.

The proposed new Section 13(c) would also expressly establish that the district court hearing a permanent injunction case has the authority to order a broad range of preliminary and permanent relief in such actions, including divestiture in antitrust cases and, in particular, consumer redress in deception cases. This would be consistent with current caselaw. In *FTC* v. *H.N. Singer, Inc.*, 688 F.2d 1107 (9th Cir. 1982), the court of appeals upheld the district court's preliminary injunction freezing assets, finding that the court had the authority ultimately to grant the rescission of consumer contracts. In another case, a district court ordered a manufacturer and distributor of mobile homes to notify past purchasers that their warranty rights might be greater than those stated in their written warranties. *FTC* v. *Virginia Homes Mfg. Corp.*, 509 F. Supp. 51 (D. Md. 1981), aff'd No. 81–1187 (4th Cir. July 14, 1981) (unpublished).

The two-stage procedure for obtaining consumer redress under Section 19(b) of the FTC Act has proven thus far to be extremely cumbersome. It is likely that in many future cases the Commission will want to forego an administrative proceeding and proceed immediately to district court for a determination of liability and consideration of all requests for preliminary and permanent relief by one judge. The proposal would facilitate such actions by codifying the finding in *Singer* that redress may be sought under Section 13 as well as Section 19.

Finally, by establishing a separate subsection pertaining to permanent injunction suits, the proposal would resolve the question (which was briefed but found unnecessary to decide in the *Virginia Homes* case) as to whether permanent injunctions can be sought only in those situations that also satisfy the conditions for preliminary

49

injunctions. Preliminary injunctions can be obtained only when there is a continuing violation, or when the Commission has reason to believe that a violation is about to occur. Under the proposed Section 13(c), a permanent injunction ordering, for example, consumer redress, could be sought even when the violation is discontinued.

Much to their credit, Chairman Miller and Tim Muris, the Director of the Bureau of Consumer Protection, have recognized the potential of 13(b) and encouraged more aggressive use of the Commission's authority under that section. Clarification of the current statutory language would encourage the Commission to make better use of the remedies available to it under that section and would prevent additional litigation as to exactly what those remedies are and when they are available.

### ALCOHOL ADVERTISING

The excessive, physically debilitating consumption of alcoholic beverages, particularly by young persons, is a major public health hazard in the United States. The all too familiar consequences of this problem—e.g., countless highway deaths caused by alcohol abuse, adult alcoholism and teenage alcoholism, birth defects—take a severe toll of human life and social welfare. Public concern about drunken teenage driving and teenage alcoholism in particular has become so great that it has spawned a genuine national grass-roots movement of parents, educators, clergy and the classmates of victims determined to call public attention to these problems and to get effective public action to deal with them.

To date public concern about young people in this area has focused primarily on the social and health effects of heavy alcoholic consumption, and has largely ignored a parallel phenomenon of growing significance, namely, the exponential growth in recent years in the commercial advertising and promotion of alcoholic beverages, especially televised advertising of beer and wine.

Under Congressional prodding, the FTC in the mid-70's undertook to determine whether any aspects of the increasingly pervasive and sophisticated advertising of alcoholic beverages might be having harmful effects on consumers. The Commission staff was directed to investigate in particular whether alcoholic beverage advertising might have the purpose or effect of appealing to heavy drinkers who, according to the National Institute on Alcohol Abuse and Alcoholism, make up 11% of the adult population. Congress was also interested in our studying whether any alcoholic beverage advertising was aimed at adolescents and designed to stimulate their consumption of alcoholic beverages. We reasoned that alcoholic beverage advertising directed at or appreciably affecting heavy drinkers or young persons could exploit the special vulnerabilities of these individuals and contribute to substantial consumer harm.

