THE HONORABLE JOHN H. CHUN

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

FEDERAL TRADE COMMISSION, *et al.*,

Plaintiffs,

v.

AMAZON.COM, INC., a corporation,

Defendant.

CASE NO.: 2:23-cv-01495-JHC

**PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY**

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

## INTRODUCTION

The Court requested an overview of the economic concepts relevant to Plaintiffs' claims and Amazon's defenses, situated within the relevant legal frameworks. This filing provides that overview, beginning with a brief description of the legal framework, followed by a preview of relevant economic theories to be addressed at the March 7 hearing.

## LEGAL FRAMEWORK

Plaintiffs' claims are brought under various competition statutes, including Section 2 of the Sherman Act, Section 5 of the FTC Act, and similar state laws. Although applicable legal frameworks vary, the economic theories relevant to each overlap substantially. Accordingly, the discussion below explains these economic theories in relation to Section 2 of the Sherman Act.

"A Section 2 monopolization claim 'has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (*quoting United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

The first element, possession of monopoly power in a relevant market, can be demonstrated in two ways. First, it may be shown directly through evidence that such power was exercised successfully. Second, it may be shown indirectly by demonstrating that the defendant has a large share of a properly defined antitrust market with barriers to entry. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F. 3d 1421, 1434 (9th Cir. 1995). In this case, the purpose of market definition is to aid in assessing monopoly power. Markets may be defined using a variety of methods. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co. Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021) ("[T]here is no requirement to use any specific methodology in defining the relevant market.").

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 1

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1   The second element is often referred to as "anticompetitive" or "exclusionary" conduct. In
2   particular, "[a]nticompetitive conduct consists of acts that 'tend[ ] to impair the opportunities of
3   rivals' and 'do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive
4   way.'" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (citation
5   omitted).

6   For both of these inquiries, the law requires a practical inquiry focused on "actual market
7   realities" rather than "formalistic distinctions." *Eastman Kodak Co. v. Image Technical Servs.,*
8   *Inc.*, 504 U.S. 451, 466-67 (1992).

## ECONOMIC TOPICS

### A. Understanding Market Realities (Topic 1)

*1. What economic concepts are relevant to the operation of Amazon's store and how Amazon competes?*

Competition is the process by which firms try to win business by improving their products and services to induce customers to choose them over alternatives. Competition is valuable and protected by law because it drives a wide variety of benefits, including giving firms the incentive to lower prices, add features, improve service, expand selection, innovate, and more. To understand the "actual market realities" relevant to Amazon's conduct, it is necessary to understand Amazon's business, including which dimensions of competition are important.

Amazon's relevant business is an online retail store with revenue greater than the GDP of 145 countries across an enormous range of product lines. Dkt. 327 (Second Am. Compl.) ¶ 79. Amazon seeks to have customers begin and end their shopping journey on its website or app. Amazon's online store includes both a traditional retail operation (where Amazon sells products it owns) and a marketplace (where Amazon provides a platform for third parties to sell their

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 2

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

products).

In retail settings generally, firms compete to attract customers on dimensions such as price, selection, and shopping experience. Some firms sell many different categories of products and offer many choices within those categories, while others specialize. Competition is typically more intense between retail stores that have adopted similar strategies along these dimensions of competition, although some competition occurs with more distant competitors. For example, supermarkets compete more closely with one another than they do with convenience stores, even though they carry some of the same products. *See, e.g.*, *FTC v. Kroger Co.*, No. 3:24-cv-00347-AN, 2024 U.S. Dist. LEXIS 223077, at *41-42 (D. Or. Dec. 10, 2024) (recognizing supermarkets as a valid antitrust market despite some competition with other store formats); *Cal. v. Am. Stores Co.*, 697 F. Supp. 1125, 1129 (C.D. Cal. 1988), *aff'd in relevant part*, 872 F.2d 837 (9th Cir. 1989) ("Even if convenience stores competitively price a few food items, such as bread and milk, in direct competition with supermarkets, such is not sufficient to justify inclusion of all retail grocery sales from whatever outlet in the relevant product market.").

In online retail in particular, certain aspects of competition become much more significant, such as scale. Shelf space does not constrain how many different products and brands an online store can offer, and search functions make it possible to locate less-common items sold by a wider variety of sellers. This can allow online stores to compete differently from physical stores on the selection offered and enable some online stores to specialize in offering a much broader and deeper selection of products than smaller online stores.

