THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION, et al.,

Plaintiffs,

v.

AMAZON.COM, INC., a corporation,

Defendant.

Case No. 2:23-cv-01495-JHC

**AMAZON'S ECONOMICS DAY HEARING STATEMENT**

AMAZON'S ECONOMICS DAY HEARING STATEMENT
CASE NO. 2:23-cv-01495-JHC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

Pursuant to the Court's December 2, 2024 Order, ECF No. 365, Amazon respectfully submits this written statement concerning the topics to be addressed at the March 7, 2025 hearing.

## I. Introduction

Plaintiffs claim that Amazon has unlawfully maintained a monopoly through allegedly exclusionary conduct in violation of Section 2 of the Sherman Act.[1]  In antitrust cases such as this, rigorous economic analysis will inform the central questions the Court must ask: In what market or markets must we look for any anticompetitive and procompetitive effects?  Have Plaintiffs demonstrated that Amazon possesses monopoly power in such market(s)?  Have Plaintiffs established a prima facie case by demonstrating the challenged conduct is not competition on the merits but rather has the purpose and effect of excluding competition without providing a better product to consumers?  If so (and only if so), has Amazon demonstrated its conduct also has procompetitive effects?  The Court will need to apply economic concepts, and evaluate economic evidence, in assessing each of these questions.

The Parties identified eleven economic topics for the Court, *see* ECF No. 290, and Amazon will be ready to discuss them at the March 7 hearing.  This submission groups those topics into key issues that Amazon views as likely to be particularly useful to the Court in this matter.

**Relevant Markets (Topics 2-5):**  Plaintiffs in a monopoly maintenance case must establish the existence of "relevant markets," which is a hybrid legal and economic concept that essentially defines the arena in which competition occurs.  This is foundational in an antitrust case because an overly narrow or broad market definition may lead to inaccurate conclusions about the defendant's competitive position and any alleged competitive harm caused by the conduct at issue.  A vigorous competitive process naturally leads more efficient companies—those that provide consumers with what they want, at prices they like—to succeed where others may not.  The antitrust laws do not prohibit such competition and such success; to the contrary, they encourage it.  Defining relevant markets provides necessary context to assess economic (and other) evidence

---

[1] For an overview of the applicable legal framework for monopoly maintenance claims, see *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989-92 (9th Cir. 2020) and *Epic Games, Inc. v. Apple*, 67 F.4th 946, 998-99 (9th Cir. 2023).

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 1
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
Tel +1.206.274.6400   Fax +1.206.274.6401

regarding whether a defendant's challenged conduct has harmed competition, or whether it is evidence of vigorous competition among companies.

**Monopoly Power (Topics 6-8):** To support their claims, Plaintiffs must show that Amazon has "monopoly power," which is defined as the power to profitably and durably raise prices above (or, the corollary, to reduce output below) "competitive" levels in a relevant market. Because prices and output change for myriad reasons in a competitive market, and because it is exceedingly difficult for a court to assess what a "competitive" price is, well-founded economic evidence is critical. The assessment by courts and economists of whether a defendant may possess monopoly power is generally based on both the defendant's share of the relevant market, as well as whether there are substantial and durable barriers to entry and expansion in the relevant market that prevent existing and potential competitors from driving prices back down in the event a putative monopolist raises them.

**Exclusionary Conduct vs. Competition on the Merits (Topics 9-11):** Because the antitrust laws exist to protect competition, and not individual competitors, the laws encourage companies to compete vigorously and do not punish them for their resulting success, provided that it flows from competition on the merits as opposed to excluding competitors from the relevant market through anticompetitive means. Economic evidence can provide insight into the reasons why a defendant has or has not been successful in the marketplace and whether certain conduct should be considered exclusionary, or whether it is tough (but lawful) competition on the merits. Economists recognize, for example, that conduct can promote competition, even where it limits certain actions by other market participants. Economic evidence can also help the Court assess whether the conduct has resulted in anticompetitive effects in the relevant markets.

**The Economics of Amazon's Store (Topic 1):** In assessing relevant markets, monopoly power, and exclusionary conduct and its impact, economists will consider the economic principles that underlie the structure and dynamics of Amazon's store, including the policies, programs, and practices that are designed to benefit consumers, align the incentives of the sellers who participate

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 2
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

alongside Amazon in Amazon's store, and the ways in which Amazon's business model is a result of the product differentiation and innovation encouraged by the antitrust laws.

