```
                 UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

                                    )
FEDERAL TRADE COMMISSION, et al.,   )
                                    ) CASE NO. C23-1495-JHC
                 Plaintiffs,        )
                                    ) Seattle, Washington
v.                                  )
                                    ) March 7, 2025
AMAZON.COM, INC., a corporation,    ) 9:00 a.m.
                                    )
                 Defendant.         ) ECONOMICS DAY HEARING
                                    )
_____

              VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JOHN H. CHUN
              UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

  For the Plaintiff       Kenneth H. Merber
  Federal Trade           Edward H. Takashima
  Commission:             Federal Trade Commission
                          600 Pennsylvania Avenue NW
                          Washington, DC 20580


  For the Plaintiff       Timothy D. Smith
  States and Tribes:      Oregon Department of Justice
                          1162 Court Street NE
                          Salem, OR 97301-4096


  For the Defendant       Heidi K. Hubbard
  Amazon.com, Inc.:       John E. Schmidtlein
                          Jonathan Pitt
                          Williams & Connolly
                          680 Maine Avenue SW
                          Washington, DC 20024

                          Patricia A. Eakes
                          Morgan Lewis & Bockius LLP
                          1301 Second Avenue, Suite 3000
                          Seattle, WA 98101
```

Proceedings recorded by mechanical stenography; transcript produced with aid of computer

                    ECONOMICS DAY HEARING
                          9:00 A.M.
_____

          THE CLERK:  This is Case No. C23-1495, Federal Trade

Commission, et al., versus Amazon.com, Inc.

     Counsel, please make your appearances for the record.

          MR. MERBER:  Ken Merber on behalf of the Federal Trade

Commission, Your Honor.

          MR. TAKASHIMA:  Good morning, Your Honor.

Ed Takashima for the Federal Trade Commission.

          MR. SMITH:  Good morning, Your Honor.  Ted Smith from

the Oregon Department of Justice.  Your Honor, I'm appearing on

behalf of the plaintiff states and the territories, all of whom

are acting by and through their respective attorneys general.

          MS. HUBBARD:  Good morning, Your Honor.  Heidi Hubbard

appearing for Amazon.  I'll just do appearances.  My co-counsel

Patty Eakes, my colleagues Jonathan Pitt and John Schmidtlein.

          THE COURT:  Good morning to all of you.  Welcome back

to Seattle.

     All right.  This session will be a brief status conference

and then an Economics Day hearing.

     Counsel, thank you for the joint status report in advance

of the status conference.

     Is there anything you'd like to address in connection with

that report?

          MR. TAKASHIMA:  Good morning, Your Honor.  Yes, there

are a few things that I'd like to address.

One is just following up on Amazon's reply in their motion to extend the privilege log deadline. The statement by Amazon inviting further briefing regarding Amazon's privilege practices, I just want to say on behalf of plaintiffs, we are totally open to that and we support that.

The only two suggestions we'd make for the court, if so inclined, one would be to direct Amazon, if they make any claims about its privilege log practices, to substantiate those with declarations.

THE COURT:  I'm sorry.  You're going to have back up a second.  I didn't catch what you said two sentences ago.

MR. TAKASHIMA:  I apologize, Your Honor.

If the court is so inclined to have additional briefing on Amazon's privilege practices, we have two suggestions for the court, proposals.

One is a direction to Amazon that, if they make any claims regarding its privilege logging practices, to substantiate those with declarations from the executives at Amazon who are responsible for those practices and policies.

And I'm not just talking about the in-house attorneys overseeing individual cases.  I think the evidence we presented to the court indicates that these are more systemic, that the decisions come from above, and that the court should hear from the actual decision-makers.

And then our second suggestion is just that the court have an evidentiary hearing and actually allow questioning from the court and plaintiffs' counsel of those declarants.

I understand that the court raised that as a possibility at the private plaintiffs hearing at the end of January, and there's precedent for that based on other cases. The *Epic v. Google* and the *Epic v. Apple* case both involved further questioning.

THE COURT: Okay. Is there agreement on that particular issue? I'm guessing perhaps not.

MS. HUBBARD: There is not, Your Honor. I'd like to be heard on it.

THE COURT: Go ahead.

MS. HUBBARD: Thank you, Your Honor.

Good morning. Heidi Hubbard appearing for Amazon.

The specific issue in the joint status report, as the court is aware, was a request by Amazon for a short extension of a deadline on one privilege log.

And as we indicated in the -- and we're sorry that we had to burden the court with that. The circumstances that gave rise to that request for a short extension are detailed in LCR 37, which is Docket No. 419, and attached to that is also a declaration.

But probably the most important thing, not to bury the lead, is that we have now completed that privilege log, and it's

going to go out today, so there is not a ripe issue with respect to that particular deadline.  And as the court is aware, we did not ask for the extension of any other deadlines, and there are a number of upcoming deadlines related to privilege.

What's important about that is that there is a process, an orderly process here for completing the work on privilege. There are deadlines for additional productions and an additional log, and all of that will be completed by April 14th.

And then, in an orderly process, the parties should meet and confer to see whether there are, in fact, any issues.  I am aware, although I am not counsel for Amazon in the private cases, that another thing that will be happening in the next few weeks is that the court there will be looking at a set of documents in camera pursuant to an order there, and I think that those documents will be going to the court in short order.

The reason I'm pointing that out is that the court will have more information in that process about privilege practices, and the parties in this case, where there's no teed-up dispute on privilege, there was sort of a drive-by of potshots by the plaintiffs when we asked for that short extension, and they said no.

There will be -- the deadlines, we will meet.  We should meet and confer, and then we should narrow and focus if there are issues that remain on privilege practices.

And, Your Honor, I take strong issue with the accusations

that the plaintiffs have made in this case, and I take them seriously, and I want to answer any concerns the court has, but they are making inaccurate accusations about privilege practices.

And what's important is that we have an orderly, fair process that is actually helpful to the court. Because the issues have been -- it's not a generalized suspicion that they are trying to promote, but that these deadlines are met, the parties meet and confer, we narrow the issues on privilege.

Your Honor, in the related private cases, will have specific issues or questions that Your Honor would like to address, and we want to then address them.

So I would like to say, let's think about a schedule on briefing and what it should look like once these other deadlines have been met in this process, which is only the next five or six weeks, has been completed, so we're not having any more of this random potshots when there's no ripe issue in this case.

THE COURT: Thank you.

Mr. Takashima?

MR. TAKASHIMA: I'll just note, Your Honor, that, in its briefing, Amazon asked for, quote, a briefing schedule after Econ Day. If Amazon now wants to defer that, we're happy to do whatever is helpful for the court, but this is Amazon's request that we're responding to.

THE COURT: Okay. Thank you.

MR. TAKASHIMA:  Your Honor, the second issue I wanted to raise, just hoping for the court's guidance here, in the last couple of days, we've learned that Amazon is, essentially, disregarding some deadlines set out in the coordination order; specifically, there are two, but more important is, the coordination order sets out and requires that once one party has issued a deposition notice to a third party, the other side has 14 days to issue any document subpoenas for documents in connection with that deposition.

That deadline has passed for three upcoming depositions noticed by plaintiffs.  We learned that Amazon is continuing to attempt to serve subpoenas, or maybe have served subpoenas, on those witnesses regardless of the deadline, and I'm concerned this is going to unnecessarily push out the dates for the depositions that we were trying to take.

Amazon's explanation, when we asked for this, has been, at first, it was trying to voluntarily obtain documents from the third parties, which I think is fine and proper, but it doesn't obviate the deadlines set by the court in the coordination order; and then second, that we have provided contact information for the third parties, which we did, and Amazon had the information for over a week before their deadline hit.

When we raised this issue with Amazon, Amazon's response, in part, was that, fine, if they can't obtain documents before those depositions noticed by plaintiffs, they'll just issue an

additional 30(b)(6) notice for the various third parties.  I think that's, pretty clearly, an end run around the court's scheduling, unduly burdensome, and improper.

And then, finally, there's been a related issue where, again, there is a 14-day deadline for -- a 14-day deadline for Amazon to cross-notice depositions that are first noted by plaintiffs.  Again, Amazon has blown that deadline for three of these third parties.  We said we're fine with Amazon issuing a prompt cross-notice, if it's going to do so, but not to use that cross-notice as a way of artificially pushing out those depositions to make up for the late document subpoenas.  Without it, this wouldn't be an issue.

THE COURT:  Thank you.

MS. HUBBARD:  Your Honor, this particular issue first got raised on Wednesday of this week, and so if I misspeak on something, it is because I have been trying to understand it.

But I believe that the issue centers around just getting documents from third parties before they're deposed.  I think everybody agree that that's better if we can do it.

The plaintiffs have objected to the timeliness of Amazon's attempt to get documents from three of the third parties before they were deposed.  And I think, as I understand it, what happened is that Amazon lawyers were trying to work with the third parties informally.  Because we have found that that can make the process less burdensome on third parties --

THE COURT:  Sure, but that process has to be done with the deadline in mind.

MS. HUBBARD:  It does, Your Honor, and I'm not in any way excusing that.  I think what happened here is that that process took longer than anticipated, and the deadlines got lost sight of.

But I will say that this is -- this particular dispute, as I've tried to get to the bottom of it last night, is something that looks, to me, like it will get worked out among the parties and among the third parties.

One of the third parties has said that they will be able to make the documents available before the date for their depositions.

The dates for the two other depositions, they're all -- all the dates are three weeks out.  The dates for the other two depositions, there's some issue with the availability of other parties who want to participate in the coordination order, so those other two depositions may be more than three weeks out.

Our goal is to do our very best to get the documents in advance of the depositions and without delaying the depositions, but just getting them scheduled at a time that works for everyone.

So I don't know that there's actually a ripe dispute yet on this issue.  I think everybody is under instructions to try to get this worked out.

On the 30(b)(6) question that was raised by plaintiffs' counsel, just a word on that.

For reasons that are unclear to me, the plaintiffs subpoenaed individual people at these three third-party companies. That's fine if they want to do that. What we have found, in some of the third party-depositions, is that somebody who is individually subpoenaed, as you would expect, may not have the knowledge of some of the areas that Amazon wants to gain information about from that third party.

So the idea that there might have to be a 30(b)(6) notice to the entity itself, the company itself, is really just to make sure that adequate information is obtained from that particular third-party company. It's not any kind of end run.

If the FTC wants to just ask one individual about that individual's personal knowledge, that is, obviously, their choice.

So the 30(b)(6), I think, is just a let's make sure we all get adequate information from the particular third parties.

That's my best effort to understand the issue. And I think my overriding request to the teams and to our colleagues on the other side of the aisle is that we should be able to work this out, so let's work this out so that we're not inconveniencing, especially, the third parties, if we can get it figured out.

THE COURT:  Okay.  Thank you.

MR. TAKASHIMA:  Your Honor, I think the underlying

issue here is similar to the privilege logging deadline, where there is a deadline set by the court or rule set by the court, Amazon doesn't like it, Amazon blows that deadline, and then says, Well, it's not that big of a deal, it's only a guideline, we can make it up on the back end.

In this situation, if Amazon is going to sit here today and tell us that, you know, the dates we set for these depositions are not going to move, or, at the very least, Amazon is not going to argue to move them based on whether any of the documents it's seeking through its belated subpoenas, fine, but I strongly suspect that may not be the case, and, instead, essentially, having a pushing-and-shoving match up to the last minute.

And this has been an endemic problem, where I think the vast majority, if not almost all of our third-party depositions, we've noticed them, and then they've had to get bumped out, and in some cases, more than once, because Amazon says, Oh, we have these documents and we're still working on them.  It will threaten our case, at some point, to delay the discovery schedule.

As for the 30(b)(6) deposition issue, I would totally understand if, when we issue a deposition notice, Amazon, in its discretion, wants to respond with a cross-notice for both an individual deposition and the 30(b)(6) deposition.  That's not what's happened here.

In this case, we brought up this issue of untimely depositions being pushed out, and Amazon's response was, Well, fine, we'll just issue a 30(b)(6) deposition. That's a threat to third parties. It's not something being done out of an abundance of caution.

Thank you, Your Honor.

THE COURT: Okay. Are those the two issues that you wanted to raise?

MR. TAKASHIMA: They are, Your Honor.

THE COURT: Okay.

Ms. Hubbard, is there anything else in connection with the status report?

MS. HUBBARD: No, Your Honor. I just want to say that I would never say to the court that deadlines are no big deal, and I just don't want that characterization --

THE COURT: I wouldn't think you would say that.

MS. HUBBARD: Okay. For the record.

THE COURT: All right. Let's move on to the Economics Day hearing. We're going to have 90 minutes per side. The plaintiffs will go first. You don't have to use all your 90 minutes, if don't want to, but you get 90 minutes.

And who will be presenting on plaintiffs' side?

MR. MERBER: I will, Ken Merber, Your Honor.

THE COURT: Great. And on the defense side?

MR. SCHMIDTLEIN: I will be, Your Honor, John

Schmidtlein.

THE COURT:  Thank you.  I want to thank you for your submissions.  I find them well written and informative.  I assume that both sides will elaborate on the written materials.  Also, I hope that you'll take the opportunity to respond to assertions in the other side's written materials.

On that note, I hope the lawyers on both sides will alert me to what you believe are the key differences between the parties as to the economic theories.  Put another way:  If possible, I'd like to have you give me a preview of key decisions I'll have to make, at some point, in connection with these economic theories, if that makes sense.

It's 9:16 right now, and so we're going to go until 10:46, for the plaintiffs, and then we'll take a break, and then we'll go to the defense side.  All right?

MR. MERBER:  Thank you.  And I'll just give you copies.

THE COURT:  Mr. Merber, you can answer this question now or at the appropriate time during your presentation, but the last sentence of Amazon's brief says, quote, Economists should be guided, above all else, by the foundational principle that the antitrust laws are to be invoked only if competition itself is harmed to the detriment of consumers.

And I underscore "to the detriment of consumers."

My question for you is, do you have a response to that?

MR. MERBER:  Yes.

So that is a fairly standard description of what the antitrust laws are trying to accomplish, which is they're trying to protect competition, and the reason they're trying to protect competition is because competition protects consumers.  And when I say "consumers," I mean anyone that's doing business with a firm that, perhaps, has monopoly power.  So their customers, or even, actually, their suppliers.

So, in general, if a firm that is selling products to consumers has monopoly power and they've achieved or maintained that power through anticompetitive means, that's going to be harmful to their customers, which, in that case, would be consumers.  So in that sense, that's accurate.

THE COURT:  And what harm to consumers does Amazon seek to prove in this case?  Higher prices?  Lower quality?  Anything else?

MR. MERBER:  Sure.

So competition provides a wide range of benefits, which include higher -- lower prices, better selection, better quality, greater incentives to innovate and add features to products or stores.

And what we're challenging here is a course of conduct that, ultimately, prevented or inhibited rivals from being able to gain the scale they needed to complete effectively, and that can have a wide variety of different effects.  So some of the

individual practices were targeted at price competition and selection competition, so we think that those practices most directly raised prices to both sellers that were selling through Amazon's platform and to shoppers that were purchasing products in the online superstore market and limited the selection that was available at rival stores.  So we think that it had harms on both of those dimensions.

