THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION, et al.

Plaintiffs,

v.

AMAZON.COM, INC., a corporation,

Defendant.

Case No. 2:23-cv-01495-JHC

**AMAZON'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
December 23, 2026

*ORAL ARGUMENT REQUESTED*

**REDACTED**



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

## TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

I. STATEMENT OF UNDISPUTED MATERIAL FACTS ..............................................2

A. Plaintiffs' Alleged Relevant Markets....................................................2

B. Retail Fulfillment ..................................................................................3

C. Amazon's Fulfillment Operations.........................................................4

D. Amazon Prime .......................................................................................6

E. Plaintiffs' Fulfillment-Related Allegations............................................6

F. Plaintiffs' Expert's Competitive Effects Opinions ..................................7

1. Johnson's Seller Constraints Opinion ..........................................8

2. Johnson's Foreclosure of Fulfillment Competition Opinion ..........11

G. "Project Nessie" .....................................................................................12

1. Amazon's Introduction of Project Nessie ....................................12

2. Amazon's Deprecation of Project Nessie .....................................13

3. Plaintiffs' "Evidence" Regarding Amazon's Continued Use of Project Nessie..........................................................................14

II. LEGAL STANDARD..............................................................................................15

III. ARGUMENT.........................................................................................................16

A. Summary Judgment Should Be Granted as to Amazon's Fulfillment Conduct. ..............................................................................................16

1. Plaintiffs Have the Burden to Show Substantial Market-wide Effects. .......................................................................................16

2. Plaintiffs Fail to Meet Their Burden. ..........................................18

B. Summary Judgment Should Be Granted on All "Nessie" Claims. .........................25

1. The FTC's Legal Theory Is Novel and Untested. ..........................26

2. Plaintiffs May Not Seek to Enjoin Past Conduct That Is Unlikely to Recur. ..................................................................................29




MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

3. Summary Judgment Should Be Granted on All "Nessie" Injunction Requests. ....32

4. State Plaintiffs Lack Evidence of Consumer Harm. ....35

IV. CONCLUSION ....37



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

## TABLE OF AUTHORITIES

**Pages(s)**

**CASES**

*1-800 Contacts, Inc. v. FTC*,
1 F.4th 102 (2d Cir. 2021) .................... 19, 24

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .................... 20, 24

*AliveCor, Inc. v. Apple Inc.*,
163 F.4th 1259 (9th Cir. 2026) .................... 15, 28

*Ames v. Oceanside Welding and Towing Co., Inc.*,
767 A.2d 677 (R.I. 2001) .................... 35

*AMG Cap. Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) .................... 25, 29, 34

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
2020 WL 3414662 (S.D. Cal. June 22, 2020) .................... 7

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) .................... 17

*Bhan v. NME Hosps., Inc.*,
929 F.2d 1404 (9th Cir. 1991) .................... 16

*Blythe v. Nat'l Collegiate Athletic Ass'n*,
--- F.4th ---, 2026 WL 2653349 (9th Cir. Sep. 9, 2026) .................... 16

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .................... 18

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .................... 18

*Brown v. Stored Value Cards, Inc.*,
953 F.3d 567 (9th Cir. 2020) .................... 15

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993) .................... 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................... 16

*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .................... 30



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

*Coca-Cola Co. v. Omni Pac. Co.*,
2000 WL 33194867 (N.D. Cal. Sep. 27, 2000) .................................................. 18, 19, 23, 24

*Connecticut v. Sandoz, Inc.*,
2026 WL 2436643 (D. Conn. Aug. 12, 2026) ........................................................... 31

*Continental Res., Inc. v. Wolla Oilfield Servs., LLC*,
510 P.3d 175 (Okla. 2022) ........................................................................................ 35

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984) ...................................................................................... 27

*Endy v. County of Los Angeles*,
975 F.3d 757 (9th Cir. 2020) ..................................................................................... 15

*Enrico's, Inc. v. Rice*,
730 F.2d 1250 (9th Cir. 1984) ................................................................................... 31

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................................................ 16, 17

*FTC v. Credit Bureau Ctr., LLC*,
937 F.3d 764 (7th Cir. 2019) ..................................................................................... 30

*FTC v. Elec. Payment Sols. of Am. Inc.*,
2021 WL 3661138 (D. Ariz. Aug. 11, 2021) ........................................................ 31, 32, 33

*FTC v. Evans Prods. Co.*,
775 F.2d 1084 (9th Cir. 1985) ............................................................................. *passim*

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ................................................................................................. 27

*FTC v. Infinity Grp. Servs., Inc.*,
2009 WL 10672411 (C.D. Cal. Sep. 2, 2009) ..................................................... 31, 33

*FTC v. Merchants Servs. Direct, LLC*,
2013 WL 4094394 (E.D. Wash. Aug. 13, 2013) ........................................................ 31

*FTC v. Meta Platforms, Inc.*,
811 F. Supp. 3d 67 (D.D.C. 2025) ...................................................................... 30, 34

*FTC v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2020) .............................................................................. *passim*

*FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019) ........................................................................... 30, 31, 34

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) ................................................................................................. 27



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

*FTC v. U.S. Anesthesia Ptrs., Inc.*,
2024 WL 2137649 (S.D. Tex. May 13, 2024) .......... 31

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
723 F.3d 1019 (9th Cir. 2013) .......... 17

*HDMI Licensing Adm'r, Inc. v. Availink, Inc.*,
820 F. Supp. 3d 944 (N.D. Cal. 2025) .......... 17, 20

*In re Google Digital Advert. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022) .......... 32

*In re HIV Antitrust Litig.*,
656 F. Supp. 3d 963 (N.D. Cal. 2023) .......... 16

*Larsen v. PTT, LLC*,
737 F. Supp. 3d 1076 (W.D. Wash. 2024) .......... 15

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
119 F.4th 711 (9th Cir. 2024) .......... 15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 30

*McLaughlin Ford, Inc. v. Ford Motor Co.*,
473 A.2d 1185 (Conn. 1984) .......... 35

*Metro Indus., Inc. v. Sammi Corp.*,
82 F.3d 839 (9th Cir. 1996) .......... 17, 23, 24

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) .......... 28

*Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*,
823 F.2d 829 (4th Cir. 1987) .......... 23, 24

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) .......... 31, 32, 34

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......... 16

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) .......... 28

*Parth v. Pomona Valley Hosp. Med. Ctr.*,
630 F.3d 794 (9th Cir. 2010) .......... 16

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) .......... 24



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
619 F. Supp. 441 (N.D. Cal. 1985) .......... 22, 24

*Ramirez v. Health Net of Ne., Inc.*,
938 A.2d 576 (Conn. 2008) .......... 35

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 17

*Richards v. Direct Energy Servs., LLC*,
915 F.3d 88 (2d Cir. 2019) .......... 28, 35, 36

*Ryan, LLC v. FTC*,
746 F. Supp. 3d 369 (N.D. Tex. 2024) .......... 27, 28

*S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*,
138 F.3d 869 (11th Cir. 1998) .......... 20

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007) .......... 15

*Sterling Merch. v. Nestle S.A.*,
656 F.3d 112 (1st Cir. 2011) .......... 17

*Toscano v. PGA Tour*,
201 F. Supp. 2d 1106 (E.D. Cal. 2002) .......... 17

*Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .......... 28, 36

*Washington v. Trump*,
814 F. Supp. 3d 1173 (W.D. Wash. 2026) .......... 15

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) .......... 31

**STATUTES**

15 Okla. Stat. § 752 .......... 35

15 U.S.C. § 45 .......... 26, 27

15 U.S.C. § 53 .......... 25

**RULES**

Fed. R. Civ. P. 56(a) .......... 15



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

## INTRODUCTION

Plaintiffs' lawsuit, which is of unprecedented breadth, challenges a jumble of Amazon business practices. Since Plaintiffs filed their complaint, millions of documents and hundreds of terabytes of data have been produced, scores of Amazon personnel and third-party witnesses have sat for deposition, and the parties have exchanged thousands of pages of expert reports and conducted fifteen expert depositions. That fulsome discovery has revealed incurable deficiencies in certain of Plaintiffs' sweeping claims that provide an opportunity to meaningfully narrow the issues to be tried.

The primary focus of Plaintiffs' complaint relates to certain of Amazon's current pricing practices. But Plaintiffs' lawsuit also cobbles together claims based on (a) discrete Amazon fulfillment conduct, and (b) a long-abandoned pricing program called "Project Nessie." Plaintiffs have not provided a sufficient evidentiary basis on which to allow these two ancillary theories to proceed to trial.

As to Amazon's fulfillment conduct, Plaintiffs allege that having Prime-eligible products (marked by the "Prime badge") is necessary for third-party sellers to be successful in Amazon's store and, in turn, that the Prime badge is reserved for sellers who use Fulfillment by Amazon ("FBA"). But despite fulsome discovery, Plaintiffs have not provided evidence sufficient to meet their burden of showing that this alleged "FBA-Prime requirement" has market-wide anticompetitive effects. Plaintiffs rely instead on abstract theories and sparse anecdotes about how competition *might* be harmed by the challenged fulfillment conduct. Such hypotheses and anecdotes do not create a genuine dispute of fact.

As to Project Nessie, the FTC and four States seek to enjoin a program in which Amazon, years ago, sought to test whether it could profitably raise its own prices for certain products considered to be priced at "unsustainable" levels. Discovery has indisputably confirmed that Amazon terminated the program in 2019 after Amazon came to believe—and subsequent testing confirmed—that Project Nessie's perceived benefits were largely illusory and outweighed by its



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

costs. Summary judgment should be granted because neither the FTC nor Plaintiff States may obtain an injunction against conduct that was discontinued years ago and is unlikely to recur. Further, to the extent that any State seeks damages arising from Project Nessie, summary judgment should still be granted because Plaintiffs have no evidence that Project Nessie caused any consumer harm.

Disposing of these two components of Plaintiffs' claims will substantially narrow the issues for trial, allowing the parties and the Court to focus on the pricing conduct that is at the heart of the litigation. Plaintiffs' fulfillment theory implicates different conduct, invokes discrete legal and economic concepts, and anticipates distinct competitive effects from Plaintiffs' theories on Amazon's pricing practices. Eliminating it would obviate the need for testimony from third-party logistics providers and carriers, shorten the testimony provided by many additional third-party seller witnesses, and materially narrow the parties' presentation of expert testimony. Similarly, only a handful of Plaintiffs even bring the separate non-antitrust claims relating to Project Nessie, which Amazon deprecated nearly seven years ago. Resolving those claims now would further narrow the trial testimony from Amazon personnel and eliminate certain expert opinions entirely. Summary judgment is an appropriate mechanism to adjudicate Plaintiffs' fulfillment theory and Nessie claims, and summary judgment should be granted in Amazon's favor.