Based on the advertising campaigns and marketing studies of a few major alcoholic beverage producers, the Commission's staff determined there was a strong possibility that advertising was being designed to appeal to actual or potential alcohol abusers. Furthermore, information from other industry and academic research sources indicated the existence of similar questionable advertising and promotional practices throughout the industry. Nevertheless, Consumer Protection Director Muris recommended last year that the alcoholic advertising investigation be closed. Resorting to Catch-22 logic, the staff closing memorandum reasoned that since these questionable promotional practices appeared to be pervasive in the industry, it would be unfair to proceed only against the individual companies that had been investigated, and therefore no action of any kind should be taken by the Commission. In opposing the closing, I urged the Commission to conclude that the evidence warranted more investigation of these advertising practices in the alcoholic beverage industry, not less. Unfortunately, a majority of the Commission voted in favor of closing the investigation.

Chairman Miller also indicated in a letter to Congressman Florio (attached) that the Commission had obtained information beginning in 1976 concerning the effect of advertising on alcohol consumption:

"Various staff activities were undertaken [after March 1976]. Generally these involved the gathering of available information concerning the extent and nature of (1) injury caused by alcohol abuse and alcoholism; and (2) consumer knowledge of alcohol-related information, including, for example, the functional impairment resulting from alcohol use, the efficacy of various commonly accepted methods of 'sobering-up' and the relative alcohol content of liquor, beer and wine. The data gathered suggested that some consumers, especially teenagers, are unaware of these basic alcohol facts that would enable them to make rational and responsible drinking decisions."

50

Although he concludes that it would not be appropriate to pursue additional investigation, I believe the evidence collected so far points strongly to the opposite conclusion.

To my knowledge, neither the Commission nor any other responsible federal agency is seriously studying, much less moving against, advertising practices in the alcoholic beverage industry which may be having the deliberate or practical effect of encouraging consumption by heavy or young drinkers. This failure of action has been exacerbated by recent ruptures in the self-regulatory apparatus of the advertising industry, including the indefinite suspension of the National Association of Broadcasters Advertising Code, which contained specific restrictions and standards relating to alcoholic beverage advertising.

It would, therefore, be entirely appropriate for the Congress to direct the Commission to conduct an industrywide investigation of current alcoholic beverage advertising practices in order to determine the extent to which they may be encouraging the consumption of alcohol by highly vulnerable groups, particularly young and heavy drinkers. At the conclusion of the study, the Commission would be directed to transmit to Congress a comprehensive report of its findings and any recommendations for industry, legislative or regulatory action.

NURSING HOMES

No consumer is more vulnerable to fraud and abuse than the resident of a nursing home. Often without resources or family, ill and no longer able to live independently, the elderly individual is forced to spend his or her remaining days in a relationship of total dependency on an unfamiliar institution whose purpose is not only to provide care, but to make money. This situation inherently creates an enormous disparity of bargaining power between the nursing home consumer and proprietor.

Horror stories of abuses in nursing home care became almost legend in the 1970s. Whether or not they hold true today, in view of some reform efforts, is uncertain. Whatever the case, such stories, as tragic as they may be, are rightfully the responsibility of state and federal health authorities, not the Federal Trade Commission. The Commission does have an important role to play, however, in promoting fair dealing by balancing the inherently unequal business relationship between the resident and the home.

It is for this reason that the Commission began to take an active look in the late 1970's at some of the most troublesome aspects of the business side of nursing home operations that affected the bargaining power of the nursing home consumer, both in shopping for nursing home services and in protecting the resident's consumer rights inside the home. Our staff examined a variety of suspect business practices, including arguably unfair disclaimers or waivers of the home's legal responsibility for the health, safety and property of the resident; collection and patient deposit account clauses, and other one-sided contract provisions; abusive billing policies, including hidden and price overcharges; inadequate protections against sudden termination or transfer from the home; unfair restrictions on visitors' access to residents; requirements that residents purchase their pharmaceuticals and other needs only from suppliers approved by the nursing home; and false or misleading representations in the promotion of nursing home services and facilities to prospective residents.