Where an online store expands its selection by allowing third party sellers to sell through its marketplace, it can generate and benefit from network effects. "Network effects" is an economic term describing how a product or service improves as more people use it. A retail marketplace

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 3

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

exhibits what economists call "indirect network effects": the more shoppers use the store, the greater the attraction to sellers, and the more sellers offering products, the greater the attraction to shoppers due to the increased selection. Where network effects are significant, online marketplaces face large initial hurdles to growth, as they need to simultaneously attract shoppers and sellers to begin this feedback loop.

Because economies of scale and network effects are large in digital markets, online retail stores may compete to become a default option for customers to begin, and often end, their shopping journey.

### B. Monopoly Power and Market Definition (Topics 2-8)

Plaintiffs have alleged two relevant markets in which Amazon possesses monopoly power. The Online Superstore Market consists of firms with a broad and deep selection of products available online, competing to build long-term relationships with consumers across categories as their default shopping destination. The Online Marketplaces Services Market consists of firms competing to provide third-party sellers with an online sales platform, including, most critically, access to a large, established customer base in the United States.

*2. How do economists define a relevant antitrust market?*

A market is an "area of effective competition" and consists of a product or service and its reasonable substitutes (both in terms of the product or service and the geographic areas at issue). *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015). Products or services are "reasonable" substitutes if a significant number of customers would switch among them in the face of small changes to prices, quality, or other relevant product characteristics. A relevant market need not include all substitutes and indeed a product or service can compete in multiple valid antitrust markets at the same time. *See Kroger*, 2024

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 4

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

U.S. Dist. LEXIS 223077, at *42 ("A relevant market, however, need not include every possible competitor, only reasonable substitutes. And it is well established that a submarket, demarcating a smaller subset of a larger market, may be used as the relevant product market for antitrust analysis.") (*citing Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018)). For example, a firm might compete in a broad market (e.g., sale of cars) and also a narrower market (e.g., sale of sports cars) at the same time. Which of these valid markets is relevant to a particular case depends on the challenged conduct. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570 (9th Cir. 2024) (agreeing "market definition must be relevant to the theory of harm at issue.").

Economists likewise define a market as an area of effective competition, where "effective" means that the competition across a group of products or services is driving companies to improve their offerings (*i.e.*, lower prices, improved service, etc.). A variety of economic tools, discussed below, can be used to assess whether a candidate group of products or services generates effective competition.

*3. What economic principles apply to market definition, including but not limited to reasonable substitutability of products and services?*

Economists evaluate the effectiveness of competition across a group of products or services by considering "demand substitution": how customers respond, or are likely to respond, to changes in the terms of trade.

First, economists consider whether products are reasonable substitutes such that they constrain the competitive decision-making of rival firms. In particular, they look at the available evidence to assess how closely products compete by assessing how much customers substitute when relative price or non-price terms change or by using other indicia (such as how similar the products are) that predict the degree of substitution. Economists can help measure the likely

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 5

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

1  magnitude of substitution using both qualitative and quantitative evidence.

2      Second, economists consider the context of the analysis. Many market definition tools

3  developed in the context of mergers, for example, can fail to detect valid markets in which

4  monopoly power has already been exercised due to a phenomenon termed "the Cellophane

5  fallacy." *FTC v. Meta Platforms, Inc.*, No. 20-3590 (JEB), 2024 U.S. Dist. LEXIS 205748, at

6  *60 (D.D.C. Nov. 13, 2024). In short, if a firm has already exercised market power, such as by

7  raising prices, then its customers have already started to substitute to alternatives that seemed

8  *un*reasonable when the market was competitive. When defining a market, it is important not to

9  misclassify these alternative products and services as reasonable substitutes.

10      *4. What types of qualitative evidence can inform market definition?*

11      Several types of qualitative evidence can inform market definition, many of which were

12  identified in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). Qualitative evidence is

13  probative of how customers have, or will, substitute among services, which drives whether those

14  services act as a check on the exercise of market power. *Kroger*, 2024 U.S. Dist. LEXIS 223077,

15  at *23 ("Courts treat the *Brown Shoe* indicia as 'evidentiary proxies for direct proof of

16  substitutability' and may use them to define the relevant product market." (citation omitted)). For

17  example, economists analyzing a monopolization case may consider business records and

18  testimony regarding how industry participants and observers view their business. Businesses and

19  observers often identify key competitors and subsets of products or firms that compete more

20  closely than others. Business-driven classifications can be informative of whether competition

21  across a group of services is driving tangible effects on customers and thus helps define a valid

22  antitrust market.