**The Reliability of Evidence and Methodologies (All Topics):** The Court will need to assess the reliability and soundness of the data and methodologies of the economic evidence submitted by the Parties. Seeking to extrapolate a market-wide conclusion as to whether the conduct at issue has harmed competition from limited anecdotes, for example, does not represent a sound methodology.

## II.  Economic Concepts

### A.  Relevant Markets

As most courts, including the Ninth Circuit, have recognized, "defining the relevant market is indispensable to a monopolization claim." *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989).[2]  A relevant market provides context that allows the Court to assess whether challenged conduct harmed competition such that the defendant could profitably raise prices above a competitive level. As an example, if the challenged conduct harmed only 1 of 10 substantial competitors in a relevant market, the Court should give little weight to a complaint from that one competitor and should view with skepticism an econometric analysis that relies on that complaint to show that the conduct purportedly led to higher prices for consumers.

In defining the relevant product market, economists include all competitors that meaningfully limit the defendant's ability to profitably raise prices (or restrict output). Many markets consist of products that differ considerably from each other but nonetheless are reasonable substitutes in the eyes of consumers. Economists recognize that competitors' efforts to differentiate their products do not necessarily cause those products to exist in different antitrust markets. Economists thus employ accepted methodologies based on reliable quantitative and qualitative tools and evidence (e.g., data on customer preferences and purchases and ordinary-course assessments of competition, etc.) to assess competition and customer substitution between

---

[2] While some courts acknowledge the theoretical possibility of establishing a Section 2 violation without reference to a relevant market, they virtually never do so in specific cases, for the reasons discussed in the text.

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 3
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

different products to help determine which competitors to include in the relevant market.[3] To do so, economists often rely on the Hypothetical Monopolist Test ("HMT"), which is an accepted methodology that seeks to identify the narrowest market in which a hypothetical monopolist could profitably impose a small but significant non-transitory increase in price ("SSNIP"). *Epic Games*, 67 F.4th at 975.[4]

As to Plaintiffs' consumer-facing alleged market of "online superstores," economists can use these tools to assess whether this market captures all of the retailers (and each of the channels in which those retailers offer products for sale) that customers see as reasonable substitutes for products that are available in Amazon's store. As an example, Plaintiffs allege that retailers who focus on particular categories of products, such as Chewy and Home Depot, are outside the relevant market because they do not offer the same one-stop-shopping experience for more than one category of consumer products.[5] As one respected antitrust scholar has explained, this alleged market strains common sense: A "customer seeking to outfit a kitchen can readily buy the toaster from Amazon, the blender from Target.com, and the microwave from a brick-and-mortar department store," which indicates that the relevant market is broader than asserted by Plaintiffs. *See* Herbert Hovenkamp, *Antitrust and eMarkets*, Stan. L. & Pol'y Rev. (forthcoming 2025) (manuscript at 27) (available on SSRN).[6] Thus, for example, Plaintiffs' allegation that Target.com sales are within the market, but that Target brick-and-mortar sales are outside that market, can be

---

[3] Economists may seek to estimate the cross-elasticity of demand, which measures the extent to which consumers will switch to another product in response to an increase in the price of the first product (or vice versa). *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995); *see also Epic Games*, 67 F.4th at 975. Similarly, economists also may seek to assess the cross-elasticity of supply, which measures the extent to which other companies can expand or begin offering new supply of products in response to a significant price increase.

[4] With regard to any risk that the HMT could be rendered inaccurate by the "cellophane fallacy" or could otherwise lead to an overly broad market definition, economists can conduct analyses to address such risks. Economists should not, however, substitute rigorous analyses like the HMT with isolated or anecdotal evidence that does not reflect market-wide behavior.

[5] Plaintiffs' consumer-facing "Online Superstore Market" also excludes "[o]nline purchases of perishable grocery products." 2d Am. Compl., ECF No. 327 ¶ 162. And Plaintiffs' seller-facing "Online Marketplace Services Market" excludes any services provided by first-party vendor relationships, and any services provided by software-as-a-service ("SaaS") providers like Shopify. *Id.* ¶¶ 193-202.

[6] The markets Plaintiffs have alleged include hundreds of thousands of products that are often sold by different sets of competitors, and economists will need to evaluate whether there is an economic justification for this approach when markets are typically defined on a product-by-product or service-by-service basis.