But, ultimately, we think it impeded the growth of potential rivals into more effective competitors, and that could have had effects on any number of different dimensions of competition because they're very hard to anticipate in the abstract.

And that's why, in general, when courts are trying to assess what was the overall impact on competition.  And then on consumers, what they're looking for is conduct that was reasonably capable of contributing to the maintenance of a monopoly without requiring plaintiffs to reconstruct a but-for world.

Because competition is complex, it happens on a lot of dimensions, and it's very hard to say exactly what would happen if potential rivals had had the opportunity to grow into larger and more efficient competitors in the absence of Amazon's challenged conduct.

THE COURT:  You just said it's hard to say exactly what would have happened.  Are you implying that, in your

presentation at trial, you're not going to hypothesize what would have happened had there not been the unlawful conduct and a rival had been allowed to achieve scale?

MR. MERBER:  Well, I guess -- and this ties to something else that's in Amazon's papers that I would want to address, which is, they have a section on quantifying harms.

I think it ties less to understanding what would have happened.  One of the things we'll be talking about is what are some key dimensions of competition in these markets, and they include price and selection.  So we do think that price and selection are things that were directly affected by the individual elements of the course of conduct, and then overall were affected by the challenges that Amazon's conduct created to the competitive process.

So we do think that we will be able to identify that price and selection are things that are affected; on the other hand, it's often not possible to quantify what the total effect would be, because, again -- and we'll talk about some of these issues as we go through -- but these are industries that have things like network effects and feedback loops in your growth, where, as you grow, you become more attractive to both shoppers and sellers, and that allows you to improve what you're offering, your overall offering, in a lot of different ways:  Convenience, price, selection, and other things.

So I do think we'll be able to identify some specific

dimensions of competition that we think were affected, but it's not going to be exhaustive, necessarily, and it's often challenging.

And, again, this is something courts have wrestled with in a large number of cases, where -- where the concern is that competition wasn't allowed to grow because industry barriers were artificially enhanced by anticompetitive conduct.

It's very challenging for plaintiffs to reconstruct the entire but-for world accurately, and defendants who have engaged in anticompetitive conduct can't really take -- can't really benefit from the fact that it's difficult to prove exactly how the but-for world would have developed.

So I do think there will be specific harms that we'll be emphasizing and able to show, but reconstructing a but-for world exactly as it would have been is, generally, not possible.

THE COURT:  Thank you.

And before we proceed, something for both parties.  If you have any suggestions for a reading list for me, that would be welcomed.  Defense side cited the Hovenkamp article, which I downloaded today from SSRN.  If there's anything else I should be reading, let me know, please.

Go ahead, please.

MR. MERBER:  Okay.

Well, suggestion on the issue I was just discussing was a case, actually, that I had in mind, *United States v. Microsoft*,

which I'm sure you're familiar with, but they talk about the difficulties in reconstructing a but-for world in the absence of the conduct, particularly when that conduct is --

(Court reporter requests counsel to slow down.)

THE COURT:  You must be from the East Coast.

MR. MERBER:  I am, Your Honor.

So I'm here today to discuss the economic concepts that underlie plaintiffs' case, as you requested.  I'm more than happy to take questions as I go.

And one thing I just want to emphasize is that I'm talking about the facts as we've alleged them in the complaint, given where we are in fact discovery, and the expert discovery is still to come.  So the facts I'm talking about are still in the complaint stage.

So what I'm planning to do, first, is give a very brief overview of the case.  I know you're already familiar with it, but just to highlight what elements of it I'll be emphasizing today, and then talk through the two key -- the two elements of a Sherman Act Section 2 claim, which you're familiar with, and I'm talking about Section 2 of the Sherman Act, specifically, because it gives rise to -- it gives us an opportunity to discuss the relevant economic concepts, not because it's the only statute at issue here, but those concepts are relevant to all of the different claims to one degree or another.

So, first, Section 2 of the Sherman Act, it has two

elements, monopoly power in a relevant market and maintenance of that power through anticompetitive conduct.

You're familiar with this. This is drawn from your decision on the motion to dismiss.

And the key allegations here, which I just touched on, briefly, as you said, was that Amazon has monopoly power in two markets, the online superstore market and the online marketplace services market, and that they anticompetitively maintained that power through the course of conduct that I was just talking about, that prevents rivals from gaining the scale they need to effectively complete, and, particularly, by impeding price competition and selection competition.

THE COURT: Before you move on --

MR. MERBER: Yeah.

THE COURT: -- who are Amazon's competitors in the online superstore market?

MR. MERBER: Sure. So one of the things we'll talk about when I'm talking about market definition is that there can be more than one valid market defined around the same product or service at the same time. And so one of the things that --

THE COURT: Your sports car --

MR. MERBER: Correct, yes, the sports car. Exactly.

So there's different ways that these markets can be examined, and this is something that our experts are analyzing, because they're going to look at evidence of a variety of

different things -- documentary, testimonial, data -- to see how substitution is working.

So there's a few different cuts of the market that are under consideration. This includes things like, is Amazon the only firm that is an online superstore market? Is Walmart the only competitor? Should we be looking at Amazon, Walmart, Target, and eBay, or should we be looking at one of Amazon's internal classification systems to identify a group of competitors, depending on what exactly Amazon is using those categorizations for.

So I don't have a definitive answer to that question at the moment, in terms of who exactly will be in the market, but those are the sorts of groupings that we're currently thinking about and our experts are analyzing.

THE COURT: Would you agree that Walmart is in the online superstore market?

MR. MERBER: I think that's likely. But one of the things that can happen is that economists will look at, essentially, what happens when a firm raises prices, what substitution do you see, and if there were evidence -- if the evidence ends up supporting the idea that Amazon raised prices and saw very little substitution to anyone, that might even suggest that Amazon was only the firm in that market. So that's a possible outcome.

THE COURT: So at this point, you can't say who else

is definitely in the online superstore market?

MR. MERBER:  Correct.

THE COURT:  Would that be the same with the online marketplace services market?

MR. MERBER:  Yes.  It's the same situation, because the experts are analyzing the substitution patterns as the factual record is being developed.

THE COURT:  Is there any case law or secondary source that recognizes the online superstore market or the online marketplace services market?

MR. MERBER:  So I don't know that there's -- so cases often identify different words.  I don't know if there is a case that focuses on this market, specifically.

In terms of documentary evidence, the things we cite in the complaint -- which, again, is what I'm focused on when I'm talking about facts here -- is that there are industry analysts that report market shares for consumption of people that are involved in this industry, and they tend to include -- we have it in the complaint -- charts or market shares, and they intend to include Walmart -- sorry -- in addition to Amazon, Walmart, Target, and eBay as -- as in the superstore and marketplace markets, where they do that kind of --

THE COURT:  Maybe I wasn't clear on my question.  I guess I was wondering whether the term "online superstore market," the term "online market" verus "services market," is

that a term generated by the FTC, or does it come from economic literature?  What's the origin of those terms?

MR. MERBER:  Oh, I see.  I am not certain of the answer to that.  I don't believe we cited any documents in the complaint that drew those terms from there.

I guess one thing I will just note is, there is a lot of cases in which the named definition of a market is, clearly, one that was created during litigation.  One example is the *Whole Foods* case.

THE COURT:  So a lot of sewage of errors terms.

MR. MERBER:  Correct.  I believe the term they ended up litigating on was "premium, natural, and organic supermarket market."  That market was upheld, but people don't tend to -- that doesn't exactly roll off the tongue, and people don't tend to talk about stores as premium, natural, and organic supermarkets in the everyday speech, or even in business speech.

THE COURT:  Thank you.

MR. MERBER:  So one thing I want to cover at the very outset is sort of what competition is.  This is what the antitrust laws are protecting and what Congress was trying to encourage when they passed these laws.

So competition is a process of rivalry by which firms try to win business from each other, and this effort to win business drives them to lower price, improve service, improve quality, innovate, do any number of different things.  And all of those

things are good and protected by law because it benefits society and consumers, in particular, customers of the firms that are engaged in competition.

And competition can be stronger or weaker, and it really depends on how close the available substitutes are. When I say "close," what I mean is how easy is it for a customer to say, You've made your products a little bit worse, and I'm unhappy with that, I'd like to switch to something else, what are my options?

The closer those options are, the easier it is to switch to them, and the better they will work for you, the more competition there is. So when there's lot of good alternatives, there's strong competition, and when there's few and weaker alternatives, you have less strong competition.

THE COURT: There are a couple of neutral references to the cellophane fallacy or the cellophane paradox in your briefing. Are you implying that that applies to Amazon?

MR. MERBER: Yes, I do think that's a consideration that will have to be taken into account when we're defining markets. Essentially, the -- I take it you might be familiar with the cellophane fallacy already.

THE COURT: Somewhat.

MR. MERBER: But the basic idea is, if we had a market for -- I'll use cars again. If we had a market for cars and it's competitive and prices were at a competitive level, they

had a bunch of different sellers, and then one of those sellers monopolized the entire market for cars.  Well, we just talked about what can you do.  If you've monopolized a market, you have the power to raise prices.

So let's say they do raise prices, they exercise that power and they raise prices a lot because they, in this example, accumulated quite a bit of power.

So having done so, some people that don't especially like, let's say, motorcycles, might start to buy motorcycles instead of cars, even though when cars were at a competitive level, they never even thought about it.

That's evidence that a firm that monopolized the car market has monopoly power over cars.  It's not evidence that, actually, motorcycles have to be included in the relevant market.  The fact that they were able to raise their prices so much on just cars is telling you that cars was a market, not that motorcycles were accidentally omitted before in the first analysis.

So we've alleged that Amazon has been exercising monopoly power, for example, by raising its take rate in the marketplace services market and by degrading the consumer search experience in the superstore market.

And so to the extent that they have done those things and we prove that, that is something the economists will have to keep in mind when they analyze the substitution they see in the market today, because you might see different substitution

patterns after those -- after those exercises of monopoly power than you would have beforehand.

And so I'll talk about this a little -- I can talk about it now, I suppose.  When we get to the market-definition discussion, I think I'll come back to this a little bit more, because I think that context will be somewhat helpful.

So there's a couple elements of Amazon's business, overall, that I just want to highlight, again, early on.  And part of the reason for this is that both antitrust law and economists are interested in understanding the practical realities of a market that they're looking at, and not hyperformalism.

And so for the economic analysis that's going to happen, one of the things economists will do at the outset, economists model things, and they analyze things using these models, and those models simplify the real world, and they leave out things to focus on a few and important things.

But in order to choose which models apply and how you are going to conduct that analysis, you need to have an understanding of what sort of competition you're trying to study, what are some key features of that competition, and if you don't know that before you start choosing your models, you might choose inapposite models.  So economists sort of need to understand some background before they really get into their work.

So with Amazon's business, you know, Amazon's store is

unique in its size and breadth of selection in reaching U.S. shoppers.  They have sales larger than the GDP of over 100 countries, they carry over a billion products, and they achieve this with a store that's structured as sort of a hybrid retailer and marketplace.

So they have first-party sales, where Amazon makes the sale itself.  They buy products from a vendor, and then they resell them.  And they have third-party sellers, whose products also appear in the store.  And in support of that, they also have a fulfillment network, which is used by both Amazon's products and third-party sellers, in many cases.

And there's a couple of features of the store that I want to emphasize, and the reason I'll emphasize these is because they'll come up again when we talk about market power, market definition -- sorry -- monopoly power, market definition, and the conduct.

So first is Amazon's Prime subscription, which includes a number of different services, but among them is fast shipping, which shoppers can sign up for by paying for an annual subscription.  And one of the things that that gets them is it gets them that fast shipping on Prime-eligible products, and those are indicated with a little badge, and Prime subscribers tend to prefer them.

The second is the Buy Box, which we talk about extensively in the complaint, so I'll just cover it, briefly, here.  It's a

display on their web page, where Amazon -- and it's illustrated, on the slide I have up, in the red rectangle.

The Buy Box is highlighting one seller out of many, if there are many, for that product, and giving you the ability to purchase from them when you click the "buy now" or "add to cart" button.

And the reason the Buy Box is important is because 98 percent of sales on Amazon happen through the Buy Box, and not through other ways of clicking or -- clicking through more menus to get to other sellers that might be offering the same product.

I also want to talk, just at the outset, very briefly, about retail competition in general and talk about what is it that a retailer is doing.

A retailer is -- and this is not Amazon, specifically. This is just retail competition, generally.

A retailer is buying products from somebody and creating a selection of products that they think will attract people to their store, and then reselling those products.  And the way -- so they're an intermediary between manufacturers and shoppers, and the service they're providing and getting paid for is how they gather a selection and are able to charge a markup for getting people into this convenient shopping experience that they like.

So they're competing with other retailers that are providing a similar service that also creates a selection of

products that's attractive to shoppers.

And so key mentions of competition between these retailers are price, selection, and convenience. So all of this is going to come up again when we talk about Amazon's retail business and their marketplace. But these are some general features of retail, generally, and the key thing I want to emphasize is just, they're competing over the service they provide, which is providing access to a good selection of goods at reasonable prices.

So that brings us to monopoly power, the first element of a Section 2 claim. And the definition is relatively straightforward and similar between courts and economists. For courts, it's the power to control price or exclude competition, and for economists, they don't talk about monopoly power when they aren't dealing with an antitrust case. They talk about market power, and market power is the ability to earn profits that you couldn't earn in a competitive market.

Lots of firms have some amount of market power, but it exists on a continuum, and they tend to define monopoly power as a lot of it, a significant amount of market power.

And how much power you have turns on what I was talking about earlier in terms of ways of competition. How close are the substitutes? How easily could your customers turn to somebody else if you raise your prices some? If the answer is "not very easily," you have more market power and, eventually,

monopoly power.

THE COURT:  Do you know what percentage of third-party sellers on Amazon are in anti-discounting agreements, the minimum-margin type of agreement?

MR. MERBER:  So third parties -- so minimum-margin agreement, as I understand it, is something that a vendor, rather than a third-party seller, enters into, and it deals with the people that are selling the products to Amazon, and not directly to shoppers.

THE COURT:  Right.

MR. MERBER:  There's a couple -- so let me answer that a couple ways.

Number one, for a long time, up until about 2019, all sellers -- all third-party sellers on Amazon had price-parity clauses that prevented them from offering lower prices on other sites.

After 2019, Amazon used an algorithm that still applied to all third-party sellers, and that algorithm would remove them from the Buy Box if the product was available for less elsewhere.  So they couldn't lower their prices somewhere else, and that was -- and, again, that applied and applies to all sellers.

And then the third piece of that is, there is a program called Amazon Standards for Brands -- and I think there might be one other that we mentioned in the complaint -- that applies to

a subset of certain important sellers.  I don't know the percentage, to answer your question directly.  But that continues to have contractual price-parity provisions, again.