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Plaintiffs' Alleged Relevant Markets

Plaintiffs allege monopolization claims with respect to two purported relevant antitrust markets: an "online superstore" market—consisting only of Walmart online, Target online, and eBay—and a market for "online marketplace services." 2d Am. Compl. (ECF 327) ("Compl.") ¶¶ 123, 172-173, 186. Although Plaintiffs' challenge to the alleged FBA-Prime requirement turns on their assessment of how sellers and fulfillment providers purportedly respond to or are impacted by Amazon's fulfillment practices, they plead no claim pertaining to any relevant market for retail fulfillment services.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

### B. Retail Fulfillment

According to Plaintiffs' Complaint, retail "[f]ulfillment involves storing, picking (retrieving from storage), packaging, and preparing items purchased from online retail stores for delivery."[1] *Id.* ¶ 111. Those fulfillment processes typically occur at specialized warehouses called fulfillment centers. *Id.*; Ex. 1 (Rabinovich Rep.) ¶ 12.[2] Fulfillment centers receive products from suppliers and store the products until an order is placed. Ex. 1 (Rabinovich Rep.) ¶¶ 8, 10. Then, the ordered products are picked from storage, packaged in shipping boxes or bags, and transferred to a shipping carrier for delivery to the customer. *Id.* ¶ 14.

Plaintiffs claim that fulfillment operations can be done in-house by a seller or retailer or outsourced to a third-party logistics firm, known as a "3PL." *Id.* ¶ 12. Large e-commerce retailers typically use in-house fulfillment centers or contract for outsourced fulfillment centers that operate exclusively for their use. *Id.* ¶¶ 31, 33. For purposes of this motion, Amazon accepts the characterization by Plaintiffs' expert that small and midsized retailers are more likely to hire 3PLs that operate fulfillment centers serving multiple retailers and various e-commerce channels. Ex. 1 (Rabinovich Rep.) ¶¶ 32, 34. A retailer can hire a single 3PL to provide fulfillment for every product it sells and every channel on which it sells, or the retailer can spread its products across multiple 3PLs. *Id.* ¶¶ 91-106.

The hallmarks of successful fulfillment are speed, cost, and reliability. *See id.* ¶ 10 (explaining an option that "may be more advantageous in terms of cost, responsiveness, and reliability"). [redacted]. Ex. 2 ([redacted] Dep.) at 157:15-23. Today, affordable two-day shipping is "table stakes," or the "standard

---

[1] Plaintiffs have taken the position that "[d]elivery is a related but distinct service" from fulfillment. Compl. ¶ 113. Amazon disagrees with this artificial distinction, but that dispute is immaterial because Amazon accepts Plaintiffs' understanding of the components of fulfillment (solely) for purposes of this motion.

[2] Elliot Rabinovich is a supply chain professor Plaintiffs engaged as an expert witness. All numbered exhibits are to the contemporaneously filed Declaration of Molly A. Terwilliger.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

expectation." *Id.* at 155:20-156:3; *see also* Ex. 1 (Rabinovich Rep.) ¶ 60 ("Low-cost, fast (two-day, next-day, and faster) delivery has become an order qualifier to compete in e-commerce …."). On reliability, customers "[redacted]." Ex. 3 ([redacted] Dep. (Sep. 10, 2025)) at 148:17-18; *see also id.* at 148:15-16 [redacted]"). Retailers have again sought to meet customer expectations by investing in fulfillment strategies that ensure products are delivered within the promised timetable. *See, e.g.*, Ex. 4 ([redacted] Dep.) at 222:4-10 (noting [redacted]). In sum, when fulfillment is faster, cheaper, and more reliable, customers are happy and will purchase more in the future. *Id.* at 222:6-10 ("[redacted]"); Ex. 5 (Rabinovich Dep.) at 146:5-18 (explaining that Amazon "managed to use [fulfillment] to generate customer loyalty").

**C. Amazon's Fulfillment Operations**

Amazon has invested heavily in fulfillment. The Amazon Fulfillment Network ("AFN") is a collection of fulfillment centers owned and operated by Amazon. AFN originally was designed (and is still used) as Amazon's in-house fulfillment solution for products sold by Amazon as a first-party retailer. Ex. 6 (D. Clark Dep. (Aug. 13, 2025)) at 170:25-171:2; Ex. 7 (Mehta Dep. (Aug. 8, 2025)) at 270:25-271:10.

In 2006, Amazon began allowing third-party sellers to also use its AFN network to fulfill the items they sold in Amazon's store through an optional add-on service called Fulfillment by Amazon ("FBA"). Ex. 6 (D. Clark Dep. (Aug. 13, 2025)) at 170:19-24; Ex. 8 (Taylor Dep.) at 17:24-18:10. To accommodate inventory and orders on behalf of third-party sellers, Amazon made further investments to its fulfillment network to adapt and expand its infrastructure. *See, e.g.*, Ex. 9 (AMZN-RTL-FTC-10357948); Ex. 10 (AMZN-RTL-FTC-07689442). Third-party sellers decide independently how to fulfill orders for their products, including whether to use FBA. *See, e.g.*,



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

Ex. 11 (Johnson Rep.) ¶ 273 ("Outside of FBA, sellers may also self-fulfill or use a 3PL …."). Those who use FBA can use the service [redacted]). Ex. 12 ([redacted] Dep.) at 57:21-58:4, 70:11-71:2; Ex. 13 ([redacted] Dep.) at 56:16-23. Such non-Amazon fulfillment options include at least seventeen 3PLs with national reach that have entered the market since FBA's launch in 2006. *See* Ex. 14 (Vyas Rebuttal) ¶¶ 115-117 & Ex. E. Plaintiffs' proffered expert on the fulfillment industry, Professor Elliot Rabinovich, was not asked to evaluate either Amazon's conduct or the competitiveness of the fulfillment industry. Ex. 5 (Rabinovich Dep.) at 89:17-21, 92:17-20, 138:15-20. Rabinovich nonetheless confirmed in deposition that sellers have numerous options of "many different sizes" for e-commerce fulfillment, including some providers that have reached "viable scale to … participate in the industry." *Id.* at 122:20-123:3; *see also* Ex. 15 (Rabinovich Reply) ¶ 80 ("I agree there are many 3PL e-commerce fulfillment providers, many of which have carved out specific specialized niches."), *id.* ¶ 92 ("[T]here are many 3PLs that provide e-commerce fulfillment, as well as a large number of 3PLs providing marketplace-type fulfillment specifically."); Ex. 5 (Rabinovich Dep.) at 232:17-22, 260:15-23, 261:23-262:2.

Amazon also allows sellers to use AFN for products sold *off* Amazon, through a service called Multi-Channel Fulfillment ("MCF"). Ex. 16 ([redacted] Dep.) at 86:10-18; Ex. 17 ([redacted] Dep.) at 139:23-141:6. For example, a product sold by a third-party seller on eBay's marketplace can be fulfilled for that seller by Amazon through MCF. Ex. 11 (Johnson Rep.) ¶ 988. Due at least in part to Amazon's innovation and foresight, it has developed low-cost, fast fulfillment capabilities that "are closely followed by [Amazon's] competitors." Ex. 5 (Rabinovich Dep.) at 143:17-144:12 (Amazon has "accumulated strong … capabilities" in "internet fulfillment"); Ex. 11 (Johnson Rep.) ¶ 263; Ex. 18 ([redacted] Dep.) at 38:5-15; Ex. 2 ([redacted] Dep.) at 155:20-156:19. Amazon has set aggressive goals to reduce the time to fulfill and deliver products ordered on its website and invested heavily to meet them. Ex. 19 ([redacted] Dep. (Dec. 17, 2025)) at



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

159:10-18; Ex. 20 (Jassy Dep. (Aug. 21, 2025)) at 219:13-220:7. Because of those efforts, "[redacted]. Ex. 2 ([redacted] Dep.) at 155:20-156:19.

### D. Amazon Prime

Amazon offers a paid subscription service, Amazon Prime, which gives customers an opportunity to get access to fast, free shipping—two-day, one-day, or even same-day—on certain Prime-eligible products, which are displayed with a Prime badge on Amazon's website. Ex. 21 ([redacted] Dep.) at 100:19-102:18. Products fulfilled by Amazon (whether its own products as a first-party retailer or products sold by third-party sellers) are typically, but not always, Prime-badged. *Id.* at 105:20-106:6; Ex. 8 (Taylor Dep.) at 29:13-19. Through a program called Seller-Fulfilled Prime ("SFP"), Amazon gives third-party sellers an option to earn Prime eligibility for orders fulfilled through non-Amazon providers, so long as they meet the Prime standards for fast and reliable delivery. Ex. 21 ([redacted] Dep.) at 106:14-19; *see* Ex. 22 ([redacted] Dep.) at 68:24-69:7 [redacted]

### E. Plaintiffs' Fulfillment-Related Allegations

According to Plaintiffs, a third-party seller cannot succeed on Amazon without having Prime-eligible products that bear the Prime badge, Compl. ¶¶ 354, 361, and Prime eligibility is "generally condition[ed]" on a seller's use of FBA, *id.* ¶¶ 355, 363. Although SFP allows sellers to earn the Prime badge without using FBA, Plaintiffs aver that in practice, Amazon has limited enrollment in SFP and most sellers do not use the program. *Id.* ¶¶ 406-411.[3]

[3] There is no requirement that a seller use FBA for its offers to be Prime-eligible. Nor is Prime eligibility necessary for a seller to succeed on Amazon. This motion sets to the side disagreements over whether Amazon's fulfillment conduct qualifies as a "tie" or otherwise constitutes any cognizable exclusionary act. Amazon instead moves for summary judgment on the fulfillment conduct's causation—that is, Plaintiffs have not come forward with evidence that the FBA-Prime requirement, assuming the existence of such a policy, has caused substantial anticompetitive effects in the alleged markets.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

Plaintiffs identify two alleged consequences that flow from the purported FBA-Prime requirement: (a) sellers face higher overall fulfillment costs because they are forced to use two different fulfillment services (i.e., FBA for Amazon sales and a different fulfillment solution for non-Amazon sales); and (b) because sellers are compelled to place inventory with FBA, independent fulfillment providers are deprived of the scale necessary to compete effectively and drive down fulfillment costs. *Id.* ¶ 368. Plaintiffs allege that these imagined higher costs reduce competing retailers' ability to compete with Amazon in the relevant markets. *Id.* ¶ 438.

### F. Plaintiffs' Expert's Competitive Effects Opinions

Plaintiffs retained Professor Justin Johnson, an economist at Cornell University's College of Business, to evaluate the competitive effects of the conduct challenged in the Complaint.[4] Ex. 11 (Johnson Rep.) ¶ 4. He took divergent approaches for the two categories of conduct he was asked to assess. With respect to the challenged *pricing* conduct, which is not at issue in this motion, Johnson conducted a variety of econometric regression analyses purporting to isolate and quantify claimed anticompetitive effects in the four stores Plaintiffs claim compose the relevant market.[5] *See generally id.* ¶¶ 367-373, 491-517, 854-861.