The staff's investigation, which was essentially completed by early 1981, indicated that many of these business practices were occurring and appeared to be a serious problem in the nursing home industry. Nevertheless, since that time, the Commission has never taken or even considered taking any action in the nursing home area.[1] In the meantime, the evidence from our staff's investigation is now several years old and may conceivably be too incomplete and too dated to provide a reliable picture of current business practices in this industry. Apparently believing that the Commission's data base is too weak and too old to support Commission action of any kind, or even to warrant further investgation to get more current information,

---

[1] On the basis of this investigation, the Commission did file comments in 1980 on a Department of Health and Human Services proposal for a "Patients Rights" section to be added to the Conditions of Participation by nursing homes in Medicaid reimbursement programs. As you may recall, however, those proposed revisions, which were intended to establish and strengthen the consumer rights of nursing home residents, were subsequently rescinded by the Reagan Administration.

The Commission is presently considering, independent of its nursing home investigation, a proposed consent agreement with a "life care" facility. Part of a new-growth industry, life care homes, unlike nursing homes, only accept elderly individuals who are still independent and healthy.

51

Bureau Director Muris has recommended to the Commission that our entire nursing home investigation be closed.

While the Commission may not have the best available information of current nursing home business practices as a result of its recent inactivity in this area, new evidence has come to light from an independent source indicating a continuing pattern of consumer abuses in our nation's nursing homes. I am referring to the two-month old report by the Staff of the Senate Special Committee on Aging entitled, "Consumer Frauds and Elderly Persons: A Growing Problem." Based on a recent nationwide survey of district attorneys, attorneys general, chiefs of police and state consumer affairs offices, the report finds that consumer and economic frauds directed at the elderly are pervasive and growing, and names nursing home abuses as one of the ten most harmful frauds in the nation. The report states:

"Abuses in nursing homes have been well publicized during the last decade, largely due to the efforts of the committee. Most of the concern that has been generated has focused on the quality of care issues and indications of medicare and medicaid fraud. Because the Government, as the purchaser of services, is so evidently defrauded by these activities, we have often lost sight of the fact that the seniors are often also defrauded. They may be conned into paying an "admission fee" to purchase a place in a medicaid facility, overcharged for specific services, defrauded out of personal maintenance funds, and forced to pay for specific services and supplies that should be included in the home's per diem rate.

"One of the more recent variations on this theme is the development of 'lifecare' facilities. In these instances, seniors are persuaded to sign over all of their assets with the promise that they will be taken care of until they die. Often, the facility changes ownership or goes out of business, leaving the seniors stranded and exposed.

"Another recent example of nurisng home fraud is provided by the Iowa nursing home resident who was taken on a shopping spree by two female employees. While he was there, a clerk observed one of the employees take a credit card from the elderly man's pocket, make a purchase, and return it. The nursing home resident had no recollection of the event."

These reported frauds are remarkably similar to the kinds of questionable business practices that have been previously investigated by the Commission.

In view of this new survey evidence from local consumer protection authorities across the country, the Commission should be considering a positive plan of action for this area rather than a recommendation for shutting down its nursing home program. The Commission should determine through follow-up investigation of its staff's earlier findings, as well as those of the Senate Aging Committee, what it can do affirmatively to help eliminate abusive business practices in the nursing home industry. However, given the pending rrecommendation to terminate our nursing home project, and the lack of any sign that the present FTC Administration considers a strong Commission presence in the nursing home industry to be a high priority, I am not overly optimistic that internal proposals for positive action will be adopted. I would urge the Committee, if it agrees that the Senate Aging Committee's findings help establish a need for further investigation and action, to direct the Commission to exercise its statutory authority in this area by bringing cases, issuing reports, guidelines or policy statements, or taking any other appropriate action to deal with abusive business practices in this industry. To determine whether the Commission has carried out this mandate, it should be instructed by the Committee to transmit periodic reports of its activities in this area.