23      As another example, economists may consider the service's characteristics and uses. Services

24

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 6

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

with similar features or that can be used for similar things tend to compete more closely with one another than less similar services. For example, a service for searching a wide selection of products is more readily replaced with another service that searches a similar selection, and less effectively replaced by a service focused on a subset of those products.

*5. What types of quantitative evidence can inform market definition?*

Quantitative evidence relevant to market definition can help inform the extent to which customers substitute between different services and the significance of that substitution on market outcomes—that is, how well one service constrains another from exercising market power. Economists may use a variety of metrics to measure how readily customers switch or are likely to switch services, and to which alternatives, based on various indicia, informing the analysis of whether services are "reasonable" substitutes and whether a firm has market power. Tests like the "Hypothetical Monopolist Test" (HMT) provide a conceptual framework that may help gauge whether substitution to a group of competing services acts as a significant check on a firm's market power. In some cases, there may be sufficient data to conduct a quantitative HMT. Interpreting any quantitative metric or test requires consideration of the context. For example, the HMT was developed for merger analysis and requires adaptation when used in a monopolization context to account for the Cellophane fallacy. *See, e.g.*, *Epic Games*, 67 F.4th at 975 n.7 (noting risk that HMT in non-merger cases may result in "a false negative: *over*-defining a market and finding no market power where, in fact, it does exist.").

*6. How do economists define monopoly power for antitrust purposes?*

Monopoly power is "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571. Economists analyze "market power," which is the power of a firm to increase its profits relative to the competitive level. Economists generally treat monopoly power as a significant

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 7

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

amount of market power, and the amount of power exists on a continuum. The fewer close substitutes or the larger the barriers to switching to one of those alternatives, the more market power a firm has. Market power matters to an economist both because (a) market power allows firms to offer their customers worse terms, and (b) firms with significant market power have greater ability engage in tactics that tend to preserve that power or further reduce competition, even if those same tactics would be harmless if used by a firm without such power. *See Epic Games*, 67 F.4th at 983 ("the existence of market power is a significant finding that casts an anticompetitive shadow over a party's practices in a rule-of-reason case." (cleaned up)).

*7. What types of evidence can help an economist assess whether a firm has monopoly power in a relevant market?*

Economists assess monopoly power with two types of evidence: direct and indirect. Direct evidence of power is shown where a firm was able to exercise monopoly power (such as by raising prices or decreasing quality) and was not deterred from doing so by customers substituting to alternative options. Indirect evidence of monopoly power consists of an analysis of market structure. Specifically, monopoly power is evident where one firm in a defined market has a durable high market share protected by barriers to entry. Economists rely on indirect evidence because market shares in these settings can be informative about substitution patterns. If one firm has a high share, that suggests its rivals' products or services are somewhat distant substitutes, e.g. they are more expensive or of lower quality, even if the reasons they are more distant substitutes are difficult to observe.

*8. How do economists analyze barriers to entry in connection with assessing whether a firm has monopoly power?*

Barriers to entry are relevant to monopoly power because they limit the competitive

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 8

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

constraints on firms in the market. Such barriers include not only barriers to new firms entering the market, but also barriers to expansion by existing firms. When considering monopoly power, economists analyze barriers to entry in terms of practical impediments to entry and expansion, regardless of whether those impediments are created through improper means. Whether an entry barrier was created or enhanced anticompetitively is instead relevant to the analysis of anticompetitive conduct, discussed below.

### C. Anticompetitive Conduct (Topics 9-11)

Plaintiffs allege that Amazon has used several anticompetitive tactics to choke off competition in the relevant markets and thus prevented Amazon's rivals from gaining the scale they need to effectively compete with Amazon.