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 4
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

tested using these economic techniques to determine whether consumers view Target's website and brick-and-mortar store as substitutes when shopping.

As to Plaintiffs' seller-facing alleged market for "online marketplace services," economists can assess whether the alleged market includes all available service options that a seller can use to reach consumers. This could include, for example, integrated services (e.g., those provided to sellers by Walmart) as well as a set of services that a seller can engage on its own (e.g., a website and customer interface from Shopify with fulfillment services offered by FedEx).

### B. Monopoly Power

Monopoly power means that a company has the "substantial ability to control prices or exclude competition." *Epic Games*, 67 F.4th at 998 (internal quotation marks and citation omitted). But monopoly power is not the same as market power. To be cognizable, monopoly power must be "durable"—it must survive the test of time. *Id.*[7] Monopoly power means that a company does not face pressure to lower prices, invest in innovation, or enhance quality or customer service because it does not face competitive constraints from actual or potential competitors. Here, Plaintiffs must first establish that (i) their alleged relevant markets exist, and (ii) Amazon has a high share (typically 70% or more) of each relevant market. But a large market share is not sufficient by itself to establish monopoly power because "any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods or personal services for less." *Syufy*, 903 F.2d at 664. Plaintiffs thus also must show that there are durable and significant barriers that prevent new companies from entering the relevant market or existing companies in the market from expanding their share.

In considering whether there are significant barriers to entry, economists look to a range of potential evidence. Reviewing prior successful entry and/or expansion of other companies is a common way to evaluate the existence of barriers to competition. For example, with respect to Plaintiffs' alleged online superstore market, economists will assess what the efforts of established

---

[7] *See also United States. v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990) ("Is this the type of situation where market forces are likely to cure the perceived problem within a reasonable period of time?").

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 5
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400  FAX +1.206.274.6401

retailers like Walmart, Nordstrom, Macy's, Kohl's, and Kroger to launch and grow online stores that also provide opportunities for third-party sellers—as well as the launch and growth in the United States from new retailers like Temu and Shein—indicate about the existence of any meaningful barriers to entry or expansion.[8]  Similarly, economists can assess whether barriers exist when established brick-and-mortar retailers have expanded and diversified operations, including by improving their online stores and by offering hybrid "multichannel" or "omnichannel" shopping experiences that provide consumers the opportunity to combine the conveniences of online searching, shopping, and/or payment with the conveniences of in-store shopping, in-store pickup, and in-store returns.  As to Plaintiffs' seller-facing market, economists will consider, among other things, the expansion of seller service providers, including efforts by Shopify, BigCommerce, UPS, FedEx, and the efforts by a host of logistics and fulfillment companies to develop services for sellers.

Economists also recognize that a monopolist is less likely to invest in innovation because the existence of a durable monopoly alleviates the need to incur such costs.  Economists can thus consider whether Amazon's historical and continuing investments in innovation are consistent with this principle, including with respect to Amazon's fulfillment network, the expanded benefits available to Amazon Prime members, and the ongoing effort to launch new tools, services, and programs for third-party sellers.

Economists could theoretically consider whether there is any direct evidence of Amazon's ability to raise prices above competitive levels while restricting output in a relevant market, although such evidence is rarely available.  *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc).  Here, Plaintiffs largely focus on two types of supposedly direct evidence.

In the consumer-facing market, Plaintiffs allege that Amazon's decisions about advertising and so-called self-preferencing have degraded the quality of the search results that customers

---

[8] Although "scale" and "network effects" may in some circumstances constitute barriers to entry, economists assessing whether such claimed barriers to entry are substantial and durable will consider the extent to which such phenomena actually apply to the facts here and prevent other online and brick-and-mortar retailers from competing with Amazon for the same customers.

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 6
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

receive when shopping in Amazon's store.  Economists will seek to test this theory, including by asking whether increases in advertisements and/or self-preferencing, to the extent they exist, consistently degrade the shopping experience (otherwise, such decisions could not be evidence of monopoly power) and whether other retailers who are not alleged to be monopolists have engaged in similar conduct (in which case, the conduct is presumptively efficient and procompetitive).