THE COURT:  Okay.  Thank you.

MR. MERBER:  So in showing monopoly power, there's, typically, two ways of doing this:  One in indirect evidence, and what that means is market structure; and the other is direct evidence, in which you're looking for someone who has actually exercised monopoly power in a way you could see.

So I'll start with the indirect evidence.

Indirect evidence of monopoly power looks like high market shares of a relevant market with barriers to entry.  And why do economists care about that?  They care because if you have a market and the shares are distorted such that one firm's shares are much higher than the other, that's telling you that customers within that market aren't substituting that much from the larger company to the others.  And as we talked about, the less customers are willing to substitute, the more power you have.  And so high market shares are informative of power.

Now, we'll get to the barriers-to-entry part as well, but the reason you care -- we'll get to the barriers-to-entry part in just a little bit.

THE COURT:  So is it your position that no matter how the relevant markets are defined, the definition is within a range such that Amazon is exercising monopoly power?

MR. MERBER:  Yes.

THE COURT:  Okay.

MR. MERBER:  That's correct, yes, that's correct.

So a couple components there:  A high share of a relevant market.  In order to assess whether that's true, you need to define a market, and you need to know what that market is.  So for that to work, we need to understand what a market is and what economists are looking for when they define a market.

So a market is an area of effective competition, and what I mean by that is that a market is a group of firms selling some product or service where the threat of substitution from one to another is driving real-world outcomes that benefit their customers.

And when that's true, when the competition among a group is driving real-world outcomes that benefit their customers like that, then that is a market that's, effectively, protected by the antitrust laws and where we can start to worry about whether it might be monopolized, because if it is, those real-world benefits are going to go away or diminish, and so that's -- that's what we're looking for.

And so why do we do this?  Well, one is so that we can identify shares and use that to help us assess a firm's power.  And we want to make sure that, when we do it, we're focused on, number one, an area where competitive concerns could actually arise.  So if competition among a group was not effective,

didn't drive real-world outcomes, we wouldn't be worried about monopolizing whatever that was, because it wouldn't hurt anybody.

But where competition is driving real-world outcomes, if someone monopolized that group of products or services, it would hurt people and lead to real-world harms.

So there's a couple of things.  I already touched on -- I think we touched on these a little bit already.  Number one, the sports car analogy from our filing.  A product can compete in more than one market at the same time, and that's because the competition within one group could be effective, on some dimensions or to some extent, in a way that matters to customers and is affecting real-world outcomes.  But they might also have some competition with other products or services that are also driving real-world outcomes.

And what we care about when we define a market is not including everything -- and this is what the *Kroger* decision that we cited was saying -- we don't have to have included all of them; we have to have included a group that matters, because, again, if someone monopolizes that group, we're going to see harms in the real world, and so that's what we're worried about.

To your earlier point, precise metes and bounds are not required.  This is something courts have said a lot of times.  I didn't invent that phrasing.  And this goes to the point you were just saying.  Are we alleging that whatever the precise

boundaries are of the superstore market, are we alleging that Amazon has power?  Correct.

It's not necessarily -- in many cases, any case where there is a premium segment and, say, a budget segment, and maybe even a segment in between, it can be difficult to draw the line exactly where a premium segment starts and the middle segment stops, where the budget segment starts and the middle segment stops.  It could be hard to draw the line, but that doesn't mean there aren't meaningful differences in competition, particularly between budget and premium, that courts are interested in understanding and economists are interested in understanding. And so you don't have to -- the fact that the line is hard to place, precisely, doesn't mean you can't have a market there.

And the last legal point I'll mention is, as the Ninth Circuit has recently reiterated, there's no one methodology that economists have to use when they're defining markets.  Again, we're trying to be pragmatic and understand -- recognize real competition.  And so whatever sorts of evidence probative of that is what economists are going to look at in a particular case.  They don't have to use one particular method.

So when economists are actually defining markets, they generally do a few things that I've mentioned here.  This is not a checklist, but it's -- you know, they tend to look at a few things.

Number one, they think about the product or service that's

at issue that they think might have been subject to anticompetitive conduct, and then they start to look for what are reasonable substitutes for that, what are some things that might be constraining that firm's exercise of market or monopoly power so I can start figuring out what substitution matters, what are the key dimensions of competition that are driving decisions in this particular space.

And when they do it -- again, focusing on the definition of competition around trying to win business -- they ask, What are the customers' alternatives?  So they're focused on customers' ability to switch to somebody else if you do something they don't like, if you raised your price, if you make your product worse.  So that's call "demand substitution," and that's what the economists focus on when they're defining markets.

The other thing that can happen, of course, is supply substitution.  Businesses might change their strategy, they might enter a market, they might adjust what they sell.  If they see some exercising of monopoly power, we'll be analyzing that in terms of their expansion, and not at this initial phase of defining what a market is.  So it's relevant to what we're doing, but it doesn't come into the analysis yet.

And, at that point, they start to assess whether -- having identified some reasonable substitutes that seem particularly important for the conduct they're analyzing and seeing how much they're constraining the product or service of one firm, that's

when they start to assess, Okay, well, is this competition important?  Does it drive outcomes, and if it went away, would there be harm to consumers or customers in this market?

Again, any kind of customers in whatever market we're talking about is the protected group, or even suppliers, because you can also have monopsony.  We're not getting into that here.

And then they look at barriers to entry, because, again, what I just mentioned, other business might change their approach.  But they don't -- they use that to make sure that the market shares they calculate in the market that they've defined are meaningful and likely to stick around, and not to define a market in the first place.

THE COURT:  How do you define substitutes or reasonable substitutes for Amazon here?  Is it analyzed from a level of generality?  Like, for the average shopper, Walmart might be a reasonable substitute, or is it more you look at somebody who's looking for a pair of shoes, and then there's Zappos and some other, you know -- how do you analyze it?

MR. MERBER:  Sure.  So -- and we already talked about the cellophane fallacy, so maybe I'll skip ahead here.

So what we're really focused on is the competition to build a long-term relationship with a customer and become their go-to or default store.

And that is a service that Amazon is providing, and we think that service matters and drives outcomes to create an

online superstore market.  We think that's something customers care about.  They value having a very meaningful shopping experience, where their information is saved, their preferences are already baked into what they're being shown, and it's easy to make a purchase quickly.  And we think -- and so they can go to that place whenever they want to buy just about anything.

And we think that competition to achieve that status as the go-to store for a customer, a shopper, is important and meaningful, and that's the competition that we think is being harmed most directly by the conduct that we've challenged.

And so an analogy here is, in a physical retail space, one-stop shops, so something like a supermarket, brings together a wide variety of different products, they sell lots and lots of different things, some of those things are sold at stores that are not supermarkets.

But lots of courts and lots of economists have recognized that supermarkets compete with each other to draw you into the store in the first place, and having drawn you into the store, you're going to buy a whole bunch of different products.

And so that store-level competition matters, and it's important and drives some real-world outcomes that are worth protecting under the antitrust laws.

So the *Kroger* case, once again, that's exactly what happened; the *Whole Foods* case I just mentioned; those are all cases where courts and economists have all recognized

store-level competition, where you are competing to be a store.

It's not the same as a one-stop shop, exactly, because in the online space, the convenience that you're trying to establish is not that you saved them time by not having to go to a bunch of different stores and physically travel, but you saved them time by having their information, having the relationship with them, allowing them to reorder things, a whole variety of different services that make them want to go to your store whenever they want to buy just about anything, because that's, generally, where they're going to end up buying whatever they were looking for.

So this is not to say that there's no such thing as a market for, let's say, televisions or shoes or whatever.  It's just that that's competition between people that are making and selling those products where it's most significant; whereas, here, we're talking about store-level competition, where Amazon is competing to be the place you start your shopping journey, and that's what we're talking about, and we think that matters, and that's why we think the online superstore market is the right way to look at it.

I did skip a couple of things that I'll just mention quickly.

One is, when we are defining -- I had said courts don't require any particular methodology in defining markets.  There's a bunch of different ways that courts and economists have gone

about this.  They look at qualitative evidence.  A lot of those types are described in cases as the *Brown Shoe* indicia.

THE COURT:  In Amazon's briefing, they're sort of dismissive of anecdotal evidence.  Is this what they're talking about?

MR. MERBER:  It might be.  I'm not totally sure.

So in Amazon's briefing, when they talk about cherry-picked anecdotes and unrepresentative sellers -- there's a lot of adjectives in there -- if what they mean is that the court shouldn't rely on unreliable evidence, then, of course, we agree.  If what they mean is you have to have detailed data on every store in the country before you can do any kind of analysis, and it has to be a statistical analysis before you can have any kind of probative evidence, then we disagree with that.

Courts and economists often rely on qualitative evidence. That can be things like the fact that there are industry reports analyzing a particular group of sellers, that's industry recognition; the fact that Amazon analyzes a particular group of stores in a different way than they think about the others.

Again, what we're trying to figure out is, do they compete? Are they making decisions to try and win business, based on these other stores?  If they are, that's telling you that it's driving, again, real-world market outcomes that matter for customers, and if that competition went away, we would have harms to those customers.

So insofar as they're saying that only statistical evidence is probative, we disagree.  If they're saying that, again, in the more general sense of cherry-picked things and if that's what was doing the work, then, sure, we don't disagree with that.

The second type of evidence, or a common methodology, it's a framework that can be done qualitatively or quantitatively for a monopolist test.  And this is a test that grew out of merger analysis, and so one of the things, when you're using it, you have to keep in mind it's the cellophane fallacy, because what it does, as typically applied, is it asks, okay, here's a product or service that's sold by a bunch of firms.  What happens if only one of them is now selling it?

It's the exact same example I gave you with cars in the cellophane fallacy.  And if the answer is they would raise prices or they would do something equivalently bad for customers, then we've identified an area of effective competition that we want to protect under the antitrust laws, because it's going to hurt people if it goes away.

And, again -- and I'll just note, what they're typically looking for is the ability to raise prices by five percent if this competition went away.  So they're not looking for infinite ability to raise prices.  They're looking for a small but significant ability to raise prices.

THE COURT:  There's an acronym, right?

MR. MERBER:  There is.  It varies depending on the indicia of the merger guidelines you're looking at, but, in most of the cases, it's a SSNIP, small but significant increase in price.  The most recent version also points out there could be a change in other terms that aren't price:  Quality, degradation, et cetera.

And the reason you're looking for that, as opposed to infinite power, is because we don't need infinite power for a consumer to end up harmed if this competition is lost.  So economists usually are looking for five-percent price increases as a cutoff for, Here's an effective area of competition.

And part of the reason I want to emphasize that is, there's another thing Amazon brings up in its papers, where they talk about how Amazon is making investments and continues to make investments.

I think what both the five-percent cutoff in the typical hypothetical monopolist test and the cellophane fallacy discussion illustrate is that, even after you've exercised monopoly power, you're still going to face some constraints and you're still going to have some reason to invest and innovate and do things that are helpful for your customers.  Because, eventually, as you keep raising prices, your customers will start to melt away and find alternatives.  It's just that that decision point and how strong your incentive is to do those things gets weaker.  It doesn't go to zero.

So there's some implication that if Amazon does any work at all to improve its products from here on out, that's proof that they don't have monopoly power, and that's not right.  So that's just one thing I want to mention there.

And the last -- just going back to evidence for market definition, the last piece that I want to emphasize is, that direct evidence of monopoly power, that's -- you know, just backing up for a second -- that's what we're trying to figure out here.  The reason we were defining markets and analyzing shares was to assess monopoly power.

So why am I talking about the direct evidence?  Because this is, essentially, the hypothetical monopolist test run in the real world.

So a hypothetical monopolist test, you say, What if one firm sold these products, when, in reality, a bunch of them do, would they be able to raise prices?

Direct evidence of power is not what if, it's something we've actually observed.  One firm does control whatever it is they sell and they did raise prices and they were successful.  There was not enough substitution for customers to move away from them.  So that's telling you that the thing they're selling is an important area of competition, and terms would be better if they faced closer competition within that particular product or service.

Customers care about it enough to stick around when they

raised their prices.  So it's an area of effective competition. If there were more competition, it would be effective, because customers care about this a lot.

So we already talked about the superstore market.  I'll briefly mention the second market we've alleged, which is the online services market.  And, here, the key service is providing sellers access to shoppers.  That's the main -- there's other things we discuss in the complaint, but that's the primary aspect of this.

Now, I mentioned that we were going to come back to barriers to entry, eventually, and here we are.

Barriers to entry are helping us answer the question, Are these market shares meaningful?  If they actually tried to exercise monopoly power and raise their prices, would their share collapse, or do they actually have the power that their share implied?

And the way you would answer that question is, would everybody else that's currently in the market or new firms entering the market be able to win all that business away from them if they tried to raise prices?  Effectively, would there be a growth in competition from other places that defeated that. And anything that prevents those firms from coming in is a barrier to entry or expansion, and it's going to help you answer that question and determine if the shares actually matters.

So in the two markets we've alleged, the online marketplace

services and the online superstore markets, we've alleged that scale and network effects are barriers to entry.  You can't compete as effectively until you reach scale, which is hard to get at the beginning, and you often need to take advantage of network effects to get the scale you need.

And we're going to talk about that more in just a second, because Amazon's challenged conduct is, actually, targeted at this.  It's targeted at preventing rivals from getting the scale and getting the network effects started that they need to be effective competitors to Amazon, and so we'll talk about that further as we get to the conduct.

THE COURT:  I have a question.

MR. MERBER:  Sure.  Absolutely.

THE COURT:  Am I correct in understanding that, in the online marketplace services market, the consumer who you are claiming is harmed is not the shopper for products on Amazon, but it is the person who is trying to have their products sold on Amazon?

MR. MERBER:  That's correct, most directly.  We do, actually, think that because these markets are interrelated, it, ultimately, translates into harm to shoppers as well.  But the most direct harm -- and the consumer, in the example you're talking about there, is the seller who doesn't have options of where else to go to sell their products, and so the service they're purchasing becomes more expensive.

THE COURT:  You are probably aware of the *Hogan v. Amazon* case that was just argued at the Ninth Circuit yesterday. You might want to keep an eye on that.

MR. MERBER:  Okay.

So the last thing, we touched on this a little bit in monopoly power, the last topic is direct evidence.  And this is where a firm has actually successfully raised prices or degraded quality, and that, like I said, takes the hypothetical monopolist test and makes it real.  And so that is evidence that helps you to understand what the market is.  It also helps you see the thing that we're concerned about, under Section 2, monopoly power, actually exists, because they have done something that you couldn't do without monopoly power.

So with that, I want to switch -- and mindful of my time, I want to switch to anticompetitive conduct.

So the definition of anticompetitive conduct, which, again, I'm taking from the Ninth Circuit case you quoted in the decision on the motion to dismiss.  It's a little bit long. It's acts that tend to impair new opportunities of rivals and do not further the competition on the merits, or do so in an unnecessarily restrictive way.