In contrast, Johnson does not offer any econometric or quantitative analysis to demonstrate market-wide competitive effects purportedly caused by the challenged *fulfillment* conduct. With respect to that conduct, Johnson opines that the supposed FBA-Prime requirement harms competition because it "makes it more costly for sellers to sell *off Amazon*." *Id.* ¶ 139; *see id.* ¶¶ 214-215. The "reduced profitability for sellers" that results, Johnson argues, causes market-

---

[4] Amazon separately moves to exclude certain of Johnson's fulfillment-related opinions. Even if those opinions are admissible, they are insufficient to create a triable issue on whether the alleged FBA-Prime requirement caused market-wide harm. *See, e.g.*, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 3414662, at *4 (S.D. Cal. June 22, 2020) (expert's "unsupported assertions" on harm to competition were "insufficient at the summary judgment stage").

[5] Amazon disputes the validity of Johnson's findings based on a number of flaws that do not bear on this motion. The issue here is not that Johnson's opinions about the fulfillment conduct's effects rest on flawed quantitative analysis; it is that *no* opinion he offers on market-wide price or output effects rest on quantitative analysis, not even rough approximations.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

wide harm in the two alleged relevant markets (i.e., both the shopper- and seller-facing markets). *Id.* ¶ 149. Johnson does not provide any regression analyses—or any other econometric or statistical analysis—to measure these claimed effects. Nor does Johnson opine that Amazon charges supracompetitive fees for its FBA service. And Johnson does not offer any opinion that measures any specific anticompetitive effect that resulted from the alleged FBA-Prime requirement.[6]

### 1. Johnson's Seller Constraints Opinion

Johnson posits three categories of costs that he claims flow from the alleged constraint on sellers' ability to manage their fulfillment operations: (1) sellers face increased "administrative costs and complexities" because they are purportedly unable, or less able, to use non-Amazon fulfillment solutions, *id.* ¶ 931; (2) sellers have less ability to consolidate or "pool" their on- and off-Amazon inventory with a single fulfillment solution,[7] *id.* ¶ 961; and (3) the conduct interferes with "volume discounts" that sellers might be able to negotiate with carriers and 3PLs, *id.* ¶ 978.

*Administrative Costs and "Complexities."* Johnson claims that using a single fulfillment solution for sales on and off Amazon "would have reduced administrative costs by reducing the time it took to manage inventory in multiple warehouses." *Id.* ¶ 937 & n.1415; *id.* ¶¶ 935-941. To support this assertion, Johnson cites testimony from nine sellers and a consultant. *Id.* Johnson discloses no empirical analysis testing these generalized assertions. He does not conduct any study purporting to quantify these increased "administrative costs and complexities" for all sellers, for the nine sellers whose testimony he relies on, or for any of the over one million active sellers in

---

[6] Rabinovich, Plaintiffs' fulfillment industry expert, did not opine on Amazon's conduct or the competitiveness of the industry, and thus he does not opine that there has been any harm to the fulfillment industry. Ex. 5 (Rabinovich Dep.) at 89:17-21, 92:17-20, 138:15-20. Quite to the contrary, Rabinovich could not identify a single fulfillment provider that was unable to offer fulfillment services or a single large retailer that was unable to fulfill its e-commerce orders. *Id.* at 248:20-24, 291:24-292:11, 297:10-14. Indeed, he was unaware of a single retailer among the top 100 largest retailers that was "unable to secure fulfillment services for its e-commerce orders." *Id.* at 297:10-14.

[7] According to Johnson, an "inventory pool is a stock of inventory used to satisfy orders coming from one or more online channels." Ex. 11 (Johnson Rep.) ¶ 944.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

Amazon's store. *See id.* ¶ 934. He does not offer any opinion that any particular seller would have decided to fulfill 100% of their products with a non-Amazon provider absent the supposed FBA-Prime requirement. And he discloses no analysis to show that these "administrative costs and complexities" cause higher prices or lower output in either alleged market.

*Inventory Pooling.* Johnson next claims that the fulfillment conduct increases costs by impeding sellers' ability to efficiently manage their inventory, namely by "pooling" their inventory with a single fulfillment service. According to Johnson, this gives rise to "inventory-splitting costs"—that is, the expense associated with maintaining the inventory needed to keep its products in-stock on multiple channels simultaneously. *Id.* ¶ 872 n.1295. He concedes, however, that under Amazon's MCF service, participating sellers "can use the same pool of inventory to fulfill orders via FBA and via off-Amazon channels that permit MCF fulfillment." *Id.* ¶ 182. In other words, sellers can use FBA to "pool" their inventory, if they decide doing so would help them operate efficiently for sales both on and off Amazon.

Johnson did not conduct any analysis to "attempt to directly quantify" the benefits of pooling inventory or calculate splitting costs. Ex. 23 (Johnson Dep.) at 270:25-272:13. He likewise did not perform any quantitative analysis to compare the cost of using FBA versus other fulfillment services. *Id.* at 270:17-24. He agrees that there are "legitimate pro-competitive reasons why a seller would want to use multiple fulfillment services," so would expect some sellers might choose to "use multiple fulfillment services" even absent the alleged FBA-Prime requirement. *Id.* at 268:17-24.

Yet he nevertheless claims that Amazon's conduct increases sellers' costs, and in turn harms competition across the markets, by interfering with inventory pooling. He offers no analysis quantifying the number of sellers that experience this supposed increased cost, the extent of the cost increase, or the degree to which prices or selection are affected. He does not even approximate a price or selection effect. Johnson instead offers a stylized example in which a single hypothetical seller's decision to split inventory between two hypothetical channels *could* lead to inventory loss



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

under demand scenarios created by Johnson. Ex. 11 (Johnson Rep.) ¶¶ 949-952. He assumes that these hypothetical fulfillment services have the same inventory costs, *id.* ¶ 966, yet he did not analyze as a "statistical" or "empirical" matter Amazon's fulfillment costs versus those charged by any other provider, Ex. 23 (Johnson Dep.) at 61:22-62:6, 269:9-270:24, and so cannot say whether this assumption is accurate. Based on his model, he claims that Amazon's conduct reduces "incentives to sell off Amazon." Ex. 11 (Johnson Rep.) ¶ 967.

He also relies on testimony from several retailers and sellers suggesting that inventory from *some* sellers on *some* stores may be lower because sellers prioritize FBA. *Id.* ¶¶ 953-954 (citing testimony from [redacted]); *id.* ¶ 967 ([redacted]). He further observes that some sellers would prefer some hypothetical single-fulfillment solution over the status quo. *Id.* ¶¶ 968-969 ([redacted]). Johnson acknowledges in his expert reports that "there are several reasons sellers may find it advantageous to rely on a wider array of fulfillment service providers." Ex. 24 (Johnson Reply) ¶ 678 (quoting Rabinovich Rep. ¶ 103).[8]

*Volume Discounts.* Finally, Johnson claims that the alleged FBA-Prime requirement makes it more difficult for sellers "to negotiate volume discounts with" other fulfillment services, which, he claims, leads to higher prices and reduced selection. Ex. 11 (Johnson Rep.) ¶ 978. Johnson does not provide any quantitative analysis identifying the extent to which such "volume discounts" are affected by the conduct, let alone quantify any price or output effects attributable

[8] For his part, Rabinovich did not try to quantify the benefits and costs of pooling inventory with one provider. While he discusses the benefits some sellers may enjoy from inventory pooling, he also opined that "there are several reasons sellers may find it advantageous to rely on a wider array of fulfillment service providers," including the ability to "place their inventory closer to consumers," the avoidance of risk that unforeseen events would "overwhelm[] any particular fulfillment services provider," and the ability to "spread the risk of disruptions on the providers' side." Ex. 1 (Rabinovich Rep.) ¶¶ 103-106. Moreover, Rabinovich did not offer an opinion on whether there was anything preventing a seller from consolidating its inventory with one fulfillment provider, Ex. 5 (Rabinovich Dep.) at 185:9-18, and he testified that an Amazon seller can consolidate its inventory with one fulfillment provider serving multiple channels, *id.* at 284:19-285:6. Additionally, Rabinovich did not offer an opinion on the additional cost for a seller to use Amazon as one fulfillment provider and a separate fulfillment provider, *id.* at 196:1-7, nor did he do an empirical analysis to understand when it makes sense for a seller to use one provider as opposed to more than one provider, *id.* at 196:20-24.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

to the reduction in "volume discounts." He relies on testimony from a single seller who testified that [redacted] *Id.* ¶ 980 & n.1485 ([redacted]).[9] He also points to two emails in which sellers raise the possibility of better carrier rates by withholding selection from FBA. *Id.* ¶ 981. From this, Johnson spins out a chain of events under which fewer discounts leads to higher variable costs, which in turn leads to lower profits, ultimately resulting in competitive harm. *Id.* ¶ 982.

### 2. Johnson's Foreclosure of Fulfillment Competition Opinion

Johnson claims that the "FBA-Prime requirement *likely* limits the scale and hence the capabilities of 3PLs and other marketplace-neutral fulfillment solutions, and so competition in the relevant markets is *likely* reduced." *Id.* ¶ 1043 (emphases added); *see id.* § V.E. Johnson did not "perform[] a separate empirical study in which [he] examine[d] economies of scale in fulfillment," Ex. 23 (Johnson Dep.) at 278:12-17, and he does not offer an opinion about what scale would be sufficient to enable a 3PL effectively to compete with FBA, *id.* at 277:10-18. He likewise does not opine that any particular 3PL would have achieved any particular level of scale absent the challenged conduct. *Id.* at 268:25-269:7. And Johnson does not identify any 3PL that would have offered the same quality as FBA at the same or lower cost absent the challenged fulfillment conduct. *Id.* at 257:23-258:17. His expert report claims that, absent the FBA-Prime requirement, "sellers would benefit from the *likely* lower costs and higher quality of 3PLs," but he does not perform any quantitative analysis to show what those "likely" lower costs would be. Ex. 11 (Johnson Rep.) ¶ 201.[10] As Plaintiffs put it, Johnson does not "identify specific sellers or rivals

---

[9] The majority of that seller's [redacted] *See* Ex. 25 ([redacted] Dep. (Jan. 27, 2025)) at 38:17-24.