#### ELIMINATION OF NOTIFICATION REQUIREMENT IN SECTION 19 REDRESS CASE

Section 19(c)(2) provides that in any action in which the Commission seeks consumer redress for violation of a Commission rule, or for commission of an act or practice that a reasonable man would have known under the circumstances was dishonest or fraudulent, the court shall cause notice of the pendency of the action to be given to all persons, partnerships, and corporations allegedly injured by the deceptive practices. The legislative history sheds no light on the purpose of this provision. While doubtless well-intentioned, it serves no practical purpose and, as applied to date, poses a formidable barrier to the Commission's ability to utilize the provisions of Section 19 to protect consumers.

Section 19(c)(2) is apparently modeled after the notice requirements of Rule 23 of the Federal Rules of Civil Procedure, governing class actions. Notice in a Rule 23 class action, however, serves a purpose that is totally irrelevant to a Section 19 action. In a Rule 23 action, consumers must be notified of the pendency of a case so they may choose whether to opt in or out of the litigation, since their legal rights

may be affected by the outcome. In a Section 19 action, however, the Commission does not sue as a class representative to enforce rights of individual consumers; it sues as a governmental agency to enforce a statutory provision that only it may enforce. Accordingly, contractual or other legal rights of injured consumers cannot be affected by redress actions, and there is no necessity to accord consumers a right to opt into or out of a redress action.

Obviously, where the Commission succeeds in gaining a judgment of consumer redress and collecting actual monies from the defendant with which redress may be paid, notice to injured parties may be needed to permit them to obtain their funds. Such notice, however, can be required by the court without specific authorization as part of the final judgment when the Commission has prevailed. Section 19(c)(2), unfortunately, requires that notice be given of the pendency of the action. In the only case to address the section so far, the court has construed this to mean that notice must be given during the action, before the assessment of damages and even before discovery of the defendant's assets. Consistent with the rule for class actions, the court has also ordered the Commission to give notice of the action, at its own expense, subject to recoupment of the costs as court costs from defendant. *FTC* v. *Glenn W. Turner*, No. 79–474 (M.D. Fla.).

While we believe the court's ruling is incorrect,[2] it is not an implausible construction of Section 19(c)(2). The effects of such a ruling, however, can be devastating. Often when it sues for redress, the Commission does not know in advance whether it will be able to recover any money should it prevail on the merits. It is pointless, and may actually be harmful, to give notice to consumers of the possibility of redress when that possibility may not be realistic. Moreover, it wastes funds—either those of the Commission or those of the defendant—to require such notice at a time when it serves no purpose. Indeed, faced with the necessity to give costly notice without any assurance that consumers will ever be repaid, or that the cost of notice will be repaid, the Commission may be forced to abandon redress cases where it lacks tangible evidence of recoverable assets. To eliminate this problem, I urge elimination of Section 19(c)(2), to be effective immediately as to all pending cases.

### INSURANCE STUDIES

The McCarran-Ferguson Act (15 U.S.C. §§ 1011–1015) of 1945 designates the states as the regulators of the "business of insurance," with limited exceptions. However, until 1980, the Commission retained the authority to study insurance problems pursuant to its general authority under Section 6 of the FTC Act to gather information and investigate the businesses of companies affecting interstate commerce. Based on that authority, the FTC undertook a number of studies of insurance issues between 1972 and 1980, with the aim of assisting the states and reporting to Congress on various consumer protection and competition concerns. Investigations led to reports on life insurance cost disclosure, Medicare supplement insurance, and industrial insurance. These studies proved valuable to state legislators and regulators who have the primary responsibility for regulating insurance, and to the public generally which spends billions of dollars annually for various forms of insurance.

Despite the usefulness of these activities, insurance studies by the Commission were terminated with enactment of the FTC Improvements Act of 1980. This Act removed the FTC's Section 6 investigatory authority over insurance, unless a study or report is requested by a majority of the members of the Committee on Commerce, Science and Transportation of the Senate or the Committee on Interstate and Foreign Commerce of the House of Representatives.