*9. What is anticompetitive conduct, as opposed to competition on the merits?*

Economists analyze whether conduct is anticompetitive using a framework similar to the one described in *Dreamstime*, 54 F.4th at 1137. To assess whether conduct is competition on the merits or anticompetitive, economists examine how conduct affects the competitive process, that is, firms' efforts to win business by improving their own product offerings or terms, such as by reducing prices. Competition on the merits involves improvement to one's own market offering, which contrasts with anticompetitive conduct, for example conduct that makes it harder or more expensive for a rival to offer their competing service.

*10. How do economists evaluate whether challenged conduct harms competition in a relevant antitrust market?*

Economists use qualitative and quantitative evidence to understand how a practice affects the competitive process. An impact on market outcomes like price, selection, or quality can be informative as to whether the competitive process that led to those outcomes is functioning well

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 9

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

or poorly. Economists are concerned with how practices affect the competitive process in both the short and long runs. Concepts such as game theory may be relevant, particularly given that Amazon itself used game theory to design some of the challenged practices. Dkt. 327 (Second Am. Compl.) ¶ 330. Economists in an antitrust case may look at evidence of a company's statements or analyses as to why they are adopting a particular practice because market participants may be well-positioned to understand how different strategies are likely to affect competition.

Economists look at a firm's conduct holistically. Whether a firm uses several practices that each artificially restrain competition a little or uses a single practice that artificially restrains competition a lot makes no economic difference. It matters whether the individual practices are anticompetitive rather than competition on the merits, but whether their negative effects on the competitive process are significant individually (rather than collectively) does not.

*11. How do economists evaluate whether challenged conduct has generated procompetitive benefits for competition in a relevant antitrust market?*

Economists conduct the same analysis to determine the impact of a practice on the competitive process regardless of whether there are anticompetitive effects or procompetitive benefits. The key difference is how the analysis is treated under the relevant legal tests—if a practice has both positive and negative effects on competition, the first question is whether those positive effects could have been achieved without the competitive harms. Only if those benefits were inextricably linked to the harmful conduct would a fact-finder examine which effect—benefits or harms—predominates. *United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (2001) (describing framework).

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 10

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

Dated: February 28, 2025              Respectfully submitted,

*s/ Kenneth H. Merber*
SUSAN A. MUSSER (DC Bar # 1531486)
EDWARD H. TAKASHIMA (DC Bar # 1001641)
KENNETH H. MERBER (DC Bar # 985703)
ERIC ZEPP (NY Bar # 5538491)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel.:  (202) 326-2122 (Musser)
       (202) 326-2464 (Takashima)
Email: smusser@ftc.gov
       etakashima@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 11

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

*s/ Michael Jo*
Michael Jo (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Bureau
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6537
Email: Michael.Jo@ag.ny.gov
*Counsel for Plaintiff State of New York*

*s/ Victoria Field*
Victoria Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06016
Telephone: (860) 808-5030
Email: Victoria.Field@ct.gov
*Counsel for Plaintiff State of Connecticut*

*s/ Alexandra C. Sosnowski*
Alexandra C. Sosnowski (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office of the Attorney General
One Granite Place South
Concord, NH 03301
Telephone: (603) 271-2678
Email: Alexandra.c.sosnowski@doj.nh.gov
*Counsel for Plaintiff State of New Hampshire*

*s/ Robert J. Carlson*
Robert J. Carlson (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th Street, Suite 1000
Tulsa, OK 74119
Telephone: (918) 581-2885
Email: robert.carlson@oag.ok.gov
*Counsel for Plaintiff State of Oklahoma*

*s/ Timothy D. Smith*
Timothy D. Smith, WSBA No. 44583
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
Telephone: (503) 934-4400
Email: tim.smith@doj.state.or.us
*Counsel for Plaintiff State of Oregon*

*s/ Jennifer A. Thomson*
Jennifer A. Thomson (admitted *pro hac vice*)
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jthomson@attorneygeneral.gov
*Counsel for Plaintiff Commonwealth of Pennsylvania*

*s/ Michael A. Undorf*
Michael A. Undorf (admitted *pro hac vice*)
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
Email: michael.undorf@delaware.gov
*Counsel for Plaintiff State of Delaware*

*s/ Christina M. Moylan*
Christina M. Moylan (admitted *pro hac vice*)
Assistant Attorney General
Chief, Consumer Protection Division
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: (207) 626-8800
Email: christina.moylan@maine.gov
*Counsel for Plaintiff State of Maine*