In the seller-facing market, Plaintiffs allege that Amazon has been able to raise the fees it charges to sellers without losing sellers.  Economists will evaluate whether those fees in fact reflect the cost or value of services that Amazon offers, and will need to make apples-to-apples comparisons between Amazon and other companies in the market to ensure any such comparisons provide meaningful economic assessments of alleged monopoly power.

### C.  Exclusionary Conduct vs. Competition on the Merits

The antitrust laws do not punish a competitor for "growth or development as a consequence of a superior product, business acumen, or historic accident." *Epic Games*, 67 F.4th at 998 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  Economists thus ask whether the challenged conduct reflects competition on the merits (e.g., the conduct is designed to improve a product or service) or whether the conduct excludes competitors from the marketplace (e.g., substantially forecloses competitors from reaching consumers without providing any benefit to consumers).[9]  Here, economists look at the particular policies and practices that Plaintiffs identify (e.g., Amazon's practice of matching the prices offered by other retailers) to assess whether they block other companies from competing, or whether they instead reflect Amazon's procompetitive efforts to compete for each sale.  And consistent with the applicable legal standard, economists will consider whether each category of conduct on its own leads to anticompetitive effects.  *See, e.g., Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) ("[When] each individual action alleged … does not rise to anticompetitive conduct in the relevant

---

[9] If exclusionary, there must be a "preliminary showing of significant and more-than-temporary harmful effects on *competition* (and not merely upon a competitor or customer) before … practices can rise to the level of exclusionary conduct." *Am. Pro. Testing Serv. v. Harcourt Brace Jovanovich Legal & Pro. Publs.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (emphasis in original) (internal quotation marks and citation omitted).

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 7
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

market, their collective sum likewise does not."); *In re Epipen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("[C]ourts disaggregate the exclusionary conduct into its component parts before applying the relevant law.").

### i. Conduct Addressing Free-Riding and Minimizing Externalities

Conduct may promote competition—in which case it is not exclusionary conduct—even if it limits the actions of other companies. And companies often employ such conduct to address problems economists recognize as "free-riding" and "externalities."

Free-riding arises when one company (here, a third-party seller) seeks to reap the advantages of investments made by another company (here, Amazon), but does not bear some or all of the costs. This can deter a company like Amazon from making the investments in the first instance, and it can result in negative externalities, which are costs to Amazon, consumers, and other sellers that occur as a result of the seller free-riding. Amazon has made significant investments in creating a reliable and secure consumer experience and a reputation for competitive prices in its store. When a third-party seller relies on Amazon's reputation, but then fails to deliver a quality experience or a competitive price, a customer is likely to associate the negative experience with Amazon and thus the resulting reputational harm is suffered by Amazon and everyone participating in Amazon's store, not just the one third-party seller. Because of this, some third-party sellers may have an incentive to increase profits in the short-term by offering products that do not function as advertised, promising unrealistic delivery speeds, manipulating customer reviews, or by raising prices significantly.

To limit this risk, and to ensure that all of the sellers in its store live up to Amazon's reputation for a reliable and high-quality service as well as competitive prices, Amazon has an incentive to regulate the conduct of third-party sellers in Amazon's store. One way to do so is by imposing what economists recognize as procompetitive "vertical restraints." Economists will thus evaluate whether the conduct challenged by the Plaintiffs reflects Amazon's efforts to promote competition by preserving a high-quality consumer experience (including by offering competitive prices and fast and reliable delivery) and otherwise maintaining customer satisfaction. This

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 8
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

includes, for example, the evaluation of Amazon's Select Competitor Featured Offer Disqualification ("SC-FOD") process, the Standards for Brands Selling in Amazon's Store ("ASB") policy, the Customer Experience Ambassador ("CXA") program, and the eligibility requirements for receiving the Amazon Prime badge.

### ii. Quantifying Any Anticompetitive Effect

If the Court were to determine that some conduct is exclusionary under the antitrust laws, economists can help evaluate whether the negative effects that Plaintiffs allege (e.g., higher prices) actually exist. And if they exist, whether such effects are actually caused by the exclusionary conduct and, if so, whether such effects are market-wide. To test Plaintiffs' hypothesis, economists might analyze available data and employ statistical methods to test whether the challenged conduct caused prices to rise as alleged in a statistically significant fashion. With respect to SC-FOD, for example, economists could evaluate whether sellers successfully raise prices with other retailers (as Plaintiffs allege) or whether a seller typically responds by lowering the price for its product in Amazon's store (which is inconsistent with Plaintiffs' theory). Finally, economists will assess whether there are other potential causes of the alleged effects, as well as what would have occurred in the market in the absence of the allegedly exclusionary conduct.