And so, often, the first question you get about that definition is, why does it keep going after "tend to impair the opportunities of rivals"?  And the reason there's more to the definition is because competition itself also impairs the

opportunities of your rivals.  If I lower my prices, it's harder for them to win sales because my prices got better.

And so really what economists are trying to distinguish when they identify anticompetitive conduct is conduct that's making my competitors' products worse, harder to access, more expensive, whatever the case may be.  It's making the overall choice set worse rather than making the overall choice set better for the customers.  So that's what we're trying to distinguish.

And the last piece of it is the "unnecessarily restrictive way."  If a firm does something that partially improves their product but unnecessarily impedes their rivals' opportunities at the same time, they could have improved their product without that impediment, then we can focus on the impediment on its own, because it wasn't actually tied that closely to the benefits that they were talking about.

So, here, as you know, we're challenging a course of conduct that's targeting Amazon's rivals' or potential rivals' ability to gain scale, and we'll talk about exactly why scales are important.

There's one thing I want to mention -- this is another place where Amazon's papers say something that I just want to address.

What the Ninth Circuit said is that the combined impact of an overall course of conduct needs to be looked at holistically

and not broken out into individual pieces and assessed separately, and Amazon's brief talks about individual components.

So it's a little bit ambiguous in what sense Amazon means that in their papers, but there's two components:  One is, when you're deciding what is part of an anticompetitive course of conduct, it's true that the individual components have to be anticompetitive rather than competition on the merits.

But the second component to this is, we're trying to understand, did this have a reasonable possibility of substantially contributing to their monopoly power, and, essentially, having been anticompetitive, did it actually change anything or was it de minimis effect on competition, even though it was a negative de minimis effect.

And so when you're -- so they're sort of right in the sense that we're not challenging conduct that we think was competition on the merits, but, on the other hand, we think it is important to keep in mind, when you're assessing the overall impact on these markets, how all of these different elements of conduct work together to increase the magnitude of the anticompetitive effect, the effect on competition.

So scale is really important in online retail, and that's important because that's what we say Amazon's overall course of conduct is targeting.  Their founder has -- has said that.  You know, economies of scale is a well-understood thing, where your

average costs go down as you have larger operations.

And some of the key ways to gain scale are offering shoppers better prices, offering a better selection, and, in a marketplace context, offering sellers lower take rates or a larger shopper base.

And scale is helpful and different in the online retail space than it is physically for a couple of reasons that I'll highlight.

Number one, because you don't have a physical store, you don't run out of shelf space. You can carry a much deeper selection of products and a much broader selection of products, and that allows you, when you're reaping a very large customer base, to go even deeper into your selection, because products that a small percentage of customers are interested in, it still makes sense to carry if you're serving the entire United States but would just about never make sense to carry in any small, focused, geographic region because it will translate into almost no sales for you.

So it can change -- it opens up possibilities to really increase your breadth and depth, and those are critical to the superstore market that we're talking about, where you're competing to be the default, go-to store, because one of the things customers care about for a store like that is that they're going to find what they're looking for.

Now, again, these markets are related, and they're related

through something called "network effects," which is a relatively simple concept.  It's that, in any network, customers value more participation from others.

So, here, what I'm showing you on this slide is Walmart recognizing that in an internal presentation.  This is excerpted from the complaint.  And Walmart was recognizing that, as they added sellers, they could increase their assortment, or selection, and as they did that, they would add shoppers, the shoppers would find what they wanted more often and would buy more stuff, which would also, again, attract more sellers, and this would kick off a feedback loop -- that's the loop we're showing here -- where adding sellers attracts more shoppers, which attracts more sellers and kicks off the cycle of growth.

And this is what we're saying Amazon's conduct was targeting and is impeding both sides of the cycle, making it harder to attract sellers and harder to attract shoppers so that this growth cycle -- Amazon tends to refer it to as a "flywheel" -- this feedback loop couldn't get started for potential or actual competitors in these markets.

THE COURT:  What's your response to -- I think it's footnote 8 in Amazon's brief.  They talk about network effects and include brick-and-mortar retailers there, and brick-and-mortar retailers is mentioned more than once in their briefing.

What's your response to that, the inclusion of those

retailers?

MR. MERBER:  I think we've been talking mostly about the scale and network effects making it hard for other online retailers to offer the same sorts of breadth and depth of selection and attract sellers in the same way.

In terms of brick and mortar, you know, for some of these reasons, they aren't offering a comparable service.  In particular, what I was just referring to a couple of slides ago, online, you can carry a much broader selection and a much deeper selection of products than any physical store can do, because they're constrained by the physicality of the store, the number of shelves, the amount of walking customers are going to do inside, and you don't face those constraints as an online store.

And so you're competing to be somebody's go-to store for whatever they want.  Brick-and-mortar stores can't compete in the same way on selection for some of those things.

THE COURT:  And I haven't read the Hovenkamp article yet.  Maybe you have.

MR. MERBER:  Yes, I have looked at it, briefly.

THE COURT:  They have this quote in there saying, "Customers seeking to outfit a kitchen can readily buy the toaster from Amazon, the oven from Target.com, and the microwave from a brick-and-mortar department store," then the quote ends, and they say, "which indicates the relevant market is broader than asserted by plaintiffs."

Is that quote taken out of context, or is that what Hovenkamp is actually indicating?

MR. MERBER:  I believe that is what Hovenkamp is indicating.  I just disagree with Hovenkamp there.

Again, I'll go back to the super- -- sorry -- the supermarkets example.

Courts and economists often recognize that products -- that there can be store-level competition at the same time that there's product-by-product competition.

So what Hovenkamp is really emphasizing there is that there is a market for, let's say, toasters, and that's true, there can be a market for toasters.  It's just not the market we're talking about.

We're talking about the market where large stores with a broad breadth and depth of selection are competing to be somebody's default, go-to store for a lot of products.  And both of those can exist at the same time, and that's just not the one we're talking about here, is, essentially, the issue.

Again, this is why courts have defined markets around supermarkets, even though lots of products that you buy in a supermarket are available at lots of other kinds of stores.

So I'll take 46.

THE COURT:  You have 90 minutes.

MR. MERBER:  I apologize.  I have more time than I realized.  Okay.  Great.

So when economists are assessing anticompetitive conduct in general, they do a few things. So, first, they're looking at the context. What is happening here? What are the incentives and ability to compete. Are there companies that are offering some sort of arguably reasonable substitutes here?

And then what they try to do is understand how the conduct at issue affects the incentive and ability of those firms to engage in competition.

So if something changes their incentive so they don't have an incentive to compete, or changes their ability to compete because it's now become more expensive to improve their products, that's going to have negative effects on competition. And that's what economists are trying to figure out is, did the conduct that they're analyzing have those kinds of effects on rivals?

And one of the things that they might look at to help understand that is looking at how the market has actually changed on some outcomes that they think are tied to that competitive process, like price or quality or output or something like that. So that's, essentially, what they're looking for.

And here, we've challenged a couple of things, and I'll talk about how this applies.

So first is Amazon's antidiscounting tactics. And we've talked about how their store has sort of a hybrid model between

traditional retail and third-party marketplace sales.  First I'll talk about the third-party sellers.  And we mentioned this briefly already, so I won't belabor it.

But Amazon has used a variety of different contract terms and algorithmic approaches to punish its sellers for offering discounts elsewhere that -- particularly as its take rate goes up and increases their costs, which, generally, will increase their prices -- allows them to be in a situation where they could raise take rates without seeing price differential.

THE COURT:  What's a take rate?

MR. MERBER:  Oh, I apologize.  A take rate is the overall sum total of the fees that Amazon charges to sellers in the marketplace services market.

So they break out their fees into a variety of different categories, but what really matters when you're trying to access customers is what's the total amount it costs you to access those customers effectively.  So overall, the, essentially, all-in price is what I'm referring to when I say "take rate."

So as that take rate, the total price charged to sellers, is going up, price-parity clauses prevent that from turning into retail shopper-facing price differential between Amazon's store and other stores that have marketplaces.

And courts have addressed these, at least, a couple of times.  By "these," I mean price-parity clauses and an algorithm that has the same economic effect as a contract clause.  An

economist doesn't care if it's achieved by algorithm or contract. They just care what incentives it creates for these sellers. And so, here, it eliminates the incentive to lower prices elsewhere, so it blocks price competition there.

Then, second, we have the first-party side of Amazon's business, where what we're challenging is Amazon's practice of price mirroring, which they designed as, essentially, a training program for rival sellers -- or, sorry -- rival superstores.

And they designed it using an economic concept, actually, called "gain theory," and the goal in designing it, as we cited in the complaint, is to avoid a perfectly competitive market and make sure prices actually go up, market-wide prices go up.

And so the way this works, if you're following -- we go back to our definition of competition, trying to win business by competing on various dimensions, like lowering prices.

Well, the reason that you're incentivized to lower your prices is that you might win some more business if you lower prices, and that's what we're looking for out of competition. So your typical choice is, do I lower my prices and gain some market share, or do I raise my prices and gain some margin at the expense of some market share, and you have to make that decision.

Now, the reason gain theory comes into this, gain theory is how economists study strategic interactions, and by "strategic," what I mean is, I have to choose my price, and whether that wins

me business or not depends on what other people do as well.  And so I can -- I can understand I have to make a strategic choice.

And in this case, what Amazon's program was designed to do was to break the link between competing on price and gaining or losing market share, gaining or losing margin.

So if Amazon copies my price no matter what I do, my choice set looks different.  I can either choose the same market share at higher margins or that same market share at lower margins, and once I understand that that's my choice set, the answer is pretty simple.

And this is, you know, what we allege happened, in part, combined with the third-party approach that we talked about on the last slide with, for example, *Jet*, is that they went from attempting to lead on price and gain scale and build business by offering better prices, to, instead, canceling that approach because they realized that, with Amazon's practices in place, that wasn't feasible, and, instead, copied prices themselves.

So the last component of Amazon's overall course of conduct is fulfillment coercion, and this is related to how Amazon makes it much more difficult to reach sellers -- sorry -- for sellers to reach shoppers if they don't use Amazon's fulfillment services.

So fulfillment services are storing products, picking those products out when someone orders it, putting it in a package, and sending it off to be delivered.  And Amazon offers that

service to third-party sellers and does it for its own products as well. And for the third-party sellers, if they don't use that service, they can't -- they can almost never be Prime eligible. And Prime eligibility, which we talked about before, ties in to their popular Prime subscription and drives a lot of sales.

And so what's that doing? You recall, the reason you use online marketplace services -- the reason the seller buys those services in the first place is to get access to customers, and it doesn't work very well if they don't have Prime eligibility, so many of them work really hard to have Prime eligibility, including by signing up for Amazon's fulfillment services.

And the reason this has an effect that we're concerned about is that this does a couple of things: Number one, it makes it harder for those third-party sellers to multi-home, and by "multi-home," what I mean is sell on another site as well.

So if Walmart's marketplace is another place they can sell, they now, to sell there, have to use two fulfillment providers instead of just one, because Amazon's fulfillment service doesn't work well for Walmart. And so since you have to use two, that raises your costs of serving Walmart, even if you would have preferred to use a store-neutral fulfillment provider, and it makes it harder for Walmart, or whoever, to recruit sellers to their marketplace.

And the second issue that this creates is it prevents the

growth of an ecosystem that would serve multiple stores and not care about where the order came from, Amazon versus somebody else.

And the reason we highlight those things is because this is what Amazon was worried about.

So at one point, Amazon had considered getting rid of this requirement, at least in part, with a program called Seller Fulfilled Prime, and as part of that program -- the reason they considered getting rid of it is they thought more products would be available to Prime as Prime eligible for our Prime subscribers, which would make our product better.  We might want to relax this requirement so that our product improves for our customers, our shoppers, and also makes our sellers happy, so both markets, it provides some advantages.

So they thought about this, and then as they looked at what's happening, they were concerned, as we described in our complaint, that it was going to create this ecosystem and reduce entry barriers for rival stores, and so, instead, they shut down the program rather than continuing to reap these benefits to their own products that would have also allowed a third-party ecosystem to grow that would also be beneficial to other stores.

So, again, we took that --

THE COURT:  Is there a good analogy to that in other cases?

MR. MERBER:  A good analogy to that in other cases?

That's an excellent question.  I don't have a case -- a specific case in mind with very similar facts.

I think the general concern that impeding a rival's access to an important source of supply can be a form of anticompetitive conduct is recognized in lots of cases.  And that's, effectively, what's happening here.

I think, in this case, the third-party sellers are a key component to having a successful marketplace and turning that into an effective superstore, and making it harder for them to access services is making it more challenging for those rivals to grow.

And so I think the closest analogy is the sorts of things where you're cutting off a supply -- you're cutting off or weakening access to an important supply or input for your competitor.

So I'd have to think harder to remember a case that's addressing that topic more directly, but that's what I think is happening.

It's something that comes up, for example, in vertical mergers, actually.  Using a merger to cut off your competitors' access to an important supply input is something that comes up in those sorts of mergers, and in cases we dealt with those, and I think this is similar, but, obviously, not the merger.

So together, the antidiscounting or the fulfillment coercion are the course of conduct that we're challenging.

And we talked at the beginning about some key components of competition in online retail, and those were price, selection, and convenience.  And, here, the course of conduct is targeting, very directly, price and selection, and it's really cutting off the ability of, as I said, actual or potential rivals to gaining the scale they need to really become effective competitors in both of these marketplaces:  In the online superstore market, to having enough breadth and depth of selection to become a realistic alternative as someone's go-to or default store, and in the online marketplace services market, making it harder for someone to have the kind of enormous customer base that's really going to attract huge numbers of sellers.

And I think that was everything I wanted to cover.  I did manage to take fewer than 90 minutes, although if you have additional questions, I am, of course, happy to answer.

THE COURT:  I have a general, big-picture question.

Let's just assume, for sake of argument, that there are millions of Amazon shoppers out there who would candidly say that they're happy with Amazon, they feel like they get great selection, they feel like they get reasonable prices.  They feel like it's a very convenient way to shop.  The product shows up sometimes, like the next day or the same day.

Are you saying that those consumers are sort of like the proverbial frogs in the water that's slowly getting warmer and warmer, and they're not really sensing the incremental price

increases, the incremental reduction in the quality of selection?

MR. MERBER:  Yes, I think that's exactly right.

So customers in any market, when they decide whether they think they're getting a good deal from somebody, what they're doing is they're comparing it to alternatives that currently exist.  And if the alternatives that currently exist are worse than they would have been without the conduct, then the customers, when they make that comparison, essentially, as you say, don't know what they're missing.

So, yes, I think that's exactly right.

And, again, when we talk about monopoly power, it's not infinite.  In the cellophane fallacy example I used with cars and motorcycles, eventually they found something else to substitute to, and it was a constraint on the further exercise of monopoly power, but that just didn't address the fact that all the competition within the car market had been lost, and all of the benefits that came with that competition had been lost.

So if you are focused on the remaining competition, which is always going to exist because there's always going to be some new substitute once you've exercised enough power, then focusing on that is sort of missing the benefits that could have existed without the conduct.