[10] Although Rabinovich focused on the scale of Amazon's fulfillment operations, he was careful to disclaim any opinion that a fulfillment service provider must have Amazon's scale in order to compete. Ex. 5 (Rabinovich Dep.) at 243:9-18. He has not opined that there is some "minimum scale that's required to compete in the fulfillment industry," and has not identified any Amazon conduct that prevented "fulfillment providers from reaching the scale and capabilities." *Id.* at 126:24-127:3, 232:17-22. And Rabinovich confirmed that some fulfillment providers have reached "viable scale to … participate in the industry." *Id.* at 122:20-123:5.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

that raised off-Amazon prices due to the FBA-Prime requirement." Ex. 26 (Pls.' Oct. 13, 2026 Supp. Resp. to Interrog. No. 4) at 20.

### G. "Project Nessie"

Project Nessie was a method of pricing certain products for limited periods of time that Amazon began using in 2015 and discontinued in 2019.

#### 1. Amazon's Introduction of Project Nessie

Project Nessie arose out of a belief that Amazon's first-party price matching strategy sometimes resulted in its prices for certain products becoming "deadlocked" (i.e., stuck) at levels that did not "reflect[] the current conditions" in the market after Amazon and other retailers matched a price that a competing retailer had intended only as a short-term promotion. Ex. 27 (AMZN-RTL-FTC-09089370) at -371. Project Nessie was introduced in 2015 to test whether it was possible for Amazon to break out of certain deadlocks by temporarily raising its own price to a different level (usually by matching the second-lowest competitor price), before again resuming its default price-matching strategy after a period of time (most commonly, 20 days). Ex. 28 (Amazon-FTC-CID_07675017) at -.001; Ex. 29 (Lafontaine Rebuttal) ¶ 386 n.517.

Because Project Nessie would leave Amazon uncompetitive on prices for a period of time, Amazon developed a series of criteria or "guardrails" that varied over time but that were designed (i) to limit the number of products that were eligible for Project Nessie, (ii) to limit the number of eligible products that actually were enrolled in a Nessie pricing experiment at any one time, and (iii) to ensure that the overall number of customer impressions ("glance views") of products that had been enrolled in a Nessie pricing experiment did not exceed a certain percentage of the total customer impressions within a product category on a given day (which percentage varied over time, but was, for example, at different times 2%, 3%, or 5% of total glance views). Ex. 30 (AMZN-RTL-FTC-08632832) at -836; Ex. 31 (Groehn Rep.) ¶ 48.

From 2015 to 2019, Amazon attempted to evaluate the success of Project Nessie by looking at whether the competitor price with which it had formerly been "deadlocked" had changed after



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

a Nessie experiment was used to temporarily change Amazon's price. Ex. 32 (AMZN-RTL-FTC-13850805) at -805. Amazon considered an individual Nessie experiment to have been a success if the formerly "deadlocked" price had risen to match or exceed Amazon's price by the time the experiment came to an end (indicating that Nessie had successfully broken a deadlock). *Id.* Amazon then assumed that the benefits from a successful Nessie experiment lasted for an entire calendar year. Ex. 28 (Amazon-FTC-CID_07675017) at -.003. In this way, Amazon calculated both an internal estimate of Project Nessie's success rate (which ranged from around [redacted] in Project Nessie's first year, down to around [redacted] by early 2019) and estimates of how much those experiments in total improved the profitability of Amazon's retail store. *Id.*; Ex. 30 (AMZN-RTL-FTC-08632832) at -836.

**2. Amazon's Deprecation of Project Nessie**

By early April 2019, Amazon had come to the conclusion that its "success rate for Nessie [was] likely over-estimated due to an unknown number of 'false positives,'" and that "[f]or this and other reasons … Nessie's benefits have been highly over-stated." Ex. 32 (AMZN-RTL-FTC-13850805) at -805. Accordingly, "Nessie was shut down on April 2, 2019 for all [product] categories except Books." *Id.* Amazon then planned to further evaluate "the 'true' economic value of Nessie" through formal tests. *Id.*

Between late August and October 2019, Amazon performed a controlled experiment (the "A/B test") wherein it divided a set of Nessie-eligible products into a "test" group and a "control" group, then had prices for the products in the test group changed by Project Nessie, while prices in the control group continued to follow Amazon's default price-matching rules. Ex. 28 (Amazon-FTC-CID_07675017) at -.001. After comparing the outcomes in the two groups, Amazon determined that much of what it had formerly considered to be successful applications of Project Nessie were indeed "false positives," in that the same pricing outcomes it observed in the test group also occurred in the control group that had not been affected by Project Nessie. *Id.* at -.003. After eliminating the impact of these false positives, Amazon estimated that Project Nessie had



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

only actually been successful for between 1.4% and 1.6% of its applications. *Id.* The same A/B test also showed that the benefits from even a successful application of Project Nessie were much shorter in duration than was previously thought. Whereas Amazon had originally assumed that the benefits of a successful application of Nessie would last for an entire calendar year, the A/B test showed the "financial benefit duration of Nessie to be between 20–57 days." *Id.* The test also showed that Nessie had a "large" impact on Amazon's price competitiveness, which Amazon worried could undermine customer trust. *Id.* at -.001, .004. Based on these findings, Project Nessie was "disabled" as of November 2019.[11] *Id.* at -.004. The data scientist who performed this test testified that he "feel[s] very confident about" the validity of Amazon's findings. Ex. 33 ([redacted] Dep.) at 291:6-11.

The witnesses who were questioned about Project Nessie universally testified that the program was shut down in 2019, it had not been reactivated since that time, and Amazon had no plans to reactivate it. *See* Ex. 34 ([redacted] Dep. (July 23, 2025)) at 93:17-94:11; Ex. 35 ([redacted] Dep.) at 314:7-315:11; Ex. 33 ([redacted] Dep.) at 291:23-292:9. There are likewise no Amazon employees or Amazon resources allocated to restarting Project Nessie. Ex. 35 ([redacted] Dep.) at 315:7-8. Thus, and notwithstanding what it had once believed about Project Nessie, "in the fullness of time, we just found Nessie was not effective." Ex. 36 ([redacted] Dep. (July 22, 2025)) at 232:15-21; *see also* Ex. 33 ([redacted] Dep.) at 283:24-284:7 ("Nobody is interested in Nessie anymore.").

### 3. Plaintiffs' "Evidence" Regarding Amazon's Continued Use of Project Nessie

Plaintiffs reference one email in their Complaint that they assert shows that Amazon intends to use Project Nessie in the future. Compl. ¶ 433. In that email, from January 2022, an Amazon executive posed a question of whether Amazon "***should*** … test" increasing its prices to

[11] The A/B test ended in October 2019, *id.* at -.001, after which time no new products entered a Nessie application. The Nessie applications that were ongoing at that time concluded in November 2019. *See* Ex. 29 (Lafontaine Rebuttal) at 442 (timeframe of Project Nessie dataset).



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

address rising inflation, and mentioned "[o]ur old friend Nessie, perhaps with some new targeting logic?" as the potential means of conducting that test. Ex. 37 (AMZN-RTL-FTC-06805230) at -234 (emphasis added). The executive's question was answered by his team, who said that they "***do not recommend*** reinstating Nessie in the short term, while our prices rise in line with inflation." *Id.* at -231 (emphasis added). The executive then replied: "I'm aligned with how you are thinking …." *Id.* at -230. That exchange of messages concluded nearly five years ago. It is undisputed that it did not lead to Amazon taking any actual steps in the direction of restarting Project Nessie.

## II. LEGAL STANDARD

"Summary judgment is proper when, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *AliveCor, Inc. v. Apple Inc.*, 163 F.4th 1259, 1264 (9th Cir. 2026) (internal quotation marks omitted) (quoting *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 575 (9th Cir. 2020)); *see* Fed. R. Civ. P. 56(a). "The Court can grant partial summary judgment on portions of a claim or defense." *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076, 1083 (W.D. Wash. 2024); *see* Fed. R. Civ. P. 56(a).

"When, as here, the moving party does not have the burden of proof on an issue at trial, it 'can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case.'" *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 717 (9th Cir. 2024) (quoting *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Id.* at 718 (internal quotation marks omitted) (quoting *Soremekun*, 509 F.3d at 984). "Although the court must draw all 'justifiable inferences' in favor of the nonmoving party, the nonmoving party may not rely on 'mere allegations or denials' to create a genuine issue of material fact." *Washington v. Trump*, 814 F. Supp. 3d 1173, 1195 (W.D. Wash. 2026) (quoting *Endy v. County of Los Angeles*,



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

975 F.3d 757, 763 (9th Cir. 2020)). If a party cannot show a genuine dispute as to "an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment will be granted. *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 799 (9th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III. ARGUMENT

### A. Summary Judgment Should Be Granted as to Amazon's Fulfillment Conduct.

After extensive fact and expert discovery, Plaintiffs have not met their burden to show that the FBA-Prime requirement has caused substantial anticompetitive effects in either of their alleged relevant markets—none of which involves a market for the provision of any component of retailer fulfillment services. While their expert engages in various econometric analyses purporting to evaluate competitive effects attributable to certain Amazon *pricing* policies and practices, Plaintiffs offer no such support for their theory that the *fulfillment* conduct resulted in market-wide harm. Plaintiffs' strategy of bundling their disparate theories into an overarching "monopolization" claim does not excuse their burden to show that each theory has anticompetitive effects. *See, e.g.*, *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 969, 980 (N.D. Cal. 2023) (granting summary judgment as to some, but not all, theories of antitrust liability). Summary judgment is therefore appropriate.

#### 1. Plaintiffs Have the Burden to Show Substantial Market-wide Effects.

Plaintiffs must show that the challenged conduct "ha[d] a substantial anticompetitive effect that harms consumers in the relevant market." *Blythe v. Nat'l Collegiate Athletic Ass'n*, --- F.4th ---, 2026 WL 2653349, at *5 (9th Cir. Sep. 9, 2026) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018)). This means that Plaintiffs must show "an anticompetitive impact on the market as a whole," *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985 (9th Cir. 2023) (quotation omitted), not merely isolated instances of harm to individual market participants, *e.g.*, *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1414 (9th Cir. 1991). "Insisting on proof of harm to the whole market fulfills



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993); *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir. 1996) ("[W]hile 'conduct that eliminates rivals reduces competition,' 'reduction of competition does not invoke the Sherman Act until it harms consumer welfare.'" (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995))).

Several principles follow from this standard. First, Plaintiffs cannot meet their burden by showing a *theoretical* or *de minimis* injury to competition. *See Metro Indus.*, 82 F.3d at 848 (affirming grant of summary judgment where plaintiff "speculated that it could provide direct evidence of injury to competition in the future" but "produced no evidence of reduced output or increased prices"). Plaintiffs instead "must provide 'proof of actual detrimental effects on competition,' such as reduced output, increased prices, or decreased quality in the relevant market." *HDMI Licensing Adm'r, Inc. v. Availink, Inc.*, 820 F. Supp. 3d 944, 966 (N.D. Cal. 2025) (quoting *Epic Games*, 67 F.4th at 983). Second, Plaintiffs must provide "evidence" to show that these concrete anticompetitive effects are "attributable to the challenged" conduct. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021) (affirming grant of summary judgment).