This 1980 amendment should be repealed. It was enacted primarily in response to the Commission's life insurance cost disclosure study, which exposed the low rates of return for whole life policies and proposed a method by which the states could require a uniform disclosure concerning rates of return which consumers could use to compare policies. Since that time it has become even clearer that the investment value of insurance policies are extremely difficult for individual consumers to evaluate.

In the absence of a repeal of that amendment, however, there are a number of useful studies listed below which the Commission could conduct. Even though it is not clear that Congressional approval is required for the studies, because of the am-

---

[2] Before the court we argued that the requirement to give notice of the "pendency" of an action could be read to allow notice after a judgment fund had been amassed. We also argued that the general rule requiring plaintiff to give notice in class actions, *Eisen* v. *Carlisle & Jacqueline*, 417 U.S. 156 (1974), is applicable only where there has been no adjudication of liability. In the *Turner* case, the court has adjudicated the defendant liable for redress, although no amount has been set or, of course, any money collected.

53

biguity of the 1980 provision, the Commission is effectively deterred from proceeding in these areas without Congressional clearance. Congrss could direct the FTC to determine within 60 days which insurance studies it believes it can most effectively pursue and to report its findings to the Commerce Committees of both houses. The Commission should be further directed to complete those studies it has determined to be feasible and useful, and then report the results of such studies to the Congress and the States.

Possible studies include:

(1) *Analysis of New Life Insurance Products: Variable Life and Universal Life.* An FTC study might analyze new life insurance products such as variable life (where the savings portion of premiums is invested in common stocks) and universal life (a combination of term and whole life, where consumers can tailor the face amount of insurance and the premium structure to their changing needs). A particular issue it might examine, for example, is the effectiveness of the SEC-required disclosure of information on variable life.

(2) *Private Health Insurance to Supplement Medicare.* In light of the likelihood of fundamental changes in the Medicare program (such as proposed change to prospective reimbursement), there will undoubtedly be major changes in the Medicare supplement insurance market. An FTC study might analyze options for keeping the private market working efficiently, based in part on the experience of various states.

(3) *Consumer Information in the Purchase of Auto Insurance.* This study would explore the availability and usefulness of information furnished prior to consumers' purchase of auto insurance. It would assess whether consumers can comparison shop for auto insurance and how better information might be made available. It would also examine insurance practices in modifying or cancelling policies based on claim experience and other unilateral policy modifications by insurers. Finally, it would assess whether consumers have adequate notice of insurers' legal and contract rights at the time of the initial transaction and whether insurers' practices deter legitimate claims.

Sincerely,

MICHAEL PERTSCHUK,
*Commissioner.*

### APPENDIX—POSSIBLE STATUTORY LANGUAGE

*1. Auto defects*

Section ——. The Federal Trade Commission Act is amended by adding a new Section —— as follows.

The Commission is directed to issue an advance notice of proposed rulemaking for the purpose of initiating a rulemaking proceeding, pursuant to Section 18 of the Federal Trade Commission Act, concerning unfair or deceptive practices in:

(1) Failing to inform purchasers of new vehicles of unreasonable or unexpected levels of design or production defects;

(2) Failing to inform purchasers of new vehicles of appropriate use and care information relating to design or production defects; and

(3) Warranty performance in repairing or replacing new vehicles during the warranty period.

*2. Clarification of injunction authority*

Section 13(b) of the FTC Act is amended by inserting after the word "bond" in the second sentence a period and then the following:

"In such an action, the court may exercise the full range of equitable authority, including the power to order such ancillary relief as may be reasonably necessary in order to preserve the possibility of complete and meaningful relief at the conclusion of litigation."