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 12

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222

| | | |
|---|---|---|
| 1 | s/ Schonette Walker | s/ Lucas J. Tucker |
| | Schonette Walker (admitted *pro hac vice*) | Lucas J. Tucker (admitted *pro hac vice*) |
| 2 | Assistant Attorney General | Senior Deputy Attorney General |
| | Chief, Antitrust Division | Office of the Nevada Attorney General |
| 3 | Office of the Maryland Attorney General | 100 N. Carson St. |
| | 200 St. Paul Place | Carson City, NV 89701 |
| 4 | Baltimore, MD 21202 | Telephone: (775) 684-1100 |
| | Telephone: (410) 576-6473 | Email: LTucker@ag.nv.gov |
| 5 | Email: swalker@oag.state.md.us | *Counsel for Plaintiff State of Nevada* |
| | *Counsel for Plaintiff State of Maryland* | |
| 6 | | s/ Andrew Esoldi |
| | s/ Katherine W. Krems | Andrew Esoldi (admitted *pro hac vice*) |
| 7 | Katherine W. Krems (admitted *pro hac vice*) | Deputy Attorney General |
| | Deputy Chief, Antitrust Division | New Jersey Office of the Attorney General |
| 8 | Office of the Massachusetts Attorney General | 124 Halsey Street, 5th Floor |
| | One Ashburton Place, 18th Floor | Newark, NJ 07101 |
| 9 | Boston, MA 02108 | Telephone: (973) 648-7819 |
| | Telephone: (617) 963-2189 | Email: Andrew.Esoldi @law.njoag.gov |
| 10 | Email: katherine.krems@mass.gov | *Counsel for Plaintiff State of New Jersey* |
| | *Counsel for Plaintiff Commonwealth of* | |
| 11 | *Massachusetts* | s/ Jeffrey Herrera |
| | | Jeffrey Herrera (admitted *pro hac vice*) |
| 12 | s/ Scott A. Mertens | Assistant Attorney General |
| | Scott A. Mertens (admitted *pro hac vice*) | New Mexico Office of the Attorney General |
| 13 | Assistant Attorney General | 408 Galisteo St. |
| | Michigan Department of Attorney General | Santa Fe, NM 87501 |
| 14 | 525 West Ottawa Street | Telephone: (505) 490-4878 |
| | Lansing, MI 48933 | Email: jherrera@nmag.gov |
| 15 | Telephone: (517) 335-7622 | *Counsel for Plaintiff State of New Mexico* |
| | Email: MertensS@michigan.gov | |
| 16 | *Counsel for Plaintiff State of Michigan* | s/ Zulma Carrasquillo-Almena |
| | | Zulma Carrasquillo (admitted *pro hac vice*) |
| 17 | s/ Zach Biesanz | Assistant Attorney General |
| | Zach Biesanz (admitted *pro hac vice*) | Antitrust Division |
| 18 | Senior Enforcement Counsel | Puerto Rico Department of Justice |
| | Office of the Minnesota Attorney General | P.O. Box 9020192 |
| 19 | 445 Minnesota Street, Suite 1400 | San Juan, Puerto Rico 00901-0192 |
| | Saint Paul, MN 55101 | Telephone: (787) 721-2900 |
| 20 | Telephone: (651) 757-1257 | Email: zcarrasquillo@justicia.pr.gov |
| | Email: zach.biesanz@ag.state.mn.us | *Counsel for Plaintiff Commonwealth of Puerto* |
| 21 | *Counsel for Plaintiff State of Minnesota* | *Rico* |

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY  
CASE NO. 2:23-cv-01495-JHC - 13

FEDERAL TRADE COMMISSION  
600 Pennsylvania Avenue, NW  
Washington, DC 20580  
(202) 326-2222

s/ Stephen N. Provazza
Stephen N. Provazza (admitted *pro hac vice*)
Special Assistant Attorney General
Chief, Consumer and Economic Justice Unit
Department of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Email: sprovazza@riag.ri.gov
*Counsel for Plaintiff State of Rhode Island*

s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Counsel for Plaintiff State of Vermont*

s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: maddencm@doj.state.wi.us
*Counsel for Plaintiff State of Wisconsin*

PLAINTIFFS' PRE-HEARING FILING FOR ECONOMICS DAY
CASE NO. 2:23-cv-01495-JHC - 14

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2222