### D. The Economics of Amazon's Store

When assessing the conduct in this case, economists will also consider economic concepts that reflect the structure and operation of Amazon's store. *First*, in assessing competition, economists will ask whether consumers have benefited, such as through improved prices, greater supply, or greater quality of goods regardless of whether individual competitors have failed or succeeded. As discussed above in Section II.C, Amazon has sought to address free-riding and externalities occurring in its store by regulating seller conduct to ensure that customers receive low prices, accurate reviews, and fast and reliable delivery.

*Second*, economists will consider whether Amazon has been successful through product innovation and differentiation. This concept is reflected in Amazon's intense focus on establishing and maintaining customer trust by offering an improved shopping experience that brings long-term

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 9
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

satisfaction to consumers. Over time, this has allowed Amazon to compete with all manner of well-established online and brick-and-mortar retailers, such as Walmart, Target, Nordstrom, Kohls, Home Depot, Costco, Walgreens, Best Buy, Wayfair, as well as any number of locally owned shops and corner stores, among many others. Amazon has also raised the bar across the retail industry. Established retailers have responded to Amazon's innovation by opening up their own stores to third-party sellers and expanding their online store offerings. Retailers have also used their existing brick-and-mortar footprint and improved online stores to offer consumers an omnichannel shopping experience. And Amazon's provision of extraordinary customer service has caused retailers to work to improve price, selection, customer service, return policies, and delivery times.

### E. The Reliability of Evidence and Methodologies

In assessing all of the economic evidence in this case, the Court will need to determine its reliability and persuasive value. In doing so, economists typically consider both the reliability of any data (e.g., any concerns about inaccurate or inconsistent data) as well as the methodology used in any economic analysis (e.g., whether the methods are statically reliable or consistent with established practice). On this second point, economists will be particularly cautious not to extrapolate broad or general conclusions from inadequate or biased data. This is often a concern when isolated or anecdotal examples, as opposed to statically reliable, market-wide data, are used as the basis for an economic analysis. Economists would not, for example, accept as reliable an analysis of market-wide effects on prices and output based on cherry-picked statements in a defendant's business documents, or the anecdotal testimony of a limited and unrepresentative sample of market participants.

### III. Conclusion

Economic analyses will play an important role at each step of the analytical framework that applies to Plaintiffs' monopoly maintenance claims. Throughout this work, economists should be guided, above all else, by the foundational principle that the antitrust laws are to be invoked only if competition itself is harmed to the detriment of consumers.

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 10
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

DATED this 28th day of February, 2025.

**MORGAN, LEWIS & BOCKIUS LLP**

By: *s/ Patty A. Eakes*
Patty A. Eakes, WSBA #18888
Molly A. Terwilliger, WSBA #28449
1301 Second Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 274-6400
Email: patty.eakes@morganlewis.com
           molly.terwilliger@morganlewis.com

**WILLIAMS & CONNOLLY LLP**

Heidi K. Hubbard (*pro hac vice*)
John E. Schmidtlein (*pro hac vice*)
Kevin M. Hodges (*pro hac vice*)
Jonathan B. Pitt (*pro hac vice*)
Edward C. Reddington (*pro hac vice*)
Carl R. Metz (*pro hac vice*)
Carol J. Pruski (*pro hac vice*)
Katherine Trefz (*pro hac vice*)
680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5000
Email: hhubbard@wc.com
           jschmidtlein@wc.com
           khodges@wc.com
           jpitt@wc.com
           ereddington@wc.com
           cmetz@wc.com
           cpruski@wc.com
           ktrefz@wc.com

**COVINGTON & BURLING LLP**

Thomas O. Barnett (*pro hac vice*)
Derek Ludwin (*pro hac vice*)
Kate Mitchell-Tombras (*pro hac vice*)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Phone: (202) 662-5407
Email: tbarnett@cov.com
           dludwin@cov.com
           kmitchelltombras@cov.com

*Attorneys for Defendant Amazon.com, Inc.*

AMAZON'S ECONOMICS DAY HEARING STATEMENT - 11
CASE NO. 2:23-cv-01495-JHC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401