THE COURT:  Thank you.

It's about 10:28 right now.  We're going to take a break,

and then we'll turn to the defendant's presentation.

I'd like both sides to think about whether they'd like additional opportunity to address the court after both of those presentations.

We'll be in recess.

(Court in recess 10:29 a.m. to 10:45 a.m.)

THE COURT:  All right.  Mr. Schmidtlein, you have until 12:15, but you don't have to take all that time if you don't need it.

MR. SCHMIDTLEIN:  Thank you, Your Honor.  May I approach?

THE COURT:  Yes.

MR. SCHMIDTLEIN:  Thank you very much, Your Honor, for making the time and allowing both parties the opportunity to talk with you this morning.  It's very, very helpful to us, as we're at this stage in the case, to have this opportunity to interact before the experts have finished all their work, which I think they're working on reports and all the other things that come later in the case.  So we're very, very grateful to have this opportunity.  I think I can speak for both parties on that.

Today, I'm going to try to run through a variety of the topics.  These are now familiar, and I'm going to try to -- to the extent, you know, we've covered some of this ground this morning.  My colleague has gone through some of these same things.  I'm going to try to hit on some points that I directly

want to respond to; also try to maybe amplify some of the points that weren't covered so that I'm, hopefully, not making this overly duplicative for Your Honor and to make this more useful for you.

Because I think a lot of the economic concepts that we're talking about here are relevant to, obviously, the legal framework and questions overlap, I thought I would just start, very briefly, there, and then try to get into Topics 1 through 11, and then give you some background and some flavor, I think, of what we know is being done and sort of what may come. Kind of a, you know, coming attractions, if you will, as to what the types of economic issues we think you're going to have to grapple with later in the case.

The framework, I think as Mr. Merber set forth here, we're principally talking about Section 2 of the Sherman Act, and it's the plaintiffs' burden to prove monopoly power in a properly defined market, exclusionary conduct, which is not competition on the merits but something that actually excludes and harms the competitive process. And then they also have to show that the challenged conduct caused substantial anticompetitive effects. This is what I think the case law typically refers to as plaintiffs' prima facie burden. And if they meet that burden, then it shifts to Amazon to be able to show pro-competitive benefits associated with the challenged conduct. If Amazon does that, then it shifts back to the plaintiffs, and they have to

engage in some methods of trying to rebut the pro-competitive benefits that Amazon has set forth.

THE COURT:  Asking whether the pro-competitive benefits could have been achieved without the anticompetitive conduct?

MR. SCHMIDTLEIN:  That is one way -- this is certainly one of the inquiries that courts have looked at.  I think -- to preview a difference that Your Honor may have to grapple with, not today but down the road here, I think one of them is, what is that standard on that last point?  Again, if we get there. If we get there.  Respectfully, I expect our position is going to be they're not going to be able to meet their prima facie burden, but if they do and we get to this second part, we think the case law sets forth, as we've tried to summarize it here on this last bullet, they can rebut it, but only by showing substantially less-restrictive means that achieve the same benefits without significantly increasing costs.

We've cited some cases in our papers.  I think that is going to be, probably, a legal and maybe also a factual difference that we're going to have and we may present it to you at a different time.

I think the way the case is -- and the *Alston* Supreme Court case, I think is the one I'm thinking about most here -- this isn't a game of after the fact coming in and saying to Amazon, Oh, you know, you probably could have done this, roughly, the same, and it would have been a little less restrictive.  I mean, in other words, I don't think courts are well equipped -- and I think the law tries to get at this.

Courts are not well equipped to second-guess around the margins, second-guessing businesspeople, Oh, you really could

have tweaked it this way or that way.  They're really looking, as we said here, substantially less restrictive, achieve the same benefits without significantly increasing the costs.  But, again, I think that's something that's probably a coming attraction for you, potentially, later in the case.

Another issue we talked about, or I think it was touched on earlier, this question of, does the conduct kind of get rolled up together, or do you have break it out and try to assess each category of conduct individually?  And Mr. Merber, I think, said that certainly you do have to do that when assessing whether or not the conduct was competition on the merits as opposed to exclusionary conduct, and I agree with him on that.

I think where we may disagree -- and, again, I think this may be an issue that eventually lands with you -- is I think that the separate question of have there actually been anticompetitive effects?  In other words, if you find that -- I'll take just an example from the case.

You heard about conduct relating to Amazon's standard for brands, that policy.  If you were to analyze that policy and you were to conclude, looking at that policy on its own, that it did not generate the requisite substantial anticompetitive effects, assuming they've proved the relevant market and assuming they've proved monopoly power, because the anticompetitive effects come next, I think our position will be, then that category of conduct is out.  In other words, you'd be in a position to find,

whether at summary judgment or at trial, that that conduct was lawful.  You can't, to use the -- I think some of the cases, they sort of say zero plus zero plus zero does not equal one. So if that turns out to be a zero, you can't go there and say, Well, maybe it was a point two.  Now I'm going to look at the Prime badge, the fulfillment category of conduct, which is a separate category of conduct, and if I look at that and if I find that reaches the threshold, then I can then drag Amazon's standard for brands over the line with it.

So, again, I think that is a legal issue, but I think it's also going to translate into how you see and how you hear from the economists, because I think the economists are going to have to look at the conduct separately, and then perhaps some of the conduct the economists may try to posit economical arguments that might tie them together.  But, again, I think that sort of remains to be seen, but I do think this is an important issue that may come back to Your Honor, and I wanted to flag that for you here today.

As you've heard, there is, at least -- and, again, I've tried to simplify it for purposes of today -- things that we think --

THE COURT:  Just a quick question.  I see that you've cited this Ninth Circuit case from 1979.  Any cases newer than that that say anything differently in the Ninth Circuit?

MR. SCHMIDTLEIN:  I don't believe so, Your Honor.  I

don't believe so.  And, again, there are -- that are no recent cases.  The *EpiPen* case is probably -- the circuit court case, I think that has most recently really sort of addressed this in a very, very comprehensive fashion.

So we've got -- again, just for purposes of today, simplifying what we think of as standards for Amazon's store. These are some of the things you've heard about this morning. The selective competitor, Featured Offer, disqualification or SC-FOD, the Amazon standard for brands, things like that, I think things that the plaintiffs characterize as price parity types of conduct.  We've got first-party price matching, and then we've got the Prime badge eligibility.

I want to talk a little bit about, next, Amazon's store and some of the economic concepts that are relevant to the operation of the store and how Amazon competes, because I do think this provides some foundational aspects and context for how we're going to evaluate the actual conduct in the case.

So what are some of the economic concepts?  And I'm certainly not going to be exhaustive here, so please don't hold all our experts to just this list.  But some of them that I think you're probably going to hear about are the notion of maximizing consumer welfare, product innovation, how does that fit into the conduct that we're talking about, what we refer to as the free-rider problem, and then, again, how standards for seller conduct -- and economists -- and there's economic

literature around this idea of setting standards to try to align incentives to address free-rider problems.

THE COURT:  And you may have recalled my first question to counsel in his presentation about harm to consumers --

MR. SCHMIDTLEIN:  Yes.

THE COURT:  -- and the last sentence in your brief. And sort of what I was getting at there was -- and I, by no means, am an antitrust law expert -- I had this understanding that something considered the Chicago School of Antitrust Law that focuses on harm to consumers and prices, focusing on prices.

And I was just wondering whether sort of that tension in academia permeates to this particular case.  And based on counsel's answer, it sounds like no, but if there is that tension here, please let me know.

MR. SCHMIDTLEIN:  I agree with Mr. Merber.  I don't think it does, because I believe that the courts have consistently, and the precedent today, does anchor on that consumer welfare standard.

You know, in other countries there's been some debates about should we adopt some different standard, but in our free market, competition-based-driven society and the economics that the Sherman Act were founded upon, I believe the case law is pretty uniformly consistent that consumer welfare really is the

north star, because -- and I do agree with my colleague here -- the competitive process, sort of promoting that competition on the merits, usually is the thing that will translate into consumer welfare.  And so when we focus on that and the consumer at the end of that process, that is typically going to allocate resources and make markets perform more competitively.

So I don't think there's a tension, for purposes of where we are in this case, but I appreciate the question.

So how do economists usually evaluate consumer welfare?  Again, I think you heard some of these this morning.  Price, quality and convenience, available selection.

Another one I do want to sort of emphasize, because I'm not sure it was flagged earlier this morning, is overall market output.

Economists, typically, when they are looking at how a market is performing, typically, where you see large or significant increases in overall output -- usually measured by sales, production, things like that -- that usually indicates that the market is functioning competitively.

Because, again -- and I've only got an undergraduate economics degree.  You're going to hear from people with much more advanced ones than that.

Normally, if you're going to impact price, you're going to have to restrict output.  That's normally -- those two are usually thought of by economists as very, very closely linked.

Because if a monopolist tries to raise price but they can't actually reduce output, that additional output, from either competitors, you know, others in the market, it's going to tend to bring that price down.

So I think you're going to hear -- I imagine, in this case, you're going to hear about both of those.

THE COURT:  Can you illustrate that concept in terms of this particular case?

MR. SCHMIDTLEIN:  So, yes, in a sense of -- and I'm going to try to graphically, if I can pull it off here, illustrate it through some of the slides.

A lot of the issues in this case -- and let me see if I can push forward here.

So a lot of the issues in this case, Your Honor, relate to standards, sort of almost like store policies that Amazon has with respect to third-party sellers.

Let me just sort of diverge a little bit here on Amazon.

And product innovation -- product innovation, I think, is something you're going to hear a lot about as well, because Amazon has historically innovated, and some of those innovations have substantially, I think, increased market-wide output.

And one of the big ones was, it saves -- you know, and it was a long time ago, so people have forgotten that Amazon, actually, originally was a store that only was what you called a first-party retailer; in other words, Amazon went out, they

bought products for wholesale, originally mostly books, they bought those, they put them in their store, then Amazon owned the books, Amazon set the price, and then Amazon shipped.  In other words, Amazon controlled the entire experience because it was Amazon's products that they were reselling, typically.

Amazon took a big step back in 1999 and did something very, very innovative, which was it opened its store.  It said, Well, we're going to continue to sell first-party products by Amazon, but we're also going to open it, and we're going to allow third parties access and the benefits of the Amazon store.

That, we believe, is -- eventually, the economists are going to look at how did that impact overall output.  How did that impact consumers' ability to get the access to products, sellers' ability to get their products to market?

And, again, I think the economists are going to have to evaluate whether that was an output-enhancing innovation and something that also enhanced price competition.

One of the things that that -- although that created what is frequently called the free-rider problem, what economists refer to.

Here we've tried to depict a little bit of how that problem arose.  So here you have an example, on the left, of a third party's product.  It is a Yeti Rambler.  On the right, you have a Lego set.  The product on the right, that's a product that is actually an Amazon first-party product.  The product on the left

is a third-party product.

But the consumer experience that Amazon is trying to create in the store is identical for both, so that when the consumer sort of sees these products in the store, they're not necessarily, like, locked in on, Oh, is this an Amazon first-party product or is it a Yeti third-party product?  They just know they're shopping on Amazon's store.  And over time -- obviously, Amazon, again, we submit, worked very hard to build up a reputation, a standard for its products and everything else that not only Amazon benefits from but the third party benefits from.

The free-rider problem comes into place where these third-party sellers, they benefit from that seamless shopping experience.  But if they, actually, don't deliver, if they behave in a way in the store that's actually bad for the consumers, that can come back and harm Amazon, both, sort of more generally, the brand of the store, it will hurt Amazon's first-party sales, and also could potentially harm other third parties, because now if the seller has a bad experience with that third-party product, it can harm everyone else.

And what might be some of those things sellers might try to do to a free-rider?  Well, they might try to offer, like, significantly higher prices on Amazon than they're offering elsewhere.

Even price gouging, you know, during certain times -- the

pandemic, we're probably all familiar with instances where there was alleged price gouging in a variety of markets by different sellers.

They can engage in sort of misleading advertising or marketing.  They can overpromise in terms of product availability.  There's nothing worse than going onto any website, finding the product you want, you go to checkout, and you find out it's out of stock.  That's a bad customer experience.  If it occurs over time, it tarnishes the brand of the overall store.  Even though, you know, it might not hurt that seller that much, it hurts the store.  And then, obviously, there's issues about customer satisfaction and false reviews and delivery.  All these are part of the customer experience.  And so I think you're going to hear about that free-rider problem from the economists in the case.

And then you're also going to hear about how -- and I think there is literature at a high level around this, and it depends on different industries -- but there is notions of, well, how do we regulate, then, these free-rider issues?

THE COURT:  Why are we talking about the free-rider problem?  It doesn't seem like plaintiffs are taking issue with Amazon's standards for brands, or ASB.  Why is it relevant?

MR. SCHMIDTLEIN:  They are taking issue with several things; for example, they are taking issue with --

THE COURT:  Let me back up and rephrase that.

They're not taking issue with anything that Amazon does to protect the quality of the customer experience, as I understand it.  So --

MR. SCHMIDTLEIN:  I actually believe that they are, and let me give you a couple of examples:  First, they are very much directly taking issue with how Amazon operates what Amazon calls the "Featured Offer," and the market algorithm -- that is Amazon's innovation -- that results in how Amazon chooses what's going to be a Featured Offer.

And one of the aspects that they are challenging is Amazon's decision that, if your product is priced somewhere else higher, you can still sell in the store, but we're not going to feature you, you're not going to be the featured choice, to be the Featured Offer, if consumers can find that at one of our competitors, and Amazon looks at a lot of different competitors.

If consumers repeatedly become accustomed to finding the exact same product at higher [sic] prices elsewhere, that harms the Amazon store, that harms Amazon's brand, and it denigrates Amazon's featuring -- the Featured Offer is sort of Amazon's stamp of approval that we think this is a good product for you to purchase in our store.  And so that's one example.

I think there's also an aspect of their challenging on our standards of fulfillment, and we disagree with them, just factually, as to the accusations and the allegations around whether you need to use Fulfillment by Amazon, FBA, which is

Amazon's own fulfillment.

We disagree with their characterizations about third-party sellers' ability to get the Prime badge through other means. We actually have a program called SFP, Seller Fulfilled Prime, that they can get the badge from.

But they are challenging sort of the manner in which we've innovated and we choose and we select products for the Prime badge. And I'll talk a little bit more about that, Your Honor, but I think those are -- over time, the Prime badge is becoming a very, very important aspect of the Amazon brand and the Amazon customer experience.

Getting that reliable, fast, free-shipping experience is very integral to the Amazon brand, and, going back to your earlier question, I believe has been integral to expanding overall market output.

I think the economists are going to be looking at the question of have these innovations led consumers to actually buy more? And you're going to hear, I think, evidence, and probably economic analysis, around how have other competitors responded to Amazon's fulfillment practices?

I mean, I'm sure you can probably remember, it wasn't that long ago, it may seem like it, but that long ago when you went online and you shopped and you put your credit card in and you hit "buy," and you sort of, almost kind of blessed yourself or said a little prayer and hoped that the product would eventually

find its way to your house, and now, without even thinking, it just shows up.