Applying these principles, courts in this Circuit regularly grant summary judgment when an antitrust plaintiff cannot show a substantial adverse effect on competition in the relevant market as a whole. *E.g.*, *id.* at 1113; *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013) (affirming grant of summary judgment for failure to show "harm to competition in the entire automotive exhaust product market"); *Metro Indus.*, 82 F.3d at 848; *Toscano v. PGA Tour*, 201 F. Supp. 2d 1106, 1121-23 (E.D. Cal. 2002). In *HDMI Licensing*, for instance, the court rejected the notion that "*theoretical* harm to competition" would suffice. 820 F. Supp. 3d at 967. The plaintiff could not skate by summary judgment by appealing to "economic theory" or asserting that purchasers would have had more options and better prices in



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

an alternative reality. *Id.* (citing *Sterling Merch. v. Nestle S.A.*, 656 F.3d 112, 119-22 (1st Cir. 2011)).

Likewise, in *Coca-Cola Co. v. Omni Pacific Co.*, an antitrust claim failed at summary judgment because its proponent failed to "quantify or otherwise demonstrate the level of impact" the challenged policy had on the relevant market. 2000 WL 33194867, at *7 (N.D. Cal. Sep. 27, 2000). There was expert opinion that the challenged conduct caused "substantial problems" for certain market participants and that certain competitors' output diminished. *Id.* But the failure to show concrete harm across the market doomed the antitrust claim. *See id.* at *8.

**2. Plaintiffs Fail to Meet Their Burden.**

The Court should grant summary judgment as to Plaintiffs' challenge to Amazon's fulfillment conduct because they have not met their burden of showing a substantially adverse effect of reduced output or increased prices in either of their alleged relevant markets.

**a. Plaintiffs Fail to Show that Alleged Constraints on Sellers' Fulfillment Options Has Caused Substantial Anticompetitive Effects in the Relevant Markets.**

Plaintiffs fail to show anticompetitive effects based on their theory that the claimed FBA-Prime requirement raises sellers' costs and in turn harms competition. Most substantially, Plaintiffs offer no evidence demonstrating that any of the *theoretical* mechanisms they invoke—higher administrative costs and "complexities," increased difficulty pooling inventory, or inability effectively to negotiate volume discounts with carriers and fulfillment providers—have actually materialized for some substantial portion of sellers. They similarly have no evidence that these hypothetical higher costs *for sellers* have somehow translated into harm to competition *among the retailers* in Plaintiffs' alleged markets, thereby resulting in market-wide price increases or output decreases.[12] *See, e.g.*, *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 990-91 (9th Cir. 2020) ("[N]ovel

[12] Plaintiffs recognize that output in the relevant markets has increased significantly since Amazon launched FBA and allegedly "required" sellers to use that service to make their offers Prime-eligible. *See, e.g.*, Ex. 38 (Evans Reply) ¶ 495 (observing that total e-commerce sales grew from $0.5 trillion in 2013 to $1.2 trillion in 2025 "as a result of economic expansion and an increased demand for online shopping"). When "output is expanding at the same time prices are increasing, rising prices are equally consistent with growing



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

business practices—*especially* in technology markets—should not be conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the *precise harm* they have caused or the business excuse for their use." (second emphasis added; quotation omitted)).

On the flipside, Plaintiffs have not shown that these mechanisms have increased costs to such an extent that any of the three other marketplaces that allegedly compete with Amazon on "seller services" have been impeded in their ability to compete for sellers, much less that seller fees increased or output decreased in that purported market. Plaintiffs "did not conduct an empirical analysis of" the effects of sellers' supposedly increased costs on prices or output in the relevant markets. *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021). They did not even attempt to establish that sellers in fact have faced increased costs due to the fulfillment conduct at issue in this motion, let alone quantify any such increased costs. *E.g.*, Ex. 23 (Johnson Dep.) at 270:25-272:13.

**1) Plaintiffs' Anecdotes Do Not Show Market-wide Harm.**

What Plaintiffs offer in place of economic analysis is no substitute for concrete evidence of market-wide harm. *See Coca-Cola*, 2000 WL 33194867, at *8. For instance, Johnson relies on anecdotal accounts from a handful of sellers in support of his sweeping claim that the FBA-Prime requirement leads to higher administrative costs and "complexities" for sellers. *Supra* § I.F.1; *see 1-800 Contacts*, 1 F.4th at 118 (government failed to show price effects by offering "theoretical and anecdotal" evidence). Even his cherry-picked examples are hardly ringing endorsements of his theory. He characterizes one consultant's testimony as recognizing that consolidation makes it [redacted]." Ex. 11 (Johnson Rep.) ¶ 937 (quoting [redacted]

---

product demand," and so evidence of rising market prices does not itself establish anticompetitive effects. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993); *see also FTC v. Qualcomm, Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (explaining that rising prices can be "fully consistent with a free, competitive market" (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))). Plaintiffs do not even get to this consideration, however, because they show *no evidence* that market prices did increase.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

[redacted] Dep. Tr. (Sep. 10, 2025) at 146:22-148:2). At best, that anecdote indicates that there may be some advantages to consolidating inventory in some circumstances; it does not even gesture toward potential anticompetitive effects. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1174 (9th Cir. 2016) ("evidence decoupled from harm to competition—the bellwether of antitrust—is insufficient to defeat summary judgment"). And Johnson performs no analysis to generalize his hand-selected anecdotes to the 1.1 million sellers in the Amazon store. Ex. 24 (Johnson Reply) ¶ 217.

Worse still, Johnson relies on just three anecdotes to claim that Amazon's conduct interferes with volume discounts to such an extent that it harms market-wide competition. *Supra* § I.F.1. These examples do not provide, even on their limited terms, any evidence of harm and instead suggest that moving inventory from SFP to FBA "*could* increase" shipping rates by some unknown amount without any assessment of overall quality-adjusted costs or indication of any corresponding effect on prices or output. Ex. 11 (Johnson Rep.) ¶ 981. But "anecdotal speculation and supposition are not a substitute for evidence" showing actual and substantial anticompetitive effects. *Aerotec*, 836 F.3d at 1174; *see HDMI Licensing*, 820 F. Supp. 3d at 967. This is especially true where Plaintiffs rely on a tiny sliver of the vast contingent of Amazon sellers that use FBA and make no effort to demonstrate that their context-free anecdotes provide a suitable basis from which to extrapolate market-wide harm. *See Aerotec*, 836 F.3d at 1174, 1181; *S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 877 (11th Cir. 1998) ("speculation about anticompetitive effects is not enough").

**2) Plaintiffs' Hypothetical Exercises Do Not Show Market-wide Effects.**

Plaintiffs fare no better by relying on a stylized hypothetical to support a broad claim that "an inability to pool [inventory] increases the seller's costs, lowers the seller's profits, and so the seller has lower incentives to provide selection to" multiple channels. Ex. 11 (Johnson Rep.) ¶ 966.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

To establish that this theory is viable, Plaintiffs must provide *evidence* that: (a) some significant quantity of third-party sellers would prefer to fulfill in one place; (b) that this would result in third-party sellers having a cost advantage off Amazon; and (c) that this cost advantage would translate into Walmart, Target, and eBay (the only participants in Plaintiff's gerrymandered "relevant market") emerging as more significant competitors. As an initial matter, Johnson offers no opinion or analysis that, absent the alleged fulfillment conduct, all or even any material number of third-party sellers would not use FBA and would instead consolidate all of their fulfillment through a non-Amazon provider. *Supra* § I.F.1.

Indeed, Johnson recognizes that "there are several reasons why sellers may find it advantageous to rely on a wider array of fulfillment service providers." Ex. 24 (Johnson Reply) ¶ 678 (quoting Rabinovich Rep. ¶ 103). Testimony from even the few sellers on which Johnson relies refutes the very first link in his chain. The [redacted] testified that [redacted]." Ex. 39 [redacted] Dep.) at 136:16-21. [redacted] testified that the company [redacted]" Ex. 12 ([redacted] Dep.) at 109:5-110:1. He also disagreed that the [redacted] Ex. 12 ([redacted] Dep.) at 109:5-9.

Other sellers, whose testimony Johnson did not address in his report, further undermine the suggestion that third-party sellers opt into FBA despite higher costs. [redacted], for instance, testified that [redacted]. Ex. 40 ([redacted] Dep.) at 110:15-23,



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

187:18-23. Yet another, [redacted], testified that it uses FBA because [redacted] Ex. 13 ([redacted] Dep.) at 54:2-5.[13]

These obvious counterexamples confirm that summary judgment is appropriate. For Plaintiffs to establish market-wide effects, it must be the case that a substantial portion of the 1.1 million sellers in Amazon's store would prefer to consolidate inventory off Amazon to gain a cost advantage, but do not do so because of the alleged FBA-Prime requirement. But Plaintiffs cannot support such a sweeping inference from a small set of examples of sellers claiming to hold that belief, especially where some sellers plainly disagree. To illustrate at a broader scale, in 2024, 21.8% of sellers used some combination of FBA and non-FBA fulfillment services for their Amazon sales, and 29.3% of sellers did not use FBA at all. Ex. 29 (Lafontaine Rebuttal) ¶ 462. Thus, even with the purported benefits of the alleged FBA-Prime requirement, hundreds of thousands of sellers use multiple fulfillment solutions *just on Amazon*, and hundreds of thousands more do not use FBA at all.

Moreover, Johnson freely concedes that he has not "done an empirical study in which I attempt to directly quantify … the benefits of pooling inventory." Ex. 23 (Johnson Dep.) at 272:2-13. He therefore has no basis to suggest that some cost advantage would result from the inventory pooling he anticipates. Johnson's hypothetical thought experiment is unmoored from any real-world costs charged by different fulfillment services, which he did not study. Ex. 23 (Johnson Dep.) at 61:22-62:6, 270:17-24. Plaintiffs' decision to try to show anticompetitive effects through a hypothetical—created by Johnson to serve his opinion—instead of empirical analysis fails as a matter of law. "A theoretical model of market behavior, regardless of its logic, is insufficient to sustain the plaintiff's burden of proving an actual and substantial

---

[13] The witness testified that he does not believe that [redacted] Ex. 13 ([redacted] Dep.) at 136:7-21; *see id.* 139:12-14 [redacted]").



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

anticompetitive effect resulting from the defendants' alleged conduct." *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 619 F. Supp. 441, 453 (N.D. Cal. 1985).