Section 13(b) is further amended by striking the language beginning "Provided, further", inserting a period, and substituting the following:

(c) If the Commission determines that further development of the law through the issuance of a complaint and the conduct of a proceeding under Section 5 is unnecessary to establish that a person, partnership, or corporation has engaged in an unfair method of competition or an unfair or deceptive act or practice in or affecting commerce, or has otherwise violated any provision of law enforced by the Federal Trade Commission, the Commission may seek, and after proper proof the court may issue, a permanent injunction. The court in such an action shall have the authority to order all preliminary and permanent relief as may be reasonably necessary to remedy fully the violation, including any relief as may be available in an action

54

under Section 19(b). Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business."

Section 13(c) is amended by redesignating it as Section 13(d).

*3. Alcohol advertising*

The FTC is directed to conduct a study of advertising practices in the commercial promotion and sale of alcoholic beverages, including beer, wine and liquor, for the primary purpose of determining whether such advertising has or may have the purpose or effect of stimulating alcoholic consumption by children, adolescents, or persons who are considered to be heavy users of alcoholic beverages.

At a minimum the study shall review and assess:

(1) The prevalence and health effects of alcoholic consumption;

(2) The prevalence, trends, themes, and consumer impact of alcoholic beverage advertising;

(3) Consumer knowledge of the health effects of alcoholic consumption;

(4) The past role and activities of the FTC and other relevant governmental agencies concerning the methods and effects of alcoholic beverage advertising; and

(5) Appropriate public and private responses to any problems found to be associated with alcoholic beverage advertising that warrant remedial action.

In conducting the study, the FTC shall generate and collect data from all relevant sources, including the internal records of alcoholic beverage advertisers, and to the extent necessary for this purpose shall make full use of its powers of compulsory process under Sections 6 and 9 of the FTC Act. At the completion of the study, the Commission shall submit a report of its findings and any recommendations for industry, regulatory or legislative action to the Congress. Following transmittal of this report to the Congress, the Commission thereafter shall be required to transmit an annual report to the Congress no later than January 1 of each year concerning: (1) current patterns of alcohol consumption; (2) current practices, methods, and effects of alcoholic beverage advertising and promotion; and (3) such recommendations for legislation it may deem appropriate.

*4. Nursing homes amendment*

The FTC is directed to reopen and complete its investigation of various business practices associated with the sale of nursing home services, and to exercise its full authority under this Act to prevent such practices which are in violation of Section 5(a)(1) of this Act. The FTC is further directed to transmit a report not later than January 1, 1984 of its initiatives and activities under this provision to the Committee on Commerce, Science and Transportation of the Senate and to the Committee on Energy and Commerce of the House of Representatives.

*5. Insurance studies*

The FTC is directed to submit to the Senate Committee on Commerce, Science and Transportation and the House Committee on Energy and Commerce within 60 days of enactment of this provision a list of feasible insurance studies which can be completed within 18 months and which are likely to result in benefits to consumers, the states and the Congress. The Commission shall complete those studies deemed feasible after consultation with the Committees.

ATTACHMENT

FEDERAL TRADE COMMISSION,
OFFICE OF THE CHAIRMAN,
*Washington, D.C., March 1, 1983.*

Hon. JAMES J. FLORIO,
*Chairman, Subcommittee on Commerce, Transportation and Tourism, Committee on Energy and Commerce, House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: Thank you for your letter of inquiry regarding Commission activities in the area of broadcast advertising of liquor. The Commission's staff has in fact looked into industry practices in this area in the past, and I am happy to provide you with a description of the staff's findings as well as several documents.

Until about 1976, Commission activities in the area of alcohol advertising had been limited primarily to considerations of whether particular claims in specific advertisements were deceptive. By that time, however, Commission staff attention had focused on the possible effect of advertising and media images on alcohol abuse. At the March 1976 hearings of Senate Subcommittee on Alcoholism and Narcotics, Commission staff testified regarding the committee's concerns as to whether alcohol advertising had any of at least three effects: (1) encouraging drinking beyond the