And it's not just Amazon now that's doing that. We're seeing lots and lots of other retailers having to respond to that innovation by having to increase their ability to securely, safely, and at a high quality deliver their products.

So we do think that those aspects of overall brand and the experience are being challenged.

I hope that's responsive to your question, Your Honor.

THE COURT:  Thank you.

MR. SCHMIDTLEIN:  Again, going back to the standards for conduct, as I talked about earlier, Amazon sort of started off as a first-party-only retailer, and in this model, they can control the whole experience. But once you open it up to third parties', and you're selling both first parties' and third parties', you've now got the free-rider problem, and so you are going to have to impose some sort of standards on that.

Here, on this slide, Your Honor, this is the Featured Offer innovation that I was talking about just a moment ago. And the Featured Offer is the product of something -- it's called the Featured Market algorithm, where Amazon, because of the third-party sellers that are now able to sell on the store sign up and have their products available. There are scores and scores of products now available on the store. That, in and of itself -- as the plaintiffs suggest, that that is sort of the

defining advantage, but it actually comes with real challenges, too.

If you open up a search page on Amazon -- and there is just sort of a dizzying array of products for you -- you might actually not find that particularly helpful, particularly when they can all have different prices, different delivery terms, and all sorts of different other things that are hard to evaluate.

So one of Amazon's innovations is using algorithms, proprietary algorithms.  They evaluate each of the array of different products from different sellers.  They group them together to try to figure out which ones are the best, and it eventually results in what is called the Featured Offer innovation.

And here you can see -- again, this is just a mock -- the type of page you would get showing Amazon's Featured Offer.  And this is, again, algorithmically what they believe the user would be most satisfied with.  The user doesn't have to buy it.

THE COURT:  Is there any factual dispute regarding what these algorithms actually do?

MR. SCHMIDTLEIN:  That's a good question.  I don't think there is a dispute that the Featured Offer is designed by Amazon to try to deliver to the consumer what Amazon believes is the product that the consumer is going to be satisfied with.

They may not always get it right.  It's computer science.

It's not perfect.  And even humans, if they were doing it, wouldn't be perfect.  But this is what they are trying to do.

And they are -- and, again, as I mentioned earlier, Amazon's placing its sort of imprimatur on this feature, and consumers have, over time, they -- they like it.  This is actually one of the innovations that has actually helped Amazon compete more effectively.

Now, if a user looks at that and says, Well, I'm not sure about this, I'd like to see what the other offers are, they can click on the other sellers on Amazon's box here below, and then they can go and look in the store at all of the other seller offers for same or similar products.

Again, the fact that your product may not be the Featured Offer doesn't mean we've barred it from the store, which, Your Honor, may be what, back in the first-party days, happened.  You know, people would decide, Well, I'm only going to carry two or three of these types of products because, as counsel mentioned, there's only so much shelf space.  Here, Amazon actually gives you a wider array of products, but they're trying to organize them and help you sort through them in a way that Amazon believes is helpful to the consumer.

THE COURT:  So that filter button up there on the right, I'm assuming that is designed to help the consumer get an even smaller subset.

MR. SCHMIDTLEIN:  Correct, that's exactly right.  And

the consumer -- you know, if different consumers have different preferences and, you know, different likes, they can change the filter to say, Hey, I only want products priced in a certain range, or I only want certain delivery terms, things like that so that they can pick and choose a different selection of products if they have very specific demands that are important to them.  Because not all consumers are identical.

So the select competitor Featured Offer's qualification -- we just talked about this -- ensures that Amazon does not knowingly feature sellers in Featured Offers where the same product is sold by well-known competitors at a lower price.

So this, again, just to kind of -- this is a mocked-up example here.  If we have here -- you know, this -- this is to ensure that, in this instance -- here we've got Yeti, on the left side, on Amazon for $39.  It's available at Ace Hardware for $35.  So if Amazon determines this, because it is evaluating other pricing in the market, it won't say to the seller, You're out of Amazon, but what it will say is, "Your offer is not eligible to be the Featured Offer."  And Amazon will send a letter to the seller notifying them so that they have the ability to take action.

And if you look in the letter, it says -- it's towards the bottom there -- "If you'd like to restore Featured Offer eligibility, visit pricing help within the pricing section of Seller Central" -- those are web pages that are designed to help

sellers -- "to lower your price on Amazon."

The goal of this is not to tell people what they have to do off Amazon; it's to tell sellers, If you want to be eligible for the Featured Offer, you need to lower your price, and it tells them the price they need to lower it to.

THE COURT:  Can they also remedy it, though, by increasing the price elsewhere?

MR. SCHMIDTLEIN:  They can.  And I think one of the things is that, in terms of the economics of this case, Your Honor, you should expect, once all the data is produced in this case, to be able to evaluate, what -- what has the seller conduct actually been?  Has this resulted, in aggregate, higher prices, or is it actually resulting in lower prices?

And so I think one of the questions you asked earlier, the fact that there might be some sellers who respond to this by -- on a particular product, raising their price elsewhere, that doesn't tell you what's going on market-wide.  Because I feel fairly certain, although I've not studied the Yeti Rambler, specifically, I feel fairly confident opining that the Yeti Rambler does not have monopoly power.  And so you would need to evaluate, Oh, well, if this seller happened to decide to raise its price, what are the other products that are still available on Amazon?  In other words, what are the other Yeti Ramblers that are available on Amazon?  Is the practice here actually going to result in any real increase in market-wide prices for

these products?  Where else is the Yeti Rambler available, and at what other prices?

THE COURT:  Putting aside the question of whether Yeti is the Gucci of today's outdoor gear, you showed a letter here on slide 26.  Is Amazon going to be able to quantify how often these are sent, how big of an issue this is, or is this a cherry-picked letter?

MR. SCHMIDTLEIN:  No, no, I think this is the -- this is kind of the form letter, if you will.

And these absolutely do happen.  And I think you are going to -- and you should expect to see how prevalent this is and, again, whether this actually translates into market-wide effects on price, output, and other indicia that economists would look for when measuring anticompetitive effects.  You absolutely should expect the economists to be doing those sorts of analyses.

And we say "cherry-picked," not just find an example where somebody says, Oh, I got this letter and I decided not to lower my price on Amazon, I decided to raise my price somewhere else, that's not telling you what's going on market-wide, and it's not telling you whether there is actually an anticompetitive effect that would be cognizable under the antitrust laws.

You've heard a little bit about Amazon's standard for brands and customer experience.  Again, I'm not going to dwell on this.  I think we may have a dispute about how this program

works.  It's, typically, important brands that Amazon decides it's going to source as a first-party seller, and so it decides that for certain, really, really image-important brands that it wants to make sure it has a really, really good customer experience, they're going to take it in-house and make it a first-party brand.

Again, I think in the evaluating whether there's any impact on price here, you should expect the economists to come forward with real, live, market-wide evidence of what impact, if any, this is having on any relevant market.

The same is true of the first-party price matching.  You heard a little bit about that this morning as well.  There is a a rich economics literature around price matching, and I think you're going to hear from the economists on that.  It's obviously a very, very, very old practice, and, frankly, one that, to my knowledge, has never been found to be violative of the antitrust laws.

If a party lowers its price and somebody else decides to match that, unilateral pricing is lawful, even by a monopolist.

THE COURT:  And plaintiffs aren't saying that, just that in isolation, is problematic?

MR. SCHMIDTLEIN:  I think we have a dispute as to whether, effectively, what they're saying, because then you're getting into, Well, did you just mean to match it because that was the competitive price in the market?  Were you matching it

because you were trying to send them some signal?

I don't think courts are in a position to regulate that kind of behavior.  And I think you're going to hear from the economists around why unilateral pricing behavior, so long as it is non-predatory, is typically viewed as pro-competitive behavior, even when a party raises its price.

THE COURT:  How about when considered in the aggregate of other conduct?

So my understanding of plaintiffs' theory is that it's not just that.  That, in connection with other conduct of Amazon, is what is wielding the problem here.

MR. SCHMIDTLEIN:  I think this harkens back to the conversation early on about whether you can aggregate conduct or not.  I think you would have to see that somehow this behavior, in some ways, was so interconnected or intertwined that there was almost some synergistic effect between the two.  And, you know, obviously, respectfully, I submit you're not going to see that.  I don't think the economists are going to be able to make that connection, either.

But, again, I think this is -- this is really, in some ways, a bit of a distinct conduct, because it 's conduct that has, for -- you know, as long as the Sherman Act has been around, it's conduct that's been viewed as lawful conduct, not something that can be regulated, because now, otherwise, you're really in the business of saying, Well, if they've lowered their

price, you can't lower yours to match them, unless you're doing it for a good reason, if you're doing it temporarily.

I don't think, from an administrability standpoint, courts are in a position to be able to parse whether a price increase is a good thing or a bad thing, absent predatory pricing. But, again, this is something you'll hear more on, Your Honor.

And then we've got have the Prime badge eligibility. Again, I talked earlier about these are offers in the store that meet certain standards. The badge indicates to shoppers what they can expect about the product, delivery experience, and FBA is one of the ways, not the only way, but one of the ways that you can get the Prime badge and get that imprimatur, which, again, we think is really important.

On the Amazon detail pages, if something is Prime eligible, Amazon likes to call that out, and it will put there, to the customer, Here's what that Prime badge means in this context, free returns, free delivery, free delivery overnight, you know, here's when your order is going to be fulfilled. These are things that are very, very important to customers and have become very, very important to the Amazon brand.

I want to jump to relevant markets, Your Honor, and some of this my colleague covered with you, and so I'm going to try to cover it as well.

We do believe that defining the relevant market is an indispensable part of a monopolization claim. And I think one

issue you've already, probably, sussed out from our papers that there's going to be a disagreement about, sort of how important this direct evidence is and is relevant market something that is a soft requirement, something we can, you know, sort of kind of get to, and you can have multiple markets.  I think, not surprisingly, we have a very, very different view of that.

Defining the relevant market is critical, because without a properly defined relevant market, you can't really -- you can't really assess whether a firm has monopoly power; in other words, monopoly power only makes sense in the context of an actual market.

And so we think, you know -- again, I think you heard some of this already -- an economist will consider what consumers view as viable substitutes, competitor responses to either price increases or innovation.

You're also, I think, going to see here a lot of data.  The retail, unlike some other products or services where maybe there's not widespread availability of data, or the products are free, they're ad-driven products to the customer.  There's no actual price to the customer.

Here, we've got no shortage of data, and so looking at what happens when the price goes up, do we see substitution, where do we see customers buying the same products, I think you're going to see and be provided with a pretty rich -- and you should expect very rich analytics around substitution and price

effects.

And, again, you heard this morning about the hypothetical monopolist test.  Again, the idea there is to identify the narrowest market in which an alleged monopolist could profit in raised prices.

And you've heard about the SSNIP test.  And I apologize in advance, it's probably not going to be the last time here today you hear about the SSNIP test.

You're also -- I'm going to apologize -- you're going to hear about the cellophane fallacy.

THE COURT:  You can mix it up and call it the paradox, too.

I have a question for you about this relevant-market question.

Counsel -- and I'm paraphrasing here -- mentioned that what he's talking about is an online store that, hopefully, in the viewpoint of Amazon, is the customers' first and last stop on their shopping trip.

Assuming that's the case, who else seeks to do that?

MR. SCHMIDTLEIN:  I would suggest to Your Honor -- let me unpack that a little bit, because I think there is a number of different economic concepts that are embedded into that.

One, you've got this notion of, kind of, one-stop shopping, and you heard counsel referring, I think repeatedly, to grocery stores, the *Kroger* case, the *Whole Foods* case.

In order for you to presume we're in that world, you would need real-life data to suggest that there are substantial -- I don't know what percentage -- but substantial consumers that are one-stop shoppers, and by that I mean they go -- they only go to Amazon once they've got sort of like a grocery list for a grocery store.  And the fact that Amazon has the broad array of products means that Amazon is the only place they go for those products.

I think against that, you should be looking for and assessing what I think the economists will refer to as "multi-homing," and that's really more like Professor Hovenkamp, the quote we had from him.

If you are seeing consumers saying, I'll buy this product on Amazon, but this other product, which is also available on Amazon, I may also buy that somewhere else.  And that somewhere else might be a Walmart, but it also might be a department store.  It also might be a specialty retailer.  It might be REI's website, somebody who's not -- you wouldn't consider, I think within their definition, an online superstore.

That type of consumer purchasing behavior and whether -- when people come on Amazon, I mean, there will be data available, I believe, in this case that will inform you as to whether is the typical person who comes on Amazon, are they buying one product, maybe two products per trip, or are they buying this much larger cluster of products?

If you see a lot of one-product purchases, or maybe two-product purchases, I think an economist would tell you that competition for that one-off-product purchase must include, as other viable substitutes, a lot of other retailers, other than the other superstores.  And I'm going to get to --

THE COURT:  Then how do you deal with the shopper who is tired, it's been a long day, they don't want to think too much about where to go.  They just always go to Amazon.  They're happy as an Amazon customer, and, basically, it's shampoo one day, it's a book the next day, it's a gift for your parents the next day.  What about that?

MR. SCHMIDTLEIN:  Well, that sounds like a situation where Amazon has successfully competed to win their loyalty or their consumer trust, but that doesn't tell you can Amazon raise prices to them, because you really need to know how many people are in that bucket.

Because if -- let's say, if that's your sort of experience, but my experience is very different, and I'm somebody who looks very much across lots of different retailers for those different products, I might buy one product here, I might buy one product there, you'll get the benefit of my behavior.

Because Amazon can't -- what I think the economists would say, Amazon can't price discriminate.  In other words, when you go online, they won't say, Ah, here's a loyal Amazon customer, we're going to jack the price up.

THE COURT:  So the smart-shopper benefits to other people.

MR. SCHMIDTLEIN:  Yes.  Again, I think you're going to see data around this.  But you really need to -- if you can't price discriminate like that, and Amazon really can't.  I mean, it's not like you can generate different prices for different people, and you get a different price for the Yeti Rambler than I get, then that's sort of a market functioning competitively.

And by the way, I don't think there's anything unusual about that, market-wide, in retail.  We all may have our own peculiar favorite place.  I know there are places where I prefer to buy outdoor hiking clothing.  It's not Amazon, but I have individual places that I like to buy that.  But there may be other people who would prefer to buy it on an online superstore. I'm helping to discipline that market for them.

THE COURT:  Let me toss out another idea.

Recognizing that Amazon has other lines of business that are not an issue in this case, like Amazon Web Services, just looking at the online store, how about the idea that there really has never been a company like Amazon in this space, and there isn't one right now.  They are this unique phenomenon and are taking up 100 percent of the market in what they do.

How would you respond to that?

MR. SCHMIDTLEIN:  Well, it's a good lead-in to this next slide I have here, because, respectfully, I would say

Amazon doesn't, because the very same products are available elsewhere.