In short, Plaintiffs' belief that the FBA-Prime requirement harms competition by constraining sellers piles contingency on contingency: They claim that a sufficiently large number of third-party sellers would achieve cost savings (e.g., reduced administrative costs, volume discounts) and efficiencies (e.g., inventory pooling) associated with unspecified non-FBA fulfillment solutions in the abstract; absent those savings and efficiencies—again, all else equal, according to Plaintiffs—sellers incur greater fulfillment costs; and, in turn, Plaintiffs speculate that sellers across the market choose to set higher prices or offer less selection than they would otherwise at Walmart.com, Target.com, and eBay such that these firms theoretically cannot effectively compete with Amazon. But while such a theory may suffice at the pleading stage, it does not stand in for evidence demonstrating and quantifying that such harms have actually occurred, sufficient to warrant a trial on the issue. *Coca-Cola*, 2000 WL 33194867, at *8; *Metro Indus.*, 82 F.3d at 848; *see also Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (summary judgment appropriate where alleged effects rested on "general economic theory" and not "market surveys or other studies of the relevant market to determine the actual effect the appellees had on competition").

**b. Plaintiffs Fail to Show that Alleged Foreclosure of Fulfillment Competition Has Caused Anticompetitive Effects in the Alleged Relevant Markets.**

Plaintiffs likewise fail to show that anticompetitive effects resulted from the FBA-Prime requirement's supposed foreclosure of fulfillment competitors.[14] Their theory in this respect is that Amazon's conduct has deprived 3PLs and other fulfillment services from achieving sufficient "scale" to "facilitate competition in the relevant market." Ex. 11 (Johnson Rep.) ¶ 144. The best

---

[14] Again, Plaintiffs have not alleged that Amazon has monopolized a market for any sort of "fulfillment services" and therefore have no claim based on harm to competition in any such market. *Supra* § I.A. For the same reason, any purported "harm" to 3PLs and their customers, which are "outside the relevant markets," is "beyond the scope of antitrust law." *Qualcomm*, 969 F.3d at 993.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

Plaintiffs offer here is Johnson's cautious opinion that the conduct "likely" limits competitors' scale and therefore "likely" reduces competition. *Id.* ¶ 1043. Johnson's reluctance is understandable, because he did not actually do any empirical analysis of economies of scale in fulfillment and does not know what scale would be sufficient to enable a 3PL to compete. Ex. 23 (Johnson Dep.) at 277:10-18, 278:12-17. In any event, Plaintiffs' burden requires "proof of *actual* detrimental effects" on competition in the relevant market, and Plaintiffs fail to meet that burden with an expert opinion on the "likely" directional effects. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022); *R.C. Dick Geothermal*, 619 F. Supp. at 450 (to show "substantially adverse effect on competition," plaintiff must provide "evidence of actual, not merely speculative, impact upon competitive conditions in the relevant market"). Theoretical harm to competition is not sufficient. *Aerotec*, 836 F.3d at 1174; *1-800 Contacts*, 1 F.4th at 118.

As with the seller constraint theory addressed above, Plaintiffs do not rely on any empirical evidence demonstrating that foreclosure of fulfillment competition has in fact hamstrung sellers to such a degree that prices have increased or output decreased in the relevant market. But the law requires concrete evidence of market-wide harm to competition. *Coca-Cola*, 2000 WL 33194867, at *8; *Metro Indus.*, 82 F.3d at 848; *see also Military Servs. Realty*, 823 F.2d at 832. That is absent here. Johnson readily admits that he did not undertake to study the core components of his "foreclosure" theory:

- He did not try to quantify the volume that 3PLs would have achieved absent the FBA-Prime requirement.
- He did not identify a single competitor who failed to achieve sufficient "scale," whatever that might be, due to the conduct.
- He did not try to analyze the scale needed for a 3PL to compete effectively with Amazon (and, therefore, cannot say whether any 3PL would have achieved requisite scale).



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

- He did not quantify the "likely" cost reductions 3PLs would achieve absent the FBA-Prime requirement.

*See supra* § I.F. Without the basic analysis supporting the claim that the FBA-Prime requirement forecloses competition from 3PLs and therefore causes substantial harm across the alleged markets, Johnson's "opinion" remains speculation that falls far short of Plaintiffs' burden.

**B. Summary Judgment Should Be Granted on All "Nessie" Claims.**

The FTC and four States bring claims challenging a long-since-abandoned Amazon pricing program that operated under the name "Project Nessie."[15] The undisputed record shows that Amazon implemented Project Nessie beginning in 2015 as a way to assess whether Amazon might be able to profitably raise its own prices for certain products that it considered to be priced at "unsustainable" levels. See Ex. 28 (Amazon-FTC-CID_07675017) at -.001. But the program was terminated in 2019 after Amazon came to believe—and subsequent testing confirmed—that the perceived benefits of Project Nessie were largely illusory, and that they were significantly outweighed by its costs (in particular, the cost of undermining Amazon's reputation for price competitiveness). Accordingly, Project Nessie was "shut down" for all product categories except for print books in April 2019, and that shutdown was made permanent and extended to all product categories by the end of that year.

Summary judgment should be granted on the "Nessie" claims because neither the FTC nor Plaintiff States may obtain an injunction against conduct that was discontinued years ago, and for which there is no likelihood of recurrence. The FTC is restricted by statute to only seeking injunctions when the defendant "is violating, or is about to violate," a law enforced by the FTC. 15 U.S.C. § 53(b)(1); *see AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 76 (2021). The Ninth Circuit has construed that language to "preclude[]" injunctive relief when the FTC cannot show

---

[15] *See* Compl. ¶¶ 418-34 (Nessie Allegations); Count IV (FTC Nessie Claim) ¶¶ 459-65; Counts VII ¶¶ 484-85, XVI ¶¶ 534-35, XVII ¶ 540, and XX ¶¶ 599-600 (UDTPA claims of Connecticut, Oklahoma, and Rhode Island; New York claim).



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

that the alleged violation is "ongoing or likely to recur." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087-88 (9th Cir. 1985). Similar principles govern the State Plaintiffs' claims. The undisputed record is that Project Nessie has not been operational for more than seven years, that it was shut down because Amazon concluded that it did not serve a useful business purpose, and that Amazon has made no attempt to restart Project Nessie since that time. Because "there is nothing to be enjoined," *Qualcomm*, 969 F.3d at 1005, summary judgment should be granted on Count IV (against the FTC) and, in relevant part, State Counts VII, XVI, XVII, and XX.

To the extent that any individual State is pursuing claims for alleged harms caused by Amazon's past use of Project Nessie, summary judgment should also be granted for the further reason that Plaintiffs have not developed any evidence that it caused consumer harm that could support such a claim. Plaintiffs rely entirely upon internal Amazon assessments of how the program supposedly contributed to its profits during the years that it was operational. But increased *profits* are not proof of *consumer harm*, and those internal assessments are the same ones that Amazon later concluded were unreliable and overstated Project Nessie's benefits to such an extent that the program was shut down. Even if those earlier assessments are evidence of *something*, they still are not proof of *injury to consumers* capable of sustaining Plaintiffs' claims.

**1. The FTC's Legal Theory Is Novel and Untested.**

The FTC brought Count IV alleging a "standalone" violation of Section Five of the FTC Act, 15 U.S.C. § 45(a), thereby alleging that "Project Nessie" may be found to be an "[u]nfair method[] of competition in or affecting commerce" even though it does not violate the Sherman Act or any other law, and has never been otherwise adjudicated to be "unfair" by the FTC through its administrative process. *See* ECF 289 (Order on Def.'s Mot. to Dismiss), at 22-23 (describing Plaintiffs' standalone Section 5 claim). It remains true that Amazon is aware of no other court in at least the last thirty years that has been asked to decide whether conduct is an "unfair method of competition" even though it does not violate any other law. Throughout the FTC's history, and



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

by design, that is a question that has been relegated to the *Commission itself*, to be adjudicated in the first instance through the FTC's administrative process and then subject to judicial review on appeal. *See* 15 U.S.C. § 45(b) (describing FTC's authority to initiate an administrative proceeding to determine if *it* is "of the opinion that the method of competition … in question is prohibited"); *id.* § 45(c) (describing process for filing with the Court of Appeals "a written petition praying that the order of the Commission be set aside").[16]

The FTC's legal theory is that Amazon violated the law by unilaterally deciding to raise the prices for some of its products to make additional profits and in doing so considered the competitive responses of rival retailers—a theory that has never before been alleged by any antitrust enforcer, much less accepted by any court. In *E.I. du Pont de Nemours & Co. v. Federal Trade Commission*, 729 F.2d 128 (2d Cir. 1984) ("*Ethyl*"), the FTC sought to outlaw certain unilateral practices by gasoline additive manufacturers on the theory that they facilitated price coordination. The Second Circuit vacated the Commission's administrative decision finding a violation of Section 5, observing that the FTC offered no reasonable basis for distinguishing between lawful and "unfair" business practices. In particular, the court noted that: "Labelling one producer's price change in [an oligopolistic] market as a 'signal,' parallel price changes as 'lock-step,' or prices as 'supracompetitive,' hardly converts [a company's] pricing into an 'unfair' method of competition." *Id.* at 139. Because the "Commission owes a duty to define the conditions under which conduct claimed to facilitate price uniformity would be unfair so that businesses will have an inkling as to what they can lawfully do rather than be left in a state of

---

[16] *See also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) ("The standard of 'unfairness' under the FTC Act is, by necessity, an elusive one, encompassing … practices that the Commission determines are against public policy…."); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239-40 (1972) ("Congress … explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition'"); *id.* at 249 ("A court cannot label a practice 'unfair' under [Section 5]. It can only affirm or vacate an agency's judgment to that effect."); *Ryan, LLC v. FTC*, 746 F. Supp. 3d 369, 376 (N.D. Tex. 2024) ("[W]hether a practice is considered an 'unfair method of competition' … is typically decided through case-by-case administrative adjudication").



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

complete unpredictability," *id.*, and it has utterly failed to do that here, the Court may grant summary judgment on that basis alone.[17]

Since the Second Circuit's decision in *Ethyl*, the Supreme Court and Ninth Circuit have repeatedly held that courts are "ill suited" to the task of determining "the proper price, quantity, and other terms of dealing" that businesses should utilize. *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009) (same); *AliveCor*, 163 F.4th at 1267-68 (same); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133-34 (9th Cir. 2004) (affirming grant of summary judgment because the plaintiff "is essentially asking this court to identify the proper price that [defendant] should charge in the retail market—a role the Supreme Court has deemed courts ill suited to perform.") (internal quotation omitted). Courts have applied similar principles to the statutes under which individual states bring their claims. *See, e.g., Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 103-04 (2d Cir. 2019) (explaining that "charging high prices does not on its own give rise to a CUTPA [Connecticut Unfair Trade Practices Act] violation."). Moreover, this Court has already examined some of the co-Plaintiff States' "Nessie" claims and held that "[b]ecause Amazon uses Project Nessie to charge prices that adhere to 'market forces present in our capitalist society,' such conduct is not plausibly unconscionable" and has no "capacity to mislead" consumers. ECF 450 (Order on Amazon's 2nd Mot. to Dismiss), at 5, 7. Every day countless firms across scores of industries evaluate whether or not to raise prices on their products

---

[17] In November 2022, the FTC issued a "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5" of the FTC Act. *See* ECF 127 (Mot. to Dismiss), at 16 n.12. That Policy Statement contains, among other things, the FTC's interpretation and characterization of the holdings of various cases, as well as its identification of the "significant general principles concerning whether conduct is an unfair method of competition" in the eyes of the FTC. However, in response to Amazon raising concerns with the FTC's potential reliance upon that Policy Statement, the Court held that the Policy Statement was "inapt here" because "neither side argues that the Court should look to [it] in interpreting [] Section 5 of the FTC Act." ECF 289 (Order on Mot. to Dismiss), at 24 n.9. Moreover, since the time of the Court's analysis, at least one other court has considered the issue and held that "the FTC lacks substantive rulemaking authority with respect to unfair methods of competition." *Ryan*, 746 F. Supp. 3d at 387, *appeal dismissed on motion of Appellant Fed. Trade Comm'n*, No. 24-10951 (5th Cir. Sep. 8, 2025).