So, Your Honor, I take your question that it's Amazon is a very, very large store, and they built the store, again, through all these innovations. And if the products that are sold on Amazon were only sold on Amazon, that might be a different story. That might be a different story. In other words, if Amazon, literally, was the only place you could go to buy a Yeti Rambler and thousands of other products, critical products that are important to you. But that's not the case. The very, very same products that are available on Amazon are available elsewhere. Amazon doesn't have exclusive agreements with sellers. Sellers may like to sell on Amazon, but there is not a condition to selling on Amazon that you can't sell anywhere else.

So you asked counsel earlier today sort of who's in your market, and he said, I think in essence, We're thinking about it and our economists are looking at it.

Here's what their complaint said: Their complaint said it's Amazon, eBay, it's Target, and it's Walmart, but for Target and Walmart, it's only online. It's not their actual brick-and-mortar physical stores.

And so, you know, everything here on the right, obviously -- and these are examples of all sorts of retailers, big retailers, retailers who have substantial product sales,

some broader, some more specialized.  But I think you're going to see data and you should expect the economists to be evaluating to what extent do all these other stores exert competitive constraint on Amazon.  And you're going to see and you're going to hear about lots of evidence about who Amazon internally views as its competitors, who is Amazon looking to as to pricing, availability, you know, other types of innovation conduct in the market?  How is Amazon viewing other stores?

Again, and without giving away any secrets here today, you're going to hear that Amazon views lots and lots of people, other than eBay, Target, and Walmart online.  And when I talked earlier about the select competitor Featured Offer discount or disqualification, that looks to other retail prices in the marketplace.  Amazon looks at many, many other people when it's looking at that pricing for that featured market algorithm.

So I think that type of evidence, I think, is something you're going to see.  And again, respectfully, the fact that Amazon has a big store with lots of products doesn't mean Amazon has monopoly power if those products are available in many, many other places, you know, on competitive terms.

So some of the questions, I think, that will be looked at here are, where else are the products available, how do the customers shop for them, and how do the customers substitute, who does Amazon monitor?

We talked about the Hovenkamp article earlier.  I mean, I

think this is the type of phenomenon I think you're going to hear about and the economists are going to want to evaluate.

The online marketplace services market, the seller-side-facing market, again, based on the complaint, we understood that only included Amazon, Walmart, and eBay, and excluded a whole variety of other competitors, both first-party sellers, third-party marketplaces, where, again, a seller could go, and whether they themselves contracted for fulfillment, delivery, inventory management, those types of things, these are other alternative channels that they can get their products to market.

THE COURT:  So can you elaborate a little bit more on the three categories on the right side of the slide?

MR. SCHMIDTLEIN:  Sure.

So as I understand plaintiffs' claim, they claim that Amazon's seller services, sort of what -- I think they referred to it kind of as access to consumers but then translates into the actual fees.  I think counsel referred to it as the "take rate," which is how Amazon charges sellers for the services Amazon provides, whether it's being the store, inventory, fulfillment, what have you, depending on what collection of services the seller engages in Amazon to provide.

When evaluating whether Amazon has monopoly power, you need to look at, well, where else can a seller effectively get those services?  Where else can they get the access?

And, again, I think they included, obviously, a very narrow list.  They may still be evaluating it, I understand, from their economists' ongoing work, but their complaint was very, very limited.

First-party opportunities, these are stores where, going back to my original discussion about the first-party-only retail model, these are stores where the seller can just sell the product to the first party, and then they resell it.  So they take care of all the seller services; you've just sold them the product, and they worry about getting it to the consumer.

We would respectfully submit that that's another competitive offer.  Even though it may not be the seller buying on, sort of, a line-item-by-line-item basis, it's a way for them to get their products to market.

Same with other third-party marketplaces.  These are places where, like Amazon, you can also sell as a third party, and they will offer you a variety of services.

And then there are other various parties that will allow you to actually put up, let's say, your own website.  Say I don't want to sell exclusively through Amazon, I want to have my own direct-to-consumer website.  Well, there's a whole range of firms that are available to provide and help a seller, a brand, go sell directly, and that can be people involved in fulfillment, inventory, customer reviews.  All these various services that Amazon provides under one roof, sellers can go and

get those from various other parties.

THE COURT:  The postal service does this?

MR. SCHMIDTLEIN:  Well, they're fulfillment.  You can go and ship your products through the postal service if you are an individual brand.

THE COURT:  Okay.

MR. SCHMIDTLEIN:  So, again, I think the economists are going to ask a variety of questions about where the sellers look for other services, how substitutable are they, who does Amazon monitor, and do different sellers need different collections and services.  Not all sellers need or value all of the different services that may be available.

I now want to talk about monopoly power.  Again, this was a question we talked about at some length.  I think we have some, probably, close agreement on the definition of monopoly power.  I'd probably disagree a little bit with the idea that this is sort of a lot of market or a little bit of market power, depending on what the adjective is.  I certainly agree that monopoly power doesn't mean you're the only seller.  Sort of the traditional, I think, definition of a monopolist is only one seller.  You can have monopoly power and still have some other people in the market, but it certainly has to be something greater than normal market power, because most firms have some degree of market power.

In evaluating monopoly power, again, you're going to look

at the ability to raise prices market-wide for a sustained time period.  You can look at market shares and the number and size of current and future competitors, whether there are significant barriers to entry.

And I know counsel said earlier that, you know, the fact that Amazon is innovating doesn't tell you anything.  I sort of disagree with that.  I think if you're seeing a lot of innovation in the market, that, I think the economists will tell you, is a good indicia of a market that doesn't have substantial barriers to entry.

THE COURT:  I didn't take their statement that way.  I took it as the concept of innovation not being mutually exclusive with a monopoly.

MR. SCHMIDTLEIN:  I think that's true.  But, again, I think it may not, by itself -- the fact of innovation by itself will not necessarily defeat an allegation of monopoly power.  But I think if you see a lot of it and you see a lot of investment, I think that is something that is going to be very germane to evaluating whether, in fact, it does exist.

On the question of market share, again, I think this is something that economists will typically look at.  But, again, it's not the end-all, be-all, again, looking at what the size of the market is and who the other potential competitors are outside the market.

THE COURT:  Let me ask you a question that you may

have to unpack as well.

What is the percentage of Amazon's market share, as far as being a product seller online?

MR. SCHMIDTLEIN:  A product seller online?

THE COURT:  Their online store, selling to consumers, what is their market share?

MR. SCHMIDTLEIN:  I don't know the answer to that.  In other words, if you looked at all online sellers -- in other words, not just Walmart and eBay -- I suspect that number is going to be not even close.

THE COURT:  You're saying it depends on how you define the relevant market?

MR. SCHMIDTLEIN:  Absolutely.  I mean, they, obviously, want to define this market to just be Walmart -- Walmart online.

I can tell you this:  If Walmart physical stores are in the relevant market, Amazon's market share is nowhere near a level that would support a finding of monopoly power.

I don't have it off the top of my head, but if you included all online stores, not just superstores, Amazon's market share is not going to fall into the monopoly power.  But, again, I think the economists will be tabulating that data for you once they've completed their party discovery.

Significant and durable barriers to entry, I think this is an area that, again, was touched on.  I think this is also going

to be a very rich area for assessment and analysis by the experts in this case, because I think we're probably going to have a dispute about how substantial and significant the entry barriers are.

You're going to hear, I think, a lot of evidence, at least on our side, about lots and lots of new people coming to market in different shapes and forms, whether online or offline. Retail has historically been one of the most competitive businesses, and, you know, going back to the beginning where we had sort of the neighborhood store, then we went to the department store, and then we went to the shopping mall, and then the Internet exploded it all.  This continuum of competition and output expansion, we think, is one of the best stories of innovation and competition, retail, that the American economy has seen.

And I think you're going to see evidence of this.  You're going to see evidence of lots and lots of individual brands opening their own stores, lots and lots of individual brands having very successful websites, where the people just come and shop for their product.

You're going to hear evidence of Walmart, how they had to get into online and that they're offering the same prices online that they're offering in the store.  Why?  Because consumers view those as substitute experiences.

You've got people -- you can buy the product online, then

you can pick it up at their store.  There's all sorts of different evolutions here that we think are going to give you a picture of who's really competing in this market and who's not.

And when you talk about barriers to entry, you know, how much actual entry you see and how substantial and meaningful it is, that is, obviously, going to be relevant.  And, again, we believe you're going to see evidence of lots and lots of new things, whether it's in the online marketplace, services market, or in the consumer market.

Network effects, I wanted to sort of respond a bit to that.

The economists are definitely going to talk about network effects.  And I think it's going to be important to just sort of step back and try to put -- what are network effects and where do they fit into the case.

I think, from a legal perspective, network effects are spoken of as potential barriers to entry.  Counsel, I think, talked earlier about -- put up a Walmart document that talked about --

THE COURT:  The wheel.

MR. SCHMIDTLEIN:  -- the wheel.  The more customers you have, the more sellers will want to be in your store; the more sellers you have in your store, the more customers.

That exists in every retail store in the country.  This is not an unusual network effect.  Candidly, it's something referred to as an "indirect network effect."  I think you're

going to hear from the economists about what's a direct network effect, which, I think, the economists, typically, think of as providing a much more significant and substantial barrier to entry.

Let me give you an example of network effect, from old school:  The telephone.  The value of the telephone is directly impacted by how many consumers actually own a telephone.  So the value of the telephone, to me, goes up if you also have a telephone and others have a telephone.  That's a direct network effect.

If the product, let's say, the telephones, our telephones only interoperated with each other, they didn't work with other people's telephones, and we had a big market share, we were the first telephone to come to market, that would be a significant direct network effect that the economists would opine on in terms of barriers to entry.

Indirect network effects, I think, are what you're going to be hearing about in this case, and that's the flywheel example.  Economists typically think of those as not being substantial, but it is a factual issue that will have to be examined.

And the reason why it's not a direct network effect, Your Honor, is, whether -- respectfully, whether you shop on Amazon or not is really not -- doesn't matter to me; in other words, my enjoyment of the Amazon store is not dependent upon whether you're specifically in the Amazon store.

Now, I think this is going to go back to some of the questions we talked about previously, one-stop shopping, some of these scale issues.

THE COURT: But because I shop at Amazon, then you have a larger customer base, and, therefore, more sellers will want to sell on Amazon, and then that benefits you.

MR. SCHMIDTLEIN: Depending on what I purchase there, it could. But in other words, it's not that direct network effect of that telephone example I gave you. I think they will even concede that what we're talking about here are indirect network effects, and, as I said, those are ubiquitous.

And at the end of the day, the question is, okay, do they exist, how strong are they, and do they translate into a substantial barrier to entry, and that's a question that you can look to other evidence for.

You can test how strong a network effect is by saying, Well, do I see lots of other entry? I submit, Your Honor, you're going to see lots of evidence of other entry that dispels the idea that, if there is a network effect in play here, it equates to a substantial barrier to entry.

Another, I think, economic concept that I mentioned earlier, this notion of multi-homing. If I, as a consumer, can go to lots of other different websites to buy the exact same product that's on Amazon -- with virtually no switching cost, it's just moving my browser and typing into my computer -- those

very, very low switching costs suggest that the network effect will be very low.

But, again, I think these are testable economic phenomenon that I think you're going to hear about and I think that you should expect the economists to be analyzing as part of the economic work in this case.

We talked a little bit about direct evidence this morning. Again, I think this is an area where we're going to have a disagreement with the plaintiffs as to how viable direct evidence is by itself to prove monopoly power.

I think the cases that typically talk about direct evidence also look at indirect evidence. And I guess the only point I would leave you with here today is, if by "direct evidence" they mean an anecdotal episode in a market, I don't even think that qualifies as the type of direct evidence that a court could rely on.

But in a case like this, where you're going to see lots and lots -- there's lots of data available. You should expect the economists to come armed with real statistical quantitative analyses, not anecdotal direct evidence, if that's what the plaintiffs are talking about.

We talked a little bit about how they're going to prove their claim. What's their monopoly-power proof? We didn't hear a lot about pricing. We heard a lot about advertising; has Amazon put too many ads on the page?

Again, I think that's something that economists can evaluate.  They can look at, are the ads actually degrading the consumer experience?  I think their claim here is, if you put too many ads on an Amazon search-results page, that's bad for the consumer.  Well, they're going to have prove that.  They're going to have to demonstrate, are the ads helpful or are they not helpful?  Do we see other competing companies who are not alleged to have monopoly power engaging in the same type of conduct?

THE COURT:  Hypothetically, how does an ad help the consumer if Amazon is already curating and making more high profile the superior product?

MR. SCHMIDTLEIN:  Two ways; at least, I guess, two ways, I think you're going to hear.

One is, it does give other sellers an opportunity to get in front of a consumer; and, two, it does promote a certain amount of competition amongst the sellers for those spots.

And, typically, that type of behavior is pro-competitive, giving them some additional visibility into other products.  Sometimes the products that are advertised, Your Honor, are what you call -- I think the economists would call "complements."  And you may have had this experience on a website, not necessarily even Amazons's.

Let's say you're searching a site for -- I don't know -- soccer balls.  You might see ads on the site for soccer cleats

or soccer gloves, things that you might also want to consider buying if you're looking for a soccer ball.

So this type of advertising, again, is pro-competitive, we would submit.  It's actually useful for the consumer to have those in the context of a search-results page.

On the fee side, again, you should expect that if they're going to make a claim of monopoly power based on Amazon's fees or the take rate, that's something that needs to be verified and analyzed very carefully, and they're going to have to do real-life, apples-to-apples comparisons of Amazon's fees versus others' fees, and that's going to involve not only pricing but quality for the entire experience.

And it's going to, I think, also involve looking at things like return on investment; in other words, is Amazon actually giving them, through their store, a better return on investment, even with Amazon's fees, than they are able to get elsewhere.

Again, this is something I think is going to be subject to real-life, empirical, economic analysis for you to evaluate, whether or not we have direct evidence of monopoly power.

Jump ahead to conduct and effects.  We've talked a little bit about what sort of conduct that's competition on the merits that harms a competitor but not competition.

I think we are probably in agreement that conduct can be pro-competitive yet harm a competitor.  If I have a better product, I price it better, higher quality, all these things.

The fact that it harms somebody else doesn't mean it's exclusionary conduct.

So that's sort of a threshold assessment that you're going to have to make for all these categories of conduct. And then the conduct, only if you get past that gate, you then have to evaluate whether the conduct has actually harmed the competition in the relevant market.

And, again, I think you're going to see there is a variety of questions and considerations here. Does it enhance a party's ability to compete on price and product quality? Do other firms who don't have monopoly power engage in the same types of conduct? If they do, I think the economists would say that's an indicator that it is pro-competitive behavior, because they wouldn't be able to benefit from it if other firms were not monopolists.

And, again, we've talked about some of these things already. In the context for the actual conduct in this case, do these storewide standards help Amazon ensure pro-competitive prices? A better shopping experience? Have they reduced output or lowered quality? Is there an actual connection or causation between the conduct and the effects?