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

and consider the responses of their rivals—no law or regulation or court precedent has ever suggested that such conduct is unlawful.

The FTC's "Nessie" claim is novel because it asks the Court (1) to make a determination of what constitutes an "unfair practice" that in nearly every other instance has been made by the FTC itself in the first instance, and (2) to condemn as unlawful a form of conduct that the Supreme Court and Ninth Circuit have said courts are ill-equipped to evaluate and that Amazon had no notice could ever be attacked as violative of Section 5 of the FTC Act. Amazon raises these points to demonstrate that the FTC's insistence on litigating this stale claim should be understood in light of how unusual of a task the FTC is asking the Court to take on. It is asking the Court to become the *first* court to rule on the merits of a standalone unfair method of competition claim that seeks to regulate a firm's unilateral price-setting conduct—and in the circumstances of conduct that has long ago been abandoned.

### 2. Plaintiffs May Not Seek to Enjoin Past Conduct That Is Unlikely to Recur.

Summary judgment should be granted for the straight-forward reason that years before this litigation was filed, and before the FTC launched an investigation into the conduct at issue in this litigation, Amazon thoroughly evaluated Project Nessie from a business perspective, concluded that it had an insubstantial effect on prices, and made the voluntary decision to shut the program down on that basis. *Supra* § I.G.2. There is no evidence contradicting the fact that Amazon reached those conclusions and took those actions. Plaintiffs and their expert quibble with whether Amazon *should* have reached a different evaluation of Project Nessie, but that is immaterial to the controlling questions of whether Project Nessie is operational now or has been operational at any time during the last seven years (it is not and has not been), or whether there is any likelihood of Amazon resuming a program that it concluded years ago was not consistent with how it wants to operate its business (there is not). That is all that matters.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

The FTC's authority to obtain injunctions is defined by statutory language that is inherently "prospective, not retrospective." *AMG Cap. Mgmt.*, 593 U.S. at 76. "[T]he words 'is violating' and 'is about to violate' (not 'has violated') set[] forth when the Commission may request injunctive relief." *Id.* These and other portions of the statutory text "reflect that [Section 13(b) of the FTC Act] addresses a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness." *Id.* As a result, "'past wrongs are not enough for the grant of an injunction'; instead, an injunction will only issue if the wrongs are ongoing or likely to recur." *Qualcomm*, 969 F.3d at 1005 (quoting *Evans Prods.*, 775 F.2d at 1087) (alterations omitted). Applying these standards, courts in the Ninth Circuit and elsewhere have consistently entered judgment against the FTC when it lacked evidence that alleged wrongdoing either was ongoing or *likely* to recur in the future.[18]

For example, in *Evans Products*, the Ninth Circuit affirmed an order from Judge McGovern of this District denying an FTC request for an injunction on the basis that it had failed to show that the alleged violations (false advertisements) were either still ongoing or likely to recur. 775 F.2d at 1088. It was uncontested that the last such advertisement had been published three years before the FTC filed suit, and the record lacked evidence that further false advertisements were "likely." *Id*. Injunctive relief was therefore "precluded." *Id.*

---

[18] The Ninth Circuit first adopted the "likely to recur" standard as an act of *Chevron* deference to the FTC's own interpretation of Section 13(b). *See Evans Prods.*, 775 F.2d at 1086 ("We accord 'considerable weight' to the meaning given a statute by the agency charged with administering it.") (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)). However, the Supreme Court has since overturned the *Chevron* doctrine. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Other courts have rejected the FTC's interpretation as incompatible with the text of the statute. *See, e.g., FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156-59 (3d Cir. 2019) (rejecting the "likely to recur" standard and requiring proof of "existing or impending" violations); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772-73 (7th Cir. 2019) (Section 13(b) requires proof of "ongoing or imminent harm" from "ongoing or imminent unlawful conduct."); *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 88 (D.D.C. 2025), *appeal docketed,* No. 26-5028 (D.C. Cir. Jan. 26, 2026) (requiring proof of "conduct that currently violates the law or imminently will."). Recognizing that *Evans Products* is controlling here, Amazon notes this point mainly to preserve it for appeal; under either standard, the FTC cannot make the relevant showing.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

Likewise in *Qualcomm*, allegedly unlawful exclusive-dealing contracts between the defendant Qualcomm and its customer Apple had been voluntarily terminated "two years before the FTC filed its action." 969 F.3d at 1005. That termination occurred because Apple made a business decision that its interests were better served by purchasing modem chips for its iPhones from a different supplier. *Id.* at 1004. As a result, even though the Ninth Circuit "agree[d] with the district court" that the discontinued contracts were "structured more like exclusive dealing contracts than volume discount contracts, they do not warrant the issuance of an injunction." *Id.* at 1005. The Ninth Circuit accordingly reversed the judgment of the district court and dissolved the injunction it had entered. *Id.* ("[B]ecause these agreements were terminated years ago by Apple itself, there is nothing to be enjoined."). Several district courts, both within and without the Ninth Circuit, have reached similar conclusions.[19]

The same standards also apply to the State Plaintiffs' claims to the extent that they also seek to enjoin the pricing behavior at issue in Project Nessie. Indeed, the "likely to recur" standard adopted in *Evans Products* is simply the common law standard applicable to any plaintiff seeking an injunction. *See Evans Prods.*, 775 F.2d at 1087 (quoting *Enrico's, Inc. v. Rice*, 730 F.2d 1250, 1253 (9th Cir. 1984)); *Shire ViroPharma*, 917 F.3d at 157 ("The FTC borrows its 'likelihood of recurrence' standard from the common law standard for an award of injunctive relief."); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969) (plaintiffs seeking an

---

[19] *See, e.g., FTC v. Merchants Servs. Direct, LLC*, 2013 WL 4094394, at *3 (E.D. Wash. Aug. 13, 2013) (stating that "the Court cannot conclude that future violations are *likely* to occur" given that the violations identified by the FTC were "substantially outdated" and the defendant had taken remedial measures such as updating its training program); *FTC v. Elec. Payment Sols. of Am. Inc.*, 2021 WL 3661138, at *16-17 (D. Ariz. Aug. 11, 2021) (FTC failed to show that misconduct was "likely to recur" when the last alleged violation "occurred two years before the FTC filed suit" and the case had been pending for four years with no "additional evidence indicating that [defendant] is likely to repeat the violative behavior"); *FTC v. Infinity Grp. Servs., Inc.*, 2009 WL 10672411, at *2 (C.D. Cal. Sep. 2, 2009) (FTC's reliance upon "a single taped conversation" in which defendant's representative told an undercover investigator "to call back in a month" and inquire again about recently-discontinued conduct, held insufficient to show likelihood of recurrence); *FTC v. U.S. Anesthesia Ptrs., Inc.*, 2024 WL 2137649, at *6 (S.D. Tex. May 13, 2024) (rejecting FTC argument that defendant still "having the 'blueprints, finances, and personnel to continue [its] scheme'" was sufficient, because "the mere capacity to do something does not meet the requirement that the thing is likely to recur.").



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

injunction must show "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation *likely to continue or recur*.") (emphasis added).[20]

Courts accordingly dismiss the claims of, or enter judgment against, state plaintiffs who fail to show that the conduct that they seek to enjoin is either ongoing or likely to recur. *See, e.g.*, *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 30 (D.D.C. 2021) (injunctive claims of forty-six states and other territories dismissed for failure to show that past wrongdoing was likely to recur); *Connecticut v. Sandoz, Inc.*, 2026 WL 2436643, at *14 (D. Conn. Aug. 12, 2026) (entering judgment against the claims of forty-five states because the mere possibility of future violations did not make the conduct "*likely* to continue or recur"); *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 402-03 (S.D.N.Y. 2022) (claim brought by ten states could not support an injunction because the alleged conduct, which ran from 2014 to 2019, had fully ended before the Complaint was filed and there were no facts making it "likely" to recur).

**3. Summary Judgment Should Be Granted on All "Nessie" Injunction Requests.**

Applying these principles, summary judgment should be granted in full against all of Plaintiffs' claims that seek to enjoin Project Nessie—which includes the entirety of Count IV, and relevant portions of Counts VII, XVI, XVII, and XX. The undisputed record shows that Project Nessie was almost entirely discontinued in early April 2019, some four and a half years before Plaintiffs filed their Complaint. *See* Ex. 32 (AMZN-RTL-FTC-13850805) at -805. It was fully discontinued in November 2019, nearly four years before the Complaint was filed, and it has remained in that status for the additional three years that this case has been pending. Ex. 28 (Amazon-FTC-CID_07675017) at -.001, .004; *see also Elec. Payment Sols.*, 2021 WL 3661138, at *16-17 (counting both the time before, and after, the FTC filed suit in assessing the likelihood

---

[20] As the Third Circuit explained, that common law standard is more permissive than the one Congress required the FTC to meet when it enacted Section 13(b). *See Shire ViroPharma*, 917 F.3d at 157-59. But even if the Court *also* applies that standard to the FTC, there is no reason why any plaintiff must prove anything *less* than that.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

of recurrence). Moreover, Project Nessie was shut down because Amazon concluded after a formal study that it ***was not in its interests to continue the program***, and there is nothing about the seven-year period since the program was disbanded that could cause Amazon to now reach a different conclusion. For these reasons, "there is nothing to be enjoined," *Qualcomm*, 969 F.3d at 1005, and summary judgment should be entered on Count IV and, to the extent they seek relief related to Project Nessie, Counts VII, XVI, XVII, and XX. *See also Evans Prods.*, 775 F.2d at 1087-88; *Facebook, Inc.*, 549 F. Supp. 3d at 18-20, 49.

Plaintiffs have signaled their intention to make certain counter-arguments; none has any merit. First, Plaintiffs allege that "Amazon paused Project Nessie in 2019 only when regulatory scrutiny, including the [FTC]'s initiation of the investigation that led to this Complaint, caused Amazon to superficially change or conceal many of its practices." Compl. ¶ 432. That is unequivocally false and unsupported in the record. Rather, Amazon "shut down" Project Nessie except as to one product category on April 2, 2019, in the belief that the program's "benefits have been highly over-stated." Ex. 32 (AMZN-RTL-FTC-13850805) at -805. That occurred ***two and a half months before*** the FTC sent its first document preservation letter on June 17, 2019, and many months before its Voluntary Access Letter of August 19, 2019, or its Civil Investigative Demand ("CID") of February 20, 2020. *See* ECF 264 (Order on Mot. to Compel) at 2.[21] But even if Amazon had made the decision to abandon Project Nessie with some knowledge of an FTC investigation, that still would not carry the FTC's burden of showing that the program is "likely" to recur after the litigation ends. *See Elec. Payment Sols.*, 2021 WL 3661138, at *16 (evidence that included proof "that the violative conduct did not cease until after the FTC gave [defendant] notice of [its] lawsuit against" a similarly situated party did not suffice to show that the conduct was "likely" to recur).

[21] None of these communications from the FTC identified Project Nessie as a subject of the FTC's inquiry.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

Second, Plaintiffs point to a single anecdote from 2022 that was discussed above. *Supra* § I.G.3. But that exchange occurred nearly ***five years ago***, some twenty-one months before Plaintiffs' Complaint was filed. It led to nothing and therefore cannot be evidence of anything that today is "likely" to occur. *See, e.g., Infinity Grp. Servs.*, 2009 WL 10672411, at *2 (employee's suggestion to "call back in a month" and inquire whether a challenged practice had resumed was not evidence sufficient to show a likelihood of recurrence).

Third, Plaintiffs' expert Groehn quibbles with the validity of the conclusions Amazon reached on the basis of its 2019 A/B test and argues in effect that terminating Project Nessie was *not* in Amazon's interest notwithstanding its belief that it was. *See* Ex. 41 (Groehn Reply) ¶¶ 116-19. That contention is utterly meaningless. Groehn is not a decision-maker at Amazon. Whatever he may believe, the undisputed record is that ***Amazon*** concluded based on the A/B test (and beliefs held before that test) that Project Nessie's purported benefits were minimal and its costs were larger, and it shut the program down on that basis. *See* Ex. 28 (Amazon-FTC-CID_07675017) at -.004. No amount of argument from Plaintiffs' proffered expert constitutes evidence that Amazon is "likely" to reconstitute a program that *it* abandoned seven years ago for reasons that *it* found persuasive long before the Complaint here was filed. *See Facebook*, 549 F. Supp. 3d at 18 (argument that defendant failed to prove it would not resurrect a discontinued program "gets it backwards: it is the States' burden to substantiate the claim for injunctive relief by providing proof … that the harm is likely to occur again.") (quotation omitted).

Fourth, Plaintiffs allege that "[t]here are no technical barriers to Amazon resurrecting … its use of Project Nessie" and that it could "begin using Nessie again at any time[.]" Compl. ¶ 434. Setting aside that there is no evidence that Amazon ***wants*** to "begin using Nessie again," there is no evidence to support that contention. Amazon has no employee who is presently (or for the last several years) assigned to work on anything relating to Project Nessie. Ex. 35 ([redacted] Dep.) 315:7-10. The "technical barrier" to "resurrecting" Project Nessie is that the world has carried on



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

for seven years without Amazon doing anything to keep that program operational, and it accordingly would require an allocation of resources to restoring "Project Nessie" and making it functional with the store that exists today. In seven years, Amazon has not taken that step, and there is no basis on which to conclude that it is "likely" to do so, *Evans Prods.*, 775 F.2d at 1087-88, much less that it will do so "imminently," *Meta Platforms*, 811 F. Supp. 3d at 88; *Shire ViroPharma*, 917 F.3d at 159.

For all of these reasons, summary judgment should be granted on Plaintiffs' claims for a permanent injunction against Project Nessie.

**4. State Plaintiffs Lack Evidence of Consumer Harm.**

It is unclear whether any State Plaintiffs are pursuing claims for relief relating to Amazon's past operation of Project Nessie (as opposed to claims for enjoining its recurrence in the future). Their responses to Amazon's interrogatories have been vague and elusive, failing to state with clarity whether the States' Nessie-based claims seek monetary relief. (The FTC, for its part, is precluded from seeking such relief. *See AMG Capital Mgmt.*, 593 U.S. at 75-76).

To the extent that State Plaintiffs may seek such damages, summary judgment should be granted because they failed to adduce evidence of consumer injury necessary to sustain such a claim. Although the language of individual statutes varies, they all require proof that Project Nessie "offend[ed] established public policy" or was "immoral, unethical, oppressive, unscrupulous or substantially injurious …."[22] 15 Okla. Stat. § 752(14); *see also Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001); *Ramirez v. Health Net of Ne., Inc.*, 938 A.2d 576, 588-89 (Conn. 2008).[23] The Court has already held that Nessie is "not plausibly

---

[22] Oklahoma requires injury "to customers," 15 Okla. Stat. § 752(14), while Rhode Island and Connecticut also consider injury to competitors, *see Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001); *McLaughlin Ford, Inc. v. Ford Motor Co.*, 473 A.2d 1185, 1190 (Conn. 1984). Plaintiffs have not identified any alleged harm to competitors from Project Nessie.

[23] New York's claims are not premised on a violation of substantive state law but instead on alleged violations of federal law, *see* ECF 289 at 47, and thus would require the Court to undertake the same novel task of determining what constitutes an "unfair method of competition" under the FTC Act. *See supra* § III.B.1.



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

unconscionable" and that it has no "capacity to mislead" consumers. ECF 450 (Order on Amazon's 2nd Mot. to Dismiss) at 5, 7. No State Plaintiff has identified any "established public policy" against a retailer unilaterally raising its prices on certain products and considering how its competitors react. Nor have they shown that such conduct was "immoral, unethical, oppressive, [or] unscrupulous." That resolves most of the potential grounds for unfairness, leaving only the possibility of it causing a substantial injury. *See, e.g., Richards*, 915 F.3d at 104 ("Connecticut law is clear that widespread business practices that are consistent with 'common business norms' do not violate CUTPA."); *Continental Res., Inc. v. Wolla Oilfield Servs., LLC*, 510 P.3d 175, 179 (Okla. 2022) ("Consumer protection acts are meant to regulate commerce which is infected with deceptive or unconscionable practices and are not meant to be general regulations of 'clean' commerce."); *Ames*, 767 A.2d at 681 (Rhode Island's DTPA requires courts to consider whether the offending practice "causes substantial injury to consumers (or competitors or other businessmen).").

None of Plaintiffs' experts identify harm to consumers resulting from Project Nessie. The closest that Plaintiffs come to introducing an opinion that Project Nessie injured consumers is Groehn's assertion (based upon Amazon documents that it subsequently concluded were incorrect) that Project Nessie ***increased Amazon's profits*** by some amount. *See* Ex. 31 (Groehn Rep.) ¶¶ 120-23. But not only were those conclusions disavowed by Amazon following more sophisticated analysis, they are utterly irrelevant to the question whether Amazon's implementation of Project Nessie ***harmed consumers*** in a legally relevant sense. "[C]harging high prices does not on its own give rise to a[n unfair trade practices] violation." *Richards*, 915 F.3d at 103 (applying Connecticut law). Corporate profits are proof of nothing more than that a company managed to sell something to consumers that they valued more than it cost the company to offer it to them. That cannot be treated as proof of illegality or actionable injury without effectively outlawing the free market economy on which the United States depends. Certainly, there is no



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

basis upon which a court can look at a corporation's profits and decide, on that alone, that its exchange with consumers was otherwise than fair and lawful. *Cf. Trinko*, 540 U.S. at 408 (explaining that courts are "ill suited" to "act as central planners, identifying the proper price, quantity, and other terms of dealing").

Aside from Amazon's internal (and later disavowed) estimates of Project Nessie's contribution to its bottom line, Plaintiffs and Groehn offer nothing that could constitute proof of injury. He does not analyze the impact of Project Nessie on competition in any relevant market. Ex. 42 (Groehn Dep.) 41:21-42:11, 231:15-232:23, 234:20-237:1. His opinions do not consider whether other sellers of the same products made their products available to consumers at prices higher or lower than Amazon's. *Id.* 243:6-245:18, 248:8-249:6. While he presents four "case studies" to illustrate Project Nessie's operation (out of the millions of products sold by Amazon), he explicitly disavows the proposition that these examples demonstrate adverse impact upon consumers. *See* Ex. 41 (Groehn Reply) ¶ 55 ("The purpose of my case study analysis is not to draw broad conclusions about every Nessie application."). In short, he presents nothing upon which a finder of fact could conclude that Amazon ***harmed*** consumers or that any damages could be awarded based upon its past operation of Project Nessie. For these reasons as well, summary judgment should be granted.

## IV. CONCLUSION

For the foregoing reasons, Amazon respectfully requests that the Court grant summary judgment in its favor on Plaintiffs' antitrust claims based on their allegations that Amazon's fulfillment conduct harms competition in the relevant markets and on all claims relating to Project Nessie.

///

///

///

///



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400 FAX +1.206.274.6401

DATED: October 16, 2026.

*I certify that this memorandum contains 13,840 words, in compliance with the Local Civil Rules and this Court's Order (ECF 714).*

**MORGAN, LEWIS & BOCKIUS LLP**

By: *s/ Molly A. Terwilliger*
Patty A. Eakes, WSBA #18888
Molly A. Terwilliger, WSBA #28449
1301 Second Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 274-6400
Email: patty.eakes@morganlewis.com
molly.terwilliger@morganlewis.com

**WILLIAMS & CONNOLLY LLP**
Heidi K. Hubbard (*pro hac vice*)
John E. Schmidtlein (*pro hac vice*)
Kevin M. Hodges (*pro hac vice*)
Jonathan B. Pitt (*pro hac vice*)
Carl R. Metz (*pro hac vice*)
Carol J. Pruski (*pro hac vice*)
680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5000
Email: hhubbard@wc.com
jschmidtlein@wc.com
khodges@wc.com
jpitt@wc.com
cmetz@wc.com
cpruski@wc.com

**COVINGTON & BURLING LLP**
Thomas O. Barnett (*pro hac vice*)
Derek Ludwin (*pro hac vice*)
Kate Mitchell-Tombras (*pro hac vice*)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Phone: (202) 662-5407
Email: tbarnett@cov.com
dludwin@cov.com
kmitchelltombras@cov.com

*Attorneys for Defendant Amazon.com*