I want to just pause here, briefly, because I want to just address something counsel said earlier today when he referenced the *U.S. v. Microsoft* case and sort of the standard for what they have to prove and does something tend to enhance a monopoly

position by enhancing barriers to entry.

*U.S. v. Microsoft* presented a somewhat unusual set of facts, and let me explain what I mean.

The conduct that was eventually evaluated by the D.C. Circuit in *U.S. v. Microsoft* involved a monopolization claim involving the operating system market and when Microsoft was determined to be a monopolist because of the Windows operating system in the PC operating system market.

The conduct involved in that case, as you may recall, was involving, primarily, browsers, and it involved a variety of conduct that Microsoft engaged in to try to make sure that Internet Explorer sort of took over the browser market from Netscape Navigator, which was sort of the early, preferred, leading browser.

The reason why that conduct was found anticompetitive with relationship to an operating system is because browsers were determined to be what they call "middleware," and they could be a platform upon which developers could build their software, and if a browser worked across lots of different operating systems, then everybody's software would run across all those operating systems.

In that case, they determined that Microsoft's monopoly was protected by something called "the applications barrier to entry."  That was because, back in the those days, if you had already bought a lot of software applications that ran on

Windows, they wouldn't run on another operating system.  So we'd already made that investment in Windows.  It made it harder to switch.  It was a barrier to entry.  By getting rid of the browser, they got browser competition, they were able to sort of keep that, potentially, barrier to entry.

Microsoft argued on appeal, We're not liable because you didn't show that but for our conduct there would have been more competition in the operating system market.  It was almost like you've killed off the browser competition before people could write applications that would reduce the applications' barrier to entry.

And I think what the D.C. Circuit said, Well, the conduct had the potential to do so, and so, Microsoft, we're not going to reward you and say the government had to show you would have lost the monopoly.

Here, we're in a very different situation.  They're claiming that Amazon's conduct, it's not that -- they're claiming we've harmed actual competitors.  They claim that other retailers would actually behave differently somehow.  There are real-life-today effects in the market, not that this is some futuristic maybe there will be application barrier to entry reduced that will then have an impact to operating systems.

For that reason, when it comes to anticompetitive effects, they need to come forward with real-life effects.  And I do think that that but-for world here is a very necessary and

important concept that the court is going to have to consider, and here's why:

If what the plaintiffs are saying here and the point of this case is, Amazon, you can't engage in the following courses of conduct, I think you necessarily have to consider, What does the Amazon store look like in the absence of that conduct, and what does competition in the marketplace look like absent being able to have these standards or some of the other conduct in the case?

THE COURT:  And their theory or what they're seeking, their goal as to remedies, has that crystallized more since the inception of the case?

MR. SCHMIDTLEIN:  It has not, Your Honor.  It has not.

So that's why we think it's very important that their economists be in a position to not just come forward and say that's bad, because bad compared to what?  I think that is an important question that I think you're going to be asked to wrestle with.

If we take away these standards, are we going to have Wild West pricing on Amazon that's not good for our consumers?  Are we going to have people trying to deliver their products through not very, very reliable or effective delivery methods, but they still get the Amazon Prime brand?  What exactly is it that they imagine the world is going to look like?  And, again, I think that's going to need to be crystallized more so you can make

those types of judgments.

But I apologize for the diatribe there.

We've talked about the Prime badge and fulfillment and what consumers expect.

THE COURT:  You've got about five minutes.

MR. SCHMIDTLEIN:  There's going to be a variety of questions there.

Pro-competitive benefits, again, we talked about the fact that you only get to this once they've met their prima facie case.

Economists will look at does the conduct improve the shopping experience, customer trust, lower prices, and increase competition?

We've talked a little bit about the substantially less-restrictive alternative, the question that I flagged for you, I think, earlier.

And then last, but certainly not least, I think any presentation or discussion about economic evidence is likely going to drag you into some evaluation of the reliability of the evidence.  And I don't think I'm going out on a limb to suggest that you're probably going to get steeped in *Daubert* case law.

THE COURT:  I was just going to ask.

MR. SCHMIDTLEIN:  I don't want to make bold predictions, but I think you're likely going to see, at some point, probably evaluations of the reliability.  And, again,

this is going to be really, really important.  Is the data accurate, consistent, unbiased?  Are the methods, are these established, accepted, statistically reliable?  Are the conclusions statistically significant from industrywide analysis?  Again, are these isolated, anecdotal types of evidence?

Your Honor, I think that concludes my presentation.

Again, I thank you very, very much for your patience this morning.  And we conferred, I think, before the -- as you asked us to, and, obviously, I'll let counsel speak.  You've afforded us a lot of latitude, and if you have additional questions, obviously, we are both very happy to address those.  So, really, whatever you would prefer at this point, we're happy to -- we want to be helpful to you.

THE COURT:  Okay.  Well, I want to ask the plaintiffs if they want an opportunity to respond to any of Mr. Schmidtlein's presentation here.  And if I gave you that opportunity, I'd give Mr. Schmidtlein a chance to respond as well.

MR. MERBER:  I think there may be a few things that we'd like to respond to, and I don't know how you want to handle that.

THE COURT:  Well, how much time would you like?

MR. MERBER:  I think, in the interest of not having this drag out for far too long, just a few minutes would be

sufficient.

THE COURT:  Okay.  I'll give you five minutes.

MR. MERBER:  Okay.  Thank you, Your Honor.

I think, as you could probably hear, there are a number of areas in which we are in agreement on various issues, so I'm not going to try and talk about everything, but just to highlight a couple of things that I think are worth talking about.

Number one, you had asked for a case from the Ninth Circuit more recently addressing aggregation of claims.  I think this was actually briefed in the motion to dismiss, so you can look at both parties there for more case law on this, but I think we cited some recent Ninth Circuit cases.  In the slides, I cited the *City of Anaheim.*  I was just talking about this.

A couple other points:  In discussing the online superstore market, it came up as a possible source of evidence, which is, how many products do customers purchase at the same time in one trip?

And I think your question may have already reflected this, but we're not alleging that this functions the same as a physical one-stop shop where you buy a lot of things at once. We're alleging, as I think you were alluding to in your follow-up questions, that this becomes the place you go to as a default and as a go-to.  And so it's not identical, and the fact that you bought three things individually rather than together doesn't have anything to do with that question.

THE COURT: Right. I think that a trip to Amazon's online store can be quite different from the brick-and-mortar Fred Meyer store.

MR. MERBER: Exactly, Your Honor.

One thing I want to talk about with some of the -- I think Amazon was characterizing it as market participants or some sort of competitive constraint in the marketplace services market.

The core service that we're talking about there is providing access to customers, and so whole categories of service providers on that slide don't provide access to customers at all. They help you build a website, they might deliver your products after you've built your own website, found your own customers, and made your own sale. But whole categories of those don't do the main service that we're alleging to be in that market, and so I just want you to have that in your mind as you're thinking about that.

THE COURT: That's why I asked about the postal service.

MR. MERBER: The postal service is an example, certainly. They don't do almost any of -- certainly they don't do the main service, and, actually, none of the services we allege.

One point I want to bring up: When we're talking about identifying monopoly power through market shares, Amazon's slide, and, actually, I think their papers, referenced 70

percent as the requirement for establishing monopoly power.

So the Ninth Circuit, they did say that it's not dispositive and requires analysis of other evidence, which I agree with.  But the Ninth Circuit actually says 65 percent, not 70 -- that was as recently as *Dreamstime* a couple of years ago -- and has affirmed findings of monopoly power at lower shares for exactly the reason that they mentioned.  Other evidence can be relevant as well, but particularly challenging barriers to entry.  So I'm just correcting or on commenting on that percentage.

One thing, this may be a subtle point, but with respect to network effect, I just wanted to make a couple of responses.

Number one, we're not alleging that the existence of network effects is either extraordinary or inherently bad, but what we're saying is that they are present, which I think Amazon agrees, and that -- and then what we're alleging is that Amazon's conduct has actually made it harder for rivals to take advantage of those network effects in building their own stores, and that increase in a barrier to entry, by impeding rivals' ability to start their own flywheel, that's what we're challenging.  It's not the fact that network effects are relevant; it's the way they're impacted by Amazon's conduct.

The other thing I just want to mention is that -- and I think Mr. Schmidtlein's examples tracked with this -- but the difference between direct network effects and indirect network

effects is not the magnitude of those effects or how important they are.  It has to do with the types of parties that you're paying attention to.

So his example of direct network effects was correct.  In a telephone network, you care about additional users.  But the reason they're direct instead of indirect isn't because they're large.  It's because they are the same category of user of the network that you are.  So when I use the telephone network and you use the telephone network, it allows us to have a conversation, and that helps both of us when we're in the same category.

Indirect network effects occur when there's two categories of users, such as shoppers and sellers.  And shoppers care about adding sellers; sellers care about adding shoppers.  That's what makes it indirect, not that they're small.

One other relatively minor point:  You had asked how does placing advertisements help shoppers?  I think the answer actually talked about how additional advertisements helped Amazon.

In particular, Mr. Schmidtlein mentioned that the sellers might compete to be featured in the advertisement, but the way they do it is by paying more money to Amazon when they bid on advertisement placements.

Paying more to Amazon does not improve the outcomes for shoppers at all.  It does help Amazon.  It is a form of

competition, but it is not a form of competition in the superstore market or that benefits Amazon's shoppers.

THE COURT:  Well, let's say I'm at an NHL hockey match, and I see a Jersey Mike's Subs ad, and I'm hungry and I think, Oh, I'm kind of hungry, I should get a Jersey Mike's sub.

MR. MERBER:  So is it possible for advertisements for a complement, as Mr. Schmidtlein said?  It's possible for an advertisement to be helpful, in that context.

What we allege in the complaint is that you see additional advertisements for the same kind of a product rather than a complement that's more expensive, and that you sometimes see what Amazon refers to as "defects," where they're totally irrelevant and nobody who is running that search is likely to want them, and Amazon didn't think anyone was likely to want them.

So we do talk about ad quality.  It's not impossible for ads to help Amazon shoppers, but our allegations are that there were an increase in ads that aren't helping Amazon shoppers.

And then the last thing I want to mention is Microsoft.  So I agreed with the entire summary of Microsoft and what it says, except for the actual conclusion, which is that it doesn't apply here and it's not analogous.

I think that we are actually alleging that competition would look very different in the superstore and marketplace services markets if other stores had been able to kickstart

their own network effects, grow their own scale, and become a more realistic alternative as a default option.  And so I do think that's a similar sort of thing.

And it actually reminded me.  You had asked me for a case that was similar to our fulfillment claim, and I think *Microsoft* might actually be that case.

As my colleague was explaining, in *Microsoft,* they were talking about the operating system market, and the conduct targeted browsers.  And the reason that mattered is that browsers -- a vibrant ecosystem of browsers serving as a development platform for apps was going to help eliminate the power of their operating system.

So things that were happening with this complementary service, browsers, was eventually going to erode their power over operating systems, and they didn't want that to happen, so they targeted it.  That's what we're talking about in the fulfillment space as well.

THE COURT:  To save me some time, this is the Judge Penfield Jackson case in D.C., the *Microsoft* case?

MR. MERBER:  I believe --

THE COURT:  Was there more than one?

MR. SCHMIDTLEIN:  Yes.  This was the Judge Jackson decision that eventually resulted in Judge Ginsberg's decision in the D.C. Circuit.

THE COURT:  Wasn't there more than one appeal?  I want

to make sure I read the right one.

MR. SCHMIDTLEIN:  There were multiple, multiple appeals on that case, but on liability, there's principally one decision.

THE COURT:  Okay.  Thank you.

MR. MERBER:  This is the en banc from 2001, right?

MR. SCHMIDTLEIN:  It's a 2001 decision.

THE COURT:  2001, and it was en banc?

MR. SCHMIDTLEIN:  Yes.

THE COURT:  Thank you.

MR. MERBER:  That was everything I wanted to address. Thank you.

THE COURT:  Thank you.

Mr. Schmidtlein?

MR. SCHMIDTLEIN:  Very briefly, Your Honor, and most of these are helpful corrections where I misspoke earlier.

I may have incorrectly said -- I'm sure I did -- that the Buy Box eligibility issues arise when there are offers elsewhere for higher prices, and then there were lower prices.  In other words, if the product is available off Amazon at a lower price, then you're not eligible for the Buy Box on Amazon.

THE COURT:  That's how I understood you.

MR. SCHMIDTLEIN:  Okay.  I wanted to make sure I get that right.

The other issue that I probably should emphasize there is,

the Buy Box only gets triggered and you only get into a situation where there could be higher pricing off Amazon.

You asked me the question of, Well, is one of the ways that could solve their problem raising the price off of Amazon?

In many, many cases -- and I think you'll probably see some economic analysis around this.  In many circumstances, the price that is disqualifying a seller on Amazon is actually not a price that that seller is actually setting off of Amazon.

So let me give you the following example:  If the Yeti example I gave you before was being sold off of Amazon at DICK'S Sporting Goods, DICK'S is a first-party-only retailer, and DICK'S decides, for whatever reason, to set it lower, Yeti can't fix that by raising the price at DICK's.  Yeti can fix that by lowering the price on Amazon.

So I think you're probably going to see -- as part of that holistic assessment of, is this conduct actually resulting in higher or lower prices, you're going to be becoming more familiar with those types of economic phenomena.

On this question of, again, sort of the seller services and access to the market, I guess I would just leave you with a couple of things.

You know, consumers today, lots of consumers buy online, but they can buy the same product when they walk into a local store.  So you can buy shampoo on Amazon, or you can walk into your local CVS or grocery store and buy shampoo.

That type of sort of multichannel purchasing, I think you're probably going to see economic analysis of and how the economists will explain how that actually helps them evaluate the impacts in the market.

And then the last -- just the last point I want to make is, and this may relate to the network effects. I know counsel has talked about how these markets are interconnected. I'll leave you with this:

If you were to find that the consumer market was vibrant and competitive; in other words, they haven't proved their narrow online superstore market, I think the economists will tell you that if Amazon doesn't have monopoly power in a market that is consumer facing, then it is going to be very difficult, if not economically impossible, for them to exert monopoly power on a seller-side market. Because if they tried to do that, if they mistreated sellers on that side of the market, it's only going to harm them on the consumer market.

So, again, I think you're going to see, probably, the analyses, and you're going to be hearing, probably, economic work around that issue.

I hope this has been helpful to you today, and, again, we're very, very grateful for your time and patience.

THE COURT: Counsel, I want to thank you for the hard work that you've put into the written materials, as well as your presentation today, which took hours. It was illuminating for

me, and educating.

I think kind of the next order of business as far as this topic is, my hope is that when you next present me with a joint status report before our next status conference, I'd like to have a proposal as to the next Economics Day hearing, where I would be expecting to hear from the economists themselves.

Anything else?  All right.  Have safe trips home.  We're in recess.

(Proceedings concluded at 12:27 p.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 12th day of March 2025.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter
WSL